1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3

 4    JERRY K. CHAMBLISS,              )

 5              Plaintiff,             )

 6         vs.                        ) Case No. 1:05CV02490

 7    NATIONAL RAILROAD PASSENGER      )

 8    CORPORATION,                     )

 9              Defendant.             )

10              *         *         *         *         *

11                    ORIGINAL

12

13

14

15         The deposition of JERRY CHAMBLISS was taken

16    on Wednesday, May 24, 2006, commencing at

17    10:15 a.m., at the offices of the National Railroad

18    Passenger Corporation, 60 Massachusetts Avenue,

19    N.E., Third floor, Washington, D.C., before Mario A.

20    Rodriguez, CCR No. 0315162, Notary Public.

21

22              *         *         *         *         *
```

M.A.R. REPORTING GROUP
Professional Cou
www.mar-r
(7

DEFENDANT'S
EXHIBIT

A

9

1      Q.    Okay.  Any full-time employment prior to

2  Amtrak?

3      A.    Yes.

4      Q.    Okay.  What full-time positions?

5      A.    I was a bartender at Red Lobster.

6      Q.    When was that?  As best you remember.

7      A.    Let's see.  I started here in '89.  That

8  was probably about '87, '88.

9      Q.    So you started at Amtrak in 1989?

10     A.    Yes.

11     Q.    What position did you start in?

12     A.    Started as a coach cleaner.

13     Q.    How long were you a coach cleaner?

14     A.    For about seven or eight years.

15     Q.    1996 or so?

16     A.    Yeah.

17     Q.    Okay.  At that point, what position did you

18  take?

19     A.    Well, after I was a coach cleaner, I took

20  on the position of pipe fitter B.  But during the

21  time I was a coach cleaner, I had other positions.

22     Q.    Tell me about those.

58

1     A.   Yes, it is.

2     Q.   And that's dated June 15th, 2005?  Is that

3 when it was filed?

4     A.   Yes.

5     Q.   Did you file it?

6     A.   Yes.

7     Q.   Where did you file this charge?

8     A.   I think I filed it in Baltimore and they in

9 turn told me to file it in Washington.

10     Q.   Was it filed in Washington on the 15th?

11     A.   I don't know because they sent it to

12 Washington.  I don't know when they sent it.  It's

13 stamped June 22nd.

14     Q.   Okay.  Did you also file a charge with the

15 D.C. Human Rights Commission?  Do you see the D.C.

16 Office of Human Rights?

17     A.   Yeah, I see it at the top.

18     Q.   Well --

19     A.   Like I said, they forwarded my paperwork

20 from Baltimore, so I don't know what office they

21 forwarded it to, and then they contacted me.

22     Q.   The only one that you filed though was the

 1    living in Maryland part of the time or D.C. part of

 2    the time.  Because she worked in D.C. they decided

 3    that they didn't recognize common-law marriage.

 4         BY MR. FISCHLER:

 5         Q.    To your knowledge, did she certify that

 6    they were legally married?

 7         A.    I don't know.

 8         Q.    Okay.

 9              (A recess was taken.)

10         BY MR. FISCHLER:

11         Q.    Tell me what happened.  Are you ready?

12         A.    Yes, I'm ready.

13         Q.    Tell me what happened on May 10, 2004,

14    between you and Mr. Snyder.

15         A.    I was sitting at the lunch table during a

16    safety meeting.  After the safety meeting was over,

17    I was waiting for my job assignment.  Mr. Snyder

18    stood up at the other end of the table.  I was

19    talking with Mr. Vullo.

20         Q.    Who is Mr. Vullo?

21         A.    He's was an NEC supervisor.  Now he's

22    Amtrak assistant superintendent in high-speed rail.

1      Q.    Okay.

2      A.    Mr. Snyder threw a piece of paper in my

3   direction, which went over my shoulder.  That's what

4   caught my attention.  I turned and the look -- saw

5   the piece of paper flying, and I said, What you

6   trying to do?  Trying to hit me?

7            And he said, No, this is trying to hit you.

8   He picked up the book, threw it, smacked me in the

9   face with it, right across the bridge of my nose.

10     Q.    Okay.

11     A.    At this point in time, Mr. Vullo exited,

12   basically ran out.

13     Q.    He said he threw the book -- you said he

14   threw the book at you.  Describe the book.

15     A.    It was a red safety book.

16     Q.    This is not hidden.  I apologize.  This

17   is -- this is the only one I have got, and this is

18   the exhibit that was used from your arbitration

19   hearing.  Is this the book that you're talking

20   about?

21     A.    It was something like it, but the book he

22   had was a little bit -- it seemed like a little bit

1        THE WITNESS:  I don't know who he got along

2  with.  Again, Mr. Snyder was only my foreman one day

3  a week.

4        BY MR. FISCHLER:

5     Q.   Okay.

6     A.   I didn't have a relationship with him to be

7  playing with him or anything else.

8     Q.   Did people generally complain about

9  Mr. Snyder?  Is that the buzz you heard in the

10  workplace?

11     A.   After what happened to me, that's the idea

12  I got.  I mean, because a lot of people came to me

13  complaining about the things he had done.

14        Even my union rep came to me -- well, as a

15  matter of fact, Chris Bello made a statement in

16  front of my union rep and I that he was a cornball

17  and he does things -- I believe he's the one that

18  walked off the platform and was injured for some

19  reason.  Nobody knows how he walked off the

20  platform.

21     Q.   The people who complained to you, were

22  they -- did they complain about race?  It sounds

1    please.

2        A.    It's a written statement from general

3    foreman Chris Bello.

4        Q.    On about a quarter of the way down, it

5    says, Mr. Chambliss had no idea why Mr. Snyder would

6    throw the rule book at him.  I asked Mr. Chambliss

7    if he felt it was done in a violent or malicious

8    manner.  He replied that he didn't know.  He just

9    couldn't understand why Mr. Snyder would do

10   something like that.

11           Is that accurate?

12       A.    That's what it says.

13       Q.    Is that your recollection of the

14   conversation you had with --

15       A.    My recollection of the conversation at that

16   point in time, I was highly upset.  I had been

17   through -- this thing happened at 7:30 in the

18   morning, before 7:30 in the morning.  And they chose

19   to do nothing.

20           I was upset.  My head was pounding.  I

21   don't even believe I was thinking clearly.  I just

22   wanted something done.  And he was attempting to

1  question me, and I was, like, Well, why was nothing

2  done earlier?

3      Q.    So this is --

4      A.    So at that point in time, for what I was, I

5  was barely answering his questions.  He even writes

6  in there that Mr. Chambliss was clearly upset --

7      Q.    Um-hum.

8      A.    -- by what had happened.

9      Q.    Okay.

10     A.    So as far as my answers at that point in

11 time, after any incident with anyone, my answers

12 were vague and I was asking myself what was going

13 on.  Why they doing this?

14     Q.    And this was at noon?

15     A.    Yes.

16     Q.    That's your recollection, that's right?

17     A.    I think it was after noon, but that's what

18 he wrote.  I can't --

19     Q.    Well, what is your recollection?

20     A.    Like I said, that day, things happened.  I

21 was upset about it.  I know that nothing was being

22 done.

1     Q.   Okay.

2     A.   And because nothing was being done, I

3  called Amtrak police and had them try to get

4  something done because Amtrak management wasn't

5  doing anything.

6     Q.   The bottom of the last sentence, During the

7  meeting Mr. Chambliss never made mention of any

8  injury he received from the incident and did not

9  appear to be injured in any way.

10      Do you recall mentioning you were injured?

11     A.   Like I said, during that point in time, I

12  was upset.  I was under a lot of stress.  My head

13  was hurting.  I don't remember all of what I said in

14  that meeting.

15     Q.   When Mr. Snyder threw the book at you, the

16  safety book, where did it hit you?

17     A.   Hit me across the bridge of my nose.

18     Q.   Did it knock your glasses off your face?

19     A.   No, it didn't.

20     Q.   Did it move them?  Were they tilted?

21     A.   I don't recall.

22     Q.   Okay.

95

1   narrative number 1.  Do you see where I am?  It's

2   about two-thirds of the way down the page.

3       A.   On the third page?

4       Q.   Yes.

5       A.   Yes.  Yes.  Yes.

6       Q.   Captain Forney notified.  No injuries

7   reported.  No further RP, which I assume is

8   reporting party.  Would like to make a police report

9   in reference to being hit in the face with a book by

10  his superintendent at LOC.  I don't know what that

11  stands for.

12      A.   Location.

13      Q.   Okay.  It says, No injuries reported.  Do

14  you recall telling anyone that you were hurt or that

15  you were injured at that point?

16      A.   At that point in time, no.

17      Q.   At the bottom of the page and on to page 4,

18  there is a discussion of what happened.  I just

19  wanted to check with you if that's an accurate

20  recitation of the incident as best you remember

21  telling the Amtrak police officer?

22      A.   He didn't put all of my witnesses down.  He

96

1    said there was no need.

2        Q.    Anything else that was omitted?  The

3    description of the event, is that pretty close to

4    accurate?

5        A.    Yes, except for the distance.  I didn't

6    know the distance at that point in time.  He kept

7    asking he me, Was it about five feet?  Ten feet?

8              I said, I don't know.

9              He said, I'm just going to put ten feet.

10       Q.    What do you think the distance was?

11       A.    I couldn't tell you.  Right now, where

12   you're sitting from me now, I couldn't tell you.

13   I'm blind in my left eye, so as far as distances and

14   things like that, I can't tell.

15       Q.    Okay.  After you talked to the police

16   officer, what did you do?

17       A.    After I talked to the police officer, I

18   left work.

19       Q.    Did you leave work at the end of your shift

20   or early?

21       A.    I left work at the end of my shift.

22       Q.    Okay.  What happened?

1      A.    I went home.

2      Q.    Okay.  Did you report to work the next day?

3      A.    No.

4      Q.    Why not?

5      A.    When I got -- well, when I got home, I was

6  still under a lot of stress.  My head was pounding.

7  I called Amtrak's mental health line, and after

8  speaking with a counselor on there, they determined

9  I was under too much stress to go into work the next

10  day.  So they told me to mark off and they set me up

11  with a counselor or psychiatrist, whatever.

12      Q.    Due to stress?

13      A.    Yes.

14      Q.    Okay.  How many days were you out of work?

15      A.    I was out of work subsequently, I believe,

16  four or five days.  The next morning, when I woke

17  up, went to wash my face -- I had an appointment

18  with the counselor -- I went to wash my face, my

19  nose was sore.  I then went to the doctor to make

20  sure nothing was broken or anything.  Still having

21  headaches.

22           The doctor followed up.  He said my face

99

1    A.    About 250.

2    Q.    You weigh 250?

3    A.    (Nodding head.)

4    Q.    You're a pretty solid guy for 250.  I'm

5    sorry.  You're never supposed to pause when somebody

6    tells you their weight, but that surprised me.

7         So you came back to work, I don't know --

8    May 10th.  I should have checked this.  What day of

9    the week was it?

10    A.    I don't know.

11    Q.    Did you come back to work during that week,

12    the next Monday?

13    A.    All I know is the doctor -- my doctor and

14    the mental health lines, both of them agreed I

15    should take a couple of days off.  I took five days

16    off.  I returned, I think on the 17th.

17    Q.    What happened when you returned to work?

18    A.    What happened when I returned to work?

19    Well, let me back up a little bit.

20         I was instructed by the mental health line

21    people to not deal with anything because I was under

22    a lot of stress.  He said, Just leave everything

1    A.    Not all of them, no.

2    Q.    Did you understand what the procedure was

3  when you were injured on the job?

4    A.    I understand that this was a different type

5  of situation.

6    Q.    Well, let's talk generally first and then

7  we'll come back to this.

8          Generally, what's the procedure when you're

9  injured on the job?

10    A.    Generally, the procedure is you're injured,

11  your supervisor is notified and then they do

12  everything from that point on.

13    Q.    Okay.  So you are supposed to notify your

14  supervisor or an employee is supposed to notify his

15  or her supervisor?

16    A.    Yes.

17    Q.    Why was this circumstance different?

18    A.    This circumstance was different because in

19  normal circumstances, like, if I was to fall and

20  break a leg or something like that, I couldn't move

21  or do anything, work stoppage.  Someone would have

22  to be notified.

1      Q.   Okay.

2      A.   And then it went to the next stage of the

3   appeal, at which it was denied.  And then it went

4   to, I guess, arbitration.

5      Q.   And what happened at arbitration?

6      A.   I was returned back to work.

7      Q.   Let me show you what I'm going to mark as

8   Exhibit 22.

9           (Chambliss Deposition Exhibit Number 22 was

10   marked for identification.)

11          BY MR. FISCHLER:

12     Q.   Can you identify this document.

13     A.   National Mediation Public Law Board.

14     Q.   Have you seen this document before?

15     A.   Yes, I have.

16     Q.   What do you understand it to be?

17     A.   I understand it to be a decision by the law

18   board.

19     Q.   Okay.

20     A.   Whether it be unfair or whatever.

21     Q.   Did you think it was unfair -- well, let me

22   back up.

130

1          Is this the award that reinstated you at

2    Amtrak?

3          A.    Yes, it is.

4          Q.    Did you think it was unfair?

5          A.    Yes, I do.

6          Q.    Why so?

7          A.    Because the evidence that I wanted to

8    present I never got the opportunity to present.

9          Q.    Why not?

10          A.    Because there were circumstances involving

11    this case like the things I've told you about my

12    attendance and the guidelines.   They weren't allowed

13    to be -- they were just ignored.   And when it came

14    to arbitration, there was no discussion of it.

15          They went behind closed doors with my union

16    rep, discussed what was going to happen.   They

17    brought me in.   I sat down in the chair, they

18    introduced themselves.   They said, Do you have

19    anything to say?

20          I said, I feel like these charges were

21    wrong and brought up because of this incident

22    between Mr. Snyder and myself.   I feel -- and that's

1    to the company until his return.  By his actions, he

2    deprived Amtrak of its right to send him to a

3    company doctor to determine whether he had been

4    injured and, if so, how seriously.

5              Are any of the statements in that paragraph

6    incorrect?

7        A.    Let me read it again.

8        Q.    Take your time.

9        A.    Yes.

10       Q.    Okay.  Why?

11       A.    All the while failing to report his injury

12   to the company until his return.

13       Q.    Did you report the injury before May 17th?

14       A.    I reported it as I stated earlier to

15   Mr. Mascetti, who is my union rep.

16       Q.    You said that that was when you returned on

17   May 17th?

18       A.    No.  I said that was earlier, when I first

19   marked off stress.  I reported, I called in, and to

20   me stress is a type of injury.

21       Q.    When did you report that?

22       A.    That day, that night when I called in.  I

1    have a phone record of me calling me in, reporting

2    that I wasn't going to be returning to work.

3        Q.    Who did you report that to?

4        A.    It's a mark-off number.

5        Q.    Okay.

6        A.    You don't report to anyone.  You call a

7    tape.

8        Q.    What did you say?

9        A.    I said, I'm marking off stress.

10        Q.    Did you say at any point that you were

11    injured in the accident?

12        A.    Well, the stress was from the accident.  I

13    thought it was self-explanatory.

14        Q.    At any point, did you say you were injured

15    in the accident?  When is the first time you said,

16    I'm injured?

17        A.    When I talked to Mr. Mascetti that same

18    day.

19        Q.    What day is that?

20        A.    May the 10th.

21        Q.    Okay.

22        A.    Not that -- not May the 10th.  I told him

140

1    about the stress on May the 10th.

2        Q.    That's not my question.

3        A.    I'm answering your question.

4        On May the 10th, I told him about the

5    stress and I was marking off.  On May 11th, when I

6    felt my face sore and I went to the doctor, I called

7    him on May 11th and I told him about --

8        Q.    Called who?

9        A.    Mr. Mascetti.

10        Q.    And Mr. Mascetti was your union rep?

11        A.    Correct.

12        Q.    Who did you tell from the company?

13        A.    I'm getting to that.

14        My union rep is, to my knowledge, is, and

15    since my lawyer, he is able to speak for me on that

16    subject matter.  He then in turn went to Mr. Dino

17    and reported to him on -- I believe he said it was

18    the 12th.  Mr. Dino told him he wasn't me.  He

19    wasn't accepting that from him.

20        Q.    Let me ask the question again.  When did

21    you tell somebody from the company that you were

22    injured?

141

1    A.    I might not understand the question because

2  Mr. Mascetti is from the company.

3    Q.    No, not your union rep.

4        MR. RAMSEY:   Management.

5        THE WITNESS:   Management.

6        BY MR. RAMSEY:

7    Q.    When did you tell your supervisor that you

8  were injured?

9    A.    The 17th.

10   Q.    Okay.   Anything else in that paragraph that

11  I read that you disagree with?

12   A.    The last paragraph, By his actions, he

13  deprived Amtrak of its right to send him to a

14  company doctor or determine whether he had been

15  injured.

16   Q.    How so?

17   A.    Because after I was hit, if they were

18  concerned about me being injured, why didn't they

19  have me examined?   Let me take you to the doctor

20  anyway and find out, make sure your nose wasn't

21  injured.   They had the opportunity at that point in

22  time to say, Okay, well, let me get you checked out

1    that set the chain of events?

2        A.    Yes.

3        Q.    Is that right?

4        A.    Yes.

5        Q.    Okay.  Paragraph 31, Snyder acted with the

6    intent and capability to do bodily harm to the

7    plaintiff.  This conduct was perpetrated with actual

8    malice.

9              How does this relate to this count?

10       A.    I'm not following you.

11       Q.    Tell me what paragraph 31 has to do with

12   your interference of economic relationship count.

13       A.    Well, to me, when Mr. Snyder did, again,

14   his actions precipitated the events of Amtrak filing

15   charges against me.

16       Q.    Okay.

17       A.    When he acted that way, when he did what he

18   did, to me that was with malice, I mean, and he

19   followed me around the job and doing the things he

20   was doing, trying to get more evidence, so to speak,

21   against me.

22       Q.    What is the basis of your claim that you

192

1   have a contractual relationship with Amtrak?

2       A.    Union agreement.

3       Q.    And that's Exhibit 21?

4       A.    Okay, okay.

5       Q.    Well?

6       A.    Yes.

7       Q.    Okay.  I'm not trying to trick you.  I want

8   to be sure the record is clear.

9       A.    Okay.

10      Q.    Anything other than the union agreement

11  that you are relying on for your contractual

12  relationship?

13      A.    I guess not, no.

14      Q.    Well, are you sure of that?  I don't want

15  you guessing.

16      A.    I don't know how you want me to answer

17  that.

18      Q.    Are you aware of any other basis for your

19  claim that you have a contract other than your union

20  agreement?

21      A.    No.

22      Q.    Okay.  Count 5 is intentional infliction of

196

BY MR. FISCHLER:

1

2    Q.    Can you identify this document, please.

3    A.    W-2, 2005.

4    Q.    From what company?

5    A.    BG&E Home Products and Services.

6    Q.    And how much did you earn from BG&E Home

7    during 2005?

8    A.    $9,998.50.

9    Q.    How long did you work for BG&E Home in

10   2005?

11   A.    Up until September, I believe.

12   Q.    When were you offered reinstatement from

13   Amtrak?

14   A.    Can you clarify that question.

15   O.    Let's look back at Exhibit 22, I believe.

16   22.

17         This is the opinion from the arbitrator.

18   And it's dated -- is this right?

19   A.    January 20, 2006.

20   Q.    When did you return to Amtrak?  When was

21   your first day back?

22   A.    November something.  I don't know the exact

197

1    date.

2              MR. RAMSEY:   '05.

3              THE WITNESS:   '05.

4              MR. FISCHLER:   Right.   That's what I

5    thought.

6              BY MR. FISCHLER:

7         Q.   Do you know when you received an offer from

8    Amtrak to come back?   Wasn't it earlier in the year?

9    Wasn't it sometime in July, if I remember correctly?

10        A.   No.   They put an offer on the table that if

11   I would sign away all my rights to everything, then

12   they would reinstate me and they would watch me for

13   the next two years.

14        Q.   And when was that?

15        A.   I believe that was in January/February.

16        Q.   Of 2006?

17        A.   No, 2005.

18        Q.   2005.   Okay.   When did the arbitrator

19   require that you get your job back?   That was an

20   offer in settlement, that January offer?

21        A.   No, I don't think it was an offer in

22   settlement.

198

1      Q.    Well, you didn't accept it but it was a

2  proposal?

3      A.    Okay.

4      Q.    That's why I say "offer."

5      A.    Okay.

6      Q.    You didn't accept it?

7      A.    All right.

8      Q.    But then wasn't there a time when the

9  arbitrator required the company to reinstate you?

10     A.    Yeah.  It was end of 2005, a so-called

11  bench award or something --

12     Q.    Right.

13     A.    -- to that effect.  I had received nothing

14  on paper, no documentation.

15     Q.    But you started in November, so it was

16  before --

17     A.    Right, because I went on and started

18  because after talking with my union, I asked them to

19  get me something in writing to -- the terms I was

20  going back under.  I didn't know any terms.

21     Q.    Uh-huh?

22     A.    And after waiting a while, they said, Okay,

199

1    they didn't have money to get an award from the

2    arbitrator or anything written.

3        So after discussion back and forth, they

4    told me to just come on back to work and they would

5    handle it later.

6        Q.    So the first time the union told you you

7    could come back to work was November?

8        A.    It was the end of the year.  I don't know

9    exactly.

10        Q.    Did you have an ankle injury or some

11    other --

12        A.    Yes, I did.

13        Q.    -- injury during 2005?

14        A.    Not during 2005.  I had an ankle injury

15    when T was at Amtrak.

16        Q.    Earlier?

17        A.    Earlier.  In 2003, I think it was.

18        Q.    Okay.

19        MR. FISCHLER:  Let me show you this and

20    let's mark this as 27.

21        (Chambliss Deposition Exhibit Number 27 was

22    marked for identification.)