## Giurfa, Giuseppe Dino

**From:** Bello, Christopher
**Sent:** Monday, December 29, 2003 12:42 PM
**To:** Giurfa, Giuseppe Dino
**Subject:** Steve Snyder Injury

Dino,
concerning the Steve Snyder injury I am requesting that he be charged with a violation of the standards of excellence, specifically, "Attending to Duties". Mr Snyder failed to stay alert and aware of his location when he walked off the platform in 19 track union station causing injury to himself. Amtrak's Standards of Excellence requires employee's to **remain alert** to their duties at all times.

CMB       Dec 24   11:30 PM.

69

Amtrak/Chambliss1698

## HEARING INFORMATION CALL-IN SHEET

Called In: __6/14/2004__     __1:52 PM__     __04.__
            Date                Time             File #

Employee Name: __SNYDER, STEVEN__

SS#: __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__

Position: __High Speed Supvr Tech__     Union.- __ARASA__

Business Unit: _____     Product Line- _____

Location: __Ivy City, Washington, DC__     Department: __Mechanical__

Out of Service (OOS).-     ☐ Yes     ☒ No     If Yes, effective date: _____

Rules Violated: (Rules of Conduct, Standards of Excellence, NORAC)

<u>Standards of Excellence - Attending to Duties</u>

Specification (Brief Synopsis):

<u>While assigned as the Supervising Technichian on May 11, 2004, you allegedly struck Mr. Chambliss in the face with the Safety Rule Book. This is a violation of Amtrak's safety policy.</u>

Incident Date: __May 10, 2004__     Date of First Knowledge: __5/10/04__

Charging Officer: __Joseph C. Allione, Jr., Manager, HSR__     __202-906-2845  cell:  443-336-6868__
                   Name                                          Telephone #

Waiver Offer:     ☒ Yes     ☐ No     If Yes, date: __6/14/04__

**(Charging officer must furnish this information prior to date of investigation)**

Hearing Schedule: _____     _____     _____
                   Date              Time            Location

## ** CHARGING OFFICER/S MUST SEND COPY OF CHARGES TO SUSAN MANGATAL @ 777-2105**

_70_

# Amtrak®  **Unusual Occurrence Report**

**IMPORTANT:** Timely submission of this form is required by Federal Railroad Administration (FRA) Title 49, Part 225 of the code of Federal Regulations.

The following sequence of reporting must be strictly adhered to
- ⇨ **First**  Notify the Operations Center at 1-800-424-0217 or ATS 734-2308 immediately when an incident occurs.
- ⇨ **Second**  Complete one form for each Amtrak consist involved in the incident.
- ⇨ **Third**  Fax the completed form and all accompanying documents to Central Reporting with 72 hours of the incident.

| Section 1: To be completed by person on damaged equipment: | 1. Name of Person Completing Section 1: **Dino Giurfa** |
|---|---|

| 2. Date of Occurrence: **5 /21 / 04** | 3. Time: **1 : 15** ☐ AM ☒ PM | 4. Milepost Number (nearest tenth): **n/a** | 5. Nearest City/Town: **Washington** | 6. State: **DC** |
|---|---|---|---|---|

| 7. County: **n/a** | 8. Name Other Railroad Involved: **no other railroad** | 9. Railroad that owns the track **Amtrak** | 10. Timetable Direction: ☐ N ☐ S ☐ E ☐ W |
|---|---|---|---|

**11. Type of Accident:**
☐ Derailment  ☐ Collision  ☐ Grade Crossing  ☐ Fire  ☐ Obstruction  ☐ Explosion  ☒ Other (Explain in box 44)

**12. Commuter Service**
☐ N/A  ☐ Coaster (SDR)  ☐ Caltrain  ☐ Metrolink  ☐ VRE  ☐ Marc  ☐ ConDot  ☐ MBTA

| 13. Train No. **2171** | 14. Nearest Amtrak Sta.: **WAS** | 15. Type of On-Track Equipment: ☐ Freight ☒ Passenger ☐ Commuter ☐ Work Train ☐ Single Car ☐ Cut of Cars ☐ Light Loco (s) ☐ Yard/Switching ☐ Maint./Inspection Cars |
|---|---|---|

| 16. Total Locomotives Derailed: **0** | 17. Total Cars Derailed: **0** | 18. Was Consist Transporting Passengers? ☐ Yes ☒ No |
|---|---|---|

| 19. No. of Hazmat Cars in Consist: **0** | 20. No. of Hazmat Cars Damaged/Derailed: **0** | 21. No. of Hazmat Cars Releasing Product: **0** | 22. No. of People Evacuated: **0** | 23. Temp. (F): **80** | 24.Track No./Name: **11 shop** |
|---|---|---|---|---|---|

| 25. Type of Track: ☐ Main ☒ Yard ☐ Siding ☐ Industry | 26. Specific Site, if not on Main Line:**HSR Main. fac.** | 27. Visibility: ☐ Dawn ☒ Day ☐ Dusk ☐ Dark | 28. Weather: ☒Clear ☐ Cloudy ☐ Rain ☐ Fog ☐ Sleet ☐Snow |
|---|---|---|---|

**29. FRA Track Class (check one box):**

| Track Class | Freight Trains | Passenger Trains |
|---|---|---|
| ☐ x | 10 | PROHIBITED |
| ☐ 1 | 10 | 15 |
| ☐ 2 | 25 | 30 |
| ☐ 3 | 40 | 60 |
| ☐ 4 | 60 | 80 |
| ☐ 5 | 80 | 90 |
| ☐ 6 | 110 | 110 |
| ☐ OTHER | | |

**30. Method of Operation (check all boxes that apply):**

| A. ☐ ATCS | H. ☐ Current of Traffic |
|---|---|
| B. ☐ Auto Train Control | I. ☐ Time Table/Train Orders |
| C. ☐ Auto Train Stop | J. ☐ Track Warrant Control |
| D. ☐ Cab Signals | K. ☐ Direct Traffic Control |
| E. ☐ Traffic Control | L. ☐ Yard Limits |
| F. ☐ Interlocking | M. ☐ Special Instructions |
| G. ☐ Automatic Block | N. ☐ Other Than Main Track Rules |
| | O. ☒ Other (Explain in box 46) |

| 31. Number of Crew Members? Engineers/Operator: **0**   Fireman **0** Conductors: **0**   Brakemen: **0** | 32. Length on Time of Duty? Engineer/Operator:   Conductor: Hours: **0** Mins: **0**   Hours: **0** Mins: **0** |
|---|---|

33. List unit number of: first involved in the incident and all units damaged.
**TS17** ψ        ψ        ψ        ψ        ψ        ψ        ψ        ψ        ψ        ψ

| Total Locos in Consist: Head **1**  Mid **6**  Rear **1** | Total Cars in Consist: **6** | Position of 1ˢᵗ Involved: **0** | Unit Number of first Involved: **2022** |
|---|---|---|---|

| Section 2: To be Completed by person accountable for damaged equipment: | 34. Name of Person Responsible for Submitting Form: **Dino Giurfa** | 35. Date: **5/21/04** |
|---|---|---|

| 36. Title: **Asst. Superintendent HSR** | 37. Telephone Number: **202-906-2900** | 38. Product Line: **n/a** | 39. Division: **MAD** | 40. SBU: **n/a** |
|---|---|---|---|---|

| 41. Actual Train Speed (MPH): **0** | 42. Estimated M/W Damage: **0** | 43. Estimated Equipment Damage: **0** |
|---|---|---|

44. Primary Cause (be specific): **de-energizament of catenary**

45. Contributing Cause (be specific):

46. Narrative, Describe what happened. Provide information you possess. If the information comes from someone else, please identify the person: (continue on separate sheet if necessary) Supervisor actuated main catenary de-energize control button inside the maintenance facility while pantograph on power car 2022 was still on the wire and drawing power, catenary ground lever went to ground and line was blown. Supervisor name: Steven S. Snyder. SSN# 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

| 47. Was a Drug and Alcohol Test Performed? ☒ Yes ☐ No If yes, include a copy of **NRPC 2744 Notification of D/A Testing** | 48. Was the cause or contributing cause a Human factor? ☒ Yes ☐ No If yes, include **NAMES's and SSN's in Block 46.** |
|---|---|

RPC 2673 (6/98) Word Template Page 1

**COMPLETE THE REMAINING PORTION IF ACCIDENT/INCIDENT TOOK PLACE AT A GRADE CROSSING**

| Section 3: To be completed by person on damaged equipment: | 49. Name of Person Completing Section 3: |
|---|---|

| 50. DOT-AAR Grade Crossing ID Number: ☐ Public ☐ Private | 51. Highway or Street Name: |
|---|---|

52. Type of Highway User:

| A. ☐ Auto | E. ☐ Van | | 53. Estimated Highway User Speed (MPH): | 54. Whistle Ban? ☐ Yes ☐ No ☐ Unknown |
|---|---|---|---|---|
| B. ☐ Truck | F. ☐ Bus | J. ☐ Other motor vehicle | | |
| C. ☐ Truck-Trailer | G. ☐ School Bus | K. ☐ Pedestrian | 55. Highway User Direction | |
| D. ☐ Pickup Truck | H. ☐ Motorcycle | M. ☐ Other (specify) | ☐ N  ☐ S  ☒ E  ☐ W | |

56. Highway User Position:
☐ Stalled on Crossing  ☐ Stopped on Crossing  ☐ Moving Over Crossing  ☐ Trapped on Crossing

57. Highway User:
☐ Stuck Train  ☐ Stuck By Train

58. Railroad Equipment Involved:
☐ Train Units Pulling Moving  ☐ Car(s) Moving  ☐ Light Loco(s)  ☐ Train Units Pushing  ☐ Car(s) Standing  ☐ Light Loco(s) Standing
☐ Train Standing  ☐ Other:

59. Type of Crossing Warning (Check all numbers that apply):
1. ☐ Gates     3. ☐ Standard FLS  5. ☐ Hwy Traf Sig  7. ☐ Crossbucks  9. ☐ Watchman    11. ☐ Others (explain in box 46)
2. ☐ Cantilevers FLS  4. ☐ Wig Wags  6. ☐ Audible  8. ☐ Stop Signs  10. ☐ Flagged by Crew  12. ☐ None

60. Signaled Crossing Warning (If items 1, 2, 3, 4, 5, or 6 in Box 57, Type of Crossing Warning are checked, mark the status of the warning device at the time of the accident. Choose one of the following seven status codes.)

1. ☐ Provide minimum 20 second warning.      5. ☐ Confirmed warning time greater than 60 seconds.
2. ☐ Alleged warning time greater than 60 seconds.  6. ☐ Confirmed warning time less than 20 seconds.
3. ☐ Alleged warning time less than 20 seconds.    7. ☒ Confirmed no warning.
4. ☐ Alleged no warning.

If status code 5, 6, or 7 are checked, check one letter code explanation from the list below:

A. ☐ Insulated rail vehicle.
B. ☐ Storm/lightning damage.
C. ☐ Vandalism.
D. ☐ No power/batteries dead.
E. ☐ Devices down for repair.
F. ☐ Devices out of services.
G. ☐ Warning time greater than 60 seconds attributed to accident involved train stopping short of the crossing, but within track circuit limits, while warning devices remain continuously active with not other in-motion train present.
H ☐ Warning time greater than 60 seconds attributed to track circuit failure (e.g. insulated rail joint or rail bonding failure, or ballast fouled, etc.).

J. ☐ Warning time greater than 60 seconds attributed to other train/equipment within track circuit limits.
K. ☐ Warning time less than 20 seconds attributed to signals timing out before train's arrival at the crossing/island circuit.
L. ☐ Warning time less than 20 seconds attributed to train operating counter to track circuit's design speed.
M. ☐ Warning time less than 20 seconds attributed to train speed in excess of track circuit's design speed.
N. ☐ Warning time less than 20 seconds attributed to signal system's failure to detect train approach.
P. ☐ Warning time less than 20 seconds attributed to violation of special train operating instructions.
R. ☐ No warning attributed to signal system's failure to detect the train.
S. ☐ Other cause(s) (Explain in box 46)

61. Location of Warning: ☐ Both Sides  ☐ Side of Vehicle Approach  ☐ Opposite Side of Vehicle Approach

| 62. Crossing warning interconnected with highway signals? ☐ Yes ☐ No ☒ Unknown | 63. Crossing illuminated by street or special light? ☐ Yes ☐ No ☐ Unknown |
|---|---|

| 64. Driver passed standing highway vehicle? ☐ Yes ☐ No ☐ Unknown | 65. Driver drove behind or in front or train and was struck by second train? ☐ Yes ☐ No ☐ Unknown |
|---|---|

66. Motorist action at crossing: ☐ Drove around/through gates  ☐ Stopped and then proceeded  ☐ Did not stop
☐ Stopped on crossing  ☐ Other:

67. View of track was obstructed by: ☐ Permanent structure  ☐ Standing RR equipment  ☐ Passing train
☐ Topography  ☐ Vegetation  ☐ Highway vehicles  ☐ Not obstructed  ☐ Other

| 68. Driver was: ☐ Killed ☐ Injured ☐ Uninjured | 69. Total number of people in the vehicle including the driver: |
|---|---|
| 70. Driver's gender: ☒ Male ☐ Female | Total number of vehicle occupants injured including the driver: |
| 71. Driver's Age: | Total number of vehicle occupants killed including driver: |
| 72. Was the driver in the vehicle? ☐ Yes ☐ No | Total number of people on the train including passengers and crew: |

| 73. Was highway users or equipment transporting hazardous materials? ☐ Yes ☐ No |
|---|

| 74. Make, model and year of highway vehicle: | 75. Estimated dollar damage to highway vehicle: |
|---|---|

76. Special Study Block:

| 77. Police Department Name: | 78. Police Department Telephone Number: |
|---|---|

NRPC 2673 (6/98) Word Template Page 2

72

Amtrak/Chambliss1674

# Amtrak   **Unusual Occurrence Report**

**IMPORTANT** Timely submission of this form is required by Federal Railroad Administration (FRA) Title 49, Part 225 of the code of Federal Regulations.
The following sequence of reporting must be strictly adhered to
⇒ **First**   Notify the Operations Center at 1-800-424-0217 or ATS 734-2308 immediately when an incident occurs.
⇒ **Second**  Complete one form for each Amtrak consist involved in the incident.
⇒ **Third**   Fax the completed form and all accompanying documents to Central Reporting with 72 hours of the incident.

**Section 1:** To be completed by person on damaged equipment

**1. Name of Person Completing Section 1:** Dino Ghirfa

| 2. Date of Occurrence: 5/21/04 | 3. Time: 1:15 ☐ AM ☒ PM | 4. Milepost Number (nearest tenth): n/a | 5. Nearest City/Town: Washington | 6. State: DC |

| 7. County: n/a | 8. Name Other Railroad Involved: no other railroad | 9. Railroad that owns the track Amtrak | 10. Timetable Direction: ☐ N ☐ S ☒ E ☐ W |

**11. Type of Accident:**
☐ Derailment  ☐ Collision  ☐ Grade Crossing  ☐ Fire  ☐ Obstruction  ☐ Explosion  ☒ Other (Explain in box 44)

**12. Commuter Service**
☐ N/A  ☐ Coaster (SDR)  ☐ Calrain  ☐ Metrolink  ☐ VRE  ☐ Marc  ☐ ConDot  ☐ MBTA

| 13. Train No. 2171 | 14. Nearest Amtrak Sta.: WAS | 15. Type of On-Track Equipment: ☐ Freight ☒ Passenger ☐ Commuter ☐ Work Train ☐ Single Car ☐ Out of Cars ☐ Light Loco (6) ☐ Yard/Switching ☐ Maint./Inspection Cars |

**16. Total Locomotives Derailed:** 0  **17. Total Cars Derailed:** 0  **18. Was Consist Transporting Passengers?** ☒ Yes ☐ No

| 19. No. of Hazmat Cars in Consist: 0 | 20. No. of Hazmat Cars Damaged/Derailed: 0 | 21. No. of Hazmat Cars Releasing Product: 0 | 22. No. of People Evacuated: 0 | 23. Temp. (F): 80 | 24. Track No./Name: 11 shop |

| 25. Type of Track: ☒ Main ☐ Siding ☐ Industry | 26. Specific Site, if not on Main Line: HSR Main. fac. | 27. Visibility: ☒ Dawn ☒ Day ☐ Dusk ☐ Dark | 28. Weather: ☒ Clear ☐ Cloudy ☐ Rain ☐ Fog ☐ Sleet ☐ Snow |

**29. FRA Track Class (check one box):**

| Track Class | Freight Trains | Passenger Trains |
|---|---|---|
| ☐ X | 10 | PROHIBITED |
| ☐ 1 | 10 | 15 |
| ☐ 2 | 25 | 30 |
| ☐ 3 | 40 | 60 |
| ☐ 4 | 60 | 80 |
| ☐ 5 | 80 | 90 |
| ☐ 6 | 110 | 110 |
| ☐ OTHER | | |

**30. Method of Operation (check all boxes that apply):**

| A. | ☐ ATCS | H. | ☐ Current of Traffic |
|---|---|---|---|
| B. | ☐ Auto Train Control | I. | ☐ Time Table/Train Orders |
| C. | ☐ Auto Train Stop | J. | ☐ Track Warrant Control |
| D. | ☐ Cab Signals | K. | ☐ Direct Traffic Control |
| E. | ☐ Traffic Control | L. | ☐ Yard Limits |
| F. | ☐ Interlocking | M. | ☐ Special Instructions |
| G. | ☐ Automatic Block | N. | ☐ Other Than Main Track Rules |
| | | O. | ☒ Other (Explain in box 46) |

| 31. Number of Crew Members? Engineer/Operator: 0   Fireman  0   Conductor: 0   Brakeman: 0 | 32. Length on Time of Duty? Engineer/Operator:        Conductor: Hours: 0 Mins: 0        Hours: 0 Mins: 0 |

**33. List unit number of first involved in the incident and all units damaged.**
TS17

| Total Locos in Consist: Head 1  Mid 6  Rear 1 | Total Cars in Consist: 6 | Position of 1ˢᵗ Involved: 6 | Unit Number of first Involved: 2022 |

**Section 2:** To be Completed by person accountable for damaged equipment

**34. Name of Person Responsible for Submitting Form?** Dino Ghirfa  **35. Date:** 5/21/04

| 36. Title: Asst. Superintendent HSR | 37. Telephone Number: 202-906-2900 | 38. Product Line: n/a | 39. Division: MAD | 40. SBU: n/a |

| 41. Actual Train Speed (MPH): 0 | 42. Estimated M/W Damage: 0 | 43. Estimated Equipment Damage: 0 |

**44. Primary Cause (be specific): de-energizement of catenary**

**45. Contributing Cause (be specific):**

**46. Narrative.** Describe what happened. Provide information you possess. If the information comes from someone else, please identify the person: (continue on separate sheet if necessary) Supervisor actuated main catenary de-energize control button inside the maintenance facility while pantograph as power car 2022 was still on the wire and drawing power, catenary ground lever went to ground and line was blown. Supervisor name: Steven S. Snyder. SSN# 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

| 47. Was a Drug and Alcohol Test Performed? ☒ Yes ☐ No If yes, include a copy of NRFC 2744 Notification of D/A Testing | 48. Was the cause or contributing cause a Human factor? ☒ Yes ☐ No If yes, include NAMES's and SSN's in Block 46. |

NRFC 2673 (6/98) Word Template Page 1

Reason for error
E.1) Hang up or line fail
E.2) Busy
E.3) No answer
E.4) No facsimile connection

7 3

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 7595 Memory TX | 8777122250 | P. 5 | OK | |

* * * Transmission Result Report (MemoryTX) (May.21. 2004 3:50PM) * * *

P. 1

Amtrak/Chambliss1705

# Amtrak·                          **Unusual Occurrence Report**

**IMPORTANT**  Timely submission of this form is required by Federal Railroad Administration (FRA) Title 49, Part 225 of the code of Federal Regulations.

The following sequence of reporting must be strictly adhered to
- **First**   Notify the Operations Center at 1-800-424-0217 or ATS 734-2308 immediately when an incident occurs.
- **Second**  Complete one form for each Amtrak consist involved in the incident
- **Third**   Fax the completed form and all accompanying documents to Central Reporting with 72 hours of the incident.

| Section 1:   To be completed by person on damaged equipment: | | 1. Name of Person Completing Section 1: Dino Glurfa | | | |
|---|---|---|---|---|---|

| 2. Date of Occurrence: 5/21/04 | 3. Time: 1:35 ☐ AM ☒ PM | 4. Milepost Number (nearest tenth): n/a | 5. Nearest City/Town: Washington | | 6. State: DC |
|---|---|---|---|---|---|

| 7. County: n/a | 8. Name Other Railroad Involved: no other railroad | 9. Railroad that owns the track Amtrak | | 10. Timetable Direction: ☐ N ☐ S ☐ E ☐ W |
|---|---|---|---|---|

| 11. Type of Accident: ☐ Derailment | ☐ Collision   ☐ Grade Crossing   ☐ Fire   ☐ Obstruction   ☐ Explosion   ☒ Other (Explain in box 44) |
|---|---|

| 12. Commuter Service ☐ N/A | ☐ Coaster (SDR) | ☐ Caltrain | ☐ Metrolink | ☐ VRE | ☐ Marc | ☐ ConDot | ☐ MBTA |
|---|---|---|---|---|---|---|---|

| 13. Train No. 2171 | 14. Nearest Amtrak Sta.: WAS | 15. Type of On-Track Equipment: ☐ Single Car ☐ Cut of Cars | ☐ Freight   ☒ Passenger   ☐ Commuter   ☐ Work Train ☐ Light Loco (s) ☐ Yard/Switching ☐ Maint/Inspection Cars |
|---|---|---|---|

| 16. Total Locomotives Derailed: 0 | 17. Total Cars Derailed: 0 | 18. Was Consist Transporting Passengers? ☐ Yes   ☒ No |
|---|---|---|

| 19. No. of Hazmat Cars in Consist: 0 | 20. No. of Hazmat Damaged/Derailed: 0 | 21. No. of Hazmat Cars Releasing Product: 0 | 22. No. of People Evacuated: 0 | 23. Temp. (F): 80 | 24.Track No./Name: 11 shop |
|---|---|---|---|---|---|

| 25. Type of Track: ☒ Yard  ☐ Siding | ☐ Main ☐ Industry | 26. Specific Site, if not on Main Line:HSR Main. fac. | 27. Visibility: ☐ Dawn ☒ Day ☐ Dusk ☐ Dark | 28. Weather: ☒ Clear  ☐ Cloudy ☐ Rain  ☐ Fog  ☐ Sleet  ☐ Snow |
|---|---|---|---|---|

| 29. FRA Track Class (check one box): | | | 30. Method of Operation (check all boxes that apply): | | |
|---|---|---|---|---|---|
| **Track Class** | **Freight Trains** | **Passenger Trains** | A.   ☐ ATCS | H.   ☐ Current of Traffic | |
| ☐ x | 10 | PROHIBITED | B.   ☐ Auto Train Control | I.   ☐ Time Table/Train Orders | |
| ☐ 1 | 10 | 15 | C.   ☐ Auto Train Stop | J.   ☐ Track Warrant Control | |
| ☐ 2 | 25 | 30 | D.   ☐ Cab Signals | K.   ☐ Direct Traffic Control | |
| ☐ 3 | 40 | 60 | E.   ☐ Traffic Control | L.   ☐ Yard Limits | |
| ☐ 4 | 60 | 80 | F.   ☐ Interlocking | M.   ☐ Special Instructions | |
| ☐ 5 | 80 | 90 | G.   ☐ Automatic Block | N.   ☐ Other Than Main Track Rules | |
| ☐ 6 | 110 | 110 | | O.   ☒ Other (Explain in box 46) | |
| ☐ OTHER | | | | | |

| 31. Number of Crew Members? Engineer/Operator: 0          Fireman   0 Conductor:   0                  Brakeman:   0 | 32. Length on Time of Duty? Engineer/Operator:                    Conductor: Hours: 0 Mins:   0              Hours: 0 Mins:   0 |
|---|---|

33. List unit number of first involved in the incident and all units damaged.
T917  ▼        ▼        ▼        ▼        ▼        ▼        ▼        ▼

| Total Locos in Consist: Head 1   Mid 6   Rear 1 | Total Cars in Consist: 6 | Position of 1st Involved: 0 | Unit Number of first  Involved: 2022 |
|---|---|---|---|

| Section 2:   To be completed by person accountable for damaged equipment: | | 34. Name of Person Responsible for Submitting Form: Dino Glurfa | | 35. Date: 5/21/04 |
|---|---|---|---|---|

| 36. Title: Asst. Superintendent HSR | 37. Telephone Number: 202-906-2900 | 38. Product Line: n/a | 39. Division: MAD | 40. SBU: n/a |
|---|---|---|---|---|

| 41. Actual Train Speed (MPH): 0 | 42. Estimated M/W Damage: 0 | 43. Estimated Equipment Damage: 0 |
|---|---|---|

| 44. Primary Cause (be specific): de-energizement of catenary |
|---|

| 45. Contributing Cause (be specific): |
|---|

46. Narrative, Describe what happened. Provide information you possess.  If the information comes from someone else, please identify the person:  (continue on separate sheet if necessary) Supervisor actuated main catenary de-energize control button inside the maintenance facility while pantograph on power car 2022 was still on the wire and drawing power, catenary ground lever went to ground and line was blown. Supervisor name: Steven S. Snyder.  SSN# 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

| 47. Was a Drug and Alcohol Test Performed? ☐ Yes   ☐ No If yes, include a copy of NRPC 2744 Notification of D/A Testing | 48. Was the cause or contributing cause a Human factor? ☒ Yes   ☐ No If yes, include NAMES's and SSN's in Block 46. |
|---|---|

NRPC 2673 (5/98) Word Template Page 1

---

E.4) No facsimile connection
E.3) No answer
E.2) Busy
E.1) Hang up or line fail
Reason for error



74

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 7594 | Memory TX | 8777269S | P. 5 | OK | |

\* \* \* Transmission Result Report (MemoryTX) (May.21. 2004 3:48PM) \* \* \*

P. 1

Amtrak/Chambliss1706

# Amtrak®

**Drug and Alcohol Testing Notification Form**

**Important Note:  First, meet all testing criteria, then test employee immediately.**

| Employee Name | Employee Number | Date of Test: | Time of Test: |
|---|---|---|---|
| STEVEN S. SNYDER | 373 626 560 | 5/21/04 | 3:15 PM |
| Employee Job Title | Hours of Service: | Work Location: | Commuter Service (if Applicable)❶ |
| Supervising Technician | ☐ Yes  ☒ No | WASH. D.C. NYcity | N/A |

❶ Commuter Services: Connecticut Dot (CDOT); MBTA; VRE; MARC; Metrolink (SCRRA); Peninsula (PCS); Coaster (SDNR)

**Reason for Testing Employee (check one):**                                    Refer to PERS-19 for Additional Information

**For Cause:**

☐  Accident/Injury (drug and alcohol) use Non-DOT/Company forms.

☐  Rule Violation (drug and alcohol) use Non-DOT/Company forms.

☒  Reasonable Suspicion (drug and/or alcohol-depending on the suspicion) use Non-DOT/Company forms.  Except if the employee is "hours of service" and was required to perform or was performing corrued service at the time of the suspicion, use DOT/Federal Forms. If a test is not conducted within 2 hours of the determination to test (maximum 8 hours), write a statement indicating the reason for the delay and attach it to this form.
    ☐ Alcohol    ☐ Drugs    ☒ Drugs and Alcohol

**FRA Post Accident**
The following four tests are to be performed using the "FRA Post Accident Toxicological Box".  Administer the test(s) promptly. If not administered within 4 hours, proceed with testing procedures and write  a statement indicating the reason(s)  for the delay and attach it to this form.

☐  **Major Train Accident**  Test all crew members of trains involved plus any other "hours of service" employee(s) directly and contemporaneously involved in the circumstances of the accident. Test any on-duty railroad ["hours-of-service" and "non-hours-of-service"] employees fatally injured in the accident.

☐  **Impact Accident** ☐    **Fatal Train Incident** ☐    **Passenger Train Accident** ☐
Test all crew members of trains involved plus any other "hours of service" employees directly and contemporaneously involved in the circumstances of the accident, except employees who the responding supervisor can immediately determine, based on specific information, had no role in the cause or severity of the accident/incident. Test any on-duty railroad ["hours-of-service" and "non-hours-of-service"] employees fatally injured in the accident.

**FHWA Post-Accident**

☐  An employee holding a commercial drivers license (CDL) required by Amtrak and was involved in a FHWA reportable accident must be urine drug and breath alcohol tested, within 2 hours of the accident (8 hr. max for alcohol, 32 hrs. for drug), using DOT/Federal testing forms. If tests are not conducted within 2 hours of the determination to test, write a statement indicating the reason for delay and attach it to this form.

**FHWA Reasonable Suspicion**

☐  (Drug and/or alcohol-depending on the suspicion).  If the employee is required by Amtrak to hold a CDL and is performing CDL functions at the time of the suspicion, a DOT/Federal testing form MUST be used. If an alcohol test is not conducted within 2 hours of the determination to test, write a statement indicating the reason for the delay and attach it to this form.
    ☐ Alcohol    ☐ Drugs    ☐ Drugs and Alcohol

| Please Print Clearly | | |
|---|---|---|
| Medical Facility Representative  Margaret  Murphy | Medical Facility Rep. Telephone No.  800 222-2785 | |
| Name of Medical Facility Performing Collection  ConMed Solutions | | |
| Amtrak Supervisor's Name:  Dino CIURFA | Amtrak Supervisor's Signature | |
| Amtrak Supervisor's Title  Asst. Superintendent | Amtrak Supervisor's Telephone Number  202 906 2900 | Amtrak Supervisor's Pager Number | Amtrak Supervisor's Cell Phone Number  410 458 1930 |

**Distribution:**
WHITE: Fax immediately to 202-906-2795 (ATS 777-2795), Attn: Drug and Alcohol Programs
Yellow: General/Facility Manager
PINK: Requesting Supervisor

NRPC 2744 (6/98)

Reason for error   E.1) Hang up or line fail   E.2) Busy   E.3) No answer   E.4) No facsimile connection

75

| File No. | Mode | Destination | Pg (s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 7592 | Memory TX | 8777127786 | P. 1 | OK | |

* * * ( Transmission Result Report (MemoryTX) (May.21. 2004 3:45PM) * * *

P. 1

Amtrak/Chambliss1707

# Amtrak

# **Unusual Occurrence Report**

**IMPORTANT** Timely submission of this form is required by Federal Railroad Administration (FRA) Title 49, Part 225 of the code of Federal Regulations.

The following sequence of reporting must be strictly adhered to
⇒ **First** Notify the Operations Center at 1-800-424-0217 or ATS 734-2308 immediately when an incident occurs.
⇒ **Second** Complete one form for each Amtrak consist involved in the incident.
⇒ **Third** Fax the completed form and all accompanying documents to Central Reporting with 72 hours of the incident.

**Section 1:** To be completed by person in Damaged equipment

| 1. Name of Person Completing Section 1: Dina Giurfa |
|---|

| 2. Date of Occurrence: 5/21/04 | 3. Time: 1:15 ☐ AM ☒ PM | 4. Milepost Number (nearest tenth): n/a | 5. Nearest City/Town: Washington | 6. State: DC |
|---|---|---|---|---|

| 7. County: n/a | 8. Name Other Railroad Involved: no other railroad | 9. Railroad that owns the track Amtrak | 10. Timetable Direction: ☐ N ☐ S ☐ E ☐ W |
|---|---|---|---|

| 11. Type of Accident: ☐ Derailment ☐ Collision ☐ Grade Crossing ☐ Fire ☐ Obstruction ☐ Explosion ☒ Other (Explain in box 44) |
|---|

| 12. Commuter Service ☐ N/A ☐ Coaster (SDR) ☐ Caltrain ☐ Metrolink ☐ VRE ☐ Marc ☐ ConDot ☐ MBTA |
|---|

| 13. Train No. 2171 | 14. Nearest Amtrak Sta.: WAS | 15. Type of On-Track Equipment: ☐ Freight ☒ Passenger ☐ Commuter ☐ Work Train ☐ Single Car ☐ Cut of Cars ☐ Light Loco (s) ☐ Yard/Switching ☐ Mntce/Inspection Cars |
|---|---|---|

| 16. Total Locomotives Derailed: 0 | 17. Total Cars Derailed: 0 | 18. Was Consist Transporting Passengers? ☐ Yes ☒ No |
|---|---|---|

| 19. No. of Hazmat Cars in Consist: 0 | 20. No. of Hazmat Cars Damaged/Derailed: 0 | 21. No. of Hazmat Cars Releasing Product: 0 | 22. No. of People Evacuated: 0 | 23. Temp. (°F): 80 | 24. Track No./Name: 11 shop |
|---|---|---|---|---|---|

| 25. Type of Track: ☒ Main ☐ Siding ☐ Industry | 26. Specific Site, if not on Main Line: HSR Mntn. fac. | 27. Visibility: ☐ Dawn ☒ Day ☐ Dusk ☐ Dark | 28. Weather: ☒ Clear ☐ Cloudy ☐ Rain ☐ Fog ☐ Sleet ☐ Snow |
|---|---|---|---|

| 29. FRA Track Class (check one box): | | | 30. Method of Operation (check all boxes that apply): | | |
|---|---|---|---|---|---|
| **Track Class** | **Freight Trains** | **Passenger Trains** | A. ☐ ATCS | H. ☐ Current of Traffic | |
| ☐ X | 10 | PROHIBITED | B. ☐ Auto Train Control | I. ☐ Time Table/Train Orders | |
| ☐ 1 | 10 | 15 | C. ☐ Auto Train Stop | J. ☐ Track Warrant Control | |
| ☐ 2 | 25 | 30 | D. ☐ Cab Signals | K. ☐ Direct Traffic Control | |
| ☐ 3 | 40 | 60 | E. ☐ Traffic Control | L. ☐ Yard Limits | |
| ☐ 4 | 60 | 80 | F. ☐ Interlocking | M. ☐ Special Instructions | |
| ☐ 5 | 80 | 90 | G. ☐ Automatic Block | N. ☒ Other Than Main Track Rules | |
| ☐ 6 | 110 | 110 | | O. ☐ Other (Explain in box 46) | |
| ☐ OTHER | | | | | |

| 31. Number of Crew Members? Engineers/Operator: 0    Fireman 0   Conductors: 0    Brakemen: 0 | 32. Length on Time of Duty? Engineer/Operator: Hours: 0 Mins: 0    Conductor: Hours: 0 Mins: 0 |
|---|---|

| 33. List unit number of first involved in the incident and all units damaged. TS17 u    u    u    u    u |
|---|

| Total Locos in Consist: Head 1 Mid 6 Rear 1 | Total Cars in Consist: 6 | Position of 1st Involved: | Unit Number of first Involved: 2022 |
|---|---|---|---|

| **Section 2:** To be Completed by person accountable for damaged equipment | 34. Name of Person Responsible for Submitting Form: Dina Giurfa | 35. Date: 5/21/04 |
|---|---|---|

| 36. Title: Asst. Superintendent HSR | 37. Telephone Number: 202-906-2906 | 38. Product Line: n/a | 39. Division: MAD | 40. SBU: n/a |
|---|---|---|---|---|

| 41. Actual Train Speed (MPH): 0 | 42. Estimated M/W Damage: 0 | 43. Estimated Equipment Damage: 0 |
|---|---|---|

| 44. Primary Cause (be specific): de-energization of catenary |
|---|

45. Contributing Cause (be specific):

| 46. Narrative, Describe what happened. Provide information you possess. If the information comes from someone else, please identify the person: (continue on separate sheet if necessary) Supervisor actuated main catenary de-energize control button inside the maintenance facility while pantograph on power car 2022 was still on the wire and drawing power, catenary ground lever went to ground and line was blown. Supervisor name Steven S. Snyder. SSN# 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 |
|---|

| 47. Was a Drug and Alcohol Test Performed? ☒ Yes ☐ No If yes, include a copy of NRFC 2744 Notification of D/A Testing | 48. Was the cause or contributing cause a Human factor? ☒ Yes ☐ No If yes, include NAMES's and SSN's in Block 46. |
|---|---|

NRPC 2673 (6/98) Word Template Page 1

*(rotated fax transmission report text)*

Reason for error
E.1) Hang up or line fail    E.2) Busy
E.3) No answer    E.4) No facsimile connection

76

| No. Mode | Destination | Pg (s) | Result | Page Not Sent |
|---|---|---|---|---|
| 7591 Memory TX | 87342308 | P. 2 | OK | |

\* \* \* - Transmission Result Report (Memory TX) (May.21. 2004 3:45PM) \* \* \*

P. 1

Amtrak/Chambliss1708

## (COMPANY) REASONABLE SUSPICION
## ALCOHOL/DRUG TEST REPORT

**CRITERIA**

➤ If a supervisor observes an employee on duty or reporting for duty whose appearance, behavior, speech or odor is reasonably associated with alcohol use and the supervisor determines that the employee may be in violation of Amtrak policy, the supervisor will require the employee to submit to an alcohol test.

➤ If a supervisor observes an employee on duty or reporting for duty whose appearance, behavior, speech or odor is reasonably associated with drug use and the supervisor determines that the employee may be in violation of Amtrak policy, the supervisor will require the employee to submit to a drug test.

➤ The tests are to be completed within two (2) hours of employee notification. If not, the reason(s) for the delay must be stated on this report. Any test not completed within eight (8) hours of employee notification will not be conducted and the reason(s) for canceling the test(s) must be stated on this report.

➤ Reasonable suspicion tests conducted on employees NOT assigned to perform Hours of Service functions or CDL Service must be documented on Company forms. Reasonable suspicion tests conducted on employees assigned to perform Hours of Service functions or CDL Service must be documented on Federal forms provided in the Federal Drug and Alcohol Testing package.

| | |
|---|---|
| Employee Name: Steven S. SNYDER | Employee SSN: 373 62 6560 |
| Employee Position/Job Title: Supervising Technician | Personnel #: |
| Work Location: WASH. D.C. HSR | *(Please provide both)* |
| Supervisor #1: Name: DINO GIUFFRA | Supervisor #2 (if applicable): Name: |
| Title: ASST. SUPERINTENDENT | Title: |
| Phone: 202 906 2900 | Phone: |
| Date of Observation: 5/21/04 | Signs and Symptoms Observed (use guide codes from reverse sides): 5 – 7 |
| Time of Observation: 1:20 PM | |

**STATEMENT OF YOUR OBSERVATION (use extra sheet if necessary)**

Employee made statements in the course of his duty uncharacteristic of his behavior associated with his position. His statement/information relayed to another employee was the sole cause for the incident to that date for blowing the main catenary inside the High Speed Rail maintenance facility.

**REASONS FOR DELAY OR CANCELED TEST**

---

**FAX** completed form to Amtrak-Health Services @ (202) 906-2786 or ATS: 777-2786

Revised August 1, 2001                                                    Over ⇨

Reason for error
E.1) Hang up or line fail          E.2) Busy
E.3) No answer          E.4) No facsimile connection

77

| File No. Mode | Destination | Pg (s) | Result | Page Not Sent |
|---|---|---|---|---|
| 7589 Memory TX | 87717727B6 | P. 1 | OK | |

*  *  *  Transmission Result Report (Memory TX) (May. 21. 2004 3:43PM)  *  *  *

P. 1

Amtrak/Chambliss1709

# Amtrak®

# Drug and Alcohol Testing Notification Form

**Important Note:  First, meet all testing criteria, then test employee immediately.**

| Employee Name STEVEN S. SNYDER | Employee Number 373 626560 | Date of Test: 5/21/04 | Time of Test: 3:15 PM |
|---|---|---|---|
| Employee Job Title Supervising Technician | Hours of Service: ☐ Yes ☒ No | Work Location: WASH. D.C. IVY CITY | Commuter Service (If Applicable)❶ N/A |

❶ **Commuter Services:** Connecticut Dot (CDOT); MBTA; VRE; MARC; Metrolink (SCRRA); Peninsula (PCS); Coaster (SDNR)

**Reason for Testing Employee (check one):**          **Refer to PERS-19 for Additional Information**

## For Cause:

☐  Accident/Injury (drug and alcohol) use Non-DOT/Company forms.

☐  Rule Violation (drug and alcohol) use Non-DOT/Company forms.

☒  Reasonable Suspicion (drug and/or alcohol-depending on the suspicion) use Non-DOT/Company forms; **_Except_** if the employee is "hours of service" and was assigned to perform or was performing covered service at the time of the suspicion, use **DOT/Federal** Forms.  If a test is not conducted within 2 hours of the determination to test (maximum 8 hours), write a statement indicating the reason for the delay and attach it to this form.

   ☐ Alcohol    ☐ Drugs    ☒ Drugs and Alcohol

## FRA Post Accident:

The following four tests are to be performed using the "FRA Post-Accident Toxicological Box".  Administer the test(s) promptly.  If not administered within 4 hours, proceed with testing procedures and write  a statement indicating the reason(s)  for the delay and attach  it to this form.

☐  **Major Train Accident** Test all crew members of trains involved plus any other "hours of service" employee(s) directly and contemporaneously involved in the circumstances of the accident.  Test any on-duty railroad ["hours-of-service" and "non-hours-of-service"] employees fatally injured in the accident.

☐  **Impact Accident**    ☐    **Fatal Train Incident**    ☐    **Passenger Train Accident**
Test all crew members of trains involved plus any other "hours of service" employees directly and contemporaneously involved in the circumstances of the accident, _except_ employees who the responding supervisor can immediately determine, based on specific information, had no role in the cause or severity of the accident/incident.  Test any on-duty railroad ["hours-of-service" and "non-hours-of-service"] employees fatally injured in the accident.

## FHWA Post-Accident

☐  An employee holding a commercial drivers license (CDL) required by Amtrak **_and_** was involved in a FHWA reportable accident must be urine drug **_and_** breath alcohol tested, within 2 hours of the accident (8 hr. max for alcohol, 32 hrs. for drug), using **DOT/Federal** testing forms.  If tests are not conducted within 2 hours of the accident, write a statement indicating the reason for delay and attach it to this form.

## FHWA Reasonable Suspicion

☐  (Drug and/or alcohol-depending on the suspicion).  If the employee is required by Amtrak to hold a CDL and is performing CDL functions at the time of the suspicion, a **DOT/Federal** testing form **MUST** be used.  If an alcohol test is not conducted within 2 hours of the determination to test, write a statement indicating the reason for the delay and attach it to this form.

   ☐ Alcohol    ☐ Drugs    ☐ Drugs and Alcohol

| Please Print Clearly | |
|---|---|
| Medical Facility Representative MARGARET L. MURPHY | Medical Facility Rep. Telephone No. 800 228-2788 |
| Name of Medical Facility Performing Collection Clinlet Solutions | |

| Amtrak Supervisor's Name: DINO GIURFA | Amtrak Supervisor's Signature | | |
|---|---|---|---|
| Amtrak Supervisor's Title Asst. Superintendent | Amtrak Supervisor's Telephone Number 202 906 2900 | Amtrak Supervisor's Pager Number | Amtrak Supervisor's Cell Phone Number 410 458 1930 |

**Distribution:**
**WHITE:** Fax immediately to 202-906-2786 (ATS 777-2786), Attn: Drug and Alcohol Programs
Yellow: General/Facility Manager
PINK: Requesting Supervisor

NRPC 2744 (6/99)

# Amtrak®

# Drug and Alcohol Testing Notification Form

***Important Note: First, meet all testing criteria, then test employee immediately.***

| Employee Name | Employee Number | Date of Test: | Time of Test: |
|---|---|---|---|
| STEVEN S. SNYDER | 373 626 6560 | 5/21/04 | 3:15 PM |

| Employee Job Title | Hours of Service: | Work Location: | Commuter Service (If Applicable) ❶ |
|---|---|---|---|
| Supervising Technician | ☐ Yes ☒ No | WASH. D.C. IVY CITY | N/A |

❶ **Commuter Services:** Connecticut Dot (CDOT); MBTA; VRE; MARC; Metrolink (SCRRA); Peninsula (PCS); Coaster (SDNR)

**Reason for Testing Employee (check one):**          **Refer to PERS-19 for Additional Information**

## For Cause:

☐  Accident/Injury (drug and alcohol) use Non-DOT/Company forms.

☐  Rule Violation (drug and alcohol) use Non-DOT/Company forms.

☒  Reasonable Suspicion (drug and/or alcohol-depending on the suspicion) use Non-DOT/Company forms; ***Except*** if the employee is "hours of service" and was assigned to perform or was performing covered service at the time of the suspicion, use **DOT/Federal** Forms. If a test is not conducted within 2 hours of the determination to test (maximum 8 hours), write a statement indicating the reason for the delay and attach it to this form.

☐ Alcohol      ☐ Drugs      ☒ Drugs and Alcohol

## FRA Post Accident:

The following four tests are to be performed using the "FRA Post-Accident Toxicological Box". Administer the test(s) promptly. If not administered within 4 hours, proceed with testing procedures and write a statement indicating the reason(s) for the delay and attach it to this form.

☐  **Major Train Accident** Test all crew members of trains involved plus any other "hours of service" employee(s) directly and contemporaneously involved in the circumstances of the accident. Test any on-duty railroad ["hours-of-service" and "non-hours-of-service"] employees fatally injured in the accident.

☐  **Impact Accident**      ☐  **Fatal Train Incident**      ☐  **Passenger Train Accident**
Test all crew members of trains involved plus any other "hours of service" employees directly and contemporaneously involved in the circumstances of the accident, ***except*** employees who the responding supervisor can immediately determine, based on specific information, had no role in the cause or severity of the accident/incident. Test any on-duty railroad ["hours-of-service" and "non-hours-of-service"] employees fatally injured in the accident.

## FHWA Post-Accident

☐  An employee holding a commercial drivers license (CDL) required by Amtrak ***and*** was involved in a FHWA reportable accident must be urine drug ***and*** breath alcohol tested, within 2 hours of the accident (8 hr. max for alcohol, 32 hrs. for drug), using **DOT/Federal** testing forms. If tests are not conducted within 2 hours of the accident, write a statement indicating the reason for delay and attach it to this form.

## FHWA Reasonable Suspicion

☐  (Drug and/or alcohol-depending on the suspicion). If the employee is required by Amtrak to hold a CDL and is performing CDL functions at the time of the suspicion, a **DOT/Federal** testing form **MUST** be used. If an alcohol test is not conducted within 2 hours of the determination to test, write a statement indicating the reason for the delay and attach it to this form.

☐ Alcohol      ☐ Drugs      ☐ Drugs and Alcohol

**Please Print Clearly**

| Medical Facility Representative | Medical Facility Rep. Telephone No. |
|---|---|
| MARGARET L MURPHY | 800 222-2788 |

| Name of Medical Facility Performing Collection |
|---|
| Clinlet Solutions |

| Amtrak Supervisor's Name: | Amtrak Supervisor's Signature |
|---|---|
| DINO GIURFA | |

| Amtrak Supervisor's Title | Amtrak Supervisor's Telephone Number | Amtrak Supervisor's Pager Number | Amtrak Supervisor's Cell Phone Number |
|---|---|---|---|
| Asst. Superintendent | 202 906 2900 | | 410 458 1930 |

**Distribution:**
**WHITE:** Fax immediately to 202-906-2786 (ATS 777-2786), Attn: Drug and Alcohol Programs
**Yellow:** General/Facility Manager
**PINK:** Requesting Supervisor

NRPC 2744 (6/99)

79

Amtrak/Chambliss1676

## (COMPANY) REASONABLE SUSPICION
## ALCOHOL/DRUG TEST REPORT

### REASONABLE SUSPICION SIGNS AND SYMPTOMS

Based upon observing any of the following signs and symptoms in an Amtrak employee on duty or reporting for duty **and** determining that the employee may be in violation of Amtrak policy relating to alcohol and drug abuse, the supervisor will require the employee to submit to <u>breath alcohol</u> (if the suspicion is for alcohol) and/or <u>urine drug</u> (if the suspicion is for controlled substances) testing.

| Odor of | Thinking | Speech | Walk/Stand | Possession of |
|---|---|---|---|---|
| 1. Alcoholic Beverage | 3. Hallucinating | 8. Slurred | 12. Staggering | 17. Alcohol |
| 2. Marijuana | 4. Disoriented | 9. Incoherent | 13. Swaying | 18. Prohibited Drugs |
| | 5. Confused | 10. Thick, Sluggish | 14. Falling | 19. Unauthorized Prescription Drugs |
| | 6. Memory Loss | 11. Endless, Anxious Talking | 15. Unable to Walk | 20. Drug Paraphernalia |
| | 7. Poor Concentration | | 16. Unable to Stand | |

| Mood | General | Eyes | Face | Hands |
|---|---|---|---|---|
| 21. Excited | 31. Sleeping | 42. Watery | 48. Flushed | 51. Shaky (tremors) |
| 22. Euphoric Uncontrolled Laughing | 32. Difficult to Awaken | 43. Glazed | 49. Pale | 52. Fumbling |
| 24. Fearful | 33. Crying | 44. Dilated Pupils | 50. Sweating | 53. Slow |
| 25. Anxious | 34. Angry Gestures | 45. Red Eyes | | 54. Wringing Hands |
| 26. Irritable | 35. Fighting | 46. Droopy Lids | | 55. Excessive Movement |
| 27. Aggressive | 36. Suicidal Gestures | 47. Rapid Movement | | |
| 28. Panic | 37. Poor Coordination | | | |
| 29. Indifferent | 38. Fainting | | | |
| 30. Depressed | 39. Vomiting | | | |
| | 40. Urination on Self | | | |
| | 41. Defecation on Self | | | |

### REMINDER:

➢ **Hours of Service Employees** are tested using **Federal** custody and control forms if employee was performing or subject to performing covered service at the time of observation.

➢ **CDL** employees are tested using **Federal** custody and control forms.

All other reasonable suspicion tests must be documented on **Company** forms.



## (COMPANY) REASONABLE SUSPICION
## ALCOHOL/DRUG TEST REPORT

**CRITERIA**

➢ If a supervisor observes an employee on duty or reporting for duty whose appearance, behavior, speech or odor is reasonably associated with alcohol use **and** the supervisor determines that the employee may be in violation of Amtrak policy, the supervisor will require the employee to submit to an alcohol test.

➢ If a supervisor observes an employee on duty or reporting for duty whose appearance, behavior, speech or odor is reasonably associated with drug use **and** the supervisor determines that the employee may be in violation of Amtrak policy, the supervisor will require the employee to submit to a drug test.

➢ The tests are to be completed within two (2) hours of employee notification. If not, the reason(s) for the delay must be stated on this report. Any test not completed within eight (8) hours of employee notification will not be conducted and the reason(s) for canceling the test(s) must be stated on this report.

➢ Reasonable suspicion tests conducted on employees **NOT** assigned to perform **Hours of Service** functions or **CDL Service** must be documented on **Company** forms. Reasonable suspicion tests conducted on employees assigned to perform **Hours of Service** functions or **CDL Service** must be documented on Federal forms provided in the **Federal** Drug and Alcohol Testing package.

| | |
|---|---|
| **Employee Name:** Steven S. SNYDER | **Employee SSN:** 373 62 6560 |
| **Employee Position/Job Title:** Supervising Technician<br>**Work Location:** WASH. D.C. HSR | **Personnel #:** _____<br>*(Please provide both)* |
| **Supervisor #1:**<br>**Name:** DINO GIURFA<br>**Title:** Asst. SUPERINTENDENT<br>**Phone:** 202 906 2900 | **Supervisor #2 (if applicable):**<br>**Name:** _____<br>**Title:** _____<br>**Phone:** _____ |
| **Date of Observation:** 5/21/04<br>**Time of Observation:** 1:20 PM | **Signs and Symptoms Observed (use guide codes from reverse sides):** 5 - 7 |

**STATEMENT OF YOUR OBSERVATION** (use extra sheet if necessary)

Employee made statements in the course of his duty uncharacteristic of his behavior associated with his position. His statement/information relayed to another employee was the sole cause for the incident on this date for blowing the main catenary inside the High Speed Rail maintenance facility

**REASONS FOR DELAY OR CANCELED TEST**

_____

_____

**_FAX_ completed form to Amtrak-Health Services @ (202) 906-2786 or ATS: 777-2786**

P. 1

* * * Transmission Result Report(MemoryTX) ( Sep.28. 2005 12:13PM ) * * *

| e no. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|-------|------|-------------|-------|--------|---------------|
| 1441 | Memory TX | 3349 | P. 1 | OK | |

---

Reason for error
· E.1) Hang up or line fail        E.2) Busy
  E.3) No answer                    E.4) No facsimile connection

## WAIVER

28-Sep-05                                    HSR #    CMB05.264.01
                                             O.D.I. #

SNYDER STEVEN                                 HIGH SPEED SPVR TECH
13613 CLARY SAGE DRIVE                                        ARASA
CHANTILY    VA 20151

I agree to waive my right to a Formal Investigation in connection with the below listed charge(s) and specification(s) and agree to accept the discipline assessed by the National Railroad Passenger Corporation. Furthermore, I agree to waive my right to appeal the discipline assessed.

Charge: Violation of Amtrak's Anti-Discrimination and Anti-Harrassment Policy specifically the section(s) pertaining to " Harrassment"

Specification: While assigned as the Supervising Technician you allegedly made epithets, slurs, or negative stereotyping based on race, religion, or other protected personal characteristic. This constitutes a violation of Amtrak's Anti-Discrimination and Anti-Harrassment Policy (4.2)

Discipline Assessed: 15 days suspension to be served immediately starting 9/28/2005 and resignation from the Supervisor position (ARASA roster). Once Mr. Snyder has served the suspension he will have bumping rights in the IBEW roster starting October 13th 2005.

_____                    9/28/05
Employee Signature                          Date

_____                    9/28/05
Witness  Signature                          Date

_____                    9/28/05
Management Signature                        Date

H.R File

82

Amtrak/Chambliss1701

NATIONAL RAILROAD PASSENGER CORPORATION

| HEARING INFORMATION CALL-IN SHEET | 401 "W" Street, NE, Washington, DC 20018 |

Called In: _6/21/2004_      _12:14 PM_      _04._   AMTRAK
         Date         Time      File #

Employee Name:   SNYDER, STEVEN

SS#:   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

Position:   High Speed Supvr Tech      Union.- ARASA

Business Unit: _____      Product Line- _____

Location:   Ivy City, Washington, DC      Department: Mechanical

Out of Service (OOS).-   ☐ Yes    ☒ No     If Yes, effective date: _____

Rules Violated: (Rules of Conduct, Standards of Excellence, NORAC)

Standards of Excellence - Attending to Duties

Specification (Brief Synopsis):

While assigned as the Supervising Technician on May 21, 2004 you allegedly told the NecMsc Supervisor that pantographs on TS17 were down. De-inergizing the catenary based on your alleged information caused the catenary to go to ground and blow the line.

Incident Date:   May 21, 2004      Date of First Knowledge: 05/21/04

Charging Officer:   Joseph C. Allione, Jr., Manager, HSR     202-906-2845 cell: 443-336-6868
                  Name                   Telephone #

Waiver Offer:   ☒ Yes    ☐ No     If Yes, date:   6/21/04
         (Charging officer must furnish this information prior to date of investigation)

Hearing Schedule: _____    _____    _____
                  Date               Time            Location

** CHARGING OFFICER/S MUST SEND COPY OF CHARGES TO
SUSAN MANGATAL @ 777-2105**

---

Reason for error
E.1) Hang up or line fail     E.3) No answer
E.2) Busy     E.4) No facsimile connection

---

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 7994 Memory TX | 2105 | P. 3 | OK | OK |

* * * Transmission Result Report(MemoryTX) ( Jun.21. 2004 12:15PM ) * * *

83

P. 1

Amtrak/Chambliss1703

NATIONAL RAILROAD PASSENGER CORPORATION
## HEARING INFORMATION CALL-IN SHEET
401 "W" Street, NE, Washington, DC 20018

| | | | |
|---|---|---|---|
| Called In: | 6/21/2004 | 12:14 PM | 04. |
| | Date | Time | File # |

**Employee Name:**   SNYDER, STEVEN

**SS#:**   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

**Position:**   High Speed Supvr Tech                 Union.-  ARASA

**Business Unit:**                                    Product Line-

**Location:**   Ivy City, Washington, DC             Department:  Mechanical

**Out of Service (OOS).-**    ☐ Yes   ☒ No         If Yes, effective date:

**Rules Violated: (Rules of Conduct, Standards of Excellence, NORAC)**

Standards of Excellence – Attending to Duties

**Specification (Brief Synopsis):**

While assigned as the Supervising Technician on May 21, 2004 you allegedly told the NecMsc Supervisor that pantographs on TS17 were down. De-inergizing the catenary based on your alleged information caused the catenary to go to ground and blow the line.

**Incident Date:**   May 21, 2004          **Date of First Knowledge:**  05/21/04

**Charging Officer:**   Joseph C. Allione, Jr., Manager, HSR      202-906-2845 cell: 443-336-6868
                        Name                                      Telephone #

**Waiver Offer:**   ☒ Yes   ☐ No      **If Yes, date:**  6/21/04
(Charging officer must furnish this information prior to date of investigation)

**Hearing Schedule:**   _____   _____   _____
                              Date             Time            Location

** CHARGING OFFICER/S MUST SEND COPY OF CHARGES TO
SUSAN MANGATAL @ 777-2105**

---

E.4) No facsimile connection      E.2) Busy      E.1) Hang up or line fail      E.3) No answer                     Reason for error

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 7994 Memory TX | 2105 | P. 3 | OK | |

*** Transmission Result Report(MemoryTX) ( Jun.21. 2004 12:15PM ) ***

P. 1

Amtrak/Chambliss1703

## HEARING INFORMATION CALL-IN SHEET

Called In:   6/14/2004          1:52 PM          04.
                Date              Time              File #

Employee Name:   SNYDER, STEVEN

SS#:   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

Position:   High Speed Supvr Tech        Union.- ARASA

Business Unit:                            Product Line-

Location:   Ivy City, Washington, DC      Department: Mechanical

Out of Service (OOS).-   ☐ Yes   ☒ No      If Yes, effective date: _____

Rules Violated: (Rules of Conduct, Standards of Excellence, NORAC)

Standards of Excellence – Attending to Duties

Specification (Brief Synopsis):

While assigned as the Supervising Technichian on May 11, 2004, you allegedly struck Mr. Chambliss in the face with the Safety Rule Book. This is a violation of Amtrak's safety policy.

Incident Date:   May 10, 2004          Date of First Knowledge: 5/10/04

Charging Officer:   Joseph C. Allione, Jr., Manager, HSR    202-906-2845  cell: 443-336-6868
                       Name                                    Telephone #

Waiver Offer:   ☒ Yes   ☐ No      If Yes, date:   6/14/04
                (Charging officer must furnish this information prior to date of investigation)

Hearing Schedule: _____   _____   _____
                    Date       Time      Location

** CHARGING OFFICER/S MUST SEND COPY OF CHARGES TO
SUSAN MANGATAL @ 777-2105**

---

Reason for error    E.1) Hang up or line fail    E.3) No answer
                    E.2) Busy                     E.4) No facsimile connection

---

*84*

| File No. Mode | Destination | Pg (s) | Result | Page Not Sent |
|---|---|---|---|---|
| 7874 Memory TX | 2105 | P. 3 | OK | |

* * * Transmission Result Report(MemoryTX) (Jun.14. 2004 1:51PM) * * *

p. 1

Amtrak/Chambliss1710

P. 1

* * * Transmission Result Report(Immediate TX) ( Jun.14. 2004  1:26PM ) * * *

| Date | Time | Destination | Mode | TXtime | Page | Result | Pers. Name | File No. |
|------|------|-------------|------|--------|------|--------|------------|----------|
| Jun.14. | 1:20PM | 2261 | G3TED | 6'07" | P. 13 | OK | | 7872 |

| | | | | |
|---|---|---|---|---|
| # : Batch | C : Confidential | $ : Transfer | P : Polling |
| M : Memory | L : Send later | @ : Forwarding | E : ECM |
| S : Standard | D : Detail | F : Fine | U : Super Fine |
| > : Reduction | | | |

Amtrak/Chambliss1711

**AMTRAK**                          **Accident Investigation Committee Report**

| Incident Number: | Date of Injury: 12 / 24 /03 |
| Name of Injured: Steven Snyder | Social Security Number: 373 – 62 – 6560 |

### Accident Analysis

Steven Snyder a 48 yr. old male HSR foreman with no prior injuries assigned to Union Station was walking backwards in track 19 North looking back at train 2259 when he lost track of his position on the platform and fell off the platform. After falling off the platform Mr. Snyder contacted Msc supervisor Jeff Cason via radio and informed him of the incident. Mr Snyde reported that he landed on his feet but was experiencing pain in his left

knee. He was transported to Providence Hospital for treatment and evaluation.

Cause : Mr Snyder failed to remain alert to his position on the platform and did not "STOP" and look behind before backing up.

### Was a Safety Rule violated?

☐ Yes     ☐ No   If yes, list numbers.

### Contributing Factors

It was Christmas eve, employee most likely failed to stay focussed on his job and responsibilities.

### Committee Recommendations

This was a most inexcusable and rare accident . Every Holiday during the daily safety meeting every shift supervisor stresses the importance of concentrating and staying focussed on duties and responsibilities. During holiday periods managers and supervisors will have to be even more vigilant at stressing focus and alertness at all times when on the job.

### Accident Investigation Committee

Date and time committee established 12 / 29 /2003    8 : 00   ☒ AM   ☐ PM

| Name | Title | Signature |
|---|---|---|
| Chris Bello | General Foreman | |
| Jeff Cason | Msc supervisor | |
| Jeff Wiegel | Q.A Inspector | |
| Department Head (review and approval) | Signature | Date |
| Giuseppe Giurfa | | 1-12-04 |

NRPC 405 (07/02) word template

Amtrak is a registered service mark of the National Railroad Passenger Corporation.

- 1 -

Reason for error
E.1) Hang up or line fail    E.2) Busy    E.3) No answer    E.4) No facsimile connection

*86*

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 5558 | Memory TX | 3784 | P. 4 | OK | |

* * * Transmission Result Report (Memory TX) ( Jan.12. 2004 11:19AM ) * * *

P. 1

Amtrak/Chambliss1712

**AMTRAK**                    **Accident Investigation Committee Report**

| Incident Number: | | Date of Injury: 12 / 24 /03 |
|---|---|---|
| Name of Injured:  Steven Snyder | | Social Security Number: 373 – 62 – 6560 |

### Accident Analysis

Steven Snyder a 48 yr. old male BSR foreman with no prior injuries assigned to Union Station was walking backwards in track 19 North looking back at train 2259 when he lost track of his position on the platform and fell off the platform. After falling off the platform Mr. Snyder contacted Msc supervisor Jeff Cason via radio and informed him of the incident. Mr Snyde reported that he landed on his feet but was experiencing pain in his left knee. He was transported to Providence Hospital for treatment and evaluation.

**Cause :**  Mr Snyder failed to remain alert to his position on the platform and did not "STOP" and look behind before backing up.

### Was a Safety Rule violated?

☐ Yes    ☐ No    If yes, list numbers,

### Contributing Factors

It was Christmas eve, employee most likely failed to stay focused on his job and responsibilities.

### Committee Recommendations

This was a most inexcusable and rare accident. Every Holiday during the daily safety meeting every shift supervisor stresses the importance of concentrating and staying focused on duties and responsibilities. During holiday periods managers and supervisors will have to be even more vigilant at stressing focus and alertness at all times when on the job.

### Accident Investigation Committee

Date and time committee established 12 / 29 /2003    8 : 00   ☒ AM   ☐ PM

| Name | Title | Signature |
|---|---|---|
| Chris Bello | General Foreman | |
| Jeff Cason | Msc supervisor | |
| Jeff Wiegel | Q-A Inspector | |

| Department Head (review and approval) | Signature | Date |
|---|---|---|
| Giuseppe Giurfa | | 1-12-04 |

NRPC 405 (07/02) word template

Amtrak is a registered service mark of the National Railroad Passenger Corporation.

- 1 -

Reason for error    E.1) Hang up or line fail    E.2) Busy    E.3) No answer    E.4) No facsimile connection

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 5556 | Memory TX | 2531 | p. 4 | OK | |

* * * Transmission Result Report(MemoryTX) ( Jan.12. 2004 11:17AM ) * * *

p.1

Amtrak/Chambliss 1713

AMTRAK

# NOTICE FOR HOLDING MEDICALLY DISQUALIFIED EMPLOYEES OUT OF SERVICE PENDING RESULTS OF D&A

DATE: 12-25-03

NAME: STEVEN SNYDER

LOCATION: WASHINGTON HSR FACILITY

CRAFT: SUPERVISING TECHNICIAN

Notification is hereby given that you are held out of service, beginning 4:05AM 12-25-03, in connection with INJURY THAT OCURRED IN 19 TRACK UNION STATION

You will be advised promptly with regard to any further action that will be taken.

[signature]
Signature of Charging Officer

General Foreman
Title

CERTIFICATE OF SERVICE

RECEIVED this 25 day of DEC 2003.

[signature]
EMPLOYEE SIGNATURE

88

P. 1

* * Transmission Result Report (MemoryTX) ( Dec.29. 2003 8:51AM ) * * *

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 5363 | Memory TX | 3784 | P. 6 | OK | |

Reason for error
E.1) Hang up or line fail
E.2) Busy
E.3) No answer
E.4) No facsimile connection

**Amtrak®**                                     **Drug and Alcohol Testing Notification Form**

*Important Note:  First, meet all testing criteria, then test employee immediately.*

| Employee Name | Employee Number | Date of Test | Time of Test: |
|---|---|---|---|
| STEVEN SNYDER | 575 62 6560 | 12-25-03 | 3:35 AM |

| Employee Job Title | Hours of Service: | Work Location: | Commuter Service (If Applicable) ❶ |
|---|---|---|---|
| SUPERVISING TECHNICIAN | ☐ Yes  ☒ No | WASHINGTON HSR | N/A |

❶ Commuter Services: Connecticut Dot (CDOT); MBTA; VRE; MARC; Metrolink (SCRRA); Peninsula (PCS); Coaster (SDNR)

**Reason for Testing Employee (check one):**                    Refer to PERS-19 for Additional Information

**For Cause:**

☒  ·  Accident/Injury (drug and alcohol) use Non-DOT/Company forms.

☐     Rule Violation (drug and alcohol) use Non-DOT/Company forms.

☐     Reasonable Suspicion (drug and/or alcohol-depending on the suspicion) use Non-DOT/Company forms.  Except if the employee is in "hours of service" and was assigned to perform or was performing covered service at the time of the suspicion, use DOT/Federal Forms.  If a test is not conducted within 2 hours of the determination to test (maximum 8 hours), write a statement indicating the reason for the delay and attach it to this form.
            ☐ Alcohol        ☐ Drugs        ☐ Drugs and Alcohol

**FRA Post Accident:**
   The following four tests are to be performed using the "FRA Post-Accident Toxicological Box". Administer the test(s) promptly. If not administered within 4 hours, proceed with testing procedures and write a statement indicating the reason(s) for the delay and attach it to this form.

☐     Major Train Accident  Test all crew members of trains involved plus any other "hours of service" employee(s) directly and contemporaneously involved in the circumstances of the accident. Test any on-duty railroad ["hours-of-service" and "non-hours-of-service"] employees fatally injured in the accident.

☐     Impact Accident        ☐  Fatal Train Accident       ☐  Passenger Train Accident
      Test all crew members of trains involved plus any other "hours of service" employee directly and contemporaneously involved in the circumstances of the accident, except employees who the responding supervisor can immediately determine, based on specific information, had no role in the cause or severity of the accident/incident. Test any on-duty railroad ["hours-of-service" and "non-hours-of-service"] employees fatally injured in the accident.

**FHWA Post-Accident**
      An employee holding a commercial drivers license (CDL) required by Amtrak and was involved in a FHWA reportable accident must be urine drug and breath alcohol tested, within 2 hours of the accident (8 hr. max for alcohol, 32 hrs. for drug), using DOT/Federal testing forms. If tests are not conducted within 2 hours of the accident, write a statement indicating the reason for delay and attach it to this form.

**FHWA Reasonable Suspicion**

☐     (Drug and/or alcohol-depending on the suspicion).  If the employee is required by Amtrak to hold a CDL and is performing CDL functions at the time of the suspicion, a DOT/Federal testing form MUST be used.  If an alcohol test is not conducted within 2 hours of the determination to test, write a statement indicating the reason for the delay and attach it to this form.
            ☐ Alcohol        ☐ Drugs        ☐  Drugs and Alcohol

**Please Print Clearly**

| Medical Facility Representative | Medical Facility Rep. Telephone No. |
|---|---|
| Scott M. Carter | (703) 243 4414 |

| Name of Medical Facility Performing Collection |
|---|
| Concentra |

| Amtrak Supervisor's Name: | Amtrak Supervisor's Signature | | |
|---|---|---|---|
| CHRISTOPHER BELLO | Bello | | |

| Amtrak Supervisor's Title | Check Supervisor's Telephone Number | Amtrak Supervisor's Pager Number | Amtrak Supervisor's Cell Phone Number |
|---|---|---|---|
| GENERAL FOREMAN | ATS 777-2906 | | 410-207-5262 |

**Distribution:**
WHITE: Fax immediately to 202-906-2786 (ATS 777-2786), Attn: Drug and Alcohol Programs
Yellow: General/Facility Manager
PINK: Requesting Supervisor

NRPC 2744 (6/99)

Reason for error
E.1) Hang up or off line fail
E.2) Busy        E.3) No answer
E.4) No facsimile connection

* * * Transmission Result Report(MemoryTX) (Dec.25, 2003 5:38AM) * * *

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 5331 Memory TX | 2786 | P. 2 | OK | |

89

Amtrak/Chambliss1715

## NOTICE FOR HOLDING MEDICALLY DISQUALIFIED
## EMPLOYEES OUT OF SERVICE PENDING RESULTS OF D&A

DATE: _12-25-03_

NAME: _STEVEN SNYDER_

LOCATION: _WASHINGTON HSR FACILITY_

CRAFT: _SUPERVISING TECHNICIAN_

Notification is hereby given that you are held out of service, beginning

_4:05AM     12-25-03_ , in connection with

_INJURY THAT OCURRED IN 19 TRACK UNION_

_STATION_

You will be advised promptly with regard to any further action that will be taken.

Signature of Charging Officer

**General Foreman**

Title

### CERTIFICATE OF SERVICE

RECEIVED this _____ day of _DEC_ 200_3_

EMPLOYEE SIGNATURE

E.1) Hang up or line fail    E.3) No answer
E.2) Busy    E.4) No facsimile connection

*90*

---

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 5330 Memory TX | 2595 | P. 5 | OK | |

* * * Transmission Result Report(MemoryTX) (Dec.25. 2003  5:36AM) * * *

p. 1

Amtrak/Chambliss1716

AMTRAK

## NOTICE FOR HOLDING MEDICALLY DISQUALIFIED
## EMPLOYEES OUT OF SERVICE PENDING RESULTS OF D&A

DATE: _12-25-03_

NAME: _STEVEN   SNYDER_

LOCATION: _WASHINGTON   HSR   FACILITY_

CRAFT: _SUPERVISING   TECHNICIAN_

Notification is hereby given that you are held out of service, beginning

_4:05AM   12-25-03_ . in connection with

_INJURY   THAT   OCURRED   IN   19 TRACK   UNION_

_STATION_

You will be advised promptly with regard to any further action that will be
taken.

Signature of Charging Officer

General Foreman
Title

### CERTIFICATE OF SERVICE

RECEIVED this _25_ day of _DEC_ 200_3_

EMPLOYEE SIGNATURE

Reason for error
E.1) Hang up or line fail    E.3) No answer
E.2) Busy    E.4) No facsimile connection

---

*91*

| File
No. | Mode | Destination | Pg (s) | Result | Page
Not Sent |
|---|---|---|---|---|---|
| 5329 | Memory TX | 2250 | P. 5 | OK | |

* * * ( Transmission Result Report(MemoryTX) ( Dec.25. 2003  5:34AM) ) * * *

P. 1

Amtrak/Chambliss1717

# Amtrak

## INJURED EMPLOYEE'S TEN DAY REPORT

| Division | Location UNION STATION |
|---|---|

| Name of Injured Employee STEVEN SNYDER | Occupation FOREMAN |
|---|---|

Place Where Accident Occurred  TRACK 19

| Date Injured 12-24-03 | Time Injured 11:30 pm | Employee's Status ☒ Regular  ☐ Extra | Assigned Hours 7P - 3A | Did Employee Complete Tour ☐ Yes  ☒ No (Explain below) |
|---|---|---|---|---|

**IF TOUR NOT COMPLETED CHECK APPLICABLE BOX OR BOXES**

| ☒ Medical Attention | ☐ Accident Investigation | ☐ Could Have Worked |
|---|---|---|
| ☐ Other (Explain) | ☒ D & A Testing | ☐ Could Not Have Worked |

| Date | Period Following Injury | Hours Worked From | Hours Worked To | Details of Work Performed |
|---|---|---|---|---|
| 12-25-03 | 1st Day | | | RD |
| 12-26-03 | 2nd Day | | | RD |
| 12-27-03 | 3rd Day | | | DA/O |
| 12-28-03 | 4th Day | | | DA/O |
| 12-29-03 | 5th Day | | | DA/O |
| 12-30-03 | 6th Day | 7 pm | 3 am | WR |
| 12-31-03 | 7th Day | 7 pm | 3 am | WR |
| 1-1-04 | 8th Day | | | RD |
| 1-2-04 | 9th Day | | | RD |
| 1-3-04 | 10th Day | 8 am | 4 pm | WR |

Note: Under column "Details of Work Performed" select the applicable entry for each day from the following list:

WR   =   Worked Regular Duties
WL   =   Worked Light/Restricted Duties (Explain Duties)
RD   =   Regular Rest Day
HD   =   Holiday
DA   =   Doctor's Appointment
SV   =   Scheduled Day of Vacation

OI   =   Off Duty Due to Injury
OO   =   Off Duty Due to unrelated Illness/Injury or Reason (Explain)
OC   =   On Call, Fit for Regular Duty
DA/W   =   Off Pending D&A Test Results — Could Have Worked
DA/O   =   Off Pending D&A Test Results — Have Worked

| Signature of Supervisor | Signature of Injured Employee |
|---|---|
| STI SUPERVISON | |
| Occupation | Occupation Sig Tech |

signature certifies that this report is correct to the best of my knowledge.
PC 2265 (07/91) Word Template

E.4) No facsimile connection
E.2) Busy
E.1) Hang up or line fail
E.3) No answer
Reason for error

5446 Memory TX    3784    OK    P. 1
File No. Mode    Destination    Pg (S)    Result    Page Not Sent

* * * ( Transmission Result Report(MemoryTX) ( Jan. 5. 2004 3:02PM ) * * *

P. 1

Amtrak/Chambliss1718

# Amtrak
## INJURED EMPLOYEE'S TEN DAY REPORT

| Division | | Location  UNION STATION |
|---|---|---|
| Name of Injured Employee  STEVEN SNYDER | | Occupation  FOREMAN |
| Place Where Accident Occurred  TRACK 19 | | |

| Date Injured | Time Injured | Employee's Status | Assigned Hours | Did Employee Complete Tour |
|---|---|---|---|---|
| 12-04-03 | 11:30 pm | ☒ Regular  ☐ Extra | 7P - 3A | ☐ Yes  ☒ No (Explain below) |

**IF TOUR NOT COMPLETED CHECK APPLICABLE BOX OR BOXES**

☒ Medical Attention  ☐ Accident Investigation  ☐ Could Have Worked
☐ Other (Explain)  ☒ D & A Testing  ☐ Could Not Have Worked

| Date | Period Following Injury | Hours Worked From | Hours Worked To | Details of Work Performed |
|---|---|---|---|---|
| 12-05-03 | 1st Day | | | RD |
| 12-06-03 | 2nd Day | | | RD |
| 12-07-03 | 3rd Day | | | DA/ |
| 12-08-03 | 4th Day | | | DA/ |
| 12-09-03 | 5th Day | | | DA/ |
| 12-30-03 | 6th Day | 7 PM | 3 AM | WR |
| 12-31-03 | 7th Day | 7 PM | 3 AM | WR |
| 1-1-04 | 8th Day | | | RD |
| 1-2-04 | 9th Day | | | RD |
| 1-3-04 | 10th Day | 8 AM | 4 PM | WR |

Note: Under column "Details of Work Performed" select the applicable entry for each day from the following list:
WR = Worked Regular Duties  OI = Off Duty Due to Injury
WL = Worked Light/Restricted Duties (Explain Duties)  OC = Off Duty Due to unrelated Illness/Injury or Reason (Explain)
RD = Regular Rest Day  OC = On Call, Fit for Regular Duty
HD = Holiday  DA/W = Off Pending D&A Test Results — Could Have Worked
DA = Doctor's Appointment  DA/O = Off Pending D&A Test Results — Have Worked
SV = Scheduled Day of Vacation

*Signature of Supervisor                           Signature of Injured Employee

S+E Supervisor                                    Occupation  Sig Tech

* signature certifies that this report is correct to the best of my knowledge.
JRFC 2265 (07/91) Word Template

Reason for error  E.1) Hang up or line fail  E.3) No answer
E.2) Busy  E.4) No facsimile connection

93

| File No. | Mode | Destination | Pg (s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 5445 | Memory TX | 2595 | P. 1 | OK | |

* * * Transmission Result Report (Memory TX) ( Jan. 5. 2004 3:01PM ) * * *

P. 1

Amtrak/Chambliss1719

 **AMTRAK®**

 ENTERED 6 21 06

**Employee Discipline Input Form**

| Employee Name: Steven Snyder | Social Security Number: 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 |
|---|---|
| Payroll Code: 14 | Personnel District Code: EA4 |
| Labor Union: AB | O.D.I. File Number: 04.250 |

## Violation Data

| Rule Violation | Date of Violation (Year/Month/Day) |
|---|---|
| 402 | 04 / 05 / 11 |
| 460 | 04 / 05 / 11 |
| | |
| | |
| | |

## Discipline Data

| Discipline Assessed: S02 | Date Assessed (Date of Decision Letter Year/Month/Day) 04 06 14 |
|---|---|
| Proceeding: ☒ Waiver  ☐ Hearing | Hearing Officer: Art Dulindro |

---

**For Labor Relations Department Use Only**

| Labor Relations File No.: | Date Received: |
|---|---|

Issues: (Identify all applicable arguments raised)

| | | |
|---|---|---|
| | | |
| | | |
| | | |

| Action Taken: ☐ Upheld | ☐ Overturned | ☐ Modified |
|---|---|---|

Modification Code (if applicable – by Labor Relations **LRA** or Arbitration **BRD**)

| Authorized by: | Date: |
|---|---|

**Distribution:**    White – Human Resources      **Yellow** – Hearing Officer      **Pink** – Labor Relations

NRPC 2827 (06/03)
Amtrak is a registered service mark of the National Railroad Passenger Corporation

Amtrak/Chambliss1573

**NATIONAL RAILROAD PASSENGER CORPORATION**
**EMPLOYEE DISCIPLINE INPUT FORM**

EMPLOYEE NAME: _____ Steven Snyder _____

PAYROLL CODE: BE _14_ SOCIAL SECURITY NUMBER: _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_

PERSONNEL DISTRICT CODE: _EA4_ LABOR UNION: _AT_

O. D. I. FILE NUMBER: _____ 04.050 _____

### VIOLATION DATA

| Rule Violation | Date of Violation (Year/Month/Day) |
|---|---|
| 400 /401 | 03/12/24 |

### DISCIPLINE DATA

Discipline Assessed: _____ REP _____

Date Assessed (date of decision letter-YMD): _04/01/23_

Proceeding: (Waiver: W) or Hearing: H (circle one)

_____ Hearing Officer _____

### FOR LABOR RELATIONS DEPARTMENT USE ONLY

Labor Relations File No.: _____ Date Received: _____

Issues: _____ _____ _____ _____ _____ _____
(identify all applicable arguments raised)

Action taken: Upheld _____ Overturned _____ Modified _____

Modification Code (if applicable): _____
(by Labor Relations **LRA** or Arbitration **BRD**)

_____ Authorized by _____     _____ Date _____

**White** - Personnel     **Yellow** - Hearing Officer     **Pink** - Labor Relations

NRPC 2827

Amtrak/Chambliss1576

# 6.  DEPOSITION TESTIMONY OF DENNIS SMITH

Page 1

1   JERRY CHAMBLISS                    IN THE

2              Plaintiff              CIRCUIT COURT

3   vs.                               FOR

4   NATIONAL RAILROAD PASSENGER       BALTIMORE CITY

    CORPORATION

5                                     24-C-04-008216

               Defendant

6   _____/

7

8            The deposition of DENNIS SMITH was held on

9   Tuesday, October 18, 2005, commencing at 10:30 A.M.,

10  at the Law Offices of Whiteford, Taylor & Preston,

11  7 St Paul Street, Suite 12K, Baltimore, Maryland,

12  21202, before Chuck Peppler, Notary Public.

13

14  APPEARANCES:

15              JOHN F. HANNAWAY, ESQUIRE

                   On behalf of Plaintiff

16

                ILANA SUBAR, ESQUIRE

17                 On behalf of Defendant

18

19  ALSO PRESENT:  JERRY CHAMBLISS

20

                              97

    REPORTED BY:   Chuck Peppler

Dennis Smith - 10/18/05

Page 2

1          STIPULATION
2          It is stipulated and agreed by and between
3    counsel for the respective parties that the filing of
4    this deposition with the Clerk of Court be and the
5    same are hereby waived.
6          . . .    - - - - - - -
7    Whereupon,
8          DENNIS SMITH,
9    called as a witness, having been first duly sworn
10   to tell the truth, the whole truth, and nothing but
11   the truth, was examined and testified as follows:
12         EXAMINATION BY MR. HANNAWAY:
13   Q.    Would you state your name, please, sir?
14   A.    Dennis Smith.
15   Q.    It's, S-M-I-T-H, your last name?
16   A.    Yes.
17   Q.    Mr. Smith, this is called a deposition,
18   what we're going through here today. Have you ever
19   been deposed before?
20   A.    Yes, I have.
21   Q.    Under what circumstances was that?

Page 3

1    A.    There was another lawsuit involving an
2    Amtrak employee.
3    Q.    In what capacity were you deposed?
4    A.    Just as a witness in the claimant's case.
5    Q.    Then you're familiar with how this
6    deposition occurs. Let me just give you some
7    guidelines. This gentleman here is a stenographer.
8    He takes down everything you or I say or your attorney
9    says verbatim. We receive back a transcript in
10   question and answer form all typed up. I tell you
11   that because we both have to speak. We can't nod our
12   heads yes, shake our heads no or shrug our shoulders I
13   don't know. If I start doing that, you can tell me to
14   stop and I'll do the same for you. If we continue,
15   he'll tell us both to stop.
16         If I ask you a question and you don't
17   understand it because of the way it's phrased, don't
18   answer it. Say I don't understand what you're saying.
19   If you don't understand the question because I mumble
20   or you can't hear me, tell me to speak up and I will
21   ask you the question again.

Page 4

1          If you don't understand a question, you
2    don't know the answer, say I don't know. I don't want
3    you to guess here today. If you feel comfortable
4    giving an estimate of a date, time, something like
5    that, feel comfortable in giving that estimate, but
6    call it an estimate.
7          If later on you remember something
8    different than what you testified to, someone could
9    ask you what did you did yesterday afternoon. You'll
10   say something. Then you'll go, oh, wait a minute, I
11   didn't mean to say that 20 minutes later. I made a
12   mistake. That was last Saturday. This past Saturday,
13   I went here and did this thing. Break in. Say
14   remember that question I went over before or I
15   answered before, I would like to change it.
16         The reason I give you that preamble is
17   because if I ask you a question and you give an
18   answer, I'm going to assume that you heard the
19   question, you understood it and you're basing your
20   answer on personal knowledge. Fair enough?
21   A.    Yes.

Page 5

1    Q.    If at any time you need a break for
2    anything, let us know. This is being conducted
3    pursuant to a case that's pending in the Circuit Court
4    for Baltimore City. It's a less informal than
5    testifying in court. But, what you testify in this
6    case, what you say here today could be brought up in
7    court in a certain format.
8          Could you outline your educational
9    background for me?
10   A.    A high school graduate.
11   Q.    Where did you graduate?
12   A.    Southern High School in Baltimore,
13   Maryland.
14   Q.    When did you graduate?
15   A.    1979.
16   Q.    Did you have any training or education of
17   any kind after 1979?
18   A.    Yes, a couple of months of college at a
19   community college in California. Sequoia Community
20   College, I believe it was called.
21   Q.    You were raised in Baltimore?

2 (Pages 2 to 5)

Dennis Smith - 10/18/05

Page 6

1    A.    Yes.
      Q.    Are you presently married?
3    A.    No.
4    Q.    Have you ever been married?
5    A.    Yes.
6    Q.    When and for how long were you married?
7    A.    Eight years, from 1982 until eight years
8    after that.
9    Q.    Do you have any children?
10   A.    One.
11   Q.    Is that a boy or a girl?
12   A.    Girl.
13   Q.    How old is she?
14   A.    Twenty.
15   Q.    What is your Social Security number?
16   A.    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.
17   Q.    Your date of birth?
18   A.    11/16/61.
19   Q.    When did you go to the community college?
20   Was it right after high school?
21   A.    No, it was a couple of years after I

Page 7

1    joined the Marine Corp.
2    Q.    When did you join the Marine Corp?
3    A.    In July of 1979.
4    Q.    Right after graduation?
5    A.    Yes.
6    Q.    What rank did you achieve?
7    A.    E-4.
8    Q.    How long were you in the military for?
9    A.    Four years.  Four years active, two years
10   inactive reserves.
11   Q.    Assignment is not the right word, but what
12   were your responsibilities and duties?
13   A.    Electrical equipment technician.
14   Q.    So, you got out of active duty in '83?
15   A.    Yes.
16   Q.    Where were you discharged from?
17   A.    Camp Pendleton, California.
18   Q.    Was it right after that when you went to
19   community college?
20   A.    No, it was during my first year of being
21   stationed at Camp Pendleton.

Page 8

1    Q.    While in the Marine Corp?
2    A.    Yes.
3    Q.    When did you return to Baltimore after the
4    Marines?
5    A.    I returned to Baltimore upon discharge,
6    July of 1983.
7    Q.    Does your work history start at that
8    point?
9    A.    Yes.  I started working approximately two
10   to three months after being discharged, however, not
11   at my present, my later employment.
12   Q.    Where did you go to work after the
13   military service?
14   A.    I worked for an agency at a company in
15   Columbia, Columbia Data Products.
16   Q.    What did you do there?
17   A.    Quality assurance technician.
18   Q.    What does that mean?
19   A.    You inspected printed circuit boards and
20   other components for computers in a assembly line
21   setup.

Page 9

1    Q.    How long did you work there?
2    A.    I think it was about four or five months.
3    Q.    After that, where did you go work at?
4    A.    At my present place of employment, Amtrak.
5    Q.    So, that would have bought us to sometime
6    in '83, you went to work at Amtrak?
7    A.    It was '84.
8    Q.    You have been at Amtrak since then?
9    A.    Yes.
10   Q.    What was your first job with Amtrak?
11   A.    My first job with Amtrak was as a block
12   operator.
13   Q.    What craft was that?
14   A.    It's in the transportation department,
15   which is basically like the railroad version of an air
16   traffic controller.
17   Q.    What did you do there as a block operator?
18   A.    As a block operator, I was responsible for
19   aligning routes, establishing signals for trains
20   running along the northeast corridor, at that
21   particular time between Washington and Philadelphia.

3 (Pages 6 to 9)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 10

1    Q.    Where did you work physically?
2    A.    Various locations.  There were towers that
3    were ever so many miles along the railroad.  For the
4    most part while I was in that position, I worked what
5    they called the extra board, which means you didn't
6    have a regular shift, regular hours.
7    Q.    You get assigned to whatever, on call?
8    A.    Yes.
9    Q.    How long were you a block operator?
10    A.    Approximately, two years.
11    Q.    So, to about '87?
12    A.    About like that.  I was a block operator
13    approximately two years.
14    Q.    That was until about '87?
15    A.    More like '86, I believe.
16    Q.    Where did you go after that with Amtrak?
17    A.    Then I went from block operator to train
18    director.
19    Q.    What does a train director do?
20    A.    Train director is basically the same
21    thing, except for the fact that you have more control

Page 11

1    over what happens.  A block operator, you follow the
2    directions of a dispatcher.  As train director, you're
3    both an operator and dispatcher and a few other areas
4    of responsibility also.
5    Q.    Were any of the responsibilities as a
6    train director administrative in nature?
7    A.    Yes.
8    Q.    Dealing with personnel and that kind of
9    stuff?
10    A.    No, not of that nature.
11    Q.    What were your administrative
12    responsibilities as a train director?
13    A.    Well, administratively, I take care of
14    paperwork.  There are various forms of paperwork that
15    went along with the job.
16    Q.    So, none of your responsibilities dealt
17    with personnel matters?
18    A.    No.  There were four positions at this
19    location with one position being the train director in
20    charge, which basically meant that you were not the
21    supervisor of the other three people who worked with

Page 12

1    you, but you were the one that made the decisions as
2    far as the movement of the trains.
3    Q.    How long were you a train director?
4    A.    Probably 12, 13 years.
5    Q.    '87?
6    A.    I don't recall what year.
7    Q.    Where did you hold that position?
8    A.    In Washington, D.C.
9    Q.    Was that at Ivy City that you held that
10    position?
11    A.    No.
12    Q.    Where was it?
13    A.    At the station, Union Station.
14    Q.    Then what was your next job with Amtrak?
15    A.    Supervisor of operations.
16    Q.    Supervisor of what?  Did it comprise of a
17    geographical location?
18    A.    No, it was basically a liaison between all
19    the various departments involved in the movement of
20    trains both locally and nationally.
21    Q.    Where did you work out of?

Page 13

1    A.    Washington, Union Station.
2    Q.    Was your office located in Union Station?
3    A.    Not in the station, no.
4    Q.    Where was it located?
5    A.    There is an office building across the
6    tracks from the station, which is in the same vicinity
7    as the station.
8    Q.    Do you know what street it's on?
9    A.    Second Street.
10    Q.    How long did you hold that position for?
11    A.    Approximately, four years.
12    Q.    Which takes us to?
13    A.    1990, I think.  A little further than
14    that.  I'll have to think on that for a second.  I'll
15    have to go back and count from the block operator
16    status to tell you a year, approximately the year I
17    went into that position.
18    Q.    Then what was your position after that?
19    A.    My position after that was manager of high
20    speed train operations.
21    Q.    When Accela came in, you switched over

4 (Pages 10 to 13)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 14

there?

A. Yes.

3 Q. Can you date that for me?

4 A. Not really.

5 Q. We're into 2000?

6 A. It's either 1999 or 2000, I believe.

7 Q. As manager of high speed rail, what were

8 your responsibilities?

9 A. My main responsibilities were to

10 coordinate the movement of high speed trains from the

11 mechanical facility to the station. However, as a

12 manager, your responsibilities are always subject to

13 change.

14 Q. How long did you hold that position?

15 A. Approximately, three years.

16 Q. Do you recall when you left that position?

17 A. I left that position, November 1st of this

18 year will be three years.

19 Q. 11/1/05?

20 A. It will be three years that I have been

21 gone from that position.

Page 15

1 Q. I might have asked you. What is your

2 present position?

3 A. My present position is train manager.

4 Q. Was part of your responsibilities as

5 manager of high speed rail to deal with personnel

6 matters?

7 A. Yes.

8 Q. What type of personnel matters would you

9 deal with?

10 A. Any type that came up.

11 Q. Give me some examples. I'm unfamiliar.

12 You're the boss.

13 A. Absenteeism matters, training situations,

14 scheduling, and again there were so many others that

15 you can't characterize. They just came on a daily

16 basis.

17 Q. Were you ever what's called a charging

18 officer?

19 A. Yes.

20 Q. Was that when you were the manager of high

21 speed rail?

Page 16

1 A. Yes.

2 Q. Were you ever a charging officer in any of

3 your other capacities?

4 A. No.

5 Q. Are you presently as the train manager a

6 charging officer?

7 A. ' Yes.

8 Q. What is a charging officer?

9 A. A charging officer is basically a person

10 that conducts the investigation into possible

11 violation of rules and regulations. If the

12 information warrants a formal investigation, then the

13 charging officer basically serves as, I guess the

14 prosecuting attorney, I guess you could say.

15 Q. Deciding whether or not to bring charges

16 and if so what charges to bring?

17 A. Yes, and proving those charges.

18 Q. Prior to your job as manager of high speed

19 rail, would that have also entailed conducting any

20 investigations with respect to complaints made by

21 employees to the actions of supervisors or foremen?

Page 17

1 A. Anything that was in noncompliance with

2 the rules and regulations that we were obligated to

3 work by.

4 Q. Is that a yes?

5 A. Yes.

6 Q. You would receive referrals concerning

7 complaints that employees made about supervisors?

8 A. No, we need referrals.

9 Q. Well, how would you hear about complaints?

10 You tell me what the Amtrak lingo is. How would you

11 hear about a complaint an employee had about a

12 supervisor? Would someone call you? Would they write

13 you a letter? Would you get an e-mail?

14 A. You would hear about complaints, just

15 hearsay. You would hear about complaints in just your

16 general conversations with your employees.

17 Q. Any other method you would hear about

18 complaints?

19 A. If someone had a complaint for which they

20 wanted specific actions taken against, then you may

21 have something written, documented.

5 (Pages 14 to 17)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 18

1    Q.    What would those written documents be?
2    What form would they be in?
3    A.    Just a letter, a handwritten or typed
4    letter from the person filing the complaint.
5    Q.    From an employee?
6    A.    Yes.
7    Q.    Would you ever receive a referral of
8    complaints that an employee made to another division
9    within Amtrak?
10   A.    I don't recall having anything like that,
11   no.
12   Q.    Never?
13   A.    Not that I can recall.
14   Q.    Would the labor relations people ever
15   contact you and say we got a problem here and send you
16   a letter?
17   A.    Most complaints that went to labor
18   relations came from us.
19   Q.    I'm asking you, do you recall ever
20   receiving complaints forwarded to you from the labor
21   relations people?

Page 19

1    A.    No, I don't.
2    Q.    So, you have no recollection of that ever
3    occurring during your career as the manager of high
4    speed rail?
5    A.    Not that I can recall.
6    Q.    Do you recall ever receiving a request
7    from labor relations concerning complaints made by,
8    let's see, Harry Charleus?
9    A.    I don't recall receiving anything from
10   labor relations, no.
11   Q.    What do you recall concerning those
12   complaints?
13   A.    Nothing specific from Mr. Charleus that I
14   can definitely say was from Mr. Charleus.
15   Q.    I'm asking whether it's from Mr. Charleus
16   or anyone. I'm asking you what you presently recall
17   concerning any complaint made by Mr. Charleus.
18   A.    I don't recall anything specific made by
19   Mr. Charleus that I can recall.
20   Q.    Do you recall anything generally that you
21   recall receiving?

Page 20

1    A.    The only thing I can recall was a letter.
2    I don't remember where the letter came from, but I do
3    recall Mr. Charleus being mentioned in the letter.
4    Q.    Do you recall what the contents of the
5    substance of the letter was?
6    A.    Yes. The letter was in relation to
7    Mr. Snyder.
8    Q.    Were you shown by anyone here today or at
9    any time, let's say in the past month, a letter from
10   Mr. Charleus?
11   A.    Yes.
12   Q.    When did that occur?
13   A.    Today.
14   Q.    You reviewed that letter?
15   A.    Yes, I did.
16   Q.    Do you recall receiving that letter?
17   A.    No, I don't.
18   Q.    Did you review any other documents?
19   A.    Let me change my answer to I don't recall
20   receiving the letter. However, when I read the letter
21   today, I did recall having seen the letter before.

Page 21

1    Q.    It refreshed you saying oh, yeah, I got
2    this.
3    A.    I read this, yes.
4    Q.    What other documents did you review in
5    preparation for your testimony today?
6    A.    Just one of the policies. I don't
7    remember exactly which policy it was, an Amtrak
8    policy.
9    Q.    What did it pertain to?
10   A.    I can't recall because there are so many
11   policies that we have. I looked at the document that
12   was put in front of me and recognized it as one of
13   Amtrak's policies, but I can't say specifically.
14   Q.    How long ago did you look at this policy?
15   A.    Maybe 30, 45 minutes ago.
16   Q.    You don't remember. Did you read it?
17   A.    I didn't read it verbatim, no. I did look
18   at it.
19   Q.    You don't remember what the topic was?
20   A.    I identified it as an Amtrak policy.
21   Q.    So, you were able to identify it,

6 (Pages 18 to 21)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 22

understand what it was 30 minutes ago and say yeah,
that's an Amtrak policy?

3      A.    Yes.

4      Q.    But, 30 minutes later, you can't remember

5    what the policy was pertaining to?

6      A.    Not specifically what policy it was. I

7    don't remember the specific policy of what it was.

8    Most of our policies of that nature, they all look the

9    same in form.

10      Q.    I understand. Do you recall what the

11    policy pertained to?

12      A.    It had something to do with the

13    allegations of this case.

14      Q.    Well, what? Tell me what the policy was

15    about.

16      A.    Well, if I can tell you exactly what it

17    was about, I can tell you exactly what policy it was.

18      Q.    I don't care about the policy number. I

19    don't care word for word. I'm asking you what the

20    substance of what you read 30 minutes ago in

21    preparation of this deposition.

Page 23

1      A.    I did not read the policy itself. I

2    looked at the document and I identified it as an

3    Amtrak policy.

4      Q.    But, you don't have any idea what the

5    policy dealt with?

6      A.    I just know it had something to do with

7    the nature of this case.

8      Q.    What did it have to do with the nature of

9    the case?

10      A.    Well, again, if I could say specifically

11    what it had to do with -- I mean, it could have been

12    the harassment policy. It could have been the

13    workplace violence policy. I don't remember exactly

14    which it was. I just identified it as an Amtrak

15    policy.

16      Q.    If you don't know what the substance of it

17    was, how did you arrive at the conclusion that it

18    pertains to this case?

19      A.    Because it was presented to me in relation

20    to this case.

21      Q.    You just said you looked at it and said

Page 24

1    yes, this policy pertains to this case. That was your

2    conclusion after looking at the Amtrak policy?

3      A.    Yes.

4      Q.    If you don't know what the policy was

5    about, how do you arrive at the conclusion that it

6    pertains to this case? It could have been a policy

7    about throwing switches.

8      A.    No, I wouldn't have identified that policy

9    as relating to this case as I know it.

10      Q.    I understand. But, in order to arrive at

11    the conclusion that it pertains to this case, you had

12    to know what the policy was, correct?

13      A.    Yes.

14      Q.    Then what was the policy?

15      A.    The policy, I don't know specifically, but

16    as I said, it could have been the policy that speaks

17    to harassment or speaks to workplace violence or a

18    couple of other things that I feel, as much as I know

19    what this case is about, could have related to this

20    case.

21      Q.    You're familiar with the Amtrak policy

Page 25

1    that relates to harassment?

2      A.    Yes, I'm familiar with it.

3      Q.    Tell me the Amtrak policy related to

4    harassment.

5      A.    Tell it to you how?

6      Q.    As a manager of high speed rail who just

7    testified that you deal with all sorts of personnel

8    decisions, presumably those dealing with harassment

9    also, correct?

10      A.    Yes.

11      Q.    So, as part of your responsibilities, when

12    you were the manager of high speed rail, was to deal

13    with harassment and Amtrak policies of harassment.

14      A.    Yes.

15      Q.    Amtrak trains, you would deal with that,

16    correct?

17      A.    Amtrak did not give specific training

18    dealing with that, not to me anyway. You attended

19    classes that informed you of policies that were in

20    place.

21      Q.    One of those you just mentioned was

7 (Pages 22 to 25)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 26

1  harassment?
2     A.  Yes.
3     Q.  Which may or may not have been the
4  document you reviewed here today prior to coming here?
5     A.  Yes.
6     Q.  It was your responsibility as manager of
7  high speed rail to deal with and to understand
8  Amtrak's harassment policy and apply it with respect
9  to your responsibilities when dealing with personnel
10  decisions, correct?
11     A.  Yes.
12     Q.  What is Amtrak's harassment policy?
13     A.  I don't know the policy verbatim.  If
14  there's a case for which the harassment policy I feel
15  is relevant, I will pull out the policy.
16     Q.  Then you have pulled out the harassment
17  policy to review through your career?
18     A.  I have.
19     Q.  Tell me your understanding of Amtrak's
20  harassment policy.
21     A.  There are several sections of the policy,

Page 27

1  which again I cannot state to you verbatim.
2     Q.  I'm not asking you verbatim.
3     A.  Well, for me to explain my understanding
4  of the policy, again, I have to make sure you
5  understand that there are several sections of the
6  policy, some of which may pertain to certain cases and
7  some of which may not.
8     Q.  That's fine.  Go ahead and answer.  Tell
9  me what your understanding of Amtrak's harassment
10  policy is.
11     A.  My understanding of the policy is that the
12  specific items listed in the policy are not to be
13  tolerated.
14     Q.  Which ones do you recall?  Tell me what's
15  not to be tolerated.
16     A.  There are different forms of harassment.
17     Q.  Tell me what the different forms are that
18  you recall.
19     A.  Racial, verbal.  Those are the two main
20  ones that come to mind.
21     Q.  What would racial harassment be?  Give me

Page 28

1  an example.  How about calling someone a nigger?
2     A.  It depends on who's calling that person a
3  nigger.
4     Q.  The supervisor calls employees a nigger.
5     A.  Well, for it to be considered a racial
6  incident, then the race of the people involved would
7  really play a big part in that.
8     Q.  The supervisor's white and the employees
9  are black and calls them niggers.
10     A.  Are you asking would I consider that as
11  racial harassment?
12     Q.  You're the supervisor.  You're trained in
13  harassment.  Does Amtrak consider that to be a form of
14  harassment?
15     A.  Based on the policy as I would apply it,
16  it would be my determination that would be form of
17  racial harassment.
18     Q.  How about calling them bitches?
19     A.  I would not consider that as racial.
20     Q.  Jungle bunnies?
21     A.  It depends on what you mean by jungle

Page 29

1  bunny.
2     Q.  What's the common understanding with the
3  racial slur that a white person, or not necessarily a
4  white person, but another person would call a black
5  person a jungle bunny.
6     A.  Well, again, it depends on what that
7  person means by jungle bunny.  Jungle bunny is not a
8  term that I can give you a definitive definition for,
9  because it all depends on who's using it and in what
10  context.
11     Q.  An Amtrak supervisor using it with respect
12  to his black employees.
13     A.  I cannot say that was a form of racial
14  harassment, because I don't have a definition for
15  jungle bunny.
16     Q.  You mean Amtrak doesn't provide you one?
17     A.  I've never seen anything documented that
18  would explain to me what a jungle bunny is.
19     Q.  Do they in the rules, as far as you know,
20  define the term nigger?
21     A.  I have not seen it.  I can't recall seeing

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027    /04

Whitman Reporting – Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 30

1  anything in writing defining that term.
2      Q.    So, the same as the term jungle bunny?
3      A.    You mean, are they one in the same?
4      Q.    I mean, neither of them to your
5  recollection --
6      A.    I have never seen a written definition of
7  that in any Amtrak policies.
8      Q.    You also referenced verbal harassment.
9  What would verbal harassment be?
10     A.    Verbal harassment to me would be
11 unnecessarily using profane language or speaking
12 unnecessarily in a threating manner.
13     Q.    What do you mean by unnecessarily?
14     A.    Meaning that say if you chose to just
15 start yelling at your employees.  Maybe the employees
16 were already doing what they should be doing,
17 something along those lines.
18     Q.    Something inappropriate?
19     A.    Yes.
20     Q.    Whether or not something is racial
21 harassment or verbal harassment was left up to your

Page 31

1  discretion to determine if, in fact, what had occurred
2  in a given situation under the Amtrak rules could be
3  concluded by you to be harassment under Amtrak rules?
4      A.    Can you repeat that?
5      Q.    It made no sense, did it?  It's at your
6  discretion to determine, correct me if I'm wrong, but
7  your job dealing with personnel situations, when you
8  were the manager of high speed rail, dealing with the
9  situation.  We're going back now, because you said one
10 of the things you think you looked at today for a
11 document was Amtrak's harassment policy.  Correct me
12 if I'm wrong, it's my understanding from you --
13     A.    No, I didn't say that was one of the
14 policies I looked at.  I said it was a policy that in
15 some way pertained to this case as I know it.
16     Q.    Then you said the policy could have been
17 the harassment policy.
18     A.    It could have been.
19     Q.    Could it have been the workplace policy?
20     A.    Yes.
       Q.    Any others that it could have been?

Page 32

1      A.    Not that I can think of off the top of my
2  head.
3      Q.    So, you reviewed a document today.  There
4  was only one document?
5      A.    There were a couple of documents, but from
6  what I can remember just one which was the policy.
7      Q. ' One policy.  That one policy you looked at
8  could have been harassment or it could have been
9  workplace, to the best of your recollection?
10     A.    Yes.
11     Q.    Under harassment, you said harassment
12 could be racial or verbal and we've gone through
13 those.  It's my understanding that when you worked as
14 manager of high speed rail and were presented with
15 harassment complaints, racial or verbal, that it was
16 you who determined whether, in fact, as you said
17 before, you were like a prosecutor, whether the
18 conduct that you learned about as a result of your
19 investigation rose to the level of being a violation
20 of Amtrak's harassment policy?
21     A.    No, it was not totally my decision.  My

Page 33

1  role was to gather the facts as best that they could
2  be.  Then at that point if there appeared to be the
3  suggestion of harassment of some nature, then my
4  obligation was to forward this to the dispute
5  resolution office, whose job it is to deal with those
6  situations.
7      Q.    So, you did make a determination.  If it
8  was harassment, you would forward it on.  If you
9  determined it was harassment, you would forward it on?
10     A.    No, it wasn't about me determining whether
11 it was harassment.  If it was alleged that it was
12 harassment of some sort, then I was obligated to
13 forward it on.
14     Q.    Were you called upon to conduct
15 investigations in your job?
16     A.    Yes.
17     Q.    In your investigations on the job,
18 wouldn't you arrive at the conclusion as to whether or
19 not your job as manager of high speed rail, a
20 conclusion of whether or not it was your opinion that
21 Amtrak's harassment policy had been violated?

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 34

1    A.    My job in conducting an investigation was
2    just to gather facts.
3    Q.    Not arriving at any conclusions?
4    A.    My job was to gather the facts.
5    Q.    Who would arrive at the conclusions?
6    A.    If the facts warranted going to a formal
7    investigation, the conclusion would be made by the
8    hearing officer.
9    Q.    Who would determine whether or not it
10   warranted a formal investigation?
11   A.    The facts would determine whether it
12   warranted a formal investigation, the facts as I saw
13   it. Once I gathered the facts, if I felt that there
14   was enough evidence to possibly warrant a formal
15   investigation, then that could be my call to do so.
16   Q.    So, you were the one who determined
17   whether there was sufficient evidence to say we need a
18   formal investigation?
19   A.    You mean in this specific case?
20   Q.    Well, we're just talking about harassment,
21   when you receive a harassment complaint.

Page 35

1    A.    No, it is not always my call. I answer to
2    someone else. I have a boss also and sometimes it
3    would be his call. Everything I did, of course, had
4    to be forwarded to my direct supervisor.
5    Q.    I understand. I probably read you wrong
6    then. It was my understanding that as part of you
7    looking into the facts, that you would arrive at a
8    determination, as manager of high speed rail, as to
9    whether or not -- what was the next step that
10   occurred?
11   A.    A formal investigation. Yes. I could
12   determine or I could make a decision as to whether I
13   thought there should be, however, that could always be
14   overruled by my superior.
15   Q.    I understand. We can all be overruled by
16   superiors. But, it was your responsibility to make a
17   determination as to whether or not the allegations of
18   harassment after your investigation warranted a formal
19   proceeding?
20   A.    Again, I can't answer that with a yes or
21   no question. You can't apply a blanket policy to

Page 36

1    these type issues. Sometimes I would be asked to make
2    the decision and sometimes they would have to be
3    forwarded to my superior. Sometimes it would have to
4    be forwarded to the resolution office, who would then
5    determine whether it was necessary to conduct a formal
6    investigation.
7    Q.    But, you had the authority at some point
8    to say yes, that's warranted or no, it isn't?
9    A.    Yes.
10   Q.    The harassment policy dealt with racial
11   and verbal!
12   A.    That's not all it dealt with.
13   Q.    Okay. What else?
14   A.    That's all I can think of off the top of
15   my head.
16   Q.    Anything else?
17   A.    Nothing that I can think of right off the
18   top of my head.
19   Q.    Do you presently deal with personnel
20   matters in your job?
21   A.    Yes.

Page 37

1    Q.    Do you deal with harassment complaints in
2    your job and things like that?
3    A.    Yes, I do.
4    Q.    How many harassment complaints have you
5    dealt with, let's say, in the past six months?
6    A.    None.
7    Q.    Now, you also said there may have been a
8    workplace policy that you looked at.
9    A.    Workplace violence. They're all contained
10   in the same policy as best I can remember.
11   Q.    What does Amtrak's workplace violence
12   policy deal with?
13   A.    Just as it states, violence in the
14   workplace.
15   Q.    How does it define what violence is?
16   A.    You would have to take that straight from
17   the policy. I can't state that to you as it's
18   written.
19   Q.    Were your responsibilities as manager of
20   high speed rail the same with complaints lodged under
21   the workplace violence policy? Were your

10 (Pages 34 to 37)

Dennis Smith - 10/18/05

Page 38

1  responsibilities the same as you've just outlined with
2  respect to the harassment policy?
3      A.  Do you mean does the same policy apply?
4      Q.  Your responsibility.  Someone comes to
5  you.  They have harassment.  The policy could have
6  been harassment, right?
7      A.  Yes.
8      Q.  We're dealing there with racial and verbal
9  harassment, to the best of your recollection.  You
10  have outlined your responsibilities to conduct an
11  investigation and make certain determinations, which
12  could be overruled later on or not.  When someone
13  comes to you with a workplace violence complaint
14  against the supervisor, are your responsibilities the
15  same or were your responsibilities the same, as
16  manager of high speed rail, as you have outlined them
17  with respect to an harassment complaint?
18      A.  Yes.
19      Q.  You don't recall what Amtrak considers
20  workplace violence to be?
21      A.  I can't give you the definition of it, no.

Page 39

1      Q.  Do you have an understanding of it.  Do
2  you know when you see it?
3      A.  Yes.
4      Q.  Why don't you tell me what that is?
5      A.  My understanding of it is, that violence
6  in the workplace.
7      Q.  Well, does violence mean physical
8  violence?  Can it mean verbal violence?  Can it mean
9  threats?
10      A.  It can mean any of those.
11      Q.  So, it can it mean threats, verbal
12  threats?
13      A.  Yes, I would determine that.
14      Q.  It can be the actual touching of someone?
15      A.  Yes.
16      Q.  Anything else?
17      A.  No.
18      Q.  So, Amtrak workplace violence policy deals
19  with verbal threats.  By that, I mean threats of
20  violence.
21      A.  Verbal or physical.

Page 40

1      Q.  Or physical.
2      A.  Yes.
3          MR. HANNAWAY:  Is this the letter you were
4  shown?  Can you mark this please as A or 1, however
5  you want to do it.
6          (Mr. Smith's Deposition Exhibit Number 1
7  was marked for purposes of identification.)
8      Q.  That's the procedure, you receive a
9  complaint of harassment or workplace violence, which
10  we've gone through your responsibilities on.  You
11  receive that complaint.  Then does Amtrak have
12  procedures that require you to document any of this,
13  what you do as manager of high speed rail with respect
14  to harassment or workplace violence complaints?
15      A.  I require that anyone making a complaint
16  document it.
17      Q.  Are you, as manager of high speed rail,
18  required to use any forms, make any documents, any
19  writings on paper?
20      A.  If there's going to be an investigation,
21  yes, everything is documented.

Page 41

1      Q.  When you use the term investigation, are
2  you talking about the formal step in the procedure?
3      A.  I'm talking any investigation and I'm
4  speaking in regard to the way I conduct it, my
5  business --
6      Q.  I just want to know did Amtrak, to your
7  knowledge, require you to follow any procedure in
8  conducting your investigation as manager of high speed
9  rail of any workplace violence or harassment
10  complaints?
11      A.  Yes.
12      Q.  What documents does Amtrak require you, as
13  manager of high speed rail, in conducting your
14  investigation to use or generate?
15      A.  Mainly statements from the person making
16  the complaint, person or persons making the complaint,
17  then whatever actions you took in regards to the
18  statements that were forwarded to you.
19      Q.  So, statements could have already been
20  generated concerning certain incidents and they could
21  be forwarded to you or you could generate the

11 (Pages 38 to 41)

Dennis Smith - 10/18/05

Page 42

1    statements yourself or both?
2        A.   No, I would not generate it myself, not to
3    initially launch an investigation, no.
4        Q.   So if you were called upon to conduct an
5    investigation -- when I use the term investigation,
6    I'm dealing with harassment and workplace violence.
7    If statements are secured from people, a large number
8    of witnesses or the person making the complaint or
9    anyone, you would then receive those?
10       A.   Yes, if the people making the complaint
11   wanted action taken.
12       Q.   Would you receive any other information
13   before you started your investigation?
14       A.   No.  Basically, all I would get would be
15   statements about the complaint.
16       Q.   When you say get, you don't mean you would
17   go out and get them, you receive them?
18       A.   I don't go out and solicit it, no.  It's
19   brought to me.
20       Q.   Then you start your investigation?
21       A.   Yes.

Page 43

1        Q.   Does Amtrak require you, as part of you
2    conducting your investigation, to generate any type of
3    reports, any type of documents, any type of writings
4    of any kind?
5        A.   Yes.
6        Q.   What are those?
7        A.   Just a summary of what actions were taken.
8        Q.   You write that?
9        A.   If I'm the one conducting the
10   investigation, yes.
11       Q.   Is that on a form or is it just typed on a
12   blank piece of paper?
13       A.   For me, most times it's just typed on a
14   piece of paper.
15       Q.   What do you include in there?
16       A.   Whatever happened, the facts of what
17   happened.  That's based on my conversations with the
18   people that I spoke to and whatever actions I may have
19   taken up to that point.
20       Q.   Is that when you put your recommendations
21   in also?

Page 44

1        A.   No, I don't make recommendations at that
2    point.  Again, that's just a fact-finding mission.
3    Then after all the facts are gathered, then depending
4    on the nature of the incident, either myself or myself
5    in conjunction with other managers or my superiors
6    would then make a determination as to what the next
7    step would be.
8        Q.   What form does that take?
9        A.   That could be a roundtable discussion.
10       Q.   Any records kept relating to that?
11       A.   Not always, no.
12       Q.   Let's assume you don't send it up to the
13   supervisor.  You said that could occur, correct?
14       A.   It can occur, yes.
15       Q.   In an instance where you're called upon to
16   conduct an investigation, you get statements that have
17   been made by people.  You look into it and you decide
18   not to send it up for a hearing or a more formal
19   continuing procedure, do you generate any documents in
20   that instance?
21       A.   You mean, if I look at whatever I have and

Page 45

1    decide that there is no further action, do I document
2    that?
3        Q.   You conduct your investigation, right, as
4    you said?
5        A.   Yes.
6        Q.   You get a complaint.  You conduct your
7    investigation.  You testified that sometimes you
8    determine it should continue on up the ladder and be
9    formalized and hearings take place or you determine
10   that it shouldn't be, and then presumedly there it
11   stops at your level; is that correct?
12       A.   Yes, sometimes it can stop at my level.
13       Q.   At the times that it does stop at your
14   level, would you have generated any documents then?
15       A.   No.
16       Q.   How do you keep track of your
17   investigations if you don't talk to people?
18       A.   Because if it's going to go, if there is
19   enough evidence or facts to warrant an investigation,
20   then there are certain mandatory documentation that
21   would be generated from that point.  If there is not

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 46

1    enough to have it go that far, then most times that
2    means basically all you did was just talk to one
3    person maybe, so now you got just this person's word
4    against that person's word, where most times it's not
5    going to stand up in a formal investigation.
6        Q.   What do you mean?  Explain it to me again.
7    What do you mean when you use the term formal
8    investigation?
9        A.   Formal investigation means that specific
10   rules are identified that this person may be in
11   violation and as such now it goes into a formal
12   proceeding, which means doing pretty much what we're
13   doing right now.
14       Q.   Got you.  Is that the proceeding where the
15   person, I'm going to say cuts a deal and you see where
16   people say yes, I'll take three days.  I admit.  I'll
17   take three days without pay as punishment.
18       A.   Are you saying does that ever happen?
19       Q.   Yes.  After it becomes formalized, because
20   it's being sent for a formal investigation.
21       A.   Yes, that can happen.

Page 47

1        Q.   Sort of like charges are brought and the
2    person comes in and says, all right, I admit.  I'll
3    take three days or whatever.
4        A.   Yes, that's considered taking a waiver.
5        Q.   Then person B could come in and say no, I
6    want to fight this and it goes to a hearing?
7        A.   Yes.
8        Q.   So, if after your review, let's call it
9    investigation, if you generated documents and you
10   don't recommend a formal investigation, where do your
11   documents go that you generated?
12       A.   Well, there's probably not going to be any
13   documents, because if there's not enough evidence to
14   warrant an investigation, then nothing can be put in
15   the file of the person being accused.
16       Q.   You probably don't recall.  I think you
17   said before.  Do you remember in September of '02 that
18   you were referred a complaint by Harry Charleus?
19       A.   I don't remember specifically getting
20   something from Mr. Charleus.
21            MR. HANNAWAY:  Mark this as number 2.

Page 48

1            (Mr. Smith's Deposition Exhibit Number 2
2    was marked for purposes of identification.)
3        Q.   Do you recall seeing that letter?
4        A.   I don't recall specifically that, no.
5        Q.   But, you may have seen that or you may not
6    have?
7        A.   I may have, but I don't remember exactly
8    that I have.
9        Q.   You'll admit from the contents of it, that
10   it's a letter to Mr. Harry Charleus concerning his
11   letter of August 22, 2002 referencing the conduct of
12   Amtrak foreman Steve Snyder.  That she, Betty Blair,
13   division manager of labor relations, is referring the
14   matter to you, Dennis Smith, manager of high speed
15   rail, requesting that you investigate Mr. Charleus'
16   concerns.  Is that an accurate representation of the
17   letter?
18       A.   Yes.
19       Q.   Do you recall being called upon to
20   investigate in September of 2002, the allegations made
21   by Mr. Charleus?

Page 49

1        A.   I don't recall exactly when it was, but I
2    do recall having talked to Mr. Snyder about complaints
3    lodged, at least a complaint lodged against him.  I
4    don't remember exactly who that complaint came from.
5        Q.   Is that the only time you recall talking
6    to Mr. Snyder about complaints about him?
7        A.   There was just the one time, yes.
8        Q.   You never heard any other complaints about
9    him, ever?
10       A.   I don't recall any specific complaints.  I
11   can't say that I haven't, because there were a lot of
12   complaints about a lot of things with that program.
13       Q.   Do you recall any complaints generally
14   about Mr. Snyder from employees?
15       A.   Not that I can recall off the top of my
16   head, no.
17       Q.   Now, this letter references that she,
18   Ms. Betty Blair, was forwarding you Mr. Charleus'
19   letter.  That's marked as Exhibit 1.  Do you recall
20   receiving that?
21       A.   I don't recall receiving it.  But, after

Dennis Smith - 10/18/05

Page 50

1    having read it, I do remember loosely the letter.
2      Q.   You remember receiving that?
3      A.   No, I don't remember receiving it, no.
4      Q.   Do you recall receiving any documents with
5    respect to Mr. Charleus' concerns raised in his
6    August 22, 2002 letter or any complaints of
7    Mr. Charleus with respect to Mr. Snyder?
8      A.   I don't remember receiving anything that I
9    can specifically say was from Mr. Charleus. There
10   could have been, but I can't say for sure that
11   whatever I may have received came from Mr. Charleus.
12     Q.   When you receive something generally from,
13   let's say the division manager of labor relations, you
14   set up a file?
15     A.   Yes, if whatever I received recommends
16   action be taken on whatever it is they're addressing.
17     Q.   Well, if you're asked to investigate.
18     A.   If I'm asked to investigate, yes, there is
19   going to be a file.
20     Q.   You open a file?
21     A.   Yes.

Page 51

1      Q.   So, Exhibit 2 we've already stated is
2    produced by Amtrak. It's a letter from her. Do you
3    know Betty Blair?
4      A.   Yes, I do.
5      Q.   Asking you to investigate and presumedly
6    you investigated?
7      A.   Well, I can't say that. Just because
8    Betty Blair sent a letter referencing me doesn't mean
9    I would definitely be the one to have to do it.
10     Q.   Who else would have done it?
11     A.   There are other managers that served in
12   the same capacity as I did.
13     Q.   But, it mentions your name.
14     A.   That doesn't matter.
15     Q.   It doesn't matter.
16     A.   It could mention my name. But, as I said,
17   other managers that serve in the same capacity that I
18   do could have been assigned to investigate.
19     Q.   Would you have assigned them?
20     A.   No, that would come from my superior.
21     Q.   Who was your superior?

Page 52

1      A.   Back then, I went through about three
2    different superiors. At the time of this particular
3    incident, I don't remember exactly which one was at
4    the helm then.
5      Q.   So, even though Amtrak labor relations
6    division manager says I'm sending this to Dennis Smith
7    for him to investigate, it doesn't mean that you would
8    be the one to conduct the investigation?
9      A.   Not necessarily.
10     Q.   So, why would she put down the
11   individual's name?
12     A.   I can't speak for why she would. I don't
13   know.
14     Q.   Do you recall any times other than this by
15   Betty Blair to conduct any investigation?
16     A.   Not that I can recall.
17     Q.   So, you might have or you might not have?
18     A.   It's possible, but not that I can recall.
19     Q.   Did you conduct any investigation with
20   respect to Mr. Charleus' complaint?
21     A.   Again, I don't remember that I

Page 53

1    specifically received something from Mr. Charleus.
2      Q.   I didn't ask you that.
3      A.   Then in that case, no.
4      Q.   You don't remember conducting any
5    investigation?
6      A.   That was generated by Mr. Charleus?
7      Q.   I didn't ask you that.
8      A.   Well, that's what I'm asking. Is that
9    what you're saying?
10     Q.   No. This is the question. Did you
11   conduct any investigation with respect to complaints
12   made by Harry Charleus, Lisa James, Tyrk Jenkin,
13   Carlos Alvarado, Phoung Hoang, Doria Washington, any
14   of them considering actions of Mr. Snyder?
15     A.   I conducted an investigation concerning
16   the actions of Mr. Snyder, however, the specific
17   people who made the complaints, I cannot tell you
18   exactly who they were.
19     Q.   Do you remember what the complaints were?
20     A.   The complaints were dealing with possible
21   verbal abuse as far as profanity. That's the only

14 (Pages 50 to 53)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 54

1  specific accusation I can remember.
2      Q.  So, there might have been other
3  accusations?
4      A.  Possibly.
5      Q.  If there were accusations of being
6  threatened physically, you would have investigated
7  that also?
8      A.  Yes, if there was a formal complaint
9  lodged.
10     Q.  What's a formal complaint.
11     A.  Meaning something in writing.
12     Q.  I mean, we have the manager of labor
13  relations, you recall investigating allegations made
14  about Steve Snyder, correct?
15     A.  Yes.
16     Q.  You said you don't recall any other times
17  with respect to Mr. Snyder that you conducted an
18  investigation, correct?
19     A.  Yes.
20     Q.  Okay.  So, one time you investigated
21  Mr. Snyder with respect to allegations?

Page 55

1      A.  One time that I can recall.
2      Q.  Presumedly, that was formalized, it was a
3  formal request for you to conduct an investigation?
4      A.  What do you mean by formal?
5      Q.  You just used the term.  He can read it
6  back to you.
7      A.  I don't need him to.  If you mean, did I
8  do it based on something that was documented?
9      Q.  You used the term formal investigation,
10  formal request.
11     A.  Formal request, yes.  A formal
12  investigation is something different.
13     Q.  What's your recollection of the formal
14  request that was made?
15     A.  Just that there were some complaints made
16  against the way Mr. Snyder was supervising his
17  employees.
18     Q.  You referenced there were assertions of
19  verbal abuse?
20     A.  That was the one that I can recall
21  specifically, possible verbal abuse.

Page 56

1      Q.  Do you think there are records of that?
2      A.  Yes, I think I have.
3      Q.  What I'm referring to there, for the
4  record, is Exhibit Number 1.  I put this in front of
5  you.
6          MS. SUBAR:  Before we start, I'm going to
7  need to break.
8          MR. HANNAWAY:  Oh, go, go.
9          (There was a brief recess at 11:30 a.m.)
10     Q.  Mr. Smith, I have given you a copy of
11  what's been marked as Deposition Exhibit Number 1.
12  You referenced, it was your recollection that you did
13  in some manner recall investigating assertions made
14  about Mr. Snyder on one occasion.
15     A.  Yes.
16     Q.  But, you can't recall if those were the
17  assertions made by Mr. Charleus and his co-employees;
18  is that accurate?
19     A.  I know they were his co-employees.  Which
20  ones specifically, I don't recall.
21     Q.  You conducted an investigation of

Page 57

1  Mr. Snyder on one occasion, correct?
2      A.  Yes.
3      Q.  That you recall?
4      A.  Yes.
5      Q.  Is it your recollection that investigation
6  related to the complaints made by Mr. Charleus and his
7  co-employees?
8      A.  The investigation was in regards to
9  accusations similar to what is in Mr. Charleus'
10  letter.
11     Q.  That's not my question.  My question was,
12  is the investigation that you conducted relating to
13  the complaints by Mr. Charleus and his co-employees in
14  his letter of August 22, 2002?
15     A.  Again, I can't say that Mr. Charleus was a
16  part of the complaints that resulted in my
17  investigation.  But, yes, the people involved were
18  coworkers of his.  Which ones specifically, I don't
19  recall.
20     Q.  Well, was the investigation that resulted,
21  that you conducted, the one you conducted by

15 (Pages 54 to 57)

Dennis Smith - 10/18/05

Page 58

1  Mr. Snyder, was it as a result of this letter marked
2  Plaintiff's Number 1?
3     A.   I don't know if it was a result of this
4  specific letter, no, because, as I said, I don't
5  remember receiving this specific letter from
6  Mr. Charleus.
7     Q.   You don't remember if it pertained to what
8  your investigation, the one investigation you
9  conducted of Mr. Snyder pertaining to these
10  allegations or not or some other allegations?
11     A.   No.  As I stated a minute ago, the
12  allegations which my investigation were based on were
13  similar to what was in Mr. Charleus' letter.
14     Q.   But, it may have been another incident as
15  opposed to Mr. Charleus' complaint?
16     A.   It could have been, yes.
17     Q.   So, there may have been more than one
18  investigation by your office of Mr. Snyder?
19     A.   The only investigation I'm aware of is the
20  one conducted by myself.
21     Q.   Even though the labor relations manager

Page 59

1  directed you to conduct an investigation of
2  Mr. Charleus, you may not have conducted that
3  investigation?
4     A.   The labor relations manager didn't direct
5  me to do it.  She sent a letter stating that I do it.
6  However, as I said, I don't answer to the labor
7  relations director.  So, any manager in my capacity
8  could have carried out the request made in that
9  letter.
10     Q.   Are you denying that Betty Blair ever sent
11  you a copy of Mr. Charleus' letter?
12     A.   No, I'm not denying it.
13     Q.   But, you don't know what, if any,
14  investigation you conducted as a result of probably
15  receiving this letter?
16     A.   All I know is that an investigation that I
17  conducted was in response to accusations made similar
18  to the ones in Mr. Charleus letter.
19     Q.   So, there may have been similar
20  allegations made by employees similar to those made by
21  Mr. Charleus?

Page 60

1     A.   Of course, it's possible.
2     Q.   Who besides you would have conducted the
3  investigation, possibly conducted the investigation
4  with respect to Mr. Charleus' allegations?
5     A.   Anyone that Mr. Charleus directly
6  addressed his concerns to could have.
7     Q.   Well, we know from Amtrak's records now
8  that this was sent over to high speed rail from labor
9  relations, right?
10     A.   That's the letter you're showing now was
11  sent from labor relations, yes.
12     Q.   That says we're sending you a copy of your
13  letter to Mr. Dennis Smith.
14     A.   Yes.
15     Q.   What you're saying is, it really might not
16  have come to you, someone else there might have
17  investigated it.  Is that accurate?
18     A.   It's possible that could have happened,
19  yes.
20     Q.   So, my question is, who else could have
21  investigated it?

Page 61

1     A.   There were three other managers under the
2  same title as my own.
3     Q.   Who are they?
4     A.   Deno Giurfa, G-I-U-R-F-A.
5     Q.   What was Deno's title?
6     A.   The same as mine, manager of high speed
7  rail.  Chris Bello.
8     Q.   What was his title?
9     A.   The same title.  There were two others,
10  one of which, actually both.  I don't remember if both
11  of them were still there at the time that this all
12  took place.  One would have been Todd Zentner,
13  Z-E-N-T-N-E-R, and Dave Patterson.
14     Q.   You all held the title of manager of high
15  speed rail?
16     A.   Yes.
17     Q.   You all held the same position in terms of
18  the hierarchy in the bureaucracy?
19     A.   Yes.
20     Q.   So, you were not the boss of any of these
21  people and neither were they the boss of you?

16 (Pages 58 to 61)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting – Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 62

A.    No, we were all equal.

Q.    Were your responsibilities the same or did
you cover different?

A.    Generally the same.  But, your
responsibilities could change at any given point in
time if there were specific things that needed to be
done, then that may become one of your
responsibilities.

Q.    What did your investigation with respect
to the allegations made about Mr. Snyder consist of?

A.    I informed Mr. Snyder of the accusations
made against him.

Q.    What did you say to him?

A.    I don't remember exactly what I said.  I
asked Mr. Snyder to give me his side of the story,
then I eventually let Mr. Snyder read whatever letter
it was that I had in my possession at that time, and
then again allowed him the opportunity to address what
was in the letter.

Q.    You say you gave him an opportunity to
address.  In what manner?  Talk to you, just speak,

Page 63

write a letter, write something?

A.    No, to respond to me right then and there.

Q.    Verbally?

A.    Verbally, yes.

Q.    You said the nature of the allegations
were verbal abuse?

A.    The one that I can recall off the top of
my head, yes.

Q.    Could there have been other allegations?

A.    There could have been, yes.

Q.    Is this what you investigated that fell
under the workplace, the policies of Amtrak?

A.    You're saying Were there or could there
have been?

Q.    Were there.

A.    I don't recall.

Q.    Now, in this letter here that I showed you
marked number 1, which you may or may not have
received or investigated, it says in there in the last
paragraph, "This is not the first time Foreman Steve
Snyder has approached me in a threatening manner and

Page 64

raised his voice at me."  Do you see that there?  Do
you agree that's what it says?

A.    Yes.

Q.    You testified earlier that workplace
violence can be verbal.

A.    Yes.

Q.    It can include profane language and acting
in a threatening manner.

A.    Profane language I said could fall under
verbal harassment.

Q.    How about acting in a threatening manner?

A.    Acting in a threatening manner in my
opinion could fall under the realm of workplace
violence or at least warrant an investigation into
that matter.

Q.    When you say investigation, do you mean a
formal investigation?

A.    No.

Q.    If you recall, what did Mr. Snyder say in
response to you after you let him read a letter?

A.    Not specifically addressing everything

Page 65

that may have been in the letter.  The one thing I do
remember him saying is that it was possible, it could
be possible that yes, he may have cursed at his
people.

Q.    Do you recall addressing anything else
other than cursing at people?

A.    I don't remember the other specifics that
were addressed.

Q.    So, there may or may not have been others
that you addressed?

A.    There may have been.  If there were more
in the letter, then there were more addressed.

Q.    If employees are asserting that he
threatened them, acting in a threatening manner?

A.    If that's what was in the letter, then
that's what we addressed.

Q.    Was that the end result of your
investigation that you recall?

A.    Just the one conversation with Mr. Snyder,
yes.

Q.    What did you do after that?

17 (Pages 62 to 65)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 66

1      A.    After that, I didn't do anything other
2  than just wait to see if there would be any more
3  complaints lodged against him.
4      Q.    So, you didn't prepare any documents,
5  write any memos, write anything down as a result of
6  your investigation?
7      A.    No.  There was a summary letter written of
8  our discussion.
9      Q.    Have you seen that?
10     A.    Lately?
11     Q.    At any time.
12     A.    I wrote it.
13     Q.    When did you write it?
14     A.    I don't know if it was the next day or
15  possibly that night.
16     Q.    Where would that go?
17     A.    That would go into the files that are kept
18  in the office.
19     Q.    I mean, is it filed under Steve Snyder?
20  Is it filed in your office?  Where is it filed?
21     A.    I don't remember specifically the filing

Page 67

1  system we had at that particular time, but it would
2  have, under normal circumstances, there would have
3  been a copy of it in Mr. Snyder's individual file.
4      Q.    Does that mean personnel file?
5      A.    Yes, his local personnel file.
6          MR. HANNAWAY:  I have never seen that
7  document.  Have you?
8          MS. SUBAR:  Neither have I.
9      Q.    Would this be on a white piece of paper?
10     A.    Yes.
11     Q.    Like on the word processor and say summary
12  letter, Re: Steve Snyder such and such a date?
13     A.    Similar to the same setup as the letter
14  we're looking at.
15     Q.    A conversation about allegations made on
16  such and such a date.  In those summary letters or the
17  summary letter you wrote with respect to the
18  investigation you conducted, do you file it yourself
19  or do you give it to someone to file?
20     A.    No, I file it.  In this particular case, I
21  filed it in Amtrak's files.  I don't recall whether a

Page 68

1  copy was sent to the management company that were the
2  direct supervisors of the Amtrak employees at the
3  maintenance facility.
4      Q.    So, Amtrak has a side contract with a
5  private entity?
6      A.    Yes.
7      Q.    What would you file it under is my
8  question?  I mean, would you open a file for Steve
9  Snyder?  Would it be in a file cabinet where S is or a
10  file cabinet with somebody's letters?
11     A.    No.  It would just be in the general file
12  cabinet we have when there is an incident that takes
13  place and whoever the particular individual is
14  involved in that incident.  They then warrant
15  compiling a folder, a file, and then that file would
16  just go into the drawer.
17     Q.    Where those type?
18     A.    Where those type of files are kept.
19     Q.    So, if you go to a complaint about
20  Supervisor John Hannaway and you came to talk to me
21  about something that's asserted I did and you were

Page 69

1  called upon to investigate it, you would write up a
2  summary of our conversation and then open a file that
3  says John Hannaway?
4      A.    Yes.
5      Q.    You would put it in the file cabinet that
6  holds such summary letters concerning it?
7      A.    That holds personnel files.  There was not
8  a separate file for specific types of letters.
9      Q.    So, they go by the person of who was
10  interviewed kind of thing?
11     A.    Yes.
12     Q.    So, let's say Steve Snyder.  You would go
13  in there and there would be your letter.  If there are
14  any others, your summary memo, let's call it, or if
15  there was similar documents, those would be in there
16  also if someone else conducted an investigation?
17     A.    Yes.
18     Q.    Have you ever gone looking for that
19  summary report?
20     A.    Not that I can recall.
21     Q.    You would remember that?

18 (Pages 66 to 69)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 70

A.    If there was a need to, if there were
further allegations made, then there would have been
3  probably an additional investigation which would have
4  made it necessary to review the already existing
5  files.
6      Q.    You don't recall at any time going and
7  looking for that summary?
8      A.    No, I don't.
9      Q.    When this case started, and by this case I
10  mean Mr. Chambliss' suit that's been brought against
11  Amtrak, were you contacted by anyone to discuss the
12  matter?
13      A.    I don't know when this all originally came
14  about. I do remember that there have been a couple of
15  occasions that I was contacted in reference to any
16  possible documentation pertaining to Mr. Snyder.
17      Q.    Who contacted you?
18      A.    Deno Giurfa.
19      Q.    On both occasions?
20      A.    At least one occasion. Essentially, I was
21  contacted by Mr. David James from Amtrak's claims

Page 71

1  department.
2      Q.    They were contacting you with respect to
3  any documents that you may know of or have?
4      A.    That or any recollection I have of the
5  whole situation with Mr. Snyder.
6      Q.    As a result of you being contacted by
7  Mr. Giurfa and Mr. James, did you go looking for
8  documents?
9      A.    No.
10      Q.    Why not? They asked you to.
11      A.    Because I knew I didn't have them where I
12  was presently an employee or my department, my present
13  department. None of that stuff was forwarded with me.
14      Q.    I understand it would stay back. Did you
15  tell them, yeah, I wrote something, I think?
16      A.    I don't remember exactly what I told them,
17  but I did tell them that I didn't have specific
18  knowledge of all the details of the incident and that
19  I did know that I had no documentation in my
20  possession of the incident.
21      Q.    Did you tell them, hey, but when I was in

Page 72

1  my old position, I would have written a summary, it's
2  over there?
3      A.    Yes, I did.
4      Q.    What did they say? What did Mr. Giurfa
5  say?
6      A.    I don't remember what he said.
7      Q.    Did you inform him that the document was
8  probably over in the Snyder file in my old office?
9      A.    Yes.
10      Q.    Did you inform Mr. Davis of that, too?
11      A.    Who? Mr. James?
12      Q.    Mr. James, David James. I'm sorry. Do
13  you have a recollection of what you put in that
14  summary?
15      A.    No, I don't. But, it was just the facts
16  of what took place between myself, the conversation
17  between myself and Mr. Snyder.
18      Q.    You said you would have forwarded that to
19  someone else, a copy?
20      A.    My supervisor would have seen it.
21      Q.    If, in fact, it was required or requested,

Page 73

1  which it appears to be, you can't recall if this
2  matter was referred to you by the labor relations
3  division, would you have sent them a copy?
4      A.    Yes. Normally, from my experience if
5  labor relations asks that an investigation be
6  conducted on whatever matter, it's just normal
7  protocol that they'll get the results of the
8  investigation also.
9      Q.    You don't recall what the gist of your
10  summary was?
11      A.    No, not specifically, no.
12      Q.    Do you recall in the course of your
13  conversation with Mr. Snyder, I might have asked you
14  this, discussing and acting in a threatening manner?
15      A.    I don't recall the specifics of what we
16  discussed other than using the profane language part.
17      Q.    Did you recommend that this matter be,
18  well, we used the phrase before, a formal
19  investigation take place?
20      A.    No, I didn't.
21      Q.    Do you recall that or you did or did not

19 (Pages 70 to 73)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 74

or you don't know?

2     A.    I did not recommend that it go to a formal
3  investigation, no.
4     Q.    If you received a letter such as this
5  where employees were complaining about a supervisor
6  threatening, acting in a threatening manner to cause
7  them physical harm, presumably you would have
8  questioned the supervisor about that?
9     A.    The first thing would have happened is if
10  a letter alleges physical harm, it would have been
11  first forwarded directly to dispute resolution.  Based
12  on the severity of the accusations, that person could
13  possibly have been removed from service.
14     Q.    I understand.  That's not what I asked
15  again.  If, in fact, you received that letter, and
16  that's what we're dealing with is number 1, in there
17  you have employees asserting that Steve Snyder has and
18  continues to act in a threatening manner towards them
19  as if to cause them physical harm, you would have
20  presumedly questioned him about that, too, also?
21     A.    Yes.  If the letter alleges that, whatever

Page 75

1  the letter alleges is what I would have questioned him
2  about.
3     Q.    If you can't recall when this took place
4  or what the specific allegations were, where the
5  summary is, if it exists, where it went and who has it
6  or what you wrote in it, how do you know that you
7  didn't request a formal investigation?  How do you
8  remember that?
9     A.    Because I do remember that much about it.
10     Q.    Why didn't you request a formal
11  investigation?
12     A.    Because I didn't feel I had enough proof
13  of the allegations to warrant it.
14     Q.    He admitted using profanity.
15     A.    Yes.  But, that in itself, in the manner
16  that I recall him actually admitting to it, but
17  stating that it's possible that could have happened.
18  He didn't admit to it.  He stated that it's possible
19  that could have happened.
20     Q.    If he admitted to it, would that warranted
21  a formal investigation?

Page 76

1     A.    If he admitted to it, it's possible that
2  it could have gone to a formal investigation.
3     Q.    Do you recall doing any other
4  investigation other than talking to Mr. Snyder?
5     A.    No, not that I recall specifically.
6     Q.    Did you ever talk to Harry Charleus?
7     A.    I don't know that I actually had a
8  conversation about this specific matter with
9  Mr. Charleus.  Again, it's possible that I could have.
10  But, I can't sit here and say yes indeed, I talked to
11  Mr. Charleus about this.
12     Q.    So, you have spoken to Mr. Charleus about
13  anything?
14     A.    Yes.
15     Q.    What was the context of that conversation
16  that you now recall with Mr. Charleus?  When did it
17  take place?
18     A.    There were several conversations with
19  Mr. Charleus that came about just in our normal course
20  of duties during the workday.
21     Q.    About how many?

Page 77

1     A.    I have no idea.  There is no way to know.
2  I worked there for three years.
3     Q.    Tell me about it in the substance of any
4  conversations you recall with Mr. Charleus.
5     A.    I can't recall any specifics because of
6  the fact, as I said, Mr. Charleus is just another
7  employee, one of many whom I had to speak with or
8  encounter on a daily basis.
9     Q.    Did you ever have any conversation that
10  you recall with Mr. Charleus about the complaints he
11  had with Mr. Snyder?
12     A.    Not that I can recall specifically.
13     Q.    No, not specifically.  Generally, did you
14  ever talk to him about Steve Snyder?
15     A.    Not that I can definitely say.
16     Q.    I'm not asking definitely.
17     A.    Well, I can only speak on what I
18  definitely know.
19     Q.    So, you have absolutely no recollection of
20  ever talking to Harry Charleus about the allegations
21  and assertions he made with respect to the behavior of

20 (Pages 74 to 77)

Dennis Smith - 10/18/05

Page 78

1    Steve Snyder?
2        A.    Not that I can recall.
3        Q.    So, you may have?
4        A.    It's possible, yes.
5        Q.    You may have had conversations with him
6    with respect to your investigation of Mr. Snyder?
7        A.    It's possible, yes.
8        Q.    If you had such a conversation, would you
9    also write a summary as you did with Mr. Snyder of
10   what Mr. Charleus had to say concerning his
11   allegations?
12       A.    If Mr. Charleus had documented something
13   and forwarded it to me making a formal complaint, then
14   yes.
15       Q.    You misunderstood the question.  I can
16   have it read it back or I can continue to ask the
17   question five times like we've been doing all morning.
18   You just testified that you may have had conversations
19   with Mr. Charleus with respect to the allegations he
20   made about Mr. Snyder's behavior, correct?
21       A.    It's possible that yes, I could have had a

Page 79

1    conversation.
2        Q.    If you had such a conversation, would you
3    have written a summary of that conversation as part of
4    your investigation as you did with Mr. Snyder's
5    conversation?
6        A.    It's possible, but it's not required.  It
7    was not required as far as I'm concerned.
8        Q.    Was it required with respect to your
9    interviewing Mr. Snyder?
10       A.    Yes.
11       Q.    Why is that?
12       A.    Because interviewing Mr. Snyder was
13   gathering facts about the incident and the
14   allegations.  Any conversation after that with
15   Mr. Charleus or whoever was not a part of the
16   investigation.
17       Q.    So, are you saying now that you absolutely
18   did not talk to Mr. Charleus as a part of your
19   investigation?
20       A.    No, I'm not saying that.
21       Q.    Then we'll go again.  Therefore, you may

Page 80

1    have spoken to Mr. Charleus as part of your
2    investigation?
3        A.    It's possible, yes.
4        Q.    If you spoke with Mr. Charleus as part of
5    your investigation concerning his allegations
6    concerning Mr. Snyder, would you have written a
7    summary?
8        A.    Yes.
9        Q.    Where would that be?
10       A.    That would be in the same file with the
11   initial complaint, which would have been Mr. Snyder's
12   file.
13       Q.    Now, we know you wrote the summary with
14   respect to Mr. Snyder, correct?
15       A.    Yes.
16       Q.    You may have written one, if you talked to
17   Mr. Charleus, as part of your investigation?
18       A.    I would not have written a separate letter
19   for Mr. Charleus, no.
20       Q.    So, the summary, which you've referred to,
21   would also include any conversations you had with

Page 81

1    Mr. Charleus with respect to his allegations?
2        A.    The summary would have included anything
3    that took place from the start of the investigation to
4    the closure.
5        Q.    Do you recall talking to any other persons
6    with respect to your investigation of Mr. Snyder?
7        A.    I talked to whoever was mentioned in
8    whichever letter my investigation was based on.  I
9    don't remember the specific people.
10       Q.    So, if the investigation we're dealing
11   with is the one that the Amtrak records show was
12   referred to you, are you saying that if names were
13   mentioned in that letter, you also would have
14   interviewed those individuals?
15       A.    Yes.
16       Q.    So, if the record of Amtrak reflects that
17   you were forwarded Mr. Charleus' letter and the
18   witnesses listed are Lisa James, Tyrk, I believe you
19   pronounce it, Jenkin, Carlos Alvarado, Phoung Hoang
20   and Doria Washington, as part of your investigation,
21   you also would have interviewed them?

Towson Reporting
410-828-4148            GORE BROTHERS
                       410-837-3027            Whitman Reporting - Rockville
                                               301-279-7599

Dennis Smith - 10/18/05

Page 82

```
        A.    If they were listed in the letter that
2  caused me to initiate an investigation, yes.
3        Q.    Exhibit 1 is the one that Amtrak is saying
4  was forwarded to you.  So, if, in fact, that was
5  forwarded to you, number one as their records reflect
6  and these witnesses are listed, you would have
7  interviewed them, correct?
8        A.    If this letter was forwarded to me prior
9  to the investigation, yes.
10       Q.    Do you recall talking to Lisa James at any
11  time?
12       A.    I've talked to Lisa James on numerous
13  occasions.
14       Q.    Do you recall talking to Lisa James with
15  respect to your investigation?
16       A.    I don't recall specifically talking to
17  Lisa James with respect to this investigation.
18       Q.    So, you may have spoken to her with
19  respect to this?
20       A.    I may have.  If Lisa James was named in
21  the letter that initiated my investigation, I would
```

Page 83

```
1  have spoken to Lisa.
2        Q.    The substance of your conversation with
3  her would have also been part of the summary document
4  that we've been talking about?
5        A.    Yes.
6        Q.    Does the same hold true for Tyrk Jenkin?
7        A.    If Tyrk was listed in the letter that I
8  based my investigation on, yes.
9        Q.    The same for Carlos Alvarado?
10       A.    Anyone that would have been listed in the
11  letter.
12       Q.    For the record, in addition, Phoung Hoang
13  and Doria Washington.
14       A.    If they were listed in the letter.
15       Q.    If it wasn't Mr. Charleus who made the
16  allegations that you investigated, do you recall who
17  made the allegations?
18       A.    No, I don't, not specifically.  There were
19  several employees in Mr. Charleus' same capacity that
20  worked under Steve Snyder.
21       Q.    In the investigation you conducted, and
```

Page 84

```
1  you're referencing a letter, it was only on one
2  occasion that you received such a letter and
3  investigated?
4        A.    Only one occasion that I can recall, yes.
5        Q.    Do you recall when that took place?
6        A.    No, I don't.
7        Q.    I may have asked you this.  I apologize if
8  I did.  Other than the investigation you conducted,
9  are you aware of any other complaints with respect to
10  Mr. Snyder that have been made in any form?
11       A.    Not specific complaints that I can recall.
12       Q.    Any general complaints that you can
13  recall?  You said you met with these people all the
14  time and they're all around you.  You talk to Harry
15  Charleus.  You talk to Jerry Chambliss.  You talk to
16  Jerry Chambliss, right?
17       A.    Yes, I have.
18       Q.    You've talked to Jerry Chambliss about
19  these incidents, right?
20       A.    I don't know specifically that I have.  I
21  can't say that.
```

Page 85

```
1        Q.    How about generally?
2        A.    It's possible.
3        Q.    There are a lot of things that are
4  possible.
5        A.    Yes.
6        Q.    Is it likely?
7        A.    It's possible is the best I can say.
8        Q.    When may have you possibly spoken with
9  Jerry Chambliss about the incident?
10       A.    At any time Mr. Chambliss may have felt he
11  wanted to approach me about it.
12       Q.    Do you recall him approaching you about
13  it?
14       A.    Not specifically.
15       Q.    How about generally?
16       A.    It's possible.  That's all I can tell you.
17       Q.    Are you saying here today that you never
18  spoke to Jerry Chambliss about the incident that he's
19  asserting occurred with Mr. Steve Snyder when
20  Mr. Steve Snyder threw a book at him?
21       A.    No, I'm not saying that.
```

22 (Pages 82 to 85)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 86

1     Q.   So, you recall that you may have?
2     A.   I'm saying that it's possible.
3     Q.   What possibly could you have discussed
4 with him?
5     A.   Well, it depends on who initiated the
6 conversation. If Mr. Chambliss came to me with it,
7 then we would have discussed whatever his issues were
8 with it vice versa had I gone to him.
9     Q.   Do you recall going to him?
10     A.   No, I don't, not specifically, no.
11     Q.   Do you recall him coming to talk to you?
12     A.   Not specifically.
13     Q.   I'm not asking for specific dates.
14     A.   Well, I can't give you. I'm just trying
15 to give you specific answers to whether I know I did
16 talk to him about this particular matter.
17     Q.   Your answer is yes or no?
18     A.   My answer is I don't recall specifically
19 talking to Mr. Chambliss about this particular
20 incident.
21     Q.   Do you recall talking to go him generally?

Page 87

1     A.   About this or anything?
2     Q.   Yes.
3     A.   Of course. We've talked on numerous
4 occasions.
5     Q.   The substance of the conversations was
6 what?
7     A.   There were many.
8     Q.   Any about Steve Snyder?
9     A.   I don't recall a specific conversation
10 about Steve Snyder with Mr. Chambliss.
11     Q.   I'm not saying one specific conversation.
12 But, did you ever have a conversation with Mr. Snyder?
13     A.   I don't recall any specific conversations
14 with Mr. Chambliss about Steve Snyder. Mr. Chambliss
15 was one of many employees that I was responsible for.
16 There were a lot of complaints lodged about the whole
17 operation from numerous employees. So, I had a lot of
18 conversations with a lot of employees. To try to
19 recall specific conversations after having being
20 removed from that environment for three years, I can't
21 sit here and do that.

Page 88

1     Q.   Is it fair to say, then, that you do
2 recall employees making complaints about Steve Snyder?
3     A.   I do recall having heard complaints about
4 Steve Snyder, yes.
5     Q.   What were the nature of the complaints?
6     A.   The nature of the complaints about
7 Mr. Snyder, and again I can't give you specific
8 complaints, but Mr. Snyder was a supervisor there
9 along with three other supervisors, all of whom had
10 numerous complaints lodged against them that could
11 range anywhere from them not being given a long enough
12 lunch break or them being told to do work that doesn't
13 fall under the realm of their responsibilities. There
14 were just always complaints being made.
15     Q.   Complaints of threats of violence?
16     A.   No, not those type of complaints.
17     Q.   Never?
18     A.   I won't say never.
19     Q.   How about complaints of profanity?
20     A.   Against Mr. Snyder?
21     Q.   Yes.

Page 89

1     A.   Again, other than what may have been in
2 the letter, I can't recall specific complaints that
3 were made against any of those supervisors by any of
4 the employees.
5     Q.   Threats of violence?
6     A.   That I can recall specifically.
7     Q.   What do you mean when you say recall
8 specifically?
9     A.   I wouldn't be able to tell you yes, this
10 person said that about this one.
11     Q.   Well, I'm not asking for names, persons,
12 so, we don't have to use specific anymore. Let me get
13 it straight. I'm not asking you for this specific
14 person for this specific thing on this date. Do you
15 recall, now that we got that straight, do you recall
16 anybody making complaints about Steve Snyder?
17     A.   Yes.
18     Q.   What was the nature of the complaints?
19     A.   Anything from not being given a long
20 enough lunch break to being told to do work that
21 doesn't fall under the realm of their responsibility,

23 (Pages 86 to 89)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 90

1 and several other topics that could fall in.
2    Q.  Use of profanity?
3    A.  I don't recall specifically anything.
4    Q.  I'm not asking specific.
5    A.  Well, I have to speak specifically for the
6 record.
7    Q.  No. I've already outlined it to you. You
8 defined your term specifically. You said that you
9 were inferring I meant a specific person making a
10 specific complaint.
11    A.  No, that's not what I mean, no.
12    Q.  Well, I don't want to ask you
13 specifically. I'm asking you generally complaints
14 about the use of profanity. I don't care who said it.
15    A.  Not that I recall.
16    Q.  No, you never got any complaints about
17 Steve Snyder?
18    A.  Other than what was in the letter --
19    Q.  On that one occasion.
20    A.  -- that I asked Mr. Snyder about it.
21    Q.  Any complaints about use of racial slurs?

Page 91

1    A.  Not that I can recall.
2    Q.  Any complaints about threatening behavior?
3 Threatening, I mean physical threatening behavior.
4    A.  Not that I recall. The only thing I know
5 about Mr. Snyder is what we may have addressed based
6 on the letter as far as the nature of what you're
7 asking now.
8    Q.  When we were talking about defining
9 workplace violence and that kind of thing. Got you.
10 That covers the period, we're going to date it now,
11 that covers the period prior to September of 2002, you
12 don't recall any complaints at all?
13    A.  I don't remember when the last complaint I
14 recall was. As I said, I left there in November of
15 2002. So, anything dealing with Mr. Snyder took place
16 prior to that date.
17    Q.  Since November of 2002, who would you
18 discuss these matters with?
19    A.  No one except the times that I mentioned
20 earlier when Mr. Giurfa called inquiring and
1 Mr. James.

Page 92

1    Q.  Today you met with Amtrak's lawyer?
2    A.  Yes.
3    Q.  What was the substance of that
4 conversation?
5    A.  Basically, the same as what we're doing
6 now, other than we didn't go that much into detail as
7 we are now.
8    Q.  Were you asked about documents when you
9 talked to Amtrak's lawyer?
10    A.  I was shown documents.
11    MR. HANNAWAY:  Do you have a copy of
12 whatever he was shown?
13    MS. SUBAR:  No, I don't have it.
14    MR. HANNAWAY:  What was it?
15    MS. SUBAR:  That letter.
16    MR. HANNAWAY:  Then he referenced rules or
17 something.
18    THE WITNESS:  There was one policy.
19    MS. SUBAR:  Which you have.
20    MR. HANNAWAY:  Which one was it?
21    (A discussion was held off the record.)

Page 93

1    MR. HANNAWAY:  I'm done.
2    MS. SUBAR:  I have a few questions.
3    EXAMINATION BY MS. SUBAR:
4    Q.  What was your typical practice if you
5 heard a general conversation, complaint about either
6 an employee or a supervisor? What would you do when
7 you heard complaints of any nature?
8    A.  If I heard it, but the conversation wasn't
9 directed toward me, I really didn't do anything.
10    Q.  Pursuant to Amtrak's policy, were you
11 required to do anything when you overheard
12 conversations?
13    A.  No, because you hear a lot of
14 conversations which are basically hearsay.
15    Q.  If someone comes to you and complains to
16 you about an employee or a particular supervisor, what
17 do you tell that employee?
18    A.  I would instruct that employee to document
19 it and then bring it to me for further action.
20    Q.  So, the first step necessary for you to
21 undertake an informal or formal investigation would be

24 (Pages 90 to 93)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 94

1  a written letter or something in writing from that
2  particular employee?
3      A.   For me, yes.  I can't say that's how all
4  managers did it.  But, for me, yes, I would require a
5  statement in writing in order for me to launch an
6  investigation.
7      Q.   Earlier, you testified that you did
8  conduct an investigation at some point prior to
9  leaving high speed rail in November of 2002 regarding
10  Steve Snyder, correct?
11      A.   Yes.
12      Q.   Whatever letter we brought to your
13  attention, you testified that you interviewed those
14  individuals that were identified in the complaint
15  letter?
16      A.   Yes.
17      Q.   In addition, you interviewed Steve Snyder;
18  is that correct?
19      A.   Yes.
20      Q.   Did you inform the employees involved that
21  you would be speaking with Steve Snyder?

Page 95

1      A.   Yes.  I basically told them that once I
2  received the letter, I did let those employees know
3  that I would be speaking with Mr. Snyder about the
4  accusations in the letter.
5      Q.   Once you spoke to Mr. Snyder and heard
6  what Mr. Snyder had to say, what was your response to
7  Mr. Snyder based on what you heard him tell you?  What
8  else did you say to him?
9      A.   Because Mr. Snyder didn't admit to
10  anything, I basically just reminded him of what I
11  expected out of him as a supervisor as far as certain
12  aspects of his performance goes.  I think that was
13  more detailed towards the one accusation that he said
14  possibly could have happened.
15      Q.   To the best of your recollection, what did
16  you say to Steve Snyder regarding the use of
17  profanity?
18      A.   I don't recall exactly what I said to him.
19  Well, to say anything other than that would be just
20  speculating.
21      Q.   I don't want you to speculate.  I want you

Page 96

1  to tell me to the best of your recollection what you
2  said to Mr. Snyder.
3      A.   I would have said there are policies that
4  don't allow you to speak to your employees in a
5  verbally threatening manner.  In fact, I would not
6  expect to hear any further accusations or hope that I
7  would hear any further accusations of this happening
8  from them against his employees.
9      Q.   Would you describe that as a verbal
10  warning or how would you describe what you said to
11  him?
12      A.   It could be termed as a verbal.  Actually,
13  it's more counseling.
14      Q.   How does counseling differ from a verbal
15  warning?
16      A.   Because a verbal warning to me is done
17  when you know for a fact that the person is guilty of
18  what they're being charged with.  Counseling, I would
19  use just to remind the person of what's expected from
20  them as far as this topic goes.
21      Q.   Again, I may have already asked you this,

Page 97

1  but what did you say to Steve Snyder in quote
2  counseling him?
3      A.   I don't remember exactly what I said to
4  him.  But, it would have had to been something
5  addressing the fact that he may possibly have spoken
6  to his employees with unacceptable language,
7  profanity.
8      Q.   Would you have given guidance to him in
9  the future if such a thing were to happen again?
10      A.   If it were to happen again, then the same
11  thing would have happened.  It would have initially
12  started with an investigation into the matter, a
13  fact-finding investigation.  Then from that point, it
14  would have been determined whether it was necessary to
15  take it to a formal investigation.
16      Q.   So, in this particular situation, you
17  determined that a formal investigation was not
18  warranted?
19      A.   No, I didn't think it was warranted
20  because of the fact that all I had was just the letter
21  saying what went on.  I do remember that not many

25 (Pages 94 to 97)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 98

1  people wanted to step up and really make themselves
2  known as the person making the complaint. So, that
3  being the case, all I had was a letter, which was
4  basically this person writing the letter word against
5  Mr. Snyder's word.
6       Q.   After you had an opportunity to speak to
7  Mr. Snyder, did you ever speak again to the employees
8  who had made the particular complaint?
9       A.   Informally, yes.
10      Q.   Do you recall who you spoke to or just
11 generally that you spoke to individuals?
12      A.   No, I don't recall specifically who it
13 was, but I know I did speak to them because that's
14 just how I do these things. That's how I handle these
15 things. I'm not required to make any formal
16 documentation of my conversations with the complaint
17 after the investigation. But, I know that I will get
18 back to the people concerned to let them know. You
19 know, someone asked me about it. Somebody that would
20 made a complaint, yes, I would tell them that I spoke
21 with Mr. Snyder and the results of our conversation.

Page 99

1       Q.   After the time that you spoke to
2  Mr. Snyder regarding the complaints that had been
3  made, did you ever receive any further written
4  complaints from anyone?
5       A.   Not that I can recall.
6       Q.   If you had received a complaint, would you
7  have had to, pursuant to Amtrak's policy, investigate
8  that complaint?
9       A.   Yes. You got about five minutes. I don't
10 want to cut it too close.
11      MS. SUBAR:  No further questions.
12      EXAMINATION BY MR. HANNAWAY:
13      Q.   All the conversations you just related
14 with respect to Mr. Snyder, that's speculation, isn't
15 it? Do you recall specifically any conversations of
16 what you told Mr. Snyder?
17      A.   I recall specifically having a
18 conversation with Mr. Snyder, but the exact things
19 said, no, I can't.
20      Q.   So, anything you just testified to now in
21 response to questions was what you think you probably

Page 100

1  would have said as opposed to what you did say?
2       A.   That's what I was asked, what would I have
3  said, because I did state that I don't recall exactly
4  what was said.
5       Q.   You said if the profanity, you would have
6  warned that's a violation of Amtrak policy, right,
7  that's your procedure?
8       A.   If profanity was in a manner that made
9  someone feel threatened or was abusive, then, yes,
10 that's a violation of policy.
11      Q.   If someone, an employee felt threatened by
12 someone's behavior, which you have already said is a
13 violation of the workplace?
14      A.   That could be construed as a workplace
15 violation.
16      Q.   You also tell them that's a violation of
17 Amtrak policy?
18      A.   Yes.
19      Q.   Are you saying it's Amtrak policy that
20 you, as a manager of high speed rail, can only bring
21 formal investigations, beyond you, if you quote know

Page 101

1  for a fact that a person is guilty?
2       A.   No, it's not my job to determine whether a
3  person is guilty or not. If there are enough facts to
4  suggest that it needs to be further investigated, then
5  yes, it can go to a formal investigation.
6       Q.   It seems here the investigation you
7  conducted was sort of a he say, she say, so I can't
8  determine what happened?
9       A.   It was pretty much the letter against
10 Mr. Snyder's word.
11      Q.   A letter and you probably, as you said,
12 interviewing anybody else referenced in the letter?
13      A.   Yes.
14      Q.   Based upon all of the interviews, you say,
15 well, Snyder said it probably could have occurred, but
16 it didn't admit it occurred, therefore, no formal
17 investigation?
18      A.   That's because I had no proof of that.
19      Q.   That's fine. You have that authority
20 under Amtrak policy?
21      A.   I can make a recommendation as to whether

26 (Pages 98 to 101)

Dennis Smith - 10/18/05

Page 102

I feel further investigation is necessary.

2     Q.   In this case, you made such a
3 recommendation to not do any further investigation?
4     A.   I felt that based on the information that
5 I was able to gather, that it wasn't going to be
6 adequate to go forward with further investigation or a
7 formal investigation.
8     Q.   That was your recommendation?
9     A.   That was the conclusion I came to, yes.
10    Q.   Did you report that conclusion to someone?
11    A.   Of course, I have to let my superior know.
12    Q.   Who did you let know in this case?
13    A.   Again, we changed, my boss changed like
14 about six or eight months.
15    Q.   The position?
16    A.   The position, I don't remember his
17 specific title, but he was the only manager there who
18 was above myself and the other managers that I
19 mentioned.
20    Q.   So, you would have written something down
21 and sent to him?

Page 103

1    A.   Not necessarily written it down, no.
2    Q.   So, you would have written a summary of
3 all your interviews and your conclusions and all that
4 and put in some file?
5    A.   I would have written a summary of what
6 took place from the start of my investigation to the
7 conclusion.
8    Q.   This would have all occurred, we're
9 assuming in around September of 2002?
10    A.   I don't remember exactly.
11    Q.   Well, if we're all dealing with Amtrak
12 records and you've indicated that's when it was all
13 occurring when you would have forwarded everything.
14 You left in November when of 2002?
15    A.   I left in November. November 1st was my
16 first day in my new position.
17    Q.   So, assuming Amtrak keeps accurate
18 records.
19    A.   Actually, if I can.
20    Q.   Sure. Go ahead.
1    A.   November 1st was when my new position

Page 104

1 officially became official. I don't remember the
2 exact day that I left high speed rail.
3    Q.   Can you ballpark it for us?
4    A.   It was sometime in that area.
5    Q.   A week or two?
6    A.   It was within a couple of weeks of that
7 date, if that long.
8    Q.   So, it was sometime in the first two weeks
9 of November of '02?
10    A.   Yes.
11    MR. HANNAWAY:  I have nothing further.
12 Thank you.
13    MS. SUBAR:  One more question.
14    EXAMINATION BY MS. SUBAR:
15    Q.   You in your capacity as manager of high
16 speed rail, do you have the authority to determine
17 that counseling is warranted after conducting an
18 investigation of a complaint?
19    A.   Yes.
20    MS. SUBAR:  No further questions.
21    EXAMINATION BY MR. HANNAWAY:

Page 105

1    Q.   Have you ever sent anyone to counseling?
2    A.   No.
3    MS. SUBAR:  I said counseling.
4    MR. HANNAWAY:  Counseling, that's what I
5 said.
6    THE WITNESS:  I never sent anyone to
7 counseling.
8    Q.   Did you ever recommend counseling?
9    A.   No.
10    MR. HANNAWAY:  That was your question?
11 Maybe I'm confused.
12    MS. SUBAR:  You're confusing my question.
13 Earlier, he testified regarding counseling. He typed
14 the conversation that he had with Mr. Snyder as
15 counseling. I asked him does he, in his capacity as
16 manager of high speed rail, have the authority to
17 counsel someone if counseling is warranted after
18 conducting an investigation.
19    MR. HANNAWAY:  Oh, him, specifically him.
20    MS. SUBAR:  Right. Does he have the
21 authority to determine that a counseling conversation

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

---

**Page 106**

1 is warranted after an investigation.

2 Q. Where did counseling take place with

3 Snyder?

4 A. The same place that we held the

5 conversation, which there is a little building down at

6 the station that the people who work for Mr. Snyder,

7 they work out of that building, or that's where

8 supplies and things are stored.

9 Q. How long did the counseling session take,

10 not the whole meeting with him, but the counseling

11 session?

12 A. The counseling portion of the

13 conversation, I don't know exactly, but it wouldn't

14 have been any more than a minute or two.

15 Q. You violated the rules. You shouldn't do

16 that. That's wrong. Is that the substance of the

17 counseling that occurs?

18 A. It could be. In that particular case, I

19 don't remember exactly what was said.

20 Q. So, you don't remember what counseling?

21 A. But, I do know that Mr. Snyder was told

---

**Page 107**

1 what I would expect out of him as a supervisor.

2 Q. That was the counseling that you were

3 referring to?

4 A. That was a part of it, yes.

5 Q. There were any number of things you could

6 have done in this instance rather than simply say I

7 don't expect my managers or supervisors to do this

8 type of thing?

9 A. Yes, it could have been more than that,

10 yes.

11 MR. HANNAWAY: Sure. Nothing further.

12 MS. SUBAR: Nothing further.

13 THE REPORTER: Would you like to read and

14 sign or waive?

15 THE WITNESS: Yes, I would like to read

16 it.

17 (Deposition concluded at 12:30 p.m.)

18

19

20

21

---

**Page 108**

1 CERTIFICATE OF DEPONENT

2

3

4 I hereby certify that I have read and

5 examined the foregoing transcript, and the same is a

6 true and accurate record of the testimony given by me.

7

8 Any additions or corrections that I feel

9 are necessary, I will attach on a separate sheet of

10 paper to the original transcript.

11

12

13 _____

14 Dennis Smith

15

16

17

18

19

20

21

---

**Page 109**

1 State of Maryland

2 County of Baltimore, to wit:

3 I, CHUCK PEPPLER, a Notary Public of the

4 State of Maryland, County of Baltimore, do hereby

5 certify that the within-named witness personally

6 appeared before me at the time and place herein set

7 out, and after having been duly sworn by me, according

8 to law, was examined by counsel.

9 I further certify that the examination was

10 recorded stenographically by me and this transcript is

11 a true record of the proceedings.

12 I further certify that I am not of counsel

13 to any of the parties, nor in any way interested in

14 the outcome of this action.

15 As witness my hand and notarial seal this

16 28th day of October, 2005.

17 _____

18 CHUCK PEPPLER,

19 Notary Public

20 My Commission Expires:

21 April 1st, 2006

---

28 (Pages 106 to 109)

Towson Reporting
410-828-4148

/24 GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

```
                                    Page 110
 1                    INDEX
 2           Deposition of Dennis Smith
 3                October 18, 2005
 4
 5    Examination by:              Page
 6       Mr. Hannaway         2, 99, 104
 7       Ms. Subar            93, 104
 8
 9    Exhibit No.              Marked
10    1    Letter From Mr. Charleus      40
11    2    Letter From Ms. Blair         48
12
13
14
15
16
17
18
19
20
21
```

# 7.  DEPOSITION TESTIMONY OF CARLOS OF ALVARADO

Carlos Alvarado - 9/27/05

1    JERRY CHAMBLISS                    : IN THE

2                Plaintiff             : CIRCUIT COURT

3    v.                                : FOR

4    NATIONAL RAILROAD PASSENGER       : BALTIMORE CITY

5    CORP.                             :

                Defendants            : Case No.

6    _____ / 24-C-04-008216

                The deposition of CARLOS ALVARADO was

7    held on Tuesday, September 27, 2005, commencing at 12:54

     p.m., at the National Railroad Passenger Corporation,

8    900 Second Street, N.E., Washington, D.C.  20002, before

9    Okeemah S. Henderson, LSR, Notary Public.

10.  APPEARANCES:

11                    JOHN HANNAWAY, ESQUIRE,

12                        On behalf of Plaintiff

13

14                    ILANA SUBAR, ESQUIRE

15                        On behalf of Defendant

16                        National Railroad Passenger Corp.

17

18

19

20

_1   REPORTED BY:    Okeemah S. Henderson, LSR

Carlos Alvarado - 9/27/05

Page 2

STIPULATION

It is stipulated and agreed by and between counsel
for the respective parties that the filing of this
deposition with the Clerk of Court be and the same are
hereby waived.

- - - - - - - -

Whereupon,

CARLOS ALVARADO,

called as a witness, having been first duly sworn to
tell the truth, the whole truth, and nothing but the
truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF:

BY MR. HANNAWAY:

Q.    Would you state your name, please,
sir?

A.    Carlos Alvarado.

Q.    Mr. Alvarado, my name is John
Hannaway, I represent, I'm an attorney, Mr. Jerry
Chambliss with respect to a lawsuit he's brought against
National Railroad Passenger Corporation, Amtrak for an
incident that occurred on May 10th of 2004. You've been

Page 3

called to appear and testify at this which is called a
deposition. Have you ever been deposed or questioned
like this before?

A.    No.

Q.    This lady is a stenographer, she
writes down everything that you say or I say and she
produces what's called a transcript which is all the
questions and answers. I tell you that because at a
deposition, unlike day-to-day, we can't nod our head
yes, shake our head no and shrug our shoulders I don't
know because she has to write down words. So if I start
doing that or you start doing it, you correct me and
I'll correct you if you start doing it. Okay?

A.    Okay.

Q.    If at any time you can't hear me or
understand me or the question doesn't make sense, I
mumbling, the air conditioner comes on, tell me to speak
up, stop mumbling, your question makes no sense, please,
say it again, and I'll do so?

A.    Okay.

Q.    Don't answer any question that you

Page 4

don't hear. Don't guess. Guessing is variably wrong.
If you're going to give an estimate or an approximation
as to dates or times or who was here when, say I think,
probably as best I can remember. Okay?

A.    Okay.

Q.    If later on like we all do day-to-day
we'll be having a conversation with someone and we'll
say something and 10 minutes later you say wait a
minute, that's not what I meant and it just popped into
my head, just break right in, say what I said before I
meant to say this or whatever, it's normal for that to
occur.

I give you that because if I ask you
a question and you answer it, I'm going to assume that
you heard it, you understood it and you have the present
ability to answer it based upon personal knowledge. If
you need water or a break or anything like that, you let
me know. Okay?

A.    Okay.

Q.    Shouldn't take too long.

A.    All right.

Page 5

Q.    This matter is, as I said, you're
sworn to testify, it's just like being in court, subject
to laws of the State of Maryland even though we're
presently in the District of Columbia, this matter is
pending in the State of Maryland including perjury.
Now, did you meet with anyone prior to your deposition
today?

A.    No.

Q.    Did you meet with the lawyer for
Amtrak?

A.    No.

Q.    Did you just meet with the lawyer from
Amtrak?

A.    Yes. Yes. Sorry

Q.    Okay. And you discussed this matter
I don't want to ask you what was said but you discussed
the nature and extent of your testimony here today --

A.    Yes.

Q.    -- with the lawyer from Amtrak?

A.    Yes.

Q.    Did you meet with anyone else

2 (Pages 2 to 5)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

118

Whitman Reporting- Rockville
301-279-7599

Carlos Alvarado - 9/27/05

Page 6

concerning this deposition questioning today?

2  A.  No.

3  Q.  Did you review any documents?

4  A.  No.

5  Q.  Prior to your testimony here, did you

6  discuss your upcoming testimony with anyone before

7  today?

8  A.  No.

9  Q.  Could you tell me your age and date of

10  birth, please?

11  A.  29 October 22nd 1975

12  Q.  And what's your educational

13  background?

14  A.  I got a GED. I went to a Baltimore

15  county community college for basic electricity for about

16  6 months.

17  Q.  When did you get your GED?

18  A.  In 2000

19  Q.  Where do you presently live?

20  A.  Baltimore, Maryland.

21  Q.  City or county?

Page 7

1  A.  County.

2  Q.  What part of the county do you live

3  in?

4  A.  Dundalk

5  Q.  Are your housing prices going up?

6  A.  Yes.

7  Q.  Are you buying?

8  A.  Yeah. I'm actually selling and

9  buying.

10  Q.  Selling and buying?

11  A.  Yes.

12  Q.  So you're going to take advantage.

13  How long have you been there?

14  A.  Eight years.

15  Q.  So you're going to take advantage of

16  your 8 years and go to another place?

17  A.  Yes.

18  Q.  Are you still working at Ivy City?

19  A.  Yes.

20  Q.  You're going to commute with the gas

prices?

Page 8

1  A.  Well, I got a Toyota Corolla, so.

2  Q.  That's fine. Are you married?

3  A.  Yes.

4  Q.  How long have you been married?

5  A.  Ten years.

6  Q.  Any children?

7  A.  Three.

8  Q.  Sex and age of each?

9  A.  Two girls, 9 and 7 and a boy, he's 2.

10  Q.  Any family members and by that I mean,

11  either family members by marriage or by blood who work

12  for the railroad?

13  A.  Yes. My father-in-law.

14  Q.  And what railroad does he work for?

15  A.  Amtrak.

16  Q.  What's his craft?

17  A.  Conductor.

18  Q.  Where does he work out of?

19  A.  Washington.

20  Q.  Ivy City?

21  A.  Well, Union Station.

Page 9

1  Q.  How long has he been a conductor?

2  A.  32 years, 33, something like that.

3  Q.  Do you presently work for Amtrak?

4  A.  Yes.

5  Q.  How long have you been working for

6  Amtrak?

7  A.  November 9th will be five years.

8  Q.  So 9/9/00 was your date of hire?

9  A.  Yes.

10  Q.  Where did you work before Amtrak?

11  A.  I used to, it's called MTI doing

12  modular furniture.

13  Q.  Where was that?

14  A.  Columbia, Maryland.

15  Q.  Any other jobs other than MTI before

16  Amtrak?

17  A.  Another company called Ciminos it's

18  another modular company. I was there with them for

19  about 4 years and then I guess odds and ends jobs, I

20  guess, like temp agencies, I worked for them, too when I

21  was younger.

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Carlos Alvarado - 9/27/05

1      Q.    Your date of hire was 9/9/2000 and

2  what craft were you hired into?

3      A.    Coach cleaner.

4      Q.    How long were you a coach cleaner or

5  is that your craft?

6      A.    Still that's my craft.

7      Q.    Have you applied for other any

8  positions within Amtrak?

9      A.    Yes.

10     Q.    What have you applied for?

11     A.    Machinist, pipe fitter, electrician.

12     Q.    And you work high speed rail?

13     A.    Yes.

14     Q.    When high speed rail was down, what

15  did you work?

16     A.    The conventional side I guess you call

17  it.

18     Q.    Describe, I know what it is but just

19  for the deposition, what does a coach cleaner do?

20     A.    Takes trash off of the trains, turns

21  seats, clean, the internal and external clean.

1      Q.    You're not, you ever been assigned

2  utility worker at a high speed rail?

3      A.    No.

4      Q.    Legalities on high speed rail, any

5  problems with the water accumulating?

6           MS. SUBAR:  Objection.

7           THE WITNESS:  What do you mean, like

8  --

9  BY MR. HANNAWAY:

10     Q.    You know, like, water pooling up on

11  the floors of the galleries where the on board services

12  were?

13     A.    Yes.  Sometimes there's problems like

14  that because you have, I guess, the freezers and whatnot

15  they get clogged up and water goes all over the place

16  and I have to clean it up.

17     Q.    They come in like that?

18     A.    Sometimes yeah, because it freezes up,

19  you know, too much ice builds up and.

20     Q.    Do you know Steve Snyder?

21     A.    Yes.

1      Q.    How do you know him?

2      A.    He's my foreman.

3      Q.    Is he presently your foreman?

4      A.    No.

5      Q.    When was he your foreman?  You can

6  give the best estimate that you can

7      A.    Okay.  I'll say --

8      Q.    You came in date of hire September of

9  2000  Was he your foreman from your date of hire when

10  you first came on?

11     A.    No.  He was my foreman when I went to

12  high speed.

13     Q.    When did you go to high speed?

14     A.    I'd say roughly 2003 when I couldn't

15  bump anymore.

16     Q.    Let me see if I can jog your memory.

17  Do you recall a co-worker named Harry Charleus?

18     A.    Yes.

19     Q.    Do you recall him making a complaint

20  to the diversity department with respect to Mr. Snyder

21  back in August of 2002?

1      A.    Yes.

2      Q.    Would you have been working high speed

3  rail with Mr. Charleus?

4      A.    Yes.

5      Q.    So were you working, it would have

6  been in 2002 that you --

7      A.    Yes.  It was like 2002, 2003 because I

8  went to high speed.  I don't remember if it was --

9      Q.    Dates approximately?

10     A.    Approximate.  Right.

11     Q.    But if a letter by Mr. Charleus dated

12  August 22, 2002 relating to Mr. Snyder, you would have

13  been working at that time under Mr. Snyder?

14     A.    Yes.

15     Q.    Okay.  And how long was he your

16  foreman in terms of months, years approximately?

17     A.    On and off or?

18     Q.    I understand you have different shifts

19  and he may be the supervisor and that kind of thing?

20     A.    Right.  I'd say I guess since I came

21  to high speed on and off he's been my foreman for about,

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Carlos Alvarado - 9/27/05

Page 14

I guess, 2, 3, years, something like that.
2     Q.    Did you work with a regular crew?
3     A.    On my shifts. Yes.
4     Q.    And what was your shift? We're
5 talking about high speed rail now with Mr. Snyder?
6     A.    It alternated but I could be 11 to 7
7 or 7 at night to 3 in the morning.
8     Q.    And is it alternate -- do you go with
9 the same crew regardless of what shift you're on?
10    A.    No. No.
11    Q.    Did you work with Mr. Charleus at high
12 speed rail?
13    A.    Yes.
14    Q.    Did you work with Doria Washington at
15 high speed rail?
16    A.    Yes.
17    Q.    Did you work with Tyrek Jenkins at
18 high speed rail?
19    A.    Yes.
20    Q.    Did you work with Mr. Chambliss at
21 high speed rail; Jerry Chambliss?

Page 15

1     A.    Yes.
2     Q.    Did you work with Paula Bunch at high
3 speed rail?
4     A.    Yes.
5     Q.    Are you aware of complaints that were
6 made with respect to Mr. Snyder back in 2002?
7     A.    Yes.
8     Q.    What's your understanding of the
9 nature of those complaints?
10    A.    For my complaints or all over?
11    Q.    Generally. Any complaints that you
12 can say this person said this, this person said that?
13    A.    Well, I hear he's not a people person.
14 He's a, I don't know, very sneaky.
15    Q.    Are you aware that Harry Charleus
16 wrote a letter, too, as I referenced before?
17    A.    Yes.
18    Q.    Did you ever see that letter?
19    A.    I think I signed it if that's the
20 letter that I'm thinking of.
     Q.    Do you believe you signed the letter

Page 16

1 also --
2     A.    Yes.
3     Q.    -- with respect to Mr. Snyder?
4     A.    Yes, I think I did.
5     Q.    And was that letter, who was that sent
6 to or?
7     A.    Dennis Smith. I think he sent it to a
8 couple of places like labor relations.
9     Q.    You're saying he, you think Mr.
10 Charleus?
11    A.    Yes. Because he made copies. I know
12 he told me he made copies. I mean, if that's the letter
13 that I'm thinking of.
14    Q.    Is it possibly more than one letter
15 that he wrote?
16    A.    I don't know. I'm not really sure
17    Q.    You referencing a letter that you may
18 have signed?
19    A.    Right.
20    Q.    Are you talking about one letter or
21 possibly more than one letter?

Page 17

1     A.    Well, the only letter that I'm
2 thinking of is the one that I signed because when he
3 cussed at us.
4     Q.    He being Mr. Snyder?
5     A.    Mr. Snyder cussed at us and when he, I
6 guess, when he was playing around and he tried to kick
7 me.
8     Q.    I want to see if you agree with this
9 assertion. What I'm doing is I'm taking some quotes out
10 of the letter Harry Charleus wrote on August 2, 2002 to
11 a Keisha Harglove (phonetic) for the University
12 Department of Amtrak. You said with respect to Mr.
13 Snyder that he used profanity in a threatening manner.
14 Do you agree with that?
15    A.    Yes.
16    Q.    And that he sort of rushed towards
17 people or act in a physical manner that was threatening
18 to them?
19    A.    Yes.
20    Q.    Did you ever make any complaints about
21 Mr. Snyder making or that he had ever done to you?

Carlos Alvarado - 9/27/05

Page 18

1    A.   Yes.
2    Q.   When were these complaints made?
3    A.   Well, dates --
4    Q.   Let me put it a different way.  The
5    complaint that was made with respect to Mr. Snyder, I'm
6    going to tell you that he, I'm referring he to Mr.
7    Chambliss is asserting that he was hit in the head with
8    a book by Mr. Snyder on May 10th of 2004.
9         Let's assume that's the date he's
10   saying.  Were the complaints that you made, complaint or
11   complaints that you made with respect to Mr. Snyder
12   before or after Jerry --
13   A.   It was before.
14   Q.   About how long before, do you know?
15   A.   Maybe a year.
16   Q.   I understand it's all approximation?
17   A.   Yeah.  It's approximate.  I'm sorry
18   Q.   It's okay.  What were you complaining
19   about?  What was the nature of your complaints?
20   A.   Well, he played too much.
21   Q.   What do you mean?

Page 19

1    A.   Like, he trying to touch you
2    physically, like, you know, like, to me he tried to grab
3    my hard hat like I was a little kid, he make, like,
4    little comments like shorty or he will, like, I told
5    her, you know.
6    Q.   Her meaning counsel for --
7    A.   Counsel.  Right.
8    Q.   -- for Amtrak?
9    A.   Right.  I told her that, you know, he
10   tried to kick me.
11   Q.   How did he try to kick you?
12   A.   Playing around, you know.
13   Q.   Did you consider it to be playing
14   around?
15   A.   The way he was coming at me laughing
16   and stuff like that.  Yes.  You know, he was playing
17   around, and I told him the first time when he grabbed my
18   hard hat not to touch me, but I guess he proceeded to
19   keep playing and he tried.
20   Q.   Well, if you were playing around,
21   okay, you thought you were playing around, why -- it

Page 20

1    seems to have upset you; is that correct?
2    A.   Right.
3    Q.   I mean, you complained about it?
4    A.   Right.
5    Q.   If he was, what you categorized as
6    plying around, was that your perception or what you
7    think he was thinking?
8    A.   What he was thinking.
9    Q.   What did you think about it?  How did
10   you feel?
11   A.   I felt, you know, I didn't want him
12   touching me.  I felt, I guess, how you say it, I don't
13   know, offended, I guess, just.
14   Q.   He didn't have the right to touch you?
15   A.   Right.
16   Q.   So when you say playing around, do you
17   think that it was his --
18   A.   His playing around.
19   Q.   In his head, that he's just playing
20   around?
21   A.   Yes.

Page 21

1    Q.   But to your mind, it was something
2    more than that and you found it offensive for him to
3    touch you without permission?
4    A.   Right.
5    Q.   And you said you made a complaint
6    about that?
7    A.   Yes.
8    Q.   Who did you make that to?
9    A.   Well, I think it was Harry and Tyrek,
10   he, I think either Harry wrote the letter or Tyrek and
11   we all signed it, and I think Tyrek or Harry, one of
12   them, sent the letters out, and a couple of days later,
13   Mr. Dennis Smith came down and on the shift -- I know
14   the sift was 7 at night to 3 in the morning and it was
15   almost time to go home and he told us to excuse him out
16   of the room.
17   Q.   Excuse who out of the room?
18   A.   Us.  All the cleaners.
19   Q.   He came down, Mr. Snyder is there,
20   you're in a meeting?
21   A.   Right.  He came down, we were just

6 (Pages 18 to 21)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

132

Page 22

1  waiting to punch out and Dennis came in and told us if
2  he could excuse all of us from the room because he needs
3  to talk to Steve.  We did that but we punched out and
4  went home and he just sat there and talked to him.  Now,
5  whatever they talked about, I don't have no idea
6      Q.   And it's your understanding it was
7  something about whatever you put down in the letter?
8      A.   Yes.  Because.
9      Q.   Complaining about this guy, guy being
10 Snyder touching you without your permission?
11     A.   Yes.  And verbally saying racial slurs
12 and.
13     Q.   I'll get to that.  I'm talking about
14 physical stuff.
15     A.   Right.
16     Q.   Yanking your hard hat, safety
17 equipment.  Did he, like, take it off?
18     A.   No.  He was, like, trying to grab the
19 front of it, you know, like, I don't know, like, he
20 thought it was a baseball cap and whatnot, push it down
21 I told him I said, come on, man, don't touch me.

Page 23

1      Q.   Did he say anything to you while he
2  was doing that that you recall?
3      A.   No, I can't recall I'm sorry.
4      Q.   Is it on this same incident that the
5  attempted kicking occurred?
6      A.   Yes.
7      Q.   And tell me, describe what happened
8  there?  What were you doing at the time?
9      A.   We were actually in the cafe car and
10 that's when he tried to grab my hard hat and I told him
11 not to, please, and then as me and Tyrek was walking out
12 because I believe we were trashing the trains that
13 night, we were walking out, me and Tyrek were having a
14 conversation and that's when before he walked out of
15 the, I guess, when he walked out of the cafe car, that's
16 when I was along the side of the train and he attempted
17 to kick me and he was laughing but I, you know, he never
18 got to kick me.
19     Q.   How do you know he attempted to kick
20 you?
21     A.   Because I blocked it.

Page 24

1      Q.   You mean, did he walk right up to you
2  face-to-face?
3      A.   No.  Sideways  You know, kind of like,
4  you know how you and your son, you kind of get the, you
5  know, you walk in and you kick him in the butt, that
6  type of thing.
7      .Q.   Yes.
8      A.   That type.
9      Q.   Did you again tell him look, don't
10 touch me?
11     A.   Right.  I told him, I said, you keep
12 touching me, you know.
13     Q.   As a result of that incident, you
14 wrote to someone or brought it to the attention of and
15 Dennis Smith investigated it?
16     A.   Right.
17     Q.   Any other incidents where he's touched
18 you?
19     A.   No.
20     Q.   How about verbal.  You said you agreed
21 with the statement and he used profanity in a

Page 25

1  threatening manner  His voice and you could anticipate
2  the apprehensiveness of him being violent; is that
3  accurate?
4      A.   Yes.
5      Q.   Describe for me?
6      A.   Well, there's a couple of incidents.
7  The first incident was when we were, they called him
8  from the facility to tell us to grab all the cleaners so
9  we can go to the facility to get the trains out for the
10 morning run and, of course, we all were going walking
11 along the tracks and Ms. Doria Washington she was
12 already in the van and I was, I think the -- I was the
13 second one and.
14     Q.   So you all were walking to the van to
15 take you down to the train?
16     A.   Yes.  And he was on a cell phone and I
17 don't know who he was talking to but I know he said
18 something about -- is it okay to cuss?
19     Q.   Yes.  It's not okay but in these
20 circumstances  Yes.
21     A.   Well, he said something in the words

7 (Pages 22 to 25)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 26

1  of if these slow ass bitches will come on, then we can
2  go, we'll get there, and that's when Ms. Doria looked at
3  me and said, in a low, just looked at me, like, did you
4  hear that? You know and I said yeah, yeah, I heard it.
5      Q.    Is that the same time that he used the
6  word nigger describing you all?
7      A.    I believe so, but I don't know if that
8  was going or coming back to the station
9      Q.    So some time in that same work day?
10     A.    Some time that same work day.
11     Q.    The N word was used directed towards
12  you all?
13     A.    Yes.
14     Q.    And what did he say?
15     A.    I didn't hear the word but when we
16  were going back to the station, he said something to
17  Tyrek and Tyrek got really offended about it and he was,
18  Tyrek was going to get out of the van and go and catch
19  the shuttle bus but he told something to Steve Snyder, I
20  can't recall exactly what he said, but I know he
21  offended Tyrek and all of us, too and they got to

Page 27

1  yelling and told Tyrek, told Tyrek him to stop, to stop
2  the van and that he needs to get out and all this but
3  Steve never listens any way. So then we just proceeded
4  to come back to the station, but I know he said
5  something but I can't recall what he said.
6      Q.    Have you heard recently, he referring
7  Mr. Snyder, referring to people as jungle bunnies? Have
8  you heard of that?
9      A.    No.
10     Q.    Did you make a complaint with respect
11  to that incident in and out of the van and that kind of
12  thing?
13     A.    Yeah. I think we all did because
14  between he tried to kick me and all the cussing and
15  going around I think either Mr. Harry or Tyrek wrote
16  everything down and we signed it. So I don't know if
17  that was one letter or maybe the second letter but I
18  know it was the first letter that he got?
19     Q.    After you complained, did Mr. Snyder's
20  demeanor or manner of operating change in any way?
21     A.    A little bit, not a lot. Just, I

Page 28

1  guess, the type that if you leave us alone to do what we
2  got to do, then, you know, we'll get the job done, that
3  type of thing. You don't talk to us, we don't talk to
4  you, just tell us what to do and we'll do what we got to
5  do, that type of thing.
6      Q.    But when he had to deal with you, was
7  his temperament and demeanor and use of language and
8  threatening manner still the same?
9      A.    Well, not really because he was trying
10  to, I guess he was more of a mellow out or trying to be
11  that other person, that cool cat, you know, type of.
12     Q.    Did he succeed?
13     A.    Yeah. I mean, he doesn't mess with me
14  anymore. Me, personally He don't talk to me anymore
15  because he's not my foreman but he tells me what I got
16  to do when he's there, but besides that, he don't say
17  nothing to me while I'm there, tells me what to do and
18  I'm on my merry way and do what I got to do
19     Q.    Did you ever talk to Mr. Jerry
20  Chambliss about the complaints that he had with Mr.
21  Snyder?

Page 29

1      A.    Yes. Over the phone.
2      Q.    And what was the nature of that
3  conversation and the substance of it? What was said?
4      A.    Me and Jerry, he told me that if I
5  could, I guess, meet up with you guys, and I told him,
6  you know, at first I was trying to get a job here as a
7  mechanic, so I told Jerry I said I don't know if this is
8  going to really effect me and whatnot. I'm trying to
9  move up in the company and what and my wife told me, she
10  said not to get involved with it, and I tried not to and
11  you know, I was going to help him, you know, but then I
12  was trying to, like I said, move up, trying to do this
13  and they said that if you're trying to help Jerry that,
14  you know, you might not get the position at high speed.
15     Q.    Who said that?
16     A.    My wife. We were just talking about
17  it. So then I called Jerry and I said I hope you don't
18  get mad at me or whatnot and he understood. So then
19  when I received the letter from Dino, it was from Dino
20  and I was like, all right. So then
21     Q.    The letter relating to coming down

8 (Pages 26 to 29)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Carlos Alvarado - 9/27/05

Page 30

1    here being questioned?
2        A.   Yes.  And I totally forgot about it
3    because I work part time at Sears, so I called Dino back
4    and he was, like, oh, you know, screwed me, blah, blah,
5    blah but then when I got the second letter, I said, okay
6     So I told my wife to remind me.  I took off work to
7    come here so.
8        Q.   And she did remind you?
9        A.   Yes
10       Q.   Other than what you described, have
11   you ever complained or talked with anyone about Mr.
12   Snyder's behavior; the hitting, kicking, threatening?
13       A.   No.  Just among us, just the cleaners
14   and stuff like that, people.
15       Q.   Were you present when Mr. Chambliss
16   was hit in the face with the book?
17       A.   No, because -- Jerry, he works
18   daylight.
19       Q.   I understand  In this year, 2005, have
20   you been called in and asked to and gone ahead and
21   talked to any Amtrak personnel about this incident with

Page 31

1    Mr. Chambliss?
2        A.   No.
3        Q.   Any investigations, 2005 talking to
4    anyone with Amtrak with respect to your prior complaint
5    yours and Mr. Charleus or any co-employees' complaints
6    with respect to Mr. Snyder?
7        A.   No.
8            MR. HANNAWAY:  I have nothing
9    further.  Thank you.
10           MS. SUBAR:  I just have a few
11   questions.
12   EXAMINATION BY COUNSEL FOR THE DEFENDANT:
13   BY MS. SUBAR:
14       Q.   Before when you testified regarding an
15   attempted kicking, did Steve Snyder actually ever kick
16   you?
17       A.   No.  He tried.
18       Q.   And you testified that from his
19   prospective he was playing around with you during that
20   time?
21       A.   Yes.

Page 32

1        Q.   Also you testified that Dennis Smith
2    excused employees to speak with Steve Snyder either the
3    next day or you said a few days after the group had
4    reported the incident, correct?
5        A.   Yes.
6        Q.   Did Dennis Smith, after he spoke to
7    Steve Snyder because you weren't there at that
8    conversation, did Dennis Smith ever come back to either
9    you or any of the other employees in your presence and
10   report back what he had spoken to Steve Snyder about or
11   you never heard from Dennis Smith again?
12       A.   No, I didn't really hear from Dennis
13   Smith.  I mean, I seen him but everything that he talked
14   to Steve Snyder about was kind of confidential, but it's
15   like I talked to him and stuff and Dennis Smith, he'll
16   tell me something like you shouldn't have a problem with
17   Steve Snyder anymore but that's about it.
18       Q.   But you did have that conversation
19   with Dennis Smith after he spoke to Steve Snyder?
20       A.   That was, like, a week or two later.
21       Q.   Did he come to find you or this was

Page 33

1    just the next time you saw Dennis Smith?
2        A.   That's the next time I saw him walking
3    around.
4        Q.   And after the time that Dennis Smith
5    spoke to Steve Snyder, did you have any problems with
6    Steve Snyder from the prospective did he ever try to
7    kick you after that time?
8        A.   No.
9        Q.   Did he ever act in a threatening
10   manner to you where you felt threatened by Steve Snyder
11   physically?
12       A.   No, not after all that.  No.
13       Q.   When you say after all that, what are
14   you referring to?
15       A.   After Dennis Smith talking to him and
16   the letters and stuff like that
17           MS. SUBAR:  Nothing further.
18   EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
19   BY MR. HANNAWAY:
20       Q.   With respect to Mr. Snyder attempting
21   to kick you, he didn't kick you because you blocked the

9 (Pages 30 to 33)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

/ 35

Carlos Alvarado - 9/27/05

Page 34

1  kick, correct?
2      A.   Yes.  I kind of blocked him
3      Q.   And Mr. Snyder thought he was plying
4  around, you didn't like being touched without his
5  permission, didn't you?
6      A.   Right.
7      Q.   It upset you?
8      A.   Right.
9      Q.   Kind of made you annoyed?
10     A.   Yes.
11     Q.   What is this guy putting his hands on
12  me for without my permission?
13     A.   Right.
14     Q.   Who does he think he is?
15     A.   Right.
16          MR. HANNAWAY:  No further questions.
17     (Deposition concluded at 1:27 p.m.)
18
19
20
21

Page 35

1  City of Washington
2  District of Columbia, to wit:
3          I, Okeemah S. Henderson, LSR and
4  Notary Public of the District of Columbia, County of
5  Baltimore City, do hereby certify that the within-named
6  proceedings took place before me at the time and place
7  herein set out.
8          I further certify that the
9  proceedings were recorded stenographically by me and
10  this transcript is a true record of the proceedings.
11          I further certify that I am not
12  of counsel to any of the parties, nor an employee of
13  counsel, not related to any of the parties, nor in any
14  way interested in the outcome of this action.
15
16          _____
17          Okeemah S. Henderson, LSR
18          Notary Public
19
20  My Commission Expires:
21  February 28, 2010

Page 36

1              INDEX
2      Deposition of CARLOS ALVARADO
3          September 27, 2005
4
5  Examination by:              Page
6
7  Mr. Hannaway                 2, 33
8  Ms. Subar                    31
9
10
11  Exhibit Number:              Marked
12
13      (There were no exhibits marked.)
14
15
16
17
18
19
20



Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

# 8. DEPOSITION OF DAWN MARCELLE

137