# 6. DEPOSITION TESTIMONY OF DENNIS SMITH

96

Page 1

1   JERRY CHAMBLISS                    IN THE

2          Plaintiff                   CIRCUIT COURT

3   vs.                                FOR

4   NATIONAL RAILROAD PASSENGER        BALTIMORE CITY

    CORPORATION

5                                      24-C-04-008216

           Defendant

6   _____/

7

8          The deposition of DENNIS SMITH was held on

9   Tuesday, October 18, 2005, commencing at 10:30 A.M.,

10  at the Law Offices of Whiteford, Taylor & Preston,

11  7 St Paul Street, Suite 12K, Baltimore, Maryland,

12  21202, before Chuck Peppler, Notary Public.

13

14  APPEARANCES:

15          JOHN F. HANNAWAY, ESQUIRE

                On behalf of Plaintiff

16

            ILANA SUBAR, ESQUIRE

17              On behalf of Defendant

18

19  ALSO PRESENT:  JERRY CHAMBLISS

20

21  REPORTED BY:  Chuck Peppler    97

Dennis Smith - 10/18/05

Page 2

STIPULATION

1    It is stipulated and agreed by and between
2
3    counsel for the respective parties that the filing of
4    this deposition with the Clerk of Court be and the
5    same are hereby waived.
6    - - - - - - -
7    Whereupon,
8             DENNIS SMITH,
9    called as a witness, having been first duly sworn
10   to tell the truth, the whole truth, and nothing but
11   the truth, was examined and testified as follows:
12            EXAMINATION BY MR. HANNAWAY:
13   Q.   Would you state your name, please, sir?
14   A.   Dennis Smith.
15   Q.   It's, S-M-I-T-H, your last name?
16   A.   Yes.
17   Q.   Mr. Smith, this is called a deposition,
18   what we're going through here today.  Have you ever
19   been deposed before?
20   A.   Yes, I have.
21   Q.   Under what circumstances was that?

Page 3

1    A.   There was another lawsuit involving an
2    Amtrak employee.
3    Q.   In what capacity were you deposed?
4    A.   Just as a witness in the claimant's case.
5    Q.   Then you're familiar with how this
6    deposition occurs.  Let me just give you some
7    guidelines.  This gentleman here is a stenographer.
8    He takes down everything you or I say or your attorney
9    says verbatim.  We receive back a transcript in
10   question and answer form all typed up.  I tell you
11   that because we both have to speak.  We can't nod our
12   heads yes, shake our heads no or shrug our shoulders I
13   don't know.  If I start doing that, you can tell me to
14   stop and I'll do the same for you.  If we continue,
15   he'll tell us both to stop.
16        If I ask you a question and you don't
17   understand it because of the way it's phrased, don't
18   answer it.  Say I don't understand what you're saying.
19   If you don't understand the question because I mumble
20   or you can't hear me, tell me to speak up and I will
21   ask you the question again.

Page 4

1         If you don't understand a question, you
2    don't know the answer, say I don't know.  I don't want
3    you to guess here today.  If you feel comfortable
4    giving an estimate of a date, time, something like
5    that, feel comfortable in giving that estimate, but
6    call it an estimate.
7         If later on you remember something
8    different than what you testified to, someone could
9    ask you what did you did yesterday afternoon.  You'll
10   say something.  Then you'll go, oh, wait a minute, I
11   didn't mean to say that 20 minutes later.  I made a
12   mistake.  That was last Saturday.  This past Saturday,
13   I went here and did this thing.  Break in.  Say
14   remember that question I went over before or I
15   answered before, I would like to change it.
16        The reason I give you that preamble is
17   because if I ask you a question and you give an
18   answer, I'm going to assume that you heard the
19   question, you understood it and you're basing your
20   answer on personal knowledge.  Fair enough?
21   A.   Yes.

Page 5

1    Q.   If at any time you need a break for
2    anything, let us know.  This is being conducted
3    pursuant to a case that's pending in the Circuit Court
4    for Baltimore City.  It's a less informal than
5    testifying in court.  But, what you testify in this
6    case, what you say here today could be brought up in
7    court in a certain format.
8         Could you outline your educational
9    background for me?
10   A.   A high school graduate.
11   Q.   Where did you graduate?
12   A.   Southern High School in Baltimore,
13   Maryland.
14   Q.   When did you graduate?
15   A.   1979.
16   Q.   Did you have any training or education of
17   any kind after 1979?
18   A.   Yes, a couple of months of college at a
19   community college in California.  Sequoia Community
20   College, I believe it was called.
21   Q.   You were raised in Baltimore?

2 (Pages 2 to 5)



Page 6

1    A.    Yes.
2    Q.    Are you presently married?
3    A.    No.
4    Q.    Have you ever been married?
5    A.    Yes.
6    Q.    When and for how long were you married?
7    A.    Eight years, from 1982 until eight years
8    after that.
9    Q.    Do you have any children?
10   A.    One.
11   Q.    Is that a boy or a girl?
12   A.    Girl.
13   Q.    How old is she?
14   A.    Twenty.
15   Q.    What is your Social Security number?
16   A.    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.
17   Q.    Your date of birth?
18   A.    11/16/61.
19   Q.    When did you go to the community college?
20   Was it right after high school?
21   A.    No, it was a couple of years after I

Page 7

1    joined the Marine Corp.
2    Q.    When did you join the Marine Corp?
3    A.    In July of 1979.
4    Q.    Right after graduation?
5    A.    Yes.
6    Q.    What rank did you achieve?
7    A.    E-4.
8    Q.    How long were you in the military for?
9    A.    Four years.  Four years active, two years
10   inactive reserves.
11   Q.    Assignment is not the right word, but what
12   were your responsibilities and duties?
13   A.    Electrical equipment technician.
14   Q.    So, you got out of active duty in '83?
15   A.    Yes.
16   Q.    Where were you discharged from?
17   A.    Camp Pendleton, California.
18   Q.    Was it right after that when you went to
19   community college?
20   A.    No, it was during my first year of being
21   stationed at Camp Pendleton.

Page 8

1    Q.    While in the Marine Corp?
2    A.    Yes.
3    Q.    When did you return to Baltimore after the
4    Marines?
5    A.    I returned to Baltimore upon discharge,
6    July of 1983.
7    Q.    Does your work history start at that
8    point?
9    A.    Yes.  I started working approximately two
10   to three months after being discharged, however, not
11   at my present, my later employment.
12   Q.    Where did you go to work after the
13   military service?
14   A.    I worked for an agency at a company in
15   Columbia, Columbia Data Products.
16   Q.    What did you do there?
17   A.    Quality assurance technician.
18   Q.    What does that mean?
19   A.    You inspected printed circuit boards and
20   other components for computers in a assembly line
21   setup.

Page 9

1    Q.    How long did you work there?
2    A.    I think it was about four or five months.
3    Q.    After that, where did you go work at?
4    A.    At my present place of employment, Amtrak.
5    Q.    So, that would have bought us to sometime
6    in '83, you went to work at Amtrak?
7    A.    It was '84.
8    Q.    You have been at Amtrak since then?
9    A.    Yes.
10   Q.    What was your first job with Amtrak?
11   A.    My first job with Amtrak was as a block
12   operator.
13   Q.    What craft was that?
14   A.    It's in the transportation department,
15   which is basically like the railroad version of an air
16   traffic controller.
17   Q.    What did you do there as a block operator?
18   A.    As a block operator, I was responsible for
19   aligning routes, establishing signals for trains
20   running along the northeast corridor, at that
21   particular time between Washington and Philadelphia.

3 (Pages 6 to 9)

Dennis Smith - 10/18/05

Page 10

1   Q.   Where did you work physically?
2   A.   Various locations.  There were towers that
3   were ever so many miles along the railroad.  For the
4   most part while I was in that position, I worked what
5   they called the extra board, which means you didn't
6   have a regular shift, regular hours.
7   Q.   You get assigned to whatever, on call?
8   A.   Yes.
9   Q.   How long were you a block operator?
10  A.   Approximately, two years.
11  Q.   So, to about '87?
12  A.   About like that.  I was a block operator
13  approximately two years.
14  Q.   That was until about '87?
15  A.   More like '86, I believe.
16  Q.   Where did you go after that with Amtrak?
17  A.   Then I went from block operator to train
18  director.
19  Q.   What does a train director do?
20  A.   Train director is basically the same
21  thing, except for the fact that you have more control

Page 11

1   over what happens.  A block operator, you follow the
2   directions of a dispatcher.  As train director, you're
3   both an operator and dispatcher and a few other areas
4   of responsibility also.
5   Q.   Were any of the responsibilities as a
6   train director administrative in nature?
7   A.   Yes.
8   Q.   Dealing with personnel and that kind of
9   stuff?
10  A.   No, not of that nature.
11  Q.   What were your administrative
12  responsibilities as a train director?
13  A.   Well, administratively, I take care of
14  paperwork.  There are various forms of paperwork that
15  went along with the job.
16  Q.   So, none of your responsibilities dealt
17  with personnel matters?
18  A.   No.  There were four positions at this
19  location with one position being the train director in
20  charge, which basically meant that you were not the
21  supervisor of the other three people who worked with

Page 12

1   you, but you were the one that made the decisions as
2   far as the movement of the trains.
3   Q.   How long were you a train director?
4   A.   Probably 12, 13 years.
5   Q.   '87?
6   A.   I don't recall what year.
7   Q.   Where did you hold that position?
8   A.   In Washington, D.C.
9   Q.   Was that at Ivy City that you held that
10  position?
11  A.   No.
12  Q.   Where was it?
13  A.   At the station, Union Station.
14  Q.   Then what was your next job with Amtrak?
15  A.   Supervisor of operations.
16  Q.   Supervisor of what?  Did it comprise of a
17  geographical location?
18  A.   No, it was basically a liaison between all
19  the various departments involved in the movement of
20  trains both locally and nationally.
21  Q.   Where did you work out of?

Page 13

1   A.   Washington, Union Station.
2   Q.   Was your office located in Union Station?
3   A.   Not in the station, no.
4   Q.   Where was it located?
5   A.   There is an office building across the
6   tracks from the station, which is in the same vicinity
7   as the station.
8   Q.   Do you know what street it's on?
9   A.   Second Street.
10  Q.   How long did you hold that position for?
11  A.   Approximately, four years.
12  Q.   Which takes us to?
13  A.   1990, I think.  A little further than
14  that.  I'll have to think on that for a second.  I'll
15  have to go back and count from the block operator
16  status to tell you a year, approximately the year I
17  went into that position.
18  Q.   Then what was your position after that?
19  A.   My position after that was manager of high
20  speed train operations.
21  Q.   When Accela came in, you switched over

4 (Pages 10 to 13)

Dennis Smith - 10/18/05

Page 14

1  there?
2      A.   Yes.
3      Q.   Can you date that for me?
4      A.   Not really.
5      Q.   We're into 2000?
6      A.   It's either 1999 or 2000, I believe.
7      Q.   As manager of high speed rail, what were
8  your responsibilities?
9      A.   My main responsibilities were to
10 coordinate the movement of high speed trains from the
11 mechanical facility to the station.  However, as a
12 manager, your responsibilities are always subject to
13 change.
14     Q.   How long did you hold that position?
15     A.   Approximately, three years.
16     Q.   Do you recall when you left that position?
17     A.   I left that position, November 1st of this
18 year will be three years.
19     Q.   11/1/05?
20     A.   It will be three years that I have been
21 gone from that position.

Page 15

1      Q.   I might have asked you.  What is your
2  present position?
3      A.   My present position is train manager.
4      Q.   Was part of your responsibilities as
5  manager of high speed rail to deal with personnel
6  matters?
7      A.   Yes.
8      Q.   What type of personnel matters would you
9  deal with?
10     A.   Any type that came up.
11     Q.   Give me some examples.  I'm unfamiliar.
12 You're the boss.
13     A.   Absenteeism matters, training situations,
14 scheduling, and again there were so many others that
15 you can't characterize.  They just came on a daily
16 basis.
17     Q.   Were you ever what's called a charging
18 officer?
19     A.   Yes.
20     Q.   Was that when you were the manager of high
21 speed rail?

Page 16

1      A.   Yes.
2      Q.   Were you ever a charging officer in any of
3  your other capacities?
4      A.   No.
5      Q.   Are you presently as the train manager a
6  charging officer?
7      A. ' Yes.
8      Q.   What is a charging officer?
9      A.   A charging officer is basically a person
10 that conducts the investigation into possible
11 violation of rules and regulations.  If the
12 information warrants a formal investigation, then the
13 charging officer basically serves as, I guess the
14 prosecuting attorney, I guess you could say.
15     Q.   Deciding whether or not to bring charges
16 and if so what charges to bring?
17     A.   Yes, and proving those charges.
18     Q.   Prior to your job as manager of high speed
19 rail, would that have also entailed conducting any
20 investigations with respect to complaints made by
21 employees to the actions of supervisors or foremen?

Page 17

1      A.   Anything that was in noncompliance with
2  the rules and regulations that we were obligated to
3  work by.
4      Q.   Is that a yes?
5      A.   Yes.
6      Q.   You would receive referrals concerning
7  complaints that employees made about supervisors?
8      A.   No, we need referrals.
9      Q.   Well, how would you hear about complaints?
10 You tell me what the Amtrak lingo is.  How would you
11 hear about a complaint an employee had about a
12 supervisor?  Would someone call you?  Would they write
13 you a letter?  Would you get an e-mail?
14     A.   You would hear about complaints, just
15 hearsay.  You would hear about complaints in just your
16 general conversations with your employees.
17     Q.   Any other method you would hear about
18 complaints?
19     A.   If someone had a complaint for which they
20 wanted specific actions taken against, then you may
21 have something written, documented.

5 (Pages 14 to 17)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 18

1    Q.    What would those written documents be?
2  What form would they be in?
3    A.    Just a letter, a handwritten or typed
4  letter from the person filing the complaint.
5    Q.    From an employee?
6    A.    Yes.
7    Q.    Would you ever receive a referral of
8  complaints that an employee made to another division
9  within Amtrak?
10    A.    I don't recall having anything like that,
11  no.
12    Q.    Never?
13    A.    Not that I can recall.
14    Q.    Would the labor relations people ever
15  contact you and say we got a problem here and send you
16  a letter?
17    A.    Most complaints that went to labor
18  relations came from us.
19    Q.    I'm asking you, do you recall ever
20  receiving complaints forwarded to you from the labor
21  relations people?

Page 19

1    A.    No, I don't.
2    Q.    So, you have no recollection of that ever
3  occurring during your career as the manager of high
4  speed rail?
5    A.    Not that I can recall.
6    Q.    Do you recall ever receiving a request
7  from labor relations concerning complaints made by,
8  let's see, Harry Charleus?
9    A.    I don't recall receiving anything from
10  labor relations, no.
11    Q.    What do you recall concerning those
12  complaints?
13    A.    Nothing specific from Mr. Charleus that I
14  can definitely say was from Mr. Charleus.
15    Q.    I'm asking whether it's from Mr. Charleus
16  or anyone. I'm asking you what you presently recall
17  concerning any complaint made by Mr. Charleus.
18    A.    I don't recall anything specific made by
19  Mr. Charleus that I can recall.
20    Q.    Do you recall anything generally that you
21  recall receiving?

Page 20

1    A.    The only thing I can recall was a letter.
2  I don't remember where the letter came from, but I do
3  recall Mr. Charleus being mentioned in the letter.
4    Q.    Do you recall what the contents of the
5  substance of the letter was?
6    A.    Yes. The letter was in relation to
7  Mr. Snyder.
8    Q.    Were you shown by anyone here today or at
9  any time, let's say in the past month, a letter from
10  Mr. Charleus?
11    A.    Yes.
12    Q.    When did that occur?
13    A.    Today.
14    Q.    You reviewed that letter?
15    A.    Yes, I did.
16    Q.    Do you recall receiving that letter?
17    A.    No, I don't.
18    Q.    Did you review any other documents?
19    A.    Let me change my answer to I don't recall
20  receiving the letter. However, when I read the letter
21  today, I did recall having seen the letter before.

Page 21

1    Q.    It refreshed you saying oh, yeah, I got
2  this.
3    A.    I read this, yes.
4    Q.    What other documents did you review in
5  preparation for your testimony today?
6    A.    Just one of the policies. I don't
7  remember exactly which policy it was, an Amtrak
8  policy.
9    Q.    What did it pertain to?
10    A.    I can't recall because there are so many
11  policies that we have. I looked at the document that
12  was put in front of me and recognized it as one of
13  Amtrak's policies, but I can't say specifically.
14    Q.    How long ago did you look at this policy?
15    A.    Maybe 30, 45 minutes ago.
16    Q.    You don't remember. Did you read it?
17    A.    I didn't read it verbatim, no. I did look
18  at it.
19    Q.    You don't remember what the topic was?
20    A.    I identified it as an Amtrak policy.
21    Q.    So, you were able to identify it,

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 22

1   understand what it was 30 minutes ago and say yeah,
2   that's an Amtrak policy?
3       A.   Yes.
4       Q.   But, 30 minutes later, you can't remember
5   what the policy was pertaining to?
6       A.   Not specifically what policy it was. I
7   don't remember the specific policy of what it was.
8   Most of our policies of that nature, they all look the
9   same in form.
10      Q.   I understand. Do you recall what the
11  policy pertained to?
12      A.   It had something to do with the
13  allegations of this case.
14      Q.   Well, what? Tell me what the policy was
15  about.
16      A.   Well, if I can tell you exactly what it
17  was about, I can tell you exactly what policy it was.
18      Q.   I don't care about the policy number. I
19  don't care word for word. I'm asking you what the
20  substance of what you read 30 minutes ago in
21  preparation of this deposition.

Page 23

1       A.   I did not read the policy itself. I
2   looked at the document and I identified it as an
3   Amtrak policy.
4       Q.   But, you don't have any idea what the
5   policy dealt with?
6       A.   I just know it had something to do with
7   the nature of this case.
8       Q.   What did it have to do with the nature of
9   the case?
10      A.   Well, again, if I could say specifically
11  what it had to do with -- I mean, it could have been
12  the harassment policy. It could have been the
13  workplace violence policy. I don't remember exactly
14  which it was. I just identified it as an Amtrak
15  policy.
16      Q.   If you don't know what the substance of it
17  was, how did you arrive at the conclusion that it
18  pertains to this case?
19      A.   Because it was presented to me in relation
20  to this case.
21      Q.   You just said you looked at it and said

Page 24

1   yes, this policy pertains to this case. That was your
2   conclusion after looking at the Amtrak policy?
3       A.   Yes.
4       Q.   If you don't know what the policy was
5   about, how do you arrive at the conclusion that it
6   pertains to this case? It could have been a policy
7   about throwing switches.
8       A.   No, I wouldn't have identified that policy
9   as relating to this case as I know it.
10      Q.   I understand. But, in order to arrive at
11  the conclusion that it pertains to this case, you had
12  to know what the policy was, correct?
13      A.   Yes.
14      Q.   Then what was the policy?
15      A.   The policy, I don't know specifically, but
16  as I said, it could have been the policy that speaks
17  to harassment or speaks to workplace violence or a
18  couple of other things that I feel, as much as I know
19  what this case is about, could have related to this
20  case.
21      Q.   You're familiar with the Amtrak policy

Page 25

1   that relates to harassment?
2       A.   Yes, I'm familiar with it.
3       Q.   Tell me the Amtrak policy related to
4   harassment.
5       A.   Tell it to you how?
6       Q.   As a manager of high speed rail who just
7   testified that you deal with all sorts of personnel
8   decisions, presumably those dealing with harassment
9   also, correct?
10      A.   Yes.
11      Q.   So, as part of your responsibilities, when
12  you were the manager of high speed rail, was to deal
13  with harassment and Amtrak policies of harassment.
14      A.   Yes.
15      Q.   Amtrak trains, you would deal with that,
16  correct?
17      A.   Amtrak did not give specific training
18  dealing with that, not to me anyway. You attended
19  classes that informed you of policies that were in
20  place.
21      Q.   One of those you just mentioned was

7 (Pages 22 to 25)

Dennis Smith - 10/18/05

Page 26

1   harassment?
2      A.   Yes.
3      Q.   Which may or may not have been the
4   document you reviewed here today prior to coming here?
5      A.   Yes.
6      Q.   It was your responsibility as manager of
7   high speed rail to deal with and to understand
8   Amtrak's harassment policy and apply it with respect
9   to your responsibilities when dealing with personnel
10  decisions, correct?
11     A.   Yes.
12     Q.   What is Amtrak's harassment policy?
13     A.   I don't know the policy verbatim.  If
14  there's a case for which the harassment policy I feel
15  is relevant, I will pull out the policy.
16     Q.   Then you have pulled out the harassment
17  policy to review through your career?
18     A.   I have.
19     Q.   Tell me your understanding of Amtrak's
20  harassment policy.
21     A.   There are several sections of the policy,

Page 27

1   which again I cannot state to you verbatim.
2      Q.   I'm not asking you verbatim.
3      A.   Well, for me to explain my understanding
4   of the policy, again, I have to make sure you
5   understand that there are several sections of the
6   policy, some of which may pertain to certain cases and
7   some of which may not.
8      Q.   That's fine.  Go ahead and answer.  Tell
9   me what your understanding of Amtrak's harassment
10  policy is.
11     A.   My understanding of the policy is that the
12  specific items listed in the policy are not to be
13  tolerated.
14     Q.   Which ones do you recall?  Tell me what's
15  not to be tolerated.
16     A.   There are different forms of harassment.
17     Q.   Tell me what the different forms are that
18  you recall.
19     A.   Racial, verbal.  Those are the two main
20  ones that come to mind.
21     Q.   What would racial harassment be?  Give me

Page 28

1   an example.  How about calling someone a nigger?
2      A.   It depends on who's calling that person a
3   nigger.
4      Q.   The supervisor calls employees a nigger.
5      A.   Well, for it to be considered a racial
6   incident, then the race of the people involved would
7   really play a big part in that.
8      Q.   The supervisor's white and the employees
9   are black and calls them niggers.
10     A.   Are you asking would I consider that as
11  racial harassment?
12     Q.   You're the supervisor.  You're trained in
13  harassment.  Does Amtrak consider that to be a form of
14  harassment?
15     A.   Based on the policy as I would apply it,
16  it would be my determination that would be form of
17  racial harassment.
18     Q.   How about calling them bitches?
19     A.   I would not consider that as racial.
20     Q.   Jungle bunnies?
21     A.   It depends on what you mean by jungle

Page 29

1   bunny.
2      Q.   What's the common understanding with the
3   racial slur that a white person, or not necessarily a
4   white person, but another person would call a black
5   person a jungle bunny.
6      A.   Well, again, it depends on what that
7   person means by jungle bunny.  Jungle bunny is not a
8   term that I can give you a definitive definition for,
9   because it all depends on who's using it and in what
10  context.
11     Q.   An Amtrak supervisor using it with respect
12  to his black employees.
13     A.   I cannot say that was a form of racial
14  harassment, because I don't have a definition for
15  jungle bunny.
16     Q.   You mean Amtrak doesn't provide you one?
17     A.   I've never seen anything documented that
18  would explain to me what a jungle bunny is.
19     Q.   Do they in the rules, as far as you know,
20  define the term nigger?
21     A.   I have not seen it.  I can't recall seeing

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

104

Case 1:05-cv-02490-CKK    Document 24-4    Filed 08/22/2006    Page 10 of 30

Dennis Smith - 10/18/05

Page 30

1  anything in writing defining that term.
2      Q.    So, the same as the term jungle bunny?
3      A.    You mean, are they one in the same?
4      Q.    I mean, neither of them to your
5  recollection --
6      A.    I have never seen a written definition of
7  that in any Amtrak policies.
8      Q.    You also referenced verbal harassment.
9  What would verbal harassment be?
10      A.    Verbal harassment to me would be
11  unnecessarily using profane language or speaking
12  unnecessarily in a threating manner.
13      Q.    What do you mean by unnecessarily?
14      A.    Meaning that say if you chose to just
15  start yelling at your employees.  Maybe the employees
16  were already doing what they should be doing,
17  something along those lines.
18      Q.    Something inappropriate?
19      A.    Yes.
20      Q.    Whether or not something is racial
21  harassment or verbal harassment was left up to your

Page 31

1  discretion to determine if, in fact, what had occurred
2  in a given situation under the Amtrak rules could be
3  concluded by you to be harassment under Amtrak rules?
4      A.    Can you repeat that?
5      Q.    It made no sense, did it?  It's at your
6  discretion to determine, correct me if I'm wrong, but
7  your job dealing with personnel situations, when you
8  were the manager of high speed rail, dealing with the
9  situation.  We're going back now, because you said one
10  of the things you think you looked at today for a
11  document was Amtrak's harassment policy.  Correct me
12  if I'm wrong, it's my understanding from you --
13      A.    No, I didn't say that was one of the
14  policies I looked at.  I said it was a policy that in
15  some way pertained to this case as I know it.
16      Q.    Then you said the policy could have been
17  the harassment policy.
18      A.    It could have been.
19      Q.    Could it have been the workplace policy?
20      A.    Yes.
21      Q.    Any others that it could have been?

Page 32

1      A.    Not that I can think of off the top of my
2  head.
3      Q.    So, you reviewed a document today.  There
4  was only one document?
5      A.    There were a couple of documents, but from
6  what I can remember just one which was the policy.
7      Q.    One policy.  That one policy you looked at
8  could have been harassment or it could have been
9  workplace, to the best of your recollection?
10      A.    Yes.
11      Q.    Under harassment, you said harassment
12  could be racial or verbal and we've gone through
13  those.  It's my understanding that when you worked as
14  manager of high speed rail and were presented with
15  harassment complaints, racial or verbal, that it was
16  you who determined whether, in fact, as you said
17  before, you were like a prosecutor, whether the
18  conduct that you learned about as a result of your
19  investigation rose to the level of being a violation
20  of Amtrak's harassment policy?
21      A.    No, it was not totally my decision.  My

Page 33

1  role was to gather the facts as best that they could
2  be.  Then at that point if there appeared to be the
3  suggestion of harassment of some nature, then my
4  obligation was to forward this to the dispute
5  resolution office, whose job it is to deal with those
6  situations.
7      Q.    So, you did make a determination.  If it
8  was harassment, you would forward it on.  If you
9  determined it was harassment, you would forward it on?
10      A.    No, it wasn't about me determining whether
11  it was harassment.  If it was alleged that it was
12  harassment of some sort, then I was obligated to
13  forward it on.
14      Q.    Were you called upon to conduct
15  investigations in your job?
16      A.    Yes.
17      Q.    In your investigations on the job,
18  wouldn't you arrive at the conclusion as to whether or
19  not your job as manager of high speed rail, a
20  conclusion of whether or not it was your opinion that
21  Amtrak's harassment policy had been violated?

9 (Pages 30 to 33)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 34

1    A.    My job in conducting an investigation was
2 just to gather facts.
3    Q.    Not arriving at any conclusions?
4    A.    My job was to gather the facts.
5    Q.    Who would arrive at the conclusions?
6    A.    If the facts warranted going to a formal
7 investigation, the conclusion would be made by the
8 hearing officer.
9    Q.    Who would determine whether or not it
10 warranted a formal investigation?
11    A.    The facts would determine whether it
12 warranted a formal investigation, the facts as I saw
13 it. Once I gathered the facts, if I felt that there
14 was enough evidence to possibly warrant a formal
15 investigation, then that could be my call to do so.
16    Q.    So, you were the one who determined
17 whether there was sufficient evidence to say we need a
18 formal investigation?
19    A.    You mean in this specific case?
20    Q.    Well, we're just talking about harassment,
21 when you receive a harassment complaint.

Page 35

1    A.    No, it is not always my call. I answer to
2 someone else. I have a boss also and sometimes it
3 would be his call. Everything I did, of course, had
4 to be forwarded to my direct supervisor.
5    Q.    I understand. I probably read you wrong
6 then. It was my understanding that as part of you
7 looking into the facts, that you would arrive at a
8 determination, as manager of high speed rail, as to
9 whether or not -- what was the next step that
10 occurred?
11    A.    A formal investigation. Yes. I could
12 determine or I could make a decision as to whether I
13 thought there was, be however, that could always be
14 overruled by my superior.
15    Q.    I understand. We can all be overruled by
16 superiors. But, it was your responsibility to make a
17 determination as to whether or not the allegations of
18 harassment after your investigation warranted a formal
19 proceeding?
20    A.    Again, I can't answer that with a yes or
21 no question. You can't apply a blanket policy to

Page 36

1 these type issues. Sometimes I would be asked to make
2 the decision and sometimes they would have to be
3 forwarded to my superior. Sometimes it would have to
4 be forwarded to the resolution office, who would then
5 determine whether it was necessary to conduct a formal
6 investigation.
7    Q.    But, you had the authority at some point
8 to say yes, that's warranted or no, it isn't?
9    A.    Yes.
10    Q.    The harassment policy dealt with racial
11 and verbal?
12    A.    That's not all it dealt with.
13    Q.    Okay. What else?
14    A.    That's all I can think of off the top of
15 my head.
16    Q.    Anything else?
17    A.    Nothing that I can think of right off the
18 top of my head.
19    Q.    Do you presently deal with personnel
20 matters in your job?
21    A.    Yes.

Page 37

1    Q.    Do you deal with harassment complaints in
2 your job and things like that?
3    A.    Yes, I do.
4    Q.    How many harassment complaints have you
5 dealt with, let's say, in the past six months?
6    A.    None.
7    Q.    Now, you also said there may have been a
8 workplace policy that you looked at.
9    A.    Workplace violence. They're all contained
10 in the same policy as best I can remember.
11    Q.    What does Amtrak's workplace violence
12 policy deal with?
13    A.    Just as it states, violence in the
14 workplace.
15    Q.    How does it define what violence is?
16    A.    You would have to take that straight from
17 the policy. I can't state that to you as it's
18 written.
19    Q.    Were your responsibilities as manager of
20 high speed rail the same with complaints lodged under
21 the workplace violence policy? Were your

Towson Reporting
410-828-4148



GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 38

1　responsibilities the same as you've just outlined with
2　respect to the harassment policy?
3　　　A.　Do you mean does the same policy apply?
4　　　Q.　Your responsibility. Someone comes to
5　you. They have harassment. The policy could have
6　been harassment, right?
7　　　A.　Yes.
8　　　Q.　We're dealing there with racial and verbal
9　harassment, to the best of your recollection. You
10　have outlined your responsibilities to conduct an
11　investigation and make certain determinations, which
12　could be overruled later on or not. When someone
13　comes to you with a workplace violence complaint
14　against the supervisor, are your responsibilities the
15　same or were your responsibilities the same, as
16　manager of high speed rail, as you have outlined them
17　with respect to an harassment complaint?
18　　　A.　Yes.
19　　　Q.　You don't recall what Amtrak considers
20　workplace violence to be?
21　　　A.　I can't give you the definition of it, no.

Page 39

1　　　Q.　Do you have an understanding of it. Do
2　you know when you see it?
3　　　A.　Yes.
4　　　Q.　Why don't you tell me what that is?
5　　　A.　My understanding of it is, that violence
6　in the workplace.
7　　　Q.　Well, does violence mean physical
8　violence? Can it mean verbal violence? Can it mean
9　threats?
10　　　A.　It can mean any of those.
11　　　Q.　So, it can it mean threats, verbal
12　threats?
13　　　A.　Yes, I would determine that.
14　　　Q.　It can be the actual touching of someone?
15　　　A.　Yes.
16　　　Q.　Anything else?
17　　　A.　No.
18　　　Q.　So, Amtrak workplace violence policy deals
19　with verbal threats. By that, I mean threats of
20　violence.
21　　　A.　Verbal or physical.

Page 40

1　　　Q.　Or physical.
2　　　A.　Yes.
3　　　　MR. HANNAWAY: Is this the letter you were
4　shown? Can you mark this please as A or 1, however
5　you want to do it.
6　　　　(Mr. Smith's Deposition Exhibit Number 1
7　was marked for purposes of identification.)
8　　　Q.　That's the procedure, you receive a
9　complaint of harassment or workplace violence, which
10　we've gone through your responsibilities on. You
11　receive that complaint. Then does Amtrak have
12　procedures that require you to document any of this,
13　what you do as manager of high speed rail with respect
14　to harassment or workplace violence complaints?
15　　　A.　I require that anyone making a complaint
16　document it.
17　　　Q.　Are you, as manager of high speed rail,
18　required to use any forms, make any documents, any
19　writings on paper?
20　　　A.　If there's going to be an investigation,
21　yes, everything is documented.

Page 41

1　　　Q.　When you use the term investigation, are
2　you talking about the formal step in the procedure?
3　　　A.　I'm talking any investigation and I'm
4　speaking in regard to the way I conduct it, my
5　business --
6　　　Q.　I just want to know did Amtrak, to your
7　knowledge, require you to follow any procedure in
8　conducting your investigation as manager of high speed
9　rail of any workplace violence or harassment
10　complaints?
11　　　A.　Yes.
12　　　Q.　What documents does Amtrak require you, as
13　manager of high speed rail, in conducting your
14　investigation to use or generate?
15　　　A.　Mainly statements from the person making
16　the complaint, person or persons making the complaint,
17　then whatever actions you took in regards to the
18　statements that were forwarded to you.
19　　　Q.　So, statements could have already been
20　generated concerning certain incidents and they could
21　be forwarded to you or you could generate the

11 (Pages 38 to 41)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 42

1 statements yourself or both?
2    A.    No, I would not generate it myself, not to
3 initially launch an investigation, no.
4    Q.    So if you were called upon to conduct an
5 investigation -- when I use the term investigation,
6 I'm dealing with harassment and workplace violence.
7 If statements are secured from people, a large number
8 of witnesses or the person making the complaint or
9 anyone, you would then receive those?
10    A.    Yes, if the people making the complaint
11 wanted action taken.
12    Q.    Would you receive any other information
13 before you started your investigation?
14    A.    No.  Basically, all I would get would be
15 statements about the complaint.
16    Q.    When you say get, you don't mean you would
17 go out and get them, you receive them?
18    A.    I don't go out and solicit it, no.  It's
19 brought to me.
20    Q.    Then you start your investigation?
21    A.    Yes.

Page 43

1    Q.    Does Amtrak require you, as part of you
2 conducting your investigation, to generate any type of
3 reports, any type of documents, any type of writings
4 of any kind?
5    A.    Yes.
6    Q.    What are those?
7    A.    Just a summary of what actions were taken.
8    Q.    You write that?
9    A.    If I'm the one conducting the
10 investigation, yes.
11    Q.    Is that on a form or is it just typed on a
12 blank piece of paper?
13    A.    For me, most times it's just typed on a
14 piece of paper.
15    Q.    What do you include in there?
16    A.    Whatever happened, the facts of what
17 happened.  That's based on my conversations with the
18 people that I spoke to and whatever actions I may have
19 taken up to that point.
20    Q.    Is that when you put your recommendations
21 in also?

Page 44

1    A.    No, I don't make recommendations at that
2 point.  Again, that's just a fact-finding mission.
3 Then after all the facts are gathered, then depending
4 on the nature of the incident, either myself or myself
5 in conjunction with other managers or my superiors
6 would then make a determination as to what the next
7 step would be.
8    Q.    What form does that take?
9    A.    That could be a roundtable discussion.
10    Q.    Any records kept relating to that?
11    A.    Not always, no.
12    Q.    Let's assume you don't send it up to the
13 supervisor.  You said that could occur, correct?
14    A.    It can occur, yes.
15    Q.    In an instance where you're called upon to
16 conduct an investigation, you get statements that have
17 been made by people.  You look into it and you decide
18 not to send it up for a hearing or a more formal
19 continuing procedure, do you generate any documents in
20 that instance?
21    A.    You mean, if I look at whatever I have and

Page 45

1 decide that there is no further action, do I document
2 that?
3    Q.    You conduct your investigation, right, as
4 you said?
5    A.    Yes.
6    Q.    You get a complaint.  You conduct your
7 investigation.  You testified that sometimes you
8 determine it should continue on up the ladder and be
9 formalized and hearings take place or you determine
10 that it shouldn't be, and then presumably there it
11 stops at your level; is that correct?
12    A.    Yes, sometimes it can stop at my level.
13    Q.    At the times that it does stop at your
14 level, would you have generated any documents then?
15    A.    No.
16    Q.    How do you keep track of your
17 investigations if you don't talk to people?
18    A.    Because if it's going to go, if there is
19 enough evidence or facts to warrant an investigation,
20 then there are certain mandatory documentation that
21 would be generated from that point.  If there is not

12 (Pages 42 to 45)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 46

1  enough to have it go that far, then most times that
2  means basically all you did was just talk to one
3  person maybe, so now you got just this person's word
4  against that person's word, where most times it's not
5  going to stand up in a formal investigation.
6      Q.   What do you mean?  Explain it to me again.
7  What do you mean when you use the term formal
8  investigation?
9      A.   Formal investigation means that specific
10 rules are identified that this person may be in
11 violation and as such now it goes into a formal
12 proceeding, which means doing pretty much what we're
13 doing right now.
14     Q.   Got you.  Is that the proceeding where the
15 person, I'm going to say cuts a deal and you see where
16 people say yes, I'll take three days.  I admit.  I'll
17 take three days without pay as punishment?
18     A.   Are you saying does that ever happen?
19     Q.   Yes.  After it becomes formalized, because
20 it's being sent for a formal investigation.
21     A.   Yes, that can happen.

Page 47

1      Q.   Sort of like charges are brought and the
2  person comes in and says, all right, I admit.  I'll
3  take three days or whatever.
4      A.   Yes, that's considered taking a waiver.
5      Q.   Then person B could come in and say no, I
6  want to fight this and it goes to a hearing?
7      A.   Yes.
8      Q.   So, if after your review, let's call it
9  investigation, if you generated documents and you
10 don't recommend a formal investigation, where do your
11 documents go that you generated?
12     A.   Well, there's probably not going to be any
13 documents, because if there's not enough evidence to
14 warrant an investigation, then nothing can be put in
15 the file of the person being accused.
16     Q.   You probably don't recall.  I think you
17 said before.  Do you remember in September of '02 that
18 you were referred a complaint by Harry Charleus?
19     A.   I don't remember specifically getting
20 something from Mr. Charleus.
21         MR. HANNAWAY:  Mark this as number 2.

Page 48

1         (Mr. Smith's Deposition Exhibit Number 2
2  was marked for purposes of identification.)
3      Q.   Do you recall seeing that letter?
4      A.   I don't recall specifically that, no.
5      Q.   But, you may have seen that or you may not
6  have?
7      A.   I may have, but I don't remember exactly
8  that I have.
9      Q.   You'll admit from the contents of it, that
10 it's a letter to Mr. Harry Charleus concerning his
11 letter of August 22, 2002 referencing the conduct of
12 Amtrak foreman Steve Snyder.  That she, Betty Blair,
13 division manager of labor relations, is referring the
14 matter to you, Dennis Smith, manager of high speed
15 rail, requesting that you investigate Mr. Charleus'
16 concerns.  Is that an accurate representation of the
17 letter?
18     A.   Yes.
19     Q.   Do you recall being called upon to
20 investigate in September of 2002, the allegations made
21 by Mr. Charleus?

Page 49

1      A.   I don't recall exactly when it was, but I
2  do recall having talked to Mr. Snyder about complaints
3  lodged, at least a complaint lodged against him.  I
4  don't remember exactly who that complaint came from.
5      Q.   Is that the only time you recall talking
6  to Mr. Snyder about complaints about him?
7      A.   There was just the one time, yes.
8      Q.   You never heard any other complaints about
9  him, ever?
10     A.   I don't recall any specific complaints.  I
11 can't say that I haven't, because there were a lot of
12 complaints about a lot of things with that program.
13     Q.   Do you recall any complaints generally
14 about Mr. Snyder from employees?
15     A.   Not that I can recall off the top of my
16 head, no.
17     Q.   Now, this letter references that she,
18 Ms. Betty Blair, was forwarding you Mr. Charleus'
19 letter.  That's marked as Exhibit 1.  Do you recall
20 receiving that?
21     A.   I don't recall receiving it.  But, after

13 (Pages 46 to 49)

Dennis Smith - 10/18/05

Page 50

1  having read it, I do remember loosely the letter.
2      Q.   You remember receiving that?
3      A.   No, I don't remember receiving it, no.
4      Q.   Do you recall receiving any documents with
5  respect to Mr. Charleus' concerns raised in his
6  August 22, 2002 letter or any complaints of
7  Mr. Charleus with respect to Mr. Snyder?
8      A.   I don't remember receiving anything that I
9  can specifically say was from Mr. Charleus.  There
10  could have been, but I can't say for sure that
11  whatever I may have received came from Mr. Charleus.
12      Q.   When you receive something generally from,
13  let's say the division manager of labor relations, you
14  set up a file?
15      A.   Yes, if whatever I received recommends
16  action be taken on whatever it is they're addressing.
17      Q.   Well, if you're asked to investigate.
18      A.   If I'm asked to investigate, yes, there is
19  going to be a file.
20      Q.   You open a file?
21      A.   Yes.

Page 51

1      Q.   So, Exhibit 2 we've already stated is
2  produced by Amtrak.  It's a letter from her.  Do you
3  know Betty Blair?
4      A.   Yes, I do.
5      Q.   Asking you to investigate and presumably
6  you investigated?
7      A.   Well, I can't say that.  Just because
8  Betty Blair sent a letter referencing me doesn't mean
9  I would definitely be the one to have to do it.
10      Q.   Who else would have done it?
11      A.   There are other managers that served in
12  the same capacity as I did.
13      Q.   But, it mentions your name.
14      A.   That doesn't matter.
15      Q.   It doesn't matter.
16      A.   It could mention my name.  But, as I said,
17  other managers that serve in the same capacity that I
18  do could have been assigned to investigate.
19      Q.   Would you have assigned them?
20      A.   No, that would come from my superior.
21      Q.   Who was your superior?

Page 52

1      A.   Back then, I went through about three
2  different superiors.  At the time of this particular
3  incident, I don't remember exactly which one was at
4  the helm then.
5      Q.   So, even though Amtrak labor relations
6  division manager says I'm sending this to Dennis Smith
7  for him to investigate, it doesn't mean that you would
8  be the one to conduct the investigation?
9      A.   Not necessarily.
10      Q.   So, why would she put down the
11  individual's name?
12      A.   I can't speak for why she would.  I don't
13  know.
14      Q.   Do you recall any times other than this by
15  Betty Blair to conduct any investigation?
16      A.   Not that I can recall.
17      Q.   So, you might have or you might not have?
18      A.   It's possible, but not that I can recall.
19      Q.   Did you conduct any investigation with
20  respect to Mr. Charleus' complaint?
21      A.   Again, I don't remember that I

Page 53

1  specifically received something from Mr. Charleus.
2      Q.   I didn't ask you that.
3      A.   Then in that case, no.
4      Q.   You don't remember conducting any
5  investigation?
6      A.   That was generated by Mr. Charleus?
7      Q.   I didn't ask you that.
8      A.   Well, that's what I'm asking.  Is that
9  what you're saying?
10      Q.   No.  This is the question.  Did you
11  conduct any investigation with respect to complaints
12  made by Harry Charleus, Lisa James, Tyrk Jenkin,
13  Carlos Alvarado, Phoung Hoang, Doria Washington, any
14  of them considering actions of Mr. Snyder?
15      A.   I conducted an investigation concerning
16  the actions of Mr. Snyder, however, the specific
17  people who made the complaints, I cannot tell you
18  exactly who they were.
19      Q.   Do you remember what the complaints were?
20      A.   The complaints were dealing with possible
21  verbal abuse as far as profanity.  That's the only

14 (Pages 50 to 53)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 54

1 specific accusation I can remember.
2    Q.    So, there might have been other
3 accusations?
4    A.    Possibly.
5    Q.    If there were accusations of being
6 threatened physically, you would have investigated
7 that also?
8    A.    Yes, if there was a formal complaint
9 lodged.
10   Q.    What's a formal complaint.
11   A.    Meaning something in writing.
12   Q.    I mean, we have the manager of labor
13 relations, you recall investigating allegations made
14 about Steve Snyder, correct?
15   A.    Yes.
16   Q.    You said you don't recall any other times
17 with respect to Mr. Snyder that you conducted an
18 investigation, correct?
19   A.    Yes.
20   Q.    Okay.  So, one time you investigated
21 Mr. Snyder with respect to allegations?

Page 55

1    A.    One time that I can recall.
2    Q.    Presumedly, that was formalized, it was a
3 formal request for you to conduct an investigation?
4    A.    What do you mean by formal?
5    Q.    You just used the term.  He can read it
6 back to you.
7    A.    I don't need him to.  If you mean, did I
8 do it based on something that was documented?
9    Q.    You used the term formal investigation,
10 formal request.
11   A.    Formal request, yes.  A formal
12 investigation is something different.
13   Q.    What's your recollection of the formal
14 request that was made?
15   A.    Just that there were some complaints made
16 against the way Mr. Snyder was supervising his
17 employees.
18   Q.    You referenced there were assertions of
19 verbal abuse?
20   A.    That was the one that I can recall
21 specifically, possible verbal abuse.

Page 56

1    Q.    Do you think there are records of that?
2    A.    Yes, I think I have.
3    Q.    What I'm referring to there, for the
4 record, is Exhibit Number 1.  I put this in front of
5 you.
6        MS. SUBAR:  Before we start, I'm going to
7 need to break.
8        MR. HANNAWAY:  Oh, go, go.
9        (There was a brief recess at 11:30 a.m.)
10   Q.    Mr. Smith, I have given you a copy of
11 what's been marked as Deposition Exhibit Number 1.
12 You referenced, it was your recollection that you did
13 in some manner recall investigating assertions made
14 about Mr. Snyder on one occasion.
15   A.    Yes.
16   Q.    But, you can't recall if those were the
17 assertions made by Mr. Charleus and his co-employees;
18 is that accurate?
19   A.    I know they were his co-employees.  Which
20 ones specifically, I don't recall.
21   Q.    You conducted an investigation of

Page 57

1 Mr. Snyder on one occasion, correct?
2    A.    Yes.
3    Q.    That you recall?
4    A.    Yes.
5    Q.    Is it your recollection that investigation
6 related to the complaints made by Mr. Charleus and his
7 co-employees?
8    A.    The investigation was in regards to
9 accusations similar to what is in Mr. Charleus'
10 letter.
11   Q.    That's not my question.  My question was,
12 is the investigation that you conducted relating to
13 the complaints by Mr. Charleus and his co-employees in
14 his letter of August 22, 2002?
15   A.    Again, I can't say that Mr. Charleus was a
16 part of the complaints that resulted in my
17 investigation.  But, yes, the people involved were
18 coworkers of his.  Which ones specifically, I don't
19 recall.
20   Q.    Well, was the investigation that resulted,
21 that you conducted, the one you conducted by

Dennis Smith - 10/18/05

Page 58

1  Mr. Snyder, was it as a result of this letter marked
2  Plaintiff's Number 1?
3      A.   I don't know if it was a result of this
4  specific letter, no, because, as I said, I don't
5  remember receiving this specific letter from
6  Mr. Charleus.
7      Q.   You don't remember if it pertained to what
8  your investigation, the one investigation you
9  conducted of Mr. Snyder pertaining to these
10 allegations or not or some other allegations?
11     A.   No. As I stated a minute ago, the
12 allegations which my investigation were based on were
13 similar to what was in Mr. Charleus' letter.
14     Q.   But, it may have been another incident as
15 opposed to Mr. Charleus' complaint?
16     A.   It could have been, yes.
17     Q.   So, there may have been more than one
18 investigation by your office of Mr. Snyder?
19     A.   The only investigation I'm aware of is the
20 one conducted by myself.
21     Q.   Even though the labor relations manager

Page 59

1  directed you to conduct an investigation of
2  Mr. Charleus, you may not have conducted that
3  investigation?
4      A.   The labor relations manager didn't direct
5  me to do it. She sent a letter stating that I do it.
6  However, as I said, I don't answer to the labor
7  relations director. So, any manager in my capacity
8  could have carried out the request made in that
9  letter.
10     Q.   Are you denying that Betty Blair ever sent
11 you a copy of Mr. Charleus' letter?
12     A.   No, I'm not denying it.
13     Q.   But, you don't know what, if any,
14 investigation you conducted as a result of probably
15 receiving this letter?
16     A.   All I know is that an investigation that I
17 conducted was in response to accusations made similar
18 to the ones in Mr. Charleus letter.
19     Q.   So, there may have been similar
20 allegations made by employees similar to those made by
21 Mr. Charleus?

Page 60

1      A.   Of course, it's possible.
2      Q.   Who besides you would have conducted the
3  investigation, possibly conducted the investigation
4  with respect to Mr. Charleus' allegations?
5      A.   Anyone that Mr. Charleus directly
6  addressed his concerns to could have.
7      Q.   Well, we know from Amtrak's records now
8  that this was sent over to high speed rail from labor
9  relations, right?
10     A.   That's the letter you're showing now was
11 sent from labor relations, yes.
12     Q.   That says we're sending you a copy of your
13 letter to Mr. Dennis Smith.
14     A.   Yes.
15     Q.   What you're saying is, it really might not
16 have come to you, someone else there might have
17 investigated it. Is that accurate?
18     A.   It's possible that could have happened,
19 yes.
20     Q.   So, my question is, who else could have
21 investigated it?

Page 61

1      A.   There were three other managers under the
2  same title as my own.
3      Q.   Who are they?
4      A.   Deno Giurfa, G-I-U-R-F-A.
5      Q.   What was Deno's title?
6      A.   The same as mine, manager of high speed
7  rail. Chris Bello.
8      Q.   What was his title?
9      A.   The same title. There were two others,
10 one of which, actually both. I don't remember if both
11 of them were still there at the time that this all
12 took place. One would have been Todd Zentner,
13 Z-E-N-T-N-E-R, and Dave Patterson.
14     Q.   You all held the title of manager of high
15 speed rail?
16     A.   Yes.
17     Q.   You all held the same position in terms of
18 the hierarchy in the bureaucracy?
19     A.   Yes.
20     Q.   So, you were not the boss of any of these
21 people and neither were they the boss of you?

16 (Pages 58 to 61)

Dennis Smith - 10/18/05

Page 62

1    A.    No, we were all equal.

2    Q.    Were your responsibilities the same or did

3  you cover different?

4    A.    Generally the same.  But, your

5  responsibilities could change at any given point in

6  time if there were specific things that needed to be

7  done, then that may become one of your

8  responsibilities.

9    Q.    What did your investigation with respect

10 to the allegations made about Mr. Snyder consist of?

11   A.    I informed Mr. Snyder of the accusations

12 made against him.

13   Q.    What did you say to him?

14   A.    I don't remember exactly what I said.  I

15 asked Mr. Snyder to give me his side of the story,

16 then I eventually let Mr. Snyder read whatever letter

17 it was that I had in my possession at that time, and

18 then again allowed him the opportunity to address what

19 was in the letter.

20   Q.    You say you gave him an opportunity to

21 address.  In what manner?  Talk to you, just speak,

Page 63

1  write a letter, write something?

2    A.    No, to respond to me right then and there.

3    Q.    Verbally?

4    A.    Verbally, yes.

5    Q.    You said the nature of the allegations

6  were verbal abuse?

7    A.    The one that I can recall off the top of

8  my head, yes.

9    Q.    Could there have been other allegations?

10   A.    There could have been, yes.

11   Q.    Is this what you investigated that fell

12 under the workplace, the policies of Amtrak?

13   A.    You're saying Were there or could there

14 have been?

15   Q.    Were there.

16   A.    I don't recall.

17   Q.    Now, in this letter here that I showed you

18 marked number 1, which you may or may not have

19 received or investigated, it says in there in the last

20 paragraph, "This is not the first time Foreman Steve

21 Snyder has approached me in a threatening manner and

Page 64

1  raised his voice at me."  Do you see that there?  Do

2  you agree that's what it says?

3    A.    Yes.

4    Q.    You testified earlier that workplace

5  violence can be verbal.

6    A.    Yes.

7    Q. .  It can include profane language and acting

8  in a threatening manner.

9    A.    Profane language I said could fall under

10 verbal harassment.

11   Q.    How about acting in a threatening manner?

12   A.    Acting in a threatening manner in my

13 opinion could fall under the realm of workplace

14 violence or at least warrant an investigation into

15 that matter.

16   Q.    When you say investigation, do you mean a

17 formal investigation?

18   A.    No.

19   Q.    If you recall, what did Mr. Snyder say in

20 response to you after you let him read a letter?

21   A.    Not specifically addressing everything

Page 65

1  that may have been in the letter.  The one thing I do

2  remember him saying is that it was possible, it could

3  be possible that yes, he may have cursed at his

4  people.

5    Q.    Do you recall addressing anything else

6  other than cursing at people?

7    A.    I don't remember the other specifics that

8  were addressed.

9    Q.    So, there may or may not have been others

10 that you addressed?

11   A.    There may have been.  If there were more

12 in the letter, then there were more addressed.

13   Q.    If employees are asserting that he

14 threatened them, acting in a threatening manner?

15   A.    If that's what was in the letter, then

16 that's what we addressed.

17   Q.    Was that the end result of your

18 investigation that you recall?

19   A.    Just the one conversation with Mr. Snyder,

20 yes.

21   Q.    What did you do after that?

17 (Pages 62 to 65)

Page 66

1    A.    After that, I didn't do anything other
2  than just wait to see if there would be any more
3  complaints lodged against him.
4    Q.    So, you didn't prepare any documents,
5  write any memos, write anything down as a result of
6  your investigation?
7    A.    No.  There was a summary letter written of
8  our discussion.
9    Q.    Have you seen that?
10    A.    Lately?
11    Q.    At any time.
12    A.    I wrote it.
13    Q.    When did you write it?
14    A.    I don't know if it was the next day or
15  possibly that night.
16    Q.    Where would that go?
17    A.    That would go into the files that are kept
18  in the office.
19    Q.    I mean, is it filed under Steve Snyder?
20  Is it filed in your office?  Where is it filed?
21    A.    I don't remember specifically the filing

Page 67

1  system we had at that particular time, but it would
2  have, under normal circumstances, there would have
3  been a copy of it in Mr. Snyder's individual file.
4    Q.    Does that mean personnel file?
5    A.    Yes, his local personnel file.
6        MR. HANNAWAY:  I have never seen that
7  document.  Have you?
8        MS. SUBAR:  Neither have I.
9    Q.    Would this be on a white piece of paper?
10    A.    Yes.
11    Q.    Like on the word processor and say summary
12  letter, Re: Steve Snyder such and such a date?
13    A.    Similar to the same setup as the letter
14  we're looking at.
15    Q.    A conversation about allegations made on
16  such and such a date.  In those summary letters or the
17  summary letter you wrote with respect to the
18  investigation you conducted, do you file it yourself
19  or do you give it to someone to file?
20    A.    No, I file it.  In this particular case, I
21  filed it in Amtrak's files.  I don't recall whether a

Page 68

1  copy was sent to the management company that were the
2  direct supervisors of the Amtrak employees at the
3  maintenance facility.
4    Q.    So, Amtrak has a side contract with a
5  private entity?
6    A.    Yes.
7    Q.    What would you file it under is my
8  question?  I mean, would you open a file for Steve
9  Snyder?  Would it be in a file cabinet where S is or a
10  file cabinet with somebody's letters?
11    A.    No.  It would just be in the general file
12  cabinet we have when there is an incident that takes
13  place and whoever the particular individual is
14  involved in that incident.  They then warrant
15  compiling a folder, a file, and then that file would
16  just go into the drawer.
17    Q.    Where those type?
18    A.    Where those type of files are kept.
19    Q.    So, if you go to a complaint about
20  Supervisor John Hannaway and you came to talk to me
21  about something that's asserted I did and you were

Page 69

1  called upon to investigate it, you would write up a
2  summary of our conversation and then open a file that
3  says John Hannaway?
4    A.    Yes.
5    Q.    You would put it in the file cabinet that
6  holds such summary letters concerning it?
7    A.    That holds personnel files.  There was not
8  a separate file for specific types of letters.
9    Q.    So, they go by the person of who was
10  interviewed kind of thing?
11    A.    Yes.
12    Q.    So, let's say Steve Snyder.  You would go
13  in there and there would be your letter.  If there are
14  any others, your summary memo, let's call it, or if
15  there was similar documents, those would be in there
16  also if someone else conducted an investigation?
17    A.    Yes.
18    Q.    Have you ever gone looking for that
19  summary report?
20    A.    Not that I can recall.
21    Q.    You would remember that?

Dennis Smith - 10/18/05

Page 70

1    A.    If there was a need to, if there were
2    further allegations made, then there would have been
3    probably an additional investigation which would have
4    made it necessary to review the already existing
5    files.
6        Q.    You don't recall at any time going and
7    looking for that summary?
8        A.    No, I don't.
9        Q.    When this case started, and by this case I
10   mean Mr. Chambliss' suit that's been brought against
11   Amtrak, were you contacted by anyone to discuss the
12   matter?
13       A.    I don't know when this all originally came
14   about. I do remember that there have been a couple of
15   occasions that I was contacted in reference to any
16   possible documentation pertaining to Mr. Snyder.
17       Q.    Who contacted you?
18       A.    Deno Giurfa.
19       Q.    On both occasions?
20       A.    At least one occasion. Essentially, I was
21   contacted by Mr. David James from Amtrak's claims

Page 71

1    department.
2        Q.    They were contacting you with respect to
3    any documents that you may know of or have?
4        A.    That or any recollection I have of the
5    whole situation with Mr. Snyder.
6        Q.    As a result of you being contacted by
7    Mr. Giurfa and Mr. James, did you go looking for
8    documents?
9        A.    No.
10       Q.    Why not? They asked you to.
11       A.    Because I knew I didn't have them where I
12   was presently an employee or my department, my present
13   department. None of that stuff was forwarded with me.
14       Q.    I understand it would stay back. Did you
15   tell them, yeah, I wrote something, I think?
16       A.    I don't remember exactly what I told them,
17   but I did tell them that I didn't have specific
18   knowledge of all the details of the incident and that
19   I did know that I had no documentation in my
20   possession of the incident.
21       Q.    Did you tell them, hey, but when I was in

Page 72

1    my old position, I would have written a summary, it's
2    over there?
3        A.    Yes, I did.
4        Q.    What did they say? What did Mr. Giurfa
5    say?
6        A.    I don't remember what he said.
7        Q.    Did you inform him that the document was
8    probably over in the Snyder file in my old office?
9        A.    Yes.
10       Q.    Did you inform Mr. Davis of that, too?
11       A.    Who? Mr. James?
12       Q.    Mr. James, David James. I'm sorry. Do
13   you have a recollection of what you put in that
14   summary?
15       A.    No, I don't. But, it was just the facts
16   of what took place between myself, the conversation
17   between myself and Mr. Snyder.
18       Q.    You said you would have forwarded that to
19   someone else, a copy?
20       A.    My supervisor would have seen it.
21       Q.    If, in fact, it was required or requested,

Page 73

1    which it appears to be, you can't recall if this
2    matter was referred to you by the labor relations
3    division, would you have sent them a copy?
4        A.    Yes. Normally, from my experience if
5    labor relations asks that an investigation be
6    conducted on whatever matter, it's just normal
7    protocol that they'll get the results of the
8    investigation also.
9        Q.    You don't recall what the gist of your
10   summary was?
11       A.    No, not specifically, no.
12       Q.    Do you recall in the course of your
13   conversation with Mr. Snyder, I might have asked you
14   this, discussing and acting in a threatening manner?
15       A.    I don't recall the specifics of what we
16   discussed other than using the profane language part.
17       Q.    Did you recommend that this matter be,
18   well, we used the phrase before, a formal
19   investigation take place?
20       A.    No, I didn't.
21       Q.    Do you recall that or you did or did not

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 74

1   or you don't know?
2       A.   I did not recommend that it go to a formal
3   investigation, no.
4       Q.   If you received a letter such as this
5   where employees were complaining about a supervisor
6   threatening, acting in a threatening manner to cause
7   them physical harm, presumably you would have
8   questioned the supervisor about that?
9       A.   The first thing would have happened is if
10  a letter alleges physical harm, it would have been
11  first forwarded directly to dispute resolution. Based
12  on the severity of the accusations, that person could
13  possibly have been removed from service.
14      Q.   I understand. That's not what I asked
15  again. If, in fact, you received that letter, and
16  that's what we're dealing with is number 1, in there
17  you have employees asserting that Steve Snyder has and
18  continues to act in a threatening manner towards them
19  as if to cause them physical harm, you would have
20  presumably questioned him about that, too, also?
21      A.   Yes. If the letter alleges that, whatever

Page 75

1   the letter alleges is what I would have questioned him
2   about.
3       Q.   If you can't recall when this took place
4   or what the specific allegations were, where the
5   summary is, if it exists, where it went and who has it
6   or what you wrote in it, how do you know that you
7   didn't request a formal investigation? How do you
8   remember that?
9       A.   Because I do remember that much about it.
10      Q.   Why didn't you request a formal
11  investigation?
12      A.   Because I didn't feel I had enough proof
13  of the allegations to warrant it.
14      Q.   He admitted using profanity.
15      A.   Yes. But, that in itself, in the manner
16  that I recall him actually admitting to it, but
17  stating that it's possible that could have happened.
18  He didn't admit to it. He stated that it's possible
19  that could have happened.
20      Q.   If he admitted to it, would that warranted
21  a formal investigation?

Page 76

1       A.   If he admitted to it, it's possible that
2   it could have gone to a formal investigation.
3       Q.   Do you recall doing any other
4   investigation other than talking to Mr. Snyder?
5       A.   No, not that I recall specifically.
6       Q.   Did you ever talk to Harry Charleus?
7       A.   I don't know that I actually had a
8   conversation about this specific matter with
9   Mr. Charleus. Again, it's possible that I could have.
10  But, I can't sit here and say yes indeed, I talked to
11  Mr. Charleus about this.
12      Q.   So, you have spoken to Mr. Charleus about
13  anything?
14      A.   Yes.
15      Q.   What was the context of that conversation
16  that you now recall with Mr. Charleus? When did it
17  take place?
18      A.   There were several conversations with
19  Mr. Charleus that came about just in our normal course
20  of duties during the workday.
21      Q.   About how many?

Page 77

1       A.   I have no idea. There is no way to know.
2   I worked there for three years.
3       Q.   Tell me about it in the substance of any
4   conversations you recall with Mr. Charleus.
5       A.   I can't recall any specifics because of
6   the fact, as I said, Mr. Charleus is just another
7   employee, one of many whom I had to speak with or
8   encounter on a daily basis.
9       Q.   Did you ever have any conversation that
10  you recall with Mr. Charleus about the complaints he
11  had with Mr. Snyder?
12      A.   Not that I can recall specifically.
13      Q.   No, not specifically. Generally, did you
14  ever talk to him about Steve Snyder?
15      A.   Not that I can definitely say.
16      Q.   I'm not asking definitely.
17      A.   Well, I can only speak on what I
18  definitely know.
19      Q.   So, you have absolutely no recollection of
20  ever talking to Harry Charleus about the allegations
21  and assertions he made with respect to the behavior of

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 78

1  Steve Snyder?
2      A.    Not that I can recall.
3      Q.    So, you may have?
4      A.    It's possible, yes.
5      Q.    You may have had conversations with him
6  with respect to your investigation of Mr. Snyder?
7      A.    It's possible, yes.
8      Q.    If you had such a conversation, would you
9  also write a summary as you did with Mr. Snyder of
10  what Mr. Charleus had to say concerning his
11  allegations?
12      A.    If Mr. Charleus had documented something
13  and forwarded it to me making a formal complaint, then
14  yes.
15      Q.    You misunderstood the question.  I can
16  have it read it back or I can continue to ask the
17  question five times like we've been doing all morning.
18  You just testified that you may have had conversations
19  with Mr. Charleus with respect to the allegations he
20  made about Mr. Snyder's behavior, correct?
21      A.    It's possible that yes, I could have had a

Page 79

1  conversation.
2      Q.    If you had such a conversation, would you
3  have written a summary of that conversation as part of
4  your investigation as you did with Mr. Snyder's
5  conversation?
6      A.    It's possible, but it's not required.  It
7  was not required as far as I'm concerned.
8      Q.    Was it required with respect to your
9  interviewing Mr. Snyder?
10      A.    Yes.
11      Q.    Why is that?
12      A.    Because interviewing Mr. Snyder was
13  gathering facts about the incident and the
14  allegations.  Any conversation after that with
15  Mr. Charleus or whoever was not a part of the
16  investigation.
17      Q.    So, are you saying now that you absolutely
18  did not talk to Mr. Charleus as a part of your
19  investigation?
20      A.    No, I'm not saying that.
21      Q.    Then we'll go again.  Therefore, you may

Page 80

1  have spoken to Mr. Charleus as part of your
2  investigation?
3      A.    It's possible, yes.
4      Q.    If you spoke with Mr. Charleus as part of
5  your investigation concerning his allegations
6  concerning Mr. Snyder, would you have written a
7  summary?
8      A.    Yes.
9      Q.    Where would that be?
10      A.    That would be in the same file with the
11  initial complaint, which would have been Mr. Snyder's
12  file.
13      Q.    Now, we know you wrote the summary with
14  respect to Mr. Snyder, correct?
15      A.    Yes.
16      Q.    You may have written one, if you talked to
17  Mr. Charleus, as part of your investigation?
18      A.    I would not have written a separate letter
19  for Mr. Charleus, no.
20      Q.    So, the summary, which you've referred to,
21  would also include any conversations you had with

Page 81

1  Mr. Charleus with respect to his allegations?
2      A.    The summary would have included anything
3  that took place from the start of the investigation to
4  the closure.
5      Q.    Do you recall talking to any other persons
6  with respect to your investigation of Mr. Snyder?
7      A.    I talked to whoever was mentioned in
8  whichever letter my investigation was based on.  I
9  don't remember the specific people.
10      Q.    So, if the investigation we're dealing
11  with is the one that the Amtrak records show was
12  referred to you, are you saying that if names were
13  mentioned in that letter, you also would have
14  interviewed those individuals?
15      A.    Yes.
16      Q.    So, if the record of Amtrak reflects that
17  you were forwarded Mr. Charleus' letter and the
18  witnesses listed are Lisa James, Tyrk, I believe you
19  pronounce it, Jenkin, Carlos Alvarado, Phoung Hoang
20  and Doria Washington, as part of your investigation,
21  you also would have interviewed them?

21 (Pages 78 to 81)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 82

1    A.   If they were listed in the letter that
2 caused me to initiate an investigation, yes.
3    Q.   Exhibit 1 is the one that Amtrak is saying
4 was forwarded to you.  So, if, in fact, that was
5 forwarded to you, number one as their records reflect
6 and these witnesses are listed, you would have
7 interviewed them, correct?
8    A.   If this letter was forwarded to me prior
9 to the investigation, yes.
10    Q.   Do you recall talking to Lisa James at any
11 time?
12    A.   I've talked to Lisa James on numerous
13 occasions.
14    Q.   Do you recall talking to Lisa James with
15 respect to your investigation?
16    A.   I don't recall specifically talking to
17 Lisa James with respect to this investigation.
18    Q.   So, you may have spoken to her with
19 respect to this?
20    A.   I may have.  If Lisa James was named in
21 the letter that initiated my investigation, I would

Page 83

1 have spoken to Lisa.
2    Q.   The substance of your conversation with
3 her would have also been part of the summary document
4 that we've been talking about?
5    A.   Yes.
6    Q.   Does the same hold true for Tyrk Jenkin?
7    A.   If Tyrk was listed in the letter that I
8 based my investigation on, yes.
9    Q.   The same for Carlos Alvarado?
10    A.   Anyone that would have been listed in the
11 letter.
12    Q.   For the record, in addition, Phoung Hoang
13 and Doria Washington.
14    A.   If they were listed in the letter.
15    Q.   If it wasn't Mr. Charleus who made the
16 allegations that you investigated, do you recall who
17 made the allegations?
18    A.   No, I don't, not specifically.  There were
19 several employees in Mr. Charleus' same capacity that
20 worked under Steve Snyder.
21    Q.   In the investigation you conducted, and

Page 84

1 you're referencing a letter, it was only on one
2 occasion that you received such a letter and
3 investigated?
4    A.   Only one occasion that I can recall, yes.
5    Q.   Do you recall when that took place?
6    A.   No, I don't.
7    Q.   I may have asked you this.  I apologize if
8 I did.  Other than the investigation you conducted,
9 are you aware of any other complaints with respect to
10 Mr. Snyder that have been made in any form?
11    A.   Not specific complaints that I can recall.
12    Q.   Any general complaints that you can
13 recall?  You said you met with these people all the
14 time and they're all around you.  You talk to Harry
15 Charleus.  You talk to Jerry Chambliss.  You talk to
16 Jerry Chambliss, right?
17    A.   Yes, I have.
18    Q.   You've talked to Jerry Chambliss about
19 these incidents, right?
20    A.   I don't know specifically that I have.  I
21 can't say that.

Page 85

1    Q.   How about generally?
2    A.   It's possible.
3    Q.   There are a lot of things that are
4 possible.
5    A.   Yes.
6    Q.   Is it likely?
7    A.   It's possible is the best I can say.
8    Q.   When may have you possibly spoken with
9 Jerry Chambliss about the incident?
10    A.   At any time Mr. Chambliss may have felt he
11 wanted to approach me about it.
12    Q.   Do you recall him approaching you about
13 it?
14    A.   Not specifically.
15    Q.   How about generally?
16    A.   It's possible.  That's all I can tell you.
17    Q.   Are you saying here today that you never
18 spoke to Jerry Chambliss about the incident that he's
19 asserting occurred with Mr. Steve Snyder when
20 Mr. Steve Snyder threw a book at him?
21    A.   No, I'm not saying that.

22 (Pages 82 to 85)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 86

1    Q.    So, you recall that you may have?
2    A.    I'm saying that it's possible.
3    Q.    What possibly could you have discussed
4    with him?
5    A.    Well, it depends on who initiated the
6    conversation. If Mr. Chambliss came to me with it,
7    then we would have discussed whatever his issues were
8    with it vice versa had I gone to him.
9    Q.    Do you recall going to him?
10    A.    No, I don't, not specifically, no.
11    Q.    Do you recall him coming to talk to you?
12    A.    Not specifically.
13    Q.    I'm not asking for specific dates.
14    A.    Well, I can't give you. I'm just trying
15    to give you specific answers to whether I know I did
16    talk to him about this particular matter.
17    Q.    Your answer is yes or no?
18    A.    My answer is I don't recall specifically
19    talking to Mr. Chambliss about this particular
20    incident.
21    Q.    Do you recall talking to go him generally?

Page 87

1    A.    About this or anything?
2    Q.    Yes.
3    A.    Of course. We've talked on numerous
4    occasions.
5    Q.    The substance of the conversations was
6    what?
7    A.    There were many.
8    Q.    Any about Steve Snyder?
9    A.    I don't recall a specific conversation
10    about Steve Snyder with Mr. Chambliss.
11    Q.    I'm not saying one specific conversation.
12    But, did you ever have a conversation with Mr. Snyder?
13    A.    I don't recall any specific conversations
14    with Mr. Chambliss about Steve Snyder. Mr. Chambliss
15    was one of many employees that I was responsible for.
16    There were a lot of complaints lodged about the whole
17    operation from numerous employees. So, I had a lot of
18    conversations with a lot of employees. To try to
19    recall specific conversations after having being
20    removed from that environment for three years, I can't
21    sit here and do that.

Page 88

1    Q.    Is it fair to say, then, that you do
2    recall employees making complaints about Steve Snyder?
3    A.    I do recall having heard complaints about
4    Steve Snyder, yes.
5    Q.    What were the nature of the complaints?
6    A.    The nature of the complaints about
7    Mr. Snyder, and again I can't give you specific
8    complaints, but Mr. Snyder was a supervisor there
9    along with three other supervisors, all of whom had
10    numerous complaints lodged against them that could
11    range anywhere from them not being given a long enough
12    lunch break or them being told to do work that doesn't
13    fall under the realm of their responsibilities. There
14    were just always complaints being made.
15    Q.    Complaints of threats of violence?
16    A.    No, not those type of complaints.
17    Q.    Never?
18    A.    I won't say never.
19    Q.    How about complaints of profanity?
20    A.    Against Mr. Snyder?
21    Q.    Yes.

Page 89

1    A.    Again, other than what may have been in
2    the letter, I can't recall specific complaints that
3    were made against any of those supervisors by any of
4    the employees.
5    Q.    Threats of violence?
6    A.    That I can recall specifically.
7    Q.    What do you mean when you say recall
8    specifically?
9    A.    I wouldn't be able to tell you yes, this
10    person said that about this one.
11    Q.    Well, I'm not asking for names, persons,
12    so, we don't have to use specific anymore. Let me get
13    it straight. I'm not asking you for this specific
14    person for this specific thing on this date. Do you
15    recall, now that we got that straight, do you recall
16    anybody making complaints about Steve Snyder?
17    A.    Yes.
18    Q.    What was the nature of the complaints?
19    A.    Anything from not being given a long
20    enough lunch break to being told to do work that
21    doesn't fall under the realm of their responsibility,

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 90

1   and several other topics that could fall in.
2        Q.   Use of profanity?
3        A.   I don't recall specifically anything.
4        Q.   I'm not asking specific.
5        A.   Well, I have to speak specifically for the
6   record.
7        Q.   No. I've already outlined it to you. You
8   defined your term specifically. You said that you
9   were inferring I meant a specific person making a
10  specific complaint.
11       A.   No, that's not what I mean, no.
12       Q.   Well, I don't want to ask you
13  specifically. I'm asking you generally complaints
14  about the use of profanity. I don't care who said it.
15       A.   Not that I recall.
16       Q.   No, you never got any complaints about
17  Steve Snyder?
18       A.   Other than what was in the letter --
19       Q.   On that one occasion.
20       A.   -- that I asked Mr. Snyder about it.
21       Q.   Any complaints about use of racial slurs?

Page 91

1        A.   Not that I can recall.
2        Q.   Any complaints about threatening behavior?
3   Threatening, I mean physical threatening behavior.
4        A.   Not that I recall. The only thing I know
5   about Mr. Snyder is what we may have addressed based
6   on the letter as far as the nature of what you're
7   asking now.
8        Q.   When we were talking about defining
9   workplace violence and that kind of thing. Got you.
10  That covers the period, we're going to date it now,
11  that covers the period prior to September of 2002, you
12  don't recall any complaints at all?
13       A.   I don't remember when the last complaint I
14  recall was. As I said, I left there in November of
15  2002. So, anything dealing with Mr. Snyder took place
16  prior to that date.
17       Q.   Since November of 2002, who would you
18  discuss these matters with?
19       A.   No one except the times that I mentioned
20  earlier when Mr. Giurfa called inquiring and
21  Mr. James.

Page 92

1        Q.   Today you met with Amtrak's lawyer?
2        A.   Yes.
3        Q.   What was the substance of that
4   conversation?
5        A.   Basically, the same as what we're doing
6   now, other than we didn't go that much into detail as
7   we are now.
8        Q.   Were you asked about documents when you
9   talked to Amtrak's lawyer?
10       A.   I was shown documents.
11       MR. HANNAWAY: Do you have a copy of
12  whatever he was shown?
13       MS. SUBAR: No, I don't have it.
14       MR. HANNAWAY: What was it?
15       MS. SUBAR: That letter.
16       MR. HANNAWAY: Then he referenced rules or
17  something.
18       THE WITNESS: There was one policy.
19       MS. SUBAR: Which you have.
20       MR. HANNAWAY: Which one was it?
21       (A discussion was held off the record.)

Page 93

1        MR. HANNAWAY: I'm done.
2        MS. SUBAR: I have a few questions.
3        EXAMINATION BY MS. SUBAR:
4        Q.   What was your typical practice if you
5   heard a general conversation, complaint about either
6   an employee or a supervisor? What would you do when
7   you heard complaints of any nature?
8        A.   If I heard it, but the conversation wasn't
9   directed toward me, I really didn't do anything.
10       Q.   Pursuant to Amtrak's policy, were you
11  required to do anything when you overheard
12  conversations?
13       A.   No, because you hear a lot of
14  conversations which are basically hearsay.
15       Q.   If someone comes to you and complains to
16  you about an employee or a particular supervisor, what
17  do you tell that employee?
18       A.   I would instruct that employee to document
19  it and then bring it to me for further action.
20       Q.   So, the first step necessary for you to
21  undertake an informal or formal investigation would be

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Dennis Smith - 10/18/05

Page 94

1  a written letter or something in writing from that
2  particular employee?
3      A.   For me, yes.  I can't say that's how all
4  managers did it.  But, for me, yes, I would require a
5  statement in writing in order for me to launch an
6  investigation.
7      Q.   Earlier, you testified that you did
8  conduct an investigation at some point prior to
9  leaving high speed rail in November of 2002 regarding
10  Steve Snyder, correct?
11      A.   Yes.
12      Q.   Whatever letter we brought to your
13  attention, you testified that you interviewed those
14  individuals that were identified in the complaint
15  letter?
16      A.   Yes.
17      Q.   In addition, you interviewed Steve Snyder;
18  is that correct?
19      A.   Yes.
20      Q.   Did you inform the employees involved that
21  you would be speaking with Steve Snyder?

Page 95

1      A.   Yes.  I basically told them that once I
2  received the letter, I did let those employees know
3  that I would be speaking with Mr. Snyder about the
4  accusations in the letter.
5      Q.   Once you spoke to Mr. Snyder and heard
6  what Mr. Snyder had to say, what was your response to
7  Mr. Snyder based on what you heard him tell you?  What
8  else did you say to him?
9      A.   Because Mr. Snyder didn't admit to
10  anything, I basically just reminded him of what I
11  expected out of him as a supervisor as far as certain
12  aspects of his performance goes.  I think that was
13  more detailed towards the one accusation that he said
14  possibly could have happened.
15      Q.   To the best of your recollection, what did
16  you say to Steve Snyder regarding the use of
17  profanity?
18      A.   I don't recall exactly what I said to him.
19  Well, to say anything other than that would be just
20  speculating.
21      Q.   I don't want you to speculate.  I want you

Page 96

1  to tell me to the best of your recollection what you
2  said to Mr. Snyder.
3      A.   I would have said there are policies that
4  don't allow you to speak to your employees in a
5  verbally threatening manner.  In fact, I would not
6  expect to hear any further accusations or hope that I
7  would hear any further accusations of this happening
8  from them against his employees.
9      Q.   Would you describe that as a verbal
10  warning or how would you describe what you said to
11  him?
12      A.   It could be termed as a verbal.  Actually,
13  it's more counseling.
14      Q.   How does counseling differ from a verbal
15  warning?
16      A.   Because a verbal warning to me is done
17  when you know for a fact that the person is guilty of
18  what they're being charged with.  Counseling, I would
19  use just to remind the person of what's expected from
20  them as far as this topic goes.
21      Q.   Again, I may have already asked you this,

Page 97

1  but what did you say to Steve Snyder in quote
2  counseling him?
3      A.   I don't remember exactly what I said to
4  him.  But, it would have had to been something
5  addressing the fact that he may possibly have spoken
6  to his employees with unacceptable language,
7  profanity.
8      Q.   Would you have given guidance to him in
9  the future if such a thing were to happen again?
10      A.   If it were to happen again, then the same
11  thing would have happened.  It would have initially
12  started with an investigation into the matter, a
13  fact-finding investigation.  Then from that point, it
14  would have been determined whether it was necessary to
15  take it to a formal investigation.
16      Q.   So, in this particular situation, you
17  determined that a formal investigation was not
18  warranted?
19      A.   No, I didn't think it was warranted
20  because of the fact that all I had was just the letter
21  saying what went on.  I do remember that not many

Towson Reporting          GORE BROTHERS          Whitman Reporting - Rockville
410-828-4148              410-837-3027            301-279-7599

Dennis Smith - 10/18/05

Page 98

1  people wanted to step up and really make themselves
2  known as the person making the complaint. So, that
3  being the case, all I had was a letter, which was
4  basically this person writing the letter word against
5  Mr. Snyder's word.
6      Q.    After you had an opportunity to speak to
7  Mr. Snyder, did you ever speak again to the employees
8  who had made the particular complaint?
9      A.    Informally, yes.
10     Q.    Do you recall who you spoke to or just
11 generally that you spoke to individuals?
12     A.    No, I don't recall specifically who it
13 was, but I know I did speak to them because that's
14 just how I do these things. That's how I handle these
15 things. I'm not required to make any formal
16 documentation of my conversations with the complaint
17 after the investigation. But, I know that I will get
18 back to the people concerned to let them know. You
19 know, someone asked me about it. Somebody that would
20 made a complaint, yes, I would tell them that I spoke
21 with Mr. Snyder and the results of our conversation.

Page 99

1      Q.    After the time that you spoke to
2  Mr. Snyder regarding the complaints that had been
3  made, did you ever receive any further written
4  complaints from anyone?
5      A.    Not that I can recall.
6      Q.    If you had received a complaint, would you
7  have had to, pursuant to Amtrak's policy, investigate
8  that complaint?
9      A.    Yes. You got about five minutes. I don't
10 want to cut it too close.
11         MS. SUBAR: No further questions.
12         EXAMINATION BY MR. HANNAWAY:
13     Q.    All the conversations you just related
14 with respect to Mr. Snyder, that's speculation, isn't
15 it? Do you recall specifically any conversations of
16 what you told Mr. Snyder?
17     A.    I recall specifically having a
18 conversation with Mr. Snyder, but the exact things
19 said, no, I can't.
20     Q.    So, anything you just testified to now in
21 response to questions was what you think you probably

Page 100

1  would have said as opposed to what you did say?
2      A.    That's what I was asked, what would I have
3  said, because I did state that I don't recall exactly
4  what was said.
5      Q.    You said if the profanity, you would have
6  warned that's a violation of Amtrak policy, right,
7  that's your procedure?
8      A.    If profanity was in a manner that made
9  someone feel threatened or was abusive, then, yes,
10 that's a violation of policy.
11     Q.    If someone, an employee felt threatened by
12 someone's behavior, which you have already said is a
13 violation of the workplace?
14     A.    That could be construed as a workplace
15 violation.
16     Q.    You also tell them that's a violation of
17 Amtrak policy?
18     A.    Yes.
19     Q.    Are you saying it's Amtrak policy that
20 you, as a manager of high speed rail, can only bring
21 formal investigations, beyond you, if you quote know

Page 101

1  for a fact that a person is guilty?
2      A.    No, it's not my job to determine whether a
3  person is guilty or not. If there are enough facts to
4  suggest that it needs to be further investigated, then
5  yes, it can go to a formal investigation.
6      Q.    It seems here the investigation you
7  conducted was sort of a he say, she say, so I can't
8  determine what happened?
9      A.    It was pretty much the letter against
10 Mr. Snyder's word.
11     Q.    A letter and you probably, as you said,
12 interviewing anybody else referenced in the letter?
13     A.    Yes.
14     Q.    Based upon all of the interviews, you say,
15 well, Snyder said it probably could have occurred, but
16 it didn't admit it occurred, therefore, no formal
17 investigation?
18     A.    That's because I had no proof of that.
19     Q.    That's fine. You have that authority
20 under Amtrak policy?
21     A.    I can make a recommendation as to whether

Dennis Smith - 10/18/05

Page 102

1  I feel further investigation is necessary.
2      Q.   In this case, you made such a
3  recommendation to not do any further investigation?
4      A.   I felt that based on the information that
5  I was able to gather, that it wasn't going to be
6  adequate to go forward with further investigation or a
7  formal investigation.
8      Q.   That was your recommendation?
9      A.   That was the conclusion I came to, yes.
10     Q.   Did you report that conclusion to someone?
11     A.   Of course, I have to let my superior know.
12     Q.   Who did you let know in this case?
13     A.   Again, we changed, my boss changed like
14  about six or eight months.
15     Q.   The position?
16     A.   The position, I don't remember his
17  specific title, but he was the only manager there who
18  was above myself and the other managers that I
19  mentioned.
20     Q.   So, you would have written something down
21  and sent to him?

Page 103

1      A.   Not necessarily written it down, no.
2      Q.   So, you would have written a summary of
3  all your interviews and your conclusions and all that
4  and put in some file?
5      A.   I would have written a summary of what
6  took place from the start of my investigation to the
7  conclusion.
8      Q.   This would have all occurred, we're
9  assuming in around September of 2002?
10     A.   I don't remember exactly.
11     Q.   Well, if we're all dealing with Amtrak
12  records and you've indicated that's when it was all
13  occurring when you would have forwarded everything.
14  You left in November when of 2002?
15     A.   I left in November.  November 1st was my
16  first day in my new position.
17     Q.   So, assuming Amtrak keeps accurate
18  records.
19     A.   Actually, if I can.
20     Q.   Sure.  Go ahead.
21     A.   November 1st was when my new position

Page 104

1  officially became official.  I don't remember the
2  exact day that I left high speed rail.
3      Q.   Can you ballpark it for us?
4      A.   It was sometime in that area.
5      Q.   A week or two?
6      A.   It was within a couple of weeks of that
7  date, if that long.
8      Q.   So, it was sometime in the first two weeks
9  of November of '02?
10     A.   Yes.
11          MR. HANNAWAY:  I have nothing further.
12  Thank you.
13          MS. SUBAR:  One more question.
14          EXAMINATION BY MS. SUBAR:
15     Q.   You in your capacity as manager of high
16  speed rail, do you have the authority to determine
17  that counseling is warranted after conducting an
18  investigation of a complaint?
19     A.   Yes.
20          MS. SUBAR:  No further questions.
21          EXAMINATION BY MR. HANNAWAY:

Page 105

1      Q.   Have you ever sent anyone to counseling?
2      A.   No.
3          MS. SUBAR:  I said counseling.
4          MR. HANNAWAY:  Counseling, that's what I
5  said.
6          THE WITNESS:  I never sent anyone to
7  counseling.
8      Q.   Did you ever recommend counseling?
9      A.   No.
10          MR. HANNAWAY:  That was your question?
11  Maybe I'm confused.
12          MS. SUBAR:  You're confusing my question.
13  Earlier, he testified regarding counseling.  He typed
14  the conversation that he had with Mr. Snyder as
15  counseling.  I asked him does he, in his capacity as
16  manager of high speed rail, have the authority to
17  counsel someone if counseling is warranted after
18  conducting an investigation.
19          MR. HANNAWAY:  Oh, him, specifically him.
20          MS. SUBAR:  Right.  Does he have the
21  authority to determine that a counseling conversation

27 (Pages 102 to 105)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 106

1  is warranted after an investigation.
2      Q.    Where did counseling take place with
3  Snyder?
4      A.    The same place that we held the
5  conversation, which there is a little building down at
6  the station that the people who work for Mr. Snyder,
7  they work out of that building, or that's where
8  supplies and things are stored.
9      Q.    How long did the counseling session take,
10  not the whole meeting with him, but the counseling
11  session?
12      A.    The counseling portion of the
13  conversation, I don't know exactly, but it wouldn't
14  have been any more than a minute or two.
15      Q.    You violated the rules.  You shouldn't do
16  that.  That's wrong.  Is that the substance of the
17  counseling that occurs?
18      A.    It could be.  In that particular case, I
19  don't remember exactly what was said.
20      Q.    So, you don't remember what counseling?
21      A.    But, I do know that Mr. Snyder was told

Page 107

1  what I would expect out of him as a supervisor.
2      Q.    That was the counseling that you were
3  referring to?
4      A.    That was a part of it, yes.
5      Q.    There were any number of things you could
6  have done in this instance rather than simply say I
7  don't expect my managers or supervisors to do this
8  type of thing?
9      A.    Yes, it could have been more than that,
10  yes.
11          MR. HANNAWAY:  Sure.  Nothing further.
12          MS. SUBAR:  Nothing further.
13          THE REPORTER:  Would you like to read and
14  sign or waive?
15          THE WITNESS:  Yes, I would like to read
16  it.
17          (Deposition concluded at 12:30 p.m.)
18
19
20
21

Page 108

1          CERTIFICATE OF DEPONENT
2
3
4          I hereby certify that I have read and
5  examined the foregoing transcript, and the same is a
6  true and accurate record of the testimony given by me.
7
8          Any additions or corrections that I feel
9  are necessary, I will attach on a separate sheet of
10  paper to the original transcript.
11
12
13          _____
14                  Dennis Smith
15
16
17
18
19
20
21

Page 109

1  State of Maryland
2  County of Baltimore, to wit:
3          I, CHUCK PEPPLER, a Notary Public of the
4  State of Maryland, County of Baltimore, do hereby
5  certify that the within-named witness personally
6  appeared before me at the time and place herein set
7  out, and after having been duly sworn by me, according
8  to law, was examined by counsel.
9          I further certify that the examination was
10  recorded stenographically by me and this transcript is
11  a true record of the proceedings.
12          I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in
14  the outcome of this action.
15          As witness my hand and notarial seal this
16  28th day of October, 2005.
17
18          _____
19                  CHUCK PEPPLER,
20                  Notary Public
21  My Commission Expires:
     April 1st, 2006

28 (Pages 106 to 109)

Dennis Smith - 10/18/05

Page 110

```
 1              INDEX
 2      Deposition of Dennis Smith
 3          October 18, 2005
 4
 5   Examination by:              Page
 6     Mr. Hannaway          2, 99, 104
 7     Ms. Subar             93, 104
 8
 9   Exhibit No.                 Marked
10   1    Letter From Mr. Charleus      40
11   2    Letter From Ms. Blair         48
12
13
14
15
16
17
18
19
20
21
```

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

125