# 7. DEPOSITION TESTIMONY OF CARLOS OF ALVARADO

```
1  JERRY CHAMBLISS                    : IN THE

2            Plaintiff                : CIRCUIT COURT

3  v.                                 : FOR

4  NATIONAL RAILROAD PASSENGER        : BALTIMORE CITY

5  CORP.                              :

            Defendants                : Case No.

6  _____/ 24-C-04-008216
```

The deposition of CARLOS ALVARADO was
held on Tuesday, September 27, 2005, commencing at 12:54
p.m., at the National Railroad Passenger Corporation,
900 Second Street, N.E., Washington, D.C. 20002, before
Okeemah S. Henderson, LSR, Notary Public.

APPEARANCES:

    JOHN HANNAWAY, ESQUIRE,
        On behalf of Plaintiff

    ILANA SUBAR, ESQUIRE
        On behalf of Defendant
        National Railroad Passenger Corp.

REPORTED BY:   Okeemah S. Henderson, LSR

Page 2

1      STIPULATION
2      It is stipulated and agreed by and between counsel
3  for the respective parties that the filing of this
4  deposition with the Clerk of Court be and the same are
5  hereby waived.
6      - - - - - - - -
7  Whereupon,
8            CARLOS ALVARADO,
9  called as a witness, having been first duly sworn to
10 tell the truth, the whole truth, and nothing but the
11 truth, was examined and testified as follows:
12 EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
13 BY MR. HANNAWAY:
14     Q.   Would you state your name, please,
15 sir?
16     A.   Carlos Alvarado.
17     Q.   Mr. Alvarado, my name is John
18 Hannaway, I represent, I'm an attorney, Mr. Jerry
19 Chambliss with respect to a lawsuit he's brought against
20 National Railroad Passenger Corporation, Amtrak for an
21 incident that occurred on May 10th of 2004. You've been

Page 3

1  called to appear and testify at this which is called a
2  deposition. Have you ever been deposed or questioned
3  like this before?
4      A.   No.
5      Q.   This lady is a stenographer, she
6  writes down everything that you say or I say and she
7  produces what's called a transcript which is all the
8  questions and answers. I tell you that because at a
9  deposition, unlike day-to-day, we can't nod our head
10 yes, shake our head no and shrug our shoulders I don't
11 know because she has to write down words. So if I start
12 doing that or you start doing it, you correct me and
13 I'll correct you if you start doing it. Okay?
14     A.   Okay.
15     Q.   If at any time you can't hear me or
16 understand me or the question doesn't make sense, I
17 mumbling, the air conditioner comes on, tell me to speak
18 up, stop mumbling, your question makes no sense, please,
19 say it again, and I'll do so?
20     A.   Okay.
21     Q.   Don't answer any question that you

Page 4

1  don't hear. Don't guess. Guessing is variably wrong.
2  If you're going to give an estimate or an approximation
3  as to dates or times or who was here when, say I think,
4  probably as best I can remember. Okay?
5      A.   Okay.
6      Q.   If later on like we all do day-to-day
7  we'll be having a conversation with someone and we'll
8  say something and 10 minutes later you say wait a
9  minute, that's not what I meant and it just popped into
10 my head, just break right in, say what I said before I
11 meant to say this or whatever, it's normal for that to
12 occur.
13          I give you that because if I ask you
14 a question and you answer it, I'm going to assume that
15 you heard it, you understood it and you have the present
16 ability to answer it based upon personal knowledge. If
17 you need water or a break or anything like that, you let
18 me know. Okay?
19     A.   Okay.
20     Q.   Shouldn't take too long.
21     A.   All right.

Page 5

1      Q.   This matter is, as I said, you're
2  sworn to testify, it's just like being in court, subject
3  to laws of the State of Maryland even though we're
4  presently in the District of Columbia, this matter is
5  pending in the State of Maryland including perjury.
6  Now, did you meet with anyone prior to your deposition
7  today?
8      A.   No.
9      Q.   Did you meet with the lawyer for
10 Amtrak?
11     A.   No.
12     Q.   Did you just meet with the lawyer from
13 Amtrak?
14     A.   Yes. Yes. Sorry
15     Q.   Okay. And you discussed this matter
16 I don't want to ask you what was said but you discussed
17 the nature and extent of your testimony here today --
18     A.   Yes.
19     Q.   -- with the lawyer from Amtrak?
20     A.   Yes.
21     Q.   Did you meet with anyone else

Page 6

1  concerning this deposition questioning today?
2     A.  No.
3     Q.  Did you review any documents?
4     A.  No.
5     Q.  Prior to your testimony here, did you
6  discuss your upcoming testimony with anyone before
7  today?
8     A.  No.
9     Q.  Could you tell me your age and date of
10 birth, please?
11    A.  29 October 22nd 1975
12    Q.  And what's your educational
13 background?
14    A.  I got a GED. I went to a Baltimore
15 county community college for basic electricity for about
16 6 months.
17    Q.  When did you get your GED?
18    A.  In 2000
19    Q.  Where do you presently live?
20    A.  Baltimore, Maryland.
21    Q.  City or county?

Page 7

1     A.  County.
2     Q.  What part of the county do you live
3  in?
4     A.  Dundalk
5     Q.  Are your housing prices going up?
6     A.  Yes.
7     Q.  Are you buying?
8     A.  Yeah. I'm actually selling and
9  buying.
10    Q.  Selling and buying?
11    A.  Yes.
12    Q.  So you're going to take advantage.
13 How long have you been there.
14    A.  Eight years.
15    Q.  So you're going to take advantage of
16 your 8 years and go to another place?
17    A.  Yes.
18    Q.  Are you still working at Ivy City?
19    A.  Yes.
20    Q.  You're going to commute with the gas
21 prices?

Page 8

1     A.  Well, I got a Toyota Corolla, so.
2     Q.  That's fine. Are you married?
3     A.  Yes.
4     Q.  How long have you been married?
5     A.  Ten years.
6     Q.  Any children?
7     A.  Three.
8     Q.  Sex and age of each?
9     A.  Two girls, 9 and 7 and a boy, he's 2.
10    Q.  Any family members and by that I mean,
11 either family members by marriage or by blood who work
12 for the railroad?
13    A.  Yes. My father-in-law.
14    Q.  And what railroad does he work for?
15    A.  Amtrak.
16    Q.  What's his craft?
17    A.  Conductor.
18    Q.  Where does he work out of?
19    A.  Washington.
20    Q.  Ivy City?
21    A.  Well, Union Station.

Page 9

1     Q.  How long has he been a conductor?
2     A.  32 years, 33, something like that.
3     Q.  Do you presently work for Amtrak?
4     A.  Yes.
5     Q.  How long have you been working for
6  Amtrak?
7     A.  November 9th will be five years.
8     Q.  So 9/9/00 was your date of hire?
9     A.  Yes.
10    Q.  Where did you work before Amtrak?
11    A.  I used to, it's called MTI doing
12 modular furniture.
13    Q.  Where was that?
14    A.  Columbia, Maryland.
15    Q.  Any other jobs other than MTI before
16 Amtrak?
17    A.  Another company called Ciminos it's
18 another modular company. I was there with them for
19 about 4 years and then I guess odds and ends jobs, I
20 guess, like temp agencies, I worked for them, too when I
21 was younger.

Page 10

1  Q.  Your date of hire was 9/9/2000 and
2  what craft were you hired into?
3  A.  Coach cleaner.
4  Q.  How long were you a coach cleaner or
5  is that your craft?
6  A.  Still that's my craft.
7  Q.  Have you applied for other any
8  positions within Amtrak?
9  A.  Yes.
10 Q.  What have you applied for?
11 A.  Machinist, pipe fitter, electrician.
12 Q.  And you work high speed rail?
13 A.  Yes.
14 Q.  When high speed rail was down, what
15 did you work?
16 A.  The conventional side I guess you call
17 it.
18 Q.  Describe, I know what it is but just
19 for the deposition, what does a coach cleaner do?
20 A.  Takes trash off of the trains, turns
21 seats, clean, the internal and external clean.

Page 11

1  Q.  You're not, you ever been assigned
2  utility worker at a high speed rail?
3  A.  No.
4  Q.  Legalities on high speed rail, any
5  problems with the water accumulating?
6        MS. SUBAR:  Objection.
7        THE WITNESS:  What do you mean, like
8  --
9  BY MR. HANNAWAY:
10 Q.  You know, like, water pooling up on
11 the floors of the galleries where the on board services
12 were?
13 A.  Yes.  Sometimes there's problems like
14 that because you have, I guess, the freezers and whatnot
15 they get clogged up and water goes all over the place
16 and I have to clean it up.
17 Q.  They come in like that?
18 A.  Sometimes yeah, because it freezes up,
19 you know, too much ice builds up and.
20 Q.  Do you know Steve Snyder?
21 A.  Yes.

Page 12

1  Q.  How do you know him?
2  A.  He's my foreman.
3  Q.  Is he presently your foreman?
4  A.  No.
5  Q.  When was he your foreman?  You can
6  give the best estimate that you can
7  A.  Okay.  I'll say --
8  Q.  You came in date of hire September of
9  2000  Was he your foreman from your date of hire when
10 you first came on?
11 A.  No.  He was my foreman when I went to
12 high speed.
13 Q.  When did you go to high speed?
14 A.  I'd say roughly 2003 when I couldn't
15 bump anymore.
16 Q.  Let me see if I can jog your memory.
17 Do you recall a co-worker named Harry Charleus?
18 A.  Yes.
19 Q.  Do you recall him making a complaint
20 to the diversity department with respect to Mr. Snyder
21 back in August of 2002?

Page 13

1  A.  Yes.
2  Q.  Would you have been working high speed
3  rail with Mr. Charleus?
4  A.  Yes.
5  Q.  So were you working, it would have
6  been in 2002 that you --
7  A.  Yes.  It was like 2002, 2003 because I
8  went to high speed.  I don't remember if it was --
9  Q.  Dates approximately?
10 A.  Approximate.  Right.
11 Q.  But if a letter by Mr. Charleus dated
12 August 22, 2002 relating to Mr. Snyder, you would have
13 been working at that time under Mr. Snyder?
14 A.  Yes.
15 Q.  Okay.  And how long was he your
16 foreman for in terms of months, years approximately?
17 A.  On and off or?
18 Q.  I understand you have different shifts
19 and he may be the supervisor and that kind of thing?
20 A.  Right.  I'd say I guess since I came
21 to high speed on and off he's been my foreman for about,

Carlos Alvarado - 9/27/05

Page 14

1  I guess, 2, 3, years, something like that.
2       Q.   Did you work with a regular crew?
3       A.   On my shifts. Yes.
4       Q.   And what was your shift? We're
5  talking about high speed rail now with Mr. Snyder?
6       A.   It alternated but I could be 11 to 7
7  or 7 at night to 3 in the morning.
8       Q.   And is it alternate -- do you go with
9  the same crew regardless of what shift you're on?
10      A.   No. No.
11      Q.   Did you work with Mr. Charleus at high
12 speed rail?
13      A.   Yes.
14      Q.   Did you work with Doria Washington at
15 high speed rail?
16      A.   Yes.
17      Q.   Did you work with Tyrek Jenkins at
18 high speed rail?
19      A.   Yes.
20      Q.   Did you work with Mr. Chambliss at
21 high speed rail; Jerry Chambliss?

Page 15

1       A.   Yes.
2       Q.   Did you work with Paula Bunch at high
3  speed rail?
4       A.   Yes.
5       Q.   Are you aware of complaints that were
6  made with respect to Mr. Snyder back in 2002?
7       A.   Yes.
8       Q.   What's your understanding of the
9  nature of those complaints?
10      A.   For my complaints or all over?
11      Q.   Generally. Any complaints that you
12 can say this person said this, this person said that?
13      A.   Well, I hear he's not a people person.
14 He's a, I don't know, very sneaky.
15      Q.   Are you aware that Harry Charleus
16 wrote a letter, too, as I referenced before?
17      A.   Yes.
18      Q.   Did you ever see that letter?
19      A.   I think I signed it if that's the
20 letter that I'm thinking of.
21      Q.   Do you believe you signed the letter

Page 16

1  also --
2       A.   Yes.
3       Q.   -- with respect to Mr. Snyder?
4       A.   Yes, I think I did.
5       Q.   And was that letter, who was that sent
6  to or?
7       A.   Dennis Smith. I think he sent it to a
8  couple of places like labor relations.
9       Q.   You're saying he, you think Mr.
10 Charleus?
11      A.   Yes. Because he made copies. I know
12 he told me he made copies. I mean, if that's the letter
13 that I'm thinking of.
14      Q.   Is it possibly more than one letter
15 that he wrote?
16      A.   I don't know. I'm not really sure
17      Q.   You referencing a letter that you may
18 have signed?
19      A.   Right.
20      Q.   Are you talking about one letter or
21 possibly more than one letter?

Page 17

1       A.   Well, the only letter that I'm
2  thinking of is the one that I signed because when he
3  cussed at us.
4       Q.   He being Mr. Snyder?
5       A.   Mr. Snyder cussed at us and when he, I
6  guess, when he was playing around and he tried to kick
7  me.
8       Q.   I want to see if you agree with this
9  assertion. What I'm doing is I'm taking some quotes out
10 of the letter Harry Charleus wrote on August 2, 2002 to
11 a Keisha Harglove (phonetic) for the University
12 Department of Amtrak. You said with respect to Mr.
13 Snyder that he used profanity in a threatening manner.
14 Do you agree with that?
15      A.   Yes.
16      Q.   And that he sort of rushed towards
17 people or act in a physical manner that was threatening
18 to them?
19      A.   Yes.
20      Q.   Did you ever make any complaints about
21 Mr. Snyder making or that he had ever done to you?

5 (Pages 14 to 17)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

131

Whitman Reporting- Rockville
301-279-7599

Page 18

1   A.  Yes.
2   Q.  When were these complaints made?
3   A.  Well, dates --
4   Q.  Let me put it a different way. The
5   complaint that was made with respect to Mr. Snyder, I'm
6   going to tell you that he, I'm referring he to Mr.
7   Chambliss is asserting that he was hit in the head with
8   a book by Mr. Snyder on May 10th of 2004.
9       Let's assume that's the date he's
10  saying. Were the complaints that you made, complaint or
11  complaints that you made with respect to Mr. Snyder
12  before or after Jerry --
13  A.  It was before.
14  Q.  About how long before, do you know?
15  A.  Maybe a year.
16  Q.  I understand it's all approximation?
17  A.  Yeah. It's approximate. I'm sorry
18  Q.  It's okay. What were you complaining
19  about? What was the nature of your complaints?
20  A.  Well, he played too much.
21  Q.  What do you mean?

Page 19

1   A.  Like, he trying to touch you
2   physically, like, you know, like, to me he tried to grab
3   my hard hat like I was a little kid, he make, like,
4   little comments like shorty or he will, like, I told
5   her, you know.
6   Q.  Her meaning counsel for --
7   A.  Counsel. Right.
8   Q.  -- for Amtrak?
9   A.  Right. I told her that, you know, he
10  tried to kick me.
11  Q.  How did he try to kick you?
12  A.  Playing around, you know.
13  Q.  Did you consider it to be playing
14  around?
15  A.  The way he was coming at me laughing
16  and stuff like that. Yes. You know, he was playing
17  around, and I told him the first time when he grabbed my
18  hard hat not to touch me, but I guess he proceeded to
19  keep playing and he tried.
20  Q.  Well, if you were playing around,
21  okay, you thought you were playing around, why -- it

Page 20

1   seems to have upset you; is that correct?
2   A.  Right.
3   Q.  I mean, you complained about it?
4   A.  Right.
5   Q.  If he was, what you categorized as
6   plying around, was that your perception or what you
7   think he was thinking?
8   A.  What he was thinking.
9   Q.  What did you think about it? How did
10  you feel?
11  A.  I felt, you know, I didn't want him
12  touching me. I felt, I guess, how you say it, I don't
13  know, offended, I guess, just.
14  Q.  He didn't have the right to touch you?
15  A.  Right.
16  Q.  So when you say playing around, do you
17  think that it was his --
18  A.  His playing around.
19  Q.  In his head, that he's just playing
20  around?
21  A.  Yes.

Page 21

1   Q.  But to your mind, it was something
2   more than that and you found it offensive for him to
3   touch you without permission?
4   A.  Right.
5   Q.  And you said you made a complaint
6   about that?
7   A.  Yes.
8   Q.  Who did you make that to?
9   A.  Well, I think it was Harry and Tyrek,
10  he, I think either Harry wrote the letter or Tyrek and
11  we all signed it, and I think Tyrek or Harry, one of
12  them, sent the letters out, and a couple of days later,
13  Mr. Dennis Smith came down and on the shift -- I know
14  the sift was 7 at night to 3 in the morning and it was
15  almost time to go home and he told us to excuse him out
16  of the room.
17  Q.  Excuse who out of the room?
18  A.  Us. All the cleaners.
19  Q.  He came down, Mr. Snyder is there,
20  you're in a meeting?
21  A.  Right. He came down, we were just

Page 22

1  waiting to punch out and Dennis came in and told us if
2  he could excuse all of us from the room because he needs
3  to talk to Steve. We did that but we punched out and
4  went home and he just sat there and talked to him. Now,
5  whatever they talked about, I don't have no idea
6      Q.   And it's your understanding it was
7  something about whatever you put down in the letter?
8      A.   Yes. Because.
9      Q.   Complaining about this guy, guy being
10 Snyder touching you without your permission?
11     A.   Yes. And verbally saying racial slurs
12 and.
13     Q.   I'll get to that. I'm talking about
14 physical stuff.
15     A.   Right.
16     Q.   Yanking your hard hat, safety
17 equipment. Did he, like, take it off?
18     A.   No. He was, like, trying to grab the
19 front of it, you know, like, I don't know, like, he
20 thought it was a baseball cap and whatnot, push it down
21 I told him I said, come on, man, don't touch me.

Page 23

1      Q.   Did he say anything to you while he
2  was doing that that you recall?
3      A.   No, I can't recall I'm sorry.
4      Q.   Is it on this same incident that the
5  attempted kicking occurred?
6      A.   Yes.
7      Q.   And tell me, describe what happened
8  there? What were you doing at the time?
9      A.   We were actually in the cafe car and
10 that's when he tried to grab my hard hat and I told him
11 not to, please, and then as me and Tyrek was walking out
12 because I believe we were trashing the trains that
13 night, we were walking out, me and Tyrek were having a
14 conversation and that's when before he walked out of
15 the, I guess, when he walked out of the cafe car, that's
16 when I was along the side of the train and he attempted
17 to kick me and he was laughing but I, you know, he never
18 got to kick me.
19     Q.   How do you know he attempted to kick
20 you?
21     A.   Because I blocked it.

Page 24

1      Q.   You mean, did he walk right up to you
2  face-to-face?
3      A.   No. Sideways You know, kind of like,
4  you know how you and your son, you kind of get the, you
5  know, you walk in and you kick him in the butt, that
6  type of thing.
7      Q.   Yes.
8      A.   That type.
9      Q.   Did you again tell him look, don't
10 touch me?
11     A.   Right. I told him, I said, you keep
12 touching me, you know.
13     Q.   As a result of that incident, you
14 wrote to someone or brought it to the attention of and
15 Dennis Smith investigated it?
16     A.   Right.
17     Q.   Any other incidents where he's touched
18 you?
19     A.   No.
20     Q.   How about verbal. You said you agreed
21 with the statement and he used profanity in a

Page 25

1  threatening manner His voice and you could anticipate
2  the apprehensiveness of him being violent; is that
3  accurate?
4      A.   Yes.
5      Q.   Describe for me?
6      A.   Well, there's a couple of incidents.
7  The first incident was when we were, they called him
8  from the facility to tell us to grab all the cleaners so
9  we can go to the facility to get the trains out for the
10 morning run and, of course, we all were going walking
11 along the tracks and Ms. Doria Washington she was
12 already in the van and I was, I think the -- I was the
13 second one and.
14     Q.   So you all were walking to the van to
15 take you down to the train?
16     A.   Yes. And he was on a cell phone and I
17 don't know who he was talking to but I know he said
18 something about -- is it okay to cuss?
19     Q.   Yes. It's not okay but in these
20 circumstances Yes.
21     A.   Well, he said something in the words

Case 1:05-cv-02490-CKK    Document 24-5    Filed 08/22/2006    Page 9 of 11

Carlos Alvarado - 9/27/05

Page 26

1  of if these slow ass bitches will come on, then we can
2  go, we'll get there, and that's when Ms. Doria looked at
3  me and said, in a low, just looked at me, like, did you
4  hear that? You know and I said yeah, yeah, I heard it.
5      Q.  Is that the same time that he used the
6  word nigger describing you all?
7      A.  I believe so, but I don't know if that
8  was going or coming back to the station
9      Q.  So some time in that same work day?
10     A.  Some time that same work day.
11     Q.  The N word was used directed towards
12 you all?
13     A.  Yes.
14     Q.  And what did he say?
15     A.  I didn't hear the word but when we
16 were going back to the station, he said something to
17 Tyrek and Tyrek got really offended about it and he was,
18 Tyrek was going to get out of the van and go and catch
19 the shuttle bus but he told something to Steve Snyder, I
20 can't recall exactly what he said, but I know he
21 offended Tyrek and all of us, too and they got to

Page 27

1  yelling and told Tyrek, told Tyrek him to stop, to stop
2  the van and that he needs to get out and all this but
3  Steve never listens any way. So then we just proceeded
4  to come back to the station, but I know he said
5  something but I can't recall what he said.
6      Q.  Have you heard recently, he referring
7  Mr. Snyder, referring to people as jungle bunnies? Have
8  you heard of that?
9      A.  No.
10     Q.  Did you make a complaint with respect
11 to that incident in and out of the van and that kind of
12 thing?
13     A.  Yeah. I think we all did because
14 between he tried to kick me and all the cussing and
15 going around I think either Mr. Harry or Tyrek wrote
16 everything down and we signed it. So I don't know if
17 that was one letter or maybe the second letter but I
18 know it was the first letter that he got?
19     Q.  After you complained, did Mr. Snyder's
20 demeanor or manner of operating change in any way?
21     A.  A little bit, not a lot. Just, I

Page 28

1  guess, the type that if you leave us alone to do what we
2  got to do, then, you know, we'll get the job done, that
3  type of thing. You don't talk to us, we don't talk to
4  you, just tell us what to do and we'll do what we got to
5  do, that type of thing.
6      Q.  But when he had to deal with you, was
7  his temperament and demeanor and use of language and
8  threatening manner still the same?
9      A.  Well, not really because he was trying
10 to, I guess he was more of a mellow out or trying to be
11 that other person, that cool cat, you know, type of.
12     Q.  Did he succeed?
13     A.  Yeah. I mean, he doesn't mess with me
14 anymore. Me, personally He don't talk to me anymore
15 because he's not my foreman but he tells me what I got
16 to do when he's there, but besides that, he don't say
17 nothing to me while I'm there, tells me what to do and
18 I'm on my merry way and do what I got to do
19     Q.  Did you ever talk to Mr. Jerry
20 Chambliss about the complaints that he had with Mr.
21 Snyder?

Page 29

1      A.  Yes. Over the phone.
2      Q.  And what was the nature of that
3  conversation and the substance of it? What was said?
4      A.  Me and Jerry, he told me that if I
5  could, I guess, meet up with you guys, and I told him,
6  you know, at first I was trying to get a job here as a
7  mechanic, so I told Jerry I said I don't know if this is
8  going to really effect me and whatnot. I'm trying to
9  move up in the company and what and my wife told me, she
10 said not to get involved with it, and I tried not to and
11 you know, I was going to help him, you know, but then I
12 was trying to, like I said, move up, trying to do this
13 and they said that if you're trying to help Jerry that,
14 you know, you might not get the position at high speed.
15     Q.  Who said that?
16     A.  My wife. We were just talking about
17 it. So then I called Jerry and I said I hope you don't
18 get mad at me or whatnot and he understood. So then
19 when I received the letter from Dino, it was from Dino
20 and I was like, all right. So then
21     Q.  The letter relating to coming down

8 (Pages 26 to 29)

134

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Page 30

1  here being questioned?
2      A.  Yes.  And I totally forgot about it
3  because I work part time at Sears, so I called Dino back
4  and he was, like, oh, you know, screwed me, blah, blah,
5  blah but then when I got the second letter, I said, okay
6   So I told my wife to remind me.  I took off work to
7  come here so.
8      Q.  And she did remind you?
9      A.  Yes
10     Q.  Other than what you described, have
11 you ever complained or talked with anyone about Mr.
12 Snyder's behavior; the hitting, kicking, threatening?
13     A.  No.  Just among us, just the cleaners
14 and stuff like that, people.
15     Q.  Were you present when Mr. Chambliss
16 was hit in the face with the book?
17     A.  No, because -- Jerry, he works
18 daylight.
19     Q.  I understand  In this year, 2005, have
20 you been called in and asked to and gone ahead and
21 talked to any Amtrak personnel about this incident with

Page 31

1  Mr. Chambliss?
2      A.  No.
3      Q.  Any investigations, 2005 talking to
4  anyone with Amtrak with respect to your prior complaint
5  yours and Mr. Charleus or any co-employees' complaints
6  with respect to Mr. Snyder?
7      A.  No.
8          MR. HANNAWAY:  I have nothing
9  further.  Thank you.
10         MS. SUBAR:  I just have a few
11 questions.
12 EXAMINATION BY COUNSEL FOR THE DEFENDANT:
13 BY MS. SUBAR:
14     Q.  Before when you testified regarding an
15 attempted kicking, did Steve Snyder actually ever kick
16 you?
17     A.  No.  He tried.
18     Q.  And you testified that from his
19 prospective he was playing around with you during that
20 time?
21     A.  Yes.

Page 32

1      Q.  Also you testified that Dennis Smith
2  excused employees to speak with Steve Snyder either the
3  next day or you said a few days after the group had
4  reported the incident, correct?
5      A.  Yes.
6      Q.  Did Dennis Smith, after he spoke to
7  Steve Snyder because you weren't there at that
8  conversation, did Dennis Smith ever come back to either
9  you or any of the other employees in your presence and
10 report back what he had spoken to Steve Snyder about or
11 you never heard from Dennis Smith again?
12     A.  No, I didn't really hear from Dennis
13 Smith.  I mean, I seen him but everything that he talked
14 to Steve Snyder about was kind of confidential, but it's
15 like I talked to him and stuff and Dennis Smith, he'll
16 tell me something like you shouldn't have a problem with
17 Steve Snyder anymore but that's about it.
18     Q.  But you did have that conversation
19 with Dennis Smith after he spoke to Steve Snyder?
20     A.  That was, like, a week or two later.
21     Q.  Did he come to find you or this was

Page 33

1  just the next time you saw Dennis Smith?
2      A.  That's the next time I saw him walking
3  around.
4      Q.  And after the time that Dennis Smith
5  spoke to Steve Snyder, did you have any problems with
6  Steve Snyder from the prospective did he ever try to
7  kick you after that time?
8      A.  No.
9      Q.  Did he ever act in a threatening
10 manner to you where you felt threatened by Steve Snyder
11 physically?
12     A.  No, not after all that.  No.
13     Q.  When you say after all that, what are
14 you referring to?
15     A.  After Dennis Smith talking to him and
16 the letters and stuff like that
17         MS. SUBAR:  Nothing further.
18 EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
19 BY MR. HANNAWAY:
20     Q.  With respect to Mr. Snyder attempting
21 to kick you, he didn't kick you because you blocked the

Page 34

1  kick, correct?
2      A.  Yes.  I kind of blocked him
3      Q.  And Mr. Snyder thought he was plying
4  around, you didn't like being touched without his
5  permission, didn't you?
6      A.  Right.
7      Q.  It upset you?
8      A.  Right.
9      Q.  Kind of made you annoyed?
10     A.  Yes.
11     Q.  What is this guy putting his hands on
12 me for without my permission?
13     A.  Right.
14     Q.  Who does he think he is?
15     A.  Right.
16         MR. HANNAWAY:  No further questions.
17     (Deposition concluded at 1:27 p.m.)
18
19
20
21

Page 35

1  City of Washington
2  District of Columbia, to wit:
3          I, Okeemah S. Henderson, LSR and
4  Notary Public of the District of Columbia, County of
5  Baltimore City, do hereby certify that the within-named
6  proceedings took place before me at the time and place
7  herein set out.
8          I further certify that the
9  proceedings were recorded stenographically by me and
10 this transcript is a true record of the proceedings.
11         I further certify that I am not
12 of counsel to any of the parties, nor an employee of
13 counsel, not related to any of the parties, nor in any
14 way interested in the outcome of this action.
15
16         _____
17         Okeemah S. Henderson, LSR
18         Notary Public
19
20 My Commission Expires:
21 February 28, 2010

Page 36

1                 INDEX
2       Deposition of CARLOS ALVARADO
3           September 27, 2005
4
5  Examination by:                    Page
6
7  Mr. Hannaway                       2, 33
8  Ms. Subar                          31
9
10
11 Exhibit Number:                    Marked
12
13      (There were no exhibits marked.)
14
15
16
17
18
19
20