# 8. DEPOSITION OF DAWN MARCELLE

Dawn Marcelle -8/2/05

Page 1

```
1    JERRY CHAMBLISS
                                    IN THE
2              Plaintiff,           CIRCUIT COURT
                                    FOR
3         vs.                       BALTIMORE CITY
                                    Case No. 24-C-04-008216
4    NATIONAL RAILROAD PASSENGER
     CORP.
5
               Defendant.
6    _____/

7

8         The deposition of DAWN MARCELLE was held on

9    Tuesday, August 2, 2005, commencing at 10:00 a.m. at

10   the offices of National Railroad Passenger Corp, 900

11   Second Street, N.E., Washington, D.C. 2002, before

12   Steven Poulakos, Notary Public in and for the District

13   of Columbia.

14

15   APPEARANCES:

16           JOHN F. HANNAWAY, ESQUIRE
                  On behalf of Plaintiff
17
             ILANA SUBAR, ESQUIRE
18                On behalf of Defendant

19

20

21   REPORTED BY:   Steven Poulakos
```

*130*

Page 2

1  Whereupon,
2         DAWN MARCELLE,
3  called as a witness, having been first duly sworn to
4  tell the truth, the whole truth and nothing but the
5  truth, was examined and testified as follows:
6         EXAMINATION BY MR. HANNAWAY:
7     Q   Could you state your name, please.
8     A   Dawn Marcelle.
9     Q   It's my understanding it's spelled D-A-W-N,
10 first name; M-A-R-C-E-L-L-E, last name; is that
11 correct?
12    A   Correct.
13    Q   What is your work address?
14    A   60 Massachusetts Avenue, North Avenue,
15 Washington, D.C. 20002.
16    Q   Have you ever been deposed before?
17    A   Yes.
18    Q   What capacity?
19    A   In my job here at Amtrak?
20    Q   What's your job at Amtrak?
21    A   I'm the senior director for dispute

Page 3

1  resolution.
2     Q   What does that mean, senior director for
3  dispute resolution?
4     A   Dispute resolution is an office within
5  Amtrak's business diversity department, and I head that
6  office.
7     Q   What does that mean?
8     A   Dispute resolution handles Amtrak's
9  internal complaints, complaints of discrimination,
10 harassment that are filed by employees, former
11 employees, and applicants.
12    Q   Does it also deal with complaints of
13 someone assaulting or battering an employee?
14    A   No, it doesn't.
15    Q   So you have no information -- do you have
16 any information here today with respect to a supervisor
17 or the procedures of Amtrak when a supervisor assaults
18 or batters an employee?
19    A   Amtrak has a policy called the workplace
20 violence policy, and I generally know about the policy.
21    Q   Are the procedures that are followed when

Page 4

1  someone, let's say, makes a harassment discrimination
2  case versus an assertion that they've been battered or
3  assaulted by a supervisor?
4     A   In general terms, yes.
5     Q   The investigation is generally the same?
6     A   No, it's not.
7     Q   You're familiar with both?
8     A   Generally familiar with the workplace
9  violence policy.
10    Q   It's called the workplace --
11    A   Violence.
12    Q   -- policy?
13    A   Yes.
14    Q   How many times have you been deposed
15 before?
16    A   Two.
17    Q   What was the nature of those cases?
18    A   They were allegations of employment
19 discrimination.
20    Q   If someone used the N word, a supervisor
21 used the N word against an employee, would that fall

Page 5

1  under the discrimination?
2         We know what the N word is unfortunately
3  the would that fall under the discrimination harassment
4  procedures?
5     A   Yes.
6     Q   That wouldn't be considered an assault or
7  battery or anything like that?
8     A   No.
9     Q   Since you've been deposed before, you
10 understand that this gentleman here is a stenographer?
11    A   Yes.
12    Q   He takes down everything we say, therefore,
13 we have to speak.  Often times day-to-day we shake our
14 head no and nod our head yes and shrug our shoulders I
15 don't know.
16        I'll probably do it and you'll probably do
17 it and we'll correct each other and if we don't he will
18 so he can write down exactly what we're saying.
19        If you don't understand a question that I
20 ask you either because, like all lawyers sometimes I
21 make absolutely no sense, or you can't hear me or I

Page 6

1  mumble or for any reason ask me to rephrase the
2  question.
3      If you don't know the answer to a question
4  simply say I don't know. I don't want anybody -- I
5  don't want you to be guessing here today. That's not
6  productive for anyone.
7      Therefore, when I ask you a question I'm
8  going to assume that you heard it, that you understood
9  it, and that you were basing your answer upon your
10 personal knowledge relating to that question.
11     Fair enough?
12 A  Sure.
13 Q  If at any time you need a break or have a
14 question, feel free to say you have a question or I
15 need to take a break.
16     Secondly, again like day-to-day often times
17 we say something in answer to a question, ten minutes
18 later it will come into our heads I should have said
19 this, I didn't mean that, I was confused at the moment.
20 If at any time you feel that about a preceding question
21 just break right in and say remember you asked me 20

Page 7

1  minutes ago this, I meant to say this?
2  A  Yes.
3  Q  If you don't do that I'm going to assume
4  what you said here today at the conclusion of the
5  deposition is what you intended to say, and, again, was
6  based on personal knowledge. Fair enough?
7  A  Yes.
8  Q  You have described briefly -- and you're
9  here as a corporate designee of National Railroad
10 Passenger Corporation, Amtrak?
11 A  Yes, I am.
12 Q  Some documents were requested to be
13 produced here today. I'm going to read down this and
14 just respond and see if they're here.
15     The documents will tie into sort of the
16 parameters of the questioning outlined in the notice of
17 deposition, the corporate designee. So probably the
18 most organized way to do this.
19     The personal feel of Steve Snyder. There
20 are some documents here. I've pulled up one that as a
21 sticky that says Steve Snyder's personnel file. Does

Page 8

1  this document show the total personnel file of Steve
2  Snyder?
3  A  I don't know if it's the total personal,
4  but it looks like it's Steve Snyder's.
5  Q  What is included in personnel files?
6  A  Basic kind of information; address, contact
7  information, information about any job changes, if
8  there are any salary changes that should be in there.
9  There might be some disciplinary actions in there as
10 well.
11 Q  Are there any other files kept with respect
12 to -- other than what we're calling personnel files --
13 kept on employees that relate to employees within
14 Amtrak?
15 A  You know, there might be files with health
16 services if they have some kind of issue relating to
17 that. I guess if they ever filed a claim there might
18 be files under that. If they've filed a complaint with
19 our office there might be a file on that.
20 Q  What about files with respect to -- is a
21 file created when complaints made about an employee by

Page 9

1  another employee?
2  A  If their complaint is alleging a violation
3  of anti-discrimination, anti-harassment policy, yes.
4  Q  And that's your office is specifically?
5  A  Yes.
6  Q  What about with respect to an assertion
7  that someone has been battered by a supervisor? You
8  know what I mean by battered?
9  A  Yes.
10 Q  Assault and battery?
11 A  Yes. If there was a complaint made to the
12 Amtrak Police Department, there should be a Amtrak
13 police report.
14 Q  There would not be any other file within
15 Amtrak if it's not in the personnel file?
16 A  I'm assuming that some managers might keep
17 their own files.
18 Q  In this particular case, do you know if any
19 such files exist?
20 A  I don't know.
21 Q  Based upon the request, could you

3 (Pages 6 to 9)

Towson Reporting Company    GORE BROTHERS              Whitman Reporting-Rockville
410-828-4148                410-837-3027               301-279-7599
                                                       e1cd594f-fb2f-49c0-a0ec-9d57299c502f

Page 10

1  investigate that and if, in fact, there are additional
2  files produce them in response to the request in your
3  deposition here today?
4      A   I guess I can find out whether Steve
5  Snyder's supervisor has a file on him.
6      Q   Thank you.
7          Next, was any documents relating to any
8  concerns or complaints made by employees of the
9  Defendant relating to Steve Snyder? And in front of
10 you are it looks like four files.
11         The first one being captioned Harvey
12 Charleus, C-H-A-R-L-E-U-S -- harry. What office would
13 this come out of?
14     A   My office.
15     Q   And this is a complaint -- for the record,
16 excuse me. These are documents relating to --
17 apparently a Mr. Charleus faxed a complaint to DRO.
18         What is that?
19     A   Dispute resolution office.
20     Q   Alleging that a Mr. Snyder had cursed at
21 employees during a safety meeting and approached him,

Page 11

1  Charleus, in a threatening manner.
2         Do you know specifically what the threat --
3  what the cursing was that Mr. Snyder did on that day.
4  Would it be in the record?
5      A   Yes. If you turn to the last page there's
6  also a note from Mr. Charleus. This page.
7      Q   So what I'm looking at here now is a letter
8  dated August 22nd addressed to Kiesha Hargo?
9      A   Yes.
10     Q   Is that your office, the diversity
11 department?
12     A   She used to be in my office, yes.
13     Q   As a result of receiving this from
14 Mr. Charleus, what is the procedure that your office
15 follows?
16     A   We would have called him.
17     Q   Is there evidence of him being called here?
18     A   Yes.
19         (Whereupon, a document was marked as
20 Deposition Exhibit Number 1.)
21         BY MR. HANNAWAY:

Page 12

1      Q   I'm marking as Plaintiff's 1 what we've
2  called the personnel file of Mr. Steve Snyder. Then
3  I'm going to mark as 2 what we've just been discussing
4  which is a it looks like a Xerox of a Manila file
5  folder with the name Harry Charleus relating to an
6  incident he's asserting occurred -- or he sent a letter
7  aon August 22 is asserting that at some point prior to
8  August 14th an incident occurred with respect to
9  Mr. Snyder. I'm going to mark that for 2 as the
10 deposition.
11         (Whereupon, a document was marked as
12 Deposition Exhibit Number 2.)
13         BY MR. HANNAWAY:
14     Q   You're going to answer a question about
15 what occurred as a result of?
16     A   These look like there's some notes and they
17 appear to be Keisha Hardgrove's handwriting from a
18 conversation that she had with Mr. Charleus, in
19 addition --
20     Q   Then the procedure is she calls him, finds
21 out more what occurred?

Page 13

1      A   Right.
2      Q   And, again, that does --
3      A   Here's what areas concerns are, and
4  depending on what he says we figure out whether it's an
5  issue that our office would handle or whether it's an
6  issue that's outside our purview; but she also filled
7  out this form. Case track is our data base where we
8  keep track of complaints filed in our office.
9      Q   That's captioned case track new matter
10 form?
11     A   Yes, and it just shows on August 22, 2002,
12 she spoke to Mr. Charleus about a complaint and that's
13 information she would just put into our database.
14     Q   It just mentions the name of the accused.
15 It says matter, type. What does that mean?
16     A   What the allegations relate to, and our
17 office is focused on allegations of discrimination and
18 harassment based on some protective group status such
19 as race or gender or religion. And it appears here
20 that she checked the other harassment box.
21     Q   What does that mean?

4 (Pages 10 to 13)

Towson Reporting Company         GORE BROTHERS         Whitman Reporting-Rockville
410-828-4148                     410-837-3027          301-279-7599
                                                       e1cd594f-fb2f-49c0-a0ec-9d57299c502f

Dawn Marcelle -8/2/05

Page 14

1  A    Which means it's not a allegation of
2  discrimination or harassment based on protective group
3  status.
4  Q    What does that mean, protective group
5  status?
6  A    Protected by one of the various
7  anti-discrimination laws: Race, color, age, gender,
8  disability, veteran status, sexual orientation.
9        MR. HANNAWAY: Off the record for a second.
10       (A discussion was held off the record.)
11       BY MR. HANNAWAY:
12 Q    The letter dated August 22nd, 2003,
13 Mr. Charleus addressed to Keisha Hardgrove. Do you
14 know if in this conversation Mr. Charleus said that
15 remit to do Mr. Snyder had used the N word against a
16 black female employee
17       THE WITNESS: He apparently, didn't say it
18 in the there and he apparently didn't say it in the
19 conversation with Keisha or else it would be an issue
20 that our office handled.
21 Q    I'm assuming that on the case track new

Page 15

1  matter form under the subheading matter type a
2  different box would have been checked if that assertion
3  would be may have been --
4  A    Correct.
5  Q    Which box would have been checked?
6  A    Discrimination unfair treatment.
7  Q    That's 2 and?
8        MR. HANNAWAY: I'm going to mark same type
9  of file as 2. The name is Tyryk, T-Y-R-Y-K, last name
10 Jenkins, and I'm marking that number 3.
11       (Whereupon, a document was marked as
12 Deposition Exhibit Number 3
13 Q    Is this a file from your office?
14 A    Yes, it is.
15 Q    Dispute resolution?
16 A    Yes DRO.
17 Q    Now, is this relating to the same to your
18 knowledge relating this file here with Mr. Jenkins
19 relating to the same incident that's referenced in
20 Mr. Charleus's file?
21 A    No, it does not appear to be the same

Page 16

1  incident.
2  Q    I note in number 2 Mr. Charleus is given
3  the date of August 14th of 2002?
4  A    Right and this was an incident that
5  occurred on a shut will bus on August 13th, 2002.
6  Q    A date prior to the Charleus?
7        MR. HANNAWAY: Can we go off the record.
8        (A discussion was held off the record.)
9        BY MR. HANNAWAY:
10 Q    With respect to exhibit number 3. It has
11 the same face sheet we'll call it as Exhibit Number 2
12 captions matter status report. Is that generated when
13 a letter is received and a phone call made?
14 A    No. I printed that out I think yesterday
15 and it's just a printout of what's in our date base.
16 Q    So the same thing with respect to Exhibit 2
17 which related to Mr. Harry Charleus?
18 A    Correct.
19 Q    So after these handwritten pages that are
20 also attached to these exhibits the various letters and
21 phone notes or phone calls and things are made then a

Page 17

1  summary is entered into your database?
2  A    Correct.
3  Q    On each of these is the second page of the
4  respective documents 2 and 3 is what's now entered into
5  the database?
6  A    Correct.
7  Q    Sort of summarizing what occurred with
8  respect to your investigation is that accurate?
9  A    Yes.
10 Q    Page 1 is that matter status report. It's
11 actually page 2 after the cover sheet. Page 3 is just
12 a letter you all write responding to the complaint?
13 A    Correct.
14 Q    To the person making the complaint and that
15 was done on October 31, 2002, by Ms. Hargo?
16 A    That is right.
17 Q    And then page 4 is you know Ms. Hargo's
18 handwriting?
19 A    That's her handwriting.
20 Q    It looks like October 29, '02, she called
21 Mr. Jenkins?

5 (Pages 14 to 17)

Towson Reporting Company    GORE BROTHERS    142    Whitman Reporting-Rockville
410-828-4148               410-837-3027              301-279-7599
                                                    e1cd594f-fb2f-49c0-a0ec-9d57299c502f

Page 18

1    A    That's correct.
2    Q    And these are just notes she wrote down
3    with respect to that phone conversation --
4    A    That it what it appears like.
5    Q    -- thirty-five she spoke with Mr. Snyder on
6    October 23, '02?
7    A    Right.
8    Q    Relating to that conversation she had with
9    him? And it looks like October 21, '02, spoke with
10   Mr. Jenkins?
11   A    Actually, it's August.
12   Q    August 21, '02, spoke with Mr. Jenkins, and
13   the gest of that phone conversation. I think I'm up to
14   page 6 now. It look likes some type of called downplay
15   address.
16        Do you know what this is?
17   A    Yes, it's a printout from Amtrak's like
18   employee database just giving just basic information.
19   Q    Like phone number and address?
20   A    That contact information.
21   Q    So if you're trying to reach -- like in

Page 19

1    this case it says Steve Snyder -- Ms. Hargo is trying
2    to reach Mr. Snyder she would punch that up to get his
3    phone number?
4    A    Correct.
5    Q    It looks like -- I can't make that out, but
6    I'm guessing it's October?
7    A    It looks like October.
8    Q    17, '02. It looks like a phone call with
9    Steve Snyder and then 3:00 p.m.-11:00 looks like p.m.
10   Chris will have him call me?
11   A    I'm not sure exactly what that means. I
12   don't know that she actually spoke to Steve or whether
13   she actually spoke to Chris.
14   Q    It looks like she was trying to reach Steve
15   and wasn't able to do so.
16   A    That's what it looks like.
17   Q    And the next page is just a printout, I
18   guess, giving personnel information with respect to
19   Mr. Snyder?
20   A    Correct.
21   Q    And the next page?

Page 20

1    A    That's a copy of a postcard that we
2    generally will send out to the complainant just to let
3    him know that we've received their complaint and we're
4    working on it.
5    Q    And this is a copy of one addressed to
6    Mr. Jenkins in response to his complaint?
7    A    Correct.
8    Q    And next is a letter dated August 23rd,
9    2002?
10   A    Right. That's a standard. We would send
11   that out to a complainant just acknowledging that we
12   received their complaint and who is going to handle
13   that.
14   Q    And explain the procedure that's followed?
15   A    Correct.
16   Q    This is a form letter that's sent when you
17   determine it's --
18   A    A complaint to be.
19   Q    Investigated in your office --
20   A    Yes.
21   Q    Second to last we have the case track new

Page 21

1    matter form again, similar to the one in Mr. Charleus's
2    file. And here under matter type she found sexual
3    harassment?
4    A    That was the allegation.
5    Q    Right. So that fit within the purview of
6    your investigation?
7    A    Correct.
8    Q    The last page is a dispute resolution case
9    phone log, just what we think it is, just puts down, I
10   made a phone call this day to this person?
11   A    Right.
12   Q    Next file Jerry Chambliss captioned Jerry
13   Chambliss. And this relates to well date opened was
14   June 6th of 2003.
15        MR. HANNAWAY: Can we go off for a second.
16        (A discussion was held off the record.).
17        MR. HANNAWAY: I'm going to mark this one
18   as Number 4.
19        (Whereupon, a document was marked as
20   Deposition Exhibit Number 4.)
21        BY MR. HANNAWAY:

6 (Pages 18 to 21)

Towson Reporting Company          GORE BROTHERS           Whitman Reporting-Rockville
410-828-4148                      410-837-3027            301-279-7599
                                                          e1cd594f-fb2f-49c0-a0ec-9d57299c502f

Dawn Marcelle -8/2/05

Page 22

1  Q   Is this also a file from the DRO?
2  A   Yes, it is.
3  Q   Again, we started off with the matters
4  status reports just like the others?
5      It looks like Mr. Chambliss contacted your
6  office with respect to him being ill and needing time
7  off from work and he was referred by your office to the
8  human resources department?
9  A   His concerns were, yes.
10 Q   Because that's a family?
11 A   Family Medical Leave Act.
12 Q   So that concern did not fall under the
13 purview of your offices?  In fact, he couldn't get sick
14 pay or whatever he needed?
15 A   Time off.
16 Q   And the remaining documents just relate to
17 the phone calls that were made by your office.  There's
18 a document here that's a handwritten note that I really
19 can't make out.
20     June 18th, '03, letter from your offices?
21 A   Yes.

Page 23

1  Q   Advising Mr. Chambliss that it didn't
2  fall -- his problem didn't fall under the purview of
3  DRO?
4  A   Correct.
5  Q   And an interoffice memoranda captioned
6  confidential.  What is this here?
7  A   That's the letter where we referred his
8  concerns to human resources.
9  Q   Internally?
10 A   Yes.
11 Q   You had it here so you wrote a memo to
12 human resources?
13 A   Yes.
14 Q   Got you.
15     Then Yolando Scales, it looks like, a phone
16 message or a computer generated message just that she
17 had a phone conversation about FLMA and the right care
18 day-one program?
19 A   Yes.
20 Q   Mr. Chambliss's undated letter, it looks
21 like it was faxed on June 9th.  Then some handwritten

Page 24

1  notes.  You're familiar with her handwriting?
2  A   That's her name there so.
3  Q   Just a list of phone calls she made and the
4  dates and things like that?
5  A   Yes.
6  Q   Case manager intake form, a form used in
7  your office?
8  A   Yes.
9  Q   Just when they come in?
10 A   Yes.
11     MR. HANNAWAY:  I'm going mark the next one
12 again captioned Jerry Chambliss as 5 I think.
13     (Whereupon, a document was marked as
14 Deposition Exhibit Number 5.)
15     BY MR. HANNAWAY:
16 Q   With respect to what's been marked as
17 number 5, were you involved in this at all?
18 A   I don't recall being involved in that at
19 the time that it was filed.
20 Q   Were you ever involved in with relation to
21 an incident that was supposed to have occurred on

Page 25

1  May 10th, 2004?
2      Was your office involved in May 10th, 2004,
3  with respect to the investigation of the assertion that
4  Mr. Snyder had assaulted or battered Mr. Chambliss?
5  A   My office didn't do an investigation.
6  Mr. Chambliss, it looks like, called our office to
7  complain about the incident and how it was handled by
8  his local management and he didn't allege that the
9  incident was related to any protected group status.
10     What he did allege was that he thought that
11 Mr. Snyder hadn't been disciplined for the incident and
12 that the incident wasn't taken seriously by local
13 management, and he felt that had Mr. Snyder been black
14 he would have been disciplined.
15 Q   Is that assertion enough for the dispute
16 resolution office to get involved --
17 A   We probably --
18 Q   -- when someone contends --
19 A   We probably wouldn't.  That's kind of --
20 that's like trying to investigate just some
21 speculation, and so it's not really something that we

7 (Pages 22 to 25)

**Page 26**

1  would handle, but what we did find out was that he was
2  represented by an attorney, and so we referred it to
3  the EEO compliance unit at Amtrak.
4  Q    What was the EEO on?
5  A    They actually handle internal complaints of
6  discrimination and harassment, but they get involved
7  when an internal complaint is lodged; but the person's
8  either represented by legal counsel or somehow is
9  appearing like it's in litigation mode.
10 Q    So an assertion that comes to your office,
11 but it's handled internally, you handle the internal
12 aspects of it?
13 A    We'll handle it if it's an internal
14 complaint asking Amtrak to address it.
15 Q    As being resolved internally with Amtrak's
16 procedures, but if someone outside, be it an attorney
17 or whatever, gets involved then it goes to this other
18 office?
19 A    Exactly.
20 Q    Got you.
21 A    Yes.

**Page 27**

1  Q    Any other documents you're aware of
2  relating to complaints made by employees of Mr. Snyder?
3  A    No.
4  Q    I may have asked you this and I apologize
5  if I did.
6       Would there be documents. I know you
7  referenced before the supervisor may have a file or
8  something.
9       Other than than that possibility are there
10 any other documents that would be kept in the normal
11 course of business by Amtrak when someone asserts that
12 they were battered or assaulted by a supervisor?
13 A    Other than with Amtrak police?
14 Q    And Amtrak police, correct.
15 A    Not that I'm aware of.
16 Q    I have those they just do a little
17 printout, a computer thing.
18 A    Okay.
19 Q    Next one was complaints and your concerns
20 by Harry Charleus. I have that present here. I had
21 the named documents relating to the complaints or

**Page 28**

1  concerned concerns made by Carlos Alverez versus who
2  correct?
3       MS. SUBAR: Alvarado.
4       BY MR. HANNAWAY:
5  Q    Do you know if there are any files with
6  respect to any complaints or concerns made by Carlos
7  Alvarado with respect to Steve Snyder?
8  A    My office didn't have any, and I'm not
9  aware of any others.
10 Q    Did you look under the name Alvarado?
11 A    Okay.
12 Q    Thank you, I appreciate that.
13 A    And Alverez.
14 Q    Good.
15      We've gone over the procedures in your
16 office and investigating. These are the forms used by
17 your office?
18 A    Yes.
19 Q    That we've already gone through here and
20 saw the procedure that's followed?
21 A    Yes.

**Page 29**

1  Q    Did I ask you: Is there any other
2  procedures when someone says they were battered by a
3  supervisor that you can think of other than the police?
4  A    Not that I'm aware of.
5  Q    Would there be if let's say that in
6  violation of a rule was asserted by someone?
7  A    Like the service standards of excellence?
8  Q    Yes.
9  A    There are no necessarily procedures
10 associated with the standards of excellence. They
11 are.-
12 Q    If someone is investigated and brought up
13 on disciplinary charges and they're required for
14 concern forms to be filed out and procedures to be
15 followed?
16 A    To the extent that they're bought up on
17 disciplinary charges they're actually according to the
18 labor agreements. They're different types of notice
19 that they need to give the person who's being issued
20 discipline.
21 Q    Any disciplinary files -- is that what you

Page 30

1  call them disciplinary files?
2  A   Yes.
3  Q   Any disciplinary files with respect to
4  Steve Snyder? Were any actions taken? Were any
5  disciplinary actions taken.
6      In one of those it was in the last Jerry
7  Chambliss file there was were a few documents relating
8  to Mr. Snyder being charged and then he waived his
9  rights to a also in his personnel file he waived his
10 rights to a disciplinary hearing and accepted the
11 discipline related to that.
12 Q   And he got two days suspension?
13 A   Correct.
14 Q   That's the extent to any disciplinary
15 procedures taken with respect to May 10th of '04.
16 A   With respect to that incident, yes. There
17 might be some disciplinary charges in his personnel
18 file.
19 Q   There is. It looks like there was never
20 anything formalized. He simply accepted, waived his
21 right to the hearings and all of that kind of thing and

Page 31

1  moved forward.
2  A   What do you mean by formalized?
3  Q   They can contest within Amtrak and with the
4  union agreement any type of disciplinary action and
5  they you can go to a formal hearing. He can waive all
6  of that what is I'm saying.
7  A   It's my understanding that the process is
8  disciplinary charges are issued. A date is set for the
9  disciplinary hearing.
10 Q   Correct.
11 A   And an employee can waive their right to a
12 hearing where they can present their case and basically
13 say I'm not guilty of the disciplinary charges that
14 I've been issued. They can waive their right to that
15 disciplinary hearing, admit guilt and accept whatever
16 discipline.
17 Q   Discipline measure to be taken is?
18 A   Right.
19 Q   What investigation is conducted then with
20 respect to -- it's obvious with respect to Mr. Snyder
21 and the May 10th, 2004, incident that there was

Page 32

1  disciplinary action taken against him?
2  A   Correct.
3  Q   Who would have conducted that
4  investigation?
5  A   It was handled by local management. I
6  don't know the particular person. It should be in the
7  documents.
8  Q   What is their procedure in handling that?
9  A   For issuing discipline?
10 Q   Yes. That's a bad term. What's their
11 procedure for investigating?
12 A   I don't know that there's a standard
13 procedure for investigating, but in that particular
14 case it looks like there was statements taken from
15 Mr. Chambliss, Mr. Snyder, and some other employees
16 about the incident, and then the next thing you see are
17 the disciplinary charges that were issued and then the
18 waiver of his right to a disciplinary hearing and
19 acceptance of discipline.
20 Q   Do you know who conducted that
21 investigation?

Page 33

1  A   No, but I'm certain it's on the --
2  Q   Whatever the letter is.
3      Would the person who than wrote them, did
4  the waiver and all with Snyder be the same person?
5  A   It may not be. Usually in the departments
6  there's a person for each disciplinary hearing that's
7  designated as the charging officer.
8  Q   Got you.
9  A   And the charging officer I think would be
10 the person who signs off on any waiver and would sign
11 off on the notice, but that may not be the same person
12 that looked into whether or not disciplinary charges
13 were warranted.
14 Q   I've been provided interviews and
15 questioning of various people already by counsel in
16 discovery.
17 A   Okay.
18     MR. HANNAWAY: Thank you. I appreciate
19 your time, Ms. Marcelle.
20       - - -
21 (Whereupon, at 10:40 a.m., deposition was adjourned.)

Dawn Marcelle -8/2/05

Page 34

1           - - -
2  (By stipulation of counsel with the consent of the
3    witness, reading and signature waived.)

Page 36

INDEX
Deposition of DAWN MARCELLE
August 2, 2005

EXAMINATION BY:                          PAGE
   Mr. Hannaway . . . . . . . . . . .      2
         E X H I B I T S
DEPOSITION EXHIBITS                      PAGE
1    A Personnel File              11
2    A File Folder                 12
3    A File                        15
4    A File                        21
5    Case Manager Intake Form      24

Page 35

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Steven Poulakos, registered Professional
3  Reporter, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken by me
7  stenographically and thereafter reduced to typewriting
8  under my supervision; and that I am neither counsel
9  for, related to, nor employed by any of the parties to
10 this case and have no interest, financial or otherwise,
11 in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 27th day of
14 September, 2005.
15
16         _____
17            Steven Poulakos,
18            Notary Public
19
20 My commission expires:
21 April 30, 2006

10 (Pages 34 to 36)



Towson Reporting Company          GORE BROTHERS           Whitman
410-828-4148                      410-837-3027

e1cd594f-fb2