# 9.. DEPOSITION OF HARRY CHARLUS

148

Page 1

```
 1   JERRY CHAMBLISS

 2            Plaintiff,         IN THE
                                 CIRCUIT COURT
 3      vs                       FOR
                                 BALTIMORE CITY
 4   NATIONAL RAILROAD PASSENGER  Case No. 24-C-04-008216
     CORP.
 5
              Defendant.
 6   _____/

 7

 8            The deposition of HARRY CHARLEUS was held

 9   on Tuesday, August 2, 2005, commencing at 1:00 p.m. at

10   the offices of National Railroad Passenger Corp, 900

11   Second Street, N.E., Washington, D.C. 2002, before

12   Steven Poulakos, Notary Public in and for the District

13   of Columbia.

14

15   APPEARANCES:

16            JOHN F. HANNAWAY, ESQUIRE
                   On behalf of Plaintiff
17
              ILANA SUBAR, ESQUIRE
18                 On behalf of Defendant

19

20

21   REPORTED BY:  Steven Poulakos
```

Page 2

1  Whereupon,
2           HARRY CHARLEUS,
3  called as a witness, having been first duly sworn to
4  tell the truth, the whole truth and nothing but the
5  truth, was examined and testified as follows:
6           EXAMINATION BY MR. HANNAWAY:
7       Q   Would you state your name, please, sir?
8       A   Harry Charleus.
9       Q   And could you spell your last name?
10      A   C-H-A-R-L-E-U-S.
11      Q   Mr. Charleus, my name is John Hannaway. I
12  represent Mr. Chambliss with respect to an incident
13  that occurred on May 10th of 2004.
14          I'm going to be asking you about some
15  events that are sort of tangentially connected to that.
16  I just want to ask you, have you ever been deposed or
17  gone through something like this?
18      A   No.
19      Q   This gentleman here is a stenographer. He
20  takes down everything we say word for word and produces
21  a transcript which is verbatim in question and answer

Page 3

1  form.
2          I just tell you that because in order for
3  him to do that we have to speak up all the time. Often
4  times we'll nod our head yes or shake our head no in
5  day to day, shrug our shoulders, he can't take that
6  down. In this setting we can't do that. If I start
7  doing that you tell me and I'll do the same for you and
8  he'll do it to both of us because he has to write the
9  transcript.
10      A   Okay.
11      Q   You've been sworn to tell the truth subject
12  to perjury in the State of Maryland. If at any time
13  you don't understand a question I ask either because it
14  makes no sense or I mumble, you can't hear me, ask me
15  to repeat it. You're not expected to do remember
16  everything. I can't remember what lights I hit coming
17  to work let alone something that occurred a couple of
18  years ago.
19          If at any time you have any questions, you
20  want to take a break for any reason, let me know. This
21  is formal in the sense you're testifying in a court

Page 4

1  proceeding, but it's not as formal as testifying in
2  court.
3       Q   You work for Amtrak, sir?
4       A   Yes, I do.
5       Q   How long have you worked for them?
6       A   Since November 30th of 2000.
7       Q   What is your craft?
8       A   Currently ticket agent.
9       Q   Where how long have you been a ticket
10  agent?
11      A   Almost a year now, October.
12      Q   Of '04?
13      A   Yes.
14      Q   What station do you work out of?
15      A   Union Station Washington, D.C.
16      Q   What did you do before you were a ticket
17  agent?
18      A   Baggage handler and prior to that coach
19  cleaner.
20      Q   How long were you a baggage handler?
21      A   Approximately a year.

Page 5

1       Q   Back to '03 about?
2       A   Yes.
3       Q   About?
4       A   Yes.
5       Q   And how long were you a coach cleaner?
6       A   When I first began employment. So I'd say
7  about two-and-a-half to three years.
8       Q   Did you work high speed as a coach cleaner?
9       A   Yes.
10      Q   Did you work any other stint?
11      A   I began in the S and I service and
12  inspection department. That's in Ivy City and then I
13  transferred over to high speed rail.
14      Q   Was going in the baggage handling and
15  ticket agent all by your choice?
16      A   Yes.
17      Q   You wanted to go up there?
18      A   Yes.
19      Q   Did you ever have, back in the period when
20  you were a coach cleaner, Steve Snyder as a foreman?
21      A   Yes.

Page 6

1  Q   How often or what degree of frequency would
2  he be a foreman with you generally?
3  A   I believe when he first became foreman he
4  started on our shift. That was 3:00 to 11:00 shift.
5  Q   So it was a daily thing?
6  A   Yes, pretty much so.
7  Q   Do you know and have you worked with Doria
8  Washington?
9  A   Yes.
10 Q   Do you know, have you worked with Carlos
11 Alvarado?
12 A   Yes.
13 Q   And do you know or have you worked with
14 Mr. Chambliss?
15 A   Yes.
16 Q   Is Ms. Washington, is her craft coach
17 cleaning?
18 A   Yes.
19 Q   And was Mr. Alvarado's craft coach
20 cleaning?
21 A   Yes.

Page 7

1  Q   Is Mr. Alvarado still employed with Amtrak,
2  do you know?
3  A   I believe so.
4  Q   Last you knew he was still a coach cleaner?
5  A   Yes.
6  Q   What is your educational background?
7  A   I completed high school and completed about
8  two-and-a-half years of college.
9  Q   Where did you go to high school?
10 A   Spring Brook in Silver Spring.
11 Q   And college?
12 A   University of Maryland, College Park.
13 Q   What did you study there?
14 A   Business administration and criminal
15 justice.
16 Q   Mr. Chambliss is asserting that Mr. Snyder
17 battered him by throwing a book at his head. You
18 weren't present for that?
19 A   No.
20 Q   That being May 4th, 2004, did you speak
21 with anyone about that incident after it occurred that

Page 8

1  you recall?
2  A   Can you rephrase the question?
3  Q   Did you talk to anyone about that incident?
4  A   Only when I was contacted by Mr. Chambliss.
5  Q   By Jerry?
6  A   Yes.
7  Q   Anybody else?
8  A   No.
9  Q   Had you known about it before he called
10 you, heard about it?
11 A   I received a call from Carlos Alvarado and
12 he had mentioned that Mr. Chambliss was trying to get
13 in contact with me in reference to obtaining some
14 paperwork in reference to Steve Snyder.
15 Q   Got you.
16     Have you ever made any complaints about
17 Mr. Snyder?
18 A   Yes, I have.
19 Q   On how many occasions did you do that?
20 A   Written, I believe two or three times.
21 Q   How about verbal?

Page 9

1  A   Verbally I can't recall. I might have
2  spoken to a union representative.
3  Q   The two or three times, do you know what
4  time span that was in?
5  A   Honestly, I cannot recall. I wrote a
6  letter about it.
7  Q   Did you only write a letter on one
8  occasion?
9  A   I was under the assumption that I wrote
10 two, three letters, but.
11 Q   About two or three separate occurrences?
12 A   Yes, exactly, but I don't have them. I
13 don't have that list.
14 Q   Amtrak has given us one?
15 A   I'm aware that Amtrak has one.
16 Q   It's dated August 22, 2001, as part of
17 Plaintiff's Exhibit Number 2 for the corporate designee
18 designation. Is that the letter you wrote to Amtrak
19 back in October of 2002?
20     MS. SUBAR: August.
21     BY MR. HANNAWAY:

Page 10

1  Q   August, I keep saying October.
2  A   Yes.
3  Q   You can look at that if you want to if it
4  refreshes your memory.
5       Now, the other one or two times that you
6  wrote, do you recall if they were before or after the
7  August 2002 letter?
8  A   After.
9  Q   Now --
10 A   I believe so it was after.
11 Q   Okay.
12      With respect to the August 2002 letter, a
13 copy of which you have in front of you, what was the
14 nature of the complaints?  What had occurred?
15 A   Well, when --
16 Q   That brought about that letter?
17 A   When Steve Snyder initially started on our
18 shift 3:00 to 11:00 me and him did not have a good
19 working relationship.  There was a lot of tension, or I
20 don't know, arguments going back.  I felt that he was
21 singling me out this course about not doing work

Page 11

1  assignments, taking lunch.  It was a lot of
2  disagreement between me and him.
3  Q   Did you ever feel threatened by his
4  conduct?
5  A   On one occasion when we had a heated
6  argument in a safety meeting and I walked out and he
7  followed behind me and I stated I was walking away to
8  calm myself down because I didn't want it to escalated.
9  Q   Why did you feel threatened?  What was he
10 doing to make you feel threatened?
11 A   We were yelling back and forth.
12 Q   What occurred as he was following you out
13 that made you feel threatened, the fact that he was
14 following you?
15 A   Not that, and, yes, I did exactly -- I
16 wanted to walk away.  I didn't want it to escalate.
17 Q   This one references threats in a
18 threatening manner in using profanity.  Was that all
19 about back then?
20 A   This incident right here pretty
21 word-for-word we were leaving the train set.

Page 12

1  Q   The train what?
2  A   Train set.  Train set.  As me and Mr.
3  Jenkins proceeded to the elevator we were waiting for
4  the elevator.  Mr. Snyder rushed in barged through two
5  double doors and approached us in a threatening manner
6  which caused me and Tyryk Jenkins to clench up and he
7  just barged in and just starting yelling.
8  Q   You made a gesture?
9  A   We made a gesture taking -- bald our fist
10 in a defensive manner because the way he approached us
11 made us resort to a defensive position, so to speak.
12 Q   Did you feel threatened, physically
13 threatened by him when this was occurring?
14 A   That time, yes.
15 Q   What was he yelling about?  What was he
16 saying?
17 A   That he was -- we didn't complete or work
18 assignment and that he was looking for us, and, like I
19 stated in here, we had just finished our assignment.
20 We had seen him and we just left the train set, but he
21 was saying we weren't where we was supposed to be and

Page 13

1  he was looking for us for a substantial amount of time.
2  Q   Had he been out at the train set?
3  A   I believe so.  He was in and about.
4  Q   When you say train set, is that where the
5  trains park for you to do your work?
6  A   Yes, the train is inside of the high speed
7  rail facilities and we do cleaning work on the train.
8  Q   So you got that incident.  Do you recall
9  any other incidents with Mr. Snyder when he was
10 acting -- you have the time when you left the, was it a
11 safety meeting you were at?
12 A   This is the incident here, the threatening
13 manner, and the other one where we got into a argument
14 where I walked away.
15 Q   Was that as a safety meeting?
16 A   That was at the beginning of a safety
17 meeting.  That was like when he really first started
18 working on our shift.  This incident was after.
19 Q   Any incident is after this August of 2002
20 incident?
21 A   Nonphysical, verbal.  This one in the

Page 14

1  safety meeting where he was addressing us and he was
2  handing out assignments and people were -- the group
3  were disputing some of the assignment, work
4  assignments, and he said -- I don't recall this right
5  here what I wrote.
6       I recall it might have been another safety
7  meeting where he said stop complaining like a bunch of
8  bitches. That was one.
9       Another incident that I was witness to when
10 we were being transported by Mr. Snyder and the company
11 van from Ivy City to Union Station he was making some
12 kind of homosexual comments or directed to a co-workers
13 tie recollect Jenkins and Mr. Jenkins wasn't didn't
14 take too kindly to the comments that were being made.
15 So he was getting -- he was getting verbally -- he was
16 getting physically upset.
17     Q    Who was getting physically upset.
18     A    Tyryk Jenkins.
19     Q    Like Tyryk was going to go off on him?
20     A    Yes, he was. So I had to calm him down,
21 and at the time Steve Snyder he found it funny, and I

Page 15

1  told him it wasn't a joking matter and I was trying to
2  calm him down because I didn't want it to escalate any
3  further.
4       The other was I was told by Carlos Alvarado
5  that he came back from the platform that he said that I
6  believe I told -- that I said that he said Steve Snyder
7  had pushed him or brushed against him, but after
8  talking to Doria she he said he kicked him. I believe
9  that's what he said she said Steve Snyder kicked him,
10 but I wasn't -- that's what I was told.
11      And after this incident in the van I
12 remember I told Tyryk to write that incident up and
13 also I told Carlos to write that incident up as well
14 because, you know, I had mentioned to them that I had
15 wrote up the other incidents in reference to him that
16 way his behavior could be documented.
17     Q    Now, you said, I told her when, you just
18 now were you referring to Amtrak's attorney?
19     A    Yes.
20     Q    When we spoke yesterday?
21     A    Yes.

Page 16

1   Q    What did you all talk about yesterday?
2   A    Basically the incidents between -- the
3  incident between me and Steve Snyder and any incidents
4  that I was witness to between Steve Snyder and other
5  persons.
6   Q    So what you're talking about today
7  basically?
8   A    Yes.
9   Q    Did you ever hear Steve Snyder use the N
10 word to anyone?
11  A    No.
12  Q    When you wrote the letters that you said
13 you wrote after this August 2002 letter, did you write
14 them to the same place?
15  A    I believe so. I mean, I know I typed them
16 up. I don't know if I turned it in or, to the best of
17 my recollection, I wrote up more than one letter; but I
18 don't have them so I can only give my testimony as to
19 what I remember.
20  Q    Did you ever talk to a Dennis Smith about
21 any of these instances?

Page 17

1   A    Yes.
2   Q    Which of the instances were you related
3  that you talked --
4   A    I believe I spoke to Dennis. I don't know
5  if it was on one or two occasions. It wasn't really in
6  reference to any specific incidents. Basically he told
7  me that he was aware of the situation I guess because
8  he had received notice that he had something and he
9  would address the issue with Steve Snyder. That's what
10 he told me.
11  Q    Was that on one occasion or more than one
12 occasion that you spoke with Mr. Smith.
13  A    It might have been twice, to the best of my
14 recollection, one or two times.
15  Q    Were you ever interviewed by Mr. Jeff
16 Weigiel?
17  A    I don't recall anything. I think I spoke
18 to Deno.
19  Q    Who?
20  A    Deno. I think I might have spoke to him
21 once.

Page 18

1   Q    How about Mr. Bello, B-E-L-L-O?
2   A    Chris Bello?
3   Q    Yes.
4   A    In reference to incidents with Steve
5   Snyder?
6   Q    Yes.
7   A    It's a possibility, but I don't recall.
8        MR. HANNAWAY: Thank you.
9        MS. SUBAR: I have just a few questions.
10       EXAMINATION BY MS. SUBAR:
11  Q    When you spoke to Dennis Smith, what did he
12  say to you, to the best of your recollection?
13  A    To the best of my recollection, that -- to
14  the best of my recollection that he was aware of the
15  situation. I don't know if he said that he had the
16  letter, but he was aware of the situation and they
17  would take the necessary steps to speak to Steve Snyder
18  to resolve whatever issues was going on between -- I
19  don't know, between me or just the employees that were
20  working under him in general.
21  Q    Do you recall generally when that

Page 19

1   conference with Dennis Smith was in relation, let's
2   say, to August 22, 2002?
3   A    Maybe a couple of weeks, maybe a month
4   later. Maybe two months later. Honestly, I really
5   don't remember.
6   Q    But it was after you wrote the letter?
7   A    It was after.
8   Q    After Dennis Smith came and spoke to you,
9   did you have any other problems with Steve Snyder as
10  your supervisor or as your foreman?
11  A    No. From the time that I spoke to Dennis I
12  never had any more problems with Steve. So whatever
13  they talked to him about -- I work with him on several
14  other occasions. I never had any more problems with
15  him. I worked with him several other times.
16  Q    When you say several other times, would
17  that be on a daily basis, a weekly basis. I'm just
18  trying to get a sense.
19  A    Daily and weekly.
20  Q    So after you spoke to Dennis Smith?
21  A    Well --

Page 20

1   Q    Steve --
2   A    I don't know if it was immediately after
3   because after I spoke with him -- I started working --
4   I think I was working a different shift. So I wasn't
5   working directly with him, but after I began working
6   with Steve Snyder again I didn't have any more
7   incidents with him.
8   Q    You did have interaction? You occasionally
9   had to have interaction with Steve Snyder after you
10  spoke to Dennis Smith before you were transferred to
11  another shift?
12  A    Yes.
13  Q    After Dennis Smith spoke to you, did you
14  ever witness Steve Snyder either act violently, act in
15  a violent manner to any other employee?
16  A    Not that I can recall. I would say no.
17  Q    After you spoke were Dennis Smith, did you
18  ever hear from anyone else whether Steve Snyder had
19  acted in a violent or threatening way to them?
20  A    Only when it was brought to my attention
21  the incident with Jerry Chambliss.

Page 21

1   Q    And that was much more recently than 2002?
2   Would that have been in the past couple of months?
3   A    Yes. The only time I became aware is when
4   Carlos Alvarado contacted me.
5   Q    Do you know when Carlos Alvarado contacted
6   you, did he mention whether Jerry Chambliss had already
7   filed a lawsuit?
8   A    I believe he said he was not working with
9   Amtrak and he might have been in the process.
10  Q    But he had when Carlos Alvarado contacted
11  you --
12  A    I believe that he said he had an attorney
13  and that he was just trying to get some information
14  about the incident that had occurred with Steve Snyder.
15  Q    Did you speak to Mr. Chambliss about that?
16  A    Yes.
17  Q    Tell me the substance of that conversation?
18  A    Mr. Chambliss said that he spoke with
19  Carlos and Carlos had referred him to me about several
20  incidents that had happened between me and Steve Snyder
21  and he wanted to know if I had any copies of the

Page 22

1  letters that I had sent in to Amtrak, and I mentioned
2  to them that I would try to find them and if I could I
3  will forward it to him.
4       And I believe we spoke again and I told him
5  I couldn't find it because I didn't have the disk. So
6  I erased it or I lost the disk, but I did have one
7  letter stating -- he stated to me that Amtrak said that
8  they didn't have any incidents on file in reference to
9  Steve Snyder and I told him that couldn't be possible
10 because I know I had filed this paperwork. I believe I
11 had sent something else as well in reference to Steve
12 Snyder.
13      So I told him, let me look through all of
14 my papers and I will try to see, and I had one letter
15 that I had received back from Betty Blair saying that
16 she was in receipt of my letter in reference to Steve
17 Snyder and she would forward it to the appropriate
18 parties to handle the situation, and I believe I faxed
19 that letter over to Mr. Chambliss.
20   Q   In addition to Dennis Smith you said that
21 you also spoke to Deno. Was this a conversation

Page 23

1  between Dennis Smith, Deno and you or was it an
2  entirely separate conversation that you had with
3  Mr. Geif (sic)?
4    A   It was just between me and him. I believe
5  it was in reference to -- I can't remember the details
6  of the conversation, but I know it was in reference to
7  Steve Snyder, the situation what was going on.
8    Q   What did Mr. Geif say to you?
9    A   I don't recall. They were aware of the
10 situation and they were going to address it.
11      MS. SUBAR: Nothing further.
12      FURTHER EXAMINATION BY MR. HANNAWAY:
13   Q   You testified previously that this was one
14 of possibly three complaints that you filed with
15 respect to Mr. Snyder; is that correct?
16   A   Yes. I might have written up the
17 incidents; I might not have sent them in. So that's
18 why I said I can only go based --
19   Q   I understand, that's fine.
20   A   -- on my knowledge of the incident, but to
21 my recollection I remember that I typed them up.

Page 24

1    Q   It's also my recollection from your
2  testimony that you said that the others were sent in
3  after this one?
4    A   I believe so.
5    Q   And they were related to Mr. Snyder?
6    A   Yes.
7       MR. HANNAWAY: Thank you.
8       I have nothing further.
9       MS. SUBAR: Nothing further.
10         - - -
11 (Whereupon, at 1:20 P.m., deposition was adjourned.)
12         - - -
13 (By stipulation of counsel with the consent of the
14      witness, reading and signature waived.)

Page 25

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Steven Poulakos, registered Professional
3  Reporter, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken by me
7  stenographically and thereafter reduced to typewriting
8  under my supervision; and that I am neither counsel
9  for, related to, nor employed by any of the parties to
10 this case and have no interest, financial or otherwise,
11 in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 27th day of
14 September, 2005.
15
16 _____
17      Steven Poulakos,
18      Notary Public
19
20 My commission expires:
21 April 30, 2006

7 (Pages 22 to 25)

Towson Reporting Company          GORE BROTHERS           Whitman Reporting-Rockville
410-828-4148                      410-837-3027            301-279-7599
                                                          8971f9fc-85e4-4920-82fd-909f9c88096e

```
                            Page 26
 1              I N D E X
 2       Deposition of HARRY CHARLEUS
 3             August 2, 2005
 4
 5   EXAMINATION BY:                  PAGE
 6       Mr. Hannaway . . . . . . . . . . .  2
 7       Ms. Subar  . . . . . . . . . . . . 18
 8       Mr. Hannaway . . . . . . . . . . . 23
 9
10
11
12
13
14
15
16
17
18
19
20
21
```

156

Towson Reporting Company        GORE BROTHERS          Whitman Reporting-Rockville
410-828-4148                    410-837-3027                      301-279-7599
                                                  8971f9fc-85e4-4920-82fd-909f9c88096e