11.  Portion of Transcript from Union Hearing



NATIONAL RAILROAD PASSENGER CORPORATION

RE: AMTRAK FORMAL INVESTIGATION   :
                                  :
                                  :
                                  :
JERRY CHAMBLISS, SR. -,           : NO: 04.272
                                  : NO: 04.273
            Claimant             : NO: 04.274


Thursday, July 29, 2004
- - -

Formal Investigation of JERRY CHAMBLISS, SR.,

taken pursuant to notice at AMTRAK High Speed Rail

Office, 2nd Floor, 1401 W Street, N.E.,

Washington, DC 20018, on the above date,

commencing at 9:20 a.m.

---------------------------------------------

FAST ACCURATE SKILLED TRANSCRIPTION
Rosemarie Corapi, Partner
Linda McCullough, Partner
2307 Oakdale Avenue
Glenside, Pennsylvania 19038-4210
(215) 728-6157 (Ofc.)/(215) 728-6157 (Fax)

E X H I B I T S

| NUMBER | DESCRIPTION | MARKED |
|--------|-------------|--------|
| COMPANY'S | | |
| Exhibit A | Notice of Formal Investigation, Undated, for ODI File 04.272 (1 page) | 9 |
| Exhibit B | Rescheduling Letter for ODI File 04.272, Dated 7/14/04 (1 page) | 11 |
| Exhibit C | Notice of Intent to Impose Discipline Meeting for ODI File 04.272 (1 page) | 11 |
| Exhibit D | Notice of Formal Investigation, Undated, for ODI File 04.273 (1 page) | 22 |
| Exhibit E | Rescheduling Letter for ODI File 04.273, Dated 7/14/04 (1 page) | 22 |
| Exhibit F | Notice of Intent to Impose Discipline Meeting for ODI File 04.273 (1 page) | 23 |
| Exhibit G | Notice of Formal Investigation, Undated, for ODI File 04.274 (1 page) | 24 |
| Exhibit H | Rescheduling Letter for ODI File 04.274, Dated 7/14/04 (1 page) | 24 |
| Exhibit I | Notice of Intent to Impose Discipline Meeting for ODI File 04.274 (1 page) | 24 |
| Exhibit J and J-1 | Memo from Northeast Corridor Maintenance Services to Dino to Dino Giurfa Dated 6/24/04 Regarding Jerry K. Chambliss Absenteeism (2 pages) | 29 |
| Exhibit K | Absenee Report for Jerry K. Chambliss dated 6/21/04 from Kronos (1 page) | 36 |
| Exhibit L | National System Attendance Policy for all Amtrak Agreement-Covered Employees (3 pages) | 44 |

Page 3

E X H I B I T S

| NUMBER | DESCRIPTION | MARKED |
|--------|-------------|--------|
| COMPANY'S (Continued) | | |
| Exhibit M | Statement of Events by Steven Snyder Dated 5/11/04 (2 pages) | 105 |
| Exhibit N | Safety Rules and Instructions Booklet | 121 |
| Exhibit O | Statement of Chris Bello (1 page) | 136 |
| Exhibit P | Amtrak Incident Report for Incident 5/10/04 (4 pages) | 151 |
| Exhibit Q | NRPC 260, Amtrak Employee Injury/Illness Report for Jerry Chambliss, Completed on 6/14/04 by Joseph C. Allione, Jr. (2 pages) | 154 |
| Exhibit R | NRPC 488, Amtrak Medical Information and Consent Form Signed 6/21/04 by Jerry Chambliss (1 page) | 158 |
| Exhibit S | Dynamics of a Safety Handbook, Calculations by Wade Clark (4 pages) | 181 |
| Exhibit T | Employee Injury History for Jerry Chambliss (1 page) | 343 |
| ORGANIZATION'S | | |
| Exhibit 1 | Doctor's Note Regarding Jerry Chambliss Dated 5/11/04 With Return to Work Date (1 page) | 52 |
| Exhibit 2 | Consultation Note for Jerry Chambliss For Office Visit on 5/11/04 with Jeffrey Gaber, M.D., Page 1 (1 page) | 52 |
| Exhibit 3 | Assessment, Page 2, From Consultation Note by Jeffrey Gaber, M.D. (1 page) | 52 |

Page 4

E X H I B I T S

| NUMBER | DESCRIPTION | MARKED |
|--------|-------------|--------|
| ORGANIZATION'S (Continued) | | |
| Exhibit 4 | Kronos Missed Punch Form Dated 6/16/04 (1 page) | 52 |
| Exhibit 5 | E-Mail Messages Between Jennifer Cabral and Thomas Bernarding Regarding 6/16/04 (1 page) | 79 |
| Exhibit 6 | E-Mail Dated 4/8/04 From Jeff Cason, Subject: Brentwood Avenue Bridge (1 page) | 89 |
| Exhibit 7 | Printout Reflecting On-The-Job Injuries (1 page) | 98 |
| Exhibit 8 | Amtrak Injured Employee's Ten Day Report for Jerry Chambliss (1 page) | 99 |
| Exhibit 9 | AT&T Wireless Bill for Jerry Chambliss Covering 4/11/04 (3 pages) | 100 |
| Exhibit 10 | Kronos Missed Punch Form, Date of Missed Punch 6/12/04 (1 page) | 102 |
| Exhibit 11 | Overtime Authorization Form for Jerry Chambliss, Dated Worked 6/12/04 (1 page) | 102 |
| Exhibit 12 | Statement Dated 5/10/04 From B. Vullo (1 page) | 244 |
| Exhibit 13 | Statement Dated 5/10/04 From Jerry Chambliss (1 page) | 293 |
| Exhibit 14 | Request for Time Off Form For Jerry Chambliss (1 page) | 307 |
| Exhibit 15 | Letter from Attorney for Jerry Chambliss Dated 6/8/04 (1 page) | 321 |
| Exhibit 16 | Letter from Jerry Chambliss to Amtrak Dispute Resolutions Office, Undated (2 pages) | 354 |

- - -

169

I N D E X
(File No. 04.272)

| WITNESS | PAGE |
|---|---|
| JOSEPH C. ALLIONE, JR. | |
| Examination by Mr. Campbell | 25, 63, 71, 74 |
| Examination by Mr. Chambliss | 46, 65, 73, 74 |
| Examination by Mr. Humphreys | 61, 66 |
| JERRY CHAMBLISS | |
| Examination by Mr. Humphreys | 77 |
| Examination by Mr. Campbell | 80 |
| CLOSING SUMMATION | |
| By Mr. Campbell | 92 |
| By Mr. Humphreys | 93 |
| By Mr. Chambliss | 97 |

I N D E X
(File Nos. 04.273 and 04.274)

| WITNESS | PAGE |
|---|---|
| STEVEN S. SNYDER | |
| Examination by Mr. Campbell | 104, 120, 130 |
| Examination by Mr. Humphreys | 111, 119, 123, 127 |
| Examination by Mr. Chambliss | 113, 121, 125 |
| CHRISTOPHER BELLO | |
| Examination by Mr. Campbell | 132 |
| Examination by Mr. Humphreys | 139, 144 |
| Examination by Mr. Chambliss | 143 |
| DINO GUISEPPE GIURFA | |
| Examination by Mr. Campbell | 146 |
| Examination by Mr. Humphreys | 164, 175 |
| Examination by Mr. Chambliss | 173 |
| WADE CLARK | |
| Examination by Mr. Campbell | 178 |
| Examination by Mr. Humphreys | 185, 190 |
| Examination by Mr. Chambliss | 187, 192 |
| ROBERT MASCETTI | |
| Examination by Mr. Humphreys | 193 |
| Examination by Mr. Chambliss | 197 |
| Examination by Mr. Campbell | 202 |

I N D E X
(File Nos. 04.273 and 04.274, Continued)

| WITNESS | PAGE |
|---|---|
| PAMELA BUNCH | |
| Examination by Mr. Chambliss | 208, 224 |
| Examination by Mr. Humphreys | 211, 226, 230 |
| Examination by Mr. Campbell | 214, 224, 228 |
| STACEY DEFFENBAUGH | |
| Examination by Mr. Humphreys | 232 |
| Examination by Mr. Chambliss | 234, 236 |
| Examination by Mr. Campbell | 235, 237 |
| WILLIAM VULLO | |
| Examination by Mr. Chambliss | 238, 242 |
| Examination by Mr. Humphreys | 239, 245 |
| Examination by Mr. Campbell | 241, 246 |
| MICHAEL A. MCLEAN | |
| Examination by Mr. Chambliss | 247, 253, 254 |
| Examination by Mr. Humphreys | 250 |
| Examination by Mr. Campbell | 250, 254 |
| JOSEPH ALLIONE | |
| Examination by Mr. Humphreys | 256, 269 |
| Examination by Mr. Chambliss | 258, 264, 268 |
| Examination by Mr. Campbell | 261, 266 |
| CHRIS BELLO (RECALLED) | |
| Examination by Mr. Chambliss | 275 |
| JERRY CHAMBLISS, SR. | |
| Examination by Mr. Humphreys | 281 |
| Examination by Mr. Campbell | 298 |
| DINO GUISEPPE GIURFA (RECALLED) | |
| Examination by Mr. Humphreys | 332 |
| Examination by Mr. Chambliss | 332, 335, 336 |
| Examination by Mr. Campbell | 335, 336 |
| CLOSING SUMMATION | |
| By Mr. Campbell | 341 |
| By Mr. Humphreys | 344 |
| By Mr. Chambliss | 348 |

- - -

---

Page 7

P R O C E E D I N G S

MR. D'ALESSANDRO: Okay. We're on the tape now.

(Someone says: Alright. Can I -- oh, I'm sorry. Go ahead.)

MR. D'ALESSANDRO: This is a Formal Investigation being conducted by myself, Arthur D'Alessandro, the Hearing Officer of the Washington Division. Today's date is July the 29th, and the time is 9:20. We are located in the High Speed Rail Building in Washington, DC.

For the record this Investigation is being taped and will be transcribed at a later date. It is most important that everyone speak in a clear and distinct voice, somewhat slower and louder than normal to ensure each word is recorded for the inclusion in the transcribed account of these proceedings.

The Investigation will be conducted in the following manner. Only one person will speak at a time. The person being asked the question will make sure that the question has been completed before attempting to give his or her answer. Both the Charging Officer and the Employee and his

---

Page 8

[1] representative will have an opportunity to

[2] question each witness. At the conclusion of the

[3] Investigation, the Accused and his representative

[4] and the Charging Officer will be allowed to make

[5] closing statements. I will now read the Charges

[6] for the record.

[7] Okay. This is a Notice of a Formal

[8] Investigation; High Speed Rail No. is JC04.180.03;

[9] ODI File Number is 04.272. It's for

[10] Mr. Chambliss, Sr. -- Jerry is his first name,

[11] 1 Trestle Wood Court, Randallstown, Maryland

[12] 21133; High Speed Sheetmetal Worker Tech:

[13] "You are hereby instructed to appear for a

[14] Formal Investigation as indicated below:

[15] "Date: Thursday, July 22, 2004; Time:

[16] 9:00 a.m.; Place: Amtrak Investigations Office,

[17] 900 Second Street, N.E., REA Building Lower Level,

[18] Washington, DC 20002.

[19] "The purpose of this investigation is to

[20] develop the facts and determine your

[21] responsibility, if any, in connection with the

[22] following charge(s) and specification(s):

[23] "Charge: Violation of Amtrak's Standards

[24] of Excellence. Specifically, the section(s)

[25]

Page 17

[ 1]  to do?

[ 2]      MR. HUMPHREYS: Yes.

[ 3]      MR. D'ALESSANDRO: Is that your request?

[ 4]      MR. HUMPHREYS: Yes, sir.

[ 5]      MR. D'ALESSANDRO: Okay. We'll take a

[ 6]  recess until the next trial -- apparently, we have

[ 7]  two other investigations that are scheduled.

[ 8]      MR. CHAMBLISS: Correct.

[ 9]      MR. D'ALESSANDRO: One's for 10:30 -- one's

[10]  for 10:00, and one's for -- for 11:00. And what

[11]  we'll do is we'll, at the request of the

[12]  Organization, we'll combine all three hearings

[13]  together and -- but I will separate them in

[14]  determination of --

[15]      MR. ALLIONE: Can I object to this?

[16]      MR. D'ALESSANDRO: -- my decision.

[17]      You can object, though; that's not a

[18]  problem.

[19]      MR. ALLIONE: I do object to this. This

[20]  is -- like he said, this is a -- absenteeism is a

[21]  totally separate charge against the -- separated

[22]  from the other Charges that are pending. This is

[23]  a basic, strictly absenteeism, and we should be

[24]  able to just follow this through.

[25]

Page 18

[ 1]      MR. D'ALESSANDRO: That's understandable,

[ 2]  but it's not really a problem for me. We'll

[ 3]  combine everything at one time.

[ 4]      MR. CHAMBLISS: I have one other objection.

[ 5]      My objection is to Mr. Giurfa. He's gonna

[ 6]  be in here as a witness, I think. I don't

[ 7]  think -- I think he should be brought in at the

[ 8]  time he's gonna be a witness.

[ 9]      MR. D'ALESSANDRO: It's -- the witnesses

[10]  are present during my dissertation.

[11]      MR. CHAMBLISS: Oh, okay.

[12]      MR. D'ALESSANDRO: After the dissertation,

[13]  I dismiss everyone.

[14]      MR. CHAMBLISS: Okay.

[15]      MR. D'ALESSANDRO: With the exception of

[16]  the witness that's going to be questioned at that

[17]  time. Okay.

[18]      MR. CHAMBLISS: Okay.

[19]      MR. D'ALESSANDRO: I know you don't know

[20]  (inaudible) --

[21]      MR. CHAMBLISS: Yeah.

[22]      MR. D'ALESSANDRO: -- that's okay, too.

[23]      Alright. The time now is 9:30.

[24]      (In recess until later in the morning.)

[25]

Page 19

[ 1]      MR. D'ALESSANDRO: We're back on the record

[ 2]  at 12 minutes after 10:00. We're reconvening

[ 3]  because of the combination of the two other

[ 4]  trials. I am going to read the Charges 04.273 --

[ 5]  well before we do that, why don't we go around the

[ 6]  room and you can recognize yourself for the

[ 7]  record.

[ 8]      Mr. Campbell.

[ 9]      MR. CAMPBELL: Bernard Campbell, Charging

[10]  Officer for the NRPC.

[11]      MR. ALLIONE: Joe Allione, Amtrak High

[12]  Speed Rail.

[13]      MR. SNYDER: Steve Snyder, Amtrak Foreman

[14]  II, Supervisor Technician.

[15]      MS. BUNCH: Pamela Bunch, Coach Cleaner.

[16]      MR. MASCETTI: Robert Mascetti, Sheetmetal.

[17]      MR. HUMPHREYS: John Humphreys, Sheetmetal

[18]  Worker Local Chairman.

[19]      MR. CHAMBLISS: Jerry Chambliss, Sheetmetal

[20]  Worker, High Speed Rail.

[21]      MR. D'ALESSANDRO: Sir.

[22]      MR. BERNARDING: Tom Bernarding,

[23]  Supervisor, NEC.

[24]      MR. DEFFENBAUGH: Stacey Deffenbaugh,

[25]

Page 20

[ 1]  Electrician, Amtrak.

[ 2]      MR. VULLO: William Vullo, Supervisor, NEC.

[ 3]      MR. D'ALESSANDRO: Sir.

[ 4]      MR. McLEAN: Michael McLean, Amtrak Foreman

[ 5]  II.

[ 6]      MR. CLARK: Wade Clark, Engineering

[ 7]  Manager, NEC-MSC.

[ 8]      MR. GIURFA: Dino Giurfa, Assistant

[ 9]  Superintendent, High Speed Rail.

[10]      MR. BELLO: Chris Bello, General Foreman,

[11]  High Speed Rail.

[12]      MR. D'ALESSANDRO: Okay. First set of

[13]  Charges I'm going to read are 02.473. They're for

[14]  Mr. Chambliss, Sr., Jerry, 1 Trestle Wood Court,

[15]  Randallstown, MD 21133.

[16]      They'll all be to the same address; they'll

[17]  all be to the same gentleman.

[18]      "You are hereby instructed to appear for a

[19]  Formal Investigation as indicated below:

[20]      "Date: July 22, 2004; Time: 10:00 a.m.;

[21]  Place: Amtrak Investigations Office, 900 Second

[22]  Street, N.E., REA Building, Lower Level,

[23]  Washington, DC.

[24]      "The purpose of this investigation is to

[25]

Page 21

[1] develop the facts and determine your

[2] responsibility, if any, in connection with the

[3] following charge(s) and specification(s):

[4]     "Charge: Violation of Amtrak's Standards

[5] of Excellence.  Specifically, the section(s)

[6] pertaining to 'Safety,' reading in part:

[7] "Immediately report to your supervisor all

[8] injuries and illnesses that occur...'.

[9]     "Specification: While assigned as a

[10] pipefitter with High Speed Rail on May 10, 2004,

[11] you allegedly sustained an injury.  This injury

[12] was not reported in a timely manner.

[13]     "You may produce any witnesses you so

[14] desire and you may be accompanied by a

[15] representative as provided for in your current

[16] governing bargaining agreement without expense to

[17] the National Railroad Passenger Corporation.

[18]     "All requests for postponement of this

[19] investigation must be handled through the

[20] Investigation Office at (202) 906-2383 or direct

[21] written correspondence to the above mentioned

[22] address.  All requests for postponements are

[23] granted through the Hearing Office."

[24]     This will be Exhibit D.

[25]

Page 22

[1]     (Exhibit D marked for identification.)

[2]     MR. D'ALESSANDRO:  We're going to read a

[3] postponement letter that goes along with those

[4] Charges, addressed to the same gentleman, File No.

[5] 04.273.

[6]     Your investigation scheduled to be held on

[7] July 22, 2004, was postponed upon the request of

[8] the Carrier and the Organization by mutual

[9] agreement has been rescheduled, and the

[10] rescheduled time and date are as follows:

[11]     Thursday, July 29, 2004; 10:00 a.m.; ODI

[12] Office - Lower Level, REA Building, 900 Second

[13] Street, N.E., Washington, DC.

[14]     Your failure to present yourself at the

[15] above-scheduled investigation may result in it

[16] being conducted in absentia.

[17]     As agreement to all parties concerned, this

[18] was relocated to the High Speed Rail facility.

[19]     This is Exhibit E.

[20]     (Exhibit E marked for identification.)

[21]     MR. D'ALESSANDRO:  And then we have a

[22] Notice of Intent, an NOI notice, which is the same

[23] exact language as the Charges, and that's Exhibit

[24] F.

[25]

Page 23

[1]     (Exhibit F marked for identification.)

[2]     MR. D'ALESSANDRO:  That takes care of those

[3] sets of Charges.

[4]     The next set of Charges is for the same

[5] gentleman, Mr. Chambliss; ODI No. 04.274.  He's a

[6] High Speed Rail Sheetmetal Worker Technician.

[7]     "You are hereby instructed to appear for a

[8] Formal Investigation as indicated below:

[9]     "Date:  July 22, 2004; Time:  11:00 a.m.;

[10] Place:  Amtrak Investigations Office, 900 Second

[11] Street, N.E., REA Building, Lower Level,

[12] Washington, DC.

[13]     "The purpose of this investigation is to

[14] develop the facts and determine your

[15] responsibility, if any, in connection with the

[16] following charge(s) and specification(s):

[17]     "Charge:  Violation of Amtrak's Standards

[18] of Excellence.  Specifically, the section(s)

[19] pertaining to 'Truth and Honesty' and 'Integrity,'

[20] which reads in part:  'We will always tell the

[21] truth'.

[22]     "Specification:  While assigned as a

[23] pipefitter with High Speed Rail you allegedly

[24] claimed an injury sustained on May 10, 2004.  When

[25]

Page 24

[1] asked by supervision and Amtrak Police Department,

[2] you claimed no injury at the time of the alleged

[3] incident.

[4]     "You may produce any witnesses you so

[5] desire and you may be accompanied by a

[6] representative as provided for in your current

[7] governing bargaining agreement without expense to

[8] the National Railroad Passenger Corporation...".

[9]     This will be Exhibit G.

[10]     (Exhibit G marked for identification.)

[11]     MR. D'ALESSANDRO:  Then we have a

[12] postponement letter to this date, "H".

[13]     (Exhibit H marked for identification.)

[14]     MR. D'ALESSANDRO:  And we have an NOI

[15] Letter, which will be "I".

[16]     (Exhibit I marked for identification.)

[17]     MR. D'ALESSANDRO:  We are aware of these

[18] Charges --

[19]     MR. CHAMBLISS:  Yes, sir.

[20]     MR. D'ALESSANDRO:  -- Mr. Chambliss.

[21]     Okay.  Now I'll give the Carrier -- the

[22] Charging Officer is going to be Mr. --

[23]     MR. CAMPBELL:  Campbell.

[24]     MR. D'ALESSANDRO:  Mr. B. L. Campbell.

[25]

Page 25

[ 1] He's going to handle the trial as the Charging

[ 2] Officer.

[ 3]    Would you call your first witness?

[ 4]    MR. CAMPBELL: Yes. At this time I'd like

[ 5] to ask Mr. Allione, Amtrak — (unintelligible) III

[ 6] or Manager?

[ 7]    MR. ALLIONE: Manager.

[ 8]    MR. CAMPBELL: — Manager, for my first

[ 9] witness.

[10]    MR. D'ALESSANDRO: Okay. The rest of you

[11] gentlemen and ladies are dismissed. Don't discuss

[12] the case with anyone, either one of you, or

[13] yourself.

[14]    The time now is 19 after 10:00.

[15]    Okay. Mr. Campbell.

[16]    MR. CAMPBELL: Yes. How are you doing

[17] today, Mr. Allione.

[18]    MR. CHAMBLISS: Yes.

[19]    MR. CAMPBELL: Could you please tell this

[20] distinguished Hearing Officer who you are, a

[21] little about your background, how long have you

[22] worked for Amtrak; little chitter-chatter?

[23]    MR. ALLIONE: Joe Allione, Quality

[24] Assurance Inspector for High Speed Rail. I've

[25]

Page 26

[ 1] been a Charging Officer for High Speed Rail

[ 2] Washington since November of 2003.

[ 3]    MR. CAMPBELL: That's fine. You did say

[ 4] that you work for High Speed Rail —

[ 5]    MR. ALLIONE: Correct.

[ 6]    MR. CAMPBELL: — is that not correct?

[ 7]    MR. ALLIONE: Correct.

[ 8]    MR. CAMPBELL: Mr. Chambliss, does he work

[ 9] for High Speed Rail?

[10]    MR. ALLIONE: He does.

[11]    MR. CAMPBELL: You understand the Charges

[12] on absenteeism against this gentleman?

[13]    MR. ALLIONE: I do.

[14]    MR. CAMPBELL: Do you have any information

[15] that might give us some insight on the days that

[16] he has missed?

[17]    MR. ALLIONE: I have the original memo from

[18] Northeast Corridor Maintenance Services Company,

[19] which takes the information from the time

[20] management system, Kronos.

[21]    MR. CAMPBELL: Could I have that for a

[22] second, please. I'd like to pass off a copy to

[23] the Union.

[24]    MR. HUMPHREYS: We have a copy. We'd like

[25]

Page 27

[ 1] to make an objection.

[ 2]    MR. D'ALESSANDRO: Okay. What's your

[ 3] objection, sir.

[ 4]    MR. HUMPHREYS: We want to object to the

[ 5] simple fact that quite a few of these dates in

[ 6] question have gone passed or exceeded their time

[ 7] limits, Rule 23, paragraph b, in part that reads:

[ 8] No charges shall be made that involve any offense

[ 9] of which the Company has had actual knowledge 30

[10] calendar days or more, except where civil action

[11] or criminal proceeding results from the offense.

[12]    Not only that, we'd like to also object to

[13] the fact that — hold on one second —

[14]    UNIDENTIFIED SPEAKER: There's no specific

[15] charge.

[16]    MR. HUMPHREYS: Right.

[17]    There is no specific charge. The Charges

[18] are vague, in general. There's no charge, as well

[19] that says — is it 3 in 30 or 5 in 90, that way we

[20] can have a viable defense to argue the Charges.

[21]    MR. D'ALESSANDRO: I'll so note these for

[22] the record, your objection. The time limit issue,

[23] of course, we'll have to see if they — what they

[24] charged him with and what proof they're going

[25]

Page 28

[ 1] to — what documentation they're going to provide,

[ 2] what testimony they're going to provide to back up

[ 3] that statement.

[ 4]    MR. HUMPHREYS: Okay.

[ 5]    MR. D'ALESSANDRO: Okay. Thank you.

[ 6] Mr. Campbell.

[ 7]    MR. CAMPBELL: Yes. As you were saying,

[ 8] I'd like to have another copy —

[ 9]    MR. ALLIONE: Yes.

[10]    MR. CAMPBELL: — do you have it to give to

[11] the Hearing Officer. Mr. Hearing Officer, I'd

[12] like to put this into exhibit as our first

[13] exhibit. This will be a Memo that Mr. Allione

[14] will discuss in further detail, sir. I'm handing

[15] you your copy of the memo.

[16]    MR. HUMPHREYS: I'm sorry I —

[17]    MR. D'ALESSANDRO: Okay.

[18]    MR. CAMPBELL: It's a two-page document.

[19]    MR. HUMPHREYS: I'm sorry. I have another

[20] objection, sir.

[21]    MR. D'ALESSANDRO: Okay.

[22]    MR. HUMPHREYS: The fact that the, at the

[23] very bottom of the memo, it states all the

[24] discipline, investigated request —

[25]

Page 29

[ 1]    MR. CHAMBLISS: No. No. No. No.

[ 2]    MR. HUMPHREYS: Oh. I'm sorry. It has

[ 3] been removed. I don't have a copy of that.

[ 4]    Thank you, sir.

[ 5]    MR. CAMPBELL: That's why we were asking

[ 6] you, sir, if you would like to have a copy.

[ 7]    MR. HUMPHREYS: Alright. Right. We got

[ 8] it. Well I had a copy, just not that same copy.

[ 9]    MR. D'ALESSANDRO: Okay.

[10]    MR. CAMPBELL: I know, sir.

[11]    MR. HUMPHREYS: Thank you.

[12]    MR. D'ALESSANDRO: This is a two-page

[13] document, apparently, or are they two separate

[14] documents?

[15]    MR. ALLIONE: Two-page, one document.

[16]    MR. D'ALESSANDRO: Two-page, one document.

[17] It will be Exhibit J and J-1. Okay.

[18]    (Exhibits J and J-1 marked for

[19] identification.)

[20]    MR. CHAMBLISS: Can we get a copy of the

[21] second page?

[22]    MR. ALLIONE: Certainly.

[23]    MR. HUMPHREYS: Thank you.

[24]    MR. CAMPBELL: Could you please continue,

[25]

Page 30

[ 1] Mr. Allione.

[ 2]    MR. ALLIONE: Yes. This is a document, a

[ 3] memo from Northeast Corridor Maintenance Services

[ 4] Company to Dino Giurfa, Amtrak Assistant

[ 5] Superintendent, High Speed Rail, from Frank

[ 6] Christello, Human Resources Manager, dated June

[ 7] 25, 2004; Subject: Request for Discipline

[ 8] Investigation for Excessive Absenteeism.

[ 9]    It was received by this office on June 25,

[10] 2004 as stamped at the right-hand corner. My

[11] initials are seated(?) with the date next to the

[12] subject line.

[13]    The employee listed below has incurred

[14] three or more occurrences (illustrated below) as

[15] defined by the Amtrak National System Attendance

[16] Policy since a discipline investigation was last

[17] requested regarding their attendance on 5/1/2003:

[18]    Chambliss, Jerry K.; social security

[19] number.

[20]    Type of Occurrence - Sick (Unpaid):

[21] Monday, May 3, 2004; Tuesday, May 11, 2004 -

[22]    MR. HUMPHREYS: We want to object to that.

[23]    MR. D'ALESSANDRO: Yes, sir.

[24]    MR. HUMPHREYS: These are a part of the

[25]

Page 31

[ 1]    injury that he sustained that we are going to get

[ 2] into as we advance in the Hearing. These dates of

[ 3] May 12th or 11th, 12th, 13th, and 16th.

[ 4]    MR. D'ALESSANDRO: Eleventh, 12th --

[ 5]    MR. HUMPHREYS: Thirteenth.

[ 6]    MR. D'ALESSANDRO: -- 13th --

[ 7]    MR. HUMPHREYS: And 16th.

[ 8]    MR. D'ALESSANDRO: -- and 16th. If they

[ 9] con -- if they concur with the injury —

[10]    MR. CHAMBLISS: Yes, sir.

[11]    MR. D'ALESSANDRO: -- we'll withdraw that.

[12]    MR. CHAMBLISS: Alright.

[13]    MR. D'ALESSANDRO: I'll address that.

[14]    MR. HUMPHREYS: Okay. Thank you.

[15]    MR. ALLIONE: Okay. Type of Occurrence -

[16] Unexcused Absence (Unpaid). Date: Thursday, June

[17] 17, 2004; Date: Sunday, June 20, 2004.

[18]    MR. HUMPHREYS: We'd also like to object to

[19] that, too.

[20]    MR. D'ALESSANDRO: Okay.

[21]    MR. HUMPHREYS: It's not two separate

[22] occurrences under the Amtrak Attendance Policy,

[23] states in part: A single absence from work or

[24] assignment on one or more consecutive days for the

[25]

Page 32

[ 1]    same reason. His ADO's just happen to be, or his

[ 2] assigned days off, just happen to be between these

[ 3] two.

[ 4]    MR. D'ALESSANDRO: I don't want to

[ 5] interrupt you, but I'll note that objection for

[ 6] the record. But when you make -- when you

[ 7] cross-examine him --

[ 8]    MR. HUMPHREYS: Yes, sir. Okay.

[ 9]    MR. D'ALESSANDRO: -- you can clarify that.

[10]    MR. HUMPHREYS: Oh. Alright.

[11]    MR. D'ALESSANDRO: Okay. Not a problem.

[12]    MR. ALLIONE: To continue, Type of

[13] Occurrence - Early Quit: Wednesday, June 16,

[14] 2004; 1 hour 8 minutes.

[15]    Type of Occurrence - Late Start: Sunday,

[16] April 11, 2004 - 46 minutes; Monday, April 12,

[17] 2004 - 1 minute; Sunday, June 13, 2004 - 22

[18] minutes.

[19]    The bottom of the memo reads: In

[20] accordance with Amtrak National System Attendance

[21] Policy, this employee received all required

[22] warnings and NECMSC requested Discipline

[23] Investigations as illustrated below.... Those

[24] dates listed have been blanked off for the purpose

[25]

*174*

Page 33

[ 1] of this court -- or hearing.

[ 2]     MR. CAMPBELL: Was this a two-page document

[ 3] that you turned in?

[ 4]     MR. ALLIONE: And to continue with the

[ 5] second page -- (requests the second page from

[ 6] someone) --

[ 7]     Page two: It is clear from their

[ 8] attendance record that this employee has not taken

[ 9] any action to correct their behavior or improve

[10] their attendance after receiving the appropriate

[11] warnings.

[12]     Please make arrangements to make another

[13] discipline investigation charging the employee

[14] with excessive absenteeism and violation of the

[15] Amtrak National System Attendance Policy.

[16]     If additional information is needed, please

[17] don't hesitate to contact my office. Frank

[18] Christello, Manager, Human Resources; signed.

[19]     MR. CAMPBELL: Alright. Is that the only

[20] information that you have pertaining to this

[21] gentleman missing time?

[22]     MR. ALLIONE: I also have a report out of

[23] Kronos, which just denotes the -- it's an

[24] absentee -- absentee report which shows the actual

[25]

Page 34

[ 1] coding that they were given.

[ 2]     MR. CAMPBELL: You say it was Kronos?

[ 3]     MR. ALLIONE: It comes from the Kronos --

[ 4]     MR. HUMPHREYS: We object. We don't have a

[ 5] copy of that.

[ 6]     MR. ALLIONE: I can make a copy of that.

[ 7]     MR. D'ALESSANDRO: Could you tell me what

[ 8] that is?

[ 9]     MR. CAMPBELL: Yes. That's what we --

[10]     MR. D'ALESSANDRO: Explain that to me.

[11]     MR. CAMPBELL: That's what we were trying

[12] to do --

[13]     MR. D'ALESSANDRO: Okay.

[14]     MR. CAMPBELL: -- and we do have copies

[15] once we clear this through you, sir.

[16]     MR. D'ALESSANDRO: Okay. Thank you.

[17]     MR. CAMPBELL: Could you finish telling us

[18] what Kronos is, so they can have an idea of what

[19] this is?

[20]     MR. ALLIONE: Okay. Kronos is the

[21] electronic timekeeping timeclock for High Speed

[22] Rail. It's used primarily in Washington, DC. It

[23] uses a magnetic -- or excuse me, bar-coded swipe

[24] card to swipe in and out of your time versus using

[25]

Page 35

[ 1] a paper time card.

[ 2]     MR. CAMPBELL: Yes. Now on that there are

[ 3] dates. The only dates I'd like for you to put

[ 4] into evidence are the dates that are pertaining to

[ 5] this specific hearing, specific hearing that's

[ 6] being held today.

[ 7]     MR. ALLIONE: Yes, sir.

[ 8]     MR. CAMPBELL: Do you have copies of that?

[ 9]     MR. ALLIONE: I did.

[10]     MR. CAMPBELL: Take a look. If not, please

[11] take a moment and we'll go get some.

[12]     Could we have about two minutes, sir?

[13]     MR. D'ALESSANDRO: You can take a couple

[14] minutes. I'd like to highlight them as you review

[15] them --

[16]     MR. CAMPBELL: Yes.

[17]     MR. D'ALESSANDRO: -- just to make sure

[18] they're clarified in my mind when I make a

[19] decision. The time now is 28 after.

[20]     (Off the record.)

[21]     MR. D'ALESSANDRO: Okay.

[22]     MR. CAMPBELL: Yes. As -- as we left

[23] off -- I'm sorry. Put us back on.

[24]     MR. D'ALESSANDRO: Back on the record.

[25]

Page 36

[ 1] It's 10:34. Mr. Campbell.

[ 2]     MR. CAMPBELL: Thank you, Mr. D'Alessandro.

[ 3]     As we left off with before we had to make a

[ 4] move, I was asking you did you have anything else

[ 5] and you explained a report that you had. Could

[ 6] you finish explaining that -- and I'd also like to

[ 7] give the Hearing Officer a copy of this. We'd

[ 8] like to make this an exhibit.

[ 9]     MR. D'ALESSANDRO: Okay. This is an

[10] exhibit dated, I guess 6/21/04?

[11]     MR. ALLIONE: Correct.

[12]     MR. D'ALESSANDRO: And that will be Exhibit

[13] K, one page.

[14]     (Exhibit K marked for identification.)

[15]     MR. CAMPBELL: Mr. Allione.

[16]     MR. ALLIONE: Okay. Absent Employees,

[17] Printed for B. Hayes; Employee: Chambliss, Jerry

[18] K.; Time Frame: Range of Dates -- we're not going

[19] to discuss all these dates -- Range of Dates:

[20] 01/01/2004 to 6/21/2004; Printed on: 6/21/2004;

[21] Printed at 9:26 a.m. -- excuse me 9:23 a.m.; Page

[22] 1 of 1.

[23]     Employee Name: Chambliss, Jerry K.;

[24] Employee ID number, Social Security. We are not

[25]

Page 37

[ 1]  discussing the dates at the top. We're starting
[ 2]  with Monday, May 3rd --
[ 3]      MR. HUMPHREYS:  I have an objection.
[ 4]      MR. ALLIONE:  -- 2004.
[ 5]      MR. CAMPBELL:  Excuse me.
[ 6]      (Can I have an objection?)
[ 7]      MR. D'ALESSANDRO:  Yes, you can.  What's
[ 8]  your objection, sir?
[ 9]      MR. CHAMBLISS:  The date at the bottom is
[10]  not on the paperwork.  The last date is 6/20, is
[11]  not on the paperwork.
[12]      MR. D'ALESSANDRO:  The paperwork that he
[13]  gave us previously?
[14]      MR. CHAMBLISS:  Yeah.  The memo --
[15]      MR. CAMPBELL:  The initial charge?
[16]      MR. CHAMBLISS:  Initial charge.
[17]      MR. D'ALESSANDRO:  It's not on Exhibit J.
[18]  Is that what you're talking about?
[19]      MR. CHAMBLISS:  Um --
[20]      MR. CAMPBELL:  Yes.  That's the exhibit
[21]  he's talking about.
[22]      MR. CHAMBLISS:  Yeah.
[23]      MR. D'ALESSANDRO:  Yes; 6/20 is not on
[24]  there.  I don't see it on there.
[25]

Page 38

[ 1]      MR. CAMPBELL:  Sir, if you look --
[ 2]      MR. ALLIONE:  On the right side.
[ 3]      MR. D'ALESSANDRO:  Oh, yes, it is on there.
[ 4]      MR. CAMPBELL:  Okay.
[ 5]      MR. D'ALESSANDRO:  It's:  Type of
[ 6]  Occurrence - Unexcused Absence; it's the second --
[ 7]  second one down.
[ 8]      MR. CHAMBLISS:  Well then that's not the
[ 9]  same copy I received.
[10]      MR. D'ALESSANDRO:  It's Exhibit J, on the
[11]  Memo --
[12]      MR. CHAMBLISS:  Oh, yes, it is.  I'm sorry.
[13]  I'm sorry.  Right.
[14]      MR. D'ALESSANDRO:  Okay.
[15]      MR. CHAMBLISS:  I'm sorry.  It is on there.
[16]  I'm sorry.  I made a mistake.
[17]      MR. D'ALESSANDRO:  Okay.  Mr. Allione.
[18]      MR. ALLIONE:  Okay.  Monday, May 3rd, 2004;
[19]  Absence Type:  Absence -- all of these will be
[20]  Absence Type:  Absence -- handwritten, sick.
[21]      Tuesday, May 11, 2004; handwritten, sick.
[22]      MR. HUMPHREYS:  These will be the ones that
[23]  we object to -- excuse me.  Objection.
[24]      MR. CAMPBELL:  Your objection, sir.
[25]

Page 39

[ 1]      MR. D'ALESSANDRO:  These are the ones that
[ 2]  you -- that are on this.
[ 3]      MR. HUMPHREYS:  The 11th, 12, 13th, and
[ 4]  16th.
[ 5]      MR. D'ALESSANDRO:  Right.  This is your
[ 6]  objection:  The 11th, the 12th, the 13th, and the
[ 7]  16th.
[ 8]      MR. HUMPHREYS:  Yes, sir.  These are a
[ 9]  result of the injury.
[10]      MR. D'ALESSANDRO:  Right.  Okay.
[11]      MR. ALLIONE:  These are -- those dates were
[12]  marked as "sick".  Thursday, May 20th; had an
[13]  excused absence.  Thursday, June 3rd, had an
[14]  excused absence.  Those two dates do not -- are
[15]  not on the original charges.
[16]      Thursday, June 17, 2004; absence "61", "61"
[17]  being unexcused absence - unpaid.
[18]      Sunday, 6/20/2004; absence "61",
[19]  unexcused - unpaid.
[20]      MR. HUMPHREYS:  That will also be objected
[21]  to the fact that that was one occurrence.
[22]      MR. D'ALESSANDRO:  That's understood.
[23]      MR. HUMPHREYS:  Okay.  Alright.
[24]      MR. D'ALESSANDRO:  That was noted for the
[25]

Page 40

[ 1]  record the last time.
[ 2]      MR. HUMPHREYS:  Right.
[ 3]      MR. CAMPBELL:  Now Mr. Allione where --
[ 4]      MR. ALLIONE:  Yes.
[ 5]      MR. CAMPBELL:  -- do these reports get
[ 6]  generated from?
[ 7]      MR. ALLIONE:  The reports themselves get
[ 8]  generated from the Kronos database.
[ 9]      MR. CAMPBELL:  How does that information
[10]  get to the database; how does -- how does(sic)
[11]  they know that Mr. Chambliss represented these
[12]  days?
[13]      MR. ALLIONE:  In the Kronos system -- in
[14]  the Kronos Timekeeping System, the job position is
[15]  coded into the Kronos as to what days off and
[16]  times they're supposed to start on a daily basis.
[17]  If an individual swipes out before or after the
[18]  scheduled start time in Kronos, it throws an
[19]  electronic flag.  The same as at the end of the
[20]  shift, if a person clocks in -- or clocks out more
[21]  than eight minutes prior to the end of the shift
[22]  or anytime after the shift, then it will throw up
[23]  a flag, electronic flag, and then the Timekeeper
[24]  for NECMSC has to go back in and either modify the
[25]

Page 41

[1]  time, correct the time or explain why there is a

[2]  difference.

[3]      MR. CAMPBELL: Alright. You made a

[4]  statement about swiping. Could you clarify what

[5]  do you mean by "swiping"?

[6]      MR. ALLIONE: "Swiping is the NECMSC ID card

[7]  that each employee is issued at High Speed Rail;

[8]  has a bar-coded strip on the back of it. They

[9]  take a bar-coded strip and swipe it through a

[10]  timeclock machine, which is connected through a

[11]  modem to a central computer.

[12]      MR. CAMPBELL: And you made another

[13]  terminology, a red -- "red flag pops up"; what do

[14]  you mean by that?

[15]      MR. ALLIONE: No. I said an electronic

[16]  flag.

[17]      MR. CAMPBELL: Okay. Electronic flag.

[18]      MR. ALLIONE: There's a signal that's sent

[19]  to the Timekeeper when they're going through the

[20]  Kronos machine -- through the Kronos database.

[21]  The numbers, for example, if I clocked out -- if

[22]  I'm supposed to quit at 4:00 and I clocked out at

[23]  3:45, those numbers will be red, the color red, on

[24]  the Kronos -- in the database.

[25]

Page 42

[1]      MR. CAMPBELL: Alright. And what --

[2]      MR. ALLIONE: Which indicates that I

[3]  clocked out early.

[4]      MR. CAMPBELL: Thank you.

[5]      Would it also be the same thing if you came

[6]  in late?

[7]      MR. ALLIONE: Correct.

[8]      MR. CAMPBELL: What about if you had Code

[9]  60?

[10]      MR. ALLIONE: The codes, the actual codes,

[11]  have to be manually inputted in by the Timekeeper.

[12]      MR. CAMPBELL: Alright. Could you please

[13]  explain to me a little bit about the codes. What

[14]  is the code for being sick?

[15]      MR. ALLIONE: The code for being sick is

[16]  Code 60.

[17]      MR. CAMPBELL: Do you know what the code is

[18]  for being off without permission?

[19]      MR. ALLIONE: Sixty-one (61).

[20]      MR. CAMPBELL: What about early departure?

[21]      MR. ALLIONE: Sixty-seven (67).

[22]      MR. CAMPBELL: What about late --

[23]      MR. ALLIONE: I'm sorry.

[24]      MR. CAMPBELL: -- arrival?

[25]

Page 43

[1]      MR. ALLIONE: Early departure is a "68".

[2]  Early departure --

[3]      MR. CAMPBELL: Is it a 67 and 68, one of

[4]  those?

[5]      MR. ALLIONE: Sixty-seven (67) or 68.

[6]      MR. CAMPBELL: Right. That's either early

[7]  or late --

[8]      MR. ALLIONE: Correct.

[9]      MR. CAMPBELL: -- those two codes represent

[10]  that; is that not correct?

[11]      MR. ALLIONE: That is correct.

[12]      MR. HUMPHREYS: I have an objection. What

[13]  is that -- how is that relevant to what -- the

[14]  questions there relevant to what we're -- this

[15]  Kronos right here and Charges?

[16]      MR. D'ALESSANDRO: Is he charged with late

[17]  arrivals or early departures?

[18]      MR. CAMPBELL: Yes, sir.

[19]      MR. D'ALESSANDRO: It's on Exhibit what?

[20]      MR. ALLIONE: "J".

[21]      MR. CAMPBELL: Go back to Exhibit J.

[22]      MR. D'ALESSANDRO: Okay. So he's charged

[23]  with it on the 16th of June. Okay. I'll have --

[24]      MR. CAMPBELL: Can I proceed, sir.

[25]

Page 44

[1]      MR. D'ALESSANDRO: Yeah. I'll have to

[2]  overrule your objection, because it's in the

[3]  record. Go ahead.

[4]      MR. CAMPBELL: Okay. Do you have

[5]  guidelines of how you charge people, that you use?

[6]      MR. ALLIONE: Yes, I do.

[7]      MR. CAMPBELL: And what guidelines do you

[8]  use?

[9]      MR. ALLIONE: I use the Amtrak's National

[10]  System Attendance Policy for one. I also have all

[11]  of the -- I have access to all the Labor

[12]  Agreements between the craft unions and --

[13]  Agreements between the craft unions and Amtrak

[14]  Corporation.

[15]      MR. CAMPBELL: The -- specifically I have a

[16]  document I would like to put in as an exhibit.

[17]  It's on two sides and if --

[18]      MR. HUMPHREYS: Right. We have that.

[19]      MR. CAMPBELL: -- I'd like for you to look

[20]  at this exhibit, and on the flip side -- side

[21]  two -- there are three bullets halfway through the

[22]  information.

[23]      (Exhibit L marked for identification.)

[24]      MR. ALLIONE: Correct.

[25]

Page 45

[1]        MR. CAMPBELL: -- and I'd like for you to
[2]    read me how you could charge someone in an
[3]    excessive absenteeism.
[4]        MR. ALLIONE: Do you want me to start
[5]    (inaudible)?
[6]        MR. CAMPBELL: Yes. You could start with
[7]    "the potential need for counseling", and read that
[8]    entire paragraph.
[9]        MR. ALLIONE: Alright.
[10]        The potential need for counseling or
[11]    discipline is determined when an employee is
[12]    excessively absent. An employee may be regarded
[13]    as having an instance of excessive
[14]    absence/tardiness whenever his/her attendance
[15]    record shows any of the following:
[16]        The third occurrence of absence and/or
[17]    tardiness in a 30-day period.
[18]        A fifth occurrence of absence and/or
[19]    tardiness in a 90-day period.
[20]        Eleven or more days of absence in any
[21]    12-month period regardless of the number of
[22]    occurrences. Each additional day after eleven
[23]    days may result in additional action. This will
[24]    not apply in situations where the employee has
[25]

Page 46

[1]    experienced an extended absence to recover from a
[2]    serious medical condition, for example surgery,
[3]    that has been confirmed by the employee's
[4]    attending physician to Amtrak's medical officer.
[5]        Instances of excessive absenteeism and
[6]    tardiness will be addressed in accordance with
[7]    Amtrak's guidelines on counseling and discipline
[8]    that is attached. Expungement will be in
[9]    accordance with Amtrak's national policy agreed to
[10]    by the Joint Labor/Management Productivity Council
[11]    in 1988, as may -- or as may have been
[12]    subsequently agreed to between Amtrak and the
[13]    labor organizations.
[14]        MR. CAMPBELL: Did Mr. Chambers fall within
[15]    that Policy?
[16]        MR. ALLIONE: Yes, he did.
[17]        MR. CAMPBELL: I have no further questions
[18]    for Mr. Allione at this time.
[19]        MR. D'ALESSANDRO: Mr. Chambliss, do you
[20]    have any questions for this gentleman?
[21]        MR. CHAMBLISS: Yes, I do.
[22]        Referring to Memo J -- I mean Exhibit J.
[23]    How are you doing, Mr. Allione?
[24]        MR. ALLIONE: Good, Jer.
[25]

Page 47

[1]        MR. CHAMBLISS: On the dates May 2nd, May
[2]    the -- well May 11th, 12, 13th and 16th, did you
[3]    receive any documentation on those dates about
[4]    those absences?
[5]        MR. ALLIONE: Are you asking me as a
[6]    witness?
[7]        MR. CHAMBLISS: Yes. I'm asking you did
[8]    you receive any documentation about those dates?
[9]        MR. D'ALESSANDRO: Do you need a minute?
[10]        (No response.)
[11]        MR. ALLIONE: Yes.
[12]        MR. CHAMBLISS: What documents, if any, did
[13]    you receive?
[14]        MR. ALLIONE: I have one from Dr. Jeffrey
[15]    Gaber and Associates, dated 5/11/2004.
[16]        MR. CHAMBLISS: And -- let me see which one
[17]    you have.
[18]        Alright. Could you read what that says,
[19]    please?
[20]        MR. ALLIONE: Dr. Jeffrey Gaber and
[21]    Associates, 101 West Read Street #515,
[22]    Professional Arts Building, Baltimore, Maryland
[23]    21201; 410-986-4400.
[24]        Patient Information: Jerry Chambliss
[25]

Page 48

[1]    handwritten.
[2]        Typed: To Whom it May Concern: I hereby
[3]    certify the following statements for the patient
[4]    listed above. This patient had an appointment in
[5]    this office on    handwritten    5/11/04.
[6]    Typed    This patient has been unable to return to
[7]    work from    handwritten    5/11/04 to 5/16/04.
[8]    Again typed    This patient is allowed to return
[9]    to work on    handwritten    5/17/04. Typed
[10]    The following restriction(s) will apply until
[11]    further notice: Blank. Typed    Miscellaneous
[12]    Restrictions: Blank.
[13]        Signed: Handwritten    Jeffrey D. Gaber...
[14]    I can't figure out the rest.
[15]        MR. CHAMBLISS: M.D.
[16]        MR. ALLIONE: I was thinking "M.D." but
[17]    then it's got something --
[18]        MR. CHAMBLISS: Well it's --
[19]        MR. ALLIONE: -- after that.
[20]        MR. CHAMBLISS: -- underneath the bottom of
[21]    that, like, Jeffrey Gaber, M.D.
[22]        MR. ALLIONE: Okay.
[23]        MR. CHAMBLISS: Okay. Did you receive any
[24]    other documentation?
[25]

[ 1]    MR. ALLIONE:  I have --

[ 2]    MR. CHAMBLISS:  For that -- from a doctor?

[ 3]    MR. D'ALESSANDRO:  Are you going to submit

[ 4] these?

[ 5]    MR. CHAMBLISS:  Yes.  I don't have copies.

[ 6]    MR. D'ALESSANDRO:  Okay.

[ 7]    MR. CHAMBLISS:  I don't know if we can make

[ 8] copies.  This is the one he's talking about now.

[ 9]    MR. D'ALESSANDRO:  Okay.  Let's look at

[10] that.  Go ahead.

[11]    MR. ALLIONE:  Okay.  I have one also

[12] dated -- I believe it's dated 5/11; am I reading

[13] that right:  D/V, Date of Visit?

[14]    MR. CHAMBLISS:  I can't see what you got.

[15]    MR. CAMPBELL:  (Unintelligible) date of

[16] visit, 5/11.

[17]    MR. ALLIONE:  5/11?

[18]    UNIDENTIFIED SPEAKER:  Uh-huh.

[19]    (Inaudible comments.)

[20]    MR. ALLIONE:  From Dr. Jeffrey D. Gaber &

[21] Associates, P.A.  It's a Consultation Note;

[22] Chambliss, Jerry, D/B:  10/9/68; D/A:  5/10/04;

[23] D/V:  5/11/04; Account No. 35600.

[24]    Do you want me to read this whole things;

[25]

---

is that --

[ 2]    MR. CHAMBLISS:  Uh, no.

[ 3]    MR. ALLIONE:  -- what you're asking for?

[ 4]    MR. CHAMBLISS:  Just -- just --

[ 5]    (Inaudible comments by someone.)

[ 6]    MR. CHAMBLISS:  Yeah.  Just this last page

[ 7] right here -- you got a copy of this?

[ 8]    MR. ALLIONE:  Page two of that two-page

[ 9] document.

[10]    MR. CHAMBLISS:  That fax that you received.

[11] Go ahead.

[12]    MR. ALLIONE:  Assessment:  Mr. Chambliss

[13] has -- I'm sorry:  Jerry Chambliss, Page 2.

[14]    Assessment:  Mr. Chambliss has a headache

[15] disorder and secondary nasal pain as a result of

[16] being struck in the face by a safety manual at

[17] work yesterday.  I have recommended that he try

[18] Fioricet for the headache disorder.  This may help

[19] to relax him a bit as well.  The usual precautions

[20] were carefully outlined.  I consider him not fit

[21] for duty until May 17, 2004, and he will return to

[22] see me in approximately nine to ten days,

[23] certainly sooner if needed.

[24]    MR. CHAMBLISS:  That's (inaudible) --

[25]

---

Page 51

[ 1]    MR. ALLIONE:  Signed Jeffrey Gaber.

[ 2]    MR. CHAMBLISS:  Now having these documents,

[ 3] you still proceeded with the Charges for those

[ 4] days of absenteeism --

[ 5]    MR. CAMPBELL:  Objection.  The Charges are

[ 6] there.  He's asking the man if he's charged.  He's

[ 7] been Charged.  He's not the Charging Officer.  I

[ 8] am.

[ 9]    MR. D'ALESSANDRO:  I'll make a ruling.  The

[10] objection, I have to sustain his objection.

[11]    MR. CHAMBLISS:  Okay.

[12]    MR. D'ALESSANDRO:  We're just gonna ask him

[13] questions.

[14]    MR. CHAMBLISS:  Okay.

[15]    MR. D'ALESSANDRO:  Whether he pursued the

[16] Charges or not is immaterial at this point.

[17]    MR. CHAMBLISS:  Okay.  One other -- another

[18] document.  Now pertaining to 6/16/04 on Exhibit J,

[19] the Memo you received from NEC.

[20]    MR. ALLIONE:  Yes.

[21]    MR. CHAMBLISS:  6/16, did you get -- did

[22] you receive any information about that date,

[23] Mr. Allione?

[24]    MR. ALLIONE:  No, I did not.

[25]

---

Page 52

[ 1]    MR. CHAMBLISS:  Okay.  I'd like to put into

[ 2] evidence -- (give me that copy; inaudible,

[ 3] speaking too low) --

[ 4]    MR. D'ALESSANDRO:  While we're on the

[ 5] subject, what you're putting into evidence, you

[ 6] can give that to me.

[ 7]    The doctor's note, the first -- the first

[ 8] document that you read 5/11, one page, will

[ 9] be Exhibit 1 for the Organization.

[10]    (Exhibit No. 1 marked for identification.)

[11]    MR. D'ALESSANDRO:  The doctor's

[12] assessment -- or Consultation Note, that will be

[13] Exhibit 2; the Assessment will be Exhibit 3; and

[14] what he just handed me is Keypunch Form for a

[15] Pipefitter.  I don't know what this is.

[16]    (Exhibit Nos. 2, 3 and 4 marked for

[17] identification.)

[18]    MR. CAMPBELL:  I'd like to have a copy,

[19] please.

[20]    MR. D'ALESSANDRO:  Yeah.  We're gonna get

[21] copies of all of them for you.  We're going to

[22] take a short recess and give you a copy of all of

[23] them.  That will be Exhibit 4.

[24]    Okay.  Let's take a short break.  It's

[25]

Page 109

[1]      MR. CAMPBELL: Can I –

[2]      MR. SNYDER: – flat.

[3]      MR. CAMPBELL: Oh wait. I'd like to

[4] indicate that you are indicating that the book

[5] flipped to the open position --

[6]      MR. SNYDER: Uh-huh.

[7]      MR. CAMPBELL: -- and it would go right to

[8] the middle, which would be page 44 and 45; is that

[9] not correct?

[10]      MR. SNYDER: I'm not sure of the page

[11] number it went to, but that --

[12]      MR. CAMPBELL: That's where I'm holding it.

[13]      MR. SNYDER: -- seems like that's probably

[14] where it would go.

[15]      MR. CAMPBELL: Yes, sir.

[16]      You indicated that you threw a napkin

[17] towards him?

[18]      MR. SNYDER: I actually tossed the napkin

[19] toward the trash can, which was located

[20] approximately like the chair that's to

[21] Mr. Chambliss's left.

[22]      MR. CAMPBELL: Okay. So the napkin missed

[23] him completely, and went to the trash can; is that

[24] not correct?

[25]

Page 110

[1]      MR. SNYDER: That's correct.

[2]      MR. CAMPBELL: The booklet did strike

[3] Mr. Chambliss?

[4]      MR. SNYDER: Yes, it did.

[5]      MR. CAMPBELL: Can you tell me where it

[6] striked(sic) Mr. Chambliss at?

[7]      MR. SNYDER: Struck Mr. Chambliss right on

[8] the face.

[9]      MR. CAMPBELL: On the face. Did it knock

[10] his glasses off or anything?

[11]      MR. SNYDER: No. His glasses were still on

[12] his face, not askew, or not looking any different

[13] they always look when the book fell down off

[14] his face.

[15]      MR. CAMPBELL: Did it knock him out of his

[16] chair or anything?

[17]      MR. SNYDER: No, it did not.

[18]      MR. CAMPBELL: Did he look real upset to

[19] you at the time it hit him?

[20]      MR. SNYDER: No, he did not.

[21]      MR. CAMPBELL: Did he ever report to you

[22] that he was injured?

[23]      MR. SNYDER: No, he did not.

[24]      MR. CAMPBELL: Do you know if he reported

[25]

Page 111

[1] to anyone that he was injured that day?

[2]      MR. SNYDER: No, I do not know. I was at

[3] the Station shortly after that.

[4]      MR. CAMPBELL: Did he work the entire day?

[5]      MR. SNYDER: I -- again, I was at the

[6] Station. I'm not sure.

[7]      MR. CAMPBELL: Okay. Do you know if the

[8] Police were called?

[9]      MR. SNYDER: I do not know directly, but

[10] from hearsay, I believe I heard that the Police

[11] were called. I didn't have personal knowledge of

[12] it happening.

[13]      MR. CAMPBELL: I have no further questions

[14] for this gentleman at this time.

[15]      MR. D'ALESSANDRO: Mr. Humphreys?

[16]      MR. HUMPHREYS: Yeah, Hello, Steve; how

[17] are you doing.

[18]      According to your testimony here, your

[19] letter that you wrote to the Company, it says that

[20] you threw -- when Jerry said: "You threw that at

[21] me", you thought it was a joking matter. How did

[22] you know that Jerry was taking it as a joking

[23] matter.

[24]      MR. SNYDER: From the tone of voice.

[25]

Page 112

[1]      MR. HUMPHREYS: From his tone of voice.

[2] Alright.

[3]      And how did you say you flipped -- were you

[4] sitting, you were standing; how did you flip the

[5] book?

[6]      MR. SNYDER: I was sitting -- and if I may

[7] have the book for a moment -- I flipped it like,

[8] like this; just under-handed flip.

[9]      MR. HUMPHREYS: Under-handed? You sure it

[10] was under-handed?

[11]      MR. SNYDER: Uh-huh. I'm sure --

[12]      MR. HUMPHREYS: -- sure it wasn't

[13] over-handed?

[14]      MR. SNYDER: I am 100 percent sure it was

[15] under-handed.

[16]      MR. HUMPHREYS: You're 100 percent sure it

[17] was under-handed.

[18]      MR. SNYDER: Yes.

[19]      MR. HUMPHREYS: Alright. Have you seen --

[20] has Jerry ever been upset with you, in the past --

[21]      MR. SNYDER: No. Never --

[22]      MR. HUMPHREYS: -- had any problems in the

[23] past (inaudible; both speaking) --

[24]      MR. SNYDER: -- had any problems in the

[25]

[ 1]         MR. CAMPBELL:  There's no ruling anywhere
[ 2]  who has to be in a recreation.  It's not written
[ 3]  anywhere.  What do -- I don't understand the
[ 4]  question.
[ 5]         MR. HUMPHREYS:  Could you give me --
[ 6]         MR. D'ALESSANDRO:  I'll have to sustain --
[ 7]         MR. HUMPHREYS:  -- on that sir?
[ 8]         MR. D'ALESSANDRO:  -- the objection.  I'm
[ 9]  gonna have to let him ask the question because
[10]  it's relevant.  Go ahead.
[11]         MR. HUMPHREYS:  You said yourself and Wade
[12]  Clark were present?
[13]         MR. GIURFA:  Right.
[14]         MR. HUMPHREYS:  Well why not have a safety
[15]  committee member present during the recreation of
[16]  an incident?
[17]         MR. GIURFA:  There was a safety committee.
[18]  It was performed during 405; there were two
[19]  recreation of the incident.
[20]         MR. HUMPHREYS:  Two recreations of the
[21]  incident?
[22]         MR. GIURFA:  That's correct.
[23]         MR. HUMPHREYS:  Well that wasn't given in
[24]  the testimony prior.  That was on -- we were only
[25]

---

[ 1]  told of one --
[ 2]         MR. CAMPBELL:  Objection.
[ 3]         MR. HUMPHREYS:  -- one --
[ 4]         MR. CAMPBELL:  -- you need to ask a
[ 5]  question.
[ 6]         MR. D'ALESSANDRO:  Ask a question.  Relax.
[ 7]         MR. HUMPHREYS:  How many recreations of the
[ 8]  incident were there?
[ 9]         MR. GIURFA:  Two.
[10]         MR. HUMPHREYS:  Why was not -- why was that
[11]  not brought present just a few minutes ago when
[12]  you said that there was only one?
[13]         MR. GIURFA:  I didn't say was only one.
[14]         MR. HUMPHREYS:  It was cer -- it was
[15]  certainly noted.
[16]         MR. GIURFA:  I never said there was only
[17]  one incident.
[18]         MR. HUMPHREYS:  During the second
[19]  recreation of the incident, was a Safety Committee
[20]  Member present?
[21]         MR. GIURFA:  No.
[22]         MR. HUMPHREYS:  Why not?
[23]         MR. GIURFA:  Because there was a highly
[24]  technical issue involving --
[25]

---

Page 171

[ 1]         MR. HUMPHREYS:  -- (unintelligible; both
[ 2]  speaking), sir?
[ 3]         MR. GIURFA:  -- involving certain items
[ 4]  that a safety member will not understand.
[ 5]         MR. HUMPHREYS:  Is it Amtrak policy to have
[ 6]  a Safety Committee member during a recreation of
[ 7]  an incident or an injury?
[ 8]         MR. GIURFA:  Yes, we did.  Yes, sir.
[ 9]  Correct.  We did (unintelligible) one, 405.
[10]         MR. HUMPHREYS:  Who were they?
[11]         MR. GIURFA:  It's right on the form.
[12]         MR. D'ALESSANDRO:  What exhibit was it,
[13]  "R" -- 405 or 488?
[14]         MR. GIURFA:  "405".
[15]         MR. CAMPBELL:  You didn't turn in a 405.
[16]         MR. GIURFA:  We got one.
[17]         MR. HUMPHREYS:  We don't have one here.
[18]         So you're saying a Safety Committee member
[19]  should be present during recreation of an
[20]  incident?
[21]         MR. CAMPBELL:  Objection.  Objection.
[22]         MR. D'ALESSANDRO:  What's your objection?
[23]         MR. CAMPBELL:  I fail to see the relevancy
[24]  if it is or isn't.  He testified there was one
[25]

---

Page 172

[ 1]  there.
[ 2]         MR. D'ALESSANDRO:  If he wasn't there, he
[ 3]  wasn't there.
[ 4]         MR. HUMPHREYS:  On the 13th, Bob Mascetti
[ 5]  came in to see you.  Can you tell me what kind of
[ 6]  conversation took place?  Who was -- excuse me --
[ 7]  at that time was our Acting -- or he was our
[ 8]  Acting Local Chairman?
[ 9]         MR. GIURFA:  Okay.  He came to my office
[10]  and we started discussing Mr. Mascetti -- I mean
[11]  Mr. Chambliss's -- Chambliss's case, and the
[12]  conversation went as far as Mr. Chambliss filing
[13]  an assault with the Police Department and that's
[14]  all he knew about it.
[15]         MR. HUMPHREYS:  Did you make reference to
[16]  the fact that -- or did you ask Bob Mascetti --
[17]  I -- excuse me.  Let me rephrase that.
[18]         Did you make the statement to Bob Mascetti,
[19]  "I guess Mr. Chambliss is claiming an injury" --
[20]         MR. CAMPBELL:  Objection.
[21]         MR. HUMPHREYS:  -- on the 13th?
[22]         MR. CAMPBELL:  Objection.
[23]         MR. GIURFA:  I do not recall --
[24]         MR. CAMPBELL:  Objection.
[25]

Page 205

MR. MASCETTI: I did not see blood.
MR. CAMPBELL: Okay. Is that the only way a person's injured, Mr. Mascetti, if there is blood?
MR. MASCETTI: I cannot tell.
MR. D'ALESSANDRO: It's his opinion, Mr. Campbell.
MR. CAMPBELL: But I'm asking for it.
UNIDENTIFIED SPEAKER: -- gave it to you.
MR. CAMPBELL: Okay. (Unintelligible) you want to lead him for me, boss.
MR. D'ALESSANDRO: (Inaudible) --
MR. CAMPBELL: Okay --
MR. D'ALESSANDRO: -- leading either way.
MR. CAMPBELL: Okay. Well -- I know that.
So on 5/10, your major concern was the treatment that this gentleman should receive after he reported an incident to you; is that true or false?
MR. MASCETTI: At that time that Jerry and I talked, our concern was to report the incident.
MR. CAMPBELL: Alright. On May 17th, you talked about there was a meeting. What was that meeting held for?

Page 206

MR. MASCETTI: When I came up to find out at the end about the meeting --
MR. CAMPBELL: Yes.
MR. MASCETTI: -- and I talked to Chris Bello and Dino, was about calming(?) Steve Snyder and Jerry together and coming to an agreement and settle issues.
MR. CAMPBELL: So at -- that's seven days later from May 10th, you still had no concern about personal injury; is that not correct?
MR. MASCETTI: I'm not sure I understand that question, B.L.
MR. CAMPBELL: Okay. Let me see if I can change it for you. When did you first realize that there was an alleged injury to Mr. Chambliss?
MR. MASCETTI: I thought there was an injury when he said he had to go to the doctor's the next day when he called me.
MR. CAMPBELL: Did you tell anyone that?
MR. MASCETTI: Did I tell anyone that he was going to the doctor's, no.
MR. CAMPBELL: No further questions.
MR. HUMPHREYS: We object to that. It's a simple fact that he talked to Dino on the 13th and

Page 207

the fact was brought up that Dino made the statement that there was an injury.
MR. D'ALESSANDRO: He didn't --
(Inaudible comments.)
MR. CHAMBLISS: Just -- I've got a question. Just for the record.
MR. HUMPHREYS: Okay.
MR. D'ALESSANDRO: I understand your objection, but -- but the thing is reporting it to him doesn't make any difference. He just asked him when he was aware that he went to the doctor's and he reported that he was injured. That's (inaudible; speaking too low). It's actually irrelevant (inaudible; speaking too low).
MR. CAMPBELL: You had a question, Mr. Chambliss?
MR. CHAMBLISS: Not at this time.
MR. CAMPBELL: I have no further questions for Mr. Mascetti.
MR. D'ALESSANDRO: Have you got anything, Mr. --
MR. HUMPHREYS: Not at the moment. No. No.
MR. D'ALESSANDRO: Mr. Mascetti, you're

Page 208

dismissed.
(Unintelligible comments by someone.)
MR. D'ALESSANDRO: You can stay as long as you want. Stay as long as you want.
It's 1:57.
(Off the record.)
MR. D'ALESSANDRO: Two o'clock on the nose.
Mr. Humphreys, you have a witness that entered the room?
MR. HUMPHREYS: Yeah, we do. But I'll defer the que -- the first questioning for Mr. Chambliss.
MR. D'ALESSANDRO: Okay.
MR. CHAMBLISS: How you doing, Ms. Bunch.
MS. BUNCH: (Unintelligible; barely audible.)
MR. CHAMBLISS: Were you present in the lunchroom on May the 10th when the incident happened between Mr. Snyder and myself?
MS. BUNCH: Yes.
MR. CHAMBLISS: Could you tell us what you saw if anything?
MS. BUNCH: Do you want me to go from the safety meeting or do you --

182

Page 209

[ 1]       MR. CHAMBLISS:  Yeah.

[ 2]       MS. BUNCH:  Well we was having a safety

[ 3] meeting and after the safety meeting, me, Doria,

[ 4] and Stacey was at the table.  I was sitting this

[ 5] way, Doria had her back to him, and Stacey was

[ 6] standing up, and we were talking.  All of a sudden

[ 7] I seen somebody throw the book.  I looked and it

[ 8] hit him in the face, but I don't know where in the

[ 9] face.  So I said WOW.  I seen a book in the air,

[10] right, and I was like WOW, you know.

[11]       And then Stacey and Doria turned around,

[12] right.  So then later on we talk -- I talked to

[13] Jerry, right, and I said Jerry are you going to

[14] Dino or something, you know, and he said yeah.

[15] And then later on that day the Police came and we

[16] talked to the Police -- I talked to the Police.  I

[17] gave Chris my statement, that same day.

[18]       MR. CHAMBLISS:  Um and --

[19]       MR. D'ALESSANDRO:  Chris who?

[20]       MS. BUNCH:  Bello.

[21]       MR. D'ALESSANDRO:  Okay.  That's alright.

[22] Just...

[23]       MR. CHAMBLISS:  How would you say the book

[24] was thrown:  Was it thrown soft?  Medium?  Hard?

[25]

Page 210

[ 1]       MS. BUNCH:  It was like a hard ball.

[ 2]       MR. CHAMBLISS:  So you said -- in your

[ 3] opinion it struck me very hard.

[ 4]       MS. BUNCH:  Yeah.  It woulda hurt me.

[ 5]       MR. CHAMBLISS:  Pass it down here.

[ 6] Passing -- could you read your statement to me,

[ 7] please.

[ 8]       MS. BUNCH:  I saw -- well see I didn't go

[ 9] into detail because Chris didn't want any details.

[10]       MR. CHAMBLISS:  So you're saying that you

[11] tried to give more information, but he didn't --

[12]       MS. BUNCH:  Yeah.

[13]       MR. CHAMBLISS:  -- want to write more

[14] information?

[15]       MS. BUNCH:  Right.  He just said tell him

[16] what -- what he saw -- I saw.

[17]       I saw Steve throw the Safety Book and hit

[18] Jerry in the face.  Then he got up, walked over,

[19] told Jerry to give him his book back.

[20]       MR. CHAMBLISS:  So in your opinion, when --

[21] when you saw him walk over to me and get the book,

[22] was it a joking situation?

[23]       MS. BUNCH:  He was like:  Give me my book,

[24] you know.  He didn't say please or anything.

[25]

Page 211

[ 1] That's all I heard.

[ 2]       MR. CHAMBLISS:  Did you give this

[ 3] information to Mr. Bello when he -- when he --

[ 4] when he spoke with you?

[ 5]       MS. BUNCH:  Well I was trying, but he just

[ 6] said tell him what I saw, and that's what I saw.

[ 7]       MR. CHAMBLISS:  So basically you're saying

[ 8] that he wouldn't let you get the whole story out?

[ 9]       MS. BUNCH:  Right.

[10]       MR. CHAMBLISS:  Do you feel that Mr. Bello

[11] was honestly trying to investigate this matter to

[12] get to the truth?

[13]       MS. BUNCH:  (No response.)

[14]       MR. CHAMBLISS:  Can you answer verbally,

[15] please.

[16]       MS. BUNCH:  No.

[17]       MR. CHAMBLISS:  Okay.  I'm done at this

[18] time.

[19]       MR. D'ALESSANDRO:  Mr. Humphreys?

[20]       MR. HUMPHREYS:  Yeah.  It's just going to

[21] probably reiterate what Jerry said.  Now, in terms

[22] of hard, soft or easy, let's -- let's change the

[23] terms.  Did he throw it like a fastball in

[24] baseball or did he --

[25]

Page 212

[ 1]       MS. BUNCH:  Yeah.

[ 2]       MR. HUMPHREYS:  -- throw it like a slow

[ 3] pitch in baseball?

[ 4]       MS. BUNCH:  No.  A fastball.  It was like,

[ 5] you know, throwing a ball.

[ 6]       MR. HUMPHREYS:  So it wasn't

[ 7] under-handed --

[ 8]       MS. BUNCH:  No.

[ 9]       MR. HUMPHREYS:  -- you saw him throw it --

[10]       MS. BUNCH:  I -- I saw --

[11]       MR. HUMPHREYS:  -- over-handed --

[12]       MS. BUNCH:  Uh-huh.

[13]       MR. HUMPHREYS:  -- is that what you're

[14] telling us?

[15]       MS. BUNCH:  Yeah.

[16]       MR. HUMPHREYS:  You saw him throw the book

[17] over-hand?

[18]       MS. BUNCH:  Yeah.

[19]       MR. HUMPHREYS:  And it definitely was not

[20] under-handed?

[21]       MS. BUNCH:  No.

[22]       MR. HUMPHREYS:  Because the man was sitting

[23] at a table.  How could you pitch something

[24] under-handed sitting at a table.

[25]

Page 213

[ 1]       MR. D'ALESSANDRO: Just a question.

[ 2]       MR. HUMPHREYS: So you agree, you could not

[ 3] pitch --

[ 4]       MS. BUNCH: You can't --

[ 5]       MR. HUMPHREYS: -- a book --

[ 6]       MS. BUNCH: You can't --

[ 7]       MR. HUMPHREYS: -- underhanded --

[ 8]       MR. CAMPBELL: Objection. Please let the

[ 9] lady answer the question. You're leading --

[10]       MR. HUMPHREYS: I didn't finish my

[11] question --

[12]       MR. CAMPBELL: But you're leading her --

[13]       MR. HUMPHREYS: I changed the question --

[14]       MR. CAMPBELL: -- you're making gestures --

[15]       MR. CHAMBLISS: Objection --

[16]       MR. CAMPBELL: -- making moves --

[17]       MR. CHAMBLISS: -- be directed to the

[18] Hearing --

[19]       MR. CAMPBELL: I am, and he is hearing me,

[20] sir.

[21]       MR. D'ALESSANDRO: Just ask questions and

[22] get answers, alright.

[23]       MR. HUMPHREYS: Do I need to re-ask the

[24] question? Do you understand the question?

[25]

Page 214

[ 1]       MS. BUNCH: (No audible response.)

[ 2]       MR. HUMPHREYS: Okay. I'll re-ask the

[ 3] question.

[ 4]       From what you saw from the way Mr. Snyder

[ 5] was sitting, could he have possibly tossed the

[ 6] book easily to hit Jerry in the face the way that

[ 7] he did?

[ 8]       MS. BUNCH: No. Uh-uh, 'cause Jerry was

[ 9] sitting at the head of the table and he was

[10] sitting down here.

[11]       MR. HUMPHREYS: At one end of the table,

[12] then the other; correct?

[13]       MS. BUNCH: Right.

[14]       MR. HUMPHREYS: Alright. I don't have any

[15] further questions.

[16]       MR. D'ALESSANDRO: Mr. Chambliss?

[17]       MR. CHAMBLISS: Not right now.

[18]       MR. D'ALESSANDRO: Mr. Campbell?

[19]       MR. CAMPBELL: Yes, sir. Give me one

[20] second.

[21]       MR. D'ALESSANDRO: Okay.

[22]       MR. CAMPBELL: So Pam, you were in that

[23] room that day?

[24]       MS. BUNCH: In the lunchroom, yes.

[25]

Page 215

[ 1]       MR. CAMPBELL: Pretty well observing what

[ 2] was going on?

[ 3]       MS. BUNCH: (No audible response.)

[ 4]       MR. CAMPBELL: About how far were you

[ 5] sitting away (unintelligible) -- what was the

[ 6] distance that you would say between them?

[ 7]       MS. BUNCH: I don't -- I don't know. Was

[ 8] just one of our lunch tables. At our table in the

[ 9] lunchroom --

[10]       MR. CAMPBELL: Okay.

[11]       MS. BUNCH: -- it was -- it was like that.

[12] I mean it was that table in the lunchroom. I

[13] mean, you know, I guess um -- I don't know. I

[14] really never thought about it.

[15]       MR. CAMPBELL: Well do you think it was two

[16] feet away?

[17]       MR. CHAMBLISS: Objection. Question asked

[18] and answered.

[19]       MR. D'ALESSANDRO: He's estimating, just to

[20] give her a distance.

[21]       MR. CAMPBELL: Say was it the distance

[22] between you and Mr. Art D'Alessandro?

[23]       MS. BUNCH: Yeah.

[24]       MR. CAMPBELL: So let's say it's about

[25]

Page 216

[ 1] 12-13 feet?

[ 2]       MS. BUNCH: I don't -- I don't know,

[ 3] 'cause -- I don't want to say yeah in --

[ 4]       MR. D'ALESSANDRO: She doesn't know.

[ 5]       MS. BUNCH: I don't know.

[ 6]       MR. CHAMBLISS: She doesn't know.

[ 7]       MR. CAMPBELL: So you --

[ 8]       MS. BUNCH: I really don't know.

[ 9]       MR. CAMPBELL: -- don't know --

[10]       MS. BUNCH: I don't know.

[11]       MR. CAMPBELL: -- is that your answer?

[12]       MS. BUNCH: Yeah.

[13]       MR. CAMPBELL: You said you didn't really

[14] see where he hit him at in the face; is that

[15] you're --

[16]       MS. BUNCH: I know it -- it hit up here

[17] somewhere, but I -- I can't be exact. I saw it

[18] when it hit.

[19]       MR. CAMPBELL: Okay.

[20]       MS. BUNCH: And I thought it hit right

[21] here.

[22]       MR. CAMPBELL: So when it hit him, actually

[23] how was the book -- how did it hit him: Open?

[24] Closed? Sideways? Top or bottom? Since you saw

[25]

**Page 217**

[1]    it.

[2]        MS. BUNCH:  The edge.  Can I use this?

[3]        MR. CAMPBELL:  Yes.  You sure can.

[4]        MS. BUNCH:  This right here.  This right

[5]    here.

[6]        MR. CAMPBELL:  You're saying --

[7]        MS. BUNCH:  Hit him --

[8]        MR. CAMPBELL:  Alright.  You're saying --

[9]        MS. BUNCH:  -- (inaudible; both speaking).

[10]        MR. CAMPBELL:  -- of the edge?

[11]        MS. BUNCH:  Uh-huh.  It hit right here.

[12]        MR. HUMPHREYS:  Would that be the binder?

[13]        MR. CAMPBELL:  Excuse me.

[14]        MR. D'ALESSANDRO:  You'll have a chance.

[15]        MR. CAMPBELL:  I think I'm asking

[16]    questions.

[17]    So it was the front that hit him.

[18]        MS. BUNCH:  Uh-huh.

[19]        MR. CAMPBELL:  Hit him on his nose?

[20]        MS. BUNCH:  Yeah.  I know it was close to

[21]    his eye.

[22]        MR. CAMPBELL:  Close to his eye?

[23]        MS. BUNCH:  Uh-huh.  Well I mean, you know,

[24]    it was -- hit right here.  Right here.

[25]

**Page 218**

[1]        MR. CAMPBELL:  Along the side of the bridge

[2]    of his nose?

[3]        MS. BUNCH:  Yeah.

[4]        MR. CAMPBELL:  You said it came like a

[5]    hardball --

[6]        MS. BUNCH:  Yeah.

[7]        MR. CAMPBELL:  -- be pitched?

[8]        MS. BUNCH:  Yeah.  Yeah.  'Cause I was

[9]    like:  Whoa!  You know.

[10]        MR. CAMPBELL:  So you said you thought it

[11]    would have hurt you in the (unintelligible; both

[12]    speaking) --

[13]        MS. BUNCH:  Yeah.

[14]        MR. CAMPBELL:  About how fast do you think

[15]    that book was going?

[16]        MS. BUNCH:  It was going fast.  I mean --

[17]        MR. CAMPBELL:  (Inaudible).

[18]        MR. HUMPHREYS:  She answered the question.

[19]    We object.

[20]        MR. CHAMBLISS:  Objection.  Yeah.  He's

[21]    asked the same question over and over again.

[22]        MR. CAMPBELL:  Well I'm trying to determine

[23]    "real fast".  You do drive, don't you?

[24]        MS. BUNCH:  Uh-huh.

[25]

**Page 219**

[1]        MR. CHAMBLISS:  Objection.  She says --

[2]        MR. CAMPBELL:  You do know speed --

[3]        MR. CHAMBLISS:  -- fast like a fast -- a

[4]    softball -- fastball.

[5]        MS. BUNCH:  A hardball.

[6]        MR. D'ALESSANDRO:  Hardball.

[7]        MR. CAMPBELL:  Now since it's a hardball,

[8]    you're talking about like at the baseball games?

[9]        MS. BUNCH:  Yeah.

[10]        MR. CAMPBELL:  Do you watch baseball?

[11]        MS. BUNCH:  Yeah.

[12]        MR. CHAMBLISS:  Objection.  Relevance.

[13]        MR. D'ALESSANDRO:  Relax.  Let him ask the

[14]    question.

[15]        MR. CAMPBELL:  The average speed of a

[16]    baseball is about 80 to 90 miles an hour.

[17]        MS. BUNCH:  It was going fast.  It was -- I

[18]    mean it was like a hard -- I mean like you was

[19]    throwing a ball.

[20]        MR. CAMPBELL:  Okay.  And you saw it hit

[21]    him along the side of the bridge of his nose?

[22]        MS. BUNCH:  Yeah.

[23]        MR. CAMPBELL:  Did it knock his glasses

[24]    off?

[25]

**Page 220**

[1]        MS. BUNCH:  No.

[2]        MR. CAMPBELL:  Did it move his glasses?

[3]        MS. BUNCH:  I think so -- I -- I don't

[4]    remember 'cause I -- I was stunned 'cause you

[5]    don't see nothing like that.

[6]        MR. CAMPBELL:  You were just so shocked

[7]    that --

[8]        MS. BUNCH:  Yeah.  I was shocked.

[9]        MR. CAMPBELL:  You couldn't even believe

[10]    it.

[11]        MS. BUNCH:  It tripped me out.

[12]        MR. CAMPBELL:  Did you go pick the

[13]    gentleman up after the book hit him?

[14]        MS. BUNCH:  No.  I asked him was he alright

[15]    and what was going on, you know.

[16]        MR. CAMPBELL:  Did you see any blood or

[17]    anything (unintelligible)?

[18]        MS. BUNCH:  I really didn't pay no atten --

[19]    all I asked was is he alright and what was going

[20]    on.

[21]        MR. CAMPBELL:  Well I'm saying did you

[22]    check for any bruises or cuts.

[23]        MS. BUNCH:  I'm not a doctor; I can't do

[24]    that.

[25]

Page 221

MR. CAMPBELL: That is correct, but I mean -- but you do know a bruise or a cut if you see one?

MR. HUMPHREYS: We object.

MR. CHAMBLISS: Objection.

MR. D'ALESSANDRO: (Inaudible) answer.

MR. CAMPBELL: You made a statement that you thought that -- you went to give a statement to Mr. Bello; correct?

MS. BUNCH: Yeah.

MR. CAMPBELL: You said that you thought he wasn't looking for the truth?

MS. BUNCH: No. I said that he didn't want -- he -- all he wanted to know was what I saw, and I told him what I saw.

MR. CAMPBELL: Well isn't your statement what you saw?

MS. BUNCH: Yeah -- I mean, he didn't -- he didn't want me to -- I mean, he didn't want to hear about the safety meeting or, you know.... You know, he didn't want to hear if we were having a safety meeting. (unintelligible; barely audible) leaving out; he didn't want to hear (unintelligible; other chatter in the background)

Page 222

in there --

MR. CAMPBELL: Excuse me.

Take your time. I just had some interference with noise. I want your testimony to come out clear.

Could you go again, what did he want?

MS. BUNCH: He didn't -- he didn't want to know who was in the room, like he didn't want to know me, Stacey and Doria was doing --

MR. CAMPBELL: Yes.

MS. BUNCH: -- at the time, you know, 'cause I was trying to tell him that we was just sitting there talking when we -- when I saw the book and yelled(?). He didn't want to know that.

MR. CAMPBELL: So he asked for just the facts?

MS. BUNCH: Uh-huh.

MR. CAMPBELL: Is there anything that you would have put on that statement different if you had told him everything, just who was there and what?

MS. BUNCH: I would have told him what we were doing and how I was sitting, where I could sit -- so you know, how I was sitting and what we

Page 223

was talking -- we was just standing there talking (inaudible; speaking too low).

MR. CAMPBELL: But it -- is it not true that you didn't see everything that happened?

MS. BUNCH: What you mean?

MR. CAMPBELL: Did you see the whole thing from the time the book left his hand to when --

MS. BUNCH: I saw it, yeah.

MR. CAMPBELL: -- it traveled through the air --

MS. BUNCH: I saw it.

MR. CAMPBELL: -- when it hit him?

MS. BUNCH: I saw it.

MR. CAMPBELL: What was his immediate reaction after the book hit him?

MS. BUNCH: He sit there. He was -- I guess he was in shock.

MR. CAMPBELL: In shock. Did -- so what did he do; I mean, just sit there motionless; didn't do anything, just sit there?

MS. BUNCH: I think he was in shock.

MR. CAMPBELL: Did you ever see him put his hands up?

MS. BUNCH: No. Uh-uh. No.

Page 224

MR. CAMPBELL: No further questions.

MR. CHAMBLISS: I have one other question.

Ms. Bunch, Mr. Campbell asked you about your statement, about what you wanted to put in there. I know I was present when you made the statement to the Police Officer --

MS. BUNCH: Right.

MR. CAMPBELL: Objection. Are you asking a question?

MR. CHAMBLISS: Well I'm getting to my question.

MR. D'ALESSANDRO: Let's give him any opportunity....

MR. CHAMBLISS: You -- and I know you made a statement in the safety meeting on the next day about the incident, how it happened. Would you have put in the statement how hard you thought the book was thrown?

MS. BUNCH: Yeah. They didn't ask me that. You know. If I'd known that was, you know, I would have said how hard it was (unintelligible) threw.

MR. CAMPBELL: Let me ask that question now: How hard did he throw the book?

**Page 225**

[1]     MS. BUNCH: Like a hardball. Fast.

[2]     MR. CAMPBELL: How fast?

[3]     MR. CHAMBLISS: Objection --

[4]     MR. HUMPHREYS: We've already been through

[5] this.

[6]     MR. CHAMBLISS: We've already been --

[7]     MR. D'ALESSANDRO: Well we keep on going

[8] back to the same statement.

[9]     (Inaudible comment and tapping noise on

[10] table.)

[11]     MR. D'ALESSANDRO: And he's not -- he

[12] didn't ask him that question. He...

[13]     MR. CAMPBELL: How fast?

[14]     MS. BUNCH: I mean, he threw it like that.

[15]     MR. CAMPBELL: How fast would you consider

[16] it? Or you don't know?

[17]     UNIDENTIFIED SPEAKER: Yeah.

[18]     MS. BUNCH: I don't --

[19]     MR. HUMPHREYS: Objection.

[20]     MS. BUNCH: I know it was fast.

[21]     MR. CHAMBLISS: Thank(?) -- thank(?) --

[22] thank(?) --

[23]     MR. D'ALESSANDRO: He threw the book.

[24]     MR. CAMPBELL: Ain't no doubt about he

[25]

**Page 226**

[1] threw the book.

[2]     MR. D'ALESSANDRO: Mr. Humphreys, do you

[3] have any --

[4]     MR. HUMPHREYS: Yeah. B.L. was questioning

[5] you about the length of the table. Is it true

[6] that Steve was at one end of the table in the

[7] lunchroom -- in our lunchroom, the High Speed

[8] Rail -- and Jerry was at the other --

[9]     MS. BUNCH: Right.

[10]     MR. HUMPHREYS: -- the other end of the

[11] table; is that correct?

[12]     MS. BUNCH: Right.

[13]     MR. HUMPHREYS: Very good.

[14]     Did it create a lot of noise when it hit

[15] him?

[16]     MS. BUNCH: Yeah, it did.

[17]     MR. HUMPHREYS: Like a popping sound --

[18]     MS. BUNCH: Yeah.

[19]     MR. HUMPHREYS: -- like a smack?

[20]     MS. BUNCH: 'Cause Stacey and Dori turned

[21] around -- well turned when I said: WHOA!, you

[22] know. And then Stacey kind of turned and then

[23] when Dori heard the noise, she turned around.

[24] Because see, I was sitting towards them and Stacey

[25]

**Page 227**

[1] was standing right here and Dori was sitting right

[2] here and like we was talking and I was like:

[3] WHOA!, and Stacey kind of turned and then when --

[4] Dori turned when she heard the noise; she said:

[5] What was that, you know.

[6]     MR. HUMPHREYS: Very good, ma'am.

[7]     MS. BUNCH: And we were like a table from

[8] that.

[9]     MR. HUMPHREYS: I don't have any -- one

[10] other question. When Steve walked back over to

[11] Jerry and said give me back my book, was he being

[12] sarcastic? Was he being nasty?

[13]     MS. BUNCH: I think he was rude.

[14]     MR. HUMPHREYS: Rude?

[15]     MS. BUNCH: Yeah. I think he was very

[16] rude.

[17]     MR. HUMPHREYS: So do you think that he

[18] meant to hit Jerry on purpose; yes or no?

[19]     MS. BUNCH: Yeah.

[20]     MR. HUMPHREYS: He definitely meant to hit

[21] Jerry on purpose?

[22]     MS. BUNCH: Yeah, 'cause I mean why else

[23] would you throw a book.

[24]     MR. HUMPHREYS: And you said just -- just

[25]

**Page 228**

[1] for the record, just to make sure we understand

[2] each other, you said -- this is called a binder,

[3] the end of the book, this part of the book. Are

[4] you saying --

[5]     MS. BUNCH: Right.

[6]     MR. HUMPHREYS: -- this part of the book

[7] hit Jerry right, right between the eyes?

[8]     MS. BUNCH: Right there, yeah.

[9]     MR. HUMPHREYS: Right between the eyes?

[10] The bridge of the nose between the eyes?

[11]     MS. BUNCH: Yep.

[12]     MR. HUMPHREYS: I don't have any further

[13] questions.

[14]     MR. D'ALESSANDRO: Do you have anything

[15] else, Mr. Chambliss?

[16]     MR. CHAMBLISS: Not at this time.

[17]     MR. CAMPBELL: You refer to two more

[18] employees, Stacey and Dori?

[19]     MS. BUNCH: Uh-huh.

[20]     MR. CAMPBELL: And you said after the book

[21] hit him they turned and looked?

[22]     MS. BUNCH: Right.

[23]     MR. CAMPBELL: So they did not see the book

[24] being thrown?

[25]

**Page 229**

[1]        MR. HUMPHREYS:  Objection.  They -- they've

[2]  given statements.

[3]        MR. CAMPBELL:  Excuse me.

[4]        MS. BUNCH:  I don't -- I don't know.

[5]        MR. D'ALESSANDRO:  What's your objection?

[6]        UNIDENTIFIED SPEAKER:  Okay.

[7]        MR. D'ALESSANDRO:  She -- she

[8]  (unintelligible).

[9]        MS. BUNCH:  I don't know 'cause we didn't

[10]  really talk about it.  You know, we didn't really

[11]  get in details about it, really.

[12]        MR. CAMPBELL:  But your testimony was:

[13]  When the book made a loud popping sound, you said

[14]  whoa; is that not correct?

[15]        MS. BUNCH:  While it was in the air.

[16]        MR. CAMPBELL:  Yes.

[17]        MS. BUNCH:  I said -- I said:  WHOA!, you

[18]  know.

[19]        MR. CAMPBELL:  And that's when they turned

[20]  around?

[21]        MS. BUNCH:  Yeah.

[22]        MR. CAMPBELL:  So they were really not

[23]  looking from --

[24]        MS. BUNCH:  No, they --

[25]

**Page 230**

[1]        MR. CAMPBELL:  -- your point of view?

[2]        MS. BUNCH:  No, they wouldn't -- no, they

[3]  was -- Stacey was standing and Dori was sitting,

[4]  like there in the conversation.

[5]        MR. CAMPBELL:  Okay.

[6]        MS. BUNCH:  (Inaudible.)

[7]        MR. CAMPBELL:  And where were they in

[8]  relationship to you?

[9]        MS. BUNCH:  See the tables go like that,

[10]  right, and I'd be sitting right here; Doria'd be

[11]  sitting right here; and Stacey'd standing at the

[12]  end of the table.

[13]        MR. CAMPBELL:  So were they looking at you?

[14]        MS. BUNCH:  Yeah.

[15]        MR. CAMPBELL:  No further questions.

[16]        MR. HUMPHREYS:  I have one more question.

[17]  So what you're saying is Stacey possibly

[18]  could have seen what had happened?

[19]        MS. BUNCH:  Yeah.

[20]        MR. HUMPHREYS:  Because he was standing --

[21]        MS. BUNCH:  Right.

[22]        MR. HUMPHREYS:  -- he wasn't just looking

[23]  at you; he wasn't talking to you or Dori; is that

[24]  correct?

[25]

**Page 231**

[1]        MS. BUNCH:  Right.

[2]        MR. HUMPHREYS:  So there's a good chance

[3]  that Stacey possibly could have saw what happened?

[4]        MS. BUNCH:  Yeah.

[5]        MR. HUMPHREYS:  Thank you.  No further

[6]  questions.

[7]        MR. D'ALESSANDRO:  Mr. Chambliss?

[8]        MR. CHAMBLISS:  No.  No further questions.

[9]        MR. D'ALESSANDRO:  Mr. Campbell?

[10]        MR. CAMPBELL:  No further questions at this

[11]  time.

[12]        MR. D'ALESSANDRO:  Okay.

[13]        MR. HUMPHREYS:  Thanks, Pam.

[14]        MR. CAMPBELL:  Yes, ma'am.

[15]        MS. BUNCH:  He prob -- Stacey probably saw

[16]  it, I mean, 'cause we didn't never talk about it.

[17]        MR. HUMPHREYS:  Do me a favor, if you see

[18]  Stacey, we want to bring Stacey in real quick

[19]  'cause Stacey (unintelligible) --

[20]        MR. D'ALESSANDRO:  2:17.

[21]        (Off the record.)

[22]        MR. D'ALESSANDRO:  Eighteen after 2:00.

[23]        A witness has entered the room.  Could you

[24]  identify yourself for the record, please, sir?

[25]

**Page 232**

[1]        MR. DEFFENBAUGH:  Stacey Deffenbaugh.

[2]        MR. D'ALESSANDRO:  Okay.

[3]        MR. HUMPHREYS:  Stacey, that morning -- you

[4]  haven't given us a statement, but that morning in

[5]  the lunchroom on the day of the occurrence, were

[6]  you standing at the end of the table when this

[7]  incident occurred?

[8]        MR. DEFFENBAUGH:  I was standing -- the

[9]  table next to (inaudible).

[10]        MR. HUMPHREYS:  The table with Jerry and

[11]  Steve's incident occurred?

[12]        MR. DEFFENBAUGH:  Uh-huh.

[13]        MR. HUMPHREYS:  Did you actually see the

[14]  incident occur?

[15]        MR. DEFFENBAUGH:  (Speaking too low; sounds

[16]  like "no").

[17]        MR. HUMPHREYS:  (Inaudible remark.)  Did

[18]  you hear a loud sound or an odd sound come from

[19]  that direction.

[20]        MR. DEFFENBAUGH:  Yeah.  Everybody gasped,

[21]  then the noise, and then we turned around.

[22]        MR. HUMPHREYS:  Did the noise catch you off

[23]  guard?

[24]        MR. DEFFENBAUGH:  (Inaudible.)

[25]

Page 249

get in touch with anybody or they wouldn't talk to you, discuss with you something of that nature.

MR. CHAMBLISS: At -- at that time, did I mention to you anything about an injury?

MR. McLEAN: You did say, yeah, that you felt like that you had -- were hurt. Yeah.

MR. CHAMBLISS: Can you (unintelligible)?

MR. McLEAN: Yeah. You did say that you thought that you were hurt, yes you did, that you did go to the doctor or hospital. You said that.

MR. CHAMBLISS: At that point in time did I -- get your opinion(?), did I state to you that I was trying to re -- let them know that a injury had occurred and they wouldn't talk to me?

MR. McLEAN: Yeah. You did say something like that. Yes.

MR. CHAMBLISS: And do you remember your response to me at that point in time?

MR. McLEAN: Yeah. I told you -- I told you I don't know what to tell you 'cause if they haven't talked to you -- I didn't know what the situation was or why they wouldn't talk to you (unintelligible; speaking low and mumbling).

MR. CHAMBLISS: I'm done.

Page 250

MR. D'ALESSANDRO: Mr. Humphreys?

MR. HUMPHREYS: Yeah, Mac, could you surmise what that reason is, was?

MR. McLEAN: What reason for...?

MR. HUMPHREYS: That they didn't want to talk to Jerry?

MR. McLEAN: No. I have no idea why they didn't want to talk to Jerry. No, I don't know why.

MR. HUMPHREYS: In your opinion, do you feel as if Jerry's had some type of personality conflict with the Supervisors upstairs?

MR. CAMPBELL: Objection.

MR. D'ALESSANDRO: It's irrelevant.

MR. HUMPHREYS: I don't have any more questions.

MR. D'ALESSANDRO: Anything else?

MR. CHAMBLISS: Not at this time.

MR. D'ALESSANDRO: Mr. Campbell?

MR. CAMPBELL: Yes, Mac --

MR. McLEAN: Uh-huh.

MR. CAMPBELL: You said you've been an Amtrak Supervisor for seven years; is that not correct?

Page 251

MR. McLEAN: That's correct.

MR. CAMPBELL: Four years at High Speed Rail?

MR. McLEAN: Yes, sir.

MR. CAMPBELL: Have you had any training what you're supposed to do when an employee's injured?

MR. McLEAN: Yes, sir, I have.

MR. CAMPBELL: Could you tell me what that is?

MR. McLEAN: Yes. I need to report it immediately. Yes, sir. (Inaudible; speaking too low.)

MR. CAMPBELL: So if an employee comes to you and reports an injury, what would you do?

MR. McLEAN: I would report it to the Manager.

MR. CAMPBELL: On 5/18, Mr. Chambliss said he was talking to you --

MR. McLEAN: Yes, sir.

MR. CAMPBELL: -- about a injury he received?

MR. McLEAN: That is correct.

MR. CAMPBELL: Do you know about the date

Page 252

that he allegedly received that injury?

MR. McLEAN: No, sir. I'm not sure of that. I came off from my two ADO days; I came back from my ADO days.

MR. CAMPBELL: Did he go into any detail about that, report to you?

MR. McLEAN: Yeah. He did tell me what day it was; I couldn't remember. Yes, but I couldn't -- I can't recollect what day that it actually happened, you know.

MR. CAMPBELL: Did he tell you who he had talked to in Management?

MR. McLEAN: No.

MR. CAMPBELL: Did he at any time report to you that he was injured and needed help?

MR. McLEAN: No. He did not report it, said he needed help. We discussed it about (inaudible; speaking too low).

MR. CAMPBELL: Did you at any time think that he was reporting an injury to you?

MR. McLEAN: No.

MR. CAMPBELL: If he had reported an injury to you, said he --

MR. CHAMBLISS: Objection.

Page 253

[ 1]        MR. D'ALESSANDRO:  What's your objection?

[ 2]        MR. CHAMBLISS:  I'll withdraw.

[ 3]        MR. D'ALESSANDRO:  Okay.

[ 4]        MR. CAMPBELL:  If he had reported an injury

[ 5] to you on the 18th, what would you have done?

[ 6]        MR. McLEAN:  I would've immediately gotten

[ 7] a Manager (inaudible).

[ 8]        MR. CAMPBELL:  No further questions.

[ 9]        MR. D'ALESSANDRO:  Mr. Humphreys?

[10]        MR. HUMPHREYS:  No questions.

[11]        MR. D'ALESSANDRO:  Mr. Chambliss?

[12]        MR. D'ALESSANDRO:  During our conversation,

[13] Mr. McLean, what did I tell you about the incident

[14] that happened on May 10th?

[15]        MR. McLEAN:  You said that -- that a

[16] Foreman had thrown a book at you and had hit you

[17] in the corner(?), I guess the center of your eye,

[18] and the fact that -- I'm not sure whether you

[19] indicated whether your glasses were knocked off or

[20] not.  I don't remember that portion, but -- and

[21] that you -- that you were pretty upset about it,

[22] and I'm assuming you -- I remember you saying that

[23] you went to your doctor and got checked out and

[24] you were upset because (unintelligible) had

[25]

Page 254

[ 1] occurred or nothing was done to the Foreman.

[ 2]        MR. CHAMBLISS:  And on that occasion,

[ 3] you -- you stated earlier that I told you I had

[ 4] the injury and I asked what should I -- I do at

[ 5] that point in time?

[ 6]        MR. McLEAN:  Think that's correct.

[ 7]        MR. CHAMBLISS:  And you said that you --

[ 8] you didn't know what to tell me?

[ 9]        MR. McLEAN:  Yeah.  I said I didn't know

[10] what to tell you.

[11]        MR. CHAMBLISS:  That's all.

[12]        MR. D'ALESSANDRO:  Mr. Humphreys?

[13]        MR. HUMPHREYS:  No questions.

[14]        MR. D'ALESSANDRO:  Mr. Campbell?

[15]        MR. CAMPBELL:  At any time did

[16] Mr. Chambliss report to you a personal injury?

[17]        MR. McLEAN:  No, sir.

[18]        MR. CAMPBELL:  In your conversation with

[19] him on the 18th, at any time did you have a

[20] notion, any kind, that he was telling you about a

[21] personal injury?

[22]        MR. McLEAN:  No.  No.  It was a discussion.

[23]        MR. CHAMBLISS:  I have one more question.

[24]        What constitutes to you, Mr. McLean,

[25]

Page 255

[ 1] reporting a personal injury?

[ 2]        MR. McLEAN:  If you would tell me that you

[ 3] were actually hurt -- if you say:  I'm hurt, Mac,

[ 4] I'm hurt; I need some (unintelligible) attention.

[ 5] That to me constitutes a -- an injury.

[ 6]        MR. CHAMBLISS:  Okay.  But on that -- on

[ 7] that occasion I stated to you that I was hurt and

[ 8] I did seek medical attention; correct?

[ 9]        MR. McLEAN:  That is correct.  You did say

[10] that.

[11]        MR. D'ALESSANDRO:  Mr. Humphreys?

[12]        MR. HUMPHREYS:  (No audible response.)

[13]        MR. D'ALESSANDRO:  Mr. Campbell?

[14]        MR. CAMPBELL:  No further questions.

[15]        MR. D'ALESSANDRO:  Your dismissed.

[16]        MR. CHAMBLISS:  Thanks Mac.

[17]        MR. HUMPHREYS:  Mr. Allione.

[18]        MR. D'ALESSANDRO:  Do we have somebody --

[19] yeah.  Could you have Mr. --

[20]        MR. HUMPHREYS:  Allione.

[21]        MR. D'ALESSANDRO:  -- Allione.

[22]        (Several comments about pronunciation of

[23] "Allione".)

[24]        MR. D'ALESSANDRO:  Okay.  It's 2:44.

[25]

Page 256

[ 1]        (Off the record.)

[ 2]        MR. D'ALESSANDRO:  It's 3:45.  Another

[ 3] witness has entered the room.  Could you identify

[ 4] yourself for the record?

[ 5]        MR. ALLIONE:  Joseph Allione, Amtrak High

[ 6] Speed Rail.

[ 7]        MR. HUMPHREYS:  Alright.  Joe, just a

[ 8] couple questions.

[ 9]        On July the 6th, the morning we sat down to

[10] discuss the Intent as far as the discipline to be

[11] imposed against Mr. Chambliss, that we all have a

[12] copy of, (unintelligible..), you made a statement

[13] to Jerry and I that you wanted to pull yourself

[14] out as the Charging Officer; could you tell us

[15] why?

[16]        MR. ALLIONE:  Because of the high

[17] profile -- because of what was at stake with this

[18] case, I didn't feel that I was experienced enough

[19] to handle it.

[20]        MR. HUMPHREYS:  When you -- when we were

[21] sitting at the table, and we had been at the table

[22] for, Lord, I guess an hour, Dino walked in, and

[23] you and Dino walked outside after we had been

[24] discussing the Intent.  At that point is when you

[25]

Page 257

[ 1]    came back in and you told us that you -- that you
[ 2]    were no longer going to be the Charging Officer;
[ 3]    is that the reason why, because you felt that you
[ 4]    weren't experience enough to handle it?
[ 5]        MR. CAMPBELL: Objection. I see no
[ 6]    relevancy in the reason why he wasn't a Charging
[ 7]    Officer. I'm the Charging Officer. It has no
[ 8]    bearing on the case.
[ 9]        MR. D'ALESSANDRO: He so stated that.
[10]        MR. HUMPHREYS: Okay. Did you at any time
[11]    overhear Bob Mascetti and Dino discussing Jerry
[12]    Chambliss's injury?
[13]        MR. CAMPBELL: Objection. It would only be
[14]    hearsay.
[15]        MR. HUMPHREYS: He's -- he's here to give
[16]    us the answers.
[17]        MR. D'ALESSANDRO: He's here to give us the
[18]    answer if he overheard a conversation.
[19]        MR. ALLIONE: No, I did not overhear any
[20]    conversations.
[21]        MR. HUMPHREYS: You did not hear. Are
[22]    you -- are you absolutely, positively sure?
[23]        MR. CAMPBELL: Objection. Question
[24]    answered and answered -- asked and answered.
[25]

Page 258

[ 1]        MR. D'ALESSANDRO: Excuse me. Did you say
[ 2]    something?
[ 3]        MR. CAMPBELL: Yes. Question was asked and
[ 4]    answered. I'm a little dyslexic but I get across.
[ 5]        MR. HUMPHREYS: Then at this moment, I
[ 6]    don't have any further questions.
[ 7]        MR. D'ALESSANDRO: Mr. Chambliss.
[ 8]        MR. CHAMBLISS: How you doing, Joe.
[ 9]        Mr. Allione, at any time -- at what time
[10]    did you have any conversation with Mr. Giurfa
[11]    about the injury I sustained on the 10th?
[12]        MR. ALLIONE: Be more specific, please?
[13]        MR. CHAMBLISS: At --
[14]        MR. ALLIONE: I had several conversations
[15]    with my boss.
[16]        MR. CHAMBLISS: Okay. Well can we start
[17]    with the first one?
[18]        MR. CAMPBELL: Objection, please be a
[19]    little specific about what you want this man to
[20]    talk about.
[21]        MR. CHAMBLISS: The incident that happened
[22]    on May 10th, what his knowledge was at the time
[23]    that he discussed it with Dino.
[24]        MR. CAMPBELL: Then ask him that.
[25]

Page 259

[ 1]        MR. CHAMBLISS: That's what I'm asking.
[ 2]        MR. ALLIONE: My knowledge of your
[ 3]    incident --
[ 4]        MR. CHAMBLISS: Mr. Giurfa -- you -- you
[ 5]    and Mr. Giurfa had a conversation about the
[ 6]    incident that occurred with Mr. Snyder and myself
[ 7]    and what -- do you remember the date that y'all
[ 8]    had that conversation?
[ 9]        MR. ALLIONE: The date that Dino and I
[10]    discussed it was -- don't have a calendar in front
[11]    of me -- but I believe it was July(?) -- June 9th
[12]    when I came back from California.
[13]        MR. CHAMBLISS: So before that you had no
[14]    knowledge of an incident that happened between
[15]    Mr. Snyder and myself (inaudible)? Did you
[16]    have --
[17]        MR. ALLIONE: If I had --
[18]        MR. CHAMBLISS: -- any knowledge --
[19]        MR. ALLIONE: Yes, I did.
[20]        MR. CHAMBLISS: What knowledge did you have
[21]    before that?
[22]        MR. ALLIONE: Hearsay from --
[23]        MR. CAMPBELL: Objection. If it's hearsay,
[24]    I don't want it in the record, sir.
[25]

Page 260

[ 1]        MR. CHAMBLISS: I'm just asking about his
[ 2]    knowledge.
[ 3]        MR. D'ALESSANDRO: Direct knowledge of what
[ 4]    happened.
[ 5]        MR. ALLIONE: My direct knowledge was
[ 6]    hearsay from that day.
[ 7]        MR. CAMPBELL: I don't want it in the
[ 8]    record.
[ 9]        MR. D'ALESSANDRO: If he only overheard a
[10]    conversation or heard -- if he does -- if he
[11]    didn't do any kind of investigations on this -- on
[12]    this situation, it's not relevant.
[13]        MR. CHAMBLISS: But he did do
[14]    investigations.
[15]        MR. D'ALESSANDRO: Did you do an
[16]    investigation on this incident?
[17]        MR. ALLIONE: After the 9th of June, yes.
[18]        MR. D'ALESSANDRO: After the 9th of June?
[19]        MR. ALLIONE: Yes.
[20]        MR. D'ALESSANDRO: What -- what took place
[21]    after the 9th?
[22]        MR. ALLIONE: After the 9th of June is when
[23]    I started the investigation in regards to this --
[24]    in regards to the Charges of -- the two that are
[25]

Page 261

[ 1]  sitting in front of us now:  Trust and Honesty
[ 2]  and --
[ 3]       MR. CAMPBELL:  Let me show you the two
[ 4]  Charges.
[ 5]       MR. ALLIONE:  Thank you.
[ 6]       MR. CAMPBELL:  Take your time.  You don't
[ 7]  have to rush.
[ 8]       MR. CHAMBLISS:  He wrote them up.  He wrote
[ 9]  them.
[10]       MR. ALLIONE:  Trust and Honesty and
[11]  Integrity, and as far as the Safety in regards to
[12]  reporting a late injury.
[13]       MR. D'ALESSANDRO:  Now you can direct a
[14]  question on -- on those particular cases.
[15]       MR. CHAMBLISS:  Give me a second here.
[16]  No questions at this time.
[17]       MR. D'ALESSANDRO:  Mr. Humphreys?
[18]       MR. HUMPHREYS:  No questions right now.
[19]       MR. D'ALESSANDRO:  Mr. Campbell, do you
[20]  have anything to say?
[21]       MR. CAMPBELL:  Just for you, a few
[22]  questions, sir.
[23]       MR. D'ALESSANDRO:  Thank you.
[24]       MR. CAMPBELL:  Mr. Allione, you are aware
[25]

Page 262

[ 1]  of the two Charges that this gentleman is charged
[ 2]  with; correct?
[ 3]       MR. ALLIONE:  Yes.
[ 4]       MR. CAMPBELL:  One is for a late report?
[ 5]       MR. ALLIONE:  Correct.
[ 6]       MR. CAMPBELL:  Are you aware that he
[ 7]  alleges that he was injured on May the 10th?
[ 8]       MR. ALLIONE:  I do believe that -- yes, I
[ 9]  know that he alleges that he was injured on that
[10]  day.
[11]       MR. CAMPBELL:  At any time, did he ever
[12]  tell you he was injured?
[13]       MR. ALLIONE:  I was not informed by
[14]  Mr. Chambliss until June 9th -- or excuse me,
[15]  until June -- what's the date of the 260; whatever
[16]  date the 260 was --
[17]       MR. CAMPBELL:  Could I have the 260, please
[18]  sir.  Take your time --
[19]       MR. ALLIONE:  No problem.
[20]       MR. CAMPBELL:  -- we'll get that from the
[21]  Hearing Officer.
[22]       MR. D'ALESSANDRO:  Exhibit Q.  (Tape 3/Side
[23]  B ends.)
[24]       (Off the record.  Tape 4/Side A begins.)
[25]

Page 263

[ 1]       MR. D'ALESSANDRO:  This is Tape 4 and we're
[ 2]  on the "A" side and Mr. Campbell.
[ 3]       MR. CAMPBELL:  Yes.  Mr. Allione, as I was
[ 4]  asking, the alleged injury was on 5/10.  When did
[ 5]  you have first knowledge that Mr. Chambliss was
[ 6]  claiming an injury?
[ 7]       MR. ALLIONE:  That's not what you asked me.
[ 8]       MR. CAMPBELL:  Well that's what I'm asking
[ 9]  you now.
[10]       MR. ALLIONE:  Okay.  My first knowledge
[11]  that Mr. Chambliss was claiming an injury was on
[12]  the 9th of June.
[13]       MR. CAMPBELL:  Okay.  And when did
[14]  Mr. Chambliss physically tell you he was injured?
[15]       MR. ALLIONE:  When I questioned him either
[16]  two or three days after that.  I believe it was a
[17]  Wednesday.
[18]       MR. CAMPBELL:  And do you have a 260 in
[19]  front of you?
[20]       MR. ALLIONE:  I do.
[21]       MR. CAMPBELL:  And what is the date that
[22]  Mr. Chambliss signed that 260?
[23]       MR. ALLIONE:  June 14th, 2004.
[24]       MR. CAMPBELL:  Alright.  Thank you.
[25]

Page 264

[ 1]  How long have you been with Amtrak?
[ 2]       MR. ALLIONE:  Five years.
[ 3]       MR. CAMPBELL:  Was that a late report?
[ 4]       MR. ALLIONE:  Yes, that is a late report.
[ 5]       MR. CAMPBELL:  And why is that a late
[ 6]  report?
[ 7]       MR. ALLIONE:  Because it wasn't re -- it
[ 8]  wasn't reported to me until that time.
[ 9]       MR. CAMPBELL:  Are you the first Amtrak
[10]  official that had it on paper?
[11]       MR. ALLIONE:  Yes.  That I know --
[12]       MR. CAMPBELL:  No further questions.
[13]       MR. ALLIONE:  That I am aware of.
[14]       MR. CAMPBELL:  No further questions.
[15]       MR. D'ALESSANDRO:  Mr. Chambliss.
[16]       MR. CHAMBLISS:  The rule -- (inaudible).
[17]  In the Charges -- can I borrow your
[18]  Charges, Mr. Campbell?
[19]       MR. CAMPBELL:  Which one would you like,
[20]  sir -- or I'll give you both --
[21]       MR. CHAMBLISS:  Let me see both of them
[22]  because I don't really know which one --
[23]       MR. CAMPBELL:  -- of them since I like you
[24]  so much.
[25]

192

[ 1]     MR. CHAMBLISS: Thank you, sir. This one.

[ 2]     On the Charge on -- I don't know which

[ 3] letter this is.

[ 4]     MR. CAMPBELL: It's got a number on the

[ 5] top. See this number.

[ 6]     MR. CHAMBLISS: _04.273.

[ 7]     MR. CAMPBELL: Yes.

[ 8]     MR. CHAMBLISS: That'll work.

[ 9]     MR. CAMPBELL: That's the late reporting

[10] Charge?

[11]     MR. CHAMBLISS: Yeah.

[12]     The late reporting Charges, it states on

[13] there from the Standards of Excellence to report

[14] injuries to your supervisor; correct?

[15]     MR. ALLIONE: Correct.

[16]     MR. CHAMBLISS: And your station here at

[17] Amtrak, your position is -- is what, sir?

[18]     MR. ALLIONE: Quality Insurance Inspector,

[19] High Speed Rail/Collateral Duty Charging Officer

[20] for High Speed Rail.

[21]     MR. CHAMBLISS: So do you directly

[22] supervise any men on the floor?

[23]     MR. ALLIONE: No, I don't.

[24]     MR. CHAMBLISS: Okay.

[25]

[ 1]     MR. D'ALESSANDRO: Mr. Humphreys?

[ 2]     MR. HUMPHREYS: One question, Joe.

[ 3]     Have you ever had any -- no. Never mind.

[ 4] No questions at this moment.

[ 5]     MR. D'ALESSANDRO: Mr. Campbell?

[ 6]     MR. CAMPBELL: Yeah. Mr. Allione -- just a

[ 7] few -- how long have you been with Amtrak?

[ 8]     MR. ALLIONE: Five years.

[ 9]     (Someone says: You've already asked that.)

[10]     MR. CAMPBELL: How -- how long as a

[11] Supervisor.

[12]     MR. ALLIONE: I'm not a Supervisor.

[13]     MR. CAMPBELL: How long in Management?

[14]     MR. ALLIONE: Coming up on two years.

[15]     MR. CAMPBELL: Have you ever been trained

[16] what to do in the case of an injury -- of an

[17] employee reporting an injury?

[18]     MR. ALLIONE: Yes.

[19]     MR. CAMPBELL: And what would you do?

[20]     MR. ALLIONE: If an employee reports an

[21] injury, the first thing I'm going to ask is if

[22] they need medical attention.

[23]     MR. CAMPBELL: Okay.

[24]     MR. ALLIONE: The second thing I'm going to

[25]

---

Page 267

[ 1] do is ask them if they need to go home. If they

[ 2] do need medical attention, I'll provide them a way

[ 3] to get there, and then I'll start the

[ 4] investigation proceedings: Fill out the 260,

[ 5] which is the report of the injus --

[ 6] injury/illness; provide that member with a copy of

[ 7] the 488 to provide to Concentra medical facility

[ 8] where they go; and complete a 405, which is an

[ 9] accident investigation.

[10]     MR. CAMPBELL: You testified that you don't

[11] supervise any employees on the floor?

[12]     MR. ALLIONE: Correct.

[13]     MR. CAMPBELL: Would that change anything

[14] if any employee reported an injury to you?

[15]     MR. ALLIONE: Say that again.

[16]     MR. CAMPBELL: If an employee came up to

[17] you --

[18]     MR. ALLIONE: Uh-huh.

[19]     MR. CAMPBELL: -- and reported an injury to

[20] you, you are not his direct supervisor --

[21]     MR. ALLIONE: Correct.

[22]     MR. CAMPBELL: -- would it make any

[23] difference if he reported an injury to you, would

[24] you still do the same thing for him?

[25]

Page 268

[ 1]     MR. ALLIONE: Absolutely.

[ 2]     MR. CAMPBELL: No further questions.

[ 3]     MR. D'ALESSANDRO: Mr. Chambliss.

[ 4]     MR. CHAMBLISS: If an employee approached

[ 5] you and told you that he had an injury and he had

[ 6] spoken with his Supervisor about it or tried --

[ 7] attempted to talk -- tell his Supervisor about it

[ 8] and wasn't listened to, what would you do at that

[ 9] time?

[10]     MR. ALLIONE: I would take the report from

[11] that individual.

[12]     MR. CHAMBLISS: And at that point in time

[13] you would consider it an injury; is that what

[14] you're saying, sir?

[15]     MR. ALLIONE: When it's brought to me as an

[16] injury, unless I'm told to do otherwise, then I

[17] deal with it as an injury --

[18]     MR. CHAMBLISS: In your opinion --

[19]     MR. ALLIONE: -- which I did.

[20]     MR. CHAMBLISS: -- what constitutes

[21] bringing it to you as an injury, once you

[22] become -- once you have knowledge that an injury

[23] occurred; is that what you --

[24]     MR. CAMPBELL: Objection. I --

[25]

193

Page 269

[ 1]       MR. CHAMBLISS:  I'm trying to clarify --

[ 2]       MR. CAMPBELL:  -- fail to see --

[ 3]       MR. CHAMBLISS:  -- what his meaning is.

[ 4]  That's all.

[ 5]       MR. D'ALESSANDRO:  The reporting of an

[ 6]  injury.  Person that's injured reports to you.  He

[ 7]  has no first-hand knowledge.

[ 8]       MR. CHAMBLISS:  No.  I'm asking his opinion

[ 9]  as to what a person would say to him for him to

[10]  feel that they were reporting an injury,

[11]  basically.

[12]       MR. D'ALESSANDRO:  I'm gonna sustain -- I'm

[13]  not gonna sustain.  I'll overrule your objection.

[14]  What would you -- what constitutes you stating

[15]  that the person's injured?

[16]       MR. ALLIONE:  Someone reporting to me that

[17]  they have sustained an injury:  "I have been

[18]  injured."

[19]       MR. D'ALESSANDRO:  Okay.

[20]       MR. CHAMBLISS:  Thank you.

[21]       MR. D'ALESSANDRO:  Mr. Humphreys?

[22]       MR. HUMPHREYS:  Trying to think about how

[23]  I'm going to ask this question.

[24]       On the morning of the 17th when Jerry was

[25]

Page 270

[ 1]  asked to come upstairs to discuss his injury, were

[ 2]  you there that morning, Joe?

[ 3]       MR. ALLIONE:  Yes.  I believe I was.

[ 4]       MR. HUMPHREYS:  Why do you feel at that

[ 5]  time when Jerry came up with his Shop Steward,

[ 6]  that Dino said:  No, we're not gonna discuss this

[ 7]  matter (unintelligible; both speaking) --

[ 8]       MR. CAMPBELL:  Objection.

[ 9]       MR. D'ALESSANDRO:  Is he aware of that

[10]  statement?

[11]       MR. HUMPHREYS:  He said he was there.

[12]       MR. ALLIONE:  I was here.  You asked me --

[13]       (Unintelligible; more than one speaking.)

[14]       MR. HUMPHREYS:  Excuse me.  Let me

[15]  rephrase.

[16]       MR. D'ALESSANDRO:  Hold on.  Hold on.  When

[17]  you say "here", was he:  On the property?  On duty?

[18]  in the meeting?  I mean I'm not trying to --

[19]       MR. HUMPHREYS:  That morning, the 17th,

[20]  were you on duty here at that time?

[21]       MR. ALLIONE:  Yes, I was.

[22]       MR. HUMPHREYS:  Were you sitting in here in

[23]  this office at that time that we were -- when

[24]  Jerry was called upstairs to the meeting?

[25]

Page 271

[ 1]       MR. ALLIONE:  Are you referring to --

[ 2]       MR. HUMPHREYS:  The discussion of Jerry's

[ 3]  injury; the discussion of the incident; the

[ 4]  discussion of everything involved?

[ 5]       MR. ALLIONE:  Are you referring to the

[ 6]  Intent Meeting?

[ 7]       MR. HUMPHREYS:  No.  I'm referring --

[ 8]       MR. ALLIONE:  I'm just --

[ 9]       MR. HUMPHREYS:  -- to the --

[10]       MR. ALLIONE:  -- (inaudible; both

[11]  speaking) --

[12]       MR. HUMPHREYS:  -- fact that the 17th --

[13]  you were not here?

[14]       MR. ALLIONE:  I don't have my notes in

[15]  front of me.  I'm trying to remember that morning.

[16]       MR. HUMPHREYS:  So you're saying you were

[17]  here; you weren't here; you don't know; you don't

[18]  have your notes?

[19]       MR. CAMPBELL:  Objection.  The man said he

[20]  can't remember.  How many times has he got to tell

[21]  you.  He can't remember --

[22]       MR. CHAMBLISS:  Well the man was trying to

[23]  recall --

[24]       MR. CAMPBELL:  He doesn't have his notes.

[25]

Page 272

[ 1]       MR. CHAMBLISS:  Let the man answer.

[ 2]       MR. ALLIONE:  I'm trying to recall.

[ 3]       MR. CHAMBLISS:  Yeah.  That's what I said.

[ 4]       (Inaudible comment by someone.)

[ 5]       MR. ALLIONE:  I don't (inaudible) --

[ 6]       MR. CAMPBELL:  Can't --

[ 7]       MR. CHAMBLISS:  No.  No.  No.

[ 8]  (Unintelligible), sir?  Mr. Campbell?

[ 9]       MR. CAMPBELL:  I'm doing fine.

[10]       MR. D'ALESSANDRO:  Were you present on the

[11]  17th, that day?

[12]       MR. ALLIONE:  I believe, yes --

[13]       MR. D'ALESSANDRO:  In the --

[14]       MR. ALLIONE:  -- I was here.

[15]       MR. D'ALESSANDRO:  In the meeting?

[16]       MR. ALLIONE:  I'm trying to remember the

[17]  meeting.

[18]       MR. D'ALESSANDRO:  Okay.

[19]       MR. HUMPHREYS:  Okay.

[20]       (Unintelligible; more than one speaking.)

[21]       MR. D'ALESSANDRO:  Alright.  Go ahead.

[22]       MR. HUMPHREYS:  I'll go ahead and ask

[23]  another question.

[24]       When I walked upstairs with Jerry Chambliss

[25]

194

**Page 273**

[ 1]  that morning of the 17th, I saw Chris Bello, I saw
[ 2]  Dino Giurfa and I saw you. I'm just trying to
[ 3]  recall --
[ 4]      MR. ALLIONE: I --
[ 5]      MR. HUMPHREYS: -- don't know that I saw
[ 6]  you; I'm just trying to re -- what I'm getting at
[ 7]  is: First I asked you if you were here; you said
[ 8]  you're not sure, you have to check your notes.
[ 9]      MR. CAMPBELL: Objection. I need a
[10]  question.
[11]      MR. HUMPHREYS: In the second question --
[12]  the question coming is: Why do you feel as if we
[13]  were denied any type of -- the sit down meeting(?)
[14]  at that point was Jerry had his Union
[15]  Representation with him.
[16]      MR. CAMPBELL: Objection. I need some
[17]  clarity on the question. I don't know what he's
[18]  asking.
[19]      MR. HUMPHREYS: I'm not sure how to
[20]  rephrase the question for the simple fact that --
[21]      MR. D'ALESSANDRO: Let me say this to you:
[22]  You're not sure if he was in the meeting?
[23]      MR. HUMPHREYS: I saw him.
[24]      MR. D'ALESSANDRO: You say him on the
[25]

**Page 274**

[ 1]  property?
[ 2]      MR. HUMPHREYS: I saw him --
[ 3]      (Someone says: "In this meeting"; not sure
[ 4]  who.)
[ 5]      MR. D'ALESSANDRO: Were you in this
[ 6]  meeting?
[ 7]      MR. ALLIONE: No. I -- I can clarify that
[ 8]  because I think I know the meeting he's talking
[ 9]  about. No. No, I was not in that meeting. I was
[10]  here on the property. I was in my office that
[11]  morning, absolutely. I believe I know which
[12]  meeting you're referring to from hearsay, but no I
[13]  wasn't present at that meeting, and no, I can't
[14]  answer that question because I can't guess at
[15]  someone else's opinion.
[16]      MR. HUMPHREYS: So what you're telling me
[17]  is you definitely were not in this room at that
[18]  time?
[19]      MR. ALLIONE: I don't believe that I was in
[20]  this room at that time.
[21]      MR. HUMPHREYS: Alright. No questions.
[22]      MR. D'ALESSANDRO: Mr. Chambliss?
[23]      MR. CHAMBLISS: Not at this time.
[24]      MR. D'ALESSANDRO: Mr. Campbell?
[25]

**Page 275**

[ 1]      MR. CAMPBELL: No, sir. Not at this time.
[ 2]      MR. D'ALESSANDRO: Alright. Sir, you're
[ 3]  dismissed for the present time. Keep yourself
[ 4]  available.
[ 5]      MR. CHAMBLISS: I have another witness to
[ 6]  call.
[ 7]      MR. D'ALESSANDRO: It's two minutes after
[ 8]  3:00.
[ 9]      MR. CAMPBELL: Can I have a three-minute
[10]  restroom break?
[11]      MR. HUMPHREYS: Yeah. We need -- we want
[12]  to ask for a break, as well.
[13]      MR. D'ALESSANDRO: No problem.
[14]      (Off the record.)
[15]      MR. D'ALESSANDRO: Eleven minutes after
[16]  three. We had a gentleman enter the room.
[17]  Mr. Bello, am I correct?
[18]      MR. BELLO: Correct.
[19]      MR. CHAMBLISS: How you doing Chris, once
[20]  again. I brought you back in because before when
[21]  you were in here I don't think I believe I got any
[22]  of your testimony on -- about the 17th, what
[23]  transpired with this meeting with Mr. Snyder,
[24]  myself, and Mr. Humphreys and Mr. Bello(?); do you
[25]

**Page 276**

[ 1]  remember that meeting?
[ 2]      MR. BELLO: I do not remember that meeting.
[ 3]      MR. CHAMBLISS: Do you remember coming down
[ 4]  on the train on the 17th and asking me to come
[ 5]  upstairs so you could talk to me?
[ 6]      MR. BELLO: On the 17th?
[ 7]      MR. CHAMBLISS: Of May.
[ 8]      MR. BELLO: Yeah. I -- I do not recall
[ 9]  that.
[10]      MR. CHAMBLISS: Do you recall an occasion
[11]  where I came upstairs with my Union Rep to have a
[12]  talk and Mr. Giurfa said he would not have a
[13]  sit-down talk with us because I had my Union Rep
[14]  with us?
[15]      MR. BELLO: I recall, yes, we were supposed
[16]  to sit down, and for whatever reason that did not
[17]  take place --
[18]      MR. CHAMBLISS: So --
[19]      MR. BELLO: -- the date, on --
[20]      MR. CHAMBLISS: (Unintelligible comment.)
[21]      MR. BELLO: -- (unintelligible) what the
[22]  date was, but I recall something to that effect,
[23]  yeah.
[24]      MR. CHAMBLISS: What was that meeting
[25]

**Page 277**

[ 1]  about?

[ 2]       MR. CAMPBELL:  Objection.  What meeting?

[ 3]       MR. CHAMBLISS:  The meeting we just

[ 4]  established.

[ 5]       MR. CAMPBELL:  He hasn't established that

[ 6]  he was in that meeting.

[ 7]       MR. D'ALESSANDRO:  Were you in a meeting on

[ 8]  May 17th?

[ 9]       MR. BELLO:  The meeting never took place.

[10]       MR. CHAMBLISS:  Okay.  Let me rephrase the

[11]  question.

[12]       Did you attempt to have a meeting on that

[13]  day, the 17th?

[14]       MR. BELLO:  I did not.  That was -- I don't

[15]  know who actually called the meeting.  I was not

[16]  the initiator of the meeting, so I'm -- I'm not

[17]  totally clear what it was for.  (Unintelligible)

[18]  you may have been the one or (unintelligible) or

[19]  somebody.  I'm not --

[20]       MR. CAMPBELL:  Just answer the question,

[21]  please.

[22]       UNIDENTIFIED SPEAKER:  Okay.

[23]       MR. CHAMBLISS:  I thought he was the

[24]  Hearing Officer.

[25]

**Page 278**

[ 1]       MR. CAMPBELL:  He is the Hearing Officer.

[ 2]  I'm the Charging Officer.

[ 3]       MR. CHAMBLISS:  Well I have an objection,

[ 4]  because he's clearly trying take(?) over(?) the

[ 5]  witnesses.

[ 6]       MR. D'ALESSANDRO:  Just answer the

[ 7]  question, what you know of the 17th.

[ 8]       MR. BELLO:  Okay.  Who initiated the

[ 9]  meeting.  I don't recall who the initiator was.

[10]       MR. CHAMBLISS:  Mr. Bello, on that day, on

[11]  the date that the meeting was planned, do you

[12]  remember opening the stairway door as I opened the

[13]  steps; do you remember that?

[14]       MR. BELLO:  The stair...

[15]       MR. CAMPBELL:  Objection.

[16]       MR. CHAMBLISS:  Right outside your office

[17]  door --

[18]       MR. CAMPBELL:  Objection.  I see no

[19]  relevance to who opened the door.

[20]       MR. CHAMBLISS:  I'm trying to help him

[21]  recall the day in question.  He seems to have

[22]  amnesia at this point.  I'm trying to help him

[23]  remember.

[24]       MR. D'ALESSANDRO:  I understand that.  The

[25]

**Page 279**

[ 1]  problem is, if he doesn't remember, he doesn't

[ 2]  remember.

[ 3]       MR. CHAMBLISS:  Well the problem is he's

[ 4]  remembering parts of it.  He says he remembers the

[ 5]  meeting -- there was a meeting called.  He doesn't

[ 6]  remember what happened.  I'm trying to --

[ 7]       MR. D'ALESSANDRO:  Exactly.  Can rephrase

[ 8]  the question --

[ 9]       MR. CHAMBLISS:  Yeah.  I'm...

[10]       MR. D'ALESSANDRO:  -- think about it.

[11]       MR. CHAMBLISS:  Do you remember why that

[12]  meeting didn't take place?

[13]       MR. BELLO:  I remember Dino was upset at

[14]  something about either having the Union Rep

[15]  present or not present, I believe is what it was.

[16]  It was -- it was definitely about the incident.

[17]  Steve Snyder (unintelligible) this is all about

[18]  the incident; and just to, I guess, clarify the

[19]  facts to see -- just to clarify the whole

[20]  situation, what was going on, is what I believe it

[21]  was going to be for.

[22]       And there was a request.  I think you

[23]  either -- you wanted you Union Rep there, right,

[24]  and Dino said it was not necessary.  And from then

[25]

**Page 280**

[ 1]  things fell apart.  And that is to the best of my

[ 2]  recollection what transpired.

[ 3]       MR. CHAMBLISS:  So in your opinion if -- at

[ 4]  that point in time that -- in your opinion to --

[ 5]  from what you said, you would gather that the

[ 6]  meeting was called by Dino because he --

[ 7]       MR. CAMPBELL:  Objection.  We're still

[ 8]  beating around the specifics of the Charges.

[ 9]       MR. D'ALESSANDRO:  He doesn't know that.

[10]       MR. CHAMBLISS:  I'm just asking for his

[11]  opinion.  Like earlier he got people to give their

[12]  opinion on different things.

[13]       MR. D'ALESSANDRO:  Well what's your

[14]  opinion?

[15]       MR. BELLO:  My opinion, I -- I don't

[16]  remember -- I don't know who wanted the meeting.

[17]  How can I have an opinion on that.

[18]       MR. CHAMBLISS:  Okay.  Earlier you stated

[19]  that you had no knowledge of the incident until

[20]  Mr. Mascetti and I came into your office?

[21]       MR. BELLO:  That is correct.

[22]       MR. CHAMBLISS:  I brought you back in here

[23]  because I just want to ask you were you sure about

[24]  that because earlier today it was stated that you

[25]

196

[ 1] were told earlier?

[ 2]        MR. BELLO:  No.  I'm totally sure about

[ 3] that.

[ 4]        MR. CHAMBLISS:  Okay.

[ 5]        MR. D'ALESSANDRO:  Alright.

[ 6]        UNIDENTIFIED SPEAKER:  No questions,

[ 7] (unintelligible).

[ 8]        MR. CAMPBELL:  I don't have any questions.

[ 9]        MR. D'ALESSANDRO:  Okay.  Again, Mr. Bello,

[10] you're dismissed for the time being.

[11]        MR. BELLO:  Alright.

[12]        MR. D'ALESSANDRO:  Thank you.

[13]        Do we have anyone else?

[14]        MR. HUMPHREYS:  At the moment I'll talk --

[15] like to question Jerry.

[16]        MR. D'ALESSANDRO:  Okay.  So you're going

[17] to call Mr. Chambliss.

[18]        MR. HUMPHREYS:  Yes.  Call Mr. Chambliss.

[19]        Jerry, we have your statement here.  Would

[20] you like to go ahead and read your statement to

[21] us, please?

[22]        MR. CHAMBLISS:  Find it...

[23]        MR. HUMPHREYS:  I have two copies of it.

[24]        MR. CHAMBLISS:  I got it.

[25]

---

Page 282

[ 1]        On May 10th at the morning safety meeting,

[ 2] I was hit in the face with a book by Supervisor

[ 3] Steve Snyder.  After the meeting was over, I was

[ 4] having a conversation with Bill Vullo when

[ 5] Mr. Snyder threw a paper towel at the trash can

[ 6] next to me.  I asked if he was trying to hit me.

[ 7] Mr. Snyder said:  This was -- this was trying to

[ 8] hit you, picked up the safety book and launched it

[ 9] at me, hitting me in the face.  Stunned, I sat

[10] there in disbelief when he walked up to me and

[11] said:  I hit you in your little face, and laughed.

[12] I told him just take your book and go, because I

[13] was too angry to talk about it.  I went downstairs

[14] and called my Union Rep -- my Union man, Bob, and

[15] told him about what happened.  Later at lunch,

[16] Ms. Pam Bunch and Doria Washington told me they

[17] saw what happened and asked if I was okay.

[18]        MR. HUMPHREYS:  On the morning of the 10th

[19] sitting in the lunchroom, Steve Snyder, as you

[20] said, picked up a book and launched it at you.

[21] How did he launch the book at you:  Did he throw

[22] it hard; did he throw it like a fastball, like we

[23] previously asked our witnesses?

[24]        MR. CHAMBLISS:  Yeah.  He threw it

[25]

---

Page 283

[ 1] extremely hard.

[ 2]        MR. HUMPHREYS:  Like a fastball?

[ 3]        MR. CHAMBLISS:  Yeah.

[ 4]        MR. HUMPHREYS:  Was he sitting or standing?

[ 5]        MR. CHAMBLISS:  Trying to recall, because

[ 6] like I said, I was talking to Mr. Vullo and when

[ 7] the first piece of paper went past me, it drew my

[ 8] attention from Mr. Vullo 'cause he started to get

[ 9] up to Mr. Snyder, and I don't recall whether he

[10] was sitting or standing at that point in time.  I

[11] just -- when the -- when the paper went over my

[12] shoulder and drew my attention to it, I just asked

[13] him:  What you doing, trying to hit me.  And he

[14] stated:  This is trying to hit you and -- and

[15] threw the book.

[16]        MR. HUMPHREYS:  When you asked if -- when

[17] he was trying to hit you, were you joking?

[18]        MR. CHAMBLISS:  No.  Because the trash can

[19] was away from me.  He missed the trash can and

[20] thing went over my shoulder; it was close to my

[21] face than it was the trash can.

[22]        MR. HUMPHREYS:  After he hit you in the

[23] face with book, he walked over and he said:  I hit

[24] you in your little face; is that correct?

[25]

---

Page 284

[ 1]        MR. CHAMBLISS:  Uh, yeah.

[ 2]        MR. HUMPHREYS:  In a sarcastic tone?

[ 3]        MR. CHAMBLISS:  Yeah.

[ 4]        MR. HUMPHREYS:  How did the book hit you,

[ 5] Jerry?

[ 6]        MR. CHAMBLISS:  I don't have --

[ 7]        MR. HUMPHREYS:  I've got a Safety Book.  I

[ 8] have a Safety Book.

[ 9]        MR. CHAMBLISS:  The binder of the book

[10] struck me across the face like this.

[11]        MR. CAMPBELL:  Let it be clear for the

[12] record that he has the book across his nose, the

[13] top at his forehead; the bottom at his right

[14] cheek, for the record.

[15]        MR. D'ALESSANDRO:  It's the right cheek.

[16]        MR. CAMPBELL:  That's correct.

[17]        MR. D'ALESSANDRO:  Am I correct in assuming

[18] that?

[19]        MR. CHAMBLISS:  No -- well I'm just showing

[20] how the book hit me.  I don't --

[21]        MR. D'ALESSANDRO:  Right up your nose?

[22]        MR. CHAMBLISS:  -- he was right here; came

[23] across like this, if you want to be exact --

[24]        MR. D'ALESSANDRO:  Your right or left?

[25]

197

Page 285

[ 1]    MR. CAMPBELL:  Now he's --

[ 2]    MR. CHAMBLISS:  Right.  The book hit like

[ 3] this.

[ 4]    MR. D'ALESSANDRO:  Your left.

[ 5]    MR. CHAMBLISS:  Yes, my left.  The bottom

[ 6] of the book was at my left, top of the book to my

[ 7] right.

[ 8]    MR. HUMPHREYS:  Did you feel any pain at

[ 9] that moment?

[10]    MR. CHAMBLISS:  At that moment, I — I was

[11] in shock that he did it.  Alls I felt was -- was

[12] anger.  The moment when it happened, all -- all I

[13] felt was anger and I was shocked that it had

[14] happened.

[15]    MR. HUMPHREYS:  Shocked that an Amtrak

[16] Supervisor would hit a -- an employee in the face

[17] with a book?

[18]    MR. CHAMBLISS:  Yeah.

[19]    MR. HUMPHREYS:  You went downstairs, talked

[20] to Bob Mascetti.  Bob Mascetti came up and talked

[21] to Dino at that time?

[22]    MR. CHAMBLISS:  Yeah.  At -- at that point

[23] after he did it, there -- like I said, it was a

[24] train that was late and needed to go out.  They

[25]

Page 286

[ 1] had asked that everybody go down to the train.  I

[ 2] was upset.  I was in shock.  I didn't know what to

[ 3] do.  I proceeded downstairs and went to my train.

[ 4] I called Mr. Mascetti on my cell phone.  I asked

[ 5] him to come downstairs because I had a complaint.

[ 6] I complained that Mr. Snyder had hit me with the

[ 7] book.  He told me he would go immediately and talk

[ 8] to Mr. -- Mr. Giurfa and see what he was gonna do

[ 9] about it.

[10]    MR. HUMPHREYS:  And when Bob came back

[11] downstairs, what did he say to you?

[12]    MR. CHAMBLISS:  He said Mr. Giurfa said he

[13] would call me upstairs and take a statement.

[14]    MR. HUMPHREYS:  Did Mr. Giurfa call you

[15] back upstairs to take a statement?

[16]    MR. CHAMBLISS:  No.  At that time

[17] Mr. Giurfa did not call me back upstairs.  Later

[18] on that day, Mr. Mascetti came back to me and said

[19] that he re-approached Mr. Giurfa and he -- he

[20] deferred it to Chris Bello, when Mr. Bello came

[21] into work.

[22]    MR. HUMPHREYS:  At what time approximately

[23] did you or Mr. Mascetti come up into Mr. Bello's

[24] office to discuss the incident?

[25]

Page 287

[ 1]    MR. CHAMBLISS:  After lunch, they came --

[ 2] the Supervisors came out on the floor and told me

[ 3] that they wanted to see me upstairs.  At that

[ 4] point in time, I called my Union Rep,

[ 5] Mr. Mascetti, and we went upstairs to Mr. Bello's

[ 6] office.

[ 7]    MR. HUMPHREYS:  And Mr. Bello took your

[ 8] statement at that time?

[ 9]    MR. CHAMBLISS:  Mr. Bello sat down and

[10] asked me what was going on, explaining everything.

[11] He asked me to write a statement and give it to

[12] him and that he would be investigating it.  He

[13] said he didn't know what Mr. Giurfa wanted to do;

[14] he had just walked in; he got thrown in the middle

[15] of this; and he didn't know where it was gonna go.

[16]    MR. HUMPHREYS:  So as the day went along --

[17] you got off at 3:00 o'clock; correct?

[18]    MR. CHAMBLISS:  Yes, I did.

[19]    MR. HUMPHREYS:  You went home at that

[20] point?

[21]    MR. CHAMBLISS:  Yes, I did.  Before I got

[22] off at 3:00 o'clock, (unintelligible), I -- I was

[23] upset.  It was about 1:00 o'clock after I talked

[24] to Mr. Bello.  I called the Amtrak Police because

[25]

198

Page 288

[ 1] it was apparent to me that -- that they weren't

[ 2] going to do anything about the situation.  Amtrak

[ 3] Police came out here at about 2:00 o'clock, and

[ 4] they sat in the locker room and took a statement

[ 5] from me.  After they took my statement, they were

[ 6] walking out, they saw Ms. -- Ms. Bunch and they

[ 7] also took a statement from her.

[ 8]    MR. HUMPHREYS:  Police Officer took a

[ 9] statement from Ms. Bunch?

[10]    MR. CHAMBLISS:  Yes.

[11]    MR. HUMPHREYS:  At that point, after that

[12] happened, what did you do?

[13]    MR. CHAMBLISS:  At that --

[14]    MR. HUMPHREYS:  Was it getting close -- was

[15] it getting close to quitting time?

[16]    MR. CHAMBLISS:  At that point in time, it

[17] was past quitting time.  I clocked out; I got in

[18] my car; I went home.  I was upset.  I was stressed

[19] out; my head was hurting.  I had to pick up my —

[20] my children, which I do every day.  Went home.  I

[21] picked up my children.  Later on that day because

[22] my head was hurting and I was having a hard time

[23] dealing with the situation that had occurred, I

[24] called my medical benefits, my mental health line,

[25]

Page 289

[ 1]  and talked -- talked to someone there, one of the
[ 2]  counselors on the line.
[ 3]      MR. HUMPHREYS:  Can you tell us who the
[ 4]  counselor, what her name was?
[ 5]      MR. CHAMBLISS:  I believe her name was
[ 6]  Janice Carter.
[ 7]      MR. HUMPHREYS:  And she worked for who,
[ 8]  once again?
[ 9]      MR. CHAMBLISS:  United Health Care.  The
[10]  insurance company.  I don't know who she work
[11]  for -- it's -- it's a number on our medical card,
[12]  a 1-800-number that we're supposed to call for
[13]  mental health and substance abuse.
[14]      MR. HUMPHREYS:  And what did she have to
[15]  say to you?
[16]      MR. CHAMBLISS:  At that point in time after
[17]  talking with me for about 30-40 minutes, she
[18]  ascertained that that, well in her opinion, that I
[19]  was severely under a lot of stress and that she
[20]  wanted to get me some counseling for the situation
[21]  immediately, and I told her I -- I was supposed to
[22]  go to work the next day; she told me, no, she did
[23]  not want me to go there.  At that point in time
[24]  she felt that it would be best that I go see a
[25]

Page 290

[ 1]  counselor.  She then looked up in her log book the
[ 2]  different counselors in my area; set up a meeting
[ 3]  with a counselor and gave me what they -- what
[ 4]  they call referrals to a counselor at that point
[ 5]  in time.
[ 6]      MR. HUMPHREYS:  The next day you made a
[ 7]  doctor's appointment; is that right?
[ 8]      MR. CHAMBLISS:  Well af -- well the next
[ 9]  day, yes, I made a doctor's appointment.
[10]      MR. HUMPHREYS:  How were you feeling that
[11]  day?
[12]      MR. CHAMBLISS:  Well I woke up that morning
[13]  on -- on May 10th.  After I got off the phone with
[14]  her, I called my Union Rep, Mr. Mascetti.  I told
[15]  him what the counselor had said, and I asked him
[16]  how do I mark off because I had no knowledge about
[17]  what to do in this instance because I wasn't -- I
[18]  wasn't on the job at that point in time.  And he
[19]  said it was a good question.  He didn't know.  He
[20]  said he was gonna call the Union Rep above him and
[21]  ask him, inquire to how I was to mark off because
[22]  in his opinion the -- stress is also an injury.
[23]      So I waited.  At that point in time I took
[24]  some -- some Tylenol; I laid down; had to get some
[25]

Page 291

[ 1]  sleep.  I went to sleep.  My alarm clock went off
[ 2]  at about five-something in the morning, at
[ 3]  normally time I get up.  At that point in time I
[ 4]  called in because Mr. Mascetti had not returned my
[ 5]  call back to let me know what to do or how to mark
[ 6]  off.
[ 7]      I called in to the mark-off tape, and the
[ 8]  only options that -- since I've been here, to mark
[ 9]  off you need to mark off sick or you either mark
[10]  off personal business.  Because I was going to see
[11]  a doctor for my injuries or whatever, I marked off
[12]  sick, because I didn't know anything else at that
[13]  point in time.
[14]      MR. HUMPHREYS:  At that point in time, were
[15]  you feeling pain?
[16]      MR. CHAMBLISS:  Not at that point in time.
[17]  I -- I'd been to sleep.  I woke up.  At that point
[18]  in time I didn't feel any pain.  I didn't feel any
[19]  pain in my face until that morning because I was
[20]  still in bed when I called.  I went into the
[21]  bathroom, washed my face, washed up, and when I
[22]  went to wash my face, my face was sore.
[23]      At that point in time I was like okay, well
[24]  you know, I want to go get this checked out and
[25]

Page 292

[ 1]  make sure there's -- there's nothing wrong.
[ 2]      MR. HUMPHREYS:  So was it the next day that
[ 3]  you went to the doc -- your doctor's office?
[ 4]      MR. CHAMBLISS:  Yeah.  I contacted my
[ 5]  regular -- regular doctor, the doctor on my
[ 6]  insurance card.  He asked me what was wrong.  I
[ 7]  explained to him what had happened, and I wanted
[ 8]  to get my face checked out.  He explained to me at
[ 9]  that point in time, he said well that's --
[10]  that's -- that's a injury-type case and that your
[11]  insurance company doesn't cover that type of
[12]  situation.  He said you need to contact a
[13]  different doctor for that because I'm through your
[14]  insurance company, and we don't -- we don't deal
[15]  with that type of situations.
[16]      So I contacted Mr. Gaber's(?) office,
[17]  whatever, and got an appointment with him.  He
[18]  recommended that -- that -- that I go see him
[19]  because he deals with -- he thought it was a
[20]  worker's comp-type situation, and I went to see
[21]  him because he said the insurance company doesn't
[22]  cover that, and he's through the insurance
[23]  company.
[24]      MR. HUMPHREYS:  When you went to see him,
[25]