# 2A.  DEPOSITION TESTIMONY OF JERRY CHAMBLISS

Jerry K. Chambliss         vs.        National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                  Wednesday, May 24, 2006

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3
 4   JERRY K. CHAMBLISS,        )
 5        Plaintiff,       )
 6        vs.          ) Case No. 1:05CV02490
 7   NATIONAL RAILROAD PASSENGER   )
 8   CORPORATION,            )
 9        Defendant.       )
10        *    *    *    *    *
11
12
13
14
15        The deposition of JERRY CHAMBLISS was taken
16   on Wednesday, May 24, 2006, commencing at
17   10:15 a.m., at the offices of the National Railroad
18   Passenger Corporation, 60 Massachusetts Avenue,
19   N.E., Third floor, Washington, D.C., before Mario A.
20   Rodriguez, CCR No. 0315162, Notary Public.
21
22        *    *    *    *    *
```

---

**Page 2**

```
 1            A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4        NORRIS C. RAMSEY, ESQUIRE
 5        Law Offices of Norris C. Ramsey
 6        4105 Springdale Avenue
 7        Baltimore, Maryland  21207
 8        (410) 448-1996
 9
10   ON BEHALF OF THE DEFENDANT:
11        KEITH FISCHLER, ESQUIRE
12        Kruchko & Fries
13        1750 Tysons Boulevard
14        Suite 560
15        McLean, Virginia  22102
16        (703) 734-0554
17        (703) 734-0876 - fax
18
19
20
21
22   (Appearances continued on the next page.)
```

---

**Page 3**

```
 1   APPEARANCES (continued):
 2
 3   ON BEHALF OF THE DEFENDANT:
 4        DENYSE M. NELSON, ESQUIRE
 5        National Railroad Passenger Corporation
 6        60 Massachusetts Avenue, N.E.
 7        Washington, D.C.  20002
 8        (202) 906-3185
 9        (202) 906-2821 - fax
10
11
12
13
14
15
16
17
18
19
20
21
22
```

---

**Page 4**

```
 1               I N D E X
 2        DEPOSITION OF JERRY K. CHAMBLISS
 3               JUNE 24, 2006
 4
 5   EXAMINATION BY:             PAGE
 6   Mr. Fischler          6
 7
 8   CHAMBLISS DEPOSITION EXHIBITS:   PAGE MARKED
 9   No. 1            13
10   No. 2            15
11   No. 3            17
12   No. 4            25
13   No. 5            28
14   No. 6            28
15   No. 7            30
16   No. 8            30
17   No. 9            32
18   No. 10           34
19   No. 11           37
20   No. 12           40
21
22   (Exhibits continued on the next page.)
```

---

1 (Pages 1 to 4)

Jerry K. Chambliss                    vs.          National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                      Wednesday, May 24, 2006

Page 5

| CHAMBLISS DEPOSITION EXHIBITS: | PAGE MARKED |
| --- | --- |
| No. 13 | 52 |
| No. 14 | 57 |
| No. 15 | 73 |
| No. 16 | 85 |
| No. 17 | 92 |
| No. 18 | 104 |
| No. 19 | 106 |
| No. 20 | 116 |
| No. 21 | 127 |
| No. 22 | 129 |
| No. 23 | 164 |
| No. 24 | 165 |
| No. 25 | 195 |
| No. 26 | 195 |
| No. 27 | 199 |
| No. 28 | 207 |
| No. 29 | 210 |

Page 6

PROCEEDINGS
- - - - -

Whereupon --
        JERRY K. CHAMBLISS,
a witness, called for examination, having been first
duly sworn, was examined and testified as follows:
        EXAMINATION
    BY MR. FISCHLER:
    Q. Good morning, Mr. Chambliss. My name is
Keith Fischler, and I represent the defendants in
this case, National Railroad Passenger Corporation,
Amtrak, and Steven Snyder.
        Have you ever been deposed before?
    A. Yes.
    Q. When was that?
    A. About a year ago.
    Q. And what case was that in?
    A. That was an injury case with the railroad.
    Q. Okay. What was the injury?
    A. Mr. Snyder, when he hit me with the book.
    Q. So it's related with these set of facts?
    A. Somewhat, yes.

Page 7

    Q. Then you know, basically, how a deposition
works. I'll ask questions and you'll answer them.
If at any time you don't understand a question,
please let me know and I'll try to rephrase it for
you if I can. If I don't say anything, I'm
going to operate under the belief that you
understand what my question is asking.
        Are you taking any medication or is there
any reason you have would difficulty understanding
my questions today?
    A. No.
    Q. Any medication or any reason you would have
difficulty answering questions truthfully today?
    A. No.
    Q. If at any time during the deposition you
want to take a break, please let me know. And we
can do that. The only thing I ask is that we not
take a break while there is a question pending;
answer the question and then we can break if you
need to. Does that work?
    A. That's fine.
    Q. Okay. Why don't we start -- tell me about

Page 8

your schooling after high school, after you
completed high school.
    A. After I completed high school, I went about
a year or two ago. I attended TESST College, School
of Technology. I completed a certificate program in
refrigeration, air conditioning and heating.
    Q. I'm sorry, when did you graduate from high
school?
    A. In 1986.
    Q. Did you begin working full-time after you
graduated from TESST College? Do I have that right?
    A. Yes.
    Q. Did you begin working full-time after that?
    A. I was already working full-time.
    Q. Where were you working full-time?
    A. Here at Amtrak.
    Q. Have you been working at Amtrak your entire
career?
    A. Yes.
    Q. Starting in 1986?
    A. Oh, no. No. No. No. I had different
jobs. Fast food, that type of thing.

2 (Pages 5 to 8)

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225          (703) 534-1225
Professional Stenotype Reporters                                       www.mar-reporting.com

Case 1:05-cv-02490-CKK    Document 27-5    Filed 09/14/2006    Page 4 of 79

Jerry K. Chambliss                          vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                  Wednesday, May 24, 2006

Page 9

1　Q.　Okay.　Any full-time employment prior to
2　Amtrak?
3　A.　Yes.
4　Q.　Okay.　What full-time positions?
5　A.　I was a bartender at Red Lobster.
6　Q.　When was that?　As best you remember.
7　A.　Let's see.　I started here in '89.　That
8　was probably about '87, '88.
9　Q.　So you started at Amtrak in 1989?
10　A.　Yes.
11　Q.　What position did you start in?
12　A.　Started as a coach cleaner.
13　Q.　How long were you a coach cleaner?
14　A.　For about seven or eight years.
15　Q.　1996 or so?
16　A.　Yeah.
17　Q.　Okay.　At that point, what position did you
18　take?
19　A.　Well, after I was a coach cleaner, I took
20　on the position of pipe fitter B.　But during the
21　time I was a coach cleaner, I had other positions.
22　Q.　Tell me about those.

Page 10

1　A.　I was a safety representative.　I was
2　temporary station supervisor for MARC.　I was a
3　safety trainer for the Move Smart safety program.
4　Q.　Okay.　Were those temporary positions, or
5　how did they work?
6　A.　Well, the safety program, it was an ongoing
7　position.　The station supervisor was a temporary
8　position.　They had one individual in that job, and
9　when he went out sick, I was trained to take over
10　for him in his absence.　So he had a lot of medical
11　problems at that time so I did the job kind of
12　regularly.
13　Q.　Okay.　All right.　And then around 1996 or
14　so, were you promoted out of the coach cleaner
15　position?
16　A.　Yes.
17　Q.　What position were you promoted to?
18　A.　Pipe fitter B.
19　Q.　What is pipe fitter B?
20　A.　It's a helper position to a regular pipe
21　fitter.
22　Q.　How long did you hold that position?

Page 11

1　A.　I don't know.　I held that position for
2　about a year, maybe, before I became a pipe fitter.
3　Q.　And then you became a pipe fitter?
4　A.　Yes.
5　Q.　Is that the position you hold today?
6　A.　Yes, it is.　Well, the position I hold
7　today is pipe fitter tech.
8　Q.　Okay.
9　A.　Because you have three types of pipe
10　fitters.　You have the pipe fitter B, which is the
11　helper position; you have the regular pipe fitter,
12　which is on the conventional side; and then you have
13　a pipe fitter technician, which is on the high-speed
14　rail side.
15　Q.　When did you switch to the high-speed rail
16　side?
17　A.　I went straight from a helper to a pipe
18　fitter technician.　I believe it was -- I'm not
19　sure.　1999, 2000.　Somewhere around there.
20　Q.　So you -- did you ever hold a pipe fitter
21　position?
22　A.　No.

Page 12

1　Q.　Okay.　And you've been at high-speed rail
2　since 1999 or so?
3　A.　Yes.
4　Q.　Okay.　At any point in your employment at
5　Amtrak, have you been disciplined?
6　A.　Yes.
7　Q.　Can you tell me about the instances when
8　you have been disciplined?
9　A.　Okay.　I believe I've been disciplined for
10　absenteeism.
11　Q.　Okay.
12　A.　Instances where outside to me and to the
13　union, outside of the union agreement, management
14　decided to take a hard, fast rule and basically they
15　disciplined everyone.
16　Q.　When you say "everyone," who is everyone?
17　A.　All the workers.　See the problem here
18　is -- let me clarify that answer.
19　Q.　Okay.
20　A.　The problem is we are going from Amtrak to
21　the conventional side because there is another body
22　that handled discipline at high-speed rail.　It's a

3 (Pages 9 to 12)

Jerry K. Chambliss                          vs.                  National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                    Wednesday, May 24, 2006

Page 13

1  management company, NEC, that handled the discipline
2  at high-speed rail. Other than that, on the Amtrak
3  side, everyone wasn't disciplined. In my opinion.
4     Q. But everyone who was subject to NEC was
5  disciplined? I'm trying to get a sense of what the
6  population is.
7     A. Well, again, I can't really say that
8  either.
9     Q. Okay.
10    A. Because discipline is on a one-to-one
11 basis, so I don't know how they disciplined everyone
12 else. They went behind closed doors and they
13 handled what they handled with them.
14    Q. Okay.
15    A. With me, I had a couple of verbal warnings,
16 but other than that at high-speed rail, until the
17 incident with Mr. Snyder.
18    Q. Okay.
19       MR. FISCHLER: Let me show you what I'm
20 going to mark as Exhibit 1.
21       (Chambliss Deposition Exhibit Number 1 was
22 marked for identification.)

Page 14

1        THE WITNESS: Your question is about this?
2        MR. FISCHLER: It will be. One second.
3  Let me --
4        MR. RAMSEY: Let him ask the question.
5        MR. FISCHLER: Let's go off the record for
6  a second.
7        (Discussion off the record.)
8        BY MR. FISCHLER:
9     Q. Have you seen this document before?
10    A. Yes, I have.
11    Q. Can you identify it, please.
12    A. It's charges relating to the incident with
13 Mr. Snyder and myself.
14    Q. Okay. Tell me quickly just what you
15 understand this document to be.
16    A. I understand that document to be an attempt
17 at making a case against me when Mr. Snyder
18 assaulted me on the job.
19    Q. Okay. I want to come back to that
20 incident, but I just want to go through all the
21 documents that I've got.
22       MR. FISCHLER: Let me mark this as

Page 15

1  Exhibit 2.
2        (Chambliss Deposition Exhibit Number 2 was
3  marked for identification.)
4        BY MR. FISCHLER:
5     Q. Have you seen this document before?
6     A. No, I haven't.
7     Q. Do you know what its referencing?
8     A. It's referencing a period of time that I
9  took off in June. This document here was produced
10 at some other time. There was no question about
11 when I was going to be off. Nothing, when I took
12 those days off.
13       When I told them in truth and honesty what
14 I was taking off for and that I needed the time off,
15 there was no reason not to give me the time off.
16 They decided after I returned not to give me the
17 time off.
18    Q. Did -- was discipline imposed at this time?
19    A. No, it wasn't, because according to the
20 rules and the guidelines of the attendance policy,
21 that you can miss up to three different times, three
22 incidents before you are charged.

Page 16

1        I think it's two incidents, and this wasn't
2  two incidents. It was the 17th, and then my off
3  dates was the 18th, 19th and 20th. So that
4  constituted one incident. So I did not break any of
5  my contractual agreements as far as the union is
6  concerned with the attendance policy.
7     Q. Okay. Now -- let me find where it is. At
8  the bottom of Integrity -- do you see the paragraph
9  that is marked, Integrity?
10    A. Yes, I do.
11    Q. The very bottom of that, Because of his
12 actions, we assert that Mr. Chambliss is guilty of
13 insubordination and failing to comply with
14 management instructions.
15       Did anything happen as a result of that?
16 Were you charged with insubordination?
17    A. No, I was not charged with insubordination
18 because there was no insubordination. I informed
19 them that I was going to be off. There is no
20 insubordination. Anyone can take off at any given
21 time. It's a question of whether or not you're
22 going to get paid for it. I informed them that I

4 (Pages 13 to 16)

M.A.R. Reporting Group, LLC                Toll Free (888) 534-1225              (703) 534-1225
Professional Stenotype Reporters                                                www.mar-reporting.com

Jerry K. Chambliss                                 vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                        Wednesday, May 24, 2006

Page 17

1  wouldn't be there or else they wouldn't have known
2  that I wasn't going to be there.
3          So as far as this -- to me, this is made
4  up. Because at first the integrity thing was about
5  something totally different. They said I falsified
6  an injury. That was the integrity and honesty
7  thing. This is something new that they're coming up
8  with to try to solidify their position.
9      Q. But this is an earlier incident?
10     A. But this is the incident that after the
11 May 10th incident with Mr. Snyder that they came up
12 with.
13     Q. Okay. Let me show you what I want to mark
14 as Exhibit 3.
15         (Chambliss Deposition Exhibit Number 3 was
16 marked for identification.)
17     BY MR. FISCHLER:
18     Q. Have you seen this document before?
19     A. No, I have not.
20     Q. Okay. This document references a
21 conversation that you had on or around June 7th with
22 Mike Wiggins. Do you recall a conversation at that

Page 18

1  time?
2      A. No, I don't recall any conversation with
3  Mike Wiggins. I do recall a situation where that
4  another supervisor and I do have documentation that
5  they had given me permission off without pay.
6      Q. Who?
7      A. And that's what I was told to do in those
8  type of situations. I requested it. There was a
9  conversation between my union, between Amtrak's
10 management and my union about that being a
11 possibility. You can have off with no pay.
12         NEC didn't see it as a possibility, and
13 there was a large discussion between the two. And
14 nothing was ever decided. All this information
15 about a paper being signed, I do not recall that.
16     Q. Somebody -- you said you had another
17 conversation with another supervisor who gave you
18 permission and you have documentation?
19     A. At a different time, yes, I did.
20     Q. What time was that?
21     A. Give me time to look through my bag and I
22 can probably find it.

Page 19

1      Do you want to go off the record for a
2  couple of minutes?
3      Q. Okay. Sure.
4      (Discussion off the record.)
5      MR. FISCHLER: Let the record reflect that
6  Mr. Chambliss has gone through his documents and has
7  given me two copies of a document entitled, Amtrak
8  High-Speed Rail Request for Time Off.
9      I looked at it -- during the break, I
10 looked at it and asked Mr. Chambliss, this says, I
11 would like to request the following day off:
12 June 3rd, 2004.
13     And he was explaining that to me when we
14 interrupted to go back on the record. So let me
15 give him an opportunity --
16     THE WITNESS: My explanation to you is
17 they're stating that there is no such thing as
18 permission off, and that type of thing. There is
19 permission off. And that's when I got permission
20 off, and I have documentation showing they have
21 given me permission off, no pay.
22     At that point in time, there was a thing --

Page 20

1  those foremen got in trouble for that or something
2  happened between them and Amtrak and there was
3  discussion about whether that was proper procedure
4  or not. No one ever got back to me and told me
5  anything, but they were allowing me off with
6  permission.
7      BY MR. FISCHLER:
8      Q. I don't see anything that questions whether
9  they can give you time off without pay.
10     A. Well, they are saying in your document that
11 they have in here, they say we will always tell the
12 truth. And we imply the spirit, letter laws of the
13 practice of ethical standards. I don't see -- and
14 they are insinuating that I lied about something and
15 I'm wondering what did I lie about.
16     Q. I think the issue is whether you had
17 permission to take time off for June 17th and
18 June 20th.
19     A. There is no issue there. He said in his
20 statement --
21     Q. Who is "he"?
22     A. I guess this is, in this first --

5 (Pages 17 to 20)

M.A.R. Reporting Group, LLC              Toll Free (888) 534-1225              (703) 534-1225
Professional Stenotype Reporters                                            www.mar-reporting.com

Jerry K. Chambliss                              vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                         Wednesday, May 24, 2006

Page 21

1     Q.  Just identify it by document --
2     A.  First paragraph.
3        MR. RAMSEY:  Exhibit Number?
4        THE WITNESS:  Exhibit Number 2.
5        MR. FISCHLER:  Thank you.  Just so the
6     record is clear.  Otherwise it gets --
7        THE WITNESS:  They are saying that -- I
8     guess it's manager -- I don't know who's writing
9     this.
10       BY MR. FISCHLER:
11    Q.  It's signed on the second page, if you
12    look.
13    A.  Mr. Vullo.
14    Q.  No, it's Frank Christello.
15    A.  Frank Christello, but he's referencing a
16    conversation I guess he had with Mr. Vullo in the
17    first paragraph to me taking off and what I was
18    taking off for.
19       So they were informed that I was going to
20    be off.  They knew I was going to be off.  In turn,
21    they're saying later on that I didn't mark off.  If
22    I told them on the date that they have here that I

Page 22

1     wasn't going to be there, that's all the notice
2     contractually I have to give them.
3     Q.  It says here you requested time off.  When
4     I say here, I'm referring to Exhibit 3.  I don't
5     want to argue about this --
6     A.  Exhibit 3.  Okay.
7     Q.  It says that you requested time off and it
8     was denied.  At the end, you asked -- you "came back
9     later in the day and asked Mr. Wiggins to sign the
10    denied sheet and state the reason why, which I did,
11    stating he had no vacation or bank time available.
12    Mike Wiggins."
13       You see where I am, at the bottom of that
14    document?  So the allegation is you took off time on
15    June 17th and June 20th of 2004 when your request
16    was denied.
17    A.  Well, I'd like to -- first of all, I'd like
18    to see the sheet where I signed requesting that.
19    Have they produced that document?  I mean, you have
20    all these other documents.  Have they produced that
21    document?  Like, I produced these documents here.
22    Have they produced anything that I signed requesting

Page 23

1     for any time off?
2     Q.  Whatever we have that's in your personnel
3     file has been produced.  I didn't --
4     A.  You didn't see one because it doesn't
5     exist.
6     Q.  I don't remember whether that is.  So your
7     statement is that these two documents where you
8     requested time off on June 17th and June 20th are
9     inaccurate?
10    A.  No, it's accurate that I had a conversation
11    with Mr. Vullo about taking off those days because I
12    wanted to go out of town with my wife.  What I am
13    saying to you is there was a discussion of
14    whether -- because they had signed these documents.
15    If you see this one, this document here.
16    Q.  Right.
17    A.  I don't know if you want to put this in
18    evidence.
19       MR. RAMSEY:  Give us the date.
20       THE WITNESS:  It's dated 6/1/04.
21       MR. RAMSEY:  And what's the name of the
22    document?

Page 24

1        THE WITNESS:  And the name of the document
2     is, Request for Time Off.  He had given me
3     permission with time off.  And there was discussion
4     between Amtrak and NEC as to whether that was legal
5     to do so or not.  He was under the impression that,
6     I don't know if I can do that or not.  So I will get
7     back to you.
8        No one ever got back to me, so I went on
9     and took the time off.
10       BY MR. FISCHLER:
11    Q.  Okay.  So that's what I want to understand.
12    So your version is that no one got back to you.
13    This e-mail message that is marked as Exhibit 3
14    specifically says that the request was denied.  Is
15    that not your recollection?
16    A.  That's not my recollection.
17    Q.  Okay.  That's what --
18    A.  I mean, if they have a form with my
19    signature on it saying it was denied, I have no
20    recollection of it.
21    Q.  I'll check the file again.  I don't
22    remember one way or the other, frankly.

6 (Pages 21 to 24)

Jerry K. Chambliss                    vs.              National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                      Wednesday, May 24, 2006

Page 25

1    Let me show you what I want to mark as
2  Exhibit 4.
3    (Chambliss Deposition Exhibit Number 4 was
4  marked for identification.)
5    BY MR. FISCHLER:
6    Q.  Okay.  Have you seen this document before?
7    A.  Yes, I have.
8    Q.  Can you identify it for the record.
9    A.  It's a notice of intent to impose
10  discipline meeting, dated April 28th.
11    MR. RAMSEY:  What year?
12    THE WITNESS:  Of 2003.
13    BY MR. FISCHLER:
14    Q.  Is it April 21st?
15    A.  This says April 28, 2003.
16    Q.  I'm sorry.  The date of the letter is the
17  21st.  The date of the hearing is the 28th.  I just
18  wanted to be clear.  You confused me there for a
19  second.
20    The second page, if I could refer you to
21  the second page of this document.  Is that your
22  signature?

Page 26

1    A.  Yes, it is.
2    Q.  Okay.  And can you explain what this
3  document establishes.
4    A.  Well, better yet, I give you what happened.
5    MR. RAMSEY:  Just answer his question.
6    THE WITNESS:  Okay.  This establishes a
7  formal investigation in connection with absenteeism
8  of 14 days.
9    BY MR. FISCHLER:
10    Q.  It's a waiver --
11    A.  And a waiver of three days suspension held
12  in abeyance for six months.
13    Q.  What does that mean?
14    A.  That means if I missed any time within that
15  six-month period, I would have had three days
16  suspension.
17    Q.  Okay.
18    A.  2003.
19    Q.  Did you miss any time after that?
20    A.  You're asking me about 2003?
21    Q.  If you don't remember, that's okay.  Do you
22  remember if you served the three-day suspension?

Page 27

1    A.  I didn't serve the three-day suspension.
2    Q.  Was there something else you wanted to
3  explain?  I didn't want to cut you off.
4    A.  Well, this situation -- and I can, I guess,
5  recall the union rep that was involved in this.  I
6  took a fall, which I'm still having surgeries for at
7  home.  My doctor took me out.  My doctor left the
8  country.  He only gave me a letter for a certain
9  amount of time.
10    When I came back to work, because he was
11  out of the country, I couldn't walk.  I was in there
12  with a cane.  Amtrak sent me home because they said
13  I couldn't walk.  I couldn't work walking with a
14  cane.
15    I asked them at that point in time what did
16  they want me to do.  I didn't have a doctor; my
17  doctor was out of the country.  When he came back,
18  my doctor took me out of work again.
19    Subsequently, I had surgery on my ankle
20  because my ankle was broken.  I had surgery, so I
21  went back out.  They told me at Amtrak that it was
22  too cumbersome to go back through the days to

Page 28

1  provide me with FMLA.  So they denied my FMLA.
2    My union rep told me to sign this because
3  once the FMLA papers went through, they would go
4  back in retrospect and take all of this out.  So
5  instead of arguing it, just go ahead and sign the
6  papers.  Since you going out on surgery, they going
7  to have to give you FMLA, which Amtrak denied doing
8  afterwards.
9    MR. FISCHLER:  Let me show you what I want
10  to mark as Exhibit 5.
11    (Chambliss Deposition Exhibit Number 5 was
12  marked for identification.)
13    MR. FISCHLER:  Let me mark this also as
14  Exhibit 6.
15    (Chambliss Deposition Exhibit Number 6 was
16  marked for identification.)
17    BY MR. FISCHLER:
18    Q.  Have you seen these documents before?
19    A.  Not all of them, no.
20    Q.  Have you seen either of them before?
21    A.  I think -- you're talking about 2003.  I'm
22  not sure.  I might have seen the memo with the dates

7 (Pages 25 to 28)

Jerry K. Chambliss                      vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                      Wednesday, May 24, 2006

Page 29

1  listed on it. Maybe.
2     Q.  That's the one marked Exhibit 6?
3     A.  Because a lot of this is interoffice
4  between Amtrak and NEC. I'm not certain whether
5  I've seen them or not.
6     Q.  Do you know on Exhibit 6, that's the
7  document with all the dates on it, there is some
8  handwritten notes. Do you know whose handwriting
9  that is?
10    A.  No, I do not.
11    Q.  Okay. In looking at those dates that are
12  there, to your recollection, is this document
13  accurate that those were dates that you were either
14  sick or unexcused absence?
15    A.  There is no way I could possibly know at
16  this point in time.
17    Q.  Okay. Okay. Do you recall what happened
18  in this discipline investigation?
19    A.  I don't believe anything happened because I
20  don't believe that they had any recourse in this
21  discipline action. I think FMLA came in but I don't
22  believe anything happened. I'm not sure.

Page 30

1     Q.  Okay.
2     A.  You're talking -- these dates are 2003,
3  three years ago.
4     Q.  Let me show you what I want to mark as
5  Exhibit 7.
6        (Chambliss Deposition Exhibit Number 7 was
7  marked for identification.)
8        MR. FISCHLER: And let me mark this as
9  Exhibit 8.
10       (Chambliss Deposition Exhibit Number 8 was
11 marked for identification.)
12       THE WITNESS: This is the same as this one.
13       MR. FISCHLER: They are similar. That's an
14 earlier investigation. That's Exhibit 8.
15       BY MR. FISCHLER:
16    Q.  Have you seen these documents before?
17    A.  Again, it's 2002. I do not remember. I
18 don't recall seeing them.
19    Q.  Okay. Do you recall discipline around the
20 time of December 2002?
21    A.  I don't recall because on one set of
22 high-speed rail, NEC was calling for this discipline

Page 31

1  for that, discipline for that, and they want to deal
2  with us directly. And we were told by union
3  representatives that whatever they did didn't go in
4  our file, had nothing to do with us. We dealt with
5  Amtrak at that point in time.
6     Q.  Was it your understanding throughout this
7  time that NEC was singling you out for discipline or
8  singling out the employees of high-speed rail out
9  for discipline?
10    A.  My understanding was NEC didn't discipline
11 anyone. Amtrak disciplined. NEC would ask for
12 discipline for any number of reasons; I don't know.
13 They did interoffice memos back and forth which I
14 didn't see.
15       Amtrak decided who they were going to
16 discipline and who they weren't. And they decided
17 what they wanted to do. So in answering you that
18 way, yes, they decided on a case-by-case basis who
19 it was and what they wanted to do.
20    Q.  Did they single you out for discipline?
21    A.  At that point in time, I do not recall.
22    Q.  Okay.

Page 32

1     A.  I believe that these documents, I don't
2  think they went anywhere.
3     Q.  Okay.
4     A.  Because as far as my discipline record, as
5  far as discipline that was put down on paper with
6  me, the only thing I had in my record was the waiver
7  that I signed. That's the only formal discipline I
8  had in my record. As far as these write-ups, that
9  was considered informal verbal counselings,
10 whatever. That wasn't discipline.
11    Q.  Okay. To your recollection, I'm looking at
12 Exhibit 8, which is the document with the dates on
13 it.
14    A.  Okay.
15    Q.  Do you recall whether these instances, sick
16 leave, unexcused absence, late starts, whether they
17 are accurate or not?
18    A.  2002? I don't recall.
19    Q.  Okay.
20    A.  I don't recall.
21    Q.  Let me show you what I want to mark as
22 Exhibit 9.

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225              (703) 534-1225
Professional Stenotype Reporters                                    www.mar-reporting.com

Jerry K. Chambliss                                    vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                          Wednesday, May 24, 2006

Page 33

1     (Chambliss Deposition Exhibit Number 9 was
2   marked for identification.)
3       BY MR. FISCHLER:
4     Q.  Have you seen this document before?
5     A.  I don't recall.  It's 2002, again.
6     Q.  It's addressed to you.  Does that help?
7     A.  No.
8     Q.  It references a meeting that -- it says
9   that, You and I are having today about your
10  attendance and job performance, and it's
11  written by -- and I apologize if I mispronounce the
12  man's name.
13    A.  The man's name is Tom Ruhcowski.
14    Q.  Thank you.  Do you recall meeting with him
15  in October of 2002?
16    A.  No, I do not.
17    Q.  Do you recall a meeting with him discussing
18  your attendance and your job performance?
19    A.  No.
20    Q.  Okay.  Is it your testimony that a meeting
21  like that never, ever occurred?
22    A.  It's my testimony I don't recall.

Page 34

1     Q.  Looking at the dates that are listed here,
2   do you remember if this is an accurate recitation of
3   your attendance?
4     A.  I don't recall.
5     Q.  Let me show you what I'm going to mark as
6   Exhibit 10.
7       (Chambliss Deposition Exhibit Number 10 was
8   marked for identification.)
9       BY MR. FISCHLER:
10    Q.  Have you seen this document before?
11    A.  No.
12    Q.  Do you recall an incident where you were
13  disciplined for insubordination?
14    A.  I wasn't disciplined for insubordination.
15    Q.  Do you recall an incident where you were
16  alleged to have engaged in insubordination?
17    A.  The incident in question -- I do recall
18  this and it's kind of funny that you brought this
19  up.  The incident happened where Mr. Wilson
20  instructed Mr. Alison to go to the station.  A white
21  guy who was working at high-speed rail.  Mr. Alison
22  said, No, I'm a senior man.  Mr. Wilson, you go.

Page 35

1     Mr. Wilson is also a white gentleman
2   working at high-speed rail, said, No, I'm not going.
3   Jerry is the junior guy here.  Go get it, junior
4   boy.  You are going.
5     When they said that to me, I said, No, you
6   were instructed to go.  I'm not going.
7     They turned around to Mr. Wilson, who is a
8   supervisor, and said, Junior boy is going to get it.
9     That's when he turned and instructed me to
10  go get it.  At that point in time, I felt like,
11  because I was the only black guy involved in this
12  situation, that they were being racist.  So I said,
13  No, I'm not doing it.
14    So when Mr. Wilson instructed Mr. Alison to
15  go through the station, because he said, Okay,
16  initially I told you to go.  You go.
17    Mr. Alison left work that day.  Mr. Wilson
18  also left work that day.  They left me there by
19  myself and eventually I went to the station because
20  I was the only pipe fitter there.  So I continued
21  working that day at the station.  So there was no
22  charges brought against me at all.

Page 36

1     Q.  Who is Mr. W. Wilson?
2     A.  Wayne Wilson.  He's a pipe fitter.
3     Q.  Okay.  And now, according to this, you,
4   Mr. Alison and Mr. Wilson were all alleged to have
5   engaged in insubordination.  Do you recall what
6   happened as a result of that?
7     A.  I think they received letters in their file
8   as a result of that.  But I went to the station as
9   requested.  So I didn't receive anything like that.
10    I was involved as far as him instructing
11  them to go.  When they said, No, junior boy is going
12  to get it, I took offense to being so-called junior
13  boy.  So that's why I didn't want to go.  When they
14  left work that day, they said, I'm not going.  I'll
15  leave work first.  And those two individuals left
16  work.  I wound up going to the station.
17    Q.  Is there a subsequent letter?  Did you
18  receive any letter about this or any written
19  documentation?
20    A.  No, this is the first thing I've heard
21  about it since.
22    Q.  Let me show you what I want to mark as

9 (Pages 33 to 36)

Jerry K. Chambliss                          vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                              Wednesday, May 24, 2006

Page 37

1  Exhibit 11.
2       (Chambliss Deposition Exhibit Number 11 was
3  marked for identification.)
4     Q.  Have you seen this document before?
5     A.  No, I have not.
6     Q.  Do you recall the incident that's discussed
7  in this document?
8     A.  Somewhat, yes, I do recall the incident.
9     Q.  What do you recall about it?
10    A.  I recall that that incident transpired --
11 it was Mr. Johnson speaking to him, but on several
12 occasions, Mr. Nagy would address things to me when
13 I wasn't saying anything.  I don't know if he
14 thought he was saying something.  Or someone else in
15 the crowd was saying something, and he directed
16 towards me.
17    Q.  Is it your testimony that you didn't say
18 anything the whole -- throughout the whole time?
19    A.  No, that's not my testimony.
20    Q.  Okay.
21    A.  My testimony is that I was speaking with
22 foreman -- what's his name, Mike McLean, about an

Page 38

1  unrelated matter and Mr. Nagy came up and started
2  yelling and shouting at me.  Talking about, I know
3  what to do with you people like you.
4       And I asked him, I said, What do you mean,
5  people like me?
6       Because Mr. Nagy had been harassing me.
7  And I can furnish you with documents from the whole
8  shift about Mr. Nagy's behavior toward me.  Not just
9  a select group of people.  The whole signed a
10 document, including Bill Vullo, which you have in
11 your other documents that Mr. Nagy had been
12 harassing me.
13      And he, at that point in time -- when he
14 said that, I know what to do with people like you, I
15 asked him what he meant.
16      The other foreman there said, Jerry, don't
17 worry about it.  Just go downstairs.  He started
18 yelling at me, talking about, You need to go home.
19 I can deal with you.
20      Mr. Guyton, Robert Guyton, ran to
21 Mr. Zentner and told him that I was being threatened
22 because he felt that I was being threatened also.

Page 39

1  Mr. Guyton also called Amtrak police and Amtrak
2  police came in.  I spoke with them.  They spoke to
3  Mr. Nagy, Mr. Nagy came back to me and apologized
4  for this incident.  But I told Mr. Zentner that I
5  wanted it documented.
6     Q.  Okay.  Is Mr. Zentner a white employee or
7  black employee?
8     A.  White employee.
9     Q.  Mr. Nagy?
10    A.  White employee.
11    Q.  Mr. Guyton?
12    A.  A white employee.
13    Q.  Mr. Johnston?
14    A.  Black employee.
15    Q.  Now, this document alleges that you were
16 saying you were tired of doing double the work of
17 any other shift, that you were only going to get
18 half his work, if that, and that he would have to
19 deal with that.  Do you see where I am in the bottom
20 paragraph?
21    A.  Yes.
22    Q.  Did you make those statements?

Page 40

1     A.  No, I didn't make those statements.  And if
2  that was the case, there would be documentation or
3  paperwork saying, Write-ups, that I didn't do my
4  job.  There are no documents that I didn't do my job
5  or perform my duties.  Just his insinuation.
6       This was written up after the Amtrak police
7  approached him, and he had to cover himself.  Yet
8  again, another individual tried to cover theirself.
9  When they make their abrasive statements and do the
10 things that they do, they come back with their
11 paperwork.  That's why I wanted this incident
12 documented.
13    Q.  Okay.
14       MR. FISCHLER:  Let me show you what I want
15 to mark as Exhibit 12.
16       (Chambliss Deposition Exhibit Number 12 was
17 marked for identification.)
18       BY MR. FISCHLER:
19    Q.  Have you seen this document before?
20    A.  No, I haven't.
21    Q.  Okay.  It appears to me to be a summary of
22 the disciplinary charges that were raised against

10 (Pages 37 to 40)

Jerry K. Chambliss                     vs.              National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                    Wednesday, May 24, 2006

Page 41

1  you. Does that appear to be an accurate description
2  of the document?
3      A. Okay.
4      Q. To your knowledge, are there charges that
5  are included in here that shouldn't be or charges
6  that are excluded that should be included?
7      A. Yeah, there is a charge, the very first
8  charge at the top. The three days suspension held
9  in abeyance for six months. I felt that shouldn't
10  have been included because I was denied my FMLA,
11  which I shouldn't have been. I provided doctor's
12  documentation. I also had surgery but, once again,
13  they wanted to deny me my benefits.
14      Q. Who is they?
15      A. Amtrak management.
16      Q. Anybody in specific?
17      A. Dino Giurfa, whatever his name is, comes to
18  mind when I speak about that.
19      Q. Why did he want to deny your benefits? Why
20  did Amtrak management want to deny you your
21  benefits?
22      A. I feel like it -- well, it's hard for me to

Page 42

1  say, to be honest with you. I feel like part of it
2  is -- well, Dino, in my opinion, is a racist.
3  Bottom line.
4      Q. Okay.
5      A. On this occasion, I came to him and talked
6  to him -- Mr. Giurfa --
7      Q. "This occasion" is the top entry here?
8      A. Yes.
9      Q. Okay.
10      A. About the absenteeism and what was going on
11  with me being open and honest, just integrity thing.
12  He told me that you bring me doctor's notes like
13  everybody else did and they would be accepted.
14  Well, my doctor's notes were rejected.
15      Q. Okay.
16      A. When I bring in documentation the reason
17  why I wasn't at work, We're not accepting your
18  doctor's notes. But I do know that other white
19  employees' doctors' notes were accepted.
20      Q. What about other black employees?
21      A. Their notes were rejected also.
22      Q. Can you identify any other employees whose

Page 43

1  notes were rejected?
2      A. At this time, no, I do not, because you're
3  talking years ago.
4      Q. Can you identify any employees whose notes
5  were accepted?
6      A. Benjamin Best.
7      Q. B-E-S-T?
8      A. Yes. B-E-S-T. His notes were accepted.
9      Q. Okay.
10      A. If we were to have his record in front of
11  me, right now, his record looks like child's play
12  compared to mine. I mean, there is a long list of
13  absenteeism problems. Even one time I was taking
14  off surgery for my wife, and they gave me a hard
15  time about getting FMLA. And my wife's doctor had
16  to write them a nasty note because they were being
17  ridiculous.
18      Q. But you did take FMLA time for that injury?
19      A. For my wife, yes.
20      Q. For an injury related to your child, too?
21  Did you have FMLA time for that?
22      A. I don't remember.

Page 44

1      Q. I think a child's surgery?
2      A. Yes. I think my son had some surgery.
3      Q. Okay. So all of your requests for FMLA
4  were not denied?
5      A. No. Let me explain. My request for this
6  one wasn't denied. What they did was, even though
7  the injury happened in January and they didn't get
8  around to having surgery until May, in between that
9  time they said, Well, we're not going to go back
10  from May to there and do anything about that. We
11  are going to give you FMLA from May on.
12      Q. When did you apply for FMLA?
13      A. I applied for FMLA -- I don't remember what
14  the exact date was. But I applied before May
15  because at that point in time they had exhausted
16  everything else. They had taken me out of work for
17  30 days; I had exhausted all of my vacation because
18  I took my three weeks vacation, trying not to have
19  an attendance problem, trying to work with them, and
20  that didn't work.
21      Q. Did you request FMLA retroactively?
22      A. Yes, I did.

11 (Pages 41 to 44)

Jerry K. Chambliss                          vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                 Wednesday, May 24, 2006

Page 45

1   Q.  Okay.
2   A.  I was told and I believe I still have the
3   letter that it was too cumbersome to go back and
4   check all the dates.  And it was denied.  In other
5   words, they didn't want to do the work.
6   Q.  Okay.  If you have the letter, we'd asked
7   that you produce it so that we can get a copy of
8   that.
9   A.  Okay.
10  Q.  The remaining entries, are there any
11  questions about any of the others or any things that
12  isn't there that should be there?
13  A.  On the back page.
14  Q.  The second page, go ahead.
15  A.  Let me see, they have changed this document
16  over to say that it's truth and honesty and
17  integrity.  This is where I'm questioning how they
18  wrote this up because that document that you marked
19  Number 1 --
20  Q.  Right.
21  A.  Is the truth and honesty in 2004 on the
22  10th, and here, again, they charged me with the same

Page 46

1   thing for a claimed injury sustained in truth and
2   honesty.
3       That's what they originally made that claim
4   for.  They wrote this up afterward to cover
5   themselves, but here in your own documentation, they
6   contradict themselves.  It says, Violations, Amtrak
7   standards of excellence, specifically sections
8   pertaining to truth and honesty and integrity, read
9   in part, we always tell the truth.
10      Specifications, while assigned as a pipe
11  fitter with high-speed rail, you allegedly claim
12  that injury sustained on May 10th, 2004, when asked
13  by a supervisor and Amtrak police department, you
14  claimed no injury at that time of the alleged
15  incident.
16      Then they turn this around and they produce
17  this document for you saying it was about
18  attendance.
19      MR. RAMSEY:  And that's Exhibit Number?
20      THE WITNESS:  Number 1.
21      BY MR. FISCHLER:
22  Q.  Okay.  But look on the prior page, the very

Page 47

1   bottom.  There is a second entry related to the same
2   incident.
3   A.  Yeah.  Violation of Amtrak's standards,
4   specifically sections pertaining to safety read in
5   part:  Immediately report to your supervisor all
6   injuries and illnesses that occur.
7   Q.  Okay.
8   A.  And the one, three up from the bottom,
9   Violation of Amtrak standard of excellence
10  specifically the section pertaining to attending
11  duties not integrity and truth and honesty.
12      If they are going to make up documents,
13  they should, you know, make them look right.
14  Q.  I don't understand.
15  A.  Meaning that this document here --
16  Q.  Exhibit 1?
17  A.  Exhibit 1.
18  Q.  Um-hum.
19  A.  Has been changed to say because my charge
20  is integrity on attendance, where in their own
21  documentation --
22      MR. RAMSEY:  In Exhibit Number?

Page 48

1       THE WITNESS:  In Exhibit Number 12, it says
2   it was pertaining to duties, attending duties.
3       BY MR. FISCHLER:
4   Q.  I'm sorry.  Where does it say, Pertaining
5   to duties?
6   A.  Three up from the bottom on Number 12.
7   Q.  Isn't that a different incident?
8   A.  No.
9       MR. RAMSEY:  6/28 and 1/7/01.  That's what
10  he's asking you.
11      BY MR. FISCHLER:
12  Q.  The one that's three up is dated June 28th,
13  says, Between May 1, 2004, and June 25, 2005, you
14  allegedly had --
15  A.  Okay.  So this is something new they came
16  up with on July 8th.
17  Q.  The documents are what the documents are.
18  A.  Well, I'm just saying that it's not on this
19  page.
20  Q.  Which is not on this page?
21      MR. RAMSEY:  Exhibit 1.
22      THE WITNESS:  Exhibit 1.

12 (Pages 45 to 48)

Jerry K. Chambliss                        vs.                 National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                            Wednesday, May 24, 2006

Page 49

1    BY MR. FISCHLER:
2    Q.  Isn't it -- no, it's on the second page.
3    A.  No, it's not.
4    Q.  Well, again, I don't want to argue with
5    you, but the charge is --
6    A.  Okay.  Then you read the specifications.
7    There is no argument.
8    Q.  Okay.  The specification on Exhibit 12 is,
9    While assigned as a pipe fitter with high-speed rail
10   you allegedly claimed an injury sustained on May 10,
11   2004.  When asked by supervision and Amtrak Police
12   Department, you claimed no injury at the time of the
13   alleged incident.
14   A.  Again, this is about attendance.
15   Q.  No, Exhibit 1, the specification says,
16   While assigned as a pipe fitter --
17   A.  No, I'm wrong.  I'm wrong.  You're right.
18   Q.  It's identical.
19   A.  Okay.  I'm sorry.
20   Q.  Okay.  Well, that's why we ask these
21   questions, so we can clarify this stuff.  No
22   problem.  I just wanted to be sure I understood what

Page 50

1    was going on.
2        To your knowledge, is there any incident of
3    discipline that we haven't discussed or that isn't
4    reflected in these documents?  Discipline that you
5    received during your employment with Amtrak; let me
6    be clear about that.
7        Do you want to take a minute and go back
8    through these?  Are you confused?
9    A.  Yeah, I am confused about my answers for --
10   when you asked me questions about Exhibit 1.  I
11   misread this.  I'm not sure about what I answered
12   to.
13   Q.  I'm going to come back to the May 10th
14   incident.  So I'll give you a full opportunity to go
15   through that carefully.
16   A.  Okay.
17   Q.  I want you to have any opportunity.  If you
18   have something you want to state, I don't want to
19   get in your way, but I will come back to that, I
20   promise.
21   A.  Okay.  Now, what was your question again
22   about this document?

Page 51

1    Q.  Any other instances of discipline that you
2    have received while employed by Amtrak that we
3    haven't discussed, that aren't shown in the
4    documents?
5    A.  Not that I can recall at this time.  I
6    don't know.
7    Q.  Okay.  Do you know how discipline is
8    determined at Amtrak?
9    A.  Yes.  Somewhat.
10   Q.  Okay.  Why don't you explain what you know.
11   A.  Well, it depends on what you're talking
12   about.  What type of discipline?
13   Q.  Well, if somebody wanted to impose
14   discipline in your work group, say for an attendance
15   issue, what would they do?
16   A.  Someone wanted to impose discipline for an
17   attendance issue, they would go from verbal warning
18   to I guess a written warning to I guess days over
19   the head, days in the street, and they go from one
20   to ten days in the street before termination.
21   Q.  And days in the street would be a
22   suspension?

Page 52

1    A.  Yes.
2    Q.  And you said before, days in the head?  Did
3    I understand?
4    A.  Days over the head.  Days held in abeyance.
5    Q.  And those are days that -- it's like a
6    suspended sentence?  If you don't do anything else,
7    we won't make you --
8    A.  Correct.  If you don't do anything within
9    the six-month period, basically it's taken off and
10   they have to start all over again.
11   Q.  Let me show you what I want to mark as
12   Exhibit 13.
13       (Chambliss Deposition Exhibit Number 13 was
14   marked for identification.)
15   BY MR. FISCHLER:
16   Q.  Have you seen that document before?
17   A.  Yes.
18   Q.  Can you identify it for the record, please.
19   A.  It's Amtrak's national system attendance
20   policy.
21   Q.  And is it the attendance policy that covers
22   you in your employment?

13 (Pages 49 to 52)

Jerry K. Chambliss                    vs.          National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                  Wednesday, May 24, 2006

**Page 53**

1    A. Yes.
2    Q. Has it covered you in your employment
3 since, let's say, 2000?
4    A. Yes.
5    Q. Now, if I understand what you were saying
6 before correctly, the discipline that is imposed on
7 an employee depends on their past record; is that
8 right? In other words -- let me rephrase that.
9    A. I don't understand.
10    Q. In other words, if an employee has never
11 been disciplined before, they would get a different
12 kind of discipline than somebody who had been
13 disciplined three times in the past six months.
14 It's progressive discipline that relies on the past?
15    A. Yes, it's progressive discipline, but at a
16 certain point it starts all over again. It means
17 if -- it's progressive into you did something within
18 an allotted time frame. They have time frames on
19 here. Then it goes to the next level. If you do
20 something again in the allotted time, it goes to the
21 next level.
22        If there is a break in there, like a year

**Page 54**

1 or two, something like that passes, then it
2 basically starts over with a verbal warning.
3    Q. Fair enough.
4        Were you trained about discipline and how
5 that all worked? Did the union provide any
6 information to you?
7    A. No, we weren't trained about it. We were
8 given a handbook and said to read the handbook when
9 we first started. We were given, like, a big
10 packet, I believe.
11    Q. Now, we talked about progressive discipline
12 for attendance. Was there progressive discipline
13 for other issues like insubordination or failure to
14 comply with instructions, dishonesty?
15    A. I believe so. I'm not certain on that.
16    Q. Have you filed any claims with Amtrak prior
17 to this lawsuit?
18    A. Can you be more specific.
19    Q. Sure. Have you filed any workers'
20 compensation claims with Amtrak or Federal Employee
21 Liability Act claims?
22    A. Yes.

**Page 55**

1    Q. Can you tell me about that. One or more
2 than one?
3    A. You mean legal claims?
4    Q. Yes.
5    A. I believe there has been two, I believe. I
6 think there were two.
7    Q. Can you tell me about the two.
8    A. One was several years ago, I believe 1990.
9 1991. I don't remember.
10    Q. Okay. Around that time period. That's
11 fine.
12    A. I fell and broke my wrist at the coach
13 yard.
14    Q. How was that resolved?
15    A. I believe that was settled out of court.
16    Q. How was it settled? Do you remember the
17 terms of the settlement?
18    A. No, I do not.
19    Q. Did you get a payment?
20    A. Yes.
21    Q. Roughly remember what the payment was?
22    A. I think 20,000, something like that.

**Page 56**

1    Q. Okay. And the second one?
2    A. When Mr. Snyder assaulted me.
3    Q. Okay. How was that resolved?
4    A. Out of court.
5    Q. There was a settlement?
6    A. Yes.
7    Q. Did you receive a payment?
8    A. Yes.
9    Q. Do you recall what the payment was?
10    A. I think it was 13,000.
11    Q. Do you recall when that was?
12    A. December.
13    Q. December 2005?
14    A. Yes.
15    Q. So about six months ago?
16    A. Yes.
17    Q. Have you ever filed any EEOC claims, any
18 claims with the Equal Employment Opportunity
19 Commission?
20    A. Yes.
21    Q. Tell me about those.
22    A. One.

14 (Pages 53 to 56)

Jerry K. Chambliss                          vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                              Wednesday, May 24, 2006

Page 57

1    Q.  Okay.
2    A.  The Snyder incident.  Mr. Snyder assaulted
3    me.
4    Q.  Okay.
5    A.  I filed a complaint about that.  I filed a
6    complaint about how I was treated afterwards.
7        MR. FISCHLER:  Let's mark this as
8    Exhibit 14.
9        (Chambliss Deposition Exhibit Number 14 was
10   marked for identification.)
11       BY MR. FISCHLER:
12   Q.  I want you to focus on the second page.
13   That's really all that's relevant on this.
14       MR. FISCHLER:  In fact, if you don't mind,
15   why don't we change Exhibit 14 and just make it the
16   second page of this document.  That's going to be
17   simpler.
18       BY MR. FISCHLER:
19   Q.  Can you identify that document that has
20   been marked as Exhibit 14.
21   A.  It's a charge of discrimination.
22   Q.  Is that your signature at the bottom?

Page 58

1    A.  Yes, it is.
2    Q.  And that's dated June 15th, 2005?  Is that
3    when it was filed?
4    A.  Yes.
5    Q.  Did you file it?
6    A.  Yes.
7    Q.  Where did you file this charge?
8    A.  I think I filed it in Baltimore and they in
9    turn told me to file it in Washington.
10   Q.  Was it filed in Washington on the 15th?
11   A.  I don't know because they sent it to
12   Washington.  I don't know when they sent it.  It's
13   stamped June 22nd.
14   Q.  Okay.  Did you also file a charge with the
15   D.C. Human Rights Commission?  Do you see the D.C.
16   Office of Human Rights?
17   A.  Yeah, I see it at the top.
18   Q.  Well --
19   A.  Like I said, they forwarded my paperwork
20   from Baltimore, so I don't know what office they
21   forwarded it to, and then they contacted me.
22   Q.  The only one that you filed though was the

Page 59

1    one you filed in Baltimore?
2    A.  Right.  They sent my paperwork to
3    Washington.
4    Q.  I understand.  Did you prepare this charge
5    by yourself or did you have assistance of counsel?
6    And I don't want to know anything about what counsel
7    told you.  I just want to know if counsel was
8    involved.
9    A.  I prepared it by myself.
10   Q.  Okay.  I want -- I'm going to come back to
11   this document, but this is the only charge you filed
12   with the EEOC in your employment with Amtrak?
13   A.  That I can recall at this time.
14   Q.  Okay.  Have you ever filed a charge with
15   any other employment, in regard to any other
16   employment?
17   A.  I'm not following you.
18   Q.  This was the only charge you filed with
19   regard to Amtrak.  I want to make sure.  Was there
20   any charge that you ever filed against any other
21   employer?
22   A.  No.

Page 60

1    Q.  Have you filed grievances with your union
2    during your employment with Amtrak?
3    A.  I'm not following you.
4    Q.  Have you filed any claims at the union or
5    asked the union to investigate anything or
6    complaints with your union?
7    A.  Yes.  I have asked the union to -- let me
8    think about that.
9        Because it's hard to say because you don't
10   file complaints with the union.  You don't write
11   up -- I have -- my union officials were involved in
12   different situations, but it's more of a verbal
13   thing.  It's not a paperwork thing.
14   Q.  Have there been any formal proceedings
15   involving your union?
16   A.  Yes.
17   Q.  Tell me about those.
18   A.  Again, can you be more specific.
19   Q.  Sure.  That's fine.
20   A.  Can you be more specific about "formal."
21   Q.  Okay.
22   A.  I mean -- do you mean charges that I

15 (Pages 57 to 60)

Jerry K. Chambliss                    vs.         National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                     Wednesday, May 24, 2006

Page 61

1  brought against the company or do you -- what do you
2  mean?
3       Q.  Well, let's do it a couple of different
4  ways.  After you were terminated, there was an
5  investigation and a formal hearing, right?
6       A.  Yes.
7       Q.  And ultimately you were reinstated.
8  Anything else that's like that that you initiated
9  with the union?
10      A.  No.
11      Q.  Have there been times when you've gone to
12  the union and brought complaints about your
13  supervisors or the way you have been treated?
14      A.  They have been there and they brought
15  complaints.
16      Q.  Who is the they?
17      A.  I'll give you an example.
18      Q.  Okay.  The "they" is your union rep?
19      A.  My union rep, Mike Humphries, was with me
20  on an occasion when I went to talk with Amtrak
21  management about the Snyder incident.
22      Q.  Okay.

Page 62

1       A.  Because my union rep was with me,
2  Mr. Giurfa -- I don't know how to pronounce his last
3  name -- we call him Dino.
4       Q.  I know who you are talking about.
5       A.  Threw us out of the office because I had my
6  union rep.  He said, No, I'm not letting you in here
7  with your union rep.
8       And he spoke up for me.  He said, That's
9  illegal.  You can't do that.
10      He said, Well, both y'all get out of my
11  office.  I'm not dealing with you.
12      Q.  Okay.
13      A.  In turn, Mr. Humphries contacted another
14  union guy, Bob Mascetti, and Bob Mascetti went up to
15  talk to Mr. Giurfa about his actions and, basically,
16  he was told to get out of the office.
17      Q.  Okay.  Mr. Humphries, is he white or black?
18      A.  He's white.
19      Q.  And Mr. Mascetti?
20      A.  Also white.
21      Q.  You had said earlier, and I'm sorry I'm
22  sidetracking for a second, that Dino, you believe he

Page 63

1  was racist?
2       A.  Yes.
3       Q.  Why do you believe that?
4       A.  Because of his treatment of me.  In this
5  situation, when I reported that I was assaulted by
6  Mr. Snyder, I immediately reported it to my union
7  rep, Mr. Mascetti.  Mr. Mascetti went to Dino.
8  Nothing was done.
9       Q.  Okay.
10      A.  Dino, in turn, said he would just leave it
11  for someone else to do.
12      Q.  Why do you believe that was related to your
13  race?
14      A.  Because the way he has treated me in the
15  past.
16      Q.  Tell me.
17      A.  He has verbally assaulted me as far as cuss
18  words.  He has come close to calling me out of my
19  name on several occasions, but he hasn't.  But I get
20  the feeling he wants to.
21      Q.  Why that do you think that is because of
22  your race.  Has he done that to other employee to

Page 64

1  your knowledge?
2       A.  Yes, another individual, Mr. Haimer, the
3  black electrician here at high-speed rail was
4  working on a power car.  Another white employee -- I
5  don't know if George is white or Hispanic.  I'm not
6  sure.  Saw him up there.  He sent him upstairs to
7  Dino.  They took him out of service for five days.
8       When Mr. Haimer noticed four white
9  employees on the power car doing the same thing, he
10 brought this to Dino's attention and he was told to
11 get out of the office.  All he was doing was causing
12 problems.
13      If he saw them up there, why didn't he do
14 something about it?  The way he chose to discipline
15 Mr. Haimer was totally different than the way he
16 chose to discipline the white employees.
17      Q.  Okay.
18      A.  That's the only difference.
19      Q.  Any other examples you can point to?
20      A.  As far as -- not off the top of my head
21 except for the complaints that were told to me by
22 different black employees about Mr. Snyder and still

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225                    (703) 534-1225
Professional Stenotype Reporters                                          www.mar-reporting.com

Jerry K. Chambliss                              vs.          National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                               Wednesday, May 24, 2006

Page 65

1  nothing was done about him.
2        All these complaints about him calling
3  people "nigger," nothing was done. Complaints about
4  him kicking someone, nothing was done. Complaints
5  about, you know, coming towards people in
6  threatening manners, nothing was done. Even when he
7  hit me, nothing was done.
8        Yet there were three charges brought
9  against me, all of this, you know, this integrity
10  and everything. Where was the company's integrity?
11  Q.  Do you know -- and, again, I want to go
12  back to this incident carefully, but I just wanted
13  to ask you. You said nothing was done to
14  Mr. Snyder. Do you know that for a fact?
15  A.  Well, I'll put it to you like this. When I
16  look at the situation of me being terminated when
17  the only thing I had in my file was a -- formal
18  discipline is three days held in abeyance from over
19  a year ago, and he had several charges against him
20  for racism and treatment unbecoming a supervisor.
21  And I was terminated and he so-called received two
22  days suspension. I don't believe anything was done.

Page 66

1        I was told by several individuals that he
2  never served the two-day suspension.
3  Q.  Do you know he was demoted?
4  A.  He was demoted after the incident with me
5  for calling another employee a jungle bunny.
6        And that was reported by a black employee
7  and a white employee. He was speaking to a white
8  employee. The black employee overheard the
9  conversation and asked the white employee would he
10  make a statement, and he did. That's why he was
11  demoted. Not for what he did to me.
12  Q.  Again, I want to come back to the incident.
13        You were telling me about grievances. Are
14  there any other claims you have pursued through the
15  union?
16  A.  Well, normally if you have a complaint here
17  at Amtrak about the way things are done, you pursue
18  it through diversity, not through the union.
19  Q.  Have you filed any claims with the office
20  of diversity?
21  A.  Yes, I have.
22  Q.  Tell me about those.

Page 67

1  A.  I filed a claim against Dino.
2  Q.  When was that?
3  A.  On the incident at the top of this thing
4  when they charged me with three days in abeyance and
5  I complained before they charged me with that about
6  how I was being treated, and that I was going to
7  have surgery and my career with Amtrak was in
8  question. I wrote a letter to them --
9  Q.  Okay.
10  A.  -- concerning this. And I felt like any
11  other employee -- well, I've seen white boys have
12  health problems and they were helped out. There was
13  never an offer made to me for FMLA or anything like
14  that. And according to rules and regulations,
15  that's the first thing he was supposed to offer me.
16  That wasn't offered.
17  Q.  Okay.
18  A.  And I complained about the way I was being
19  treated and nothing happened.
20  Q.  Tell me who you know was offered FMLA.
21  A.  Benjamin Best was offered FMLA.
22  Q.  How do you know that?

Page 68

1  A.  He told me.
2  Q.  Okay. Anybody else?
3  A.  Anybody else, I can't really say because
4  everybody doesn't discuss what goes on.
5  Q.  Do you know for a fact that no
6  African-American employees were offered FMLA?
7  A.  Do I know for a fact?
8  Q.  Yes.
9  A.  No, I don't know for a fact. But I do know
10  that one African-American employee was; after he was
11  given FMLA it was rescinded.
12  Q.  Why was that?
13  A.  I know this particular employee had
14  filed -- they had common-law married.
15  Q.  I'm sorry?
16  A.  They were common-law married and her
17  husband had cancer and she filed for FMLA and it was
18  approved. They took off time to be with her
19  husband, take him through chemo. Later on, they
20  discovered that they weren't legally married; came
21  back, rescinded the days and terminated.
22  Q.  In your opinion, is that in violation of

Jerry K. Chambliss                    vs.           National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                       Wednesday, May 24, 2006

Page 69

1    the law?
2        A. I feel like it's in violation. I feel like
3    the company, given a situation, could have rescinded
4    it, but from this point on, you can't take off any
5    more days. That's what I felt should have been
6    done. Don't approve someone's time off and then
7    come back and say, Okay, well, no, we're not giving
8    you this time off, and fire them.
9        Q. Who was the employee?
10       A. I think her last name was Washington. I
11   don't know. She's a coach cleaner.
12   African-American coach cleaner.
13       Q. Did she certify that she and her partner
14   was -- that they were married?
15       A. Well, in her eyes they were, being together
16   20 years, they were common-law married. They were
17   living together, cohabitating as husband and wife
18   for 20 years. So in her eyes they were married, so,
19   yes, I guess she did.
20       MR. RAMSEY: What state were they in? Do
21   you know?
22       THE WITNESS: I don't know if they were

Page 70

1    living in Maryland part of the time or D.C. part of
2    the time. Because she worked in D.C. they decided
3    that they didn't recognize common-law marriage.
4        BY MR. FISCHLER:
5        Q. To your knowledge, did she certify that
6    they were legally married?
7        A. I don't know.
8        Q. Okay.
9        (A recess was taken.)
10       BY MR. FISCHLER:
11       Q. Tell me what happened. Are you ready?
12       A. Yes, I'm ready.
13       Q. Tell me what happened on May 10, 2004,
14   between you and Mr. Snyder.
15       A. I was sitting at the lunch table during a
16   safety meeting. After the safety meeting was over,
17   I was waiting for my job assignment. Mr. Snyder
18   stood up at the other end of the table. I was
19   talking with Mr. Vullo.
20       Q. Who is Mr. Vullo?
21       A. He's was an NEC supervisor. Now he's
22   Amtrak assistant superintendent in high-speed rail.

Page 71

1        Q. Okay.
2        A. Mr. Snyder threw a piece of paper in my
3    direction, which went over my shoulder. That's what
4    caught my attention. I turned and the look -- saw
5    the piece of paper flying, and I said, What you
6    trying to do? Trying to hit me?
7        And he said, No, this is trying to hit you.
8    He picked up the book, threw it, smacked me in the
9    face with it, right across the bridge of my nose.
10       Q. Okay.
11       A. At this point in time, Mr. Vullo exited,
12   basically ran out.
13       Q. He said he threw the book -- you said he
14   threw the book at you. Describe the book.
15       A. It was a red safety book.
16       Q. This is not hidden. I apologize. This
17   is -- this is the only one I have got, and this is
18   the exhibit that was used from your arbitration
19   hearing. Is this the book that you're talking
20   about?
21       A. It was something like it, but the book he
22   had was a little bit -- it seemed like a little bit

Page 72

1    thicker than this but it was taped differently.
2        Q. There is tape on it. It was attached to
3    something. Is that how the book was bound? It was
4    bound by staples?
5        A. I don't know. I didn't examine the book.
6        Q. Okay.
7        A. I know a book, something like this came.
8    The binder of the book cracked me across the bridge
9    of my nose, and that's when the book came apart.
10       Q. Was it bound in any specific way? How was
11   the book bound?
12       A. I guess similar to this.
13       Q. And that's just bound by staples, correct?
14       A. I guess.
15       Q. Okay. Tell me about Mr. Snyder. I take it
16   he's a white employee?
17       A. Yes.
18       Q. Approximate age?
19       A. 40. 45.
20       Q. Height?
21       A. About 6'2", 6'3". Generally in that range.
22       Q. Weight?

18 (Pages 69 to 72)

Jerry K. Chambliss                           vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                      Wednesday, May 24, 2006

Page 73

1    A.  About 2 -- 240, 245.
2    Q.  Muscular?  Fat?  Overweight?
3    A.  Medium build.  He's not slim.
4    Q.  Was he sitting or standing when he threw
5    this?
6    A.  Standing.
7    Q.  Did he throw it underhand?  Overhand?
8    A.  He threw it overhand.  As a matter of fact,
9    one of the witnesses said he threw it like a
10   baseball, like a fastball in baseball.
11   Q.  Who said that?
12   A.  Ms. Pamela Bunch.  She was one of the
13   individuals that was in the room.
14   Q.  I'm not trying to hide something from you.
15   I'm looking at the series of statements.  Why don't
16   I give you those.  Let's mark that as Exhibit 15.
17        (Chambliss Deposition Exhibit Number 15 was
18   marked for identification.)
19        BY MR. FISCHLER:
20   Q.  The first page of Exhibit 15 is your
21   statement; is that accurate?
22   A.  Yeah.

Page 74

1    Q.  And that's your signature at the bottom?
2    A.  Yes, it is.
3    Q.  And this was prepared according to the date
4    on May 10, 2004, at about 12:45 p.m.?
5    A.  Yes.
6    Q.  Is this accurate?  Is there anything you
7    would change or modify in your statement now?
8    A.  No.
9    Q.  Okay.  The second page is a statement from
10   Mr. Vullo.  Am I pronouncing his name correctly?
11   A.  Okay.
12   Q.  Have you seen this statement before?
13   A.  What was your question?
14   Q.  Have you seen this statement before?
15   A.  I don't remember.  I might have.  I'm not
16   sure.
17   Q.  About four lines up, Mr. Vullo says he left
18   the room because 2158 was very late and needed to
19   have the level 1 completed.  Do you know what that
20   means?
21   A.  It's train 2158.  It's the train that
22   leaves out early in the morning.  The level 1 is the

Page 75

1    inspection they do it on before it has leave out.
2    Q.  Was he responsible for that inspection?
3    A.  He's the supervisor in charge.  The crafts
4    people like myself included were responsible for
5    getting that train out.
6    Q.  Okay.  The third and fourth page are
7    statements from Mr. Snyder.  Have you seen his
8    statement previously?
9    A.  Yes, I have.
10   Q.  Now, at the end of the statement, so I'm on
11   the next page, did Mr. Snyder ever apologize to you?
12   A.  No.  What he did was when I -- when I
13   attempted to get someone involved to try to get them
14   to handle the situation, I guess he was told by
15   management to try to smooth things over with me.  I
16   didn't want him anywhere near me.
17        Mr. Snyder then continued to follow me
18   around the job site, which made me very
19   uncomfortable.  He continued to watch everything I
20   did.  He would stand around and just watch me.  He
21   would follow me to the bathroom.
22   Q.  Did he say anything to you?

Page 76

1    A.  No, he wouldn't say anything.  He'd just
2    follow me.
3    Q.  Okay.  Did you ask him why he was following
4    you?  Did you talk to him at all?
5    A.  At that point in time, I didn't want
6    another altercation with Mr. Snyder.  I just made
7    sure everyone knew and was aware what was going on
8    and that he was following me, and that's when the
9    Amtrak manager, Mr. Dino Giurfa, started saying
10   things to -- had his employees say things to the
11   people around me.  Letting them know, basically,
12   stay away from me.
13   Q.  Who did he say that to?
14   A.  Well, one of the people who was working
15   directly under Mr. Dino was Joe Allione.  I had
16   occasion to walk to the parking lot with a coworker,
17   Gary Jackson, and when I returned from walking to
18   the parking lot with Mr. Jackson, Mr. Allione
19   approached him and asked him what was the content of
20   our conversation.
21        And told him -- informed him that he was
22   not my union rep and was to stay out of any

19 (Pages 73 to 76)

Jerry K. Chambliss                          vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                 Wednesday, May 24, 2006

Page 77

1  happenings between Amtrak management and myself.
2      Q.  And Mr. Jackson told you that?
3      A.  Yes, he did.
4      Q.  Any other people who were talking to you?
5      A.  I think -- I don't remember.  I can't think
6  of the guy's name right now.
7          Another individual came to me and told me
8  he had witnessed Mr. Snyder following me around, but
9  he told me that he was afraid because Amtrak was
10  going to come after him if he assisted me, as far as
11  being a witness to Snyder following me around like
12  he was doing.
13      Q.  You don't remember his name?
14      A.  He is a laborer.  I can see his face, but I
15  can't think of his name.  I can't think of his name
16  right now.
17      Q.  Is he a white employee or black employee?
18      A.  He's a white employee.
19      Q.  And he thought Amtrak would take action
20  against him if he reported this?
21      A.  Yes.
22      Q.  Why did he say that; do you recall?

Page 78

1      A.  Because I don't know if he had had a
2  situation prior to that.  I don't know.  I just, you
3  know, told him, Well, I appreciate you.
4          He said, I seen him following you around,
5  and if anything happens, I'm not going to let him do
6  anything to you, but I can't testify, was basically
7  his statement to me.
8      Q.  Anybody else say anything to you like that?
9      A.  Just the different ones that came to me
10  that they had made complaints about Mr. Snyder doing
11  different things to them.
12      Q.  Who were those people?
13      A.  And basically -- Doria Washington was one,
14  complained about him calling her a nigger.
15  Carlos -- I don't know if his name is Alvarez or
16  Alvarado.
17      Q.  Carlos Alvarado?
18      A.  Yes.  Or Alvarez.  I can't remember what
19  his last name is.
20      Q.  Okay.
21      A.  But he complained about Steve kicking him.
22      Q.  Okay.  Was he a white employee?  Hispanic

Page 79

1  employee?
2      A.  Hispanic employee.
3      Q.  Okay.
4      A.  He came to me and said Steve was harassing
5  him and kicked him, and he even testified at a prior
6  deposition to this.
7      Q.  Okay.  Anybody else?
8      A.  Tyrique (phonetic) Jenkins.
9      Q.  T-Y-R-E --
10      A.  Your guess is as good as mine.
11      Q.  Jenkins?
12      A.  Yes.
13      Q.  What did he say?
14      A.  He complained about Steve calling him a
15  homosexual, and he said Steve came toward him in a
16  threatening manner.  I believe that's what his
17  statement was.
18      Q.  Is he a white employee or a black employee?
19      A.  He's a white employee.
20      Q.  Did Mr. Jenkins complain that Mr. Snyder
21  made racist comments or was making comments about
22  his sexuality?

Page 80

1      A.  I believe he made comments about his
2  sexuality.  I am not certain about the racist
3  comments.
4      Q.  Was Mr. Jenkins homosexual?
5      A.  I don't believe he was.  I don't know.
6      Q.  Okay.  Anybody else?
7      A.  Harry Shawloose (phonetic).
8      Q.  I am sorry.  Harry?
9      A.  Harry Shawloose.  I can't.
10      Q.  Don't even ask how to spell it.
11      A.  He complained about Mr. Snyder's behavior.
12      Q.  Okay.  What did Mr. Snyder do to him?
13      A.  He called him out of his name, cursed him.
14      Q.  When you say "called him out of his name,"
15  I'm not --
16      A.  Meaning I think he called him a bunch of
17  bitches or something like that, to that effect.
18      Q.  Okay.
19      A.  I wasn't there.
20          And I think he might have made a racial
21  comment to him.  I'm not certain.
22      Q.  Was Mr. Shawloose black or white?

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225                    (703) 534-1225
Professional Stenotype Reporters                                              www.mar-reporting.com

Jerry K. Chambliss                                    vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                Wednesday, May 24, 2006

Page 81

1    A.  Black.
2    Q.  Okay.  Anybody else?
3    A.  Frank Rogers made a complaint about
4  Mr. Snyder.
5    Q.  What did he complain about?
6    A.  He was the one that heard the "jungle
7  bunny" comment.
8    Q.  And you told me already, he's a black
9  employee.
10    A.  No, he's white.
11    Q.  Okay.
12    A.  And Gary Jackson.
13    Q.  Uh-huh.
14    A.  Also heard the jungle bunny comment.
15    Q.  I am sorry.  You told me this earlier but I
16  am getting confused.
17    A.  He's a black employee.
18    Q.  Okay.  Were there people who liked
19  Mr. Snyder?  It sounds like he didn't get along with
20  anybody.
21        MR. RAMSEY:  Objection.
22        You can answer.

Page 82

1        THE WITNESS:  I don't know who he got along
2  with.  Again, Mr. Snyder was only my foreman one day
3  a week.
4        BY MR. FISCHLER:
5    Q.  Okay.
6    A.  I didn't have a relationship with him to be
7  playing with him or anything else.
8    Q.  Did people generally complain about
9  Mr. Snyder?  Is that the buzz you heard in the
10  workplace?
11    A.  After what happened to me, that's the idea
12  I got.  I mean, because a lot of people came to me
13  complaining about the things he had done.
14        Even my union rep came to me -- well, as a
15  matter of fact, Chris Bello made a statement in
16  front of my union rep and I that he was a cornball
17  and he does things -- I believe he's the one that
18  walked off the platform and was injured for some
19  reason.  Nobody knows how he walked off the
20  platform.
21    Q.  The people who complained to you, were
22  they -- did they complain about race?  It sounds

Page 83

1  like there were racist comments, there were
2  homophobic comments, there were all kinds of
3  comments; is that accurate?
4    A.  Yes.
5    Q.  Were there complaints by men and women?
6    A.  Yes.
7    Q.  You said Hispanic employees, black
8  employees, white employees?
9    A.  One white employee that he wasn't talking
10  about, he was talking to, made a complaint because
11  he was offended by what he had said.
12    Q.  Okay.
13    A.  Another black employee, what was his name?
14  I don't remember his name, but he was the employee
15  that he was talking about when he called him a
16  jungle bunny.  I don't remember his name right now.
17    Q.  Do you recall any other white employees
18  complaining about Mr. Snyder?
19    A.  No.
20    Q.  Okay.  Did he get along better with the
21  white employees?
22        MR. RAMSEY:  Objection.

Page 84

1        You can answer.
2        THE WITNESS:  I have no idea.
3        BY MR. FISCHLER:
4    Q.  Okay.
5    A.  I know they didn't come to me complaining
6  about anything.
7    Q.  Did you hear any buzz or any gossip about
8  other complaints about him?
9    A.  No.
10    Q.  The second to the last page of Exhibit 15,
11  it's a handwritten statement.  I believe that is
12  Pamela Bunch but I'm not sure.
13    A.  Yes.
14    Q.  Can you identify that signature?
15    A.  Pamela Bunch.
16    Q.  Now, you said Ms. Bunch told you -- I
17  don't want to put words in your mouth, but I want to
18  be clear -- that he threw the book overhand.  Do you
19  recall when she said that?
20    A.  During the Amtrak so-called informal
21  investigation.
22    Q.  Okay.

21 (Pages 81 to 84)

Jerry K. Chambliss                          vs.                          National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                          Wednesday, May 24, 2006

Page 85

1    A.  She came in and told them -- she made a
2  statement he threw it like a fastball in baseball.
3    Q.  And then the last page, there is a
4  statement from Doria Washington?
5    A.  Yes.
6    Q.  Okay.
7    A.  Another witness that was there that they
8  don't have a statement from is Stacey Deffenbaugh.
9    Q.  And what did she say?
10    A.  That's a he.
11    Q.  Oh, I'm sorry.
12    A.  He heard the impact of the book hit me in
13  the face.  They all heard a loud bang when the book
14  hit me in the face.
15    MR. FISCHLER:  Let me show you what I want
16  to mark as Exhibit 16.
17    (Chambliss Deposition Exhibit Number 16 was
18  marked for identification.)
19    BY MR. FISCHLER:
20    Q.  Have you seen this document before?
21    A.  Yes, I have.
22    Q.  Why don't you identify it for the record,

Page 86

1  please.
2    A.  It's a written statement from general
3  foreman Chris Bello.
4    Q.  On about a quarter of the way down, it
5  says, Mr. Chambliss had no idea why Mr. Snyder would
6  throw the rule book at him.  I asked Mr. Chambliss
7  if he felt it was done in a violent or malicious
8  manner.  He replied that he didn't know.  He just
9  couldn't understand why Mr. Snyder would do
10  something like that.
11    Is that accurate?
12    A.  That's what it says.
13    Q.  Is that your recollection of the
14  conversation you had with --
15    A.  My recollection of the conversation at that
16  point in time, I was highly upset.  I had been
17  through -- this thing happened at 7:30 in the
18  morning, before 7:30 in the morning.  And they chose
19  to do nothing.
20    I was upset.  My head was pounding.  I
21  don't even believe I was thinking clearly.  I just
22  wanted something done.  And he was attempting to

Page 87

1  question me, and I was, like, Well, why was nothing
2  done earlier?
3    Q.  So this is --
4    A.  So at that point in time, for what I was, I
5  was barely answering his questions.  He even writes
6  in there that Mr. Chambliss was clearly upset --
7    Q.  Um-hum.
8    A.  -- by what had happened.
9    Q.  Okay.
10    A.  So as far as my answers at that point in
11  time, after any incident with anyone, my answers
12  were vague and I was asking myself what was going
13  on.  Why they doing this?
14    Q.  And this was at noon?
15    A.  Yes.
16    Q.  That's your recollection, that's right?
17    A.  I think it was after noon, but that's what
18  he wrote.  I can't --
19    Q.  Well, what is your recollection?
20    A.  Like I said, that day, things happened.  I
21  was upset about it.  I know that nothing was being
22  done.

Page 88

1    Q.  Okay.
2    A.  And because nothing was being done, I
3  called Amtrak police and had them try to get
4  something done because Amtrak management wasn't
5  doing anything.
6    Q.  The bottom of the last sentence, During the
7  meeting Mr. Chambliss never made mention of any
8  injury he received from the incident and did not
9  appear to be injured in any way.
10    Do you recall mentioning you were injured?
11    A.  Like I said, during that point in time, I
12  was upset.  I was under a lot of stress.  My head
13  was hurting.  I don't remember all of what I said in
14  that meeting.
15    Q.  When Mr. Snyder threw the book at you, the
16  safety book, where did it hit you?
17    A.  Hit me across the bridge of my nose.
18    Q.  Did it knock your glasses off your face?
19    A.  No, it didn't.
20    Q.  Did it move them?  Were they tilted?
21    A.  I don't recall.
22    Q.  Okay.

22 (Pages 85 to 88)

Jerry K. Chambliss                              vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                         Wednesday, May 24, 2006

Page 89

1    A.  Because when it happened, I guess you could
2  say I was in a state of shock that it had happened.
3    Q.  What did you do after it hit you?
4    A.  When it hit me -- I vaguely remember the
5  book hitting me.  I remember I was eating a bowl of
6  oatmeal.  The book came and I remember everybody
7  just gasped.  I remember him coming over to me.  I
8  remember giving him the book and I remember leaving,
9  leaving the room.
10        I went downstairs.  I contacted Bob
11  Mascetti and I told him what had happened.  He went
12  to talk to Dino, which Dino did nothing.  I went
13  over to my train.  I talked to Bill Vullo, which he
14  did nothing.
15        I attempted to get my work done.  Nothing
16  was being done.  Then later on, Mr. Mascetti came
17  back to me.  He said, Did Dino call you upstairs?
18  Did Dino do anything?
19        I told him, No.
20        He then again went back upstairs to Dino
21  and said, Dino, why you not doing anything?  This
22  man has assaulted him.  And nothing is being done.

Page 90

1  Jerry's upset about it.
2        At that point in time, Dino told him that
3  he was waiting for Chris Bello to come in, that
4  Chris Bello would handle it, a lesser manager would
5  handle it, which gave me the impression that, again,
6  this was racism.  Because if I had hit Mr. Snyder,
7  they would have called Amtrak police; I would have
8  been handcuffed and removed from the property
9  immediately.
10    Q.  Do you know of any instance where a black
11  employee hit a white employee and he was handcuffed
12  and taken off the premises?
13    A.  I know of an incident where a black
14  employee said he was going to refuse to do his job,
15  and the police were brought down there and he was
16  escorted off the property.
17    Q.  Who was that employee?
18    A.  His name is William Conaway.
19    Q.  Do you know what happened?
20    A.  Well, they said -- they had asked him to do
21  something out of the scope of his job.  He's a car
22  man, a car repairman.

Page 91

1  They had asked him to do pipe fitting work.
2  Dumping toilets on the trains.  He said, I don't
3  know how to do it.  I don't have any safety
4  equipment.  I don't know how to do it.  You know,
5  you ask me to do something I don't know how to do.
6  I am going to go do what I normally do.  He then
7  told them he was going to go ahead and do his normal
8  duties.
9        I believe the foreman, again, was Mr. Nagy.
10  Called Amtrak police.  Amtrak police then came up on
11  the train and escorted Mr. Conaway off the property.
12    Q.  Do you know any other circumstances where
13  employees have been escorted off the property by the
14  police?
15    A.  Yes.
16    Q.  Okay.
17    A.  Female employee, the one I spoke of
18  earlier, was terminated.  The police were called by
19  Mr. Allione, and she was -- told to clean out her
20  locker and she was escorted off the property.
21    Q.  Any other examples?
22    A.  No, not that I can think of right now.

Page 92

1    Q.  Okay.
2        MR. FISCHLER:  Let me show you what I'm
3  going to mark as Exhibit 17.
4        (Chambliss Deposition Exhibit Number 17 was
5  marked for identification.)
6        BY MR. FISCHLER:
7    Q.  Can you identify this document?
8    A.  It looks like the police report.
9    Q.  Okay.  Now, on the right side on the second
10  line, it says the time of the report was 13:59.  Do
11  you see where I am?
12    A.  Yes, I see where you are.
13    Q.  And then it says, Police was dispatched at
14  14:07 and arrived at 14:34.
15        Do you see where I am?
16    A.  I see where you are.
17    Q.  Is that consistent with your recollection
18  of when you called the police and when they showed
19  up?
20    A.  I don't remember.  I know I called them
21  sometime during the day and they showed up later on
22  that afternoon.

23 (Pages 89 to 92)

Page 93

1    Q.  Was it after you talked to Mr. Bello or
2  before you talked to Mr. Bello?
3    A.  I believe it was after because my union rep
4  asked me to hold off and wait and see what Amtrak
5  management was going to do.  And when they did
6  nothing, I called.
7    Q.  Let me go back for a second, if I could, to
8  Mr. Bello's statement, Exhibit 16.  I'm about
9  two-thirds of the way down.  It says, I informed
10  Mr. Snyder that Mr. Chambliss was highly upset over
11  the incident and I have to discuss the matter with
12  assistant superintendent Giurfa to determine the
13  appropriate actions or possible disciplinary action
14  necessary to address the matter.
15       Were you aware that he talked to Mr. Snyder
16  about possible discipline at the time?
17    A.  No.
18    Q.  Okay.
19    A.  I believe he's speaking in retrospect as
20  far as after because he speaks in there, he talked
21  to me -- at that point in time I believe he was
22  going to talk to Mr. Snyder, but he hadn't talked to

Page 94

1  Mr. Snyder.
2    Q.  And he didn't come back to you afterward
3  and say, This is what I learned from Mr. Snyder and
4  this is what I said to Mr. Snyder?
5    A.  No.
6    Q.  Tell me about your meeting with the police.
7  Do you recall the name of the officer you talked to?
8    A.  No, I do not.
9    Q.  On the top part, above, Verification
10  information, it says, Reporting officer,
11  Victor A. Paz.  Do you see where I am?
12    A.  Yes.
13    Q.  Does that ring a bell?  Was that his name?
14    A.  I don't recall.
15    Q.  Okay.  Do you recall your conversation with
16  the officer that you talked to?
17    A.  No, other than he asked me -- I believe he
18  asked me questions like, Were there any witnesses?
19  What happened?  Where did it happen?
20    Q.  And you answered his questions?
21    A.  Yes.
22    Q.  Let me refer you to the third page,

Page 95

1  narrative number 1.  Do you see where I am?  It's
2  about two-thirds of the way down the page.
3    A.  On the third page?
4    Q.  Yes.
5    A.  Yes.  Yes.  Yes.
6    Q.  Captain Forney notified.  No injuries
7  reported.  No further RP, which I assume is
8  reporting party.  Would like to make a police report
9  in reference to being hit in the face with a book by
10  his superintendent at LOC.  I don't know what that
11  stands for.
12    A.  Location.
13    Q.  Okay.  It says, No injuries reported.  Do
14  you recall telling anyone that you were hurt or that
15  you were injured at that point?
16    A.  At that point in time, no.
17    Q.  At the bottom of the page and on to page 4,
18  there is a discussion of what happened.  I just
19  wanted to check with you if that's an accurate
20  recitation of the incident as best you remember
21  telling the Amtrak police officer?
22    A.  He didn't put all of my witnesses down.  He

Page 96

1  said there was no need.
2    Q.  Anything else that was omitted?  The
3  description of the event, is that pretty close to
4  accurate?
5    A.  Yes, except for the distance.  I didn't
6  know the distance at that point in time.  He kept
7  asking he me, Was it about five feet?  Ten feet?
8       I said, I don't know.
9       He said, I'm just going to put ten feet.
10    Q.  What do you think the distance was?
11    A.  I couldn't tell you.  Right now, where
12  you're sitting from me now, I couldn't tell you.
13  I'm blind in my left eye, so as far as distances and
14  things like that, I can't tell.
15    Q.  Okay.  After you talked to the police
16  officer, what did you do?
17    A.  After I talked to the police officer, I
18  left work.
19    Q.  Did you leave work at the end of your shift
20  or early?
21    A.  I left work at the end of my shift.
22    Q.  Okay.  What happened?

Jerry K. Chambliss                                    vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                        Wednesday, May 24, 2006

Page 97

1    A.  I went home.
2    Q.  Okay.  Did you report to work the next day?
3    A.  No.
4    Q.  Why not?
5    A.  When I got -- well, when I got home, I was
6    still under a lot of stress.  My head was pounding.
7    I called Amtrak's mental health line, and after
8    speaking with a counselor on there, they determined
9    I was under too much stress to go into work the next
10   day.  So they told me to mark off and they set me up
11   with a counselor or psychiatrist, whatever.
12   Q.  Due to stress?
13   A.  Yes.
14   Q.  Okay.  How many days were you out of work?
15   A.  I was out of work subsequently, I believe,
16   four or five days.  The next morning, when I woke
17   up, went to wash my face -- I had an appointment
18   with the counselor -- I went to wash my face, my
19   nose was sore.  I then went to the doctor to make
20   sure nothing was broken or anything.  Still having
21   headaches.
22       The doctor followed up.  He said my face

Page 98

1    was sore and he gave me medicine for the headaches
2    and also started -- I told him I was seeing a
3    counselor that day, follow-up.
4    Q.  Tell me what you mean by "sore."  When you
5    touched it, it hurt?  Bruised?
6    A.  When I went to wash my face, I felt it was
7    sore.  Like it was something cracked in there.  It
8    was sore.  And I was having headaches.  I didn't
9    know if it was from the impact of the book and it
10   was sore.  That's why I went to the doctor to find
11   out.  He looked at it and that's when he gave me
12   some medication for the headaches and everything.
13   Q.  What medication did he give you?
14   A.  I believe it was Fioricet.
15   Q.  What's that for?
16   A.  I believe it's for the headaches and nasal
17   pain.
18   Q.  Okay.  Earlier you told me a description of
19   Mr. Snyder, but because I am bad at this, too, also,
20   how tall are you?
21   A.  I'm about 5'8", 5'9".
22   Q.  How much do you weigh?

Page 99

1    A.  About 250.
2    Q.  You weigh 250?
3    A.  (Nodding head.)
4    Q.  You're a pretty solid guy for 250.  I'm
5    sorry.  You're never supposed to pause when somebody
6    tells you their weight, but that surprised me.
7        So you came back to work, I don't know --
8    May 10th.  I should have checked this.  What day of
9    the week was it?
10   A.  I don't know.
11   Q.  Did you come back to work during that week,
12   the next Monday?
13   A.  All I know is the doctor -- my doctor and
14   the mental health lines, both of them agreed I
15   should take a couple of days off.  I took five days
16   off.  I returned, I think on the 17th.
17   Q.  What happened when you returned to work?
18   A.  What happened when I returned to work?
19   Well, let me back up a little bit.
20       I was instructed by the mental health line
21   people to not deal with anything because I was under
22   a lot of stress.  He said, Just leave everything

Page 100

1    alone.
2        I contacted my union rep and let them know
3    what was going on, Bob Mascetti, and let him know I
4    was going to be off.  I marked off stress.  When I
5    called in the mark-off tape.  I marked off stress.
6        Now I can bring you up to date on the 17th.
7    When I returned, Mr. Mascetti came to me and told me
8    he had attempted to talk to Dino about the situation
9    and told him I was marking off and I was stressed
10   and I was injured.  And Dino told him that he wasn't
11   me.  Even though he was my union representative and
12   he was supposed to speak for me, Dino would not
13   accept anything from him.
14   Q.  Okay.  Did you go to talk to Dino?
15   A.  Yes, I did.  Later on that day, I --
16   Q.  So, on the 17th?
17   A.  On the 17th, Mr. Humphries and myself went
18   to talk to Dino, and that's when we were thrown out
19   of the office and told me I couldn't come in the
20   office to talk with him with my union rep.
21   Q.  And Mr. Humphries is white, if I remember
22   right?

25 (Pages 97 to 100)

Jerry K. Chambliss                          vs.                 National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                   Wednesday, May 24, 2006

Page 101

1    A.  Yes.
2    Q.  Did you go back by yourself?
3    A.  No.  I would not go in the office with
4  him --
5    Q.  Okay.
6    A.  -- to discuss anything with him.
7    Q.  Okay.
8    A.  By myself.
9    Q.  What did Mr. Humphries say after you were
10  thrown out?
11    A.  Mr. Humphries told me this was ridiculous.
12  I don't know why they trying to railroad you, was
13  his term.
14        He then called Mr. Mascetti.  Again, told
15  Mr. Mascetti what had happened.  Mr. Mascetti
16  returned to Dino's office and he was also told to
17  leave and he didn't want to discuss it.
18        I then went to my supervisor, my direct
19  supervisor, Michael McLean, and I told Michael that
20  I was trying to report to them that I was injured
21  and to give them further background of what was
22  going on with me, and they wouldn't talk to me and

Page 102

1  asked him what I should do.  And he told me he
2  didn't know.
3    Q.  Mr. McLean is white or black?
4    A.  He's black.
5    Q.  What did he do?
6    A.  Nothing.
7    Q.  He did nothing?
8    A.  No.  He later testified that he didn't
9  think I was reporting to him that I was injured, but
10  he testified that the conversation did happen.
11    Q.  Did you tell him that you were injured?
12    A.  Yes, I told him I was injured and I was
13  trying to report it to Dino and Dino threw me out of
14  the office, and at that point in time who else was I
15  supposed to go to?  Besides him, I didn't know what
16  to do.  I asked him, What should I do?
17    Q.  Was your conversation with Mr. McLean the
18  first time you told somebody at Amtrak that you were
19  injured?
20    A.  No, I told Mr. Mascetti, who was my union
21  rep, that I was injured, that I was going to the
22  doctor, and he told Dino.

Page 103

1    Q.  Okay.  After your conversation with
2  Mr. McLean, what happened?
3    A.  Nothing.
4    Q.  You just continued working?
5    A.  Yeah.  I went back to Mr. Mascetti.  I told
6  him what had happened.  He told me, Don't worry
7  about it; just go ahead and work and stay away from
8  him.
9    Q.  Stay away from him who?
10    A.  Dino and Steve.
11    Q.  Okay.
12    A.  At this point in time, Steve was still my
13  supervisor on certain days of the week.
14    Q.  Okay.
15    A.  After that, I contacted an attorney.
16    Q.  And who was that attorney?
17    A.  Mr. Robertini.
18    Q.  And that was to file your FMLA claim?
19    A.  Yes.
20    Q.  Do you recall approximately when that was
21  filed?
22    A.  No, I do not.

Page 104

1    Q.  Okay.
2    A.  I know that they received a letter on
3  June 8th.  They called me in the office.  They
4  discussed it on June 8th.
5    Q.  Who is "they"?
6    A.  Mr. Allione and Mr. Dino.
7    Q.  And what did they say?
8    A.  Oh, you're injured?
9        I told them at that point in time, I said,
10  I tried to let you know.  You threw me out of the
11  office.
12        They told me they didn't want to discuss it
13  at that point in time.  They needed my doctor's
14  statements and they wanted me to fill out some
15  forms.  I filled out the forms, I called my
16  attorney, I got my doctor's statements, and then on
17  June 14th, they filed these so-called charges
18  against me.
19    Q.  Okay.
20        MR. FISCHLER:  Let me show you this
21  document, and we'll mark this 18.
22        (Chambliss Deposition Exhibit Number 18 was

Jerry K. Chambliss                                          vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                              Wednesday, May 24, 2006

Page 105

1    marked for identification.)
2         BY MR. FISCHLER:
3         Q.  Can you identify this document?  Have you
4    seen this document before?
5         A.  Yes.
6         Q.  Okay.  Is that your signature at the
7    bottom?
8         A.  Yes, it is.
9         Q.  Can you identify the document.
10        A.  Yes.  It's an employee personal statement.
11        Q.  Was this filled out for Amtrak?  What was
12   the purpose for completing this form?
13        A.  It was filled out for Amtrak.
14        Q.  Why?
15        A.  Because they asked me to fill it out.
16        Q.  Amtrak did?
17        A.  Yes.
18        Q.  Okay.  And why was it filled out on June --
19   well, let me first ask that.
20             It looks like the date is June 14, 2004.
21   Do you see where I am at the bottom right-hand
22   corner?

Page 106

1         A.  Yes.
2         Q.  Why was it filled out then?
3         A.  Because I was thrown out of the office.
4    They would not talk to me.  They would not take it
5    from my -- take this information from my union rep.
6    They did not want to speak with me.  After they
7    received a letter from my attorney, that's when they
8    decided that they needed to speak with me.
9         Q.  When you describe the injury -- so it's the
10   third box that goes all the way across down, if you
11   see it -- it says, "Sore face."
12        A.  Yes.
13        Q.  Do you see where I am?
14        A.  Yes.
15        Q.  Was the injury your entire face or your
16   nose or --
17        A.  It was my nose.
18        Q.  Okay.  Why did you write "sore face"?
19        A.  My nose is on my face.
20        Q.  Okay.  Let me show you what we'll mark as
21   number 19.
22             (Chambliss Deposition Exhibit Number 19 was

Page 107

1    marked for identification.)
2         BY MR. FISCHLER:
3         Q.  Okay.  Can you identify this document.
4         A.  It's an Amtrak illness report.
5         Q.  Have you seen this document before?
6         A.  I believe so.  I'm not certain.
7         Q.  Who completed this document?
8         A.  It says, Joseph Allione completed it.
9         Q.  And again, this was completed on June 14,
10   2004?
11        A.  That's what the document says.
12        Q.  Do you know why it was completed at that
13   point?
14        A.  Because Amtrak management would not talk to
15   me.  They threw me out of the office.  They weren't
16   interested in how I was doing or what was going on
17   with me.
18        Q.  Had you been injured previously, ever while
19   working at Amtrak?
20        A.  Yes.
21        Q.  Did you fill out an injury report for
22   those -- on those instances?

Page 108

1         A.  Not all of them, no.
2         Q.  Did you understand what the procedure was
3    when you were injured on the job?
4         A.  I understand that this was a different type
5    of situation.
6         Q.  Well, let's talk generally first and then
7    we'll come back to this.
8             Generally, what's the procedure when you're
9    injured on the job?
10        A.  Generally, the procedure is you're injured,
11   your supervisor is notified and then they do
12   everything from that point on.
13        Q.  Okay.  So you are supposed to notify your
14   supervisor or an employee is supposed to notify his
15   or her supervisor?
16        A.  Yes.
17        Q.  Why was this circumstance different?
18        A.  This circumstance was different because in
19   normal circumstances, like, if I was to fall and
20   break a leg or something like that, I couldn't move
21   or do anything, work stoppage.  Someone would have
22   to be notified.

27 (Pages 105 to 108)

Jerry K. Chambliss                                  vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                             Wednesday, May 24, 2006

Page 109

1    Q.  Okay.
2    A.  In this type of situation, when I was hit,
3    I didn't know that the injury had occurred until
4    later on.  I was in shock.  I was upset.  My head
5    was hurting.  I went home.  I didn't know anything
6    until the next day when I went to wash my face and
7    my nose and stuff was sore.
8        So that's what I found out.  That was
9    something I couldn't immediately say, Okay, this is
10   the situation.
11   Q.  Okay.
12   A.  Even in a car accident, if I was in a car
13   accident, they ask you, Do you have any injury right
14   now?  No.  But you could wake up the next day, your
15   back be hurting, your neck be hurting.
16       I said no at the time.  Next day, I could
17   feel pain or whatever because this is that type of
18   situation.  At that point in time, I didn't feel
19   anything.  I was upset.  My head was hurting.  I
20   can't let them know before I know.
21   Q.  Okay.
22       MR. FISCHLER:  Let's take a break.

Page 110

1        (A recess was taken.)
2        BY MR. FISCHLER:
3    Q.  I just want to check one thing.  You said
4    earlier the general procedure was that you would
5    notify your supervisor of an injury; is that right?
6    A.  Yes.
7    Q.  And you said that Mr. Snyder was your
8    supervisor for one day a week.
9    A.  Yes.
10   Q.  Who was your supervisor the remaining days?
11   A.  Michael McLean.
12   Q.  And Mr. McLean, he was black, was he not?
13   A.  Yes.
14   Q.  Now, tell me the doctors that you saw in
15   response to the injury you suffered.
16   A.  I saw Dr. Gaber.
17   Q.  G-A-B-E-R?
18       MR. RAMSEY:  Jeffery is the first name.
19       MR. FISCHLER:  Jeffrey.  Thank you.
20       THE WITNESS:  And I saw therapist Bob
21   Hollander.
22       BY MR. FISCHLER:

Page 111

1    Q.  A therapist?
2    A.  Yes.
3    Q.  Physical therapy?
4    A.  Mental health person.
5    Q.  Okay.  Did Dr. Gaber make a diagnosis?
6    A.  Yes.
7    Q.  What was his diagnosis?
8    A.  I don't have it in front of me.  I don't
9    know what his exact diagnosis was.
10   Q.  As best you recall.
11   A.  I was suffering from headaches and nasal
12   pain.
13   Q.  Nasal pain?  Is that pain -- your nose
14   hurt?
15   A.  Yes.
16   Q.  Okay.  Was there a problem with your
17   sinuses or the inside of your nose?  Was it a bone
18   problem?  Do you remember anything further about
19   that?
20   A.  What his statement was?
21   Q.  Yes.
22   A.  No, I don't remember anything more about

Page 112

1    his statement.
2    Q.  Did he prescribe any medication?
3    A.  Yes.
4    Q.  What was the medication?
5    A.  Fioricet.
6    Q.  Anything else?
7    A.  No.
8    Q.  Ice?  Any kind of treatment for it?
9    Anything that you should do?  Not do?
10   A.  Well, he took me out of work and told me I
11   needed to rest, relax.
12   Q.  Was that to help your headaches and nasal
13   pain?
14   A.  Yes.
15   Q.  And did he refer you to -- and correct me
16   if I'm wrong -- Dr. Hollander.
17   A.  No, he didn't refer me to Dr. Hollander.
18   Q.  How did you find Dr. Hollander?
19   A.  Through Amtrak's mental health line.
20   Q.  What did you see Dr. Hollander for?
21   A.  Mental health.
22   Q.  What were the specific issues?

28 (Pages 109 to 112)

Jerry K. Chambliss        vs.        National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS        Wednesday, May 24, 2006

Page 113

1    A.  Stress relating to the May 10th incident
2  with Mr. Snyder.
3    Q.  How long did you see Dr. Hollander?
4    A.  I believe I was still seeing him up through
5  August when I was terminated by Amtrak.  And they
6  terminated my benefits, so I could no longer see
7  him.
8    Q.  How often did you see him; do you remember?
9    A.  I know at first it was, like, about two
10  times a week.  Other than that, I don't recall.
11    Q.  Did it change at some point?
12    A.  I think it went down to one time a week.
13  I'm not certain.
14    Q.  How many times did you see Dr. Gaber?
15    A.  I don't remember how many times I saw him.
16    Q.  Was it more than once?
17    A.  Yes, more than once.
18    Q.  More than five?
19    A.  I don't remember.
20    Q.  So, again, I'm trying to get a timeline.
21  You came back on May 17th.  You told Mr. McLean that
22  you were injured.  He said he didn't know what to do

Page 114

1  with it.  You tried to talk to Dino a couple of
2  times.  He said, Get out of my office.
3    A.  Yes.
4    Q.  Then you went to see a lawyer?
5    A.  Yes.
6    Q.  Okay.  And as a result of your lawyer's
7  letter, the injury reports were filed?
8    A.  Yes.
9    Q.  In between -- so, May 17th to June 14th,
10  other than those incidents, did anything else happen
11  related to the May 10th incident?  Have I missed any
12  facts?
13    A.  Can you repeat that question.
14    Q.  Yeah, that's not a very artful question.
15  That's fine.
16    The steps I've got are, May 17th, you come
17  back in, you try to report to Mr. McLean, you try to
18  report to Dino.
19    A.  Um-hum.
20    Q.  You get a lawyer -- after May 17th, you get
21  a lawyer, the lawyer writes a letter.  The injury
22  report is filed June 14th.  As of June 14th, are

Page 115

1  there any steps, anything that happened that I'm
2  missing?
3    A.  I reported the incident to Amtrak's
4  diversity.
5    Q.  When was that?
6    A.  I don't remember.
7    Q.  Was it -- I'm sorry.  Go ahead.  I don't
8  mean to interrupt you.
9    A.  But I know I followed up on the phone,
10  reported it to them, and I received a letter from
11  them that they found out that I was being
12  represented by an attorney and they were turning it
13  over to Amtrak's legal department and they wouldn't
14  handle it.
15    Q.  When were you told that there was an --
16  there was a problem with your behavior?  There was a
17  question about your behavior?
18    A.  After -- about a week after I filled out
19  these incident reports.
20    Q.  So about a week after June 14th?  Sometime
21  around June 21st?
22    A.  Yes.

Page 116

1    Q.  What happened?
2    A.  I don't remember exactly.  I came to work.
3  They called me upstairs, my union rep and I
4  upstairs.
5    Q.  Who is "they"?
6    A.  Amtrak management.  Dino and Joe Allione
7  called us upstairs.  I think they called us upstairs
8  and give it to my union rep.
9    Q.  Gave what to you?
10    A.  The charges.
11    MR. FISCHLER:  Let me show you what I'm
12  going to mark Exhibit 20.
13    (Chambliss Deposition Exhibit Number 20 was
14  marked for identification.)
15    BY MR. FISCHLER:
16    Q.  Now, this references notice of
17  investigation, ODI number 04.272, dated June 28th.
18  And that talks about violation of the absentee
19  policy.  Do you see that?
20    A.  Yes.
21    Q.  And then it also references -- do you
22  remember receiving that around the end of June?

29 (Pages 113 to 116)

Jerry K. Chambliss                          vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                      Wednesday, May 24, 2006

Page 117

1    A.  Yes.
2    Q.  Below that is ODI number 04.273, dated
3    July 1, 2004, which charges you with not reporting
4    injury in a timely manner.
5    A.  Let me correct you on something.  All of
6    these were given to me at the same time.
7    Q.  That's part of what I want to find out.
8    A.  Yes.
9    Q.  Do you remember when they were given to
10   you?  I guess they must have been given to you early
11   in July.
12   A.  I don't recall, but I know they were all
13   given to me at the same time.
14   Q.  Okay.  And there is also ODI number 04.274,
15   dated July 1, 2004, which is a violation of the
16   standards of excellence that -- it's failure to
17   report an injury at the time of the alleged
18   incident.
19        And that's exhibit -- let me be sure I'm
20   doing this right.  That's Exhibit 1 that we talked
21   about earlier?
22   A.  Um-hum.

Page 118

1    Q.  Now, do you remember a meeting about all
2    these charges?
3    A.  I remember we had a meeting between
4    Mr. Humphries and Mr. Allione and myself where these
5    charges were discussed and my union rep felt as I
6    did they were a retaliation for me bringing charges
7    against Mr. Snyder.
8    Q.  And what charges did you bring against
9    Mr. Snyder?
10   A.  About him hitting me with the book.
11   Q.  What specific charges did you bring?
12   A.  Basically the injury.  They didn't want an
13   injury on their record, so they were retaliating.
14   Q.  The very bottom of page 2 of Exhibit 20,
15   there were two separate sets of charges, ODI
16   number 4.273 and ODI number 04.274 that stem from
17   the same incident.  Through testimony it was brought
18   out that you have sustained injuries in the past and
19   you were aware of the procedures to report injuries.
20   Do you remember discussing that issue at these
21   meetings?
22   A.  I remember there was several meetings.  The

Page 119

1    first meeting between Mr. Allione and myself, he
2    agreed with me that the dates that they had down
3    here for sick leave and minutes late were incorrect.
4        Some of the dates, like on number 5,
5    June 16th, I have a signed document by an NEC
6    supervisor stating that he gave me permission to
7    come in early and work my eight-hour shift.  That's
8    why I got off at the time that I did.  I didn't
9    leave an hour and 18 -- or whatever it was.
10   Q.  It looks like you were late on that day,
11   not leaving early.
12   A.  It was another day they took off --
13   Q.  Okay.  There is no reference on here to
14   leaving early.
15   A.  Well, I'm speaking of the initial
16   charges --
17   Q.  Okay.
18   A.  -- that they gave me.
19   Q.  All right.
20   A.  There was a discussion at one point in
21   time --
22   Q.  I'm sorry.  Let me interrupt you to be

Page 120

1    clear.
2        If there is another reference on the
3    earlier form of this and you resolved that, that was
4    taken off; is that correct?
5    A.  No.  That's not correct.
6    Q.  Well, where is it reflected on this
7    document?
8    A.  I believe the date was June 16th.  I'm not
9    sure.  If we can go off the record for a second and
10   I can look at my paperwork.
11   Q.  Absolutely.
12        (Pause in the proceedings.)
13   BY MR. FISCHLER:
14   Q.  Take your time.  Do you need to talk to
15   your counsel?
16   A.  No.
17   Q.  Okay.
18        (Pause in the proceedings.)
19        THE WITNESS:  Here it is.  It is that they
20   put it down wrong.  It's June 16th.  They put it
21   down by accident as an hour, 18 minutes late, but
22   they accused me of leaving an hour, 8 minutes early.

30 (Pages 117 to 120)

M.A.R. Reporting Group, LLC              Toll Free (888) 534-1225                    (703) 534-1225
Professional Stenotype Reporters                                                    www.mar-reporting.com

Jerry K. Chambliss                        vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                              Wednesday, May 24, 2006

Page 121

1    BY MR. FISCHLER:
2    Q.  How do you know that?
3    A.  Because I have the signed document from my
4    supervisor here stating that I could come in early
5    that day, and that's the shift that I worked.  If
6    you want to see this.
7    Q.  Yeah.  If that's -- I'd like to get a copy
8    of it.
9        But how do you know that the coming in late
10   is an error?
11   A.  Because I was there the full eight hours
12   that day.  They only sign that piece of paper when
13   you -- they are attesting that you worked those
14   hours.
15   Q.  And whose signature is on this?
16   A.  Tom Bernardi.  He was my supervisor at that
17   point in time.
18   Q.  Is Mr. Bernardi a white employee or black
19   employee?
20   A.  He looks to be white.
21   Q.  Okay.
22   A.  I don't know.

Page 122

1    Q.  That's a fair answer.
2        I'm just going to put this aside so we can
3    get a copy of that.
4    A.  Okay.  And you was asking me about these
5    dates.  The other dates were -- as you can see,
6    11th, 12th, 13th, 14th and 15th were my ADOs,
7    assigned days off.  And then you got the 16th, which
8    they got down there sick.  But those were the days
9    that doctor took me out for the injury I
10   sustained --
11   Q.  Just again, so the record is clear, that's
12   number 2 and number 3, May 11th, 12th, 13th and
13   May 16th.  And what they say is not reported as an
14   injury here?
15   A.  Right.
16   Q.  Okay.
17   A.  But of course they got doctor's
18   documentation as to my whereabouts and I marked off.
19   Q.  Did you submit a doctor's note?
20   A.  Yes.
21   Q.  Do we have a copy of that?
22   A.  You should.

Page 123

1    Q.  I can check for that.
2    A.  I have that with me also.
3    Q.  Okay.  We'll take a break and we can pull
4    that and make sure that it's copied so that it's
5    clear.
6    A.  Okay.  According to Amtrak's guidelines,
7    attendance guidelines, without those dates -- oh,
8    and June 13th, I believe, was a date that the bridge
9    was out.  There's a bridge that you come across to
10   get into the facility.
11   Q.  Right.
12   A.  Several white employees were given slips
13   showing that they weren't late.  I have a statement
14   signed by one of NEC's management people that he
15   gave all his people what they call misswipes for
16   their time so they wouldn't be held accountable for
17   that.
18       My ADOs were Friday and Saturday.  I did
19   not know the bridge was out until I came to work
20   that Sunday, and that's when I found out there was a
21   big detour.  And I didn't know D.C. because I don't
22   live in D.C.  I live in Maryland.

Page 124

1    Q.  Right.
2    A.  So I didn't know any other way to get
3    there.  I made several times attempts to call in to
4    try to get an idea of how get to the facility.  I
5    brought my phone records in that shows that I tried
6    to call several times.  No one would answer the
7    phone.  They didn't give me a misswipe.  They gave
8    it to the other employees, but they didn't gave me
9    one.
10   Q.  Who did you ask?
11   A.  I asked -- at that particular time, I asked
12   Tom Bernardi, and he told me that he didn't know
13   how -- he didn't know how they were going to handle
14   that situation.  But another supervisor -- I can't
15   think of his name, but I have it in my bag here.
16   Q.  Okay.  I'd like a copy of that.
17   A.  He wrote an e-mail to management stating
18   that he had given his people misswipes off because
19   the bridge was out and that he was expecting more of
20   that.
21   Q.  And all of his people were white?  Is that
22   your understanding?

31 (Pages 121 to 124)

Jerry K. Chambliss                         vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                      Wednesday, May 24, 2006

Page 125

1    A. I don't know what nationality his people
2 were. I just know what the e-mail said.
3    Q. I believe that e-mail was produced. I have
4 a memory of it. I can't swear, but I think so.
5 It's helpful to get it again.
6    A. Okay.
7    Q. But I think I've seen that.
8    A. And these were the issues that were brought
9 up by my union. Basically, because they wanted to
10 try to build a case against me, they were ignored.
11 In other situations, they would have been accepted.
12    Q. And why did they want to build a case
13 against you?
14    A. In part because I believe Dino was being a
15 racist about the whole thing.
16    Q. Okay.
17    A. How dare he make a complaint about getting
18 hit? He just should accept it and go on.
19    Q. Okay. And part?
20    A. Well, basically, that's all of it. Plus, I
21 felt like they were trying to build a case against
22 me so when the injury case went to trial, they could

Page 126

1 have ammunition, so to speak, towards making me look
2 bad.
3    Q. Who is Mr. Dellasandro?
4    A. Art Dellasandro was the hearing officer.
5    Q. Okay.
6    A. But basically, he works for Amtrak. Amtrak
7 pays him, so indirectly or whatever, he works for
8 Amtrak.
9    Q. Okay.
10    A. And the feeling with me and the union --
11 and I was told by the union -- that you can go to
12 trial if you want. It doesn't do any good because
13 Amtrak is paying for everybody so they are not going
14 to go against Amtrak. As you can see by this
15 decision, they didn't.
16    Q. What happened after this decision?
17    A. I was dismissed.
18    Q. And this is -- when was your dismissal
19 effective?
20    A. Well, it was supposed to be effective
21 April 12th, but, see, they ran out of days. They
22 had a certain amount of time to give me a decision.

Page 127

1 They didn't give me a decision April 12th -- I mean,
2 August 12 was the last day they had to give me a
3 decision.
4    Q. Right.
5    A. I came to work on August 13th for overtime
6 because when they handed me a decision saying it was
7 decided yesterday to terminate me.
8    Q. Okay.
9    A. Even though according to their time frame
10 guidelines, contractually agreed upon with my union,
11 they were out of the time frame.
12    Q. Again, so the record is clear, let me show
13 you what I'm going to mark as 21.
14        (Chambliss Deposition Exhibit Number 21 was
15 marked for identification.)
16        BY MR. FISCHLER:
17    Q. All I want to ask you, I'm not going to ask
18 you questions on it, but have you seen this document
19 before?
20    A. I think it's my union agreement. I'm not
21 certain.
22    Q. Do you want to take a look through and see.

Page 128

1 I want to verify that this is the relevant union
2 agreement.
3    A. That's what it appears to be.
4    Q. Okay.
5    A. Let me ask a question. Are you finished
6 with this document?
7    Q. Yes. I may come back to it, but I'm
8 finished with it for the time being.
9    A. I'm trying to keep a neat stack here.
10    Q. What happened after you were terminated?
11        MR. RAMSEY: Objection. What do you mean
12 by that?
13        MR. FISCHLER: That's fair.
14        BY MR. FISCHLER:
15    Q. What step did you take next to get your job
16 back?
17    A. Well, the step was up to me, and my union
18 then took over and filed a grievance.
19    Q. How was that grievance resolved?
20    A. It was sent -- my direct union man sent a
21 letter to someone in the company and they read it
22 over and denied it.

32 (Pages 125 to 128)

Jerry K. Chambliss                          vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                 Wednesday, May 24, 2006

Page 129

1   Q.  Okay.
2   A.  And then it went to the next stage of the
3   appeal, at which it was denied.  And then it went
4   to, I guess, arbitration.
5   Q.  And what happened at arbitration?
6   A.  I was returned back to work.
7   Q.  Let me show you what I'm going to mark as
8   Exhibit 22.
9       (Chambliss Deposition Exhibit Number 22 was
10  marked for identification.)
11  BY MR. FISCHLER:
12  Q.  Can you identify this document.
13  A.  National Mediation Public Law Board.
14  Q.  Have you seen this document before?
15  A.  Yes, I have.
16  Q.  What do you understand it to be?
17  A.  I understand it to be a decision by the law
18  board.
19  Q.  Okay.
20  A.  Whether it be unfair or whatever.
21  Q.  Did you think it was unfair -- well, let me
22  back up.

Page 130

1       Is this the award that reinstated you at
2   Amtrak?
3   A.  Yes, it is.
4   Q.  Did you think it was unfair?
5   A.  Yes, I do.
6   Q.  Why so?
7   A.  Because the evidence that I wanted to
8   present I never got the opportunity to present.
9   Q.  Why not?
10  A.  Because there were circumstances involving
11  this case like the things I've told you about my
12  attendance and the guidelines.  They weren't allowed
13  to be -- they were just ignored.  And when it came
14  to arbitration, there was no discussion of it.
15      They went behind closed doors with my union
16  rep, discussed what was going to happen.  They
17  brought me in.  I sat down in the chair, they
18  introduced themselves.  They said, Do you have
19  anything to say?
20      I said, I feel like these charges were
21  wrong and brought up because of this incident
22  between Mr. Snyder and myself.  I feel -- and that's

Page 131

1   when my union rep said, That's enough.
2       And I said, What do you mean?
3       He said, Okay, thank you.  That was it.
4   Q.  So the union didn't give you a chance to
5   tell your full side?
6   A.  In that instance or the other instance
7   where they had this formal investigation, when I
8   tried to bring people in to testify, they didn't let
9   the people come in.  They didn't compel the people
10  to testify.  None of my witnesses -- well, I won't
11  say none -- a few of my witnesses were allowed to
12  come in.
13  Q.  But others were not?
14  A.  Right.  Others were not.
15  Q.  Okay.
16  A.  Because they were either off or --
17  Q.  And who didn't -- whose fault is this?
18  A.  I believe it was Amtrak management, which
19  would be Dino because Dino had the ability and the
20  power to say, Okay, well, we need these people here
21  at this certain time.  I don't have that power, my
22  union doesn't have that power.

Page 132

1   Q.  But did your union subpoena the people?
2   A.  There is no subpoena process.
3   Q.  Did your union -- were they union members?
4   A.  Other unions.  Not mine.
5   Q.  Did -- you said your union said to you,
6   That's enough, during the hearing?
7   A.  Yes.
8   Q.  Why did they do that?
9   A.  I don't know.
10  Q.  Okay.
11  A.  I guess in his opinion, that less is
12  better.
13  Q.  So it was a strategic decision?
14  A.  I don't know.  I can't speak for him.
15  Q.  Okay.  Did your union introduce evidence of
16  the things we talked about regarding your
17  attendance?
18  A.  Yes.  Mr. Humphries introduced this, that
19  information, and gave him the documents.  My
20  telephone records, everything.  They were ignored.
21  Q.  By the arbitrator?
22  A.  Yes, and Amtrak.

33 (Pages 129 to 132)

Jerry K. Chambliss                          vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                      Wednesday, May 24, 2006

Page 133

1    Q.  Well, who makes the decision at this point
2  and --
3    A.  At that point in time, nothing that was
4  admitted, to my knowledge.  I don't know what
5  happened behind the scenes.
6    Q.  Okay.
7    A.  But at that point in time, when I was
8  sitting at the table, none of that --
9    Q.  Well, then why were you reinstated?
10    A.  Because as it said, in his opinion, in his
11  award, the attendance alone had no merit -- you
12  couldn't fire me on that alone.  You couldn't fire
13  me on that.
14    Q.  Okay.
15    A.  The fact that I lied about an injury, which
16  I had doctor's statements for, called it "iffy" at
17  best.
18    Q.  Well, where do you see that?
19    A.  Well, first of all, in the second
20  paragraph, they have the dates wrong.
21    Q.  The second paragraph --
22    A.  Well, make it the third paragraph on page 2

Page 134

1  on Exhibit Number 22.
2    Q.  Right.
3    A.  They have the date as being May 11th.
4    Q.  Right.
5    A.  That's wrong.
6    Q.  Okay.
7    A.  The verbiage inside of here, they took
8  Mr. Snyder's statement as law when I had three other
9  people say to the contrary.  I guess because they
10  were ethnic people, their word wasn't worth as much
11  as Mr. Snyder's because he is white.  That's the
12  only way I can take that.
13    Q.  Why is that the way you take that?
14    A.  Because if three people were to walk up to
15  you and tell you something and then one person was
16  to tell you something different, and you go with the
17  one person over the three other people who had
18  nothing to gain by that statement, you have to have
19  some type of reason why you did that.  Now, these
20  three people --
21    Q.  It's not possible to find the one person
22  more credible than the three people?  The three

Page 135

1  people are lying to help their friend or whatever
2  else --
3    A.  If they were to -- well, able to produce
4  something to say, Okay, these people are liars,
5  these people aren't credible, you have two black
6  women and one white man.  Two coach cleaners and one
7  electrician who had nothing to do with it, and yet
8  this individual that they accepted had everything to
9  do with it.  According to his statement, he hit me;
10  I did nothing to cause him to hit me.
11    Yet he is going to say, Oh, I was playing.
12  I was doing something else.  They accepted his word.
13  Oh, I lightly tossed the book.  Over these
14  individuals where one said he threw it like a
15  fastball.  All of them said they heard a loud noise
16  when the book impacted my face.  But they went with,
17  he lightly tossed a pamphlet towards me.
18    Q.  Where does it say that?
19    A.  Right there in that it says, The foreman
20  allegedly tossed a rule book or pamphlet --
21    Q.  Right.
22    A.  Right, so --

Page 136

1    Q.  Well, keep reading.
2    A.  In the carrier's view at, or to, in
3  carrier's view, the claimant following a safety
4  briefing in a lunchroom.  The booklet struck
5  claimant on or near his face.
6    Claimant spoke with carrier's assistant
7  superintendent immediately -- that's not true -- and
8  with Amtrak police later that day, apparently around
9  2:00 p.m., to report a simple assault, but according
10  to police report received in evidence, which closed
11  the case the same day, he did not complain of any
12  injury.
13    Do you need me to stop now or do you want
14  me to continue?
15    Q.  Well, again, I don't want to argue with
16  you, but --
17    A.  I'm not trying to argue.  I just want to
18  know --
19    Q.  I know.
20    A.  Again, you must forgive me because I'm
21  emotionally charged with this.
22    Q.  Yeah, I see.

34 (Pages 133 to 136)

Jerry K. Chambliss                                    vs.              National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                         Wednesday, May 24, 2006

Page 137

1    The beginning of this paragraph, as I read
2  it -- and tell me if you disagree -- is the
3  arbitrator reciting what the allegations are.  He's
4  not making a determination at this point.
5    A.  At this point, he -- okay.  I'll go along
6  with that.  He's stating the position --
7    Q.  Right.  Let me refer you to page 3.  The
8  first full paragraph.  The carrier argues that while
9  it does not condone the idea of throwing materials
10  at people, this was a simple accident.  A pamphlet
11  thrown in the lunchroom accidentally struck
12  claimant, but it was of such miniscule weight --
13  four ounces -- it did not even knock his glasses
14  off.
15    He reported no pain or injury, either at
16  the time or later that day, and although he informed
17  General Foreman Bello of the incident, he did not
18  report an injury.  He completed his tour, picked up
19  his children and only the next day claimed he had
20  been hurt.
21    He then remained out of work until
22  May 17th, all the while failing to report his injury

Page 138

1  to the company until his return.  By his actions, he
2  deprived Amtrak of its right to send him to a
3  company doctor to determine whether he had been
4  injured and, if so, how seriously.
5    Are any of the statements in that paragraph
6  incorrect?
7    A.  Let me read it again.
8    Q.  Take your time.
9    A.  Yes.
10    Q.  Okay.  Why?
11    A.  All the while failing to report his injury
12  to the company until his return.
13    Q.  Did you report the injury before May 17th?
14    A.  I reported it as I stated earlier to
15  Mr. Mascetti, who is my union rep.
16    Q.  You said that that was when you returned on
17  May 17th?
18    A.  No.  I said that was earlier, when I first
19  marked off stress.  I reported, I called in, and to
20  me stress is a type of injury.
21    Q.  When did you report that?
22    A.  That day, that night when I called in.  I

Page 139

1  have a phone record of me calling me in, reporting
2  that I wasn't going to be returning to work.
3    Q.  Who did you report that to?
4    A.  It's a mark-off number.
5    Q.  Okay.
6    A.  You don't report to anyone.  You call a
7  tape.
8    Q.  What did you say?
9    A.  I said, I'm marking off stress.
10    Q.  Did you say at any point that you were
11  injured in the accident?
12    A.  Well, the stress was from the accident.  I
13  thought it was self-explanatory.
14    Q.  At any point, did you say you were injured
15  in the accident?  When is the first time you said,
16  I'm injured?
17    A.  When I talked to Mr. Mascetti that same
18  day.
19    Q.  What day is that?
20    A.  May the 10th.
21    Q.  Okay.
22    A.  Not that -- not May the 10th.  I told him

Page 140

1  about the stress on May the 10th.
2    Q.  That's not my question.
3    A.  I'm answering your question.
4    On May the 10th, I told him about the
5  stress and I was marking off.  On May 11th, when I
6  felt my face sore and I went to the doctor, I called
7  him on May 11th and I told him about --
8    Q.  Called who?
9    A.  Mr. Mascetti.
10    Q.  And Mr. Mascetti was your union rep?
11    A.  Correct.
12    Q.  Who did you tell from the company?
13    A.  I'm getting to that.
14    My union rep is, to my knowledge, is, and
15  since my lawyer, he is able to speak for me on that
16  subject matter.  He then in turn went to Mr. Dino
17  and reported to him on -- I believe he said it was
18  the 12th.  Mr. Dino told him he wasn't me.  He
19  wasn't accepting that from him.
20    Q.  Let me ask the question again.  When did
21  you tell somebody from the company that you were
22  injured?

M.A.R. Reporting Group, LLC                Toll Free (888) 534-1225                (703) 534-1225
Professional Stenotype Reporters                                                   www.mar-reporting.com

Jerry K. Chambliss                          vs.                 National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                             Wednesday, May 24, 2006

Page 141

1    A. I might not understand the question because
2    Mr. Mascetti is from the company.
3    Q. No, not your union rep.
4        MR. RAMSEY: Management.
5        THE WITNESS: Management.
6        BY MR. RAMSEY:
7    Q. When did you tell your supervisor that you
8    were injured?
9    A. The 17th.
10   Q. Okay. Anything else in that paragraph that
11   I read that you disagree with?
12   A. The last paragraph, By his actions, he
13   deprived Amtrak of its right to send him to a
14   company doctor or determine whether he had been
15   injured.
16   Q. How so?
17   A. Because after I was hit, if they were
18   concerned about me being injured, why didn't they
19   have me examined? Let me take you to the doctor
20   anyway and find out, make sure your nose wasn't
21   injured. They had the opportunity at that point in
22   time to say, Okay, well, let me get you checked out

Page 142

1    anyway.
2    Q. I'm not going to argue with you. The
3    response would be you didn't report that you were
4    injured until May 17th, which is the point that the
5    arbitrator makes.
6    A. But the question that was asked was, do I
7    agree with that?
8    Q. I understand that. That's why I said I'm
9    not arguing with you.
10   A. Okay.
11   Q. Okay. In the next paragraph, I'm going to
12   start at the second sentence. In that regard, here
13   we find much in carrier's case that forces itself
14   upon our attention.
15       For example, in making no attempt at to
16   completeness, it is difficult to understand how
17   complainant could have incurred a disabling injury
18   under the circumstances or, if so, in view of his
19   past history with injury claims -- six injuries in
20   2004 -- he could have been unfamiliar with proper
21   reporting requirements.
22       Is there anything in that factually that

Page 143

1    you disagree with? Did you have six injuries in
2    2004?
3    A. No, I did not have six injuries in 2004.
4    Q. Where did the arbitrator get that
5    understanding?
6    A. That was a slanderous statement made by
7    B.L. Campbell in the formal investigation. At the
8    end of it, he said that he's a master at injuries.
9    He has had six previous injuries.
10   Q. Okay.
11   A. And this time he looked for the goose to
12   lay the golden egg and it laid a pancake, was his
13   statement.
14   Q. Was Mr. Campbell out to get you?
15   A. Mr. Campbell, believe it or not, is out to
16   get anyone.
17   Q. Is he white or black?
18   A. And that's the interesting part of this.
19   He's black. But he wasn't brought into this case
20   until time to make these charges. It was all
21   handled by Joe Allione. And when I brought up race
22   to him, I told them they were being racist, they was

Page 144

1    coming after me. That's when they brought
2    Mr. Campbell. So it would seem, though, improperly
3    on their behalf.
4    Q. Did Mr. Campbell support the company's
5    position?
6    A. Mr. Campbell is a manager in the company.
7    He has no choice but to support the company's
8    position.
9    Q. In taking that view, was he adopting a
10   racist view in your opinion?
11   A. All the time when does something,
12   regardless of the motive behind it, they can be used
13   as a tool in my opinion. In my opinion, he was used
14   as a tool in this instance.
15   Q. Okay. The bottom of the page, Upon careful
16   consideration of the record, the board concludes
17   that the claimant violated carrier's
18   well-established policy governing the reporting of
19   industrial injuries. We further conclude that his
20   explanations for that failure are unpersuasive.
21       If I understand your testimony correctly,
22   the only reason they could have found your

Jerry K. Chambliss                                 vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                            Wednesday, May 24, 2006

Page 145

1   explanations unpersuasive is because you're black
2   and the other people weren't?
3       A.  In that situation, yes, because here you
4   are, they took through all my doctor's notes.  The
5   company they have handle their mental health took me
6   off for five days.  I told them to check with them,
7   try to get some record.  I called them trying to get
8   some record of it.  They told me they had tapes but
9   they couldn't give me any record of the
10  conversation.
11       Why did Amtrak hire these people to do
12  their mental health thing if I can't follow the
13  instructions of their mental health people?  Their
14  mental health people told me to take off for the
15  next five days.
16       Then Amtrak charges me for taking off these
17  days.  They told me not to contact Amtrak because of
18  the amount of stress that was on me and it would
19  just cause me more stress.
20       They told me to leave that situation alone
21  and let my union reps handle it.  I did as I was
22  instructed by the people who were caring for my

Page 146

1   health at that point in time.  And again, that
2   wasn't accepted.
3       Q.  Okay.  And that was due to your race, is
4   that your testimony?
5       A.  I believe so it was.  Because like I said,
6   other individuals bringing their doctor's slips or
7   what have you, and they are accepted and they are
8   not put through this kind of scrutiny.
9       Q.  Who?  Give me some examples.
10      A.  Like I said before, Ben Best was -- came
11  in, he provided doctor's notes and he wasn't put
12  through this type of situation.
13      Q.  Anybody else?
14      A.  Like I said -- I keep telling you.  I can't
15  sit here right now --
16      Q.  Okay.
17      A.  -- in 2006 and run down a list of people.
18      Q.  Give me any other name.
19      A.  I'll give you the name of John Humphreys,
20  who agreed with me at that point in time, who is my
21  union rep, who handles discipline with everybody
22  else.

Page 147

1       Q.  To your knowledge, were there any black
2   employees whose notes were accepted?
3       A.  I don't know.
4       Q.  Okay.
5       A.  I know there were some the notes weren't
6   accepted.
7       Q.  Were there some that the notes were
8   accepted?
9       A.  I don't know.
10      Q.  Were there any white employees whose notes
11  weren't accepted?
12      A.  I don't know.  Not to my knowledge.
13      Like I'm saying, if you bring in a doctor's
14  note and they're accepting it and they are not
15  disciplining you, then there is nothing being said.
16  Most time you hear complaints about people who --
17  Okay, we're not accepting your doctor's note.
18      Q.  Did you hear any complaints from white
19  employees?
20      A.  No.
21      Q.  Did you hear any complaints from Hispanic
22  employees?

Page 148

1       A.  There is only one.
2       Q.  Did you hear any complaints from him or
3   her?
4       A.  Yeah.  That's the one who complained about
5   Steve kicking him.  About notes, as far as that is
6   concerned, I don't know.
7       Q.  Okay.  Is it possible that people
8   weren't -- that you weren't mistreated because of
9   your race but people didn't like you personally?  Is
10  it you or was it your race?
11      A.  I believe it was my race.
12      Q.  And why is that?
13      A.  As I explained before, another
14  individual -- and I speak about Ben Best a lot
15  because he was on the roster right above me.
16      Q.  Okay.
17      A.  He missed a lot more time than I missed
18  because I had to work with him every day.  That's
19  how I know how much time he missed.
20      Q.  Anybody else that you can identify?
21      A.  Not right off the top of my head at this
22  moment.

37 (Pages 145 to 148)

Jerry K. Chambliss                              vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                          Wednesday, May 24, 2006

Page 149

1    Q.  Okay.  Let's go back.  I think it's Exhibit
2    16, but don't hold me to that.
3        I'm looking for the charge.
4    A.  Which charge?
5    Q.  The charge that you filed with the EEOC.
6    MR. RAMSEY:  Here you go.
7    THE WITNESS:  14.
8    MR. FISCHLER:  I was close.  Thank you.
9    BY MR. FISCHLER:
10   Q.  I want to go through the particulars.  Do
11   you see that paragraph, the typed-in portion?  Did
12   you type this form?
13   A.  No, I did not.
14   Q.  Who typed the form?
15   A.  I don't know.
16   Q.  What did you submit?
17   A.  The form I submitted I believe was
18   handwritten.
19   Q.  Did it come back to you and then you signed
20   it?  That's your signature at the bottom, right?
21   A.  Yes, it is.
22   Q.  Okay.  Is that what happened?  How did it

Page 150

1    get typed?
2    A.  I don't know.
3    Q.  But this is the form that you ultimately
4    signed?
5    A.  Yes.
6    Q.  Okay.
7    A.  They might have sent it back to me and I
8    signed it.
9    Q.  Okay.
10   A.  I'm not sure.
11   Q.  The second paragraph:  Amtrak terminated my
12   employment on August 13, 2004.  The company has not
13   terminated the employment of similarly situated
14   white employees.
15       Who would be a similarly situated white
16   employee?
17   A.  Benjamin Best.
18   Q.  Because of his absences?
19   A.  Yes.
20   Q.  Now, are you aware of an incident where
21   Mr. Best didn't report an injury or was alleged not
22   to have reported an injury?

Page 151

1    A.  No.
2    Q.  Are you aware of an incident where Mr. Best
3    was -- allegedly falsified an injury report?
4    A.  I'm aware of an incident -- well, no.
5    Q.  Are there any other employees you believe
6    are similarly situated to you or just Mr. Best?
7    A.  There are other employees.  I can't think
8    of their names right off the bat.
9    Q.  Okay.
10   A.  What I'm saying to you is other employees
11   that were black were terminated.  One is -- I think
12   his last name is Lee -- no.  Lee Alexander.  Again,
13   terminated for -- I believe it was truth and honesty
14   in attendance.
15       Ms. Washington, as I spoke to you about
16   earlier was again terminated for truth and honesty
17   in attendance.
18   Q.  Okay.  Were there any white employees, to
19   your knowledge, who should have been terminated for
20   truth and honesty?
21   A.  I know Mr. Best had charges of truth and
22   honesty as far as FMLA abuse.

Page 152

1    Q.  There were charges regarding Mr. Best and
2    FMLA abuse?
3    A.  Yeah.  There were charges --
4    Q.  What do you know about those?
5    A.  The only thing that there were charges.
6    Every time he went upstairs for discipline, they
7    were dismissed.
8    Q.  How do you know that?
9    A.  We had a conversation about it.  He told me
10   they were dismissed.
11   Q.  What did he say?
12   A.  They were dismissed.
13   Q.  Did he say why they were dismissed?
14   A.  No, he didn't.
15   Q.  Did he say anything else about the
16   particulars of it?
17   A.  No.
18   Q.  Did he say, I got away with something?
19   A.  It was implied.
20   Q.  Tell me the conversation as best you recall
21   it.
22   A.  You had an investigation?

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225                    (703) 534-1225
Professional Stenotype Reporters                                                 www.mar-reporting.com

Jerry K. Chambliss                                              vs.                                   National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                                        Wednesday, May 24, 2006

Page 153

1    Yes, he replied.
2    So what happened?
3    He smiled at me. Nothing.
4    Q. Did you know -- did he tell you anything
5  about the underlying facts?
6    A. This is going back years. I don't recall.
7    Q. How long ago did this happen? When was
8  this conversation?
9    A. 2003, 2004.
10    Q. So around the same time you were
11  terminated?
12    A. Yes.
13    Q. Anybody else you can point to? Any other
14  white employees who you believe were similarly
15  situated?
16    A. (No response.)
17    Q. You used plural there. Was there anybody
18  else you were thinking of at the time?
19    A. Yes, there were. And I believe I wrote
20  names down of different employees on the document
21  that I sent them and I don't have it in front of me.
22  Like I said, this was put out in 2004.

Page 154

1    Q. Do you have copies of that document?
2    A. No, I do not.
3    Q. Is there anything that would refresh your
4  recollection? Anything else that you could think of
5  that would help you identify the employees you're
6  thinking of?
7    A. So much time has passed, I don't recall.
8    Q. Okay. You believe -- I believe Amtrak
9  fired me because of my race, black.
10    Have we gone over all the reasons you
11  believe that?
12    A. I can't answer that because I've been
13  answering questions. I don't --
14    Q. Well, then, I'm -- tell me the reasons you
15  believe you were fired because of your race. You
16  said you believe that Dino was racist.
17    A. Yes, because my reasons behind that is
18  because every time I report something -- and
19  throughout history, the way I've been treated at
20  Amtrak when it comes down to dealing with management
21  has been racist.
22    When I came here to the company, you had a

Page 155

1  choice of either being on the train serving drinks
2  or coach cleaner. When white employees come to the
3  job, they get a craft job or conductor's job.
4    Now, we're in D.C., but you have maybe one
5  or two white cleaners and about 200 black cleaners.
6  Just the way they go about everything, the their
7  disciplinary actions, when it comes down to white
8  employees, they come in and say, Okay, this is my
9  problem, Well, let me help you with this.
10    I had one employees while I was working
11  here, that I trained and we both went for the same
12  job.
13    MR. RAMSEY: White or black?
14    THE WITNESS: White.
15    BY MR. FISCHLER:
16    Q. Who was that?
17    A. His name is Chad Jones. He got the job
18  over me and I trained him.
19    Q. Why did he get the job?
20    A. There was never a reason given.
21    Q. Did you ask?
22    A. Yes.

Page 156

1    Q. What were you told?
2    A. I was told to go back to work.
3    Q. No one gave you a reason?
4    A. No one gave me a reason.
5    Q. Did your union pursue that?
6    A. No, they didn't.
7    Q. Did you ask your union to pursue that?
8    A. Again, this was a long time ago. I can't
9  say that I did. I can't say that I didn't.
10    Q. Don't remember?
11    A. Don't remember.
12    Q. Okay. Why wouldn't you have asked your
13  union to pursue that?
14    A. I believe I did. I'm not certain.
15    Q. Okay.
16    A. I mean, I'm under oath. I'm trying to be
17  as forward as possible.
18    Q. I appreciate that.
19    Any recollection of what the union might
20  have said or nothing at all?
21    A. Nothing at all.
22    Q. Okay. Did the union pursue claims for

39 (Pages 153 to 156)

Jerry K. Chambliss                    vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                Wednesday, May 24, 2006

Page 157

1  white employees more than for black employees?
2      A.  No.  See the thing of it is, the union's
3  position, they -- the union never really handled
4  anything as far as your complaints against the
5  company.  You went through diversity.  My complaint
6  went to diversity.  The other employees' complaints
7  went to diversity.  That was their vehicle --
8      Q.  Okay.
9      A.  To basically stop processes.
10     Q.  Okay.  When Chad Jones was promoted, did
11  you file a claim with diversity?
12     A.  I don't believe they even had a diversity
13  department back then.
14     Q.  Okay.  Well, how were things handled at
15  that point?
16     A.  Basically, on the frontline.
17     Q.  What does that mean?
18     A.  With the general foreman and the foreman.
19     Q.  And you talked to someone who said, Go back
20  to work?
21     A.  Yeah.  When I -- the situation with
22  Mr. Snyder and I, when I approached it and I

Page 158

1  complained about it, again, nothing was done.
2      Q.  Okay.
3      A.  I believe that -- and not only myself and
4  other employees believed that if a white employee
5  had a complaint about being threatened, even in
6  Amtrak's guidelines, if you exhibit threatening
7  behavior or physically assault someone, that is
8  considered workplace.  And there is zero
9  tolerance --
10     Q.  Okay.
11     A.  -- for it.  You will be terminated.
12     Q.  What other --
13     A.  Steve was not terminated.
14     Q.  What other employees have said that to you?
15     A.  Several.
16     Q.  Name them.
17     A.  Mr. Humphries has said that to me.
18     Q.  Okay.
19     A.  Mr. Jackson has said that to me.
20     Q.  Um-hum.
21     A.  Mr. Haimer has said that to me.
22     Q.  What specifically did they say?

Page 159

1      A.  That they believe that this was happening
2  because I was black.  It was just racism.
3  Mr. Haimer went to EEOC about it.  He filed a claim
4  with the EEOC which nothing has happened.
5      Q.  He filed a claim with the EEO -- the
6  external EEOC?
7      A.  Yes, he did.
8      Q.  Over what happened to you?
9      A.  Over what happened to him.
10     Q.  What happened to him?
11     A.  As I explained earlier, he was on a train
12  and they took him out of service for not wearing his
13  safety equipment for five days, and the white
14  employees, nothing was done.
15     Q.  What happened with his EEOC claim; do you
16  know?
17     A.  No, I do not know.
18     Q.  Did Mr. Humphries, Mr. Jackson, Mr. Haimer,
19  did you talk about this together or was this
20  separate conversations?
21     A.  Separate conversations.  Mr. Humphries, I
22  remember a conversation with me and him, and I

Page 160

1  expressed to him that I felt like there was a lot of
2  racism here at Amtrak and he said at first he didn't
3  see it.  But he said after going this situation with
4  me with Mr. Snyder he now sees it.
5      Q.  Did he say why?
6      A.  Because of the way I was treated.
7      Q.  Okay.  Any other reasons why you believe
8  you were terminated -- you were terminated because
9  of your race?
10     A.  Well, I'm not sure how to answer that
11  question because this termination surrounding one
12  event.
13     Q.  Right.  Well, you say here, I believe that
14  Amtrak fired me because of my race.
15     So I want to be sure I understand all the
16  reasons that you think Amtrak fired you because of
17  your race.
18     A.  What I'm doing is I'm trying to recall --
19     Q.  That's fine.  I understand.  If the answer
20  is that's all you can recall, that's okay.  I just
21  want to be sure that I don't leave something, you
22  don't surprise me with something later on.

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225          (703) 534-1225
Professional Stenotype Reporters                                         www.mar-reporting.com

Jerry K. Chambliss                                vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                           Wednesday, May 24, 2006

Page 161

1    A. I'm trying to think.
2    Q. Okay.
3    A. At this time, that's all I can recall. I
4  know there is other things.
5    Q. Okay.
6    A. But these things were happening so quickly
7  and it was -- like I said, two years ago.
8    Q. Okay. The company excessively disciplines
9  black employees.
10   A. Yes.
11   Q. Tell me about that.
12   A. Well, I gave the example of Johnny Haimer.
13  I gave the example of Ms. Washington.
14   Q. Okay.
15   A. I gave the example of myself and what they
16  did with Mr. Conaway.
17   Q. Tell me about Mr. Conaway again.
18   A. Mr. Conaway is the one they called the
19  police to remove from the train because he allegedly
20  refused to do work.
21   Q. To your knowledge, were any Hispanic
22  employees similarly disciplined?

Page 162

1    A. Again, there is only one Hispanic employee
2  that I know of. No, there is several. There is
3  three. I don't know what their discipline records
4  were. They were mainly coach cleaners. I'm a pipe
5  fitter. We work at different places.
6    Q. So you don't know?
7    A. I don't know.
8    Q. What about white employees; do you know if
9  any white employees were disciplined similarly?
10   A. I know they weren't.
11   Q. You know of no white employees that were
12  similarly disciplined?
13   A. None.
14   Q. Okay. Any Asian employees who were
15  disciplined similarly?
16   A. No.
17   Q. Any other examples of excessive discipline
18  that you can think of?
19   A. Besides the things that were done to me.
20   Q. Okay.
21   A. And other things I mentioned.
22   Q. Okay. The next paragraph: I believe I

Page 163

1  have been discriminated against because of my race,
2  black.
3    Are there any additional things besides
4  what we talked about earlier? I don't phrase it
5  that way to confuse you. I'm trying not to go back
6  through stuff we've done already.
7    A. Right. Nothing I can think of at the
8  moment.
9    Q. Okay. And you were retaliated against
10  because of your protected activity in violation of
11  Title VII. Tell me about your retaliation.
12   A. The retaliation is the write-ups for
13  missing time, the so-called lying about the injury
14  that happened.
15   Q. Anything else?
16   A. The following me around work by Steve. The
17  questioning my friends.
18   Q. Who was questioned?
19   A. Gary Jackson was questioned.
20   Q. Okay. And we talked about that before?
21   A. Yes.
22   MR. FISCHLER: Let me mark this as

Page 164

1  Exhibit 23.
2    (Chambliss Deposition Exhibit Number 23 was
3  marked for identification.)
4  BY MR. FISCHLER:
5    Q. Have you seen this document before?
6    A. Yes, I have.
7    Q. Do you remember when you received it?
8    A. No, I don't.
9    Q. What did you do after receiving this
10  document?
11   A. Rephrase the question. I don't understand
12  the question.
13   Q. You received this document, it says the
14  EEOC was closing its file. Did you want to continue
15  to pursue this matter?
16   A. Yes.
17   Q. What did you do to pursue this matter
18  further after receiving this letter?
19   A. Nothing. I had already contacted an
20  attorney.
21   Q. Okay. Did you bring this letter to the
22  attorney?

41 (Pages 161 to 164)

Jerry K. Chambliss                                    vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                              Wednesday, May 24, 2006

Page 165

1  A.  Yes, I did.
2  Q.  And did the attorney prepare a complaint?
3  A.  Yes.
4      MR. FISCHLER:  Let's go to number 24.
5      (Chambliss Deposition Exhibit Number 24 was
6  marked for identification.)
7  BY MR. FISCHLER:
8  Q.  Can you identify this document.
9  A.  It's a complaint filed by my attorney.  In
10 the United States District Court of Columbia.
11 Q.  Did you review this document before it was
12 filed?
13 A.  I don't recall.
14 Q.  Did you check if the facts were accurate
15 before it was filed?
16 A.  I don't recall.
17 Q.  Let's go back to paragraph 10 on page 2.
18     Can you explain what this paragraph means.
19 A.  Meaning what I said earlier.  That these
20 charges were brought up because I filed a complaint
21 against Mr. Snyder.
22 Q.  Paragraph 11:  Through his union, plaintiff

Page 166

1  was required to be reinstated by the defendant
2  without back pay, claims which had nothing to do
3  with his workers' compensation claim.
4      MR. RAMSEY:  That was in error on my part.
5  That last part of that sentence doesn't make sense.
6      MR. FISCHLER:  Okay.  I was going to ask
7  that.  Okay.
8  BY MR. FISCHLER:
9  Q.  Paragraph 12:  The defendant National
10 Railroad Passenger Corporation/Amtrak engaged in
11 disparate treatment against African-American
12 employees, and as part of this pattern of
13 discrimination against African-American employees,
14 it terminated the plaintiff for allegedly violating
15 rules and regulations --
16     MR. RAMSEY:  That should be "which."
17     MR. FISCHLER:  -- which white employees
18 violate but are not terminated.
19     And I just added the "terminated" at the
20 end.
21 BY MR. FISCHLER:
22 Q.  Again, I just want to verify, I don't want

Page 167

1  to go back through what we've talked about before,
2  but the claim of disparate treatment of
3  African-American employees and the pattern of
4  discrimination.
5      Is there anything more to add to that or
6  have we exhausted that situation?
7  A.  No, I've said some things today.  I wasn't
8  prepared to discuss anybody else's problems.  I
9  don't know.
10 Q.  Well, if you make these allegations, that's
11 part of what I need to know about as part of this
12 deposition.
13     You've talked about some other people.  Are
14 there any other claims that are relevant to your
15 claims that are stated in paragraph 12 of the
16 complaint?
17 A.  Just the things that I've gone through at
18 Amtrak, different jobs that I've applied for that I
19 was more than qualified for that was given to white
20 employees who are less qualified than myself.
21 Q.  Have you applied for any jobs that have
22 gone to African-American employees?

Page 168

1  A.  Probably so.
2  Q.  Okay.  I'm sorry.  I interrupted you.
3  A.  No, that's okay.
4  Q.  Any other facts that you want to raise in
5  support of the allegations of paragraph 12?
6  A.  I discussed their hiring practices as far
7  as the racist attitude toward that.  The racist
8  attitude towards discipline.
9  Q.  Anything else?
10 A.  And the racist attitudes toward complaints
11 that are made by African-American employees that are
12 basically dismissed.
13 Q.  Other than your complaints that we've
14 talked about, any other persons who have complained
15 that their complaints have been dismissed?
16 A.  The other employees that we have talked
17 about:  Tyrique Jenkins, Doria Washington, Carlos
18 Alvarez or Alvarado, I don't know his last name.
19 Q.  To your --
20 A.  Johnny Haimer.
21 Q.  Okay.  To your knowledge, have any
22 complaints filed by white employees been similarly

42 (Pages 165 to 168)

Jerry K. Chambliss                              vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                         Wednesday, May 24, 2006

Page 169

1   disregarded?
2      A.  No, I don't believe they file similar
3   complaints.
4      Q.  Do you -- does your circle of friends at
5   work include white employees?
6      A.  Yes, it does.
7      Q.  And you gossip and talk to white employees?
8      A.  Yes, I do.
9      Q.  And they never complain about Amtrak?
10     A.  They complain about Amtrak, yes.
11     Q.  Do they complain about the way they are
12  treated by management?
13     A.  They complain about the workload.
14     Q.  Do they complain about the way they are
15  treated by management?
16     A.  No.
17     Q.  Never have?
18     A.  I won't say never.  I don't know if they
19  came to me with anything.
20     Q.  Do you remember hearing any of your friends
21  who are white complain about the way they were
22  treated by Amtrak management?

Page 170

1      A.  No.
2      Q.  In 20 years you never remember a white
3   employee complaining about the way he or she was
4   treated by management?
5      A.  To my knowledge, right now, at this time I
6   can't think of anyone.
7      Q.  Okay.  Paragraph 13:  Defendant applies its
8   disciplinary policies and practices in a disparate
9   manner.
10         That's what we talked about before?
11     A.  Yes.
12     Q.  Paragraph 14:  Plaintiff filed a workers'
13  compensation claim as a result of the injuries he
14  sustained, and the defendant retaliated against the
15  plaintiff by refusing to settle plaintiff's workers'
16  compensation claim unless he waived all civil
17  rights.
18         What does that mean?
19     A.  Meaning that in that claim, they sent a
20  release, wanting me to release my rights to EEOC
21  claim and civil rights claim and any other claims,
22  and I refused to sign it.

Page 171

1      Q.  And what happened?
2      A.  Well, at first they refused to honor the
3   agreement.  Then eventually, they honored the
4   agreement and they went on and paid me anyway,
5   without me signing that release.
6      Q.  So they -- how did they retaliate against
7   you then?
8      A.  Well, what I mean -- meant by retaliation,
9   meaning that they put their clause in there, I guess
10  that's what he meant, I didn't write this paragraph,
11  by putting that clause in there and not settling my
12  case unless I signed away my rights to everything
13  else.
14     Q.  But they did settle the case?
15     A.  But at the time that this was filed, they
16  hadn't.
17     Q.  So this is no longer accurate?
18     A.  It was accurate.  That's what they did.
19  They eventually settled.  But at the time, that's
20  what they did.  So it's still accurate.
21     Q.  It's no longer accurate.  The case was
22  settled.  You're saying they refused to settle when

Page 172

1   in fact they did settle.
2      A.  But it's only stating that at one point in
3   time they refused to settle it because I wouldn't
4   sign that paper.  It doesn't say they continued to.
5   It just says they refused at one point in time.
6      Q.  Okay.
7      A.  To me, I don't know, maybe I'm just
8   misreading it.  Retaliated by refusing to settle the
9   plaintiff's work claim unless he waived all civil
10  rights.
11     Q.  Well, obviously you didn't waive all civil
12  rights because you filed this action.
13     A.  Right, but that was the statement of facts
14  that was the case at that point in time.
15     Q.  Got it.
16         Paragraph 16, again, I want to make sure
17  we've covered all of those issues.
18     A.  Well, that brings up the issue again of the
19  situation with Mr. Snyder.
20     Q.  Right.
21     A.  Horseplay is not allowed at Amtrak.  It's a
22  terminating offense.  Workplace violence is a

43 (Pages 169 to 172)

Jerry K. Chambliss                    vs.              National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                          Wednesday, May 24, 2006

Page 173

1  terminating offense. Mr. Snyder was not terminated.
2      Q.  Okay.
3      A.  He's a white employee, but again, he had
4  several complaints about his behavior and different
5  things, kicking employees, calling employees
6  "nigger." He was not terminated, yet they came up
7  with false attendance charges and a false charge
8  against me of being injured, lying about an injury
9  and I was terminated when I had nothing else in my
10  disciplinary files as far as formal discipline.
11      I had three days over my head from a year
12  and a half ago, almost two years ago. And they took
13  that, they -- what they did was -- let me explain.
14  They did the steps. You supposed to have three
15  steps that they go through.
16      Q.  Right.
17      A.  That's why they brought up three different
18  charges, trying to take me through all three steps
19  at the same time to terminate me.
20      Q.  I'm not doing to argue with you about what
21  is your in your file. We've gone through that.
22      A.  You're asking me --

Page 174

1      Q.  That's fine. I just want your opinion.
2      A.  Okay.
3      Q.  Now, it says at the end of the first
4  sentence that you were terminated -- I'm
5  paraphrasing a little bit -- by terminating him for
6  infractions that it does not terminate white
7  employees.
8      Is it your testimony that, take out whether
9  it was true or not, but if a white employee
10  falsified an injury report, he or she would not be
11  terminated?
12      A.  I don't believe they would be.
13      Q.  Can you identify any white employees who
14  have falsified an injury report and not been
15  terminated?
16      A.  Originally you asked me this on a
17  hypothetical basis. That's the way I took it.
18      Q.  Okay.
19      A.  I don't know of any --
20      Q.  Well, that's why I asked the follow-up
21  questions.
22      A.  -- situations. Like I said, discipline is

Page 175

1  done behind closed doors.
2      Q.  Do you know any employees who've exhausted
3  the attendance policy, any white employees who have
4  not been fired?
5      A.  Ben Best.
6      Q.  Did he get all the way through the
7  progressive steps?
8      A.  Yes. He had days in the street, days over
9  his head, days in the street again, days over his
10  head again, days in the street again, days over his
11  head again and he had still had not been terminated.
12  When I had never served one day of suspension, I was
13  terminated.
14      Q.  Do you know of any employees who failed to
15  report an injury who were not terminated, any white
16  employees who failed to report an injury who were
17  not terminated?
18      A.  I don't know how to answer that question
19  because in some cases they had injuries, they didn't
20  report them. Nothing was said about them and they
21  went home and dealt with it. That was a failure to
22  report to me.

Page 176

1      Q.  Did they take time off for those injuries?
2      A.  Yes.
3      Q.  Can you identify those people?
4      A.  I don't have the paperwork in front of me.
5      Q.  Okay. Are there documents that would
6  refresh your recollection?
7      A.  We had safety reports of different injuries
8  that were -- that happened. Again, we went over the
9  injuries, I don't go over the discipline.
10      Q.  But if they -- if the injury was on a
11  safety report, wasn't it by definition reported?
12      A.  Well, my injury was also on a safety report
13  but they said I didn't report it.
14      Q.  When was it on a safety report?
15      A.  It's on a safety report now.
16      Q.  When did it go on the safety report?
17      A.  I don't know exactly when it went on the
18  safety report.
19      Q.  Paragraph 17, you say that Mr. Snyder
20  attacked you because of your race?
21      A.  I felt like Mr. Snyder attacked me because
22  of my race and because he has a disposition towards

44 (Pages 173 to 176)

Jerry K. Chambliss                          vs.              National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                Wednesday, May 24, 2006

Page 177

1  ethnic people. Those are people who have made
2  complaints about him.
3      Q.  Okay.
4      A.  And because of that and they felt like
5  Amtrak wasn't going to do anything about it, he felt
6  free to hit, kick, curse and treat African-American
7  employees or ethnic employees any way he saw fit
8  because there was no discipline coming.
9      Q.  And it's your testimony that that's what
10  motivated him throwing a safety book at you?
11      A.  Yes.
12      Q.  Paragraph 18, you suffered humiliation,
13  embarrassment, loss of income, friends, benefits and
14  emotional -- I assume damage is the next word. Tell
15  me about these injuries.
16      A.  It's humiliating to sit there and even now
17  they make jokes about it. They put cartoons on the
18  board.
19      Q.  Who is "they"?
20      A.  Employees.
21      Q.  Jokes about what?
22      A.  About being hit with the book. During the

Page 178

1  safety meeting, there's jokes being said about,
2  Okay, duck. He has a safety book.
3          There was a cartoon put on the bulletin
4  board about an individual being hit with a safety
5  book, and they wrote "Steve" and "Jerry" on it.
6      Q.  Okay.
7      A.  The humiliation of then trying to report
8  this thing and all the things I went through with
9  management, and basically being called a liar. You
10  weren't hurt, you wasn't injured. The doctors
11  didn't take you out, your doctor is a liar.
12          That type of thing adds insult to injury.
13  Embarrassment, once I lost my job, I had to tell my
14  son, there are some things he used to could do that
15  he couldn't do anymore because Daddy isn't working
16  now. And, you know, you got to come out of karate.
17  And, you know, I got to cut back on some things to
18  continue with my life. That was embarrassing.
19          No father wants to tell his son that, you
20  know, Daddy doesn't have money to send you to karate
21  anymore or to do some of the things you want to do.
22          Loss of income is self-explanatory. I was

Page 179

1  out of work from my job for over a year. I lost
2  benefits as far as my railroad retirement. I lost
3  vacation time. I lost benefits through railroad
4  retirement.
5      Q.  You had another job during the period of
6  time between your termination and your
7  reinstatement?
8      A.  Yes, I did.
9      Q.  Did that job provide benefits?
10      A.  You had to pay for your benefits, so I
11  elected not to get them. The pay was so low, once I
12  paid for benefits, I would have nothing.
13      Q.  Okay.
14      A.  Emotionally, because of the stress I was
15  enduring, it was starting to cause problems in my
16  home between me and my wife because I was under a
17  lot of stress.
18          With anyone, loss of a job, financial means
19  causes a lot of stress on you. Besides the other
20  stresses I went through with being hit and all the
21  things I was going through at work, I had bills to
22  pay, I have a mortgage, car notes, that's a lot of

Page 180

1  stress, wondering how you are going to make up for
2  that loss. I was making $50,000 a year and then I
3  had nothing.
4      Q.  Okay. Page 4, Count 2, Retaliation. Prior
5  to his termination -- I am in paragraph 21 --
6  plaintiff often spoke up concerning his civil rights
7  based upon his race.
8          Tell me about that.
9      A.  Well, you brought up in one of your
10  documents with Mr. Nagy when he came after me and he
11  made the statement, I know what to do with people
12  like you or you people, something to that effect.
13  And I asked him what he meant by you people. I felt
14  like he was making a racist statement at that point
15  in time, and some of the other workers did, too.
16          On several occasions, he would blatantly
17  yell at me and abuse me in front of the other
18  coworkers. And when I made complaints to the Amtrak
19  manager then, who was Todd Zentner, and I spoke up
20  and I said, You know, they're not going to treat me
21  like this. It was again denied.
22          One statement he gave to me, he wrote down

45 (Pages 177 to 180)

Jerry K. Chambliss                         vs.              National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                            Wednesday, May 24, 2006

Page 181

1  when I made a complaint, This is my memo to myself
2  about the events transpired on such-and-such day.
3  He looked at it as a joke basically. And --
4      Q. Okay.
5      A. But other employees, when a white employee,
6  Mr. Nagy, complains that someone was bothering his
7  car. Somebody had glued his locks on his car.
8  Amtrak police were called, there was an
9  investigation put out, they came to the safety
10 meeting. Employees were warned if they were caught
11 destroying his property, that they would be
12 terminated.
13     And my question to them was, Why is it that
14 when I make a complaint, nothing is done; when
15 Mr. Nagy, a white employee, makes a complaint, the
16 police are called, an investigation is done and
17 things are shifted around?
18     Q. Isn't it a different complaint? He was
19 complaining about vandalism to his car. What would
20 the police have investigated in your complaint?
21     A. What I'm saying, diversity would have came
22 down and did an investigation.

Page 182

1      Q. But what would they have investigated? Was
2  there a dispute that he didn't say, you people or --
3      A. There was a dispute though because when he
4  said that, he came towards me. I felt my safety was
5  threatened.
6      Q. Did you file a charge with diversity?
7      A. Yes.
8      Q. What happened in response to it?
9      A. Nothing.
10     Q. Did they dismiss it? Was it just ignored?
11 What is nothing?
12     A. Nothing is nothing. You call and make a
13 complaint. They come down. They sit down and talk
14 about it. As far as in open air, they said they are
15 going to do an investigation. And --
16     Q. Did they do an investigation?
17     A. I guess they did.
18     Q. Okay. Well --
19     A. Like I said, I don't know. Because they
20 will tell you. I am saying what they tell you.
21     Q. Uh-huh.
22     A. They will investigate.

Page 183

1      Q. Did they tell you they investigated?
2      A. They said they would.
3      Q. Did they ever get back to you with the
4  results?
5      A. No.
6      Q. You never heard from them again?
7      A. No.
8      Q. Did you ever follow up?
9      A. No. At that point in time, I was feeling
10 like, I'm fighting a losing battle. You have to
11 understand, I had a whole shift of employee --
12     Q. At what point in time is this, just so
13 we're clear?
14     A. I'm not sure. I have the paperwork in my
15 bag.
16     Q. Okay.
17     A. But I had a whole shift of employees write
18 a letter complaining about the way Mr. Nagy was
19 treating me.
20     Q. Um-hum.
21     A. And again, nothing was done.
22     Q. Well, that's what I'm trying to find out.

Page 184

1  I'm trying to find out if there was an investigation
2  and what happened. Why don't you tell me what the
3  date of it is.
4      A. Can you give me one second.
5      Q. Absolutely.
6      MR. FISCHLER: Let's go off the record for
7  one second.
8      (A recess was taken.)
9      BY MR. FISCHLER:
10     Q. You were looking for a document for us.
11 When we went off the record, you were looking for a
12 document for us.
13     A. Yes.
14     Q. Have you found that?
15     A. Yes, I have.
16     Q. Terrific.
17     A. Several.
18     Q. Okay.
19     A. You wanted copies of this and you wanted
20 copies of this.
21     MR. FISCHLER: Do you mind doing that?
22     THE WITNESS: And you want copies of what

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225          (703) 534-1225
Professional Stenotype Reporters                                   www.mar-reporting.com

Jerry K. Chambliss                                    vs.                        National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                    Wednesday, May 24, 2006

Page 185

1  I'm going to show you now?
2      MR. FISCHLER:  Let's wait two seconds and
3  get copies and do it.  Some of it I may have seen
4  and choose not to ask questions about.  But let's go
5  through it.
6      Let's go off the record for a minute.
7      (Discussion off the record.)
8      BY MR. FISCHLER:
9      Q.  Paragraph 21, the third sentence, Further
10 retaliated against the plaintiff by refusing to
11 settle his workers' compensation claims unless he
12 waived his civil rights while not treating white
13 employees in the same manner.
14     That's the issue that we addressed before.
15 And it was changed, right?  Do you see where I am?
16     A.  No.
17     MR. RAMSEY:  Page 4.
18     MR. FISCHLER:  I am sorry.  Page 4 of the
19 complaint.
20     MR. RAMSEY:  Paragraph 21.
21     MR. FISCHLER:  Paragraph 21.
22     THE WITNESS:  21.  Right.

Page 186

1      BY MR. FISCHLER:
2      Q.  Paragraph 21, the third sentence, the last
3  sentence of the paragraph.
4      A.  Okay.  I got that from -- you're asking me
5  about that statement.  My attorney, when he received
6  it, and he pulled out several other agreements that
7  he had dealt with Amtrak in, and that's the first
8  time and he said all these years, he's ever seen
9  Amtrak put that kind of verbiage into a settlement
10 agreement.
11     Q.  Okay.  But it was subsequently taken out?
12     A.  It wasn't taken out.  I just didn't sign
13 it, and he sent them a letter stating that I
14 wouldn't.  And I had a judgment against Amtrak, so
15 they had to pay.
16     Q.  So was the case settled or did they pay a
17 judgment?  Earlier you testified it was settled, if
18 I recall.
19     A.  The way it was, it was -- I don't know.
20     MR. RAMSEY:  It was a stipulation of
21 dismissal filed after the settlement.
22     BY MR. FISCHLER:

Page 187

1      Q.  But was there a settlement signed?
2      A.  I didn't sign anything.
3      Q.  Okay.  Count 3, I'm on page 5 now, assault
4  and battery.  And that's solely against Mr. Snyder;
5  is that correct?
6      MR. RAMSEY:  Yes, that is correct.
7      MR. FISCHLER:  Okay.
8      BY MR. FISCHLER:
9      Q.  Paragraph -- it's numbered 4 and then 26.
10 Snyder acted with the intent -- do you see where I
11 am?
12     A.  Um-hum.
13     Q.  And capability to do bodily harm to the
14 plaintiff.  This conduct was perpetrated with an
15 actual malice.
16     He threw a four-ounce book at you.  That
17 was to do bodily harm?
18     A.  The way he threw it and the statement he
19 made, This is to hit you.  Yes, it was.  If I picked
20 up anything off this table and said, This is to hit
21 you, and hit you with it, that was to inflict bodily
22 harm.

Page 188

1      Q.  Count 4 on page 6, again, this one is also
2  against Mr. Snyder?
3      MR. RAMSEY:  Yes.
4      MR. FISCHLER:  Okay.
5      BY MR. FISCHLER:
6      Q.  Intentional interference with your
7  contractual relationship with Amtrak.  Is that an
8  accurate summary of this count?
9      MR. RAMSEY:  As his attorney, yes.
10     MR. FISCHLER:  Let me get his testimony on
11 that.
12     MR. RAMSEY:  Okay.
13     THE WITNESS:  Yes.
14     BY MR. FISCHLER:
15     Q.  What is your contractual relationship with
16 Amtrak?
17     A.  Contractual relationship, I was there to do
18 a specific job.
19     Q.  Um-hum.
20     A.  And because of his actions, it interfered
21 with me doing that job.
22     Q.  How did it interfere?

Jerry K. Chambliss                              vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                         Wednesday, May 24, 2006

Page 189

1    A.   Well, when he struck me, I was out because
2    of the injuries I sustained from him striking me.
3    Q.   Um-hum.
4    A.   The stress I was under with him following
5    me around the job.  And because of those things that
6    he did, I feel like I was brought up on charges and
7    dismissed.  All stemming this incident.
8    Q.   But he didn't bring you up on charges?
9    A.   He's part of Amtrak management.
10   Q.   So you're suing him on this count because
11   he's a member of Amtrak management and you were
12   fired?
13   A.   On this count, it's because of his actions
14   in relation to me being dismissed from Amtrak.
15   Q.   What did he do specifically to get you
16   fired?
17   A.   Well, two of the charges that Amtrak used
18   to so-called terminate me stemmed the injury I
19   sustained from his actions, from him hitting me.
20   Q.   But he didn't have anything to do with when
21   you reported the incident?
22   A.   If he had never hit me, there would have

Page 190

1    been no reporting of anything, nothing for them to
2    charge me with.
3    Q.   That's the facts underlying this count?
4    That if he hadn't thrown this at you, you wouldn't
5    have been fired?
6    A.   There was no charges brought on me before
7    that.
8    Q.   Well, there are other discipline actions
9    brought against you.  The attendance issues --
10   A.   None since 2003.
11   Q.   No.  The documents are what are the
12   documents, but okay.  I just want to be sure I
13   understand this.  Okay.
14       Paragraph 31 -- let me back up.
15   Paragraph 30, Steven Snyder occupied a managerial
16   position with the defendant, National Railroad
17   Passenger Corporation/Amtrak and caused the
18   plaintiff to be terminated from his employment with
19   National Railroad Passenger Corporation/Amtrak.
20       How did he cause you to be terminated?
21   A.   Same answers previously.
22   Q.   Because if he hadn't thrown the book --

Page 191

1    that set the chain of events?
2    A.   Yes.
3    Q.   Is that right?
4    A.   Yes.
5    Q.   Okay.  Paragraph 31, Snyder acted with the
6    intent and capability to do bodily harm to the
7    plaintiff.  This conduct was perpetrated with actual
8    malice.
9        How does this relate to this count?
10   A.   I'm not following you.
11   Q.   Tell me what paragraph 31 has to do with
12   your interference of economic relationship count.
13   A.   Well, to me, when Mr. Snyder did, again,
14   his actions precipitated the events of Amtrak filing
15   charges against me.
16   Q.   Okay.
17   A.   When he acted that way, when he did what he
18   did, to me that was with malice, I mean, and he
19   followed me around the job and doing the things he
20   was doing, trying to get more evidence, so to speak,
21   against me.
22   Q.   What is the basis of your claim that you

Page 192

1    have a contractual relationship with Amtrak?
2    A.   Union agreement.
3    Q.   And that's Exhibit 21?
4    A.   Okay, okay.
5    Q.   Well?
6    A.   Yes.
7    Q.   Okay.  I'm not trying to trick you.  I want
8    to be sure the record is clear.
9    A.   Okay.
10   Q.   Anything other than the union agreement
11   that you are relying on for your contractual
12   relationship?
13   A.   I guess not, no.
14   Q.   Well, are you sure of that?  I don't want
15   you guessing.
16   A.   I don't know how you want me to answer
17   that.
18   Q.   Are you aware of any other basis for your
19   claim that you have a contract other than your union
20   agreement?
21   A.   No.
22   Q.   Okay.  Count 5 is intentional infliction of

48 (Pages 189 to 192)

Jerry K. Chambliss                                    vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                              Wednesday, May 24, 2006

Page 193

1 emotional distress.
2         MR. RAMSEY: I'm going to have to amend
3 this count as well as some others to correct some
4 grammatical errors as well as to complete this count
5 because it doesn't have a demand.
6         MR. FISCHLER: I'll look at it when you do
7 it. I understand what you're saying.
8         MR. RAMSEY: Okay.
9 BY MR. FISCHLER:
10    Q. During your arbitration -- and we talked
11 about the award, that's Exhibit 22 -- did you argue
12 that you were subjected to racial discrimination
13 before the arbitrator?
14    A. I was told that that had no bearing on the
15 charges. I had to stick with the charges.
16    Q. Who told you that?
17    A. I was told that by the arbitrator and by
18 Amtrak charging officer.
19    Q. Did you try to raise --
20    A. Yes, I did.
21    Q. And what did your union say about that?
22    A. Well, my union representative at that time,

Page 194

1 it was his first hearing. He had no prior
2 knowledge. He didn't know what I could do.
3    Q. What did he say?
4    A. He says, I don't know what you can do.
5    Q. Did he talk to anybody else?
6    A. I don't know who he talked to.
7    Q. Okay. So you didn't raise the issue of
8 race after that?
9    A. After that, no, because basically they
10 asked questions. They dealt with their charges and
11 they said the whole situation with Snyder, even when
12 I tried to question him about the situation, said it
13 didn't have any bearing on the case and it wasn't to
14 be brought up.
15    Q. After you were terminated and before you
16 were reinstated, who did you work for?
17    A. Baltimore Gas & Electric, or BG&E Home.
18    Q. Is that part of Baltimore Gas & Electric?
19    A. It's an affiliate.
20    Q. What did you do?
21    A. I was an apprentice for their heating, air
22 conditioning and ventilation.

Page 195

1    Q. Why were you an apprentice?
2    A. Because I went through two years of
3 training for refrigeration and heating and air
4 conditioning, and you have to go through a certain
5 amount of hours before you can get your journeyman's
6 license.
7    Q. I think you testified earlier that you had
8 to pay for your benefits, so you didn't get
9 benefits?
10    A. Right.
11        (Chambliss Deposition Exhibit Number 25 was
12 marked for identification.)
13 BY MR. FISCHLER:
14    Q. Let me show you what is marked as
15 Exhibit 25.
16    A. Okay.
17    Q. So for 2004 from BG&E Home you earned
18 $10,406.45?
19    A. Yes.
20        MR. FISCHLER: Let's mark this as 26.
21        (Chambliss Deposition Exhibit Number 26 was
22 marked for identification.)

Page 196

1 BY MR. FISCHLER:
2    Q. Can you identify this document, please.
3    A. W-2, 2005.
4    Q. From what company?
5    A. BG&E Home Products and Services.
6    Q. And how much did you earn from BG&E Home
7 during 2005?
8    A. $9,998.50.
9    Q. How long did you work for BG&E Home in
10 2005?
11    A. Up until September, I believe.
12    Q. When were you offered reinstatement from
13 Amtrak?
14    A. Can you clarify that question.
15    Q. Let's look back at Exhibit 22, I believe.
16 22.
17        This is the opinion from the arbitrator.
18 And it's dated -- is this right?
19    A. January 20, 2006.
20    Q. When did you return to Amtrak? When was
21 your first day back?
22    A. November something. I don't know the exact

49 (Pages 193 to 196)

Jerry K. Chambliss                              vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                         Wednesday, May 24, 2006

Page 197

1  date.
2       MR. RAMSEY: '05.
3       THE WITNESS: '05.
4       MR. FISCHLER: Right. That's what I
5  thought.
6       BY MR. FISCHLER:
7       Q. Do you know when you received an offer from
8  Amtrak to come back? Wasn't it earlier in the year?
9  Wasn't it sometime in July, if I remember correctly?
10      A. No. They put an offer on the table that if
11 I would sign away all my rights to everything, then
12 they would reinstate me and they would watch me for
13 the next two years.
14      Q. And when was that?
15      A. I believe that was in January/February.
16      Q. Of 2006?
17      A. No, 2005.
18      Q. 2005. Okay. When did the arbitrator
19 require that you get your job back? That was an
20 offer in settlement, that January offer?
21      A. No, I don't think it was an offer in
22 settlement.

Page 198

1       Q. Well, you didn't accept it but it was a
2  proposal?
3       A. Okay.
4       Q. That's why I say "offer."
5       A. Okay.
6       Q. You didn't accept it?
7       A. All right.
8       Q. But then wasn't there a time when the
9  arbitrator required the company to reinstate you?
10      A. Yeah. It was end of 2005, a so-called
11 bench award or something --
12      Q. Right.
13      A. -- to that effect. I had received nothing
14 on paper, no documentation.
15      Q. But you started in November, so it was
16 before --
17      A. Right, because I went on and started
18 because after talking with my union, I asked them to
19 get me something in writing to -- the terms I was
20 going back under. I didn't know any terms.
21      Q. Uh-huh?
22      A. And after waiting a while, they said, Okay,

Page 199

1  they didn't have money to get an award from the
2  arbitrator or anything written.
3       So after discussion back and forth, they
4  told me to just come on back to work and they would
5  handle it later.
6       Q. So the first time the union told you you
7  could come back to work was November?
8       A. It was the end of the year. I don't know
9  exactly.
10      Q. Did you have an ankle injury or some
11 other --
12      A. Yes, I did.
13      Q. -- injury during 2005?
14      A. Not during 2005. I had an ankle injury
15 when I was at Amtrak.
16      Q. Earlier?
17      A. Earlier. In 2003, I think it was.
18      Q. Okay.
19      MR. FISCHLER: Let me show you this and
20 let's mark this as 27.
21      (Chambliss Deposition Exhibit Number 27 was
22 marked for identification.)

Page 200

1       BY MR. FISCHLER:
2       Q. Can you identify this letter.
3       A. Yes. It's a letter I wrote to the National
4  Railroad Passenger Corporation business diversity
5  department.
6       Q. Do you remember when? It's not dated.
7       A. I believe I wrote this back in early 2003
8  because that's what the dates are in here.
9       Q. Earlier you had testified about problems
10 you had had getting FMLA time and that you had
11 written a letter to the business diversity office.
12 Is that the letter?
13      A. Yes.
14      Q. In this letter did you complain that your
15 treatment was a result of your race? That race was
16 a factor in this decision?
17      A. First line, I'm writing this letter to
18 detail the events that support my case of
19 discriminatory harassment against Amtrak and NEC
20 management staff and high-speed rail facility.
21      Q. Do you explain what the basis of that
22 discrimination is?

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225                    (703) 534-1225
Professional Stenotype Reporters                                            www.mar-reporting.com

Jerry K. Chambliss                          vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                 Wednesday, May 24, 2006

Page 201

1    A. No, not in this letter, I do not. I was
2  basically giving them an idea of what was going on.
3  I felt like someone would contact me and we could go
4  into more detail.
5    Q. But why didn't you mention race
6  specifically? If that was the underlying cause, why
7  didn't you use that word?
8    A. I'm not following you.
9    Q. If you felt that the discrimination was due
10  to race, why didn't you mention race?
11    A. To me, I felt like when I wrote "case of
12  discriminatory harassment," it was good enough. I
13  didn't think I needed to say because I'm black,
14  they're doing something. So forth.
15    Q. Well, again -- okay.
16        But nowhere in here do you mention race?
17    A. In the first paragraph, to me that's when I
18  mentioned race, when I wrote discriminatory
19  harassment.
20    Q. I understand you may have thought you meant
21  race, I'm asking you did you ever use the word race
22  or any word like the word race in this letter?

Page 202

1    A. Discriminatory harassment. To me that's
2  what it meant. I mean --
3        MR. RAMSEY: Objection. The document
4  speaks for itself.
5        MR. FISCHLER: That's fine.
6        BY MR. FISCHLER:
7    Q. Couldn't they have understood
8  discriminatory as they're discriminating against me
9  because they don't like me, they are discriminating
10  against me because I've worked here longer than
11  other people, less time than other people, because
12  my skills aren't as good as other people? Aren't
13  there a lot of reasons for discrimination?
14    A. To answer your question, yes, there is a
15  lot of reason for discrimination. But the
16  discrimination I was talking about was race.
17    Q. But you never used the word "race"?
18    A. No, not in this letter, I don't believe.
19    Q. Okay. Did you ever have a conversation
20  with Mr. Snyder after the May 10th incident?
21    A. I don't recall any at this time.
22    Q. Does he still supervise you?

Page 203

1    A. No.
2    Q. Do you ever see him at work?
3    A. I was told that he's not allowed to work in
4  the facility where I'm at.
5    Q. So you never see him?
6    A. I haven't seen him since I've been back.
7  Well, I've seen him once.
8    Q. Did you have any conversation with him?
9    A. No.
10    Q. Do you know why he doesn't work at the
11  facility where you work?
12    A. Because he called another African-American
13  employee a jungle bunny and was reported and was
14  demoted back down to his tools.
15    Q. Back down to his tools? What does that
16  mean?
17    A. Meaning he was a supervisor. Now he's back
18  being an electrician.
19    Q. I figured that was it, but I wanted to make
20  sure the record is clear.
21    A. But still he hasn't been terminated.
22    Q. Okay. To your knowledge, did the

Page 204

1  arbitrator in your case issue an oral ruling before
2  he issued a written ruling? Is that what the union
3  was telling you when they said they couldn't afford
4  to get a written opinion?
5    A. I believe so.
6    Q. Do you know when that oral decision was
7  issued?
8    A. No, I do not.
9    Q. Did you keep in touch with the union
10  throughout the process?
11    A. We talked from time to time.
12    Q. Did they keep you apprised of how things
13  were developing or when they were going to hear
14  anything back?
15    A. I would get phone calls every now and then
16  or I would call, make a phone call every now and
17  then, but that's -- it wasn't like a regular --
18    Q. Was there a time when they told you the
19  arbitrator has issued an oral decision?
20    A. Yeah. I believe there was a time because I
21  eventually went back to work before the written
22  decision was --

51 (Pages 201 to 204)

Jerry K. Chambliss                                vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                    Wednesday, May 24, 2006

| | Page 205 |
|---|---|

1    Q.  Do you remember when that was?
2    A.  No, I do not.
3    Q.  Back in your complaint, Exhibit 24, do you
4  see where I am?
5    A.  Un-hum.
6    Q.  In count 3, assault and battery, you've
7  asked for $2 million in compensatory damages and
8  $2 million in punitive damages. How did you
9  calculate the $2 million in compensatory damages?
10    MR. RAMSEY:  That was his attorney's doing.
11    BY MR. FISCHLER:
12    Q.  What are your damages then that go up to
13  $2 million?
14    A.  I don't know how to answer that question at
15  this point in time. Because I haven't sat down and
16  went over all the numbers as far as --
17    Q.  Are you claiming $2 million in compensatory
18  damages?
19    A.  I'm claiming damages as to the extent of --
20  this is saying 2 million. I have to go with what
21  this says.
22    Q.  If that's -- I need to know what the basis

| | Page 206 |
|---|---|

1  of that is. How did you come --
2    A.  Again, I reported my information to my
3  attorney and my attorney drew this up.
4    Q.  And do you have medical bills?
5    A.  No. Amtrak took care of the medical bills.
6    Q.  What damages do you have as a result of the
7  assault and battery?
8    A.  Damages, mental stress.
9    Q.  Okay.
10    A.  Aggravation. I missed monetary monies that
11  I missed working, benefits from railroad retirement,
12  retirement days because I was terminated.
13    Q.  That's all from the termination?
14    A.  Right.
15    Q.  Okay.
16    A.  Every month that I worked reports to
17  railroad retirement, towards my retirement. That
18  time is gone. Vacation time is gone. My medical
19  benefits was terminated by Amtrak.
20    Q.  Okay.
21    A.  That was gone.
22    Q.  Do you intend to try to call an expert

| | Page 207 |
|---|---|

1  witness on any of these issues? Do you know?
2    A.  I haven't discussed that with my attorney.
3    Q.  All right. Have you reviewed the pretrial
4  calendar in the case, the schedule in the case? I
5  don't want conversations -- never mind. Forget
6  that. Strike that question.
7    Your intentional infliction of emotional
8  distress claim, is that only against Mr. Snyder as
9  well?
10    MR. RAMSEY:  Yes.
11    MR. FISCHLER:  Okay. And the
12  discrimination claim is against both defendants?
13    MR. RAMSEY:  Right.
14    MR. FISCHLER:  And the retaliation claim is
15  only against Amtrak?
16    MR. RAMSEY:  Um-hum.
17    MR. FISCHLER:  Okay. I just wanted to
18  confirm all of that.
19    BY MR. FISCHLER:
20    Q.  Let me give you this three-page document,
21  and let's mark this 28.
22    (Chambliss Deposition Exhibit Number 28 was

| | Page 208 |
|---|---|

1  marked for identification.)
2    BY MR. FISCHLER:
3    Q.  This first document, have you seen this
4  document before?
5    A.  Yes.
6    Q.  Can you identify it.
7    A.  That's the document I was talking about
8  earlier that Mr. Zentner, the Amtrak manager, when I
9  complained to him, he wrote this document to myself
10  from myself to document my complaint.
11    Q.  And it's dated July 13, 2001?
12    A.  Yes.
13    Q.  The second full paragraph refers to your
14  concern; is that right?
15    A.  Yes.
16    Q.  It says that he agreed with your opinion of
17  lack of professionalism on Nagy's part, and he
18  assured you he would do what he could to make sure
19  this never happened again.
20    It says, I talked to Nagy and he agreed he
21  did not handle that the way he is expected to as a
22  supervisor. Hopefully this is a dead issue and will

M.A.R. Reporting Group, LLC              Toll Free (888) 534-1225                    (703) 534-1225
Professional Stenotype Reporters                                                    www.mar-reporting.com

Jerry K. Chambliss                                vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                      Wednesday, May 24, 2006

Page 209

1  not have to be addressed again.
2      Do you see where I am?
3  A.  Yes.
4  Q.  Is it your contention that he didn't
5  address this issue?
6  A.  It's my contention that he retaliated after
7  that.
8  Q.  Who retaliated?
9  A.  Mr. Zentner.
10  Q.  How did he retaliate?
11  A.  Because he verbally admonished me and gave
12  me a different letter, dated July 13, 2001.
13  Q.  Is that part of this exhibit?  I don't want
14  to --
15  A.  No, it is not.
16  Q.  Okay.
17  A.  I'll give it to you.
18      MR. FISCHLER:  Let's make that exhibit 29.
19      MR. RAMSEY:  You gave us a letter from
20  Robert J. Guyton, Jr., that I don't know if you
21  intended --
22      MR. FISCHLER:  Yeah, I did.

Page 210

1      MR. RAMSEY:  Is that part of 28?
2      MR. FISCHLER:  We'll keep that all as part
3  of 28.
4      BY MR. FISCHLER:
5  Q.  And the letter you are referring to is
6  dated June 13th?
7  A.  July 13th, 2001.
8  Q.  Okay.  Let's make this 29.
9      (Chambliss Deposition Exhibit Number 29 was
10  marked for identification.)
11      BY MR. FISCHLER:
12  Q.  Okay.
13  A.  As I was saying, he had called me in his
14  office and I guess verbally assaulted me again and
15  gave me this letter.  And I refer to the last
16  paragraph of Exhibit 29.
17      I do not wish to have to address issues on
18  a personal level with any employees who cannot
19  conduct themselves professionally and respect the
20  purpose of this meeting and the supervisor
21  conducting it.
22      Now, I had given him the opportunity to do

Page 211

1  something about it, and again, was retaliated
2  against.  He told me he agreed with me, yet in this
3  statement, basically he's backing the foreman.  Even
4  though I had another statement from pretty much
5  everybody on the night shift saying I didn't do
6  anything.
7  Q.  Let's walk through this one thing at a
8  time.  The statement you have from the foreman is
9  the third page of Exhibit 28.  Am I right?  Dated
10  July 15th?  I mean the statement you have from
11  everybody on the night shift.
12  A.  Yes.
13  Q.  And he says on the first page of
14  paragraph 28 that he agrees with you.  The first
15  page is the July 13, 2001 letter?
16  A.  Yes.
17  Q.  Okay.  Then at the same time, there is a
18  letter that is distributed to all the night shift
19  employees.  And prior -- in this memo, your name is
20  never mentioned; am I right?
21  A.  No, my name wasn't mentioned, but like I
22  said, I was called into his office and verbally

Page 212

1  counseled.
2  Q.  When were you called into his office?
3  A.  The day he gave me these letters.
4  Q.  So July 13th?
5  A.  I don't know what day it was.  Whether the
6  incident happened on July 13th or whether I got them
7  later or --
8  Q.  Fair enough.  What did he say to you in the
9  meeting in his office?
10  A.  He said in the meeting that Mr. Nagy had
11  said I was rude and abusive in the meeting and that
12  he wasn't going to tolerate it, and he gave me this
13  letter to read as far as --
14  Q.  This letter would be Exhibit 29?
15  A.  Yes.
16  Q.  Now, were you the only one who was rude and
17  abusive or who was told he was rude and abusive?
18  A.  I was the only one called into the office
19  and talked to about it.
20  Q.  Do you know if anybody else was called in
21  earlier or later?
22  A.  They told me they weren't called in.  I was

53 (Pages 209 to 212)

Jerry K. Chambliss                              vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                          Wednesday, May 24, 2006

Page 213

1  the only one called in.
2     Q.  Okay.  What had happened?  What was the
3  underlying event?
4     A.  Mr. Green, who is also a pipe fitter, a
5  white employee, was working on a train.  Mr. Nagy
6  walked up, whistled for someone like they were a
7  dog -- in my opinion and the opinion of the
8  employees that were standing there with me -- and
9  when I did not respond to him, the next night in the
10  safety meeting, he chose to verbally attack me in
11  front of the whole shift and told me I didn't do my
12  job, and he heard me whistle for him and I didn't
13  stop to see what he wanted.
14     Q.  He heard you whistle for him?
15     MR. RAMSEY:  No, him whistle for you.
16     THE WITNESS:  Yes.
17     BY MR. FISCHLER:
18     Q.  Okay.
19     A.  Mr. Nagy whistled for me.
20     Q.  Okay.
21     A.  And I didn't stop to see what he wanted.
22     Q.  Is that typical?

Page 214

1     A.  No.
2     Q.  Whistling for you, is that a typical thing?
3     A.  No.  I'm not a dog, like I explained to
4  him.  You don't whistle for me.
5     Q.  Okay.
6     A.  Then he started in about how I didn't do my
7  job and I wasn't doing my job.  And Mr. Green tried
8  to interrupt him and tell him, That wasn't Jerry's
9  job.  That was my job.  That's what I was doing.
10     And he was ignored.  He continued to
11  verbally assault me and I waited until he finished
12  and I asked him, I said, Are you done?  And that's
13  had I told him, That wasn't my job.  That was
14  Butch's car.  That's why Butch was working on it.
15     That's when he asked Mr. Green, Was that
16  your car?
17     Mr. Green said, Yes, it was.
18     Oh, well, let's carry on with the safety
19  meeting.
20     When the white employee said it was his
21  car, it was no problem.  When he thought it was
22  mine, it was a problem.

Page 215

1     When I went to management to try to resolve
2  this, the result was retaliation on my part because,
3  again, they took the white supervisor's opinion over
4  the whole shift who gave statements saying, I didn't
5  do anything.
6     Another attempt on my part to try to work
7  within the guidelines to get something done and
8  nothing was done but retaliate against me.  He wrote
9  this letter.
10     Q.  Now, the letter says the foreman is solely
11  in charge of the meeting and should be given the
12  undivided attention of all employees for the
13  duration of the meeting.  On the first sentence of
14  the second paragraph?
15     A.  That's correct.
16     Q.  Was there a time when people weren't paying
17  attention?
18     A.  Oh, everyone was paying attention.  He was
19  yelling to the top of his lungs.  People in the
20  hallway could pay attention.
21     Q.  It says on the third paragraph, I do not
22  wish to address issues on a personal level with any

Page 216

1  employee who cannot conduct themselves
2  professionally.
3     A.  And respect the purpose of this meeting and
4  the supervisor conducting it.
5     Q.  Was there anything that you were accused of
6  doing that was not conducting yourself
7  professionally?
8     A.  Mr. Nagy wrote a letter accusing me of
9  being -- upsetting the meeting and speaking to him
10  out of turn.
11     Q.  And was that the letter that we talked
12  about earlier?
13     A.  I believe so.  I'm not sure.
14     Q.  Okay.
15     A.  But that's why --
16     Q.  Okay.
17     A.  Bill Vullo, who is now the assistant
18  superintendent of high-speed rail, for the second
19  page of Exhibit 28, wrote a letter stating, On this
20  night, during our nightly safety briefing,
21  Mr. Nagy --
22     Q.  I'm sorry, where are you?

54 (Pages 213 to 216)

M.A.R. Reporting Group, LLC                   Toll Free (888) 534-1225                          (703) 534-1225
Professional Stenotype Reporters                                                               www.mar-reporting.com

Jerry K. Chambliss                               vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                      Wednesday, May 24, 2006

Page 217

1    A.  Exhibit 28, second letter.
2    Q.  Okay.  Great.  Go ahead.
3    A.  To whom it may concern.  On this night,
4  during our nightly safety briefing, Mr. Nagy brought
5  it to the attention of the whole shift that
6  Mr. Chambliss did not perform duties assigned him.
7  It turned out the duties were that of Mr. Green, who
8  in turn took care of the problem.
9       During the briefing, Mr. Chambliss did not
10  disrupt the meeting and even asked Mr. Nagy was
11  finished before he told his side of the story.  I
12  believe Mr. Nagy should have waited until the
13  meeting was over and talked with Mr. Chambliss in
14  private before letting this information to be aired
15  in the public forum.
16    Q.  Now, Mr. Vullo -- what was the chain of
17  command?  What was Mr. Vullo's relation to
18  Mr. Zentner?
19    A.  I have to explain the whole situation.  NEC
20  was the management company brought in to manage
21  high-speed rail.
22    Q.  Right.

Page 218

1    A.  Mr. Zentner is the Amtrak manager over
2  there.
3    Q.  Right.
4    A.  Mr. Nagy is the Amtrak supervisor.
5    Q.  So Nagy reports to Zentner?
6    A.  Nagy reports to Bill Vullo.
7    Q.  Okay.
8    A.  And he reports to Mr. Zentner.
9    Q.  Then what's the relationship between
10  Mr. Vullo and Mr. Zentner?
11    A.  That was never explained to me.  I don't
12  know.
13    Q.  So clearly Mr. Vullo was getting involved
14  and taking your side?
15    A.  I asked him to write the letter and he
16  wrote the statement.
17    Q.  Do you have a problem with Mr. Vullo's
18  conduct in this?
19    A.  In that, no.
20    Q.  Okay.
21    A.  But as you see in the third page, the other
22  people agreed I didn't do anything.

Page 219

1    Q.  And I think the managers agreed, and that's
2  what everybody is saying.
3    A.  Well, to agree on a letter from myself to
4  myself behind closed doors is one thing.  When he
5  wrote a letter to put it out there to everyone, he
6  put in there specifically, I do not wish to have to
7  address issues on a personal level.
8       Mr. Guyton and myself were the only ones
9  who addressed him on a personal level.  So he could
10  only have been addressing that to the two of us.
11    Q.  Well, he says, I do not wish to address
12  issues on a personal level with any employees who
13  cannot conduct themselves professionally.
14    A.  Which is the reason why I had the other
15  letter saying that I did conduct myself
16  professionally.
17    Q.  Right.
18    A.  But so then why was this letter written?
19  Why was this statement made if there wasn't --
20    Q.  I don't know.  It's not clear that this is
21  directed at you.  I understand that is your
22  position, but --

Page 220

1    A.  Well --
2    Q.  I don't want to argue with you about it.
3  The document says what the document says.  I
4  understand your position.
5       How did you get a copy of this?  And by
6  "this" I'm talking about the memo to myself from
7  myself dated July 13th, the first page of --
8    A.  Mr. Zentner gave it to me.
9    Q.  Did he give it to anybody else?
10    A.  No, except for -- I believe Mr. Guyton.
11    Q.  So it wasn't kept.  You described it as
12  kept confidential behind closed doors.  He gave this
13  to you?
14    A.  Well, Guyton -- Mr. Guyton is the other
15  person --
16    Q.  I understand.  Did he say to you, Don't
17  give this to anybody else, or keep this
18  confidential?
19    A.  Well, basically he said this is for my
20  personal file.
21    Q.  But he gave you a copy?
22    A.  Right, because I demanded a copy to say

55 (Pages 217 to 220)

Jerry K. Chambliss                              vs.                        National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                             Wednesday, May 24, 2006

|  | Page 221 |
|---|---|
| 1 | that I sat down and talked with him about this. |
| 2 | Q.  And he gave you a copy? |
| 3 | A.  Yes. |
| 4 | Q.  Did he tell you to keep this confidential? |
| 5 | Doesn't disclose it to anybody else? |
| 6 | A.  No, he didn't have to because he didn't put |
| 7 | his name on it.  He put to myself from myself. |
| 8 | Q.  To the extent that everybody knew the |
| 9 | instance of this, everybody would know who I talked |
| 10 | to. |
| 11 | A.  But my problem is on his other letter, he |
| 12 | wrote from Todd Zentner.  And the other one, from |
| 13 | myself to myself could be anyone. |
| 14 | Q.  Did people understand who it was from, who |
| 15 | wrote this? |
| 16 | A.  I don't know the understanding of it.  I |
| 17 | don't know if anybody saw it.  I kept it for my |
| 18 | personal records. |
| 19 | Q.  And you knew who it was from? |
| 20 | A.  Yes.  But even now sitting here, you can |
| 21 | say it's from anybody. |
| 22 | Q.  Well, it's the identical typeface as the |

|  | Page 223 |
|---|---|
| 1 | say -- |
| 2 | A.  No, I'm talking about the purpose of |
| 3 | Exhibit 29.  If that was a dead issue and he was |
| 4 | wrong, then what was the purpose of Exhibit 29? |
| 5 | Q.  Well, I don't know.  I don't know the |
| 6 | context of this and there is no reason -- you're not |
| 7 | mentioned in here.  Again, I'm not going to argue |
| 8 | with you about it -- |
| 9 | A.  Okay. |
| 10 | Q.  -- but there is nothing to indicate this |
| 11 | has anything to do with you from the document.  I |
| 12 | understand what you're saying about it -- |
| 13 | A.  Okay. |
| 14 | Q.  -- but reading this document, this there is |
| 15 | nothing in here that indicates it's got anything to |
| 16 | do with you. |
| 17 | A.  Okay. |
| 18 | Q.  You were a night-shift employee? |
| 19 | A.  Yes. |
| 20 | Q.  How many night-shift employees were there |
| 21 | at this time? |
| 22 | A.  I'd say about -- well, there is seven names |

|  | Page 222 |
|---|---|
| 1 | other one.  And your conversation was with |
| 2 | Mr. Zentner.  That's the way you explain it. |
| 3 | A.  Right, but it goes to my point of how I'm |
| 4 | treated when I try to report something. |
| 5 | Q.  Okay. |
| 6 | A.  He didn't even dignify this by putting his |
| 7 | name on it and stating anything about it. |
| 8 | Q.  Okay. |
| 9 | A.  And in none of these papers is Mr. Nagy |
| 10 | addressed except for behind closed doors with me. |
| 11 | Q.  Well, he says that he talked to Mr. Nagy; |
| 12 | isn't that true? |
| 13 | A.  Where?  I agree with Mr. Chambliss's lack |
| 14 | of -- I talked with Nagy -- |
| 15 | Q.  Yeah.  I talked with Nagy and he agreed |
| 16 | that he did not handle the way he is expected |
| 17 | to as a supervisor.  Hopefully this is a dead issue |
| 18 | and will not have to be addressed again. |
| 19 | A.  Okay.  But my question is, if it's a dead |
| 20 | issue that doesn't need to be addressed, then what |
| 21 | is the purpose of this? |
| 22 | Q.  The purpose of this is to document it and |

|  | Page 224 |
|---|---|
| 1 | on there.  It's seven to ten. |
| 2 | Q.  How many employees were black of the seven? |
| 3 | A.  One, two, three.  Three. |
| 4 | Q.  About half? |
| 5 | A.  Yeah. |
| 6 | Q.  If he were targeting you personally, |
| 7 | couldn't he have just addressed this to you and put |
| 8 | this in your personnel file? |
| 9 | A.  Well, if none of the other employees at the |
| 10 | nightly safety meeting were attacked and they |
| 11 | weren't involved and this came out addressing that |
| 12 | safety meeting, he couldn't possibly have been |
| 13 | addressing them.  He was only addressing the person |
| 14 | that was attacked, me. |
| 15 | Q.  I understand.  I understand that's your |
| 16 | point. |
| 17 | MR. FISCHLER:  Let's go off the record for |
| 18 | a second. |
| 19 | (Reading and signature not waived.) |
| 20 | (Whereupon, the proceedings at 3:00 p.m. |
| 21 | were concluded.) |
| 22 | |

M.A.R. Reporting Group, LLC                Toll Free (888) 534-1225                        (703) 534-1225
Professional Stenotype Reporters                                                        www.mar-reporting.com

Jerry K. Chambliss                                    vs.              National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                         Wednesday, May 24, 2006

Page 225

1   DISTRICT OF COLUMBIA, to wit:
2          I, Mario A. Rodriguez, before whom the
3   foregoing deposition was taken, do hereby certify
4   that the within-named witness personally appeared
5   before me at the time and place herein set out, and
6   after having been duly sworn by me, according to
7   law, was examined by counsel.
8          I further certify that the examination was
9   recorded stenographically by me and this transcript
10  is a true record of the proceedings.
11         I further certify that I am not of counsel
12  to any party, nor an employee of counsel, nor
13  related to any party, nor in any way interested in
14  the outcome of this action.
15         As witness my hand and notarial seal this
16  _____ day of _____, 2006.
17
18
19  _____
20         MARIO A. RODRIGUEZ
21            Notary Public
22  MY COMMISSION EXPIRES:   6/14/2010

Page 226

1          CERTIFICATE OF DEPONENT
2          I hereby certify that I have read and
3   examined the foregoing transcript, and the same is a
4   true and accurate record of the testimony given by
5   me.
6          Any additions or corrections that I feel are
7   necessary, I will attach on a separate sheet of
8   paper to the original transcript.
9
10  _____
11         JERRY K. CHAMBLISS
12         I hereby certify that the individual
13  representing himself/herself to be the above-named
14  individual, appeared before me this
15  _____ day of _____, 2006, and
16  executed the above certificate in my presence.
17
18  _____
19         NOTARY PUBLIC IN AND FOR
20  _____
21  MY COMMISSION EXPIRES:
22  _____

Page 227

1   WITNESS:  JERRY K. CHAMBLISS
2   DATE:  MAY 24, 2006
3   CASE: JERRY K. CHAMBLISS vs. NATIONAL PASSENGER
4          RAILROAD CORPORATION
5   Please note any errors and the corrections thereof
6   on this errata sheet.  Do not write on the
7   transcript.  The Rules require a reason for any
8   change or correction.  It may be general, such as
9   "To correct stenographic error," or "To clarify the
10  record," or "To conform with the facts."
11  PAGE LINE      CORRECTION      REASON FOR CHANGE
12
13
14
15
16
17
18
19
20
21
22

57 (Pages 225 to 227)

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 228

| A | | | | |
|---|---|---|---|---|
| **A** | activity 163:10 | air 8:6 182:14 | 131:18 132:22 | appeared 225:4 |
| abeyance 26:12 | actual 187:15 191:7 | 194:21 195:3 | 136:8 138:2 | 226:14 |
| 41:9 52:4 65:18 | add 167:5 | aired 217:14 | 141:13 145:11,16 | appears 40:21 |
| 67:4 | added 166:19 | Alexander 151:12 | 145:17 150:11 | 128:3 |
| ability 131:19 | additional 163:3 | Alison 34:20,21 | 154:8,20 160:2,14 | applied 44:13,14 |
| able 135:3 140:15 | additions 226:6 | 35:14,17 36:4 | 160:16 167:18 | 167:18,21 |
| above-named | address 37:12 | allegation 22:14 | 169:9,10,22 | applies 170:7 |
| 226:13 | 93:14 209:5 | allegations 137:3 | 172:21 177:5 | apply 44:12 |
| abrasive 40:9 | 210:17 215:22 | 167:10 168:5 | 180:18 181:8 | appointment 97:17 |
| absence 10:10 | 219:7,11 | alleged 34:16 36:4 | 186:7,9,14 188:7 | appreciate 78:3 |
| 29:14 32:16 | addressed 33:6 | 46:14 49:13 | 188:16 189:9,11 | 156:18 |
| absences 150:18 | 185:14 209:1 | 117:17 150:21 | 189:14,17 191:14 | apprentice 194:21 |
| absentee 116:18 | 219:9 222:10,18 | allegedly 46:11 | 192:1 193:18 | 195:1 |
| absenteeism 12:10 | 222:20 224:7 | 48:14 49:10 | 196:13,20 197:8 | apprised 204:12 |
| 26:7 42:10 43:13 | addressing 219:10 | 135:20 151:3 | 199:15 200:19 | approached 40:7 |
| Absolutely 120:11 | 224:11,13,13 | 161:19 166:14 | 206:5,19 207:15 | 76:19 157:22 |
| 184:5 | adds 178:12 | alleges 39:15 | 208:8 218:1,4 | appropriate 93:13 |
| abuse 151:22 152:2 | admitted 133:4 | Allione 76:15,18 | Amtrak's 18:9 47:3 | approve 69:6 |
| 180:17 | admonished 209:11 | 91:19 104:6 107:8 | 52:19 97:7 112:19 | approved 68:18 |
| abusive 212:11,17 | adopting 144:9 | 116:6 118:4 119:1 | 115:3,13 123:6 | Approximate 72:18 |
| 212:17 | ADOs 122:6 123:18 | 143:21 | 158:6 | approximately |
| accept 100:13 | affiliate 194:19 | allotted 53:18,20 | ankle 27:19,20 | 103:20 |
| 125:18 198:1,6 | afford 204:3 | allowed 130:12 | 199:10,14 | April 25:10,14,15 |
| accepted 42:13,19 | afraid 77:9 | 131:11 172:21 | answer 7:2,19 | 126:21 127:1 |
| 43:5,8 125:11 | African-American | 203:3 | 12:18 26:5 81:22 | arbitration 71:18 |
| 135:8,12 146:2,7 | 68:6,10 69:12 | allowing 20:5 | 84:1 122:1 124:6 | 129:4,5 130:14 |
| 147:2,6,8,11 | 166:11,13 167:3 | altercation 76:6 | 154:12 160:10,19 | 193:10 |
| accepting 42:17 | 167:22 168:11 | Alvarado 78:16,17 | 175:18 192:16 | arbitrator 132:21 |
| 140:19 147:14,17 | 177:6 203:12 | 168:18 | 202:14 205:14 | 137:3 142:5 143:4 |
| accident 109:12,13 | afternoon 92:22 | Alvarez 78:15,18 | answered 50:11 | 193:13,17 196:17 |
| 120:21 137:10 | afterward 46:4 | 168:18 | 94:20 | 197:18 198:9 |
| 139:11,12,15 | 94:2 | amend 193:2 | answering 7:13 | 199:2 204:1,19 |
| accidentally 137:11 | age 72:18 | ammunition 126:1 | 31:17 87:5 140:3 | argue 22:5 49:4 |
| accountable 123:16 | **Aggravation** | amount 27:9 | 154:13 | 136:15,17 142:2 |
| accurate 23:10 | 206:10 | 126:22 145:18 | answers 50:9 87:10 | 173:20 193:11 |
| 29:13 32:17 34:2 | ago 6:16 8:4 30:3 | 195:5 | 87:11 190:21 | 220:2 223:7 |
| 41:1 73:21 74:6 | 43:3 55:8 56:15 | Amtrak 6:12 8:16 | anybody 41:16 68:2 | argues 137:8 |
| 83:3 86:11 95:19 | 65:19 153:7 156:8 | 8:17 9:2,9 12:5,20 | 68:3 78:8 79:7 | arguing 28:5 142:9 |
| 96:4 165:14 | 161:7 173:12,12 | 13:2 19:7 20:2 | 80:6 81:2,20 | argument 49:7 |
| 171:17,18,20,21 | agree 142:7 219:3 | 24:4 27:12,21 | 146:13 148:20 | arrived 92:14 |
| 188:8 226:4 | 222:13 | 28:7 29:4 31:5,11 | 153:13,17 167:8 | Art 126:4 |
| accused 120:22 | agreed 99:14 119:2 | 31:15 39:1,1 40:6 | 194:5 212:20 | artful 114:14 |
| 216:5 | 127:10 146:20 | 41:15,20 46:6,13 | 220:9,17 221:5,17 | Asian 162:14 |
| accusing 216:8 | 208:16,20 211:2 | 47:9 49:11 50:5 | 221:21 | aside 122:2 |
| Act 54:21 | 218:22 219:1 | 51:2,8 54:16,20 | anymore 178:15,21 | asked 19:10 22:8,9 |
| acted 187:10 191:5 | 222:15 | 59:12,19 60:2 | anyway 141:20 | 27:15 38:4,15 |
| 191:17 | agreement 12:13 | 61:20 66:17 67:7 | 142:1 171:4 | 45:6 46:12 49:11 |
| action 29:21 77:19 | 127:20 128:2 | 70:22 76:9 77:1,9 | apart 72:9 | 50:10 60:5,7 66:9 |
| 93:13 172:12 | 171:3,4 186:10 | 77:19 84:20 88:3 | apologize 33:11 | 76:19 86:6 90:20 |
| 225:14 | 192:2,10,20 | 88:4 90:7 91:10 | 71:16 75:11 | 91:1 93:4 94:17 |
| actions 16:12 62:15 | agreements 16:5 | 91:10 93:4 95:21 | apologized 39:3 | 94:18 102:1,3,16 |
| 93:13 138:1 | 186:6 | 102:18 105:11,13 | apparently 136:8 | 105:15 124:11,11 |
| 141:12 155:7 | agrees 211:14 | 105:16 107:4,14 | appeal 129:3 | 142:6 156:12 |
| 188:20 189:13,19 | ahead 28:5 45:14 | 107:19 113:5 | appear 41:1 88:9 | 174:16,20 180:13 |
| 190:8 191:14 | 91:7 103:7 115:7 | 116:6 126:6,6,8 | **Appearances** 2:22 | 194:10 198:18 |
| | 217:2 | 126:13,14 130:2 | 3:1 | 205:7 214:12,15 |

Jerry K. Chambliss                              vs.                     National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                           Wednesday, May 24, 2006

Page 229

| | | | | |
|---|---|---|---|---|
| 217:10 218:15 | 188:9 206:3,3 | based 180:7 | 90:3,4 93:1,2 | bone 111:17 |
| asking 7:7 26:20 | 207:2 | basically 7:1 12:14 | 137:17 | book 6:20 71:8,13 |
| 48:10 87:12 96:7 | attorney's 205:10 | 52:9 54:2 62:15 | Bello's 93:8 | 71:14,14,15,19,21 |
| 122:4 173:22 | August 113:5 127:2 | 71:12 76:11 78:6 | Ben 146:10 148:14 | 72:3,5,7,8,9,11 |
| 186:4 201:21 | 127:5 150:12 | 78:13 118:12 | 175:5 | 84:18 85:12,13 |
| assault 136:9 158:7 | available 22:11 | 125:9,20 126:6 | bench 198:11 | 86:6 88:15,16 |
| 187:3 205:6 206:7 | Avenue 1:18 2:6 3:6 | 157:9,16 168:12 | benefits 41:13,19 | 89:5,6,8 95:9 98:9 |
| 214:11 | award 130:1 133:11 | 178:9 181:3 194:9 | 41:21 113:6 | 118:10 135:13,16 |
| assaulted 14:18 | 193:11 198:11 | 201:2 211:3 | 177:13 179:2,3,9 | 135:20 177:10,22 |
| 56:2 57:2 63:5,17 | 199:1 | 220:19 | 179:10,12 195:8,9 | 178:2,5 187:16 |
| 89:22 210:14 | aware 76:7 93:15 | basis 13:11 31:18 | 206:11,19 | 190:22 |
| assert 16:12 | 118:19 150:20 | 174:17 191:22 | Benjamin 43:6 | booklet 136:4 |
| assigned 46:10 49:9 | 151:2,4 192:18 | 192:18 200:21 | 67:21 150:17 | bothering 181:6 |
| 49:16 122:7 217:6 | a.m 1:17 | 205:22 | Bernardi 121:16,18 | bottom 16:8,11 |
| assignment 70:17 | | bat 151:8 | 124:12 | 22:13 39:19 42:3 |
| assistance 59:5 | **B** | bathroom 75:21 | best 9:6 43:6 67:21 | 47:1,8 48:6 57:22 |
| assistant 70:22 | B 9:20 10:18,19 | battery 187:4 205:6 | 95:20 111:10 | 74:1 88:6 95:17 |
| 93:12 136:6 | 11:10 | 206:7 | 133:17 146:10 | 105:7,21 118:14 |
| 216:17 | back 14:19 19:14 | battle 183:10 | 148:14 150:17,21 | 144:15 149:20 |
| assisted 77:10 | 20:4 22:8 24:7,8 | bearing 193:14 | 151:2,6,21 152:1 | Boulevard 2:13 |
| assume 95:7 177:14 | 24:12 27:10,17,21 | 194:13 | 152:20 175:5 | bound 72:3,4,10,11 |
| assured 208:18 | 27:22 28:4 31:13 | beginning 137:1 | better 26:4 83:20 | 72:13 |
| attach 226:7 | 39:3 40:10 44:9 | behalf 2:3,10 3:3 | 132:12 | bowl 89:5 |
| attached 72:2 | 45:3,13 50:7,13 | 144:3 | BG&E 194:17 | box 106:10 |
| attack 213:10 | 50:19 59:10 65:12 | behavior 38:8 | 195:17 196:5,6,9 | boy 35:4,8 36:11,13 |
| attacked 176:20,21 | 66:12 68:21 69:7 | 80:11 115:16,17 | big 54:9 123:21 | boys 67:11 |
| 224:10,14 | 89:17,20 93:7 | 158:7 173:4 | Bill 38:10 89:13 | break 7:16,18,19 |
| attempt 14:16 | 94:2 99:7,11,19 | belief 7:6 | 216:17 218:6 | 16:4 19:9 53:22 |
| 142:15 215:6 | 101:2 103:5 108:7 | believe 11:18 12:9 | bills 179:21 206:4,5 | 108:20 109:22 |
| attempted 75:13 | 109:15 113:21 | 29:19,20,22 32:1 | binder 72:8 | 123:3 |
| 89:15 100:8 | 114:17 128:7,16 | 45:2 54:10,15 | bit 71:22,22 99:19 | bridge 71:9 72:8 |
| attempting 86:22 | 129:6,22 149:1,19 | 55:5,5,8,15 62:22 | 174:5 | 88:17 123:8,9,19 |
| attempts 124:3 | 150:7 153:6 156:2 | 63:3,12 65:22 | bitches 80:17 | 124:19 |
| attendance 15:20 | 157:13,19 163:5 | 79:16 80:1,5 | black 35:11 39:7,14 | briefing 136:4 |
| 16:6 33:10,18 | 165:17 166:2 | 82:17 84:11 86:21 | 42:20 62:17 64:3 | 216:20 217:4,9 |
| 34:3 44:19 46:18 | 167:1 178:17 | 91:9 93:3,19,21 | 64:22 66:6,8 | bring 42:12,16 |
| 47:20 49:14 51:14 | 183:3 190:14 | 94:17 97:15 98:14 | 77:17 79:18 80:22 | 100:6 118:8,11 |
| 51:17 52:19,21 | 196:15,21 197:8 | 98:16 107:6 113:4 | 81:1,8,17 83:7,13 | 131:8 147:13 |
| 54:12 123:7 | 197:19 198:20 | 120:8 123:8 125:3 | 90:10,13 102:3,4 | 164:21 189:8 |
| 130:12 132:17 | 199:3,4,7 200:7 | 125:14 131:18 | 110:12 121:18 | bringing 118:6 |
| 133:11 151:14,17 | 203:6,14,15,17 | 140:17 143:15 | 135:5 143:17,19 | 146:6 |
| 173:7 175:3 190:9 | 204:14,21 205:3 | 146:5 148:11 | 145:1 147:1 | brings 172:18 |
| attended 8:4 | background 101:21 | 149:17 151:5,13 | 151:11 154:9 | broke 55:12 |
| attending 47:10 | backing 211:3 | 153:14,19 154:8,8 | 155:5,13 157:1 | broken 27:20 97:20 |
| 48:2 | bad 98:19 126:2 | 154:11,15,16 | 159:2 161:9 163:2 | brought 34:18 |
| attention 64:10 | bag 18:21 124:15 | 156:14 157:12 | 201:13 224:2 | 35:22 61:1,12,14 |
| 71:4 142:14 | 183:15 | 158:3 159:1 160:7 | blatantly 180:16 | 64:10 65:8 90:15 |
| 215:12,17,18,20 | Baltimore 2:7 58:8 | 160:13 162:22 | blind 96:13 | 118:17 124:5 |
| 217:5 | 58:20 59:1 194:17 | 169:2 174:12 | board 129:13,18 | 125:8 130:17,21 |
| attesting 121:13 | 194:18 | 196:11,15 197:15 | 144:16 177:18 | 143:19,21 144:1 |
| attitude 168:7,8 | bang 85:13 | 200:7 202:18 | 178:4 | 165:20 173:17 |
| attitudes 168:10 | bank 22:11 | 204:5,20 216:13 | Bob 62:14,14 89:10 | 180:9 189:6 190:6 |
| attorney 103:15,16 | barely 87:5 | 217:12 220:10 | 100:3 110:20 | 190:9 194:14 |
| 104:16 106:7 | bartender 9:5 | believed 158:4 | bodily 187:13,17,21 | 217:4,20 |
| 115:12 164:20,22 | baseball 73:10,10 | bell 94:13 | 191:6 | Bruised 98:5 |
| 165:2,9 186:5 | 85:2 | Bello 82:15 86:3 | body 12:21 | build 73:3 125:10 |

Case 1:05-cv-02490-CKK     Document 27-5     Filed 09/14/2006     Page 62 of 79

Jerry K. Chambliss                          vs.          National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                        Wednesday, May 24, 2006

Page 230

125:12,21
**bulletin** 178:3
**bunch** 73:12 80:16
  84:12,15,16
**bunny** 66:5 81:7,14
  83:16 203:13
**business** 200:4,11
**Butch** 214:14
**Butch's** 214:14
**buzz** 82:9 84:7
**B-E-S-T** 43:7,8
**B.L** 143:7

**C**

**C** 2:1,4,5 6:1
**calculate** 205:9
**calendar** 207:4
**call** 62:3 89:17
  123:15 124:3,6
  139:6 182:12
  204:16,16 206:22
**called** 6:5 39:1
  80:13,14,16 83:15
  88:3 90:7 91:10
  91:18 92:18,20
  93:6 97:7 100:5
  101:14 104:3,15
  116:3,7,7 133:16
  138:19,22 140:6,8
  145:7 161:18
  178:9 181:8,16
  203:12 210:13
  211:22 212:2,18
  212:20,22 213:1
**calling** 30:22 63:18
  65:2 66:5 78:14
  79:14 139:1 173:5
**calls** 204:15
**Campbell** 143:7,14
  143:15 144:2,4,6
**cancer** 68:17
**cane** 27:12,14
**capability** 187:13
  191:6
**Captain** 95:6
**car** 64:4,9 90:21,22
  109:12,12 179:22
  181:7,7,19 214:14
  214:16,21
**care** 206:5 217:8
**career** 8:18 67:7
**careful** 144:15
**carefully** 50:15
  65:12
**caring** 145:22
**Carlos** 78:15,17

168:17
**carrier** 137:8
**carrier's** 136:2,3,6
  142:13 144:17
**carry** 214:18
**cartoon** 178:3
**cartoons** 177:17
**case** 1:6 6:11,17,18
  14:17 40:2 125:10
  125:12,21,22
  130:11 136:11
  142:13 143:19
  171:12,14,21
  172:14 186:16
  194:13 200:18
  201:11 204:1
  207:4,4 227:3
**cases** 175:19
**case-by-case** 31:18
**caught** 71:4 181:10
**cause** 135:10
  145:19 179:15
  190:20 201:6
**caused** 190:17
**causes** 179:19
**causing** 64:11
**CCR** 1:20
**certain** 27:8 29:4
  53:16 54:15 80:2
  80:21 103:13
  107:6 113:13
  126:22 127:21
  131:21 156:14
  195:4
**certificate** 8:5
  226:1,16
**certify** 69:13 70:5
  225:3,8,11 226:2
  226:12
**Chad** 155:17
  157:10
**chain** 191:1 217:16
**chair** 130:17
**Chambliss** 1:4,15
  4:2,8 5:1 6:4,9
  13:21 15:2 16:12
  17:15 19:6,10
  25:3 28:11,15
  30:6,10 33:1 34:7
  37:2 40:16 52:13
  57:9 73:17 85:17
  86:5,6 87:6 88:7
  92:4 93:10 104:22
  106:22 116:13
  127:14 129:9
  164:2 165:5

195:11,21 199:21
  207:22 210:9
  217:6,9,13 226:11
  227:1,3
**Chambliss's** 222:13
**chance** 131:4
**change** 57:15 74:7
  113:11 227:8,11
**changed** 45:15
  47:19 185:15
**charge** 41:7,8 47:19
  49:5 57:21 58:7
  58:14 59:4,11,14
  59:18,20 75:3
  149:3,4,5 173:7
  182:6 190:2
  215:11
**charged** 15:22
  16:16,17 45:22
  67:4,5 136:21
**charges** 14:12
  35:22 40:22 41:4
  41:5 60:22 65:8
  65:19 104:17
  116:10 117:3
  118:2,5,6,8,11,15
  119:16 130:20
  143:20 145:16
  151:21 152:1,3,5
  165:20 173:7,18
  189:6,8,17 190:6
  191:15 193:15,15
  194:10
**charging** 193:18
**check** 24:21 45:4
  95:19 110:3 123:1
  145:6 165:14
**checked** 99:8
  141:22
**chemo** 68:19
**child** 43:20
**children** 137:19
**child's** 43:11 44:1
**choice** 144:7 155:1
**choose** 185:4
**chose** 64:14,16
  86:18 213:10
**Chris** 82:15 86:3
  90:3,4
**Christello** 21:14,15
**circle** 169:4
**circumstance**
  108:17,18
**circumstances**
  91:12 108:19
  130:10 142:18

**civil** 170:16,21
  172:9,11 180:6
  185:12
**claim** 46:3,11 67:1
  103:18 157:11
  159:3,5,15 166:3
  167:2 170:13,16
  170:19,21,21
  172:9 191:22
  192:19 207:8,12
  207:14
**claimant** 136:3,5,6
  137:12 144:17
**claimed** 46:1,14
  49:10,12 137:19
**claiming** 205:17,19
**claims** 54:16,20,21
  55:3 56:17,18
  60:4 66:14,19
  142:19 156:22
  166:2 167:14,15
  170:21 185:11
**clarify** 12:18 49:21
  196:14 227:9
**clause** 171:9,11
**clean** 91:19
**cleaner** 9:12,13,19
  9:21 10:14 69:11
  69:12 155:2
**cleaners** 135:6
  155:5,5 162:4
**clear** 21:6 25:18
  50:6 84:18 120:1
  122:11 123:5
  127:12 183:13
  192:8 203:20
  219:20
**clearly** 86:21 87:6
  218:13
**close** 63:18 96:3
  149:8
**closed** 13:12 130:15
  136:10 175:1
  219:4 220:12
  222:10
**closing** 164:14
**coach** 9:12,13,19,21
  10:14 55:12 69:11
  69:12 135:6 155:2
  162:4
**cohabitating** 69:17
**College** 8:4,11
**Columbia** 1:2
  165:10 225:1
**come** 14:19 40:10
  50:13,19 59:10

63:18 66:12 69:7
  77:10 84:5 90:3
  94:2 99:11 100:19
  108:7 114:16
  119:7 121:4 123:9
  128:7 131:9,12
  149:19 155:2,8
  178:16 182:13
  197:8 199:4,7
  206:1
**comes** 41:17 154:20
  155:7
**coming** 17:7 65:5
  89:7 121:9 144:1
  177:8
**command** 217:17
**commencing** 1:16
**comment** 80:21
  81:7,14
**comments** 79:21,21
  80:1,3 83:1,2,3
**Commission** 56:19
  58:15 225:22
  226:21
**common-law** 68:14
  68:16 69:16 70:3
**company** 13:1 61:1
  69:3 128:21 138:1
  138:3,12 140:12
  140:21 141:2,14
  144:6 145:5
  150:12 154:22
  157:5 161:8 196:4
  198:9 217:20
**company's** 65:10
  144:4,7
**compared** 43:12
**compel** 131:9
**compensation**
  54:20 166:3
  170:13,16 185:11
**compensatory**
  205:7,9,17
**complain** 79:20
  81:5 82:8,22
  136:11 169:9,10
  169:11,13,14,21
  200:14
**complainant**
  142:17
**complained** 67:5,18
  78:14,21 79:14
  80:11 82:21 148:4
  158:1 168:14
  208:9
**complaining** 82:13

Jerry K. Chambliss                                    vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                              Wednesday, May 24, 2006

Page 231

83:18 84:5 170:3
181:19 183:18
**complains** 181:6
**complaint** 57:5,6
66:16 81:3 83:10
125:17 157:5
158:5 165:2,9,20
167:16 181:1,14
181:15,18,20
182:13 185:19
205:3 208:10
**complaints** 60:6,10
61:12,15 64:21
65:2,3,4 78:10
83:5 84:8 147:16
147:18,21 148:2
157:4,6 168:10,13
168:15,22 169:3
173:4 177:2
180:18
**complete** 193:4
**completed** 8:2,3,5
74:19 107:7,8,9
107:12 137:18
**completeness**
142:16
**completing** 105:12
**comply** 16:13 54:14
**Conaway** 90:18
91:11 161:16,17
161:18
**concern** 208:14
217:3
**concerned** 16:6
141:18 148:6
**concerning** 67:10
180:6
**conclude** 144:19
**concluded** 224:21
**concludes** 144:16
**conditioning** 8:6
194:22 195:4
**condone** 137:9
**conduct** 187:14
191:7 210:19
216:1 218:18
219:13,15
**conducting** 210:21
216:4,6
**conductor's** 155:3
**confidential** 220:12
220:18 221:4
**confirm** 207:18
**conform** 227:10
**confuse** 163:5
**confused** 25:18

50:8,9 81:16
**connection** 26:7
**consideration**
144:16
**considered** 32:9
158:8
**consistent** 92:17
**constituted** 16:4
**contact** 145:17
201:3
**contacted** 58:21
62:13 89:10 100:2
103:15 164:19
**content** 76:19
**contention** 209:4,6
**context** 223:6
**continue** 136:14
164:14 178:18
**continued** 2:22 3:1
4:22 35:20 75:17
75:19 103:4 172:4
214:10
**contract** 192:19
**contractual** 16:5
188:7,15,17 192:1
192:11
**contractually** 22:2
127:10
**contradict** 46:6
**contrary** 134:9
**conventional** 11:12
12:21
**conversation** 17:21
17:22 18:2,9,17
21:16 23:10 66:9
76:20 86:14,15
94:15 102:10,17
103:1 145:10
152:9,20 153:8
159:22 202:19
203:8 222:1
**conversations**
159:20,21 207:5
**copied** 123:4
**copies** 19:7 154:1
184:19,20,22
185:3
**copy** 45:7 121:7
122:3,21 124:16
220:5,21,22 221:2
**cornball** 82:16
**corner** 105:22
**Corporation** 1:8,18
3:5 6:11 200:4
227:4
**Corporation/Amt...**

166:10 190:17,19
**correct** 52:8 72:13
112:15 117:5
120:4,5 140:11
187:5,6 193:3
215:15 227:9
**correction** 227:8,11
**corrections** 226:6
227:5
**correctly** 53:6
74:10 144:21
197:9
**counsel** 59:5,6,7
120:15 225:7,11
225:12
**counseled** 212:1
**counselings** 32:9
**counselor** 97:8,11
97:18 98:3
**count** 180:4 187:3
188:1,8 189:10,13
190:3 191:9,12
192:22 193:3,4
205:6
**country** 27:8,11,17
**couple** 13:15 19:2
61:3 99:15 114:1
**course** 122:17
**court** 1:1 55:15
56:4 165:10
**cover** 40:7,8 46:4
**covered** 53:2
172:17
**covers** 52:21
**coworker** 76:16
**coworkers** 180:18
**cracked** 72:8 98:7
**craft** 155:3
**crafts** 75:3
**credible** 134:22
135:5
**crowd** 37:15
**cumbersome** 27:22
45:3
**curse** 177:6
**cursed** 80:13
**cuss** 63:17
**cut** 27:3 178:17

_____
**D**

**D** 4:1 6:1
**Daddy** 178:15,20
**damage** 177:14
**damages** 205:7,8,9
205:12,18,19
206:6,8

**dare** 125:17
**date** 21:22 23:19
25:16,17 44:14
74:3 100:6 105:20
120:8 123:8 134:3
184:3 197:1 227:2
**dated** 23:20 25:10
48:12 58:2 116:17
117:2,15 196:18
200:6 208:11
209:12 210:6
211:9 220:7
**dates** 16:3 28:22
29:7,11,13 30:2
32:12 34:1 45:4
119:2,4 122:5,5
123:7 133:20
200:8
**day** 19:11 22:9
35:17,18,21 36:14
82:2 87:20 92:21
97:2,10 98:3 99:8
100:15 109:6,14
109:16 110:8
119:10,12 121:5
121:12 127:2
136:8,11 137:16
137:19 138:22
139:18,19 148:18
175:12 181:2
196:21 212:3,5
225:16 226:15
**days** 15:12 23:11
26:8,11,15 27:22
41:8 44:17 51:18
51:19,20,21 52:2
52:4,4,5 64:7
65:18,22 67:4
68:21 69:5 97:14
97:16 99:15,15
103:13 110:10
122:7,8 126:21
145:6,15,17
159:13 173:11
175:8,8,9,9,10,10
206:12
**dead** 208:22 222:17
222:19 223:3
**deal** 31:1 38:19
39:19 99:21
**dealing** 62:11
154:20
**dealt** 31:4 175:21
186:7 194:10
**December** 30:20
56:12,13

**decided** 12:14
15:16 18:14 31:15
31:16,18 70:2
106:8 127:7
**decision** 126:15,16
126:22 127:1,3,6
129:17 132:13
133:1 200:16
204:6,19,22
**defendant** 1:9 2:10
3:3 166:1,9 170:7
170:14 190:16
**defendants** 6:10
207:12
**Deffenbaugh** 85:8
**definition** 176:11
**Dellasandro** 126:3
126:4
**demand** 193:5
**demanded** 220:22
**demoted** 66:3,4
203:14
**denied** 22:8,10,16
24:14,19 28:1,7
41:10 44:4,6 45:4
128:22 129:3
180:21
**denoted** 66:11
**deny** 41:13,19,20
**DENYSE** 3:4
**department** 46:13
49:12 115:13
157:13 200:5
**depends** 51:11 53:7
**DEPONENT** 226:1
**deposed** 6:13
**deposition** 1:15 4:2
4:8 5:1 7:1,15
13:21 15:2 17:15
25:3 28:11,15
30:6,10 33:1 34:7
37:2 40:16 52:13
57:9 73:17 79:6
85:17 92:4 104:22
106:22 116:13
127:14 129:9
164:2 165:5
167:12 195:11,21
199:21 207:22
210:9 225:3
**deprived** 138:2
141:13
**describe** 71:14
106:9
**described** 220:11
**description** 41:1

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 232

96:3 98:18
**destroying** 181:11
**detail** 200:18 201:4
**determination**
137:4
**determine** 93:12
138:3 141:14
**determined** 51:8
97:8
**detour** 123:21
**developing** 204:13
**diagnosis** 111:5,7,9
**difference** 64:18
**different** 8:21 15:21
17:5 18:19 48:7
53:11 60:12 61:3
64:15,22 78:9,11
108:4,17,18
134:16 153:20
162:5 167:18
173:4,17 176:7
181:18 209:12
**differently** 72:1
**difficult** 142:16
**difficulty** 7:9,13
**dignify** 222:6
**Dino** 41:17 42:2
62:3,22 63:7,10
64:7 67:1 76:9,15
89:12,12,17,18,20
89:21 90:2 100:8
100:10,12,14,18
102:13,13,22
103:10 104:6
114:1,18 116:6
125:14 131:19,19
140:16,18 154:16
**Dino's** 64:10 101:16
**direct** 101:18
128:20
**directed** 37:15
219:21
**direction** 71:3
**directly** 31:2 76:15
**disabling** 142:17
**disagree** 137:2
141:11 143:1
**disciplinary** 40:22
93:13 155:7 170:8
173:10
**discipline** 12:22
13:1,10 15:18
25:10 29:18,21
30:19,22 31:1,7,9
31:10,12,16,20
32:4,5,7,10 50:3,4

51:1,7,12,14,16
53:6,12,14,15
54:4,11,12 64:14
64:16 65:18 93:16
146:21 152:6
162:3,17 168:8
173:10 174:22
176:9 177:8 190:8
**disciplined** 12:5,8,9
12:15 13:3,5,11
31:11 34:13,14
53:11,13 161:22
162:9,12,15
**disciplines** 161:8
**disciplining** 147:15
**disclose** 221:5
**discovered** 68:20
**discriminated**
163:1
**discriminating**
202:8,9
**discrimination**
57:21 166:13
167:4 193:12
200:22 201:9
202:13,15,16
207:12
**discriminatory**
200:19 201:12,18
202:1,8
**discuss** 68:4 93:11
101:6,17 104:12
167:8
**discussed** 37:6 50:3
51:3 104:4 118:5
130:16 168:6
207:2
**discussing** 33:17
118:20
**discussion** 14:7
18:13 19:4 20:3
23:13 24:3 95:18
119:20 130:14
185:7 199:3
**dishonesty** 54:14
**dismiss** 182:10
**dismissal** 126:18
186:21
**dismissed** 126:17
152:7,10,12,13
168:12,15 189:7
189:14
**disparate** 166:11
167:2 170:8
**dispatched** 92:13
**disposition** 176:22

**dispute** 182:2,3
**disregarded** 169:1
**disrupt** 217:10
**distance** 96:5,6,10
**distances** 96:13
**distress** 193:1 207:8
**distributed** 211:18
**District** 1:1,2
165:10 225:1
**diversity** 66:18,20
115:4 157:5,6,7
157:11,12 181:21
182:6 200:4,11
**doctor** 27:7,7,16,17
27:18 43:15 97:19
97:22 98:10 99:13
99:13 102:22
122:9 138:3 140:6
141:14,19 178:11
**doctors** 42:19
110:14 178:10
**doctor's** 41:11
42:12,14,18
104:13,16 122:17
122:19 133:16
145:4 146:6,11
147:13,17
**document** 14:9,15
14:16 15:5,9
17:18,20 19:7
20:10 21:1 22:14
22:19,21 23:15,22
24:1 25:6,21 26:3
29:7,12 32:12
33:4 34:10 37:4,7
38:10 39:15 40:19
41:2 45:15,18
46:17 47:15 50:22
52:16 57:16,19
59:11 85:20 92:7
104:21 105:3,4,9
107:3,5,7,11
119:5 120:7 121:3
127:18 128:6
129:12,14 153:20
154:1 164:5,10,13
165:8,11 184:10
184:12 196:2
202:3 207:20
208:3,4,7,9,10
220:3,3 222:22
223:11,14
**documentation**
18:4,18 19:20
36:19 40:2 41:12
42:16 46:5 47:21

122:18 198:14
**documented** 39:5
40:12
**documents** 14:21
19:6 22:20,21
23:7,14 28:18
30:16 32:1 38:7
38:11 40:4 47:12
48:17,17 50:4
51:4 132:19 176:5
180:10 190:11,12
**dog** 213:7 214:3
**doing** 28:7 35:13
39:16 64:9,11
77:12 78:10 87:13
88:5 89:21 107:16
117:20 135:12
160:18 173:20
184:21 188:21
191:19,20 201:14
205:10 214:7,9
216:6
**doors** 13:12 130:15
175:1 219:4
220:12 222:10
**Doria** 78:13 85:4
168:17
**double** 39:16
**downstairs** 38:17
89:10
**Dr** 110:16 111:5
112:16,17,18,20
113:3,14
**drew** 206:3
**drinks** 155:1
**duck** 178:2
**due** 97:12 146:3
201:9
**duly** 6:6 225:6
**Dumping** 91:2
**duration** 215:13
**duties** 40:5 47:11
48:2,2,5 91:8
217:6,7
**D.C** 1:19 3:7 58:15
58:15 70:1,2
123:21,22 155:4

_____
**E**

**E** 2:1,1 4:1 6:1,1
**earlier** 17:9 30:14
62:21 81:15 87:2
91:18 98:18 110:4
117:21 120:3
138:14,18 151:16
159:11 163:4

165:19 186:17
195:7 197:8
199:16,17 200:9
208:8 212:21
216:12
**early** 74:22 96:20
117:10 119:7,11
119:14 120:22
121:4 200:7
**earn** 196:6
**earned** 195:17
**eating** 89:5
**economic** 191:12
**EEO** 159:5
**EEOC** 56:17 59:12
149:5 159:3,4,6
159:15 164:14
170:20
**effect** 80:17 180:12
198:13
**effective** 126:19,20
**egg** 143:12
**eight** 9:14 121:11
**eight-hour** 119:7
**either** 13:8 28:20
29:13 131:16
137:15 155:1
**elected** 179:11
**Electric** 194:17,18
**electrician** 64:3
135:7 203:18
**else's** 167:8
**embarrassing**
178:18
**embarrassment**
177:13 178:13
**emotional** 177:14
193:1 207:7
**emotionally** 136:21
179:14
**employed** 51:2
**employee** 39:6,7,8
39:10,12,14 53:7
53:10 54:20 63:22
64:4 66:5,6,7,8,8
66:9 67:11 68:10
68:13 69:9 72:16
77:17,17,18 78:22
79:1,2,18,18,19
81:9,17 83:9,13
83:14 90:11,11,14
90:17 91:17
105:10 108:14
121:18,19 150:16
158:4 162:1 170:3
173:3 174:9 181:5

Jerry K. Chambliss                          vs.              National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                               Wednesday, May 24, 2006

Page 233

| | | | | |
|---|---|---|---|---|
| 181:15 183:11 | 177:7 | 117:20 118:14 | facts 6:21 114:12 | 173:21 182:6 |
| 203:13 213:5 | event 96:3 160:12 | 127:14 129:8,9 | 153:5 165:14 | 220:20 224:8 |
| 214:20 216:1 | 213:3 | 134:1 149:1 158:6 | 168:4 172:13 | filed 54:16,19 56:17 |
| 223:18 225:12 | events 181:2 191:1 | 164:1,2 165:5 | 190:3 227:10 | 57:5,5 58:3,8,10 |
| employees 31:8 | 191:14 200:18 | 192:3 193:11 | factually 142:22 | 58:22 59:1,11,14 |
| 42:19,20,22 43:4 | eventually 35:19 | 195:11,15,21 | failed 175:14,16 | 59:18,20 60:1,4 |
| 64:9,16,22 68:6 | 171:3,19 204:21 | 196:15 199:21 | failing 16:13 137:22 | 66:19 67:1 68:14 |
| 76:10 83:7,8,8,17 | everybody 42:13 | 205:3 207:22 | 138:11 | 68:17 103:21 |
| 83:21 91:13 | 68:4 89:6 126:13 | 209:13,18 210:9 | failure 54:13 | 104:17 114:7,22 |
| 123:12 124:8 | 146:21 211:5,11 | 210:16 211:9 | 117:16 144:20 | 128:18 149:5 |
| 147:2,10,19,22 | 219:2 221:8,9 | 212:14 216:19 | 175:21 | 159:3,5 165:9,12 |
| 150:14 151:5,7,10 | evidence 23:18 | 217:1 223:3,4 | fair 54:3 122:1 | 165:15,20 168:22 |
| 151:18 153:14,20 | 130:7 132:15 | Exhibits 4:8,22 5:1 | 128:13 212:8 | 170:12 171:15 |
| 154:5 155:2,8,10 | 136:10 191:20 | exist 23:5 | fall 27:6 108:19 | 172:12 186:21 |
| 157:1,1,6 158:4 | exact 44:14 111:9 | exited 71:11 | false 173:7,7 | files 173:10 |
| 158:14 159:14 | 196:22 | expected 208:21 | falsified 17:5 151:3 | filing 191:14 |
| 161:9,22 162:8,9 | exactly 116:2 | 222:16 | 174:10,14 | fill 104:14 105:15 |
| 162:11,14 166:12 | 176:17 199:9 | expecting 124:19 | far 16:5 17:3 32:4,5 | 107:21 |
| 166:13,17 167:3 | examination 4:5 6:5 | expert 206:22 | 32:8 36:10 63:17 | filled 104:15 105:11 |
| 167:20,22 168:11 | 6:7 225:8 | EXPIRES 225:22 | 64:20 77:10 87:10 | 105:13,18 106:2 |
| 168:16,22 169:5,7 | examine 72:5 | 226:21 | 93:20 96:13 148:5 | 115:18 |
| 173:5,5 174:7,13 | examined 6:6 | explain 26:2 27:3 | 151:22 157:4 | financial 179:18 |
| 175:2,3,14,16 | 141:19 225:7 | 44:5 51:10 165:18 | 168:6 173:10 | find 16:7 18:22 |
| 177:7,7,20 181:5 | 226:3 | 173:13 200:21 | 179:2 182:14 | 98:10 112:18 |
| 181:10 183:17 | example 61:17 | 217:19 222:2 | 205:16 212:13 | 117:7 134:21 |
| 185:13 210:18 | 142:15 161:12,13 | explained 148:13 | fast 8:22 12:14 | 141:20 142:13 |
| 211:19 213:8 | 161:15 | 159:11 214:3 | fastball 73:10 85:2 | 183:22 184:1 |
| 215:12 219:12 | examples 64:19 | 218:11 | 135:15 | fine 7:21 55:11 |
| 223:20 224:2,9 | 91:21 146:9 | explaining 19:13 | Fat 73:2 | 60:19 114:15 |
| employer 59:21 | 162:17 | explanation 19:16 | father 178:19 | 160:19 174:1 |
| employment 9:1 | excellence 46:7 | explanations | fault 131:17 | 202:5 |
| 12:4 50:5 52:22 | 47:9 117:16 | 144:20 145:1 | fax 2:17 3:9 | finished 128:5,8 |
| 53:2 56:18 59:12 | excessive 162:17 | expressed 160:1 | Federal 54:20 | 214:11 217:11 |
| 59:15,16 60:2 | excessively 161:8 | extent 205:19 221:8 | feel 41:22 42:1 69:2 | Fioricet 98:14 |
| 150:12,13 190:18 | excluded 41:6 | external 159:6 | 69:2 109:17,18 | 112:5 |
| enduring 179:15 | executed 226:16 | eye 96:13 | 130:20,22 189:6 | fire 69:8 133:12,12 |
| engaged 34:16 36:5 | exhausted 44:15,17 | eyes 69:15,18 | 226:6 | fired 154:9,15 |
| 166:10 | 167:6 175:2 | e-mail 24:13 124:17 | feeling 63:20 | 160:14,16 175:4 |
| entire 8:17 106:15 | exhibit 13:20,21 | 125:2,3 | 126:10 183:9 | 189:12,16 190:5 |
| entitled 19:7 | 15:1,2 17:14,15 | | feet 96:7,7,9 | first 6:5 17:4 20:22 |
| entries 45:10 | 21:3,4 22:4,6 | **F** | fell 55:12 | 21:2,17 22:17 |
| entry 42:7 47:1 | 24:13 25:2,3 | face 71:9 77:14 | felt 35:10 38:22 | 36:15,20 41:7 |
| Equal 56:18 | 28:10,11,14,15 | 85:13,14 88:18 | 41:9 67:10 69:5 | 54:9 67:15 73:20 |
| equipment 91:4 | 29:2,6 30:5,6,9,10 | 95:9 97:17,18,22 | 86:7 98:6 118:5 | 102:18 105:19 |
| 159:13 | 30:14 32:12,22 | 98:6 106:11,15,18 | 125:21 140:6 | 108:6 110:18 |
| errata 227:6 | 33:1 34:6,7 37:1,2 | 106:19 109:6 | 160:1 176:21 | 113:9 119:1 |
| error 121:10 166:4 | 40:15,16 46:19 | 135:16 136:5 | 177:4,5 180:13 | 133:19 137:8 |
| 227:9 | 47:16,17,22 48:1 | 140:6 | 182:4 201:3,9,11 | 138:18 139:15 |
| errors 193:4 227:5 | 48:21,22 49:8,15 | facility 123:10 | Female 91:17 | 160:2 171:2 174:3 |
| escorted 90:16 | 50:10 52:12,13 | 124:4 200:20 | fighting 183:10 | 186:7 194:1 |
| 91:11,13,20 | 57:8,9,15,20 | 203:4,11 | figured 203:19 | 196:21 199:6 |
| ESQUIRE 2:4,11 | 71:18 73:16,17,20 | fact 57:14 65:14 | file 23:3 24:21 31:4 | 200:17 201:17 |
| 3:4 | 84:10 85:16,17 | 68:5,7,9 73:8 | 36:7 58:5,7,9,14 | 208:3 211:13,14 |
| establishes 26:3,6 | 92:3,4 93:8 | 82:15 133:15 | 60:10 65:17 | 215:13 220:7 |
| ethical 20:13 | 104:22 106:22 | 172:1 | 103:18 157:11 | Fischler 2:11 4:6 |
| ethnic 134:10 177:1 | 116:12,13 117:19 | factor 200:16 | 164:14 169:2 | 6:8,10 13:19 14:2 |

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 234

| | | | | |
|---|---|---|---|---|
| 14:5,8,22 15:4 | focus 57:12 | friends 163:17 | 54:9 68:11 69:3 | 177:5 179:21 |
| 17:17 19:5 20:7 | follow 75:17,21 | 169:4,20 177:13 | 117:6,9,10,13 | 180:1,20 182:15 |
| 21:5,10 24:10 | 76:2 145:12 183:8 | Fries 2:12 | 123:12 124:18 | 185:1 193:2 |
| 25:5,13 26:9 28:9 | followed 97:22 | front 43:10 82:16 | 155:20 167:19 | 198:20 201:2 |
| 28:13,17 30:8,13 | 115:9 191:19 | 111:8 153:21 | 210:22 215:11 | 204:13 212:12 |
| 30:15 33:3 34:9 | following 19:11 | 176:4 180:17 | 226:4 | 223:7 |
| 40:14,18 46:21 | 59:17 60:3 76:3,8 | 213:11 | giving 69:7 89:8 | golden 143:12 |
| 48:3,11 49:1 | 77:8,11 78:4 | frontline 157:16 | 201:2 | good 6:9 79:10 |
| 52:15 57:7,11,14 | 136:3 163:16 | full 50:14 121:11 | glasses 88:18 | 126:12 201:12 |
| 57:18 70:4,10 | 189:4 191:10 | 131:5 137:8 | 137:13 | 202:12 |
| 73:19 82:4 84:3 | 201:8 | 208:13 | glued 181:7 | goose 143:11 |
| 85:15,19 92:2,6 | follows 6:6 | full-time 8:10,13,14 | go 14:5,20 19:1,14 | gossip 84:7 169:7 |
| 104:20 105:2 | follow-up 98:3 | 8:15 9:1,4 | 23:12 27:22 28:3 | governing 144:18 |
| 107:2 109:22 | 174:20 | funny 34:18 | 28:5 31:3 34:20 | graduate 8:7 |
| 110:2,19,22 | food 8:22 | furnish 38:7 | 34:22 35:3,6,10 | graduated 8:11 |
| 116:11,15 120:13 | forces 142:13 | further 95:7 101:21 | 35:15,16,16 36:11 | grammatical 193:4 |
| 121:1 127:16 | foregoing 225:3 | 111:18 144:19 | 36:13 38:17,18 | Great 217:2 |
| 128:13,14 129:11 | 226:3 | 164:18 185:9 | 44:9 45:3,14 50:7 | Green 213:4 214:7 |
| 149:8,9 155:15 | foreman 37:22 | 225:8,11 | 50:14 51:17,19 | 214:15,17 217:7 |
| 163:22 164:4 | 38:16 82:2 86:3 | | 65:11 91:6,7 93:7 | grievance 128:18 |
| 165:4,7 166:6,8 | 91:9 135:19 | _____ | 97:9 100:14 101:2 | 128:19 |
| 166:17,21 184:6,9 | 137:17 157:18,18 | **G** | 101:3 102:15 | grievances 60:1 |
| 184:21 185:2,8,18 | 211:3,8 215:10 | G 6:1 | 103:7 115:7 120:9 | 66:13 |
| 185:21 186:1,22 | foremen 20:1 | Gaber 110:16 111:5 | 125:18 126:11,14 | group 38:9 51:14 |
| 187:7,8 188:4,5 | Forget 207:5 | 113:14 | 134:16 137:5 | guess 20:22 21:8,16 |
| 188:10,14 193:6,9 | forgive 136:20 | gain 134:18 | 149:1,6,10 155:6 | 27:4 51:18,18 |
| 195:13,20 196:1 | form 24:18 105:12 | Gary 76:17 81:12 | 156:2 157:19 | 69:19 72:12,14 |
| 197:4,6 199:19 | 120:3 149:12,14 | 163:19 | 163:5 165:4,17 | 75:14 79:10 89:1 |
| 200:1 202:5,6 | 149:17 150:3 | Gas 194:17,18 | 167:1 173:15 | 117:10 129:4 |
| 205:11 207:11,14 | formal 26:7 32:7 | gasped 89:7 | 176:9,16 184:6 | 132:11 134:9 |
| 207:17,19 208:2 | 60:14,20 61:5 | general 86:2 110:4 | 185:4,6 195:4 | 171:9 182:17 |
| 209:18,22 210:2,4 | 65:17 131:7 143:7 | 137:17 157:18 | 201:3 205:12,20 | 192:13 210:14 |
| 210:11 213:17 | 173:10 | 227:8 | 217:2 224:17 | guessing 192:15 |
| 224:17 | forms 104:15,15 | generally 72:21 | goes 53:19,20 68:4 | guidelines 15:20 |
| fit 177:7 | Forney 95:6 | 82:8 108:6,8,10 | 106:10 222:3 | 123:6,7 127:10 |
| fitter 9:20 10:18,19 | forth 31:13 199:3 | gentleman 35:1 | going 7:6 12:20 | 130:12 158:6 |
| 10:21 11:2,3,7,10 | 201:14 | George 64:5 | 13:20 15:11 16:19 | 215:7 |
| 11:11,13,18,20 | forum 217:15 | getting 43:15 75:5 | 16:22 17:2 21:19 | guilty 16:12 |
| 35:20 36:2 46:11 | forward 156:17 | 81:16 125:17 | 21:20 22:1 28:6,6 | guy 34:21 35:3,11 |
| 49:9,16 162:5 | forwarded 58:19,21 | 140:13 200:10 | 31:15 34:5 35:2,4 | 62:14 99:4 |
| 213:4 | found 109:8 115:11 | 218:13 | 35:6,8 36:11,14 | Guyton 38:20,20 |
| fitters 11:10 | 123:20 144:22 | Giurfa 41:17 42:6 | 36:16 39:17 42:10 | 39:1,11 209:20 |
| fitting 91:1 | 184:14 | 62:2,15 76:9 | 44:9,11 47:12 | 219:8 220:10,14 |
| five 64:7 96:7 97:16 | four 64:8 74:17 | 93:12 | 50:1,13 57:16 | 220:14 |
| 99:15 113:18 | 97:16 137:13 | give 15:15,16 18:21 | 59:10 67:6 76:7 | guy's 77:6 |
| 145:6,15 159:13 | fourth 75:6 | 19:15 20:9 22:2 | 77:10 78:5 87:12 | G-A-B-E-R 110:17 |
| floor 1:19 | four-ounce 187:16 | 23:19 26:4 28:7 | 90:14 91:6,7 92:3 | |
| flying 71:5 | frame 53:18 127:9 | 44:11 50:14 61:17 | 93:5,22 96:9 | _____ |
| FMLA 28:1,1,3,7 | 127:11 | 73:16 98:13 | 100:3,4 101:22 | **H** |
| 29:21 41:10 43:15 | frames 53:18 | 101:21 116:8 | 102:21 107:16 | Haimer 64:2,8,15 |
| 43:18,21 44:3,11 | Frank 21:14,15 | 124:7 126:22 | 116:12 122:2 | 158:21 159:3,18 |
| 44:12,13,21 67:13 | 81:3 | 127:1,2 131:4 | 124:13 126:13 | 161:12 168:20 |
| 67:20,21 68:6,11 | frankly 24:22 | 145:9 146:9,18,19 | 127:13,17 129:7 | half 39:18 173:12 |
| 68:17 103:18 | free 177:6 | 184:4 207:20 | 130:16 135:11 | 224:4 |
| 151:22 152:2 | Friday 123:18 | 209:17 220:9,17 | 139:2 142:2,11 | hallway 215:20 |
| 200:10 | friend 135:1 | given 16:20 18:5 | 153:6 160:3 166:6 | hand 225:15 |
| | | 19:7,21 24:2 54:8 | | handbook 54:8,8 |

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 235

handcuffed 90:8,11
handed 127:6
handle 75:14 90:4,5
  115:14 124:13
  145:5,21 199:5
  208:21 222:16
handled 12:22 13:1
  13:13,13 143:21
  157:3,14
handles 146:21
handwriting 29:8
handwritten 29:8
  84:11 149:18
happen 16:15 94:19
  102:10 114:10
  130:16 153:7
happened 20:2 26:4
  29:17,19,22 34:19
  36:6 44:7 67:19
  70:11,13 82:11
  86:17 87:8,20
  89:1,2,11 90:19
  94:19 95:18 96:22
  99:17,18 101:15
  103:2,6 115:1
  116:1 126:16
  128:10 129:5
  133:5 149:22
  153:2 159:4,8,9
  159:10,15 163:14
  171:1 176:8 182:8
  184:2 208:19
  212:6 213:2
happening 159:1
  161:6
happenings 77:1
happens 78:5
harassing 38:6,12
  79:4
harassment 200:19
  201:12,19 202:1
hard 12:14 41:22
  43:14 60:9
harm 187:13,17,22
  191:6
Harry 80:7,8,9
head 51:19 52:2,4
  64:20 86:20 88:12
  97:6 99:3 109:4
  109:19 148:21
  173:11 175:9,10
  175:11
headaches 97:21
  98:1,8,12,16
  111:11 112:12
health 67:12 97:7

99:14,20 111:4
  112:19,21 145:5
  145:12,13,14
  146:1
hear 84:7 147:16,18
  147:21 148:2
  204:13
heard 36:20 81:6
  81:14 82:9 85:12
  85:13 135:15
  183:6 213:12,14
hearing 25:17 61:5
  71:19 126:4 132:6
  169:20 194:1
heating 8:6 194:21
  195:3
Height 72:20
held 11:1 26:11
  41:8 52:4 65:18
  123:16
help 33:6 112:12
  135:1 154:5 155:9
helped 67:12
helper 10:20 11:11
  11:17
helpful 125:5
hidden 71:16
hide 73:14
high 8:1,2,3,7
highly 86:16 93:10
high-speed 11:13
  11:15 12:1,22
  13:2,16 19:8
  30:22 31:8 34:21
  35:2 46:11 49:9
  64:3 70:22 200:20
  216:18 217:21
himself/herself
  226:13
hire 145:11
hiring 168:6
Hispanic 64:5
  78:22 79:2 83:7
  147:21 161:21
  162:1
history 142:19
  154:19
hit 6:20 65:7 71:6,7
  85:12,14 88:16,17
  89:3,4 90:6,11
  95:9 109:2 125:18
  135:9,10 141:17
  177:6,22 178:4
  179:20 187:19,20
  187:21 189:22
hitting 89:5 118:10

189:19
hold 10:22 11:5,6
  11:20 93:4 149:2
Hollander 110:21
  112:16,17,18,20
  113:3
home 27:7,12 38:18
  97:1,5 109:5
  175:21 179:16
  194:17 195:17
  196:5,6,9
homophobic 83:2
homosexual 79:15
  80:4
honest 42:1,11
honesty 15:13 17:6
  45:16,21 46:2,8
  47:11 151:13,16
  151:20,22
honor 171:2
honored 171:3
Hopefully 208:22
  222:17
Horseplay 172:21
hour 19:9 120:21
  120:22
hours 121:11,14
  195:5
Human 58:15,16
humiliating 177:16
humiliation 177:12
  178:7
Humphreys 146:19
Humphries 61:19
  62:13,17 100:17
  100:21 101:9,11
  118:4 132:18
  158:17 159:18,21
hurt 95:14 98:5
  111:14 137:20
  178:10
hurting 88:13 109:5
  109:15,15,19
husband 68:17,19
  69:17
hypothetical 174:17

_____ I _____

Ice 112:8
idea 82:11 84:2
  86:5 124:4 137:9
  201:2
identical 49:18
  221:22
identification 13:22
  15:3 17:16 25:4

28:12,16 30:7,11
  33:2 34:8 37:3
  40:17 52:14 57:10
  73:18 85:18 92:5
  105:1 107:1
  116:14 127:15
  129:10 164:3
  165:6 195:12,22
  199:22 208:1
  210:10
identify 14:11 21:1
  25:8 42:22 43:4
  52:18 57:19 84:14
  85:22 92:7 105:3
  105:9 107:3
  129:12 148:20
  154:5 165:8
  174:13 176:3
  196:2 200:2 208:6
iffy 133:16
ignored 125:10
  130:13 132:20
  182:10 214:10
illegal 62:9
illness 107:4
illnesses 47:6
immediately 47:5
  63:6 90:9 109:9
  136:7
impact 85:12 98:9
impacted 135:16
implied 152:19
imply 20:12
impose 25:9 51:13
  51:16
imposed 15:18 53:6
impression 24:5
  90:5
impropriety 144:2
inaccurate 23:9
incident 13:17
  14:12,20 16:4
  17:9,10,11 34:12
  34:15,17,19 37:6
  37:8,10 39:4
  40:11 46:15 47:2
  48:7 49:13 50:2
  50:14 57:2 61:21
  65:12 66:4,12
  67:3 87:11 88:8
  90:13 93:11 95:20
  113:1 114:11
  115:3,19 117:18
  118:17 130:21
  137:17 150:20
  151:2,4 189:7,21

202:20 212:6
incidents 15:22
  16:1,2 114:10
include 169:5
included 41:5,6,10
  75:4
including 38:10
income 177:13
  178:22
incorrect 119:3
  138:6
incurred 142:17
indicate 223:10
indicates 223:15
indirectly 126:7
individual 10:8
  40:8 64:2 77:7
  135:8 148:14
  178:4 226:12,14
individuals 36:15
  66:1 73:13 135:14
  146:6
industrial 144:19
inflict 187:21
infliction 192:22
  207:7
informal 32:9 84:20
information 18:14
  54:6 94:10 106:5
  132:19 206:2
  217:14
informed 16:18,22
  21:19 76:21 93:9
  137:16
infractions 174:6
initial 119:15
initially 35:16
initiated 61:8
injured 82:18 88:9
  88:10 95:15
  100:10 101:20
  102:9,11,12,19,21
  104:8 107:18
  108:3,9,10 113:22
  138:4 139:11,14
  139:16 140:22
  141:8,15,18,21
  142:4 173:8
  178:10
injuries 47:6 95:6
  95:13 118:18,19
  142:19 143:1,3,8
  143:9 144:19
  170:13 175:19
  176:1,7,9 177:15
  189:2

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 236

**injury** 6:18,19 17:6
43:18,20 44:7
46:1,12,14 49:10
49:12 88:8 106:9
106:15 107:21
109:3,13 110:5,15
114:7,21 117:4,17
118:12,13 122:9
122:14 125:22
133:15 136:12
137:15,18,22
138:11,13,20
142:17,19 150:21
150:22 151:3
163:13 173:8
174:10,14 175:15
175:16 176:10,12
178:12 189:18
199:10,13,14
**inside** 111:17 134:7
**insinuating** 20:14
**insinuation** 40:5
**inspection** 75:1,2
**instance** 90:10
131:6,6 144:14
221:9
**instances** 12:7,12
32:15 51:1 107:22
**instructed** 34:20
35:6,9,14 99:20
145:22
**instructing** 36:10
**instructions** 16:14
54:14 145:13
**insubordination**
16:13,16,17,18,20
34:13,14,16 36:5
54:13
**insult** 178:12
**integrity** 16:8,9
17:4,6 42:11
45:17 46:8 47:11
47:20 65:9,10
**intend** 206:22
**intended** 209:21
**intent** 25:9 187:10
191:6
**intentional** 158:6
192:22 207:7
**interested** 107:16
225:13
**interesting** 143:18
**interfere** 188:22
**interfered** 188:20
**interference** 188:6
191:12

**interoffice** 29:3
31:13
**interrupt** 115:8
119:22 214:8
**interrupted** 19:14
168:2
**introduce** 132:15
**introduced** 130:18
132:18
**investigate** 60:5
182:22
**investigated** 181:20
182:1 183:1
**investigation** 26:7
29:18 30:14 61:5
84:21 116:17
131:7 143:7
152:22 181:9,16
181:22 182:15,16
184:1
**involved** 27:5 35:11
36:10 59:8 60:11
75:13 218:13
224:11
**involving** 60:15
130:10
**issue** 20:16,19
51:15,17 118:20
172:18 185:14
194:7 204:1
208:22 209:5
222:17,20 223:3
**issued** 204:2,7,19
**issues** 54:13 112:22
125:8 172:17
190:9 207:1
210:17 215:22
219:7,12

**_____ J _____**

**Jackson** 76:17,18
77:2 81:12 158:19
159:18 163:19
**January** 44:7
196:19 197:20
**January/February**
197:15
**Jeffery** 110:18
**Jeffrey** 110:19
**Jenkins** 79:8,11,20
80:4 168:17
**Jerry** 1:4,15 4:2 6:4
35:3 38:16 178:5
226:11 227:1,3
**Jerry's** 90:1 214:8
**job** 10:8,11 14:18

33:10,18 40:4,4
70:17 75:18 90:14
90:21 108:3,9
128:15 155:3,3,3
155:12,17,19
178:13 179:1,5,9
179:18 188:18,21
189:5 191:19
197:19 213:12
214:7,7,9,9,13
**jobs** 8:22 167:18,21
**Joe** 76:15 116:6
143:21
**John** 146:19
**Johnny** 161:12
168:20
**Johnson** 37:11
**Johnston** 39:13
**joke** 181:3
**jokes** 177:17,21
178:1
**Jones** 155:17
157:10
**Joseph** 107:8
**journeyman's**
195:5
**Jr** 209:20
**judgment** 186:14
186:17
**July** 48:16 117:3,11
117:15 197:9
208:11 209:12
210:7 211:10,15
212:4,6 220:7
**June** 4:3 15:9 17:21
19:12 20:17,18
22:15,15 23:8,8
48:12,13 58:2,13
104:3,4,17 105:18
105:20 107:9
114:9,22,22
115:20,21 116:17
116:22 119:5
120:8,20 123:8
210:6
**jungle** 66:5 81:6,14
83:16 203:13
**junior** 35:3,3,8
36:11,12

**_____ K _____**

**K** 1:4 4:2 6:4
226:11 227:1,3
**karate** 178:16,20
**keep** 128:9 136:1
146:14 204:9,12

210:2 220:17
221:4
**Keith** 2:11 6:10
**kept** 96:6 220:11,12
221:17
**kick** 177:6
**kicked** 79:5
**kicking** 65:4 78:21
148:5 173:5
**kind** 10:11 34:18
53:12 112:8 146:8
186:9
**kinds** 83:2
**knew** 21:20 76:7
221:8,19
**knock** 88:18 137:13
**know** 7:1,4,16 11:1
13:11 15:7 21:8
23:17 24:6 29:6,8
29:15 31:12 37:13
38:2,14 42:18
47:13 51:6,7,10
58:11,12,20 59:6
59:7 62:2,4 64:5
65:5,9,11,14 66:3
67:20,22 68:5,7,9
68:9,13 69:11,21
69:22 70:7 72:5,7
74:19 76:11 78:1
78:2,3,15 80:5
82:1 84:5 86:8
87:21 90:10,13,19
91:3,4,4,5,12
92:20 95:10 96:6
96:8 98:9 99:7,10
99:13 100:2,3
101:12 102:2,15
104:2,10 107:12
109:3,5,20,20
111:9 113:9,22
115:9 117:12
121:2,9,22 123:19
123:21 124:2,12
124:13 125:1,2
132:9,14 133:4
136:18,19 147:3,5
147:9,12 148:6,19
149:15 150:2
151:21 152:4,8
153:4 159:16,17
161:4 162:2,3,6,7
162:8,10,11 167:9
167:11 168:18
169:18 172:7
174:19 175:2,14
175:18 176:17

178:16,17,20
180:11,20 182:19
186:19 192:16
194:2,4,6 196:22
197:7 198:20
199:8 203:10
204:6 205:14,22
207:1 209:20
212:5,20 218:12
219:20 221:9,16
221:17 223:5,5
**knowledge** 41:4
50:2 64:1 70:5
133:4 140:14
147:1,12 151:19
161:21 168:21
170:5 194:2
203:22
**known** 17:1
**knows** 82:19
**Kruchko** 2:12

**_____ L _____**

**laborer** 77:14
**lack** 208:17 222:13
**laid** 143:12
**large** 18:13
**late** 32:16 74:18
119:3,10 120:21
121:9 123:13
**law** 2:5 69:1 129:13
129:17 134:8
225:7
**laws** 20:12
**lawsuit** 54:17
**lawyer** 114:4,20,21
114:21 140:15
**lawyer's** 114:6
**lay** 143:12
**learned** 94:3
**leave** 32:16 36:15
63:10 75:1 96:19
99:22 101:17
119:3,9 145:20
160:21
**leaves** 74:22
**leaving** 89:8,9
119:11,14 120:22
**Lee** 151:12,12
**left** 27:7 35:17,18
35:18 36:14,15
74:17 96:13,18,21
**leg** 108:20
**legal** 24:4 55:3
115:13
**legally** 68:20 70:6

Jerry K. Chambliss                    vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                    Wednesday, May 24, 2006

Page 237

lesser 90:4
letter 20:12 25:16
  27:8 36:17,18
  45:3,6 67:8 104:2
  106:7 114:7,21
  115:10 128:21
  164:18,21 183:18
  186:13 200:2,3,11
  200:12,14,17
  201:1,22 202:18
  209:12,19 210:5
  210:15 211:15,18
  212:13,14 215:9
  215:10 216:8,11
  216:19 217:1
  218:15 219:3,5,15
  219:18 221:11
letters 36:7 212:3
letting 62:6 76:11
  217:14
let's 9:7 14:5 53:3
  57:7 61:3 73:16
  108:6 109:22
  149:1 165:4,17
  184:6 185:2,4,6
  195:20 196:15
  199:20 207:21
  209:18 210:8
  211:7 214:18
  224:17
level 53:19,21 74:19
  74:22 210:18
  215:22 219:7,9,12
Liability 54:21
liar 178:9,11
liars 135:4
license 195:6
lie 20:15
lied 20:14 133:15
life 178:18
lightly 135:13,17
liked 81:18
line 42:3 92:10 97:7
  99:20 112:19
  200:17 227:11
lines 74:17 99:14
list 43:12 146:17
listed 29:1 34:1
little 71:22,22 99:19
  174:5
live 123:22,22
living 69:17 70:1
Lobster 9:5
LOC 95:10
Location 95:12
locker 91:20

locks 181:7
long 9:13 10:22
  43:12 113:3 153:7
  156:8 196:9
longer 113:6 171:17
  171:21 202:10
look 18:21 21:12
  46:22 47:13 65:16
  71:4 120:10 126:1
  127:22 193:6
  196:15
looked 19:9,10
  98:11 143:11
  181:3
looking 29:11 32:11
  34:1 73:15 149:3
  184:10,11
looks 43:11 92:8
  105:20 119:10
  121:20
losing 183:10
loss 177:13 178:22
  179:18 180:2
lost 178:13 179:1,2
  179:3
lot 10:10 29:3 76:16
  76:18 82:12 88:12
  97:6 99:22 148:14
  148:17 160:1
  179:17,19,22
  202:13,15
loud 85:13 135:15
low 179:11
lunch 70:15
lunchroom 136:4
  137:11
lungs 215:19
lying 135:1 163:13
  173:8

_____
M

M 3:4 209:20
making 14:17 79:21
  126:1 137:4
  142:15 180:2,14
malice 187:15
  191:8,18
malicious 86:7
man 34:22 89:22
  90:22 128:20
  135:6
manage 217:20
management 12:13
  13:1 16:14 18:10
  41:15,20 61:21
  75:15 77:1 88:4

93:5 107:14 116:6
  123:14 124:17
  131:18 141:4,5
  154:20 169:12,15
  169:22 170:4
  178:9 189:9,11
  200:20 215:1
  217:20
manager 21:8 76:9
  90:4 144:6 180:19
  208:8 218:1
managerial 190:15
managers 219:1
manner 79:16 86:8
  117:4 170:9
  185:13
manners 65:6
man's 33:12,13
MARC 10:2
Mario 1:19 225:2
  225:20
mark 13:20 14:22
  17:13 21:21 25:1
  28:10,13 30:4,8
  32:21 34:5 36:22
  40:15 52:11 57:7
  73:16 85:16 92:3
  97:10 104:21
  106:20 116:12
  127:13 129:7
  163:22 195:20
  199:20 207:21
marked 4:8 5:1
  13:22 15:3 16:9
  17:16 24:13 25:4
  28:12,16 29:7
  30:7,11 33:2 34:8
  37:3 40:17 45:18
  52:14 57:10,20
  73:18 85:18 92:5
  100:4,5 105:1
  107:1 116:14
  122:18 127:15
  129:10 138:19
  164:3 165:6
  195:12,14,22
  199:22 208:1
  210:10
marking 100:9
  139:9 140:5
mark-off 100:5
  139:4
marriage 70:3
married 68:14,16
  68:20 69:14,16,18
  70:6

Maryland 2:7 70:1
  123:22
Mascetti 62:14,14
  62:19 63:7,7
  89:11,16 100:3,7
  101:14,15,15
  102:20 103:5
  138:15 139:17
  140:9,10 141:2
Massachusetts 1:18
  3:6
master 143:8
materials 137:9
matter 38:1 73:8
  82:15 93:11,14
  140:16 164:15,17
McLean 2:15 37:22
  101:19 102:3,17
  103:2 110:11,12
  113:21 114:17
mean 22:19 24:18
  26:13 38:4 43:12
  55:3 60:22,22
  61:2 82:12 98:4
  115:8 127:1
  128:11 131:2
  156:16 157:17
  170:18 171:8
  191:18 202:2
  203:16 211:10
meaning 47:15
  80:16 165:19
  170:19 171:9
  203:17
means 26:14 53:16
  74:20 165:18
  179:18
meant 38:15 171:8
  171:10 180:13
  201:20 202:2
Mediation 129:13
medical 10:10
  206:4,5,18
medication 7:8,12
  98:12,13 112:2,4
medicine 98:1
Medium 73:3
meeting 25:10 33:8
  33:14,17,20 70:16
  70:16 88:7,14
  94:6 118:1,3
  119:1 178:1
  181:10 210:20
  212:9,10,11
  213:10 214:19
  215:11,13 216:3,9

217:10,13 224:10
  224:12
meetings 118:21,22
member 189:11
members 132:3
memo 28:22 181:1
  211:19 220:6
memory 125:4
memos 31:13
men 83:5
mental 97:7 99:14
  99:20 111:4
  112:19,21 145:5
  145:12,13,14
  206:8
mention 88:7 201:5
  201:10,16
mentioned 162:21
  201:18 211:20,21
  223:7
mentioning 88:10
merit 133:11
message 24:13
Michael 101:19,19
  110:11
Mike 17:22 18:3
  22:12 37:22 61:19
million 205:7,8,9,13
  205:17,20
mind 41:18 57:14
  184:21 207:5
mine 43:12 79:10
  132:4 214:22
miniscule 137:12
minute 50:7 185:6
minutes 19:2 119:3
  120:21,22
mispronounce
  33:11
misread 50:11
misreading 172:8
missed 26:14
  114:11 148:17,17
  148:19 206:10,11
missing 115:2
  163:13
misswipe 124:7
misswipes 123:15
  124:18
mistreated 148:8
modify 74:7
moment 148:22
  163:8
Monday 99:12
monetary 206:10
money 178:20

M.A.R. Reporting Group, LLC          Toll Free (888) 534-1225          (703) 534-1225
Professional Stenotype Reporters                                      www.mar-reporting.com

Case 1:05-cv-02490-CKK    Document 27-5    Filed 09/14/2006    Page 70 of 79

Jerry K. Chambliss                          vs.                 National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                   Wednesday, May 24, 2006

Page 238

199:1
monies 206:10
month 206:16
months 26:12 41:9
 53:13 56:15
morning 6:9 74:22
 86:18,18 97:16
mortgage 179:22
motivated 177:10
motive 144:12
mouth 84:17
move 10:3 88:20
 108:20
Muscular 73:2

**N**

N 2:1 4:1 6:1
Nagy 37:12 38:1,6
 38:11 39:3,3,9
 91:9 180:10 181:6
 181:15 183:18
 208:20 212:10
 213:5,19 216:8,21
 217:4,10,12 218:4
 218:5,6 222:9,11
 222:14,15
Nagy's 38:8 208:17
name 6:9 23:21
 24:1 33:12,13
 37:22 41:17 62:3
 63:19 69:10 74:10
 77:6,13,15,15
 78:15,19 80:13,14
 83:13,14,16 90:18
 94:7,13 110:18
 124:15 146:18,19
 151:12 155:17
 158:16 168:18
 211:19,21 221:7
 222:7
names 151:8 153:20
 223:22
narrative 95:1
nasal 98:16 111:11
 111:13 112:12
nasty 43:16
national 1:7,17 3:5
 6:11 52:19 129:13
 166:9 190:16,19
 200:3 227:3
nationality 125:1
near 75:16 136:5
neat 128:9
NEC 13:1,4 18:12
 24:4 29:4 30:22
 31:7,10,11 70:21

119:5 200:19
 217:19
necessary 93:14
 226:7
neck 109:15
NEC's 123:14
need 7:20 38:18
 96:1 120:14
 131:20 136:13
 167:11 205:22
 222:20
needed 15:14 74:18
 104:13 106:8
 112:11 201:13
NELSON 3:4
never 33:21 53:10
 66:2 67:13 88:7
 99:5 130:8 155:20
 157:3 169:9,17,18
 170:2 175:12
 183:6 189:22
 202:17 203:5
 207:5 208:19
 211:20 218:11
new 17:7 48:15
nigger 65:3 78:14
 173:6
night 138:22 211:5
 211:11,18 213:9
 216:20 217:3
nightly 216:20
 217:4 224:10
night-shift 223:18
 223:20
Nodding 99:3
noise 135:15
noon 87:14,17
normal 91:7 108:19
normally 66:16
 91:6
Norris 2:4,5
nose 71:9 72:9
 88:17 97:19
 106:16,17,19
 109:7 111:13,17
 141:20
notarial 225:15
Notary 1:20 225:21
 226:19
note 43:16 122:19
 147:14,17 227:5
notes 29:8 42:12,14
 42:18,19,21 43:1
 43:4,8 145:4
 146:11 147:2,5,7
 147:10 148:5

179:22
notice 22:1 25:9
 116:10
noticed 64:8
notified 95:6
 108:11,22
notify 108:13,14
 110:5
November 196:22
 198:15 199:7
number 13:21 15:2
 17:15 21:3,4 25:3
 28:11,15 30:6,10
 31:12 33:1 34:7
 37:2 40:16 45:19
 46:19,20 47:22
 48:1,6 52:13 57:9
 73:17 85:17 92:4
 95:1 104:22
 106:21,22 116:13
 116:17 117:2,14
 118:16,16 119:4
 122:12,12 127:14
 129:9 134:1 139:4
 164:2 165:4,5
 195:11,21 199:21
 207:22 210:9
numbered 187:9
numbers 205:16
N.E 1:19 3:6

**O**

O 6:1
oath 156:16
oatmeal 89:6
Objection 81:21
 83:22 128:11
 202:3
obviously 172:11
occasion 42:5,7
 61:20 76:16
occasions 37:12
 63:19 180:16
occupied 190:15
occur 47:6
occurred 33:21
 109:3
October 33:15
ODI 116:17 117:2
 117:14 118:15,16
offended 83:11
offense 36:12
 172:22 173:1
offer 67:13,15
 197:7,10,20,20,21
 198:4

offered 67:16,20,21
 68:6 196:12
office 58:16,20 62:5
 62:11,16 64:11
 66:19 100:19,22
 101:3,16 102:14
 104:3,11 106:3
 107:15 114:2
 200:11 210:14
 211:22 212:2,9,18
officer 94:7,10,16
 95:21 96:16,17
 126:4 193:18
offices 1:17 2:5
officials 60:11
oh 8:21 85:11 104:8
 123:7 135:11,13
 214:18 215:18
okay 6:19 7:22 9:1
 9:4,17 10:4,13
 11:8 12:1,4,9,11
 12:19 13:9,14,18
 14:14,19 16:7
 17:13,20 19:3
 22:6 24:11,17
 25:6 26:2,6,17,21
 29:11,17,17 30:1
 30:19 31:22 32:3
 32:11,14,19 33:20
 35:15 36:3 37:20
 39:6 40:13,21
 41:3 42:4,9,15
 43:9 44:3 45:1,6,9
 46:22 47:7 48:15
 49:6,8,19,20
 50:16,21 51:7,10
 55:10 56:1,3 57:1
 57:4 58:14 59:10
 59:14 60:21 61:18
 61:22 62:12,17
 63:9 64:17 67:9
 67:17 68:2 69:7
 70:8 71:1,10 72:6
 72:15 74:9,11
 75:6 76:3 78:20
 78:22 79:3,7 80:6
 80:12,18 81:2,11
 81:18 82:5 83:12
 83:20 84:4,22
 85:6 87:9 88:1,22
 91:16 92:1,9
 93:18 94:15 95:13
 96:15,22 97:2,14
 98:18 100:14
 101:5,7 103:1,11
 103:14 104:1,19

105:6,18 106:18
 106:20 107:3
 108:13 109:1,9,11
 109:21 111:5,16
 114:6 117:14
 119:13,17 120:17
 121:21 122:4,16
 123:3,6 124:16
 125:6,16,19 126:5
 126:9 127:8 128:4
 129:1,19 131:3,15
 131:20 132:10,15
 133:6,14 134:6
 135:4 137:5
 138:10 139:5,21
 141:10,22 142:10
 142:11 143:10
 144:15 146:3,16
 147:4,17 148:7,16
 149:1,22 150:6,9
 151:9,18 154:8
 155:8 156:12,15
 156:22 157:8,10
 157:14 158:2,10
 158:18 160:7,20
 161:2,5,8,14
 162:14,20,22
 163:9,20 164:21
 166:6,7 168:2,3
 168:21 170:7
 172:6 173:2 174:2
 174:18 176:5
 177:3 178:2,6
 179:13 180:4
 181:4 182:18
 183:16 184:18
 186:4,11 187:3,7
 188:4,12 190:12
 190:13 191:5,16
 192:4,4,7,9,22
 193:8 194:7
 195:16 197:18
 198:3,5,22 199:18
 201:15 202:19
 203:22 206:9,15
 206:20 207:11,17
 209:16 210:8,12
 211:17 213:2,18
 213:20 214:5
 216:14,16 217:2
 218:7,20 222:5,8
 222:19 223:9,13
 223:17
omitted 96:2
once 28:3 41:12
 113:16,17 178:13

Jerry K. Chambliss                          vs.                National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                 Wednesday, May 24, 2006

Page 239

179:11 203:7
ones 78:9 219:8
one-to-one 13:10
ongoing 10:6
open 42:11 182:14
operate 7:6
opinion 13:3 42:2
  68:22 132:11
  133:10 144:10,13
  144:13 174:1
  196:17 204:4
  208:16 213:7,7
  215:3
opportunity 19:15
  50:14,17 56:18
  130:8 141:21
  210:22
oral 204:1,6,19
original 226:8
originally 46:3
  174:16
ounces 137:13
outcome 225:14
outside 12:12,13
overhand 73:7,8
  84:18
overheard 66:8
overtime 127:5
Overweight 73:2

          P
P 2:1,1 6:1
packet 54:10
page 2:22 4:5,8,22
  5:1 21:11 25:20
  25:21 45:13,14
  46:22 48:19,20
  49:2 57:12,16
  73:20 74:9 75:6
  75:11 84:10 85:3
  94:22 95:2,3,17
  95:17 118:14
  133:22 137:7
  144:15 165:17
  180:4 185:17,18
  187:3 188:1 211:9
  211:13,15 216:19
  218:21 220:7
  227:11
paid 16:22 171:4
  179:12
pain 98:17 109:17
  111:12,13,13
  112:13 137:15
Pamela 73:12 84:12
  84:15

pamphlet 135:17,20
  137:10
pancake 143:12
paper 18:15 32:5
  71:2,5 121:12
  172:4 198:14
  226:8
papers 28:3,6 222:9
paperwork 40:3,11
  58:19 59:2 60:13
  120:10 176:4
  183:14
paragraph 16:8
  21:2,17 39:20
  133:20,21,22
  137:1,8 138:5
  141:10,12 142:11
  149:11 150:11
  162:22 165:17,18
  165:22 166:9
  167:15 168:5
  170:7,12 171:10
  172:16 176:19
  177:12 180:5
  185:9,20,21 186:2
  186:3 187:9
  190:14,15 191:5
  191:11 201:17
  208:13 210:16
  211:14 215:14,21
paraphrasing 174:5
parking 76:16,18
part 42:1 46:9 47:5
  70:1,1 94:9 117:7
  125:14,19 143:18
  166:4,5,12 167:11
  167:11 189:9
  194:18 208:17
  209:13 210:1,2
  215:2,6
particular 68:12
  124:11
particulars 149:10
  152:16
partner 69:13
party 95:8 225:12
  225:13
passed 154:7
Passenger 1:7,18
  3:5 6:11 166:10
  190:17,19 200:4
  227:3
passes 54:1
pattern 166:12
  167:3
pause 99:5 120:12

120:18
pay 18:5,11 19:21
  20:9 166:2 179:10
  179:11,22 186:15
  186:16 195:8
  215:20
paying 126:13
  215:16,18
payment 55:19,21
  56:7,9
pays 126:7
Paz 94:11
pending 7:18
people 38:3,5,9,14
  65:3,5 75:4 76:11
  76:14 77:4 78:12
  81:18 82:8,12,21
  99:21 123:14,15
  124:18,21 125:1
  131:8,9,9,20
  132:1 134:9,10,14
  134:17,20,22
  135:1,4,5 137:10
  145:2,11,13,14,22
  146:17 147:16
  148:7,9 167:13
  176:3 177:1,1
  180:11,12,13
  182:2 202:11,11
  202:12 215:16,19
  218:22 221:14
perform 40:5 217:6
performance 33:10
  33:18
period 15:8 26:15
  52:9 55:10 179:5
permission 18:5,18
  19:18,19,19,21
  20:6,17 24:3
  119:6
perpetrated 187:14
  191:7
person 111:4
  134:15,17,21
  220:15 224:13
personal 105:10
  210:18 215:22
  219:7,9,12 220:20
  221:18
personally 148:9
  224:6 225:1
personnel 23:2
  224:8
persons 168:11
pertaining 46:8
  47:4,10 48:2,4

phone 115:9 124:5
  124:7 139:1
  204:15,16
phonetic 79:8 80:7
phrase 163:4
Physical 111:3
physically 158:7
picked 71:8 137:18
  187:19
piece 71:2,5 121:12
pipe 9:20 10:18,19
  10:20 11:2,3,7,9
  11:10,11,13,17,20
  35:20 36:2 46:10
  49:9,16 91:1
  162:4 213:4
place 225:5
places 162:5
plaintiff 1:5 2:3
  165:22 166:14
  170:12,15 180:6
  185:10 187:14
  190:18 191:7
plaintiff's 170:15
  172:9
platform 82:18,20
play 43:11
playing 82:7 135:11
please 7:4,16 14:11
  52:18 86:1 196:2
  227:5
plural 153:17
Plus 125:20
point 9:17 12:4
  19:22 27:15 29:16
  31:5,21 35:10
  38:13 44:15 53:16
  64:19 69:4 71:11
  76:5 86:16 87:4
  87:10 88:11 90:2
  93:21 95:15,16
  96:6 102:14
  103:12 104:9,13
  107:13 108:12
  109:18 113:11
  119:20 121:17
  133:1,3,7 137:4,5
  139:10,14 141:21
  142:4 146:1,20
  153:13 157:15
  172:2,5,14 180:14
  183:9,12 205:15
  222:3 224:16
police 39:1,2 40:6
  46:13 49:11 88:3
  90:7,15 91:10,10

91:14,18 92:8,13
  92:18 94:6 95:8
  95:21 96:15,17
  136:8,10 161:19
  181:8,16,20
policies 170:8
policy 15:20 16:6
  52:20,21 116:19
  144:18 175:3
population 13:6
portion 149:11
position 9:11,17,20
  10:7,8,15,17,20
  10:22 11:1,5,6,11
  11:21 17:8 137:6
  144:5,8 157:3
  190:16 219:22
  220:4
positions 9:4,21
  10:4
possibility 18:11,12
possible 93:13,16
  134:21 148:7
  156:17
possibly 29:15
  224:12
pounding 86:20
  97:6
power 64:4,9
  131:20,21,22
practice 20:13
practices 168:6
  170:8
precipitated 191:14
premises 90:12
prepare 59:4 165:2
prepared 59:9 74:3
  167:8
prescribe 112:2
presence 226:16
present 130:8,8
pretrial 207:3
pretty 96:3 99:4
  211:4
previous 143:9
previously 75:8
  107:18 190:21
prior 9:1 46:22
  54:16 78:2 79:5
  180:4 194:1
  211:19
private 217:14
probably 9:8 18:22
  168:1
problem 12:17,20
  44:19 49:22

Jerry K. Chambliss　　　　　　　　　　　　　vs.　　　　　　National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS　　　　　　　　　　　　　　　　　Wednesday, May 24, 2006

Page 240

111:16,18 115:16
155:9 214:21,22
217:8 218:17
221:11
**problems** 10:11
43:13 64:12 67:12
167:8 179:15
200:9
**procedure** 20:3
108:2,8,10 110:4
**procedures** 118:19
**proceedings** 60:14
120:12,18 224:20
225:10
**process** 132:2
204:10
**processes** 157:9
**produce** 45:7 46:16
135:3
**produced** 15:9
22:19,20,21,22
23:3 125:3
**Products** 196:5
**professionalism**
208:17
**professionally**
210:19 216:2,7
219:13,16
**program** 8:5 10:3,6
**progressive** 53:14
53:15,17 54:11,12
175:7
**promise** 50:20
**promoted** 10:14,17
157:10
**pronounce** 62:2
**pronouncing** 74:10
**proper** 20:3 142:20
**property** 90:8,16
91:11,13,20
181:11
**proposal** 198:2
**protected** 163:10
**provide** 28:1 54:5
179:9
**provided** 41:11
146:11
**psychiatrist** 97:11
**public** 1:20 129:13
217:15 225:21
226:19
**pull** 123:3
**pulled** 186:6
**punitive** 205:8
**purpose** 105:12
210:20 216:3

222:21,22 223:2,4
**pursue** 66:17 156:5
156:7,13,22
164:15,17
**pursued** 66:14
**put** 23:17 32:5
65:15 84:17 95:22
96:9 120:20,20
122:2 146:8,11
153:22 171:9
177:17 178:3
181:9 186:9
197:10 219:5,6
221:6,7 224:7
**putting** 171:11
222:6
**p.m** 74:4 136:9
224:20

_____
**Q**

**qualified** 167:19,20
**quarter** 86:4
**question** 7:3,7,18
7:19 14:1,4 15:10
16:21 26:5 34:17
50:21 67:8 74:13
87:1 114:13,14
115:17 128:5
140:2,3,20 141:1
142:6 160:11
164:11,12 175:18
181:13 194:12
196:14 202:14
205:14 207:6
222:19
**questioned** 163:18
163:19
**questioning** 45:17
163:17
**questions** 7:2,10,13
20:8 45:11 49:21
50:10 87:5 94:18
94:20 127:18
154:13 174:21
185:4 194:10
**quickly** 14:14 161:6

_____
**R**

**R** 2:1 6:1
**race** 63:13,22 82:22
143:21 146:3
148:9,10,11 154:9
154:15 160:9,14
160:17 163:1
176:20,22 180:7
194:8 200:15,15

201:5,10,10,16,18
201:21,21,22
202:16,17
**racial** 80:20 193:12
**racism** 65:20 90:6
159:2 160:2
**racist** 35:12 42:2
63:1 79:21 80:2
83:1 125:15
143:22 144:10
154:16,21 168:7,7
168:10 180:14
**rail** 11:14,15 12:1
12:22 13:2,16
19:8 30:22 31:8
34:21 35:2 46:11
49:9 64:3 70:22
200:20 216:18
217:21
**railroad** 1:7,17 3:5
6:11,18 101:12
166:10 179:2,3
190:16,19 200:4
206:11,17 227:4
**raise** 168:4 193:19
194:7
**raised** 40:22
**Ramsey** 2:4,5 14:4
21:3 23:19,21
25:11 26:5 46:19
47:22 48:9,21
69:20 81:21 83:22
110:18 128:11
141:4,6 149:6
155:13 166:4,16
185:17,20 186:20
187:6 188:3,9,12
193:2,8 197:2
202:3 205:10
207:10,13,16
209:19 210:1
213:15
**ran** 38:20 71:12
126:21
**range** 72:21
**read** 46:8 47:4 49:6
54:8 128:21 137:1
138:7 141:11
212:13 226:2
**reading** 136:1
223:14 224:19
**ready** 70:11,12
**really** 13:7 57:13
68:3 157:3
**reason** 7:9,12 15:15
22:10 42:16 82:19

134:19 144:22
155:20 156:3,4
202:15 219:14
223:6 227:7,11
**reasons** 31:12
154:10,14,17
160:7,16 202:13
**recall** 17:22 18:2,3
18:15 27:5 29:17
30:18,19,21 31:21
32:15,18,20 33:5
33:14,17,22 34:4
34:12,15,17 36:5
37:6,8,9,10 51:5
56:9,11 59:13
77:22 83:17 84:19
88:10,21 94:7,14
94:15 95:14
103:20 111:10
113:10 117:12
152:20 153:6
154:7 160:18,20
161:3 165:13,16
186:18 202:21
**receive** 36:9,18
56:7
**received** 36:7 50:5
51:2 65:21 88:8
104:2 106:7
115:10 136:10
164:7,13 186:5
197:7 198:13
**receiving** 116:22
164:9,18
**recess** 70:9 110:1
184:8
**recitation** 34:2
95:20
**reciting** 137:3
**recognize** 70:3
**recollection** 24:15
24:16,20 29:12
32:11 86:13,15
87:16,19 92:17
154:4 156:19
176:6
**record** 14:5,7 19:1
19:4,5,14 21:16
25:8 32:4,6,8
43:10,11 52:18
53:7 85:22 118:13
120:9 122:11
127:12 139:1
144:16 145:7,8,9
184:6,11 185:6,7
192:8 203:20

224:17 225:10
226:4 227:10
**recorded** 225:9
**records** 124:5
132:20 162:3
221:18
**recourse** 29:20
**red** 9:5 71:15
**refer** 25:20 94:22
112:15,17 137:7
210:15
**reference** 95:9
119:13 120:2
**references** 17:20
33:8 116:16,21
**referencing** 15:7,8
21:15
**referring** 22:4
210:5
**refers** 208:13
**reflect** 19:5
**reflected** 50:4 120:6
**refresh** 154:3 176:6
**refrigeration** 8:6
195:3
**refuse** 90:14
**refused** 161:20
170:22 171:2,22
172:3,5
**refusing** 170:15
172:8 185:10
**regard** 59:15,19
142:12
**regarding** 132:16
152:1
**regardless** 144:12
**regular** 10:20 11:11
204:17
**regularly** 10:12
**regulations** 67:14
166:15
**reinstate** 197:12
198:9
**reinstated** 61:7
130:1 133:9 166:1
194:16
**reinstatement**
179:7 196:12
**rejected** 42:14,21
43:1
**relate** 191:9
**related** 6:21 43:20
47:1 63:12 114:11
225:13
**relating** 14:12
113:1

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 241

**relation** 189:14
217:17
**relationship** 82:6
188:7,15,17
191:12 192:1,12
218:9
**relax** 112:11
**release** 170:20,20
171:5
**relevant** 57:13
128:1 167:14
**relies** 53:14
**relying** 192:11
**remained** 137:21
**remaining** 45:10
110:10
**remember** 9:6 23:6
24:22 26:21,22
30:17 34:2 43:22
44:13 55:9,16,21
74:15 77:5,13
78:18 83:14,16
88:13 89:4,5,6,7,8
89:8 92:20 95:20
100:21 111:18,22
113:8,15,19 115:6
116:2,22 117:9
118:1,3,20,22
156:10,11 159:22
164:7 169:20
170:2 197:9 200:6
205:1
**remove** 161:19
**removed** 90:8
**rep** 27:5 28:2 61:18
61:19 62:1,6,7
63:7 76:22 82:14
82:16 93:3 100:2
100:20 102:21
106:5 116:3,8
118:5 130:16
131:1 138:15
140:10,14 141:3
146:21
**repairman** 90:22
**repeat** 114:13
**rephrase** 7:4 53:8
164:11
**replied** 86:8 153:1
**report** 47:5 92:8,10
95:8 97:2 101:20
102:13 107:4,21
114:17,18,22
117:17 118:19
136:9,10 137:18
137:22 138:11,13

138:21 139:3,6
142:3 150:21
151:3 154:18
174:10,14 175:15
175:16,20,22
176:11,12,13,14
176:15,16,18
178:7 222:4
**reported** 63:5,6
66:6 77:20 95:7
95:13 115:3,10
122:13 137:15
138:14,19 140:17
150:22 176:11
189:21 203:13
206:2
**reporting** 94:10
95:8 102:9 117:3
139:1 142:21
144:18 190:1
**reports** 114:7
115:19 176:7
206:16 218:5,6,8
**represent** 6:10
**representative** 10:1
100:11 193:22
**representatives**
31:3
**represented** 115:12
**representing**
226:13
**reps** 145:21
**request** 19:8,11
22:15 24:2,14
44:5,21
**requested** 18:8 22:3
22:7 23:8 36:9
**requesting** 22:18,22
**requests** 44:3
**require** 197:19
227:7
**required** 166:1
198:9
**requirements**
142:21
**rescinded** 68:11,21
69:3
**resolve** 215:1
**resolved** 55:14 56:3
120:3 128:19
**respect** 210:19
216:3
**respond** 213:9
**response** 110:15
142:3 153:16
182:8

**responsible** 75:2,4
**rest** 112:11
**result** 16:15 36:6,8
114:6 170:13
200:15 206:6
215:2
**results** 183:4
**retaliate** 171:6
209:10 215:8
**retaliated** 163:9
170:14 172:8
185:10 209:6,8
211:1
**retaliating** 118:13
**retaliation** 118:6
163:11,12 171:8
180:4 207:14
215:2
**retirement** 179:2,4
206:11,12,17,17
**retroactively** 44:21
**retrospect** 28:4
93:19
**return** 138:1,12
196:20
**returned** 15:16
76:17 99:16,17,18
100:7 101:16
129:6 138:16
**returning** 139:2
**review** 165:11
**reviewed** 207:3
**ridiculous** 43:17
101:11
**right** 8:11 10:13
23:16 43:11 45:20
47:13 49:17 53:8
59:2 61:5 71:9
77:6,16 83:16
87:16 91:22 92:9
96:11 100:22
109:13 110:5
117:20 119:19
122:15 123:11
124:1 127:4
131:14 134:2,4
135:19,21,22
137:7 138:2
141:13 146:15
148:15,21 149:20
151:8 160:13
163:7 170:5
172:13,20 173:16
185:15,22 191:3
195:10 196:18
197:4 198:7,12,17

206:14 207:3,13
208:14 211:9,20
217:22 218:3
219:17 220:22
222:3
**rights** 58:15,16
170:17,20,21
171:12 172:10,12
180:6 185:12
197:11
**right-hand** 105:21
**ring** 94:13
**Robert** 38:20
209:20
**Robertini** 103:17
**Rodriguez** 1:20
225:2,20
**Rogers** 81:3
**room** 73:13 74:18
89:9
**roster** 148:15
**Roughly** 55:21
**RP** 95:7
**rude** 212:11,16,17
**Ruhcowski** 33:13
**rule** 12:14 86:6
135:20
**rules** 15:20 67:14
166:15 227:7
**ruling** 204:1,2
**run** 146:17

———————
**S**
———————
**S** 2:1 6:1
**safety** 10:1,3,3,6
47:4 70:16,16
71:15 88:16 91:3
136:3 159:13
176:7,11,12,14,15
176:16,18 177:10
178:1,2,4 181:9
182:4 213:10
214:18 216:20
217:4 224:10,12
**sat** 130:17 205:15
221:1
**Saturday** 123:18
**saw** 64:6,13 71:4
110:14,16,20
113:15 177:7
221:17
**saying** 20:10 21:7
21:21 23:13 24:19
37:13,14,15 39:16
40:3 46:17 48:18
53:5 76:9 127:6

147:13 151:10
171:22 181:21
182:20 193:7
205:20 210:13
211:5 215:4 219:2
219:15 223:12
**says** 19:10 22:3,7
24:14 25:15 33:8
46:6 48:1,3,7
49:15 74:17 86:5
86:12 92:10,13
93:9 94:10 95:13
106:11 107:8,11
135:19 164:13
172:5 174:3 194:4
205:21 208:16,20
211:13 215:10,21
219:11 220:3,3
222:11
**scenes** 133:5
**schedule** 207:4
**school** 8:1,2,3,4,8
**schooling** 8:1
**scope** 90:21
**scrutiny** 146:8
**seal** 225:15
**second** 14:2,6 21:11
25:19,20,21 45:14
47:1 49:2 56:1
57:12,16 62:22
74:9 84:10 92:9
93:7 120:9 133:19
133:21 142:12
150:11 184:4,7
208:13 215:14
216:18 217:1
224:18
**seconds** 185:2
**section** 47:10
**sections** 46:7 47:4
**see** 9:7 12:17 16:8
18:12 20:8,13
22:13,18 23:4,15
31:14 39:19 45:15
58:15,17 77:14
92:11,12,15,16
93:4 94:11 95:1
105:21 106:11,13
112:20 113:3,6,8
113:14 114:4
116:19 121:6
125:2 126:14,21
127:22 133:18
136:22 149:11
157:2 160:3
185:15 187:10

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 242

203:2,5 205:4
209:2 213:13,21
218:21
**seeing** 30:18 98:2
113:4
**seen** 14:9 15:5
17:18 25:6 28:18
28:20,22 29:5
30:16 33:4 34:10
37:4 40:19 52:16
67:11 74:12,14
75:7 78:4 85:20
105:4 107:5 125:7
127:18 129:14
164:5 185:3 186:8
203:6,7 208:3
**sees** 160:4
**select** 38:9
**self-explanatory**
139:13 178:22
**send** 138:2 141:13
178:20
**senior** 34:22
**sense** 13:5 166:5
**sent** 27:12 58:11,12
59:2 64:6 128:20
128:20 150:7
153:21 170:19
186:13
**sentence** 52:6 88:6
142:12 166:5
174:4 185:9 186:2
186:3 215:13
**separate** 118:15
159:20,21 226:7
**September** 196:11
**series** 73:15
**seriously** 138:4
**serve** 27:1
**served** 26:22 66:2
175:12
**service** 64:7 159:12
**Services** 196:5
**serving** 155:1
**set** 6:21 30:21 97:10
191:1 225:5
**sets** 118:15
**settle** 170:15 171:14
171:22 172:1,3,8
185:11
**settled** 55:15,16
171:19,22 186:16
186:17
**settlement** 55:17
56:5 186:9,21
187:1 197:20,22

**settling** 171:11
**seven** 9:14 223:22
224:1,2
**sexuality** 79:22
80:2
**Shawloose** 80:7,9
80:22
**sheet** 22:10,18
226:7 227:6
**shift** 38:8 39:17
96:19,21 119:7
121:5 183:11,17
211:5,11,18
213:11 215:4
217:5
**shifted** 181:17
**shock** 89:2 109:4
**shoulder** 71:3
**shouting** 38:2
**show** 13:19 17:13
25:1 28:9 30:4
32:21 34:5 36:22
40:14 52:11 85:15
92:2 104:20
106:20 116:11
127:12 129:7
185:1 195:14
199:19
**showed** 92:18,21
**showing** 19:20
123:13
**shown** 51:3
**shows** 124:5
**sick** 10:9 29:14
32:15 119:3 122:8
**side** 11:12,14,16
12:21 13:3 92:9
131:5 217:11
218:14
**sidetracking** 62:22
**sign** 22:9 28:2,5
121:12 170:22
172:4 186:12
187:2 197:11
**signature** 24:19
25:22 57:22 74:1
84:14 105:6
121:15 149:20
224:19
**signed** 18:15 21:11
22:18,22 23:14
32:7 38:9 119:5
121:3 123:14
149:19 150:4,8
171:12 187:1
**signing** 171:5

**similar** 30:13 72:12
169:2
**similarly** 150:13,15
151:6 153:14
161:22 162:9,12
162:15 168:22
**simple** 136:9 137:10
**simpler** 57:17
**single** 31:20
**singling** 31:7,8
**sinuses** 111:17
**sit** 146:15 177:16
182:13
**site** 75:18
**sitting** 70:15 73:4
96:12 133:8
221:20
**situated** 150:13,15
151:6 153:15
**situation** 18:3 27:4
35:12 63:5 65:16
69:3 75:14 78:2
100:8 108:5 109:2
109:10,18 124:14
145:3,20 146:12
157:21 160:3
167:6 172:19
194:11,12 217:19
**situations** 18:8
60:12 125:11
174:22
**six** 26:12 41:9 53:13
56:15 142:19
143:1,3,9
**six-month** 26:15
52:9
**skills** 202:12
**slanderous** 143:6
**slim** 73:3
**slips** 123:12 146:6
**smacked** 71:8
**Smart** 10:3
**smiled** 153:3
**smooth** 75:15
**Snyder** 6:12,20
13:17 14:13,17
17:11 56:2 57:2,2
61:21 63:6 64:22
65:14 70:14,17
71:2 72:15 75:7
75:11,17 76:6
77:8,11 78:10
79:20 80:12 81:4
81:19 82:2,9
83:18 86:5,9
88:15 90:6 93:10

93:15,22 94:1,3,4
98:19 110:7 113:2
118:7,9 130:22
157:22 160:4
165:21 172:19
173:1 176:19,21
187:4,10 188:2
190:15 191:5,13
194:11 202:20
207:8
**Snyder's** 80:11
134:8,11
**solely** 187:4 215:10
**solid** 99:4
**solidify** 17:8
**somebody** 18:16
51:13 53:12 99:5
102:18 140:21
181:7
**someone's** 69:6
**Somewhat** 6:22
37:8 51:9
**son** 44:2 178:14,19
**sore** 97:19 98:1,4,7
98:8,10 106:11,18
109:7 140:6
**sorry** 8:7 25:16
48:4 49:19 62:21
68:15 80:8 81:15
85:11 99:5 115:7
119:22 168:2
185:18 216:22
**sounds** 81:19 82:22
**so-called** 36:12
65:21 84:20
104:17 163:13
189:18 198:10
**speak** 41:18 100:12
106:6,8 126:1
132:14 140:15
148:14 191:20
**speaking** 37:11,21
66:7 93:19 97:8
119:15 216:9
**speaks** 93:20 202:4
**specific** 41:16 54:18
60:18,20 72:10
112:22 118:11
188:18
**specifically** 24:14
46:7 47:4,10
158:22 189:15
201:6 219:6
**specification** 49:8
49:15
**specifications** 46:10

49:6
**spell** 80:10
**spirit** 20:12
**spoke** 39:2,2 62:8
91:17 136:6
151:15 180:6,19
**Springdale** 2:6
**Stacey** 85:8
**stack** 128:9
**staff** 200:20
**stage** 129:2
**stamped** 58:13
**stand** 75:20
**standard** 47:9
**standards** 20:13
46:7 47:3 117:16
**standing** 73:4,6
213:8
**stands** 95:11
**staples** 72:4,13
**start** 7:22 9:11
52:10 142:12
**started** 9:7,9,12
38:1,17 54:9 76:9
98:2 198:15,17
214:6
**starting** 8:20
179:15
**starts** 32:16 53:16
54:2
**state** 22:10 50:18
69:20 89:2
**stated** 138:14
167:15
**statement** 20:20
23:7 66:10 73:21
74:7,9,12,14 75:8
75:10 78:7 79:17
82:15 84:11 85:2
85:4,8 86:2 93:8
105:10 111:20
112:1 123:13
134:8,18 135:9
143:6,13 172:13
180:11,14,22
186:5 187:18
211:3,4,8,10
218:16 219:19
**statements** 39:22
40:1,9 73:15 75:7
104:14,16 133:16
138:5 215:4
**States** 1:1 165:10
**stating** 19:17 22:11
119:6 121:4
124:17 137:6

Jerry K. Chambliss                          vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                                        Wednesday, May 24, 2006

Page 243

172:2 186:13
216:19 222:7
station 10:2,7 34:20
35:15,19,21 36:8
36:16
stay 76:12,22 103:7
103:9
stem 118:16
stemmed 189:18
stemming 189:7
stenographic 227:9
stenographically
225:9
step 128:15,17
steps 114:16 115:1
173:14,15,18
175:7
Steve 78:21 79:4,14
79:15 103:10,12
148:5 158:13
163:16 178:5
Steven 6:12 190:15
stick 193:15
stipulation 186:20
stood 70:18
stop 136:13 157:9
213:13,21
stoppage 108:21
story 217:11
straight 11:17
strategic 132:13
street 51:19,20,21
175:8,9,10
stress 88:12 97:6,9
97:12 99:22 100:4
100:5 113:1
138:19,20 139:9
139:12 140:1,5
145:18,19 179:14
179:17,19 180:1
189:4 206:8
stressed 100:9
stresses 179:20
Strike 207:6
striking 189:2
struck 136:4 137:11
189:1
stuff 49:21 109:7
163:6
subject 13:4 140:16
subjected 193:12
submit 122:19
149:16
submitted 149:17
subpoena 132:1,2
subsequent 36:17

subsequently 27:19
97:15 186:11
such-and-such
181:2
suffered 110:15
177:12
suffering 111:11
suing 189:10
Suite 2:14
summary 40:21
188:8
Sunday 123:20
superintendent
70:22 93:12 95:10
136:7 216:18
supervise 202:22
supervision 49:11
supervisor 10:2,7
18:4,17 35:8
46:13 47:5 65:20
70:21 75:3 101:18
101:19 103:13
108:11,14,15
110:5,8,10 119:6
121:4,16 124:14
141:7 203:17
208:22 210:20
216:4 218:4
222:17
supervisors 61:13
supervisor's 215:3
support 144:4,7
168:5 200:18
supposed 67:15
99:5 100:12
102:15 108:13,14
126:20 173:14
sure 11:19 19:3
28:22 29:22 49:22
50:11 54:19 59:19
60:19 64:6 74:16
76:7 84:12 97:20
117:19 120:9
123:4 141:20
150:10 160:10,15
160:21 172:16
183:14 190:12
192:8,14 203:20
208:18 216:13
surgeries 27:6
surgery 27:19,20
28:6 41:12 43:14
44:1,2,8 67:7
surprise 160:22
surprised 99:6
surrounding

160:11
suspended 52:6
suspension 26:11
26:16,22 27:1
41:8 51:22 65:22
66:2 175:12
sustained 46:1,12
49:10 118:18
122:10 170:14
189:2,19
swear 125:4
switch 11:15
sworn 6:6 225:6
system 52:19

_____
                   T
table 70:15,18
133:8 187:20
197:10
take 7:16,18 9:18
10:9 12:14 16:20
20:17 28:4 43:18
50:7 68:19 69:4
72:15 77:19 99:15
106:4,5 109:22
120:14 123:3
127:22 128:15
134:12,13 138:8
141:19 145:14
173:18 174:8
176:1 178:11
taken 1:15 44:16
52:9 70:9 90:12
110:1 120:4 184:8
186:11,12 225:3
talk 61:20 62:15
76:4 89:12 93:22
100:8,14,18,20
101:22 106:4
107:14 108:6
114:1 120:14
159:19 169:7
182:13 194:5
talked 42:5 54:11
89:13 93:1,2,15
93:20,22 94:7,16
96:15,17 117:20
132:16 139:17
157:19 163:4,20
167:1,13 168:14
168:16 170:10
193:10 194:6
204:11 208:20
212:19 216:11
217:13 221:1,9
222:11,14,15

talking 28:21 30:2
38:2,18 43:3
51:11 62:4 70:19
71:19 77:4 83:9
83:10,15 198:18
202:16 208:7
220:6 223:2
talks 116:18
tall 98:20
tape 72:2 100:5
139:7
taped 72:1
tapes 145:8
targeting 224:6
tech 11:7
technician 11:13,18
Technology 8:5
telephone 132:20
tell 7:22 9:22 12:7
14:14 20:11 46:9
55:1,7 56:21
60:17 63:16 66:22
67:20 70:11,13
72:15 94:6 96:11
96:12,14 98:4
102:11 110:14
131:5 134:15,16
137:2 140:12,21
141:7 152:20
153:4 154:14
161:11,17 163:11
177:14 178:13,19
180:8 182:20,20
183:1 184:2
191:11 214:8
221:4
telling 66:13 95:14
95:21 146:14
204:3
tells 99:6
temporary 10:2,4,7
ten 51:20 96:7,9
224:1
term 101:13
terminate 127:7
173:19 174:6
189:18
terminated 61:4
65:16,21 68:21
91:18 113:5,6
128:10 150:11,13
151:11,13,16,19
153:11 158:11,13
160:8,8 166:14,18
166:19 173:1,6,9
174:4,11,15

175:11,13,15,17
181:12 190:18,20
194:15 203:21
206:12,19
terminating 172:22
173:1 174:5
termination 51:20
160:11 179:6
180:5 206:13
terms 55:17 198:19
198:20
Terrific 184:16
TESST 8:4,11
testified 6:6 79:5
102:8,10 186:17
195:7 200:9
testify 78:6 131:8
131:10
testimony 33:20,22
37:17,19,21
118:17 144:21
146:4 174:8 177:9
188:10 226:4
thank 21:5 33:14
110:19 131:3
149:8
theirself 40:8
therapist 110:20
111:1
therapy 111:3
thereof 227:5
thicker 72:1
thing 7:17 8:22
17:4,7 19:17,18
19:22 32:6 36:20
42:11 46:1 60:13
60:13 64:9 65:17
67:3,15 86:17
110:3 125:15
145:12 152:5
157:2 178:8,12
211:7 214:2 219:4
things 37:12 40:10
45:11 66:17 75:15
76:10,10 78:11
82:13,17 87:20
96:14 130:11
132:16 157:14
161:4,6 162:19,21
163:3 167:7,17
173:5 178:8,14,17
178:21 179:21
181:17 189:5
191:19 204:12
think 16:1 20:16
28:21 29:21 32:2

Case 1:05-cv-02490-CKK    Document 27-5    Filed 09/14/2006    Page 76 of 79

Jerry K. Chambliss                          vs.          National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                             Wednesday, May 24, 2006

Page 244

36:7 44:1,2 55:6
55:22 56:10 58:8
60:8 63:21 69:10
77:5,5,15,15
80:16,20 87:17
91:22 96:10 99:16
102:9 113:12
116:7 124:15
125:4,7 127:20
129:21 130:4
149:1 151:7,11
154:4 160:16
161:1 162:18
163:7 170:6 195:7
197:21 199:17
201:13 219:1
**thinking** 86:21
153:18 154:6
**third** 1:19 75:6
94:22 95:3 106:10
133:22 185:9
186:2 211:9
215:21 218:21
**thought** 37:14
77:19 139:13
197:5 201:20
214:21
**threatened** 38:21
38:22 158:5 182:5
**threatening** 65:6
79:16 158:6
**three** 11:9 15:21,21
26:11,15 30:3
41:8 44:18 47:8
48:6,12 53:13
65:8,18 67:4
134:8,14,17,20,22
134:22 162:3
173:11,14,17,18
224:3,3
**three-day** 26:22
27:1
**three-page** 207:20
**threw** 62:5 71:2,8
71:13,14 73:4,8,9
84:18 85:2 88:15
102:13 104:10
107:15 135:14
187:16,18
**throw** 73:7 86:6
**throwing** 137:9
177:10
**thrown** 100:18
101:10 106:3
137:11 190:4,22
**tilted** 88:20

**time** 7:3,15 9:21
10:11 15:8,10,14
15:15,17,18 16:21
18:1,19,20,21
19:8,22 20:9,17
22:3,7,11,14 23:1
23:8 24:2,3,9
26:14,19 27:9,15
29:16 30:20 31:5
31:7,21 35:10
37:18 38:13 43:2
43:13,15,18,21
44:9,15 46:14
49:12 51:5 53:18
53:18,20 55:10
59:13 68:18 69:6
69:8 70:1,2 71:11
76:5 86:16 87:4
87:11 88:11 90:2
92:10 93:16,21
95:16 96:6 102:14
102:18 103:12
104:9,13 109:16
109:18 113:12
117:6,13,17 119:8
119:21 120:14
121:17 123:16
124:11 126:22
127:9,11 128:8
131:21 133:3,7
137:16 138:8
139:15 141:22
143:11,20 144:11
146:1,20 147:16
148:17,19 152:6
153:10,18 154:7
154:18 156:8
161:3 163:13
170:5 171:15,19
172:3,5,14 173:19
176:1 179:3,6
180:15 183:9,12
186:8 193:22
198:8 199:6
200:10 202:11,21
204:11,11,18,20
205:15 206:18,18
211:8,17 215:16
223:21 225:5
**timeline** 113:20
**timely** 117:4
**times** 15:21 53:13
61:11 113:10,14
113:15 114:2
124:3,6
**tired** 39:16

**Title** 163:11
**today** 7:10,13 11:5
11:7 33:9 167:7
**Todd** 180:19
221:12
**toilets** 91:2
**told** 15:13 18:7 20:4
21:22 27:21 28:2
31:2 35:16 38:21
39:4 42:12 45:2
58:9 59:7 62:16
64:10,21 66:1
68:1 75:14 76:21
77:2,7,9 78:3 81:8
81:15 84:16 85:1
89:11,19 90:2
91:7,19 97:10
98:2,18 100:7,9
100:10,19 101:11
101:14,16,19
102:1,12,18,20,22
103:5,6 104:9,12
112:10 113:21
115:15 124:12
126:11 130:11
139:22 140:4,7,18
143:22 145:6,8,14
145:17,20 152:9
156:1,2 193:14,16
193:17 199:4,6
203:3 204:18
211:2 212:17,22
213:11 214:13
217:11
**tolerance** 158:9
**tolerate** 212:12
**Tom** 33:13 121:16
124:12
**tool** 144:13,14
**tools** 203:14,15
**top** 41:8 42:7 58:17
64:20 67:3 94:9
148:21 215:19
**tossed** 135:13,17,20
**totally** 17:5 64:15
**touch** 204:9
**touched** 98:5
**tour** 137:18
**town** 23:12
**train** 74:21,21 75:5
89:13 91:11 155:1
159:11 161:19
213:5
**trained** 10:9 54:4,7
155:11,18
**trainer** 10:3

**training** 195:3
**trains** 91:2
**transcript** 225:9
226:3,8 227:7
**transpired** 37:10
181:2
**treat** 177:6 180:20
**treated** 57:6 61:13
63:14 67:6,19
154:19 160:6
169:12,15,22
170:4 222:4
**treating** 183:19
185:12
**treatment** 63:4
65:20 112:8
166:11 167:2
200:15
**trial** 125:22 126:12
**trick** 192:7
**tried** 40:8 104:10
114:1 124:5 131:8
194:12 214:7
**trouble** 20:1
**true** 136:7 174:9
222:12 225:10
226:4
**truth** 15:13 20:12
45:16,21 46:1,8,9
47:11 151:13,16
151:20,21
**truthfully** 7:13
**try** 7:4 17:8 75:13
75:15 88:3 114:17
114:17 124:4
125:10 145:7
193:19 206:22
215:1,6 222:4
**trying** 13:5 44:18
44:19 71:6,6,7
73:14 101:12,20
102:13 113:20
125:21 128:9
136:17 145:7
156:16 160:18
161:1 163:5
173:18 178:7
183:22 184:1
191:20 192:7
**turn** 21:20 46:16
58:9 62:13 63:10
140:16 216:10
217:8
**turned** 35:7,9 71:4
217:7
**turning** 115:12

**two** 8:4 16:1,2
18:13 19:7 23:7
36:15 54:1 55:5,6
55:7 65:21 113:9
118:15 135:5,6
155:5 161:7
173:12 185:2
189:17 195:2
197:13 219:10
224:3
**two-day** 66:2
**two-thirds** 93:9
95:2
**type** 8:22 18:8
19:18 51:12 108:4
109:2,17 134:19
138:20 146:12
149:12 178:12
**typed** 149:14 150:1
**typed-in** 149:11
**typeface** 221:22
**types** 11:9
**typical** 213:22
214:2
**Tyrique** 79:8
168:17
**Tysons** 2:13
**T-Y-R-E** 79:9

**U**

**Uh-huh** 81:13
182:21 198:21
**ultimately** 61:7
150:3
**Um-hum** 47:18
87:7 114:19
117:22 158:20
183:20 187:12
188:19 189:3
207:16
**unbecoming** 65:20
**uncomfortable**
75:19
**underhand** 73:7
**underlying** 153:5
190:3 201:6 213:3
**understand** 7:3,7
14:15,16 24:11
47:14 52:3 53:5,9
59:4 86:9 108:2,4
129:16,17 141:1
142:8,16 144:21
160:15,19 164:11
183:11 190:13
193:7 201:20
219:21 220:4,16

Jerry K. Chambliss                              vs.                    National Railroad Passenger Corporation
Deposition of JERRY CHAMBLISS                                          Wednesday, May 24, 2006

Page 245

| | | | | |
|---|---|---|---|---|
| 221:14 223:12 | 206:18 | 76:16 134:14 | 42:17 44:6 67:16 | 135:16 140:6,16 |
| 224:15,15 | **vague** 87:12 | 211:7 | 80:19 83:9 88:4 | 152:6 155:11 |
| **understanding** 7:9 | **vaguely** 89:4 | **walked** 82:18,19 | 100:10 134:10 | 157:5,6,7 159:3 |
| 31:6,10 124:22 | **vandalism** 181:19 | 213:6 | 139:2 140:18,19 | 171:4 175:21 |
| 143:5 221:16 | **vehicle** 157:7 | **walking** 27:13 | 141:20 143:19 | 176:8,17 178:8 |
| **understood** 49:22 | **ventilation** 194:22 | 76:17 | 146:2,11 167:7 | 179:20 184:11 |
| 202:7 | **verbal** 13:15 32:9 | **want** 7:16 14:19,20 | 176:11 177:5 | 195:2 198:17 |
| **undivided** 215:12 | 51:17 54:2 60:12 | 17:13 19:1 22:5 | 178:10 186:12 | 204:21 205:16 |
| **unexcused** 29:14 | **verbally** 63:17 | 23:17 24:11 25:1 | 194:13 197:8,9 | 215:1 |
| 32:16 | 209:11 210:14 | 27:3,16 28:9 30:4 | 198:8 204:17 | **weren't** 31:16 54:7 |
| **unfair** 129:20,21 | 211:22 213:10 | 31:1 32:21 36:13 | 211:21 212:12 | 68:20 107:15 |
| 130:4 | 214:11 | 36:22 40:14 41:19 | 214:7,8,13 219:19 | 123:13 130:12 |
| **unfamiliar** 142:20 | **verbiage** 134:7 | 41:20 45:5 49:4 | 220:11 | 145:2 147:5,11 |
| **union** 12:13,13 16:5 | 186:9 | 50:7,17,18,18 | **watch** 75:19,20 | 148:8,8 162:10 |
| 18:9,10 27:5 28:2 | **Verification** 94:9 | 52:11 57:12 59:6 | 197:12 | 178:10 212:22 |
| 31:2 54:5 60:1,4,5 | **verify** 128:1 166:22 | 59:7,10,19 65:11 | **way** 24:22 29:15 | 215:16 224:11 |
| 60:6,7,10,11,15 | **version** 24:12 | 66:12 75:16 76:5 | 31:18 50:19 61:13 | **we'll** 104:21 106:20 |
| 61:9,12,18,19 | **Victor** 94:11 | 84:17,17 85:15 | 63:14 64:14,15 | 108:7 123:3 210:2 |
| 62:1,6,7,14 63:6 | **view** 136:2,3 142:18 | 101:17 104:12 | 66:17 67:18 72:10 | **we're** 42:17 44:9 |
| 66:15,18 76:22 | 144:9,10 | 106:6 110:3 117:7 | 86:4 88:9 93:9 | 69:7 147:17 155:4 |
| 82:14,16 93:3 | **VII** 163:11 | 118:12 121:6 | 95:2 106:10 124:2 | 183:13 |
| 100:2,11,20 | **violate** 166:18 | 125:12 126:12 | 134:12,13 154:19 | **we've** 163:6 167:1 |
| 102:20 106:5 | **violated** 144:17 | 127:17,22 128:1 | 155:6 160:6 163:5 | 168:13 172:17 |
| 116:3,8 118:5 | **violating** 166:14 | 136:13,15,17 | 169:11,14,21 | 173:21 |
| 125:9 126:10,11 | **violation** 47:3,9 | 149:10 160:15,21 | 170:3 174:17 | **whereabouts** |
| 127:10,20 128:1 | 68:22 69:2 116:18 | 164:14 166:22,22 | 175:6 177:7 | 122:18 |
| 128:17,20 130:15 | 117:15 163:10 | 168:4 172:16 | 183:18 186:19 | **whistle** 213:12,14 |
| 131:1,4,22 132:1 | **Violations** 46:6 | 174:1 178:21 | 187:18 191:17 | 213:15 214:4 |
| 132:3,3,5,15 | **violence** 172:22 | 184:22 190:12 | 208:21 222:2,16 | **whistled** 213:6,19 |
| 138:15 140:10,14 | **violent** 86:7 | 192:7,14,16 207:5 | 225:13 | **Whistling** 214:2 |
| 141:3 145:21 | **Virginia** 2:15 | 209:13 220:2 | **Wayne** 36:2 | **white** 34:20 35:1 |
| 146:21 156:5,7,13 | **vs** 1:6 227:3 | **wanted** 23:12 25:18 | **ways** 61:4 | 39:6,8,10,12 |
| 156:19,22 157:3 | **Vullo** 21:13,16 | 27:2 31:17,19 | **wearing** 159:12 | 42:18 62:17,18,20 |
| 165:22 192:2,10 | 23:11 38:10 70:19 | 39:5 40:11 41:13 | **Wednesday** 1:16 | 64:4,5,8,16 66:7,7 |
| 192:19 193:21,22 | 70:20 71:11 74:10 | 49:22 51:13,16 | **week** 82:3 99:9,11 | 66:9 67:11 72:16 |
| 198:18 199:6 | 74:17 89:13 | 65:12 86:22 95:19 | 103:13 110:8 | 77:17,18 78:22 |
| 204:2,9 | 216:17 217:16 | 104:14 125:9 | 113:10,12 115:18 | 79:18,19 80:22 |
| **unions** 132:4 | 218:6,10,13 | 130:7 184:19,19 | 115:20 | 81:10 83:8,9,17 |
| **union's** 157:2 | **Vullo's** 217:17 | 203:19 207:17 | **weeks** 44:18 | 83:21 90:11 |
| **United** 1:1 165:10 | 218:17 | 213:13,21 | **weigh** 98:22 99:2 | 100:21 102:3 |
| **unpersuasive** | | **wanting** 170:20 | **weight** 72:22 99:6 | 121:18,20 123:12 |
| 144:20 145:1 | **W** | **wants** 63:20 178:19 | 137:12 | 124:21 134:11 |
| **unrelated** 38:1 | **W** 36:1 | **warned** 181:10 | **well-established** | 135:6 143:17 |
| **Un-hum** 205:5 | **wait** 93:4 185:2 | **warning** 51:17,18 | 144:18 | 147:10,18 150:14 |
| **upset** 86:16,20 87:6 | **waited** 214:11 | 54:2 | **went** 8:3 10:9 11:17 | 150:15 151:18 |
| 87:21 88:12 90:1 | 217:12 | **warnings** 13:15 | 13:12 24:8 27:21 | 153:14 155:2,5,7 |
| 93:10 109:4,19 | **waiting** 70:17 90:3 | **wash** 97:17,18 98:6 | 28:3 32:2 35:19 | 155:13,14 157:1 |
| **upsetting** 216:9 | 198:22 | 109:6 | 36:8 61:20 62:14 | 158:4 159:13 |
| **upstairs** 64:6 89:17 | **waive** 172:11 | **Washington** 1:19 | 63:7 71:3 89:10 | 162:8,9,11 166:17 |
| 89:20 116:3,4,7,7 | **waived** 170:16 | 3:7 58:9,10,12 | 89:11,12,20 97:1 | 167:19 168:22 |
| 152:6 | 172:9 185:12 | 59:3 69:10 78:13 | 97:17,18,19 98:6 | 169:5,7,21 170:2 |
| **use** 201:7,21 | 224:19 | 85:4 151:15 | 98:10 100:17 | 173:3 174:6,9,13 |
| | **waiver** 26:10,11 | 161:13 168:17 | 101:18 103:5 | 175:3,15 181:5,15 |
| **V** | 32:6 | **wasn't** 13:3 15:19 | 109:5,6 113:12 | 185:12 213:5 |
| **vacation** 22:11 | **wake** 109:14 | 16:1 17:2 22:1 | 114:4 125:22 | 214:20 215:3 |
| 44:17,18 179:3 | **walk** 27:11,13 | 32:10 34:14 37:13 | 129:2,3 130:15 | **who've** 175:2 |

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 246

wife 23:12 43:14,19
69:17 179:16
wife's 43:15
Wiggins 17:22 18:3
22:9,12
William 90:18
Wilson 34:19,22
35:1,7,14,17 36:1
36:2,4
wish 210:17 215:22
219:6,11
wit 225:1
within-named
225:4
witness 6:5 14:1
19:16 21:4,7
23:20 24:1 25:12
26:6 30:12 46:20
48:1,22 69:22
77:11 82:1 84:2
85:7 110:20
120:19 141:5
149:7 155:14
184:22 185:22
188:13 197:3
207:1 213:16
225:4,15 227:1
witnessed 77:8
witnesses 73:9
94:18 95:22
131:10,11
woke 97:16
women 83:5 135:6
wondering 20:15
180:1
word 134:10 135:12
177:14 201:7,21
201:22,22 202:17
words 45:5 53:8,10
63:18 84:17
work 7:20 10:5
27:10,13,18 35:17
35:18 36:14,15,16
39:16,18 42:17
44:16,19,20 45:5
51:14 89:15 91:1
96:18,19,21 97:2
97:9,14,15 99:7
99:11,17,18 103:7
108:21 112:10
116:2 119:7
123:19 127:5
129:6 137:21
139:2 148:18
156:2 157:20
161:20 162:5

163:16 169:5
172:9 179:1,21
194:16 196:9
199:4,7 203:2,3
203:10,11 204:21
215:6
worked 54:5 70:2
121:5,13 202:10
206:16
workers 12:17
54:19 166:3
170:12,15 180:15
185:11
working 8:10,13,14
8:15,17 34:21
35:2,21 64:4
76:14 103:4
107:19 155:10
178:15 206:11
213:5 214:14
workload 169:13
workplace 82:10
158:8 172:22
works 7:2 126:6,7
worry 38:17 103:6
worth 134:10
wouldn't 17:1,1
76:1 101:22
115:13 123:16
156:12 172:3
186:14 190:4
wound 36:16
wrist 55:12
write 43:16 60:10
106:18 171:10
183:17 218:15
227:6
writes 87:5 114:21
write-ups 32:8 40:3
163:12
writing 21:8 198:19
200:17
written 33:11 36:18
40:6 51:18 86:2
199:2 200:11
204:2,4,21 219:18
wrong 49:17,17
112:16 120:20
130:21 133:20
134:5 223:4
wrote 45:18 46:4
67:8 87:18 124:17
153:19 178:5
180:22 200:3,7
201:11,18 208:9
215:8 216:8,19

218:16 219:5
221:12,15
W-2 196:3

**X**

X 4:1

**Y**

yard 55:13
Yeah 9:16 41:7
47:3 50:9 58:17
73:22 103:5
114:14 121:7
136:22 148:4
152:3 157:21
198:10 204:20
209:22 222:15
224:5
year 6:16 8:4 11:2
25:11 53:22 65:19
173:11 179:1
180:2 197:8 199:8
years 9:14 30:3
43:3 55:8 69:16
69:18 153:6 161:7
170:2 173:12
186:8 195:2
197:13
yell 180:17
yelling 38:2,18
215:19
yesterday 127:7
y'all 62:10

**Z**

Zentner 38:21 39:4
39:6 180:19 208:8
209:9 217:18
218:1,5,8,10
220:8 221:12
222:2
zero 158:8

**$**

$10,406.45 195:18
$2 205:7,8,9,13,17
$50,000 180:2
$9,998.50 196:8

**0**

0315162 1:20
04.272 116:17
04.273 117:2
04.274 117:14
118:16
05 197:2,3

**1**

1 4:9 13:20,21
45:19 46:20 47:16
47:17 48:13,21,22
49:15 50:10 74:19
74:22 95:1 117:3
117:15,20
1/7/01 48:9
1:05CV02490 1:6
10 4:18 34:6,7
49:10 70:13 74:4
165:17
10th 17:11 45:22
46:12 50:13 99:8
113:1 114:11
139:20,22 140:1,4
202:20
10:15 1:17
104 5:7
106 5:8
11 4:19 37:1,2
165:22
11th 122:6,12 134:3
140:5,7
116 5:9
12 4:20 40:15,16
48:1,6 49:8 127:2
166:9 167:15
168:5
12th 122:6,12
126:21 127:1
140:18
12:45 74:4
127 5:10
129 5:11
13 4:9 5:2 52:12,13
150:12 170:7
208:11 209:12
211:15
13th 122:6,12 123:8
127:5 210:6,7
212:4,6 220:7
13,000 56:10
13:59 92:10
14 5:3 26:8 57:8,9
57:15,20 105:20
107:9 149:7
170:12
14th 104:17 114:9
114:22,22 115:20
122:6
14:07 92:14
14:34 92:14
15 4:10 5:4 73:16
73:17,20 84:10

15th 58:2,10 122:6
211:10
16 5:5 85:16,17
93:8 149:2 172:16
16th 119:5 120:8,20
122:7,13
164 5:12
165 5:13
17 4:11 5:6 92:3,4
176:19
17th 16:2 20:17
22:15 23:8 99:16
100:6,16,17
113:21 114:9,16
114:20 137:22
138:13,17 141:9
142:4
1750 2:13
18 5:7 104:21,22
119:9 120:21
177:12
18th 16:3
19 5:8 106:21,22
19th 16:3
195 5:14,15
1986 8:9,20
1989 9:9
199 5:16
1990 55:8
1991 55:9
1996 9:15 10:13
1999 11:19 12:2

**2**

2 4:10 15:1,2 21:4
73:1 118:14
122:12 133:22
165:17 180:4
205:20
2:00 136:9
20 5:9 69:16,18
116:12,13 118:14
170:2 196:19
20th 16:3 20:18
22:15 23:8
20,000 55:22
200 155:5
2000 11:19 53:3
20002 3:7
2001 208:11 209:12
210:7 211:15
2002 30:17,20
32:18 33:5,15
2003 25:12,15
26:18,20 28:21
30:2 153:9 190:10

Jerry K. Chambliss
Deposition of JERRY CHAMBLISS

vs.

National Railroad Passenger Corporation
Wednesday, May 24, 2006

Page 247

| | | |
|---|---|---|
| 199:17 200:7 | 22:4,6 24:13 | **85** 5:5 |
| **2004** 19:12 22:15 | 122:12 137:7 | **87** 9:8 |
| 45:21 46:12 48:13 | 187:3 205:6 | **88** 9:8 |
| 49:11 70:13 74:4 | **3rd** 19:12 | **89** 9:7 |
| 105:20 107:10 | **3:00** 224:20 | |
| 117:3,15 142:20 | **30** 4:15,16 44:17 | **9** |
| 143:2,3 150:12 | 190:15 | **9** 4:17 32:22 33:1 |
| 153:9,22 195:17 | **31** 190:14 191:5,11 | **906-2821** 3:9 |
| **2005** 48:13 56:13 | **32** 4:17 | **906-3185** 3:8 |
| 58:2 196:3,7,10 | **34** 4:18 | **92** 5:6 |
| 197:17,18 198:10 | **37** 4:19 | |
| 199:13,14 | | |
| **2006** 1:16 4:3 | **4** | |
| 146:17 196:19 | **4** 4:12 25:2,3 95:17 | |
| 197:16 225:16 | 180:4 185:17,18 | |
| 226:15 227:2 | 187:9 188:1 | |
| **202** 3:8,9 | **4.273** 118:16 | |
| **207** 5:17 | **40** 4:20 72:19 | |
| **21** 5:10 127:13,14 | **410** 2:8 | |
| 180:5 185:9,20,21 | **4105** 2:6 | |
| 185:22 186:2 | **448-1996** 2:8 | |
| 192:3 | **45** 72:19 | |
| **21st** 25:14,17 | | |
| 115:21 | **5** | |
| **210** 5:18 | **5** 4:13 28:10,11 | |
| **21207** 2:7 | 119:4 187:3 | |
| **2158** 74:18,21 | 192:22 | |
| **22** 5:11 129:8,9 | **5'8** 98:21 | |
| 134:1 193:11 | **5'9** 98:21 | |
| 196:15,16 | **52** 5:2 | |
| **22nd** 58:13 | **560** 2:14 | |
| **22102** 2:15 | **57** 5:3 | |
| **23** 5:12 164:1,2 | | |
| **24** 1:16 4:3 5:13 | **6** | |
| 165:4,5 205:3 | **6** 4:6,14 28:14,15 | |
| 227:2 | 29:2,6 188:1 | |
| **240** 73:1 | **6'2** 72:21 | |
| **245** 73:1 | **6'3** 72:21 | |
| **25** 4:12 5:14 48:13 | **6/1/04** 23:20 | |
| 195:11,15 | **6/14/2010** 225:22 | |
| **250** 99:1,2,4 | **6/28** 48:9 | |
| **26** 5:15 187:9 | **60** 1:18 3:6 | |
| 195:20,21 | | |
| **27** 5:16 199:20,21 | **7** | |
| **28** 4:13,14 5:17 | **7** 4:15 30:5,6 | |
| 25:15 207:21,22 | **7th** 17:21 | |
| 210:1,3 211:9,14 | **7:30** 86:17,18 | |
| 216:19 217:1 | **703** 2:16,17 | |
| **28th** 25:10,17 48:12 | **73** 5:4 | |
| 116:17 | **734-0554** 2:16 | |
| **29** 5:18 209:18 | **734-0876** 2:17 | |
| 210:8,9,16 212:14 | | |
| 223:3,4 | **8** | |
| | **8** 4:16 30:9,10,14 | |
| **3** | 32:12 120:22 | |
| **3** 4:11 17:14,15 | **8th** 48:16 104:3,4 | |