# 11   DEPOSITION TESTIMONY OF CHRISTPOHER BELLO

Page 1

```
 1    JERRY CHAMBLISS                      :   IN THE

 2              Plaintiff                  :   CIRCUIT COURT

 3    v.                                   :   FOR

      NATIONAL RAILROAD PASSENGER          :   BALTIMORE CITY

 4    CORP.                                :

 5              Defendants                 :   Case No.

 6                                         :   24-C-04-008216

 7    _____/
```

             The deposition of CHRISTOPHER BELLO

 8    was held on Tuesday, September 27, 2005, commencing at

      11:18 a.m., at the National Railroad Passenger

 9    Corporation, 900 Second Street, N.E., Washington, D.C.

10    20002, before Okeemah S. Henderson, LSR, Notary Public.

11    APPEARANCES:

12              JOHN HANNAWAY, ESQUIRE,

13                 On behalf of Plaintiff

14

15              ILANA SUBAR, ESQUIRE

16                 On behalf of Defendant

17                 National Railroad Passenger Corp.

18

19

20

21    REPORTED BY:      Okeemah S. Henderson, LSR

Christopher Bello - 9/27/05

Page 2

```
1              STIPULATION
2         It is stipulated and agreed by and between counsel
3   for the respective parties that the filing of this
4   deposition with the Clerk of Court be and the same are
5   hereby waived.
6              - - - - - - - -
7   Whereupon,
8         CHRISTOPHER BELLO,
9   called as a witness, having been first duly sworn to
10  tell the truth, the whole truth, and nothing but the
11  truth, was examined and testified as follows:
12  EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
13  BY MR. HANNAWAY:
14      Q.   Could you state your name, please,
15  sir?
16      A.   Christopher Bello.
17      Q.   What's your middle name, please?
18      A.   Michael.
19      Q.   Mr. Bello, have you ever been deposed
20  before, that's what's going on here, a deposition?
21      A.   If I have, its been quite a while.  I
```

Page 3

```
1   don't remember.
2       Q.   So you don't know?
3       A.   I don't know.
4       Q.   A deposition is just like testifying
5   in court.  This lady is a stenographer and she's sworn
6   to ask you -- she has the authority in the State of
7   Maryland to swear you in at a deposition.  I'll be
8   asking you a series of questions primarily about an
9   incident alleged to have occurred on May 10th of 2004
10  concerning Mr. Jerry Chambliss and Mr. Steven Snyder.
11         At a deposition, as you can see, this
12  lady takes everything down verbatim.  What that means is
13  we cannot nod our head yes or shake our head no or shrug
14  our shoulders meaning she can't
15  write those things down.  She'll be producing a
16  transcript of everything I say, you say or the attorney
17  for the National Railroad Passenger Corporation says.
18         If at any time you don't understand a
19  question, either because I mumble, you can't hear me,
20  because like some lawyers, infrequently I make
21  absolutely no sense, for any reason you don't understand
```

Page 4

```
1   a question say, could you, please, rephrase it or I
2   don't understand your question.  If you don't hear a
3   question, ask me to speak up.  I give you that preamble
4   because -- and also if you don't know the answer to a
5   question, it's perfectly fine to say I don't know  If
6   you're giving an estimate, dates, times, say it's an
7   estimate
8         If at any time after you've given an
9   answer, it's human nature, we'll all say something,
10  we'll go wait a minute, that's not what I meant to say.
11  I remember now.  Go back and change, just jump right in
12  if that pops up into your head, it happens to all of us
13  day to day.  I give you that preamble because if you
14  give an answer to a question, I'm going to assume that
15  you heard it, that you understood it and you have the
16  present ability to give an answer based upon person
17  knowledge.  Fair enough?
18      A.   Fair enough.
19      Q.   If at any time you need to take a
20  break, have any questions, just speak up.
21         What's your educational background?
```

Page 5

```
1       A.   I have, of course, completed high
2   school and about two years of community college.
3       Q.   Where did you go to high school?
4       A.   Northwestern senior high
5       Q.   In the district?
6       A.   That would be in Maryland, Prince
7   George's county, Maryland.
8       Q.   And you said two years community
9   college?
10      A.   Yes.
11      Q.   And which community college?
12      A.   Howard County Community College in
13  Columbia.
14      Q.   What did you study there?
15      A.   That was just general studies.
16      Q.   Did you go right from Northwestern to
17  community college?
18      A.   No, I did not.
19      Q.   When did you graduate high school?
20      A.   1979.
21      Q.   When did you attend community college?
```

2 (Pages 2 to 5)

Christopher Bello - 9/27/05

Page 6

1     A.   I guess I first started taking classes roughly '82, '83.

3     Q.   Did you go full time to community college?

5     A.   No. I only went to school at night.

6     Q.   Were you in the military service?

7     A.   No.

8     Q.   After high school, is that when your work history started; did you go to work right after high school?

11    A.   Yes.

12    Q.   Outline your work history for me from high school to the present?

14    A.   I started to work for the Washington Turmoil Company in 1979.

16    Q.   What's the Washington Turmoil Company?

17    A.   One of the railroad operating companies that preceded Amtrak

19    Q.   What did you do for them?

20    A.   I started actually as a coach cleaner and became car men apprentice and I was a journeyman car

Page 7

men. I became a foreman II, and a foreman III.

2     Q.   This is all with Washington Turmoil?

3     A.   Now, Amtrak.

4     Q.   Why don't we do with Washington Turmoil. How long did you work for them?

6     A.   Amtrak took over Washington Turmoil in 1984 or '85.

8     Q.   And while, prior to '84, '85, you worked for Washington Turmoil as a coach cleaner?

10    A.   No. I was on Washington Turmoil. When Amtrak took over, I was already a journeyman car repairman, then with Amtrak I became a foreman II and a foreman III and now I'm a general foreman

14    Q.   Were you a member of any unions while you worked for Washington Turmoil?

16    A.   Yes.

17    Q.   Which union was that?

18    A.   Brotherhood of Railway Carmen and ARASA.

20    Q.   Give me the initials, please?

21    A.   A-R-A-S-A.

Page 8

1     Q.   What does that stand for?

2     A.   American Railway and Airline Supervisory Association.

4     Q.   Are you presently a member of any union?

6     A.   Yes. I am the member of ARASA.

7     Q.   When did you become a member of ARASA?

8     A.   I became -- are you speaking specifically about ARASA?

10    Q.   Yes.

11    A.   Foreman job, I accepted a foreman's job in 1985, I believe it was.

13    Q.   Were you with Washington Turmoil then?

14    A.   '85 is when, actually, I think it was Amtrak when I accepted the foreman's job.

16    Q.   What is your present position?

17    A.   General foreman.

18    Q.   When did you become general foreman?

19    A.   2002.

20    Q.   What are the responsibilities of a general foreman?

Page 9

1     A.   Well, there are many. It all depends on your location, your departments. My particular, I am in the basically regulatory role, and I oversee the operations of high speed facility in Washington and I make sure that the NECMSC, the contractors comply with all of Amtrak's policies and procedures and FRA regulations.

8     Q.   And how long have you held that position with high speed rail?

10    A.   Three years

11    Q.   So you held that position in 2004?

12    A.   In 2004. Yes, I did.

13    Q.   When did you start at that position?

14    A.   My current position?

15    Q.   Yes.

16    A.   In 2002

17    Q.   What training did you receive with respect to becoming a general foreman?

19    A.   There is no classroom training involved, it's all on the job.

21    Q.   Any training with respect to policy

3 (Pages 6 to 9)

Christopher Bello - 9/27/05

Page 10

1 and procedures?
2     A.   Yes.
3     Q.   It's your responsibility to enforce, I
4 assume?
5     A.   Yes, sir.
6     Q.   And there's no training with respect
7 to that. How do you become aware of it?
8     A.   No. I -- yes, there are. There are
9 classes that we attend. Yes.
10     Q.   So you do receive training with
11 respect to your job as a general foreman and have
12 received such training?
13     A.   Yes.
14     Q.   And what areas does that training
15 cover?
16     A.   There's FDA, FRA, AAR. There's --
17     Q.   American Association of Railway?
18     A.   Right.
19     Q.   What's the other one you said, FDA?
20     A.   FDA. Right
21     Q.   Food and Drug Administration?

Page 11

1     A.   That's correct. There's a human
2 resources, there's an Amtrak's hiring policies and
3 practices, they have discrimination, there are many.
4     Q.   What does the human resources portion
5 of it entail?
6     A.   That's hiring practices and policies
7 and
8     Q.   Hiring? Anything else?
9     A.   I'm sure there are. I can't quote
10 them all at the moment
11     Q.   What about workplace violence? What
12 does that fall under?
13     A.   Workplace violence.
14     Q.   Which one does it fall under? Does it
15 fall under the AAR, the FRA or the FDA?
16     A.   I don't know how to categorize that.
17     Q.   Did you have any training or did you
18 provide any rules to be followed with respect to
19 workplace violence?
20     A.   Yes.
21     Q.   And what form did that take; did you

Page 12

1 receive a memo or did you have to attend classes?
2     A.   [There have|Therefore] been various
3 memos come out about it. I can't recall whether we did
4 an on-line course on that or not but we have had --
5     Q.   So you've had courses?
6     A.   -- workplace violence regarding that
7     Q.   Regarding?
8     A.   Workplace violence.
9     Q.   And you may or may not have had
10 courses?
11     A.   Yeah. Courses I don't really
12 understand what you mean by courses.
13     Q.   Courses where you go into a classroom
14 and sit down and take a course. I'll ask you this:
15 What do you think I mean by the term courses?
16     A.   I don't know how -- that's why I asked
17 the question. I don't know what you mean. That's why I
18 asked you
19     Q.   You don't understand the word course
20 or courses C-O-U-R-S-E?
21     A.   Yes, I do but as in an extended course

Page 13

1 as in a two-week class, it's nothing like that, that's
2 my point.
3     Q.   What is it is my question.
4     A.   They would have been just one day at
5 the most probably.
6     Q.   How many times have you gone to such
7 one day courses, classes, sessions, however you want to
8 categorize it with respect to workplace violence at your
9 employment at Amtrak?
10     A.   I cannot remember
11     Q.   More than one?
12     A.   Possibly.
13     Q.   Is it done on an annual basis?
14     A.   No.
15     Q.   And each of those that you did attend,
16 how long were they, you said a day. Is that 6 hours in
17 a day or 4 hours in a day?
18     A.   Really truly, I can't, I don't
19 remember how long the classes would be
20     Q.   When is the last time you had such a
21 class?

4 (Pages 10 to 13)

Christopher Bello - 9/27/05

Page 14

A.   I cannot recall the date.
Q.   How about the first time you had such
3   a class?
4   A.   I cannot recall the date.
5   Q.   You can't recall how many, how long,
6   where or when the first time or the last time?
7   A.   That's correct.
8   Q.   Does Amtrak place an emphasis on that
9   type of thing?
10  A.   Yes.
11  Q.   Your attendance is required?
12  A.   Yes.
13  Q.   Tell me what Amtrak's policy as you've
14  been instructed in the course of classes that you take
15  with respect to your responsibility when confronted with
16  a situation of workplace violence?
17  A.   We're given the resources.  If it's
18  something that we don't feel we're capable of handling
19  or needs to be elevated to another level, we're given
20  all the proper addresses, telephone numbers and
21  resources.

Page 15

1   Q.   Are you provided with any type of
2   booklets, anything like that?
3   A.   Yes.  As a matter of fact, on our log
4   in our office there is a workplace violence letter right
5   on the wall as soon as walk into our office.  So it has
6   reference numbers for you to call and who to contact.
7   Q.   Do they describe in any of their
8   material what workplace -- we're using that term
9   workplace violence.  What word Amtrak considers
10  workplace violence to be?
11  A.   Yes.
12  Q.   And what is it?
13  A.   I cannot quote you.
14  Q.   I'm not asking you to quote me.  What
15  I'm asking you, you said Amtrak does define in the
16  classes you've been to what a workplace violence is.
17  You're put in a position to deal with the situation of
18  workplace violence?
19  A.   Sure  When an employee threatens
20  another employee, when there is actual, if there was
21  actual violence, if an employee was to get into an

Page 16

1   altercation with another employee, so it's workplace
2   violence issues.
3   Q.   And the term altercation, how would you,
4   in your position, define what an altercation
5   is?
6   A.   An incident where, that could not be,
7   where the two individuals involved would not be able to
8   come to some sort of agreement, work it out amongst
9   themselves and a supervisor has to get involved.
10  Q.   So by altercation, you don't mean by
11  someone hitting someone?
12  A.   That would be.  Yes.  I would classify
13  that as an altercation.
14  Q.   And you said threaten, what do you
15  mean by threaten?  Verbally?
16  A.   Sure.  Verbally.  Absolutely.
17  Q.   How are these things brought to your
18  attention?  Someone comes in and says so and so is
19  threatening me?
20  A.   Sure.  If the employee will bring it
21  to a supervisor's attention.  Sometimes eyewitnesses,

Page 17

1   people that have knowledge of the situation or incident
2   report it.
3   Q.   I'm asking what you would do in your
4   -- people come to you with such concerns of being
5   threatened, hit, struck by a supervisor or employees?
6   A.   Yes.
7   Q.   What do you do in those -- what's your
8   responsibility and the rules and procedures of Amtrak at
9   that point.  What do they require you to do?
10  A.   I'd have to investigate the incident
11  Q.   Do they advise you in any of their
12  materials as to what that investigation should entail?
13  Do they tell you how to conduct the investigation?
14  A.   Yes.
15  Q.   What do they require you to do under
16  their workplace violence policies, purposes, scopes and
17  guidelines?
18  A.   State eyewitnesses, you interview
19  eyewitnesses, the people involved, you get statements,
20  of course you review them and once you make an initial,
21  I guess, try and evaluate the situation, then you go

5 (Pages 14 to 17)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Christopher Bello - 9/27/05

Page 18

1  from there and you determine whether it warrants further
2  investigation or whether there would be discipline
3  involved, how serious the matter is.
4      Q.   Is there any forms that you're
5  required to use?
6      A.   For?
7      Q.   The situation we're talking about?
8      A.   Yes. Well, many times just a
9  statement will suffice.
10     Q.   Again, are there any forms that you're
11 required to use under Amtrak's policy and procedures in
12 workplace environment?
13     A.   Yes. There is workplace violence.
14 There is a form.
15     Q.   What is that form called?
16     A.   I cannot recall at this time.
17     Q.   Have you have used one?
18     A.   I cannot remember if I used one or
19 not.
20     Q.   How many times since you became a
21 general foreman in 2002 have you been confronted with a

Page 19

1  situation of workplace violence?
2      A.   That it was brought directly to my
3  attention or reported to me?
4      Q.   Yes.
5      A.   I'm not sure if I really ever have had
6  direct report of workplace violence. I don't recall one
7  being reported directly to me.
8      Q.   Are you ever brought in when it's
9  reported to someone else to deal with the situation?
10     A.   I personally have not.
11     Q.   So you're saying that you've never
12 dealt with, in your career as general foreman, a
13 situation of workplace violence; you have never been
14 involved in it?
15     A.   I have heard of other situations but
16 not that I have been formally involved in. Yes. I have
17 heard of other people having incidents but I have never
18 myself never been in charge of the investigation for
19 one.
20     Q.   Have you ever been involved in any
21 manner in your career since 2002 with a workplace

Page 20

1  violence situation?
2      A.   I do not think I have since '02.
3      Q.   Who would the employees go to if not
4  you to report such incidents?
5      A.   There are numbers on that, as I stated
6  earlier, there's a letter that is posted on our office
7  and it has the numbers on their. If the employees don't
8  feel comfortable reporting it to their immediate
9  supervisor, there are -- there are phone numbers on
10 there. The department designates employees that they
11 can contact.
12     Q.   Some man or woman gets punched in the
13 workplace and it's Amtrak policy and procedures to go
14 look at a letter and phone one of those numbers?
15     A.   That's an option I said, that's not
16 procedure.
17     Q.   I'm sorry.
18     A.   They have that option.
19     Q.   And what are the other options? Let's
20 assume it's a supervisor versus an employee?
21     A.   Uh-huh.

Page 21

1      Q.   Where does the employee go?
2      A.   They could go to their supervisor,
3  they could go to a general foreman, they could go to the
4  assistant superintendent, they could go to any number
5      Q.   They could go to you?
6      A.   Yes.
7      Q.   But they never come to you in your
8  whole career since 2002?
9      A.   For workmen, not that I can recall.
10     Q.   Who would an employee talk to with
11 respect to any problems they're having with a supervisor
12 at high speed rail?
13     A.   They could speak to myself, they could
14 speak to one of our QA managers.
15     Q.   What's QA?
16     A.   Quality assurance managers. Assistant
17 superintendent.
18     Q.   Any employees come to you to complain
19 about supervisors since 2002 when you became a general
20 foreman?
21     A.   Yes.

6 (Pages 18 to 21)

Christopher Bello - 9/27/05

Page 22

Q.   About how many occasions?

A.   Exactly, I couldn't give you an exact number.

MR. HANNAWAY:  For the record, this is Mr. Jerry Chambliss, just entered the room  He's the plaintiff in this case.

BY MR. HANNAWAY:

Q.   We're talking about employees complaints about supervisors. Any procedures set down by Amtrak for you to follow in your position with respect to complaints or problems employees are having with supervisors?

A.   Again, we investigate the matter then determine whether it would be an elevator or there was any follow up that was necessary.

Q.   Any forms you're required to use?

A.   Again, depending on if there was nothing -- if the matter wasn't, didn't warrant any more investigation, no, there is no, just a statement is placed in our files.

Q.   What is the nature of that statement

Page 23

that's placed in the files?

A.   The nature of the statement would be the person, what they have witnessed, the questions what they observed.

Q.   That was bad question. You said a statement. Is it your statement or the employees statement?

A.   If the person had come to me with a complaint, it would be. Yes. It would be my statement.

Q.   What you would write down? What you did?

A.   Yes.

Q.   So does that, when someone has a complaint, that's handled differently, correct me if I'm wrong, than if something falls under the purview of the workplace violence rules and procedures?

A.   No, not really. No. It's again, workplace violence is -- it's just a guideline and once if an issue is brought up to a supervisor, they make a determination on it.

Q.   I understand. And as you testified

Page 24

before, there's specific forms to be used when something is categorized as workplace violence?

A.   Yes, sir.

Q.   Correct me if I'm wrong, you testified previously that workplace violence could be a threat?

A.   Yes.

Q.   Is that considered by Amtrak and therefore by you as being a workplace violence situation?

A.   Yes.

Q.   What about if someone spit in someone's face?

A.   That would be, for myself, that would be --

Q.   I'm talking about, you said there's rules and all about workplace violence?

A.   Right.

Q.   And they have a uniform policy to be followed throughout Amtrak?

A.   Yes.

Q.   They tell you to follow them?

Page 25

A.   Well, right off the back, I would have taken the person, the alleged person who is spitting, they would come upstairs and they wouldn't do a thing until I checked with my resources to see exactly how to handle that.

Q.   What do you mean by come upstairs?

A.   Come up to the Amtrak office.

Q.   You mean pull them off their job?

A.   Yes.

Q.   Is any type of touching nonconsensual touching of someone? What if someone pushes someone?

A.   Any type of touching?

Q.   Yes. That's nonconsensual. If the person who is being touched doesn't consent to being touched, could be a push, could be a spit. Is that considered workplace violence?

A.   Right now, I would have to review that policy

Q.   In your opinion, like you said, in your opinion, spitting would be?

A.   Spitting would be absolutely

7 (Pages 22 to 25)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Christopher Bello - 9/27/05

Page 26

1  inappropriate  A person would be disciplined.  If
2  someone spit on somebody, they would be disciplined.  I
3  don't know if that would fall under workplace violence
4  but that would be under Amtrak's standard of excellence
5  violation but they would be disciplined.
6       Q.    If it was considered by you to be
7  workplace violence, then the forms dealing with
8  workplace violence kick in?
9       A.    I have all my reference numbers who to
10  contact and yes
11       Q.    So are you saying that it's your
12  discretion as to whether or not something is considered
13  to be workplace violence in a given incident?
14       A.    There are specific procedures and
15  there are guidelines.
16       Q.    Okay.
17       A.    My opinion would not really be
18  relevant in a matter, again, if there was an issue that
19  arose, I'm going to check with our workplace violence
20  policy  I may have my own opinions, but I am not going
21  to enforce those, it would be what Amtrak's policy is.

Page 27

1       Q.    I understand.  I'm just trying to get
2  you as a general foreman as the one certainly required
3  to follow through with any Amtrak workplace violence
4  procedures, and I'm just trying to say, before I would
5  consider this fitting to be workplace violence implying
6  that you have a certain amount of discretion or latitude
7  under Amtrak's policies for you to determine what
8  workplace -- whether an incident falls under workplace
9  violence or not?
10       A.    That would come into play, my
11  discretion would come into play when it's not
12  specifically addressed in the policy.
13       Q.    Are threats specifically addressed in
14  the policy?
15       A.    Yes.  They absolutely are.
16       Q.    Does it say what kind of threats?
17       A.    Threats  Again, I cannot quote you the
18  policy while I'm sitting here
19       Q.    What if someone throws something and
20  someone hits them?
21       A.    Again, it depends on the

Page 28

1  circumstances, was it -- what are the circumstances
2  involved in it.  If someone was passing somebody
3  something or throwing them a wrench, then no, I don't
4  think that would be considered workplace violence.
5       Q.    No.  If someone intentionally threw
6  something and somebody, hit them, is that workplace --
7       A.    To hurt them?  Yes, it is.  I would
8  consider that.  I would consider that.
9       Q.    What do you mean by hurt?
10       A.    Injure them.
11       Q.    What if the person was not injured,
12  the object is still thrown?
13       A.    Again, if there was intent there to
14  injure somebody, then it would be handled the same way.
15       Q.    So you're saying that it's Amtrak's
16  policy that someone could throw something at someone,
17  hit them but if in your opinion, the person who threw
18  intent wasn't to hurt anyone, then it doesn't fall under
19  the workplace violence procedures of Amtrak?
20       A.    I don't believe that's Amtrak's
21  policy.

Page 29

1       Q.    I'm asking you what is Amtrak's
2  policy.  An individual throws something at someone, hits
3  them; throws it intentionally.  It's not an accident.
4  Okay?
5       A.    Okay.
6       Q.    There's no injury, no physical injury?
7       A.    Okay.  Then right, I would investigate
8  that and try and get the --
9       Q.    Not the question.  The question is
10  does that fall under Amtrak's policies and procedures
11  with respect to workplace violence?
12       A.    Right now I cannot quote -- I could
13  not tell you
14       Q.    Is there anything you would have to
15  review to come up with that determination -- I mean, you
16  apply this all the time in your job.  You went to
17  quality classes.
18       A.    Don't apply this all the time  This is
19  a rare incident when it actually, there's any type of
20  workplace violence.
21       Q.    But you're trained on to how to deal

8 (Pages 26 to 29)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Page 30

1  with the situation to determine what is?
2      A.   I have taken and I have been through
3  Amtrak's classes and received information on dealing
4  with workplace violence. Yes.
5      Q.   In the hypothetical I gave you, you're
6  trained, you're a general foreman, you've been trained
7  in it. Does that hypothetical fall under Amtrak's
8  definition procedures to come into place with respect to
9  workplace violence?
10     A.   Yes, I would say that it does.
11     Q.   And when that determination is made
12 then you go over the workplace violence and you call the
13 numbers you've used and you go over the forms and you do
14 all that?
15     A.   Yes.
16     Q.   Like we discussed. Now, on May 10th
17 of 2004, I think I got to right date, correct me if I'm
18 wrong, Jerry Chambliss complained to you about Steven
19 Snyder?
20     A.   Yes.
21     Q.   And what was their relationship in the

Page 31

1  workplace? I mean, formally, what were their crafts or
2  positions?
3      A.   Mr. Chambliss was a pipe fitter and
4  Steve Snyder was a foreman.
5      Q.   Was he Mr. -- he being Mr. Snyder, Mr.
6  Chambliss's immediate supervisor?
7      A.   Yes.
8      Q.   And where were the two of them
9  assigned back in May 10 of 2004?
10     A.   At the high speed facility.
11     Q.   What were their jobs in a layman's
12 sense. What were they doing during the course of the
13 day, I know but the record needs to know?
14     A.   The pipe fitter, they would be in
15 charge of inspecting hydraulic systems, the water
16 systems, the air raising systems on the train sets, and
17 Mr. Snyder being the foreman, would assign them the
18 tasks, make sure blue flags were applied properly, the
19 tracks are locked out and tagged out as they should be
20     Q.   Blue flags, correct me if I'm wrong
21 means you have to shut down the rail and take certain

Page 32

1  precautions when a locomotive or car is being worked on
2  by employees in Amtrak?
3      A.   Yes.
4      Q.   For safety reasons. Was Mr. Chambliss
5  part of -- well, I'm going to call it a crew; in other
6  words, Mr. Snyder -- it's my understanding Mr. Snyder, a
7  high speed real would come in and the crew would include
8  coach cleaners, utility workers, pipe fitters, anybody
9  else?
10     A.   Car repairman, electricians.
11     Q.   To both inspect, repair, maintain,
12 clean, change the sand, the oil and do all that for both
13 the locomotive and the cars?
14     A.   Yes.
15     Q.   And you use the Acela, I'll call it
16 the high speed rail?
17     A.   Yes.
18     Q.   Are all the Acela's backed up by the
19 way?
20     A.   Yes, they are
21     Q.   Where was your office located?

Page 33

1      A.   In the high speed rail facility.
2      Q.   And you're the general foreman of the
3  high speed rail?
4      A.   Yes.
5      Q.   Who stands between the hierarchy of
6  the aircraft? Who stands between you and Mr. Snyder if
7  anyone?
8      A.   In the Amtrak structure, he would be a
9  direct report to me.
10     Q.   So there's a number -- his title is a
11 foreman?
12     A.   Yes.
13     Q.   There's number of foreman who report
14 to you, high speed rail, you being the general foreman?
15     A.   This structure is different in the
16 high speed rail traditional Amtrak organization, that's
17 the way it would work but high speed rail, actually Mr.
18 Snyder's direct report is a NECMSC it's a contractor
19 shop supervisor. He's the one that actually lines Mr.
20 Snyder up with the workload for the day and as far as
21 employee utilization, keeping time and all that and the

9 (Pages 30 to 33)

Christopher Bello - 9/27/05

Page 34

1  high speed rail again is a little different. I'm there
2  more of a regulatory role.
3      Q.   What about with respect to personnel
4  matters?
5      A.   Personnel matters, I'm there for
6  anything that's necessary.
7      Q.   Does it also go personnel matters say
8  between foreman and employee, do they also go through
9  NACMAC or do they go directly to you?
10     A.   Our office, the Amtrak office handles
11 all the discipline.
12     Q.   So with respect to the matter of May
13 10th 2004 between Mr. Chambliss and Mr. Snyder, you were
14 the next one up on the ladder?
15     A.   Yes.
16     Q.   Do you recall what time this whole
17 incident was brought to your attention?
18     A.   Late morning, noonish
19     Q.   Of May 10th?
20     A.   On May 10th.
21     Q.   And where were you when you became

Page 35

1  aware of the incident?
2      A.   In my office.
3      Q.   I assume Mr. Chambliss came to your
4  office?
5      A.   Yes.
6      Q.   Was anyone -- who was present?
7      A.   Myself, Mr. Chambliss and his union
8  representative Mr. Masetti.
9      Q.   What was his last name?
10     A.   Bob Masetti M-A-S-E-T-T-I I think it
11 is.
12     Q.   Did Mr. Chambliss come to complain
13 with respect to Steve Snyder that day?
14     A.   Yes.
15     Q.   What was the nature of his complaint?
16     A.   That there had been an incident with
17 foreman Snyder in a lunchroom that morning where Mr.
18 Snyder tossed a book at Mr. Chambliss during the morning
19 safety meeting
20     Q.   Did he tell you that the book hit him?
21     A.   Yes.

Page 36

1      Q.   How long did you meet with Mr.
2  Chambliss and Mr. Masetti?
3      A.   15 minutes
4      Q.   Do you recall in that 15 minutes the
5  nature of the conversation; what you said, what Mr.
6  Chambliss said, what Mr. Masetti said?
7      A.   Mr. Masetti actually spoke first, if I
8  remember properly. He was the one that, actually, first
9  one to say that there had been an incident and that they
10 were surprised about what had occurred in the lunchroom,
11 that foreman Snyder would have tossed the book at Jerry
12 for no apparent reason, inappropriate, he wanted to
13 investigate it and it was just something he shouldn't
14 have done.
15     Q.   When you heard that -- did you
16 perceive any injury to Mr. Chambliss?
17     A.   No, I didn't.
18     Q.   Did you ask him if he was hurt?
19     A.   I don't recall whether I asked him if
20 he was hurt or not at that time.
21     Q.   Given that you know someone throwing a

Page 37

1  book at someone's head, did you consider that then to be
2  a workplace violence criteria sort of incident?
3      A.   Initially at that moment when I was
4  first made aware of it, no, I didn't.
5      Q.   Did you ever consider it to be such?
6      A.   After I -- no, after I investigated
7  that, I determined that it wasn't workplace violence.
8      Q.   What did you determine it was?
9      A.   Horseplay on the part of Mr. Snyder.
10     Q.   And who told you it was horseplay?
11     A.   That was my -- that was my --
12     Q.   Bad question?
13     A.   -- my determination.
14     Q.   Bad question?
15     A.   In Amtrak standards of excellence it
16 has the definition of horseplay and that incident fit it
17 very, very close.
18     Q.   Tell me what the Amtrak standard of
19 excellence?
20     A.   Yes.
21     Q.   What's the definition of horseplay?

10 (Pages 34 to 37)

Christopher Bello - 9/27/05

Page 38

1    A.    I can't quote it at this time.
     Q.    I'll rephrase it. Did you go look it
3  up that day?
4    A.    I have a copy of the book. Every
5  management employee has got to have a copy of the
6  standards of excellence. Every employee at Amtrak has
7  to have a copy of it, not just me.
8    Q.    Do you have to keep it with you?
9    A.    It is to be in your possession at all
10  times or on company property.
11    Q.    So you have it with you?
12    A.    It's in my desk at work.
13    Q.    Well, I thought you said you had to
14  have it with you every time you were on company
15  property?
16    A.    It has to be on company property, you
17  don't have to carry it with you personally, it just has
18  to be -- you have to have it somewhere in your, as long
19  as you have it on the property.
20    Q.    So it's important you're familiar with
21  it, sounds like?

Page 39

1    A.    Yes.
2    Q.    Can you paraphrase for me, please,
3  Amtrak's, the definition of horseplay in Amtrak's
4  standard of excellence book?
5    A.    Horsing around, jokes, kidding,
6  pranks.
7    Q.    Does it say throwing something at
8  someone's head is horseplay?
9    A.    I don't believe it says anything about
10  throwing something at someone's head.
11    Q.    What was Mr. Chambliss's demeanor like
12  when he met with you?
13    A.    Surprised and basically, I would
14  consider it to have been embarrassed, he was upset and
15  embarrassed at the situation, what Mr. Snyder had done
16  and
17    Q.    So he was highly upset?
18         MS. SUBAR: Objection.
19         THE WITNESS: He was upset I don't
20  know how highly upset he was.
21  BY MR. HANNAWAY:

Page 40

1    Q.    You wrote a letter, you used the term
2  he was highly upset?
3    A.    Okay. That may have been
4         MS. SUBAR: Take the time to read the
5  statement. (The witness complies.)
6         MR. HANNAWAY: Can I have this
7  marked, please.
8  (Bello Deposition Exhibit No. 1, statement, was marked
9  for identification.)
10  BY MR. HANNAWAY:
11    Q.    I've shown you a document that's been
12  marked for the purposes of this deposition as
13  Plaintiff's No. 1. Could you tell us what that is?
14    A.    My statement regarding the matter.
15    Q.    And that fairly and accurately
16  represents what you wrote concerning the matter?
17    A.    Yes, it does.
18    Q.    Is this the extent of the paperwork
19  that you did with respect to this matter?
20    A.    No. As far as the paperwork, Mr.
21  Snyder was charged with horseplay.

Page 41

1    Q.    I didn't ask you what he was charged
2  with. I'm asking did you fill out any other paperwork
3  or fill out any other Amtrak forms or write anything
4  down with respect to this incident?
5    A.    That, the forms I'm speaking of, they
6  do have regard with the incident
7    Q.    Him being charged?
8    A.    Yes, sir.
9    Q.    What would that form be called?
10    A.    They were a notice of intent forms and
11  they were charging -- and that's for assessed
12  discipline, that's part of the foreman's agreement,
13  that's part of their discipline process.
14    Q.    You mentioned another form?
15    A.    Actually, if I'm --
16    Q.    You said charging something?
17    A.    Yes. I believe, if I'm not mistaken,
18  Mr. Snyder accepted the waiver that was for discipline
19  was offered to him and they didn't have to, it wasn't
20  necessary for him to charge him. He accepted the
21  discipline.

11 (Pages 38 to 41)

Christopher Bello - 9/27/05

Page 42

1      Q.    What was that discipline given to him?
2      A.    I don't recall exactly what his
3  discipline, how many days he served.
4      Q.    Now, you said you arrived at the
5  conclusion of the horseplay, you had to base that on
6  certain facts which you gleam as a result from your
7  investigation. What facts did you on earth and from
8  whom did you on earth would have brought you to the
9  conclusion that this was horseplay?
10     A.    In the conversations with Mr.
11 Chambliss and Mr. Masetti and Mr. Snyder and some, and
12 the witnesses' statements.
13     Q.    What did Mr. Chambliss say to you that
14 you relied upon in arriving at your determination that
15 this was horseplay and not workplace violence?
16     A.    I don't understand the question.
17     Q.    You said that you arrived at your
18 determination that this was horseplay?
19     A.    Yes.
20     Q.    As opposed to workplace violence?
21     A.    Yes.

Page 43

1      Q.    Based upon what you were told by Mr.
2  Chambliss, Mr. Marsetti, Mr. Snyder and witnesses?
3      A.    Yes.
4      Q.    What did Mr. Chambliss say to you that
5  you relied upon to arrive at your determination that
6  this incident fell under the purview of Amtrak's policy
7  with respect to horseplay as opposed to workplace
8  violence?
9      A.    Actually, one of the determined
10 factors was his reluctance of information about the
11 matter. Other than his, which is in my statement, just
12 being embarrassed and kept saying I can't understand why
13 he would do that, I mean, I don't know why he would do
14 that, sort of surprised and embarrassed.
15     Q.    And highly upset?
16     A.    And highly upset as far as -- he was
17 highly upset but that was -- I was only able to
18 determine that through the little that he spoke that
19 day, that morning
20     Q.    Okay. And those things you just
21 described are what you relied upon in Mr. Chambliss in

Page 44

1  determining that this was horseplay?
2      A.    Yes.
3      Q.    What led you to the conclusion that he
4  was highly upset?
5      A.    Because he was, I could tell that he
6  was just very surprised and embarrassed and kept
7  repeating why would he do that? I don't know why the
8  guy would do that. I can't understand why he would do
9  that, and I asked him do you think -- why do you think
10 he did it. Did he mean to hurt you? Did he do it on
11 purpose, and again, it was I don't know, I don't know, I
12 don't know why he would do that. It was pretty much the
13 same thing, same time. Every time I'd ask him, it was
14 pretty much the same answer, just surprised. He was
15 very surprised and yes, upset that someone would do
16 that.
17     Q.    Someone would hit him for no good
18 reason. What was his demeanor physically?
19     A.    Mr. Snyder or Mr. Chambliss.
20     Q.    Mr. Chambliss?
21     A.    He was sitting in the chair right next

Page 45

1  to Mr. Masetti. He was civil. He was not ranting or
2  raving or
3      Q.    Just highly upset. Now, you said that
4  the other determination -- one of the other persons you
5  interviewed to arrive at your determination that this
6  was horseplay was, you spoke with Mr. Snyder; is that
7  correct?
8      A.    Yes.
9      Q.    When did that conversation take place?
10     A.    Just as soon as I could get to the
11 station. After I had finished meeting with Mr.
12 Chambliss and Mr. Masetti and I asked individuals
13 present for their statements, I went to the station and
14 interviewed Mr. Snyder.
15     Q.    And what did Mr. Snyder say with
16 respect to the incident?
17     A.    When I approached him, he was
18 surprised and sort of looked at me, like, how could he
19 have been offended by that, it was a joke. It was, when
20 I first mentioned it, he basically took a second to
21 figure out what I was speaking of, the incident when the

12 (Pages 42 to 45)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Christopher Bello - 9/27/05

Page 46

1    book was tossed at Jerry.
2         Q.   So he viewed it as a joke?
3         A.   I don't know if joke is the proper
4    term.  He, his intent was, from the way my observations
5    and what Mr. Snyder explained to me, it was nothing more
6    than just a stupid reaction, just off the, sort of off
7    the cuff thing to do, just bum-headed thing to do.
8         Q.   Now, you said his intent was what?
9         A.   His intent wasn't malicious to harm.
10        Q.   What do you mean by malicious?
11        A.   To do Mr. Chambliss harm
12        Q.   Harm.  What kind of harm?
13        A.   Physical harm
14        Q.   To make him highly upset?  He didn't
15   intend to make him highly upset and agitated?
16        A.   I don't believe  No.  From
17   interviewing Mr. Snyder, I don't believe his intentions
18   were to make Mr. Chambliss highly upset.  No.
19        Q.   On the other hand, you had a person
20   who was, by your definition, highly upset, Mr.
21   Chambliss?

Page 47

1         A.   Okay.
2         Q.   Is it fair to say, then, that you
3    based your determination on this being as horseplay
4    because the person who hit the other said it was a joke?
5         A.   No.  And from statements and talking
6    to the other employees that observed it.
7         Q.   What other employees?  What other
8    facts did they give you?
9         A.   Right now, I can't — I don't, this
10   was a while ago, I don't remember who the eyewitnesses
11   were.  I think Bill Vullo was one of them, the NEC
12   supervisor.
13        Q.   What is his last name?
14        A.   Vullo V-U-L-L-O.
15        Q.   Do you recall what he said about it?
16        A.   Exactly, I don't know.
17        Q.   Anything else any of the other
18   witnesses told you that led you to arrive to the
19   conclusion this is horseplay?
20        A.   There are but I can't recall what they
21   are at this time.  There were, I should say, but I don't

Page 48

1    recall who they were at this time.
2         Q.   Did you ask Mr. Snyder — excuse me.
3    Mr. Chambliss and Mr. Masetti to leave your office?
4         A.   No, I did not.
5         Q.   How did the meeting with them
6    conclude?
7         A.   I would imagine that they were done
8    with the meeting and they left.
9         Q.   You said in your letter Mr. Snyder
10   intended no malice  What did you mean by that?  I might
11   have asked you that?
12        A.   Any ill will, was not intending to
13   hurt the man or.
14        Q.   So if someone does — I'm just
15   confused.  If someone does something at Amtrak, touches
16   another person without that person's permission, causes,
17   a supervisor causes that employee to be highly upset,
18   agitated, coming to a superior saying why would this guy
19   do this to me?  Why would he do it to me?  I don't
20   understand  He's highly upset.  That's horseplay?
21        A.   That could be determined as horseplay.

Page 49

1         Q.   Could it be determined as workplace
2    violence?
3         A.   I guess it depends on the situation.
4    I guess it could.
5         Q.   Does it come down to, then in Amtrak's
6    procedures in handling these type of things who it's
7    reported to and what their take on it is?
8         A.   Yes.
9         Q.   Now, was Mr. Chambliss disciplined
10   with respect to this matter?
11        A.   No, he was not.
12        Q.   What was he disciplined with respect
13   to?  He was disciplined.  He was let go, wasn't he?
14        A.   As far as Mr. Chambliss's termination,
15   I was not the charging officer, and don't have — I'm
16   not familiar with —
17        Q.   You testified in the proceeding with
18   respect to him, right?  Wasn't he brought up on charges
19   of not reporting an incident?
20        A.   Yes.  Okay
21        Q.   You were there.  You testified?

13 (Pages 46 to 49)

Christopher Bello - 9/27/05

Page 50

1      A.    Okay.
2      Q.    I don't know if it's okay or not, I'm
3  saying is that true?  You testified.  You recall that?
4      A.    Yes, I do.
5      Q.    So you are aware that Mr. Chambliss,
6  as a result of this occurrence and the events
7  surrounding it, was brought up on charges by Amtrak,
8  correct?
9      A.    Okay.  All right.  Yeah  Actually --
10     Q.    Is that a yes or no?
11     A.    Yes.
12     Q.    And he's ultimately, if I got it
13  right, he was let go by Amtrak, correct?
14     A.    Yes.
15     Q.    And it was for not reporting, what was
16  that?
17     A.    Again, I may have testified, but I am
18  not sure of what the specific charges were.
19     Q.    But he did report this incident to
20  you, right?
21     A.    Yes.

Page 51

1      Q.    When an employee is injured in some
2  manner even if an employee is injured psychologically in
3  some manner because of something they see, you've got a
4  locomotive engineer --
5      A.    But the incident you're speaking of, I
6  think may have been he was released for reporting a late
7  injury.
8      Q.    Yes, that's what we're talking about?
9      A.    He never reported an injury to me.  I
10  was never aware of an injury at any time.
11     Q.    You were aware he was highly upset, he
12  was effected by this incident with Mr. Snyder?
13     A.    Yes.
14     Q.    Okay.  You saw no physical injury?
15     A.    That's correct.
16     Q.    But you saw he was effected, he was
17  highly upset, he's agitated, he's concerned, he's trying
18  to figure out why in the heck in his mind this smuck
19  supervisor hit me in the head with a book for no good
20  reason when I have been working here for 17 years?
21     A.    Yes.

Page 52

1      Q.    Engineer drives the Acela, it occurs,
2  it's very unfortunate, four particularly kids, people on
3  rail lines, hits them, body splashes up.  Engineer
4  highly upset, agitated, not physically injured, comes
5  back and says, you know, this happened, I was highly
6  upset.  He's agitated, general foreman sees it.  He goes
7  home, it gets worse, goes to talk to someone and reports
8  he's having problems because of this incident 7 days
9  later.  Did he report it late?
10     A.    Report his injury late?
11     Q.    No.  No.  The hypothetical I just gave
12  you, the locomotive engineer strikes four individuals on
13  the track?
14     A.    No.  I don't think that would be
15  considered as reporting it late.  He's not going to be
16  charged for that.
17     Q.    Mr. Chambliss got charged.  You're
18  involved in it?
19         MS. SUBAR:  Is that a question?
20  BY MR. HANNAWAY:
21     Q.    Yes.  Mr. Chambliss was charged,

Page 53

1  correct?
2      A.    He was charged but I personally did
3  not bring the charges against him.
4      Q.    I didn't say you did, but you also
5  said to them, correct me if I'm wrong, he never reported
6  an injury to me on May 10th of 2004?
7      A.    That's right.
8      Q.    Even though you found him to be highly
9  upset, agitated, highly concerned as a result of his
10  supervisor hitting him in the head with a book?
11     A.    Right.
12     Q.    Okay.  Prior to May the 10th of 2004,
13  were any complaints made to you with respect to Mr.
14  Snyder?
15     A.    No.
16     Q.    Were you ever aware of any such?
17     A.    No.
18         MS. SUBAR:  Did you finish your
19  question?  Aware of such?
20         MR. HANNAWAY:  Referring back to
21  complaints.

14 (Pages 50 to 53)

Christopher Bello - 9/27/05

---

Page 54

BY MR. HANNAWAY:

3     Q.   In your position as general foreman of

3 high speed rail, is Amtrak's policy to advise you of

4 prior incidents with respect to foremen that you are to

5 supervise, prior complaints made by employees or?

6     A.   You mean where employee starts a new

7 supervisor starts, are we given their history?

8     Q.   Yes.

9     A.   No.

10     Q.   So Amtrak would never advise you that

11 Steve Snyder on previous occasions and I apologize to

12 everyone would call the people, these supervisors

13 niggers and bitches? That was never brought to your

14 attention?

15     A.   No.

16     Q.   Never heard about it. Did you ever

17 hear about such a thing with respect to Mr. Snyder?

18     A.   I have heard hearsay in the shop

19 walking through the shop but nothing was ever reported

20 to me.

21     Q.   When you heard such things, tell me

Page 55

1 what you heard?

2     A.   I can't recall. Just that he had used

3 inappropriate language before.

4     Q.   You mean before May 10 of 2004?

5     A.   No. I just mean before that he had

6 been known to have used inappropriate language.

7     Q.   With employees such as I have

8 described?

9     A.   Yes.

10     Q.   Do you recall when you heard such, you

11 use the term hearsay in the shop?

12     A.   Yes.

13     Q.   When was that?

14     A.   I have no idea what the dates were.

15     Q.   So could have been before the May 10

16 2004?

17     A.   Yes.

18     Q.   Have you also heard -- were you ever

19 made aware of Mr. Snyder previously kicked, hit, pushed,

20 assaulted, battered employees of Amtrak who were under

21 his supervision?

Page 56

1     A.   No.

2     Q.   This year, 2005, have you ever

3 discussed with anyone the May 10th 2004 incident

4 involving Mr. Chambliss and Mr. Snyder?

5     A.   Just reviewed the transcript with

6 Ilana before we sat down in here.

7     Q.   You mean the transcript of your

8 testimony of Mr. Chambliss's firing proceeding?

9     A.   Yes.

10     Q.   Did you ever meet with any other

11 employees in 2004 to discuss this matter?

12     A.   I may have. I can't recall who it

13 would have been now.

14     Q.   Would it have been unusual for you to

15 meet with such employees to discuss this matter in 2005?

16     A.   I'm sorry.

17     Q.   Would it have been unusual for you to

18 meet with co-employees of Mr. Chambliss in 2005 to

19 discuss the incident on May 10th of 2004 or any

20 allegations or assertions made with respect to Mr.

21 Snyder?

Page 57

1     A.   I don't recall discussing it outside

2 when I did the testimony for the hearing I can't recall

3 that.

4     Q.   That was -- what year was that?

5     A.   You have to tell me, sir

6     Q.   Okay. I don't know I have to dig in

7 that briefcase?

8     A.   I don't really recall.

9     Q.   Outside of that testimony, did you

10 ever meet with Mr. Charleus in the past 6 months to

11 discuss any of these matters?

12     A.   No, sir?

13     Q.   What about Doria Washington?

14     A.   No, sir.

15     Q.   Tyrek Jenkins?

16     A.   No, sir.

17     Q.   Paula Bunch?

18     A.   No.

19     Q.   Do you know of any other foremen or

20 supervisors from Amtrak who have held such meetings with

21 those persons?

15 (Pages 54 to 57)

Christopher Bello - 9/27/05

Page 58

1      A.    A meeting for that, dealing with that
2  specific incident or just any kind of meeting?
3      Q.    Anything relating to this incident and
4  allegations made about Mr. Snyder either this one or any
5  other?
6      A.    No. I don't know of any other
7  supervisors who would have spoken about that incident.
8      Q.    Have you heard of any such meetings
9  taking place?
10     A.    No.
11     Q.    Through hearsay around the shop?
12     A.    No.
13            MR. HANNAWAY: I have nothing
14  further. Well, wait a minute.
15         (A break was taken at 12:24 p.m.)
16         (Deposition resumed at 12:27 p.m.)
17  BY MR. HANNAWAY:
18     Q.    It's my understanding Mr. Chambliss
19  returned to work on May 17th 2005?
20     A.    I could not verify the date
21     Q.    Let me put it this way: At any time

Page 59

1  -- we have the incident May 10th 2005, correct?
2      A.    Yes.
3      Q.    Mr. Chambliss doesn't come back to
4  work for a period of time, correct?
5            MS. SUBAR: 2004.
6            MR. HANNAWAY: Did I say 5? It is 4;
7  right. Thank you.
8  BY MR. HANNAWAY:
9      Q.    He never returns back to work some
10  days later; is that your recollection?
11     A.    I can't recall whether he was off
12  right away or it was a couple of days. I really don't
13  remember how soon it was that Jerry took off.
14     Q.    And is there some point when he came
15  back to work that you asked him to come to your office,
16  this is after May 10th?
17     A.    Yes.
18     Q.    And about how long after the incident,
19  if you recall, was that?
20     A.    Again, I couldn't give you an accurate
21  estimate. I don't remember.

Page 60

1      Q.    Could it have been May 17th?
2      A.    Possibly
3      Q.    What was the purpose for you asking
4  him to come to your office?
5      A.    To talk to him about the issue, his
6  feelings, just a follow up on the issue to let him know
7  that we were addressing it and that he knew that it was
8  being addressed and the matter was being taken
9  seriously.
10     Q.    Did he come to your office?
11     A.    Yes.
12     Q.    And who was with him?
13     A.    I believe Mike Humphries, I think.
14     Q.    Who is Mike Humphries?
15     A.    He's another one of the sheet metal
16  union representatives, sheet metal worker union reps.
17     Q.    So he's one of Mr. Chambliss's, one of
18  Mr. Chambliss's union reps?
19     A.    Yes, he is.
20     Q.    Did they actually physically go in
21  your office? Well, they both came and you spoke with

Page 61

1  them, I assume?
2      A.    Yes.
3      Q.    Where did that conversation take
4  place; in your office, out in the foyer, hallway?
5      A.    I'm trying to remember. Here in the
6  conference room, I believe.
7      Q.    Anybody else present in the conference
8  room besides you, Mr. Humphries and Mr. Chambliss?
9      A.    I believe Dino was there. Yes He
10  wanted to follow up on it as well.
11     Q.    Is that Mr. Giurfa?
12     A.    Yes, it is.
13     Q.    Could you spell the last name, please?
14     A.    G-I-U-R-F-A.
15     Q.    Anybody else?
16     A.    No, sir, not that I can remember.
17     Q.    Anybody else in your sort of suite of
18  offices, not just your conference room?
19     A.    I don't remember whether there was
20  anybody in our offices that day.
21     Q.    Was Mr. Snyder present?

16 (Pages 58 to 61)

Christopher Bello - 9/27/05

Page 62

A.    I don't recall whether Steve was in
there or not.
3        Q.    You have the two people, you're
4   bringing them together, correct, Snyder and Chambliss?
5        A.    I remember having, asking one of the
6   supervisors to ask Jerry to come up, I believe. We were
7   going to talk about the issue, and I don't recall
8   whether Steve Snyder was in there or not, he may been
9   invited up there. I don't remember whether he was in
10  there at the time or he was invited or what, and he may
11  have been in there. It was a while back. I
12  [rally|really] don't recall
13       Q.    What happened at the meeting that Mr.
14  Snyder may or may not have been at or may or may not
15  have been invited. What happened? You invited Mr.
16  Chambliss, he shows up with Mr. Humphries. Mr. Snyder
17  either left the job on his own or --
18       A.    There was -- I know it was Jerry,
19  Dino, myself and I think, I'm pretty sure it was
20  Humphries and there was an exchange that for some reason
21  either Jerry or Mike Humphries didn't approve of what

Page 63

1   was going to be discussed or how it was going to be
2   determined, and I don't think the meeting ever really --
3   I don't think it ever really took place now. I don't
4   believe it happened because I don't know whether it was
5   Dino that had a problem with something or it was Mike
6   Humphries or Jerry but for some reason, there was
7   disagreement there and it did not happen.
8        Q.    Disagreement about what?
9        A.    I have no idea because I wasn't -- I
10  don't know. I wasn't at the center of that. I was
11  going to be involved in the meeting but I don't remember
12  exactly what it was.
13       Q.    And the purpose of the meeting was
14  what again?
15       A.    To follow up with that incident.
16       Q.    I mean, to do what in follow up? What
17  was the purpose of the meeting with him?
18       A.    To let Jerry know it was investigated,
19  there was going to be discipline of a file in the
20  company, policies to see if, just to see how Jerry was
21  doing. If he was satisfied with what was going on.

Page 64

1        Q.    Why would Snyder be present?
2        A.    I don't know that he was. Like I
3   said, I don't recall that if he was. If he was, I don't
4   recall. I don't recall if he was in there or not.
5        Q.    Was it after that that -- after the
6   meeting apparently that you don't recall why the meeting
7   never took place, correct?
8        A.    That's right. There was a
9   disagreement. I know why.
10       Q.    Why?
11       A.    It's because there was a disagreement.
12  I don't remember the origin of the disagreement.
13  Everybody was coming upstairs, the people on the floor
14  that I mentioned, and we were supposed to go in a
15  conference room. I think we were in a conference room
16  and there was, and again I don't remember exactly who
17  the exchange was between but there was a disagreement
18  and Mr. Humphries and Mr. Chambliss walked out and Mr.
19  Giurfa was not happy with whatever happened.
20       Q.    You just don't remember what the
21  nature of the disagreement was?

Page 65

1        A.    No, I don't.
2        Q.    Is it accurate that after that, that
3   after that day, we'll call it May 17th although it might
4   not have been, shortly afterwards that Mr. Chambliss was
5   charged with failure to report an injury?
6        A.    It was some time period after that I'm
7   sure. Yes.
8            MR. HANNAWAY: Okay. Nothing
9   further.
10           MS. SUBAR: I have nothing.
11       (Deposition concluded at 12:34 p.m.)
12
13
14
15
16
17
18
19
20
21

17 (Pages 62 to 65)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599

Christopher Bello - 9/27/05

Page 66

1    City of Washington
2    District of Columbia, to wit:
3          I, Okeemah S. Henderson, LSR and
4    Notary Public of the District of Columbia, County of
5    Baltimore City, do hereby certify that the within-named
6    proceedings took place before me at the time and place
7    herein set out.
8          I further certify that the
9    proceedings were recorded stenographically by me and
10   this transcript is a true record of the proceedings.
11         I further certify that I am not
12   of counsel to any of the parties, nor an employee of
13   counsel, not related to any of the parties, nor in any
14   way interested in the outcome of this action.
15
16         _____
17         Okeemah S. Henderson, LSR
18         Notary Public
19
20   My Commission Expires:
21   February 28, 2010

Page 67

1              INDEX
2        Deposition of Christopher Bello
3             September 27, 2005
4
5    Examination by:                   Page
6
7    Mr. Hannaway                        2
8
9    Exhibit Number:                  Marked
10
11   1          Statement              40
12
13
14
15
16
17
18
19
20

18 (Pages 66 to 67)

Towson Reporting
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting- Rockville
301-279-7599