# 12.   PORTIONS OF TESTIMONY FROM ABRITRATION HEARING

[ 1]        MR. CHAMBLISS:  An hour and eight minutes.

[ 2]        MR. CAMPBELL:  And you were allowed one

[ 3]  hour by a Supervisor to be late; is that not

[ 4]  correct?

[ 5]        MR. CHAMBLISS:  No.

[ 6]        UNIDENTIFIED SPEAKER:  That is incorrect.

[ 7]        MR. CHAMBLISS:  -- is incorrect.

[ 8]        MR. CAMPBELL:  Can I have that exhibit, you

[ 9]  have an exhibit, where the Foreman — I think it

[10]  was "5", "6" -- no.  It was an e-mail.

[11]        MR. HUMPHREYS:  The e-mail to Tom

[12]  Bernarding, I believe states that he was given

[13]  permission to come into work early; not to be

[14]  late.

[15]        MR. D'ALESSANDRO:  We're looking at Exhibit

[16]  5.

[17]        MR. CAMPBELL:  Yes.  Looking at Exhibit 5.

[18]  So Exhibit 5, sir, does that say that you

[19]  could leave early or come in early, either one?

[20]        MR. CHAMBLISS:  It states, and I'll read

[21]  this: E-Mail; Tom Bernarding; Sent:  Wednesday

[22]  6/30/2004, 7:57 p.m.; To:  Jennifer Cabral;

[23]  Subject:  Jerry Chambliss -- it's in response to

[24]  Jennifer Cabral's e-mail sent to Mr. Bernarding on

[25]

[ 1]  6/29/2004 at 12:53 p.m.; is also cc'd to Jeff

[ 2]  Mead, Mike Wiggins, Frank Christello, Jr.;

[ 3]  Subject:  Jerry Chambliss.

[ 4]        Question to Mr. Bernarding was:  Did you

[ 5]  allow Jerry Chambliss to change his schedule on

[ 6]  Wednesday 6/16 to two -- 6:00 a.m. to 2:00 p.m.?

[ 7]  I have not received anything stating such so he

[ 8]  was not paid for the full 8 hours.  I'll need you

[ 9]  to get back to me with whether or not he was

[10]  approved to work a different shift.  If you -- if

[11]  and when you allow Amtrak employees to change

[12]  their...hours, you have to let me know so I

[13]  can(sic) updated their schedules in Kronos.

[14]        His response was:  Yes.  I let him work

[15]  6:00 till 2:00 p.m.  Sorry about this.  It was

[16]  getting close to vacation for me and it just

[17]  slipped through the cracks.  I will make sure this

[18]  does not happen again.  Thanks, Tom.

[19]        MR. CAMPBELL:  So he allowed you to change

[20]  your shift one hour?

[21]        MR. CHAMBLISS:  Yes.

[22]        MR. CAMPBELL:  And what time did you arrive

[23]  that day?

[24]        MR. CHAMBLISS:  I don't remember the exact

[25]

Page 87

[ 1]  time.  Before 6:00.

[ 2]        MR. CAMPBELL:  But if we look at the swipe

[ 3]  report, Exhibit J, does this say you were 1 hour

[ 4]  and 8 minutes late -- or early quit, an hour and

[ 5]  eight minutes early quit?

[ 6]        MR. CHAMBLISS:  It doesn't have the

[ 7]  times --

[ 8]        MR. CAMPBELL:  -- or does this say late?

[ 9]        MR. CHAMBLISS:  -- that I punched in.  What

[10]  it says is I left an hour and eight minutes early

[11]  and the reason why, you want me to explain, is

[12]  because I punched in at 62(?); we were allowed to

[13]  go -- allowed to clock out at 1:52.  So since I

[14]  clocked in at 6:00, I clocked out at 1:52, instead

[15]  of clocking in at 7:00 and clocking out at 2:52.

[16]  That's where you get your hour and eight minutes

[17]  from, sir.

[18]        MR. CAMPBELL:  Also, did -- Sunday, April

[19]  the 11th, were you late?

[20]        MR. CHAMBLISS:  Sunday, April 11th, the

[21]  bridge was out.  It was taken out to my

[22]  understanding from the e-mail and everything else

[23]  I have received, the bridge was taken out of

[24]  service late Thursday night on April the 8th at

[25]

Page 88

[ 1]  around about 9:00 o'clock or so, 9:00-10:00

[ 2]  o'clock, and I was off Friday and Saturday.  I

[ 3]  live in Baltimore, Maryland, Baltimore County; I

[ 4]  was not aware that the bridge was out.  When I

[ 5]  came to work that Sunday morning, I tried to get

[ 6]  in and being as I've been coming up here for

[ 7]  almost 15 years, taking the same bridge, I don't

[ 8]  look at travel signs as far as anything else.

[ 9]  When you driving and you know where you're going,

[10]  you very seldom look at signs or street signs.  I

[11]  came in here.  When I tried to attempt to come up

[12]  on the bridge, it was blocked off.

[13]        I made several calls and I have my phone

[14]  records to state that, trying to reach a

[15]  Supervisor to try to find out how to get in here

[16]  because that was the only way I knew.  I traveled

[17]  around DC streets, 'cause I'm not familiar with DC

[18]  'cause the only thing I've come up to DC to do is

[19]  come to work and go home, and that's the way I've

[20]  come for 15 years.

[21]        I went around trying to find a way.

[22]  Luckily I stumbled my way through the roads

[23]  because I could not contact anybody here at the

[24]  facility to get in here and I was -- got here, and

[25]

**Page 89**

[ 1]    arrived, I think I arrived before the 46 minutes
[ 2]    late, but after I -- after talking to my
[ 3]    Supervisor, he told he had to swipe in and he
[ 4]    would try to find out what they were gonna do
[ 5]    about that day.
[ 6]        (Exhibit No. 6 marked for identification.)
[ 7]        MR. CAMPBELL:  So you were late on --
[ 8]        MR. CHAMBLISS:  Yes, I was.
[ 9]        MR. CAMPBELL:  -- April 11th?
[10]    Monday, April 12th, you're 1 minute late?
[11]        MR. CHAMBLISS:  No, I was not.
[12]        MR. CAMPBELL:  The swipe machine is wrong?
[13]        MR. CHAMBLISS:  The swipe machine, when I
[14]    went to swipe in, for one, the person that swiped
[15]    in before me it gives a brief moment of time when
[16]    you have to wait before you swipe in again.  At
[17]    that point in time it was 8:00 o'clock -- I mean,
[18]    not 8:00 o'clock, but 7:00 o'clock.  I attempted
[19]    to swipe.  The swipe card did not register so I
[20]    had to wait again, and I swiped again.  At the
[21]    point in time when I looked at it said 7:00, but
[22]    they have on here 7:01.  But I don't feel like I
[23]    should be held accountable for this swipe cad
[24]    messing up for a minute.  I mean, I was here.
[25]

**Page 90**

[ 1]        MR. CAMPBELL:  What about Sunday, June the
[ 2]    13th; were you late?
[ 3]        MR. CHAMBLISS:  Sunday, June the 13th.
[ 4]    This particular day, I had -- I received a miss
[ 5]    swipe.  I was called at home.  They had an
[ 6]    emergency.  They needed a pipefitter to come in
[ 7]    here for 3:00 to 11:00 the prior date, before
[ 8]    that.  Knowing that they needed someone in a
[ 9]    hurry.  I grabbed my things.  I ran out the house.
[10]    I arrived at work.  I got a miss swipe because in
[11]    my haste, 'cause I had my street clothes on, I
[12]    forgot my swipe card.  The Foreman for 3:00 to
[13]    11:00 shift gave me a miss swipe form.  At that
[14]    point in time, I spent the night in my truck out
[15]    there on the property because I didn't want to be
[16]    late for work the next day.  I did not have a
[17]    swipe card.
[18]        The next morning I woke up before my
[19]    scheduled time at 7:00 o'clock.  I went to
[20]    McDonald's; got something to eat; I came back from
[21]    McDonald's; I went to the lavatory.  After I went
[22]    to the lavatory, I went upstairs to the safety
[23]    meeting -- the safety meeting had ended by that
[24]    time, 'cause I didn't have any other facilities; I
[25]

**Page 91**

[ 1]    had to use -- wash up and stuff downstairs.  I got
[ 2]    upstairs.  It hadn't been a problem before.  You
[ 3]    know I missed one safety meeting -- I'm on the
[ 4]    safety committee; I usually don't miss safety
[ 5]    meetings -- but this particular day and took -- I
[ 6]    felt it had something to do with the injury that I
[ 7]    had sustained earlier; the Foreman took exception
[ 8]    to it.  I was admonished for being late, and since
[ 9]    I didn't have a swipe card, I needed a miss swipe.
[10]    The Foreman told me that he could not give me a
[11]    miss swipe for 7:00 o'clock, he'd have to dock me
[12]    because that's the point in time that they saw me
[13]    at 7:22.  So at that point in time, he gave me a
[14]    miss swipe for 7:22, and I was docked that time.
[15]    But I was here on the property.
[16]        MR. CAMPBELL:  And you say a Foreman said
[17]    they didn't see you until 7:22?
[18]        MR. CHAMBLISS:  Yes, sir.  That is correct.
[19]        MR. CAMPBELL:  No further questions at this
[20]    time.
[21]        MR. D'ALESSANDRO:  Mr. Humphreys, do you
[22]    have anything else?
[23]        MR. HUMPHREYS:  No.  I don't have anything
[24]    for Jerry right now.
[25]

**Page 92**

[ 1]        MR. D'ALESSANDRO:  At this point, I can
[ 2]    conclude that we're finished with this particular
[ 3]    part of the trial?
[ 4]        MR. CHAMBLISS:  Can I question myself?
[ 5]        MR. D'ALESSANDRO:  No.  Doesn't work that
[ 6]    way.  Can't talk to yourself in here.  That's
[ 7]    grounds for other (inaudible).
[ 8]        (Laughter.)
[ 9]        MR. D'ALESSANDRO:  It's 11:29.
[10]        (Off the record.)
[11]        MR. D'ALESSANDRO:  We're back on the
[12]    record.  It's 11:32, and we're in for closing
[13]    statements on 04.7 -- 04.272; I'm sorry.
[14]    Mr. Campbell.
[15]        MR. CAMPBELL:  Yes.  This is not a real
[16]    hard case.  It's absenteeism.  Let the record
[17]    speak for itself.
[18]        Mr. Chambliss swipes in and he swipes out.
[19]    He's testified to several reasons why he couldn't
[20]    make it.  One, he was sick and had an injury.
[21]    Somebody told him that he couldn't have the days
[22]    off, but he decided he needed to take 'em.  He was
[23]    here, but they didn't see him.  Excuses after
[24]    excuses after excuses.
[25]

[1] The national attendance policy is real
[2] clear: 3 days in 30; 5 days in 90; 11 days and
[3] every day after that could be an individual
[4] charge.
[5] This gentleman is guilty of absenteeism.
[6] He should learn to correct that. We've talked to
[7] him. He hasn't understood that, and if you look
[8] at some of those days, they tie right into his
[9] ADOs. I say let the record speak for itself.
[10] We're looking for a guilty verdict in absenteeism,
[11] and that's my closing statement. The record
[12] speaks for itself.
[13] MR. D'ALESSANDRO: Mr. Humphreys.
[14] MR. HUMPHREYS: Yes, sir.
[15] I'd like to go on record to state that
[16] we -- we believe that the Company has not given
[17] enough evidence to support their Charges of
[18] absenteeism against Mr. Chambliss. We have
[19] submitted evidence into question to substantiate
[20] our defense, in fact, that on some of these dates
[21] Mr. Chambliss was not -- should not be held
[22] accountable. In particular, May 11th, 12th, 13th,
[23] and 16th, actually was the result of an injury
[24] sustained while on Company property with the
[25]

[1] Supervisor.
[2] June 17th and 20th, Mr. Chambliss should be
[3] held to one occurrence on those dates due to the
[4] simple fact that Company policy states that a
[5] single absence from the Amtrak -- from the Amtrak
[6] National System Attendance Policy for all Amtrak
[7] Agreement-Covered Employees states that a single
[8] absence from work or on -- on an assigned on one
[9] or more consecutive days for the same reason.
[10] That was one -- that was one reason. There's not
[11] two dates there. We feel as if it was one.
[12] On April the 11th, Mr. Chambliss was late.
[13] We feel that the evidence that we have in the memo
[14] or the e-mail from a Mr. Cason, our NECMSC
[15] Supervisor who allowed plenty of his employees who
[16] worked that night that came in late to -- I'll
[17] have it right here in a second -- to come in late,
[18] were given time rolled back to reflect that they
[19] were not, in effect, were not late. We feel that
[20] being as Mr. Chambliss was off Friday and
[21] Saturday, he did not -- was not given that
[22] opportunity. However, we do know if we were to
[23] talk with Frank Christello or Jennifer Cabral at
[24] NECMSC Time, Human Resource people who take care
[25]

Page 95

[1] of our time, that this was given to Amtrak
[2] employees: The day before, the night of, the day
[3] after. We feel as if Mr. Chambliss should be
[4] given the same consideration as all the other
[5] Amtrak employees were given. And if not, there
[6] certainly seems to be a bias here.
[7] We feel that Mr. Chambliss has been singled
[8] out by Management. That Mr. Giurfa and
[9] Mr. Chambliss probably have some type of a
[10] personality conflict.
[11] Also, April the 12th, one minute, as we
[12] know, is very questionable, indeed. It could be
[13] as little as one second. When you're standing
[14] behind somebody to swipe in, it does take time for
[15] the Kronos clock to reflect -- to come back up to
[16] roll the time for the next person to swipe in.
[17] Given that, we're talking five or six seconds. It
[18] could be so small as one second that this man was
[19] in -- he was here; he was on Company prop -- as --
[20] as....
[21] In reference to June 13th, 22 minutes,
[22] Mr. Chambliss performed the Company a great honor
[23] by coming in here and working his overtime,
[24] working early. He was a late call at home. He
[25]

Page 96

[1] came in to work. He spent the night -- he spent
[2] the night in his vehicle, as he stated.
[3] This man, I personally work with Jerry a
[4] S&I, and I know Jerry's work performance. Him
[5] and I are a team. I know that Jerry is a good
[6] employee. He's -- he's obviously learned how to
[7] work the High Speed Rail, these new train sets
[8] that Amtrak has (unintelligible) in service. That
[9] Jerry, we feel -- or I feel, is getting the bum
[10] deal.
[11] The Company has certain -- they did not
[12] substantiate the fact that -- well, excuse me,
[13] they did not as far as the attendance was
[14] concerned on -- excuse me -- memo, "J" was the
[15] number -- or the letter involved as far as
[16] evidence submitted -- that -- excuse me. I'm
[17] losing my train of thought here. ...that Jerry
[18] was given not just one but plenty of -- he was not
[19] given a fair shake in a lot of these things,
[20] whereas other Amtrak employees were. There
[21] certainly seems to be a bias. I don't know
[22] exactly what it is. I can't put my finger on it,
[23] but it certainly seems that Amtrak has been very
[24] biased in this situation.
[25]

**Page 97**

[1] That's all I have at this time. I'm done.

[2] MR. D'ALESSANDRO: Mr. Chambliss.

[3] MR. CHAMBLISS: Can you give me two -- two

[4] seconds here.

[5] MR. D'ALESSANDRO: It's 11:46 -- no, :36;

[6] I'm sorry.

[7] (Off the record.)

[8] MR. D'ALESSANDRO: It's 11:38. We're back

[9] on the record. Mr. Chambliss.

[10] MR. CHAMBLISS: My closing argument is

[11] that -- first of all I'd like to say in my closing

[12] argument that the Carrier has yet to, and I --

[13] this is also an objection -- object to -- tell me

[14] exactly what I'm being charged with.

[15] They have presented their case. They still

[16] haven't said whether it was 3 in the 30 or 5 in

[17] the 90, anything. I mean, they haven't -- they

[18] just gave this (unintelligible) at best, in their

[19] Charges, and I want to object to that and ask can

[20] I get a ruling on that right now 'cause I --

[21] MR. D'ALESSANDRO: You won't get a ruling

[22] right now.

[23] MR. CHAMBLISS: Okay. Then also, I have to

[24] go -- run down this list, and I have to put it in

[25]

**Page 98**

[1] the way I see things.

[2] May 11th, 12th, 13th and 16th was an injury

[3] date. It's an injury date. In my 15 years of

[4] being here at Amtrak, I have never known anyone to

[5] get -- violate the Attendance Policy for being

[6] injured on the job. We have documents stating

[7] this is a -- I have documents stating this was a

[8] injury date. I have the CFR -- the CFR paperwork

[9] from Amtrak stating that it was an injury -- see

[10] that, if I can hand that to you -- stating that it

[11] was an on-the-job injury.

[12] MR. D'ALESSANDRO: Are you gonna give this

[13] to me?

[14] MR. CHAMBLISS: Yes.

[15] MR. D'ALESSANDRO: That will be Exhibit 7.

[16] (Exhibit 7 marked for identification.)

[17] MR. CHAMBLISS: Stating it was an

[18] on-the-job injury. Also, Amtrak has -- had me

[19] fill out a 10-day report on those dates, including

[20] one doctor's appointment date that I was given

[21] permission by my Supervisor to take off. If I

[22] could hand you that, also. It's a 10-day report

[23] Amtrak does.

[24] MR. D'ALESSANDRO: Ten Day Report will be

[25]

**Page 99**

[1] Exhibit 8.

[2] (Exhibit No. 8 marked for identification.)

[3] MR. CHAMBLISS: Stating that it was an

[4] injury. So to my knowledge, I don't -- I don't

[5] understand why they would go forward with those

[6] dates. I know in our Intent, Mr. Allione, when he

[7] did the Intent, took those dates off. They were

[8] reinstated for some reason; I'm not sure about

[9] what.

[10] I also agree that Thursday, June 17th and

[11] Sunday, June 20th is one incident.

[12] Also, I object to the June 16th. It's

[13] clearly noted that the Supervisor gave me

[14] permission. I did come to work that day. I came

[15] to work on time that day. Amtrak had this

[16] knowledge, and yet they still proceeded in trying

[17] to prosecute me for this time. I feel like it was

[18] malicious, and I feel like it is a result of the

[19] injury I sustained by the Supervisor.

[20] Also, on April 11th the Bridge was out. I

[21] have phone records from my cell phone, showing the

[22] dates and times that I tried to call in here to

[23] try to get another way in to the building, because

[24] you know, I knew that there was no way for me to

[25]

**Page 100**

[1] get in. And I don't know if I can enter that in,

[2] but I can show you that.

[3] MR. D'ALESSANDRO: You can, but you're

[4] going to need copies of it --

[5] MR. CHAMBLISS: Okay.

[6] MR. D'ALESSANDRO: -- unless you want to

[7] give me that one.

[8] (Exhibit No. 9 marked for identification.)

[9] MR. CHAMBLISS: I can copy it or whatever.

[10] The dates and times are highlighted and

[11] shows that at, at 6:48 I called a fellow employee

[12] to try to find out how to get in here. They

[13] didn't answer their phone. At 6:55, I called

[14] again. At 6:56, I called the Super -- one of the

[15] Supervisor's on duty. At 6:58, I called another

[16] Supervisor on duty; they didn't answer the phone.

[17] At 7:07, I called again. At 7:22, I called again.

[18] At 7:33, I called again. Again at 7:33, I called

[19] again. At 7:34 a.m., I called the NEC office

[20] number because they have a connection to the floor

[21] supervisor -- supposed to be an emergency,

[22] emergency type situations to call that number, and

[23] at 7:36 I called again. At that point in time, I

[24] found my way in here. I made every honest attempt

[25]

[ 1] to make it to work on time that day. The bridge

[ 2] was out. I had no knowledge of this until I

[ 3] pulled up here, and I couldn't get in to the

[ 4] building.

[ 5]     And as far as April the 12th, you're

[ 6] talking one minute. The swipe card, I came in; I

[ 7] had to wait for somebody else to swipe in. I

[ 8] swiped my card. It just "dit-it" and it makes a

[ 9] noise and it doesn't, doesn't register. I had to

[10] wait until that reset itself, and I swiped again

[11] right and went on to the safety meeting. I

[12] attended the safety meeting on time. It's -- it's

[13] one minute. I mean that's why I prefer the card,

[14] myself, because a human error -- I've been here 15

[15] years and I've never heard of such a thing that

[16] this -- this one-minute type thing where you have,

[17] you're dealing with a mechanical instrument that

[18] is on record, as Mr. Allione said, has been known

[19] to be faulty at any given time, but then yet they

[20] still proceeded and tried to charge me with this.

[21]     Also, to back up my statement, I said

[22] earlier that I worked on April 12th -- because we

[23] were talking about April 13th, the 22 minutes --

[24] I have the missed swipe form here dated 6/12 for

[25]

Page 102

[ 1] 11:00 to 3:00 p.m.(sic), stating -- and the

[ 2] overtime form -- stating that I did work that time

[ 3] and I was here on the property. These forms and

[ 4] everything -- and all this had been shown to

[ 5] Mr. Allione when he did the investigation. They

[ 6] were ignored and I was still prosecuted anyway,

[ 7] and my idea is in the attempt to punish me for

[ 8] filing an injury with the Company.

[ 9]     I would hope that at this level that we see

[10] that the Carrier is wrong in their efforts and

[11] that all of this be thrown out because if you

[12] over -- if you look at it you take out the injury

[13] dates, you take off the time that I have that I

[14] was given permission to come in here 6:00 to 2:00,

[15] you take the one minute off that the machine

[16] messed up, and you don't have 3 in the 30 or 5 in

[17] the 90.

[18]     So I don't see where there is any

[19] absenteeism problem at all. That's it.

[20]     (Exhibit Nos. 10 and 11 marked for

[21] identification.)

[22]     MR. D'ALESSANDRO: Okay. All the testimony

[23] presented here today will be transcribed and

[24] carefully considered after which I will render a

[25]

Page 103

[ 1] decision within the time limits provided by the

[ 2] Sheetmetal Workers Agreement, which is 15 days.

[ 3]     And the time now is 11:45 and we're going

[ 4] to go right into the next set of Charges, which is

[ 5] 04.273?

[ 6]     MR. CAMPBELL: They're both combined. They

[ 7] are so close to each other, sir --

[ 8]     MR. D'ALESSANDRO: Okay.

[ 9]     MR. CAMPBELL: -- that we'll put both --

[10]     MR. D'ALESSANDRO: We'll combine each --

[11]     MR. CAMPBELL: -- on at the same time.

[12]     MR. D'ALESSANDRO: Each witness will

[13] testify to both Charges?

[14]     MR. CAMPBELL: That's correct.

[15]     MR. D'ALESSANDRO: Understandable.

[16] Alright. It's still 12:45(sic).

[17]     (Off the record.)

[18]     MR. D'ALESSANDRO: This is the end of the

[19] first tape. I'm going to start a new one.

[20]     (Off the record. Tape 2/Side A begins.)

[21]     MR. D'ALESSANDRO: Okay. This is Tape 2,

[22] and we're going on the record for Case 04.273 and

[23] 04.274.

[24]     Mr. Campbell is the Charging Officer, and

[25]

Page 104

[ 1] do you have a witness entered the room,

[ 2] Mr. Campbell?

[ 3]     MR. CAMPBELL: Yes. I have Foreman Snyder,

[ 4] Mr. Snyder.

[ 5]     MR. D'ALESSANDRO: Would you identify

[ 6] yourself for the record?

[ 7]     MR. SNYDER: Steve Snyder, Foreman II.

[ 8]     MR. CAMPBELL: Mr. Snyder, how long have

[ 9] you been a Foreman?

[10]     MR. SNYDER: Two and a half years.

[11]     MR. CAMPBELL: And where do you work at?

[12]     MR. SNYDER: High Speed Rail Facility.

[13] Most of my time is at the Station. One day a week

[14] I'm at the facility.

[15]     MR. CAMPBELL: Do you know Mr. Chambliss?

[16]     MR. SNYDER: Yes, I do.

[17]     MR. CAMPBELL: Did you happen to have an

[18] incident with Mr. Chambliss on May the 10th?

[19]     MR. SNYDER: Yes, I did.

[20]     MR. CAMPBELL: I'm handing you a letter

[21] that you wrote; are you --

[22]     MR. HUMPHREYS: We have copies.

[23]     MR. CAMPBELL: -- are you familiar with

[24] that?

[25]

Page 105

[1]        MR. SNYDER: Yes, I am.

[2]        MR. CAMPBELL: I'd like to put this into

[3]    the exhibit -- as a corporate exhibit.

[4]    (unintelligible) number, then Mr. Snyder will read

[5]    it into the record.

[6]        MR. D'ALESSANDRO: It's a two-page

[7]    document. Two-page document, and it's dated

[8]    5/11/04 and be Exhibit M.

[9]        (Exhibit M marked for identification.)

[10]        MR. CAMPBELL: Could you please read --

[11]    well first of all, is that your statement?

[12]        MR. SNYDER: Yes. This is my statement.

[13]    It's got my signature on the end of it.

[14]        MR. CAMPBELL: Could you please read your

[15]    statement into the record?

[16]        MR. SNYDER: Certainly: 5/11/04.

[17]    Statement of events from 5/10/04.

[18]        After our 7:00 a.m. safety meeting in the

[19]    High Speed Rail lunchroom, I was sitting on one

[20]    end of one of the tables, and pipefitter Jerry

[21]    Chambliss was sitting on the other end of the same

[22]    table. I had eaten a doughnut and had a used

[23]    napkin that I tossed into the trash receptacle

[24]    about four feet to his left. Jerry commented

[25]

Page 106

[1]    something on the order of "you threw that at me"

[2]    in a joking manner. I thought nothing -- nothing

[3]    of this, Jerry is one of many workers I kid with

[4]    and kid back with me often. I said something like

[5]    "that wasn't at you" and lightly flipped the

[6]    safety brochure I had just red a rule from at

[7]    Jerry. It unintentionally hit him lightly flat in

[8]    the face. He had glasses on and it is soft enough

[9]    that they were not moved or knocked off.

[10]        I immediately apologized to Mr. Chambliss

[11]    for hitting him with the pamphlet, and his

[12]    response was something like "that had better never

[13]    happen again" to which I responded that it sure

[14]    would not. I told Jerry I was sorry at least one

[15]    more time before leaving the lunchroom, then saw

[16]    him in the locker room a few minutes later and

[17]    apologized for the incident. He did not in any

[18]    way signal to me at any of these times that he was

[19]    miffed, shocked or in any way distressed by my

[20]    actions or words.

[21]        There was no intent of harm, and

[22]    fortunately, none appeared to have occurred. It

[23]    only happened in the spirit of friendship, no

[24]    slight was in any way intended, either personal,

[25]

Page 107

[1]    racial, job-related, or any other type of

[2]    prejudice. I have had no poor relations with

[3]    Jerry (or with any other employees) and it is not

[4]    how I act anyway to take things out against anyone

[5]    if there WERE anything between us.

[6]        Shortly thereafter I was informed by

[7]    Supervisor Bill Vullo that since Joe Wilson had

[8]    not shown up for work that day, I was needed to go

[9]    to the Station. The first that I had any idea

[10]    that the situation wasn't settled was seeing Dino

[11]    Giurfa at the Station and hearing him say he

[12]    needed a statement from me regarding an incident

[13]    that had occurred at the house that morning. I

[14]    only picked up what it was when he mentioned

[15]    Mr. Chambliss and the lunchroom. There was

[16]    seriously no intent of harm or slight, and after

[17]    talking several times with him after the event, I

[18]    did not think there was any misunderstanding

[19]    between the two of us. It was a mistake, but not

[20]    an intentional one.

[21]        Respectfully yours, Steven S. Snyder.

[22]        MR. CAMPBELL: Now the day in question, do

[23]    you remember that quite clearly?

[24]        MR. SNYDER: Yes, I do.

[25]

Page 108

[1]        MR. CAMPBELL: Exactly, explain to me again

[2]    what happened.

[3]        MR. SNYDER: We'd finished the safety

[4]    meeting, given work assignments to people, told

[5]    people what we had happening and giving work

[6]    assignments to people, and I had taken the napkin

[7]    from -- that I'd used from wiping the goo from the

[8]    donut off my fingers and tossed it at the trash

[9]    can. Jerry made a comment something: You threw

[10]    that at me; that seemed to be a joking comment to

[11]    me. I said: Huh, that wasn't at you. I took the

[12]    safety pamphlet that I had, which is to your

[13]    right, right now, and flipped it -- like this --

[14]    toward Mr. Chambliss. I've measured the distance

[15]    since then that -- the table is two four-foot

[16]    tables connected to each other, so we were between

[17]    eight and ten feet apart; we were sitting just

[18]    back from the table, so it may have been ten feet

[19]    of distance. I flipped the book. I honestly

[20]    didn't even think it was gonna get as far as him

[21]    before it hit the table; I was very surprised that

[22]    it did end up hitting him, but it hit him in the

[23]    face like this -- it flipped open and hit him in

[24]    the face --

[25]

Page 109

[1]        MR. CAMPBELL:  Can I –

[2]        MR. SNYDER:  — flat.

[3]        MR. CAMPBELL:  Oh wait.  I'd like to

[4]   indicate that you are indicating that the book

[5]   flipped to the open position —

[6]        MR. SNYDER:  Uh-huh.

[7]        MR. CAMPBELL:  — and it would go right to

[8]   the middle, which would be page 44 and 45; is that

[9]   not correct?

[10]        MR. SNYDER:  I'm not sure of the page

[11]   number it went to, but that —

[12]        MR. CAMPBELL:  That's where I'm holding it.

[13]        MR. SNYDER:  — seems like that's probably

[14]   where it would go.

[15]        MR. CAMPBELL:  Yes, sir.

[16]        You indicated that you threw a napkin

[17]   towards him?

[18]        MR. SNYDER:  I actually tossed the napkin

[19]   toward the trash can, which was located

[20]   approximately like the chair that's to

[21]   Mr. Chambliss's left.

[22]        MR. CAMPBELL:  Okay.  So the napkin missed

[23]   him completely, and went to the trash can; is that

[24]   not correct?

[25]

---

Page 110

[1]        MR. SNYDER:  That's correct.

[2]        MR. CAMPBELL:  The booklet did strike

[3]   Mr. Chambliss?

[4]        MR. SNYDER:  Yes, it did.

[5]        MR. CAMPBELL:  Can you tell me where it

[6]   struck(sic) Mr. Chambliss at?

[7]        MR. SNYDER:  Struck Mr. Chambliss right on

[8]   the face.

[9]        MR. CAMPBELL:  On the face.  Did it knock

[10]   his glasses off or anything?

[11]        MR. SNYDER:  No.  His glasses were still on

[12]   his face, not askew, or not looking any different

[13]   than they always look when the book fell down off

[14]   his face.

[15]        MR. CAMPBELL:  Did it knock him out of his

[16]   chair or anything?

[17]        MR. SNYDER:  No, it did not.

[18]        MR. CAMPBELL:  Did he look real upset to

[19]   you at the time it hit him?

[20]        MR. SNYDER:  No, he did not.

[21]        MR. CAMPBELL:  Did he ever report to you

[22]   that he was injured?

[23]        MR. SNYDER:  No, he did not.

[24]        MR. CAMPBELL:  Do you know if he reported

[25]

---

Page 111

[1]   to anyone that he was injured that day?

[2]        MR. SNYDER:  No, I do not know.  I was at

[3]   the Station shortly after that.

[4]        MR. CAMPBELL:  Did he work the entire day?

[5]        MR. SNYDER:  I — again, I was at the

[6]   Station.  I'm not sure.

[7]        MR. CAMPBELL:  Okay.  Do you know if the

[8]   Police were called?

[9]        MR. SNYDER:  I do not know directly, but

[10]   from hearsay, I believe I heard that the Police

[11]   were called.  I didn't have personal knowledge of

[12]   it happening.

[13]        MR. CAMPBELL:  I have no further questions

[14]   for this gentleman at this time.

[15]        MR. D'ALESSANDRO:  Mr. Humphreys?

[16]        MR. HUMPHREYS:  Yeah, Hello, Steve; how

[17]   are you doing.

[18]        According to your testimony here, your

[19]   letter that you wrote to the Company, it says that

[20]   you threw — when Jerry said:  "You threw that at

[21]   me", you thought it was a joking matter.  How did

[22]   you know that Jerry was taking it as a joking

[23]   matter.

[24]        MR. SNYDER:  From the tone of voice.

[25]

---

Page 112

[1]        MR. HUMPHREYS:  From his tone of voice.

[2]   Alright.

[3]        And how did you say you flipped — were you

[4]   sitting, you were standing; how did you flip the

[5]   book?

[6]        MR. SNYDER:  I was sitting — and if I may

[7]   have the book for a moment — I flipped it like,

[8]   like this; just under-handed flip.

[9]        MR. HUMPHREYS:  Under-handed?  You sure it

[10]   was under-handed?

[11]        MR. SNYDER:  Uh-huh.  I'm sure —

[12]        MR. HUMPHREYS:  — sure it wasn't

[13]   over-handed?

[14]        MR. SNYDER:  I am 100 percent sure it was

[15]   under-handed.

[16]        MR. HUMPHREYS:  You're 100 percent sure it

[17]   was under-handed.

[18]        MR. SNYDER:  Yes.

[19]        MR. HUMPHREYS:  Alright.  Have you seen —

[20]   has Jerry ever been upset with you, in the past —

[21]        MR. SNYDER:  No.  Never —

[22]        MR. HUMPHREYS:  — had any problems in the

[23]   past (inaudible; both speaking) —

[24]        MR. SNYDER:  — had any problems in the

[25]

Page 113

[1] past.

[2]     MR. HUMPHREYS: Have you ever seen Jerry's

[3] facial expressions when he -- when he's ever been

[4] upset?

[5]     MR. SNYDER: I --

[6]     MR. HUMPHREYS: Do you know what -- do you

[7] know what he looks like when he's mad?

[8]     MR. SNYDER: I do not know --

[9]     MR. CAMPBELL: Objection. We're asking for

[10] the man to make conclusions he's not qualified on

[11] doing. Does he ever know his expressions, what he

[12] looks like when he's mad?

[13]     MR. D'ALESSANDRO: I'm gonna have to

[14] overrule. If he doesn't know, he doesn't know.

[15] If he does, he does. Hasn't seen him upset, he

[16] wouldn't know.

[17]     Okay. Keep going.

[18]     MR. HUMPHREYS: Alright. No further

[19] questions at the time.

[20]     MR. D'ALESSANDRO: Mr. Chambliss?

[21]     MR. CHAMBLISS: Mr. Snyder.

[22]     MR. SNYDER: Yes, sir.

[23]     MR. CHAMBLISS: First of all, I'm gonna ask

[24] are you familiar with Amtrak's Standards of

[25]

Page 114

[1] Excellence booklet?

[2]     MR. SNYDER: Yes, sir.

[3]     MR. CHAMBLISS: Are you familiar with the

[4] portion of it on Professional and Personal

[5] Conduct?

[6]     MR. SNYDER: Yes, sir.

[7]     MR. CHAMBLISS: I don't know if -- I'd like

[8] you to read the portion on Conduct, please, sir.

[9]     MR. CAMPBELL: Could I see that first,

[10] please.

[11]     MR. SNYDER: Conduct: On the Amtrak team,

[12] there is no place for activities or behaviors that

[13] compromise the safety, satisfaction and well-being

[14] of our customers, the public, or our fellow

[15] employees. Therefore, boisterous conduct such as

[16] fighting, rudeness, assault, intimidation,

[17] horseplay, and using profane or vulgar language is

[18] unacceptable. It is important to remain calm and

[19] be courteous to all customers, even those who may

[20] be difficult at times.

[21]     MR. CHAMBLISS: Also, the portion on Truth

[22] and Honesty, could you read that for me, sir?

[23]     MR. SNYDER: Certainly: Truth and

[24] Honesty - Every productive employment relationship

[25]

Page 115

[1] requires that the employee and his/her employer

[2] trust one another. So it is at Amtrak. When you

[3] become part of our Company, we place our trust in

[4] your. In turn, you must conduct yourself honestly

[5] and in a way that reflects credit upon Amtrak.

[6]     Because honesty is so important to trust

[7] and our ability to work together as a team, Amtrak

[8] has no tolerance for employees who are dishonest.

[9]     MR. CAMPBELL: Objection. I fail to see

[10] the relevancy of him reading "Trust and Honesty"

[11] into the record. No one's been charged with it,

[12] especially, this gentleman himself, what is the

[13] relevancy of him reading this into the record.

[14]     MR. D'ALESSANDRO: Could I ask you that:

[15] What is the relevance to this?

[16]     MR. CHAMBLISS: I believe that on the

[17] second Charge is -- Truth and Honesty is the

[18] Charge.

[19]     MR. D'ALESSANDRO: Yeah, but that's for

[20] you.

[21]     MR. CHAMBLISS: That's for me. I'm just

[22] asking is he familiar with the statement. That's

[23] the (unintelligible) question for him.

[24]     MR. D'ALESSANDRO: Just familiar?

[25]

Page 116

[1]     MR. CHAMBLISS: Yeah.

[2]     MR. D'ALESSANDRO: There's no need to read

[3] it. He's familiar with it.

[4]     MR. CHAMBLISS: Okay.

[5]     MR. D'ALESSANDRO: He's familiar with it.

[6]     MR. CHAMBLISS: In your statement,

[7] Mr. Snyder, you stated that you lightly threw the

[8] book towards me on --

[9]     MR. SNYDER: That is correct.

[10]     MR. CHAMBLISS: -- this particular day?

[11]     Why did you throw it?

[12]     MR. SNYDER: I was kidding around. It was

[13] prefaced by the fact that I had tossed my napkin

[14] into the trash, and you in what certainly seemed

[15] to be a kidding manner to me said: You threw that

[16] at me. I said: No, that wasn't at you; and I

[17] flipped the book.

[18]     MR. CHAMBLISS: Well um you sure you're not

[19] mistaken about what I said?

[20]     MR. SNYDER: Yes, sir.

[21]     MR. CHAMBLISS: Let -- just let me remind

[22] you a little bit --

[23]     MR. SNYDER: Uh-huh.

[24]     MR. CHAMBLISS: -- 'cause when I stated

[25]

**Page 117**

[ 1]    that to you, I asked you a question: Did you

[ 2]    throw it at me?

[ 3]        MR. SNYDER:  It didn't sound like a

[ 4]    question to me.

[ 5]        MR. CHAMBLISS:  Okay.  Also, Mr. Snyder,

[ 6]    you stated in your statement:  I have had no poor

[ 7]    relations with Jerry or -- and you put in

[ 8]    quotation marks:  With any other employees and it

[ 9]    is...how I acting -- how I act anyway to take

[10]    things out against anyone if they were anything --

[11]    if there were anything between us.

[12]        MR. SNYDER:  Uh-huh.

[13]        MR. CHAMBLISS:  So you're stating that you

[14]    haven't had any problems with any other

[15]    employees --

[16]        MR. SNYDER:  No.  I do --

[17]        MR. CHAMBLISS:  -- at any time?

[18]        MR. SNYDER:  -- not have problems.

[19]        MR. CAMPBELL:  Objection.  I'd like to

[20]    remain to about you.  I don't really want to bring

[21]    in a lot of other employees.  I'd like to talk

[22]    about the relationship between you and him.  I

[23]    fail to see the relevancy if he does have problems

[24]    with other employees.  I know he stated that, but

[25]

**Page 118**

[ 1]    he was only stating that he didn't have problems,

[ 2]    and I don't see where we're going talking about

[ 3]    someone else in this case.

[ 4]        MR. D'ALESSANDRO:  I'm going to have to

[ 5]    sustain that.  Just stick to what the Charges are

[ 6]    and what he knows about what happened.

[ 7]        MR. CHAMBLISS:  Well --

[ 8]        MR. D'ALESSANDRO:  If you have a question

[ 9]    for another employee that comes in, that's okay.

[10]        MR. CHAMBLISS:  Well no.  I was just --

[11]    just reading over what he said and asking him had

[12]    he had any problems.  I'm -- I'm trying to

[13]    establish something, that's --

[14]        MR. D'ALESSANDRO:  I know that, but...

[15]        MR. CHAMBLISS:  Okay.  Was anyone else

[16]    sitting at the table with us at that point in

[17]    time, Mr. Snyder?

[18]        MR. SNYDER:  I don't believe there was

[19]    anybody else at that table.  It was me at one end,

[20]    me at the end that was toward the center of the

[21]    room, and you at the end that was toward the

[22]    windows next to the trash can.  If there was

[23]    anybody else, I'm not aware of it.

[24]        MR. CHAMBLISS:  Okay.  Thank you.

[25]

**Page 119**

[ 1]        MR. HUMPHREYS:  Yeah.  I have a couple

[ 2]    questions, Steve -- excuse me.

[ 3]        MR. D'ALESSANDRO:  Go ahead.

[ 4]        MR. HUMPHREYS:  If you were -- if you were

[ 5]    standing at one end of the table and Jerry was

[ 6]    sitting at the other end of the table, how long

[ 7]    did you say that the table is?

[ 8]        MR. SNYDER:  It was eight feet.

[ 9]        MR. HUMPHREYS:  If -- if you lightly, if

[10]    you lightly, as you say, tossed a book, do you

[11]    think that a book would lightly toss eight-feet

[12]    across the table (inaudible; both speaking)

[13]        MR. SNYDER:  Yeah.

[14]        MR. HUMPHREYS:  -- strike somebody in the

[15]    face?

[16]        MR. SNYDER:  No.

[17]        MR. HUMPHREYS:  No, you don't?

[18]        MR. SNYDER:  I was surprised that it --

[19]        MR. HUMPHREYS:  So in other words you're

[20]    saying --

[21]        MR. SNYDER:  -- (inaudible; both

[22]    speaking) --

[23]        MR. HUMPHREYS:  -- in other words what

[24]    you're saying --

[25]

**Page 120**

[ 1]        MR. CAMPBELL:  Excuse me.  Objection.  Let

[ 2]    the man answer the question.  You asked him a

[ 3]    question --

[ 4]        MR. D'ALESSANDRO:  Let him answer.

[ 5]        MR. CAMPBELL:  -- he's trying to answer it.

[ 6]        MR. D'ALESSANDRO:  Let him answer it and

[ 7]    you can back it up with a question.

[ 8]        MR. HUMPHREYS:  Sorry.

[ 9]        MR. D'ALESSANDRO:  I sustain your

[10]    objection.

[11]        MR. HUMPHREYS:  Okay.

[12]        MR. D'ALESSANDRO:  Go ahead.

[13]        MR. SNYDER:  As I had stated, I was

[14]    surprised that it reached him before hitting the

[15]    table.  It was lightly tossed.

[16]        MR. HUMPHREYS:  So evidently your own

[17]    strength is a little stronger than you thought;

[18]    question?

[19]        MR. SNYDER:  That's entirely possible.

[20]        MR. HUMPHREYS:  Thank you.  No questions at

[21]    this time.

[22]        MR. CHAMBLISS:  At this time.  I reserve

[23]    the right to call him later.

[24]        MR. CAMPBELL:  No questions at this time --

[25]

Page 121

[ 1]    oh, excuse me, sir; I do.

[ 2]        MR. HUMPHREYS: Mr. Snyder, the day in

[ 3]    question, was a safety rule book. I'm holding one

[ 4]    in my hand, and I'm gonna hand it to you. Is this

[ 5]    the same book that you threw that day?

[ 6]        MR. SNYDER: This is the same book.

[ 7]        MR. CAMPBELL: Are you sure of that?

[ 8]        MR. SNYDER: Yes. I'm sure of that.

[ 9]    It's -- book that at least one point in time has

[10]    been mine. It has my name on it.

[11]        MR. CAMPBELL: I'd like to take this book

[12]    and put it into evidence as a –

[13]        MR. D'ALESSANDRO: Be Exhibit N.

[14]        MR. CAMPBELL: -- Corporation's exhibit.

[15]        MR. D'ALESSANDRO: Exhibit N.

[16]        (Exhibit N marked for identification.)

[17]        MR. CAMPBELL: I have no further questions

[18]    at this time.

[19]        MR. CHAMBLISS: I have a question.

[20]        MR. D'ALESSANDRO: Go ahead.

[21]        MR. CAMPBELL: (Unintelligible) when you

[22]    get done with this.

[23]        UNIDENTIFIED SPEAKER: Alright.

[24]        MR. CHAMBLISS: Mr. Snyder --

[25]

Page 122

[ 1]        MR. SNYDER: Uh-huh.

[ 2]        MR. CHAMBLISS: Is the cover attached to

[ 3]    that book?

[ 4]        MR. SNYDER: At this point in time, no the

[ 5]    cover is not.

[ 6]        MR. CHAMBLISS: Do you recall when the

[ 7]    cover came off the book?

[ 8]        MR. SNYDER: I recall that at the time

[ 9]    that -- that we had our confrontation, the cover

[10]    was close to falling off, and --

[11]        MR. CHAMBLISS: Can you just please answer

[12]    the question. Do you recall when the --

[13]        MR. CAMPBELL: Objection.

[14]        MR. CHAMBLISS: -- cover came off?

[15]        MR. CAMPBELL: Objection. The man's trying

[16]    to answer. Please allow --

[17]        (Unintelligible comments; someone else

[18]    speaking.)

[19]        MR. CAMPBELL: -- him to answer.

[20]        MR. SNYDER: I believe that when I went

[21]    over to you afterwards and picked up the book, I

[22]    picked up the book. I don't believe that the

[23]    cover fell off at that point in time.

[24]        MR. CHAMBLISS: Okay.

[25]

Page 123

[ 1]        MR. D'ALESSANDRO: Okay.

[ 2]        MR. HUMPHREYS: I have a question.

[ 3]    Steve, just a second ago you said

[ 4]    "confrontation". You said that you were joking

[ 5]    with him. Now you said that there was a

[ 6]    confrontation. Was there a confrontation?

[ 7]        MR. SNYDER: The only confrontation has

[ 8]    been what has occurred in the last two and a half

[ 9]    months. There was no confrontation at that time.

[10]        MR. HUMPHREYS: So also, you also said that

[11]    you have had no poor relations with Jerry or any

[12]    other employee. Obviously --

[13]        MR. CAMPBELL: Objection.

[14]        MR. HUMPHREYS: -- you just said that

[15]    you --

[16]        MR. CAMPBELL: Objection.

[17]        MR. D'ALESSANDRO: (Inaudible; speaking too

[18]    low) objection?

[19]        MR. CAMPBELL: If he wants to talk to

[20]    another employee, we'd be more than glad --

[21]        MR. HUMPHREYS: Not talking about Jerry --

[22]        MR. CAMPBELL: -- to let him talk --

[23]        MR. HUMPHREYS: I'm not talking about any

[24]    other employee; I'm talking about Jerry.

[25]

Page 124

[ 1]        MR. D'ALESSANDRO: He's asking him if he

[ 2]    had a confrontation with (inaudible) --

[ 3]        MR. HUMPHREYS: You said it's been about

[ 4]    two and a half -- or it's been a while since you

[ 5]    had a confrontation or problem?

[ 6]        MR. SNYDER: I'm not even saying that there

[ 7]    was a confrontation between the two of us. I'm

[ 8]    saying that --

[ 9]        MR. HUMPHREYS: Well you just did a minute

[10]    ago.

[11]        MR. CAMPBELL: Objection. Please let the

[12]    man answer.

[13]        MR. D'ALESSANDRO: Okay --

[14]        MR. HUMPHREYS: I'm sorry.

[15]        MR. SNYDER: I was just trying to describe

[16]    the situation. As -- as I stated at the time

[17]    that -- on the morning of May the 10th, there did

[18]    not seem to be any problem at all between either

[19]    one of us, and in situations that have happened

[20]    since then and since I have found out that it was

[21]    considered to have been a problem, that it was

[22]    considered that it was a malicious act that I

[23]    performed, that is where I'm considering a

[24]    confrontation.

[25]

Page 125

[ 1]        I do not consider it confrontational at
[ 2]  all.  I did what I did in the spirit of
[ 3]  friendship.  I wasn't meaning to do anything to
[ 4]  anybody.  I certainly wasn't meaning to hurt
[ 5]  anybody; I wasn't meaning to impugn their
[ 6]  integrity; I wasn't meaning to do anything.
[ 7]        MR. HUMPHREYS:  Finished?
[ 8]        MR. SNYDER:  I'm finished.
[ 9]        MR. HUMPHREYS:  So -- so in the spirit of
[10]  friendship, do you normally throw books at people?
[11]        MR. SNYDER:  No.
[12]        MR. HUMPHREYS:  Okay.
[13]        MR. CHAMBLISS:  Another question.
[14]        You said that you -- you thought it was
[15]  light and light-hearted and in the spirit of
[16]  friendship.  Also, you stated in your statement
[17]  that you apologized to me several times.  When
[18]  you're joking with someone, do you often apologize
[19]  to them if you feel like they're not upset about
[20]  what you did; do you often apologize to them
[21]  several times?
[22]        MR. SNYDER:  If something unexpected
[23]  occurs, yes.
[24]        MR. CHAMBLISS:  On those occasions, do they
[25]

Page 126

[ 1]  usually let you know that they were upset about
[ 2]  what happened, is the reason why -- is that the
[ 3]  reason why you apologize?
[ 4]        MR. CAMPBELL:  Objection.  I'd like
[ 5]  clarification on the question.
[ 6]        MR. D'ALESSANDRO:  Could you rephrase the
[ 7]  question or expand on the question.
[ 8]        MR. CHAMBLISS:  On those occasions when you
[ 9]  choose to apologize, is it because the person was
[10]  upset about --
[11]        MR. CAMPBELL:  Objection.  I --
[12]        MR. CHAMBLISS:  -- what you did?
[13]        MR. CAMPBELL:  -- like to stay specifically
[14]  to this case and not about any other time he had
[15]  to apologize.
[16]        MR. D'ALESSANDRO:  About this particular
[17]  time.
[18]        MR. CHAMBLISS:  Well I'm just trying to
[19]  understand his normal behavior.  I mean....
[20]        MR. D'ALESSANDRO:  This particular
[21]  instance.
[22]        MR. CHAMBLISS:  When you -- you said in
[23]  your statement that you, you apologized to me
[24]  several times, you did so why?
[25]

Page 127

[ 1]        MR. SNYDER:  Because the safety pamphlet
[ 2]  had touched you in the face.  I -- I didn't want
[ 3]  you to think that I'd done this on purpose.
[ 4]  Didn't want you to think that I was meaning
[ 5]  anything by it.  That's why I kept apologizing to
[ 6]  you to make it clear that this was a fluke.  I did
[ 7]  not intend to do this to you.
[ 8]        MR. CHAMBLISS:  Okay.  Then my question is:
[ 9]  If you said that you felt it was light-hearted and
[10]  it was just playing around, then why would you
[11]  feel that you had to go through apologizing and
[12]  say --
[13]        MR. CAMPBELL:  Objection.  Question asked,
[14]  asked/answered several times.
[15]        MR. D'ALESSANDRO:  You asked him twice the
[16]  same question.
[17]        MR. CHAMBLISS:  Alright.  No other
[18]  questions at this time.
[19]        MR. D'ALESSANDRO:  Mr. --
[20]        MR. HUMPHREYS:  I -- I have a couple more
[21]  questions, Steve.
[22]        You said it was an "unexpected occurrence"
[23]  just a couple seconds ago, (unintelligible)
[24]  unexpected.
[25]

Page 128

[ 1]        MR. CAMPBELL:  Objection.  Could you be
[ 2]  more clear what you're asking.
[ 3]        MR. HUMPHREYS:  I'm getting ready to ask a
[ 4]  question.  How could you unexpectedly pick up a
[ 5]  book and throw it at somebody and hit him in the
[ 6]  face; how could you unexpectedly do that?  Was
[ 7]  your intent to hit Jerry --
[ 8]        MR. CAMPBELL:  Objection.
[ 9]        MR. HUMPHREYS:  -- in the face?
[10]        MR. CAMPBELL:  Objection.
[11]        MR. D'ALESSANDRO:  -- two questions.
[12]        MR. CAMPBELL:  You're asking multiple
[13]  questions.
[14]        MR. HUMPHREYS:  I'm sorry.
[15]        MR. D'ALESSANDRO:  One at a time.
[16]        MR. CAMPBELL:  Please ask him one --
[17]        MR. HUMPHREYS:  One at a time.
[18]        MR. CAMPBELL:  -- and then let the man
[19]  answer.
[20]        Could you ask the question.
[21]        MR. HUMPHREYS:  You unexpectedly said that
[22]  you -- it was an unexpected event.  You hit him in
[23]  the face with the book.  How could you
[24]  unexpectedly hit somebody in the face with a book?
[25]

[1]     MR. SNYDER: I didn't expect the pamphlet
[2] to go as far as it went.
[3]     MR. HUMPHREYS: Are you sure that you were
[4] sitting at the time that you threw the book or
[5] were you standing?
[6]     MR. CAMPBELL: Objection. Question asked
[7] and answered.
[8]     MR. D'ALESSANDRO: Let him -- let him
[9] answer the question.
[10]     MR. SNYDER: I was sitting.
[11]     MR. HUMPHREYS: Are you aware of Jerry's
[12] vision?
[13]     MR. CAMPBELL: Objection. I see --
[14]     MR. D'ALESSANDRO: What's the relevance --
[15]     MR. CAMPBELL: I fail to see --
[16]     MR. D'ALESSANDRO: -- of this?
[17]     MR. HUMPHREYS: The relevance to this is
[18] the man has a prosthetic eye. The book was thrown
[19] and hit him in the face, causing the injury.
[20]     MR. D'ALESSANDRO: How is he going to be
[21] aware of that?
[22]     MR. HUMPHREYS: Because he's worked with
[23] him for numerous years.
[24]     MR. D'ALESSANDRO: Could you answer the
[25]

[1] question.
[2]     MR. SNYDER: I am aware that he has a
[3] prosthetic eye.
[4]     MR. HUMPHREYS: And you still hit him in
[5] the face with a book?
[6]     MR. CAMPBELL: Objection. He's already
[7] testified that he hit him with the book.
[8]     MR. D'ALESSANDRO: He's not denying that.
[9]     MR. HUMPHREYS: Okay. No more questions at
[10] the time.
[11]     MR. D'ALESSANDRO: Mr. Chambliss?
[12]     MR. CHAMBLISS: No. No more questions at
[13] this time.
[14]     MR. CAMPBELL: Yes. Just one question.
[15] May I have the Safety book, please.
[16]     You had said that this is your book; is
[17] that not correct?
[18]     MR. SNYDER: That is correct.
[19]     MR. CAMPBELL: How long have you had that
[20] book?
[21]     MR. SNYDER: Perhaps six months to a year.
[22]     MR. CAMPBELL: The end of the book pretty
[23] tattered and worn?
[24]     MR. SNYDER: Yes.
[25]

Page 131

[1]     MR. CAMPBELL: Is it possible that it was
[2] ready to dislodge from the book itself anyhow?
[3]     MR. SNYDER: It was ready to dislodge.
[4] It's been falling apart little by little from
[5] before I received the book. I got it --
[6]     MR. HUMPHREYS: Objection. We don't know
[7] the relevance of the question.
[8]     MR. D'ALESSANDRO: What's the relevance of
[9] this, Mr. Campbell?
[10]     MR. CAMPBELL: Well I think they brought it
[11] up that the book was thrown at him and the front
[12] cover was tore off behind his initial
[13] (unintelligible).
[14]     MR. D'ALESSANDRO: I don't think that has
[15] any relevance whatsoever.
[16]     MR. CAMPBELL: Alright.
[17]     MR. D'ALESSANDRO: Okay.
[18]     MR. CAMPBELL: I have no further questions
[19] at this time.
[20]     MR. D'ALESSANDRO: Anything else,
[21] gentlemen?
[22]     MR. HUMPHREYS: No questions at this time.
[23]     MR. D'ALESSANDRO: Okay. You're dismissed
[24] for the time being.
[25]

Page 132

[1]     Do you have another witness, Mr. Campbell?
[2]     MR. CAMPBELL: Yes. I'd like to call
[3] Foreman Chris Bello.
[4]     MR. D'ALESSANDRO: Okay. It's 28 after
[5] 12:00.
[6]     (Off the record.)
[7]     MR. D'ALESSANDRO: It's 12:34. Witness has
[8] entered the room. Could you identify yourself for
[9] the record, please, sir.
[10]     MR. BELLO: Yes. Christopher Bello,
[11] General Foreman for the High Speed Rail.
[12]     MR. CAMPBELL: Christopher, is it okay if I
[13] call you Chris?
[14]     MR. BELLO: Yes, you may.
[15]     MR. CAMPBELL: Okay. You know
[16] Mr. Chambliss?
[17]     MR. BELLO: Yes, I do.
[18]     MR. CAMPBELL: Could you give us a little
[19] background about you first, how long you've been
[20] working at Amtrak, where do you work; a little
[21] something about what you do, who you are?
[22]     UNIDENTIFIED SPEAKER: Objection.
[23] Relevance?
[24]     MR. CAMPBELL: For identification.
[25]

Page 145

[ 1]    threw a book and hit a Supervisor in the face,

[ 2]    what would be the procedure at that time?

[ 3]        MR. CAMPBELL: Has no bearing on this case.

[ 4]        MR. D'ALESSANDRO: We have to stick to the

[ 5]    Charges. The case -- the case doesn't involve --

[ 6]        MR. HUMPHREYS: Alright. No problem. No

[ 7]    questions.

[ 8]        MR. D'ALESSANDRO: Okay. Anything else?

[ 9]        MR. CHAMBLISS: No, not at this time.

[10]        MR. CAMPBELL: I have no further questions

[11]    at this time for Mr. Bello.

[12]        MR. D'ALESSANDRO: Okay. Mr. Bello, you're

[13]    dismissed for the time being.

[14]        MR. CAMPBELL: I'd like to call Dino, if

[15]    he -- when he goes up.

[16]        MR. D'ALESSANDRO: Yeah. Could you get

[17]    Dino?

[18]        MR. BELLO: Okay.

[19]        MR. D'ALESSANDRO: I hope he's not out

[20]    getting his car washed.

[21]        It's 12:44.

[22]        (Off the record. Tape 2 ends at this

[23]    point, over mid-way through Side A; nothing

[24]    recorded after that point, nor on Side B.)

[25]

Page 146

[ 1]        MR. D'ALESSANDRO: This is Tape 3.

[ 2]    Apparently, Tape 2 has jammed up, but we'll start

[ 3]    a new tape.

[ 4]        Mr. Campbell, I think you asked this

[ 5]    gentleman a question.

[ 6]        MR. CAMPBELL: Yes. Mr. Dino, you were

[ 7]    giving me a scenario of the incidents that you

[ 8]    personally monitored, went after, investigated,

[ 9]    for Tape 1-B(?). Could you finish where you was

[10]    at, sir?

[11]        MR. GIURFA: Yes, sir.

[12]        On May 17th, 2004, on a Monday,

[13]    Mr. Chambliss is back -- came back to work.

[14]        MR. CAMPBELL: Is that -- how many days is

[15]    that from the date of the -- is that seven days?

[16]        MR. GIURFA: That would be seven days.

[17]        MR. CAMPBELL: Okay. Go ahead, sir.

[18]        MR. GIURFA: On that morning, I scheduled a

[19]    meeting with Mr. Chambliss and Mr. Snyder to

[20]    resolve this issue. Mr. Chambliss showed up with

[21]    General Chairman, Mr. Mascetti -- I mean with

[22]    Local Chairman Mr. Mascetti, and insisted that

[23]    Mr. Mascetti be present.

[24]        I objected to the fact that this meeting

[25]

Page 147

[ 1]    was very informal between two employees and I

[ 2]    didn't want any undue influence from myself or

[ 3]    from Mr. Mascetti. Let's remember that Mr. --

[ 4]    Mr. Chambliss was the offended party and

[ 5]    Mr. Snyder was the offending party. Mr. Chambliss

[ 6]    had no reason to be -- to have any, how can I say,

[ 7]    to have any worry about that meeting because it

[ 8]    was all on Mr. Snyder and I was intending to take

[ 9]    Mr. Snyder and really know what he did and why he

[10]    did it.

[11]        MR. CAMPBELL: Okay.

[12]        MR. GIURFA: Alright. Mr. -- Mr. Chambliss

[13]    still insisted on Mr. Mascetti present --

[14]    presence. At that time I called the meeting off

[15]    on account that no benefit would have come out of

[16]    it.

[17]        Mr. Mascetti insisted on the meeting and I

[18]    then instructed Mr. Bello to attend in my place.

[19]    At this time, Mr. Chambliss refused to attend and

[20]    the meeting was canceled.

[21]        When all that option went out the door, I

[22]    instructed Mr. Allione, which is my Administrative

[23]    Assistant, to proceed with formal charges against

[24]    Mr. Snyder. On the 10th of June at 2004 on

[25]

Page 148

[ 1]    Thursday, I received a call from Mr. Temple

[ 2]    regarding Mr. Chambliss's lawyer --

[ 3]        MR. CAMPBELL: Is Mr. -- clear for the

[ 4]    record, I think you're talking about Greg Temple,

[ 5]    who is an Amtrak lawyer?

[ 6]        MR. GIURFA: That is correct. Evidently,

[ 7]    Mr. Temple has been contacted by Mr. Chambliss's

[ 8]    lawyer regarding an injury sustained by

[ 9]    Mr. Chambliss on May 10th, 2004. I then

[10]    instructed Mr. Allione to bring Mr. Chambliss

[11]    immediately to the Amtrak office on Monday,

[12]    because Friday/Saturday are -- is Mr. Chambliss's

[13]    assigned days off; therefore, I couldn't get ahold

[14]    of him, and ask him -- and told Mr. Allione to ask

[15]    Mr. Chambliss -- Chambliss if he needed to declare

[16]    an injury for the allegedly sustained injury on

[17]    May 10th -- May 10th, '04.

[18]        On that time -- at that time, Mr. Chambliss

[19]    declared the injury. The documentation for the

[20]    injury started at that time.

[21]        MR. CAMPBELL: And what time was that?

[22]        MR. GIURFA: On -- as soon as I got the

[23]    call.

[24]        MR. CAMPBELL: Which date was that, do

[25]

Page 337

Didn't want to be disrespectful.

Dino, on the 17th, you stated that you called a meeting up here?

MR. GIURFA: Just please a moment, I've got to get my notes because I -- I got 'em on my notes; that's what refreshes my memory.

MR. D'ALESSANDRO: Do you want a minute --

MR. GIURFA: -- get my notes?

MR. CHAMBLISS: Uh --

MR. GIURFA: That's the only way I can answer your question.

MR. CHAMBLISS: Yeah. Just indulge me for just five more minutes.

MR. D'ALESSANDRO: It's 24 minutes after.

(Recess.)

MR. D'ALESSANDRO: It's 25 after. We're back on the record and the gentleman has your -- do you have your notes with you now?

MR. GIURFA: Yes, Mr. D'Alessandro.

MR. CAMPBELL: Excuse me, could you rephrase the question to Dino before he answers.

MR. CHAMBLISS: I believe --

MR. D'ALESSANDRO: Re-ask the question.

MR. CHAMBLISS: Yeah. Did you call the

Page 338

meeting up here on the 17th?

MR. GIURFA: Yes, I did.

MR. CHAMBLISS: In earlier -- in earlier testimony, it was testified that you were upset that day. Why were you upset, do you remember?

MR. CAMPBELL: Objection. Has no bearing on any of the specifics in the case.

MR. D'ALESSANDRO: He -- just hold on. I'm going to sustain that because he's not the one that made that statement. You can't use somebody else's testimony to ask him questions.

MR. CHAMBLISS: Okay.

Just to make it clear for me, Dino, why did you not want a Union Rep up here, present at that point in time?

MR. GIURFA: I wanted a frank discussion. I wanted an informal discussion to resolve between two individuals, two employees with no undue influence or counseling from either Amtrak Management or the Organization. I just wanted those two individuals, meaning you and Mr. Snyder, to frankly -- frankly and amicably discuss the situation. But introducing the factor of the Organization or Amtrak Management, it would have

Page 339

prejudiced the outcome of this meeting. That was the reason why I didn't want anybody to -- to be involved in this meeting between you and Mr. Snyder.

MR. CHAMBLISS: And on that occasion, you were -- who was in attendance there at that point in time when I came up the steps; who was in attendance at the meeting -- at the scheduled meeting or however you want to put it?

MR. GIURFA: I don't understand.

MR. CHAMBLISS: Who was in the room besides yourself?

MR. GIURFA: We were never in the room.

MR. CHAMBLISS: Who did you plan on attending?

MR. GIURFA: Just the two of you. Just Mr. Snyder and Mr. Chambliss. I'd remove myself -- I would present; I would talk to you guys, tell you what was the issue, okay; see if you can come up to an agreement. If it didn't, then you would have come and told me.

MR. CHAMBLISS: And at that point in time, what would you have done?

MR. CAMPBELL: Objection.

Page 340

MR. GIURFA: Whatever --

MR. CAMPBELL: Objection. Now we're getting into "what if" something else had happened. It didn't. The facts remain the same, and we -- would only be a supposition if we went any further than that.

MR. D'ALESSANDRO: He wouldn't know the results of (inaudible; speaking too low).

MR. CHAMBLISS: In your investigation, Mr. Giurfa, you -- you made reference to you feeling like you made the determination that it was horseplay, and you said you read all the statement from the witnesses?

MR. GIURFA: That is correct.

MR. CHAMBLISS: What helped you bring about that determination; I'm trying to understand?

MR. GIURFA: By reading the statements.

MR. CHAMBLISS: That's enough. I'll pick that up later in the closing.

MR. D'ALESSANDRO: Okay?

MR. HUMPHREYS: Yeah. We're done.

MR. D'ALESSANDRO: We're finished?

MR. CAMPBELL: I'm done. Thank you, Dino.

MR. D'ALESSANDRO: So are there any more

Page 169

[1]    MR. CAMPBELL: There's no ruling anywhere
[2]  who has to be in a recreation. It's not written
[3]  anywhere. What do — I don't understand the
[4]  question.
[5]    MR. HUMPHREYS: Could you give me —
[6]    MR. D'ALESSANDRO: I'll have to sustain —
[7]    MR. HUMPHREYS: — on that sir?
[8]    MR. D'ALESSANDRO: — the objection. I'm
[9]  gonna have to let him ask the question because
[10]  it's relevant. Go ahead.
[11]    MR. HUMPHREYS: You said yourself and Wade
[12]  Clark were present?
[13]    MR. GIURFA: Right.
[14]    MR. HUMPHREYS: Well why not have a safety
[15]  committee member present during the recreation of
[16]  an incident?
[17]    MR. GIURFA: There was a safety committee.
[18]  It was performed during .405; there were two
[19]  recreation of the incident.
[20]    MR. HUMPHREYS: Two recreations of the
[21]  incident?
[22]    MR. GIURFA: That's correct.
[23]    MR. HUMPHREYS: Well that wasn't given in
[24]  the testimony prior. That was on — we were only
[25]

Page 170

[1]  told of one —
[2]    MR. CAMPBELL: Objection.
[3]    MR. HUMPHREYS: — one —
[4]    MR. CAMPBELL: — you need to ask a
[5]  question.
[6]    MR. D'ALESSANDRO: Ask a question. Relax.
[7]    MR. HUMPHREYS: How many recreations of the
[8]  incident were there?
[9]    MR. GIURFA: Two.
[10]    MR. HUMPHREYS: Why was not — why was that
[11]  not brought present just a few minutes ago when
[12]  you said that there was only one?
[13]    MR. GIURFA: I didn't say was only one.
[14]    MR. HUMPHREYS: It was cer — it was
[15]  certainly noted.
[16]    MR. GIURFA: I never said there was only
[17]  one incident.
[18]    MR. HUMPHREYS: During the second
[19]  recreation of the incident, was a Safety Committee
[20]  Member present?
[21]    MR. GIURFA: No.
[22]    MR. HUMPHREYS: Why not?
[23]    MR. GIURFA: Because there was a highly
[24]  technical issue involving —
[25]

Page 171

[1]    MR. HUMPHREYS: — (unintelligible; both
[2]  speaking), sir?
[3]    MR. GIURFA: — involving certain items
[4]  that a safety member will not understand.
[5]    MR. HUMPHREYS: Is it Amtrak policy to have
[6]  a Safety Committee member during a recreation of
[7]  an incident or an injury?
[8]    MR. GIURFA: Yes, we did. Yes, sir.
[9]  Correct. We did (unintelligible) one, .405.
[10]    MR. HUMPHREYS: Where were they?
[11]    MR. GIURFA: It's right on the form.
[12]    MR. D'ALESSANDRO: What exhibit was it,
[13]  "R" — 405 or 488?
[14]    MR. GIURFA: "405".
[15]    MR. CAMPBELL: You didn't turn in a 405.
[16]    MR. GIURFA: We got one.
[17]    MR. HUMPHREYS: We don't have one here.
[18]  So you're saying a Safety Committee member
[19]  should be present during recreation of an
[20]  incident?
[21]    MR. CAMPBELL: Objection. Objection.
[22]    MR. D'ALESSANDRO: What's your objection?
[23]    MR. CAMPBELL: I fail to see the relevancy
[24]  if it is or isn't. He testified there was one
[25]

Page 172

[1]  there.
[2]    MR. D'ALESSANDRO: If he wasn't there, he
[3]  wasn't there.
[4]    MR. HUMPHREYS: On the 13th, Bob Mascetti
[5]  came in to see you. Can you tell me what kind of
[6]  conversation took place? Who was — excuse me —
[7]  at that time was our Acting — or he was our
[8]  Acting Local Chairman?
[9]    MR. GIURFA: Okay. He came to my office
[10]  and we started discussing Mr. Mascetti — I mean
[11]  Mr. Chambliss's — Chambliss's case, and the
[12]  conversation went as far as Mr. Chambliss filing
[13]  an assault with the Police Department and that's
[14]  all he knew about it.
[15]    MR. HUMPHREYS: Did you make reference to
[16]  the fact that — or did you ask Bob Mascetti —
[17]  I — excuse me. Let me rephrase that.
[18]    Did you make the statement to Bob Mascetti,
[19]  "I guess Mr. Chambliss is claiming an injury" —
[20]    MR. CAMPBELL: Objection.
[21]    MR. HUMPHREYS: — on the 13th?
[22]    MR. CAMPBELL: Objection.
[23]    MR. GIURFA: I do not recall —
[24]    MR. CAMPBELL: Objection.
[25]

181

**Page 173**

[1]    MR. D'ALESSANDRO: It's hearsay.

[2]    MR. HUMPHREYS: It's hearsay.

[3]    MR. D'ALESSANDRO: Can bring Mr. Mascetti

[4] in if you want --

[5]    MR. HUMPHREYS: (Unintelligible; both

[6] speaking) --

[7]    MR. D'ALESSANDRO: -- to.

[8]    MR. HUMPHREYS: Yes. We'll bring

[9] Mr. Mascetti in.

[10]    Alright. At this moment no questions. No

[11] further questions from me at the moment.

[12]    MR. D'ALESSANDRO: Mr. Chambliss, do you

[13] have any questions for Mr. Giurfa?

[14]    MR. CHAMBLISS: Yes. Mr. Giurfa, on -- on

[15] May the 10th, did you approach Mr. Bello and any

[16] time and have a discussion with him about the

[17] incident that occurred between myself and

[18] Mr. Snyder?

[19]    MR. GIURFA: The only time I addressed

[20] Mr. Bello is when we became aware of the incident,

[21] I told Mr. Bello to handle it.

[22]    MR. CHAMBLISS: So you went -- let me

[23] understand this: You went to Mr. Bello and told

[24] him to handle the situation?

[25]

**Page 174**

[1]    MR. GIURFA: That's correct.

[2]    MR. CHAMBLISS: Okay. Also, do you

[3] remember what time that you went to Mr. Bello and

[4] handle the situation?

[5]    MR. GIURFA: I can't recall. It probably

[6] would be 12:00 o'clock; 1:00; 11:00. I don't

[7] recall.

[8]    MR. CHAMBLISS: Okay. Also, you said you

[9] went to Mr. Bello and -- how did you become aware

[10] of the incident?

[11]    MR. GIURFA: I believe I just answered the

[12] question before, when I said to Mr. Mascetti --

[13]    MR. CHAMBLISS: Could you indulge me, I

[14] don't remember. Could you indulge me, please.

[15]    MR. GIURFA: Indulge you. Again, I'll

[16] (unintelligible) as I said before. Pipefitter

[17] Chambliss and Sheetmetal Worker Local Chairman

[18] Mascetti approached me in my office regarding an

[19] incident involving possible workplace violence

[20] that happened the same morning at the 7:00 a.m.

[21] job briefing.

[22]    MR. CHAMBLISS: Do you recall what time was

[23] that --

[24]    MR. CAMPBELL: Objection.

[25]

**Page 175**

[1]    MR. CHAMBLISS: -- is what I'm asking?

[2]    MR. CAMPBELL: We're beating this thing to

[3] death --

[4]    MR. CHAMBLISS: Can he just --

[5]    MR. CAMPBELL: -- he's already answered the

[6] question.

[7]    MR. CHAMBLISS: He said that we came in

[8] there. I'm trying -- trying to figure out do you

[9] know what time that we came in?

[10]    MR. D'ALESSANDRO: Said he didn't recall.

[11]    MR. CHAMBLISS: Didn't recall.

[12]    Okay. No more questions at this time.

[13]    MR. D'ALESSANDRO: Mr. Humphreys, do you

[14] have anything else?

[15]    MR. HUMPHREYS: According to the Standards

[16] of Excellence that Amtrak has adopted, and that

[17] we're held such a high standard to, could you read

[18] the paragraph of Conduct to me, Dino?

[19]    MR. CAMPBELL: Objection. I fail to see

[20] the relevancy. We've already said that the

[21] Foreman was horseplaying. That's the only thing

[22] that we're gonna talk about that's relevant in the

[23] whole statement about Conduct.

[24]    MR. D'ALESSANDRO: This gentleman's not

[25]

**Page 176**

[1] Charged, and the Foreman was already handled

[2] according to the testimony.

[3]    MR. HUMPHREYS: Alright. No further

[4] questions --

[5]    MR. D'ALESSANDRO: We're aware --

[6]    MR. HUMPHREYS: -- at the moment.

[7]    MR. D'ALESSANDRO: We're aware what the

[8] Standards --

[9]    MR. HUMPHREYS: Okay. No further questions

[10] at the moment.

[11]    MR. CHAMBLISS: Well I thought he was

[12] getting to the -- where did he come with the

[13] horseplay, what made him get that determination.

[14] Um --

[15]    MR. CAMPBELL: Are you asking a question --

[16]    MR. CHAMBLISS: -- differentiate --

[17]    MR. CAMPBELL: Excuse me. Objection. Are

[18] you asking a question?

[19]    MR. D'ALESSANDRO: He's asking -- he's

[20] talking to me. Hold on.

[21]    MR. CAMPBELL: Oh. He's -- clarification

[22] is what he wants.

[23]    MR. D'ALESSANDRO: His opinion -- in his

[24] opinion that -- that's what it was, horseplay.

[25]

[ 1]        MR. D'ALESSANDRO:  It's hearsay.

[ 2]        MR. HUMPHREYS:  It's hearsay.

[ 3]        MR. D'ALESSANDRO:  Can bring Mr. Mascetti

[ 4] in if you want --

[ 5]        MR. HUMPHREYS:  (Unintelligible; both

[ 6] speaking) --

[ 7]        MR. D'ALESSANDRO:  -- to.

[ 8]        MR. HUMPHREYS:  Yes.  We'll bring

[ 9] Mr. Mascetti in.

[10]        Alright.  At this moment no questions.  No

[11] further questions from me at the moment.

[12]        MR. D'ALESSANDRO:  Mr. Chambliss, do you

[13] have any questions for Mr. Giurfa?

[14]        MR. CHAMBLISS:  Yes.  Mr. Giurfa, on -- on

[15] May the 10th, did you approach Mr. Bello and any

[16] time and have a discussion with him about the

[17] incident that occurred between myself and

[18] Mr. Snyder?

[19]        MR. GIURFA:  The only time I addressed

[20] Mr. Bello is when we became aware of the incident,

[21] I told Mr. Bello to handle it.

[22]        MR. CHAMBLISS:  So you went -- let me

[23] understand this:  You went to Mr. Bello and told

[24] him to handle the situation?

[25]

---

[ 1]        MR. GIURFA:  That's correct.

[ 2]        MR. CHAMBLISS:  Okay.  Also, do you

[ 3] remember what time that you went to Mr. Bello and

[ 4] handle the situation?

[ 5]        MR. GIURFA:  I can't recall.  It probably

[ 6] would be 12:00 o'clock; 1:00; 11:00.  I don't

[ 7] recall.

[ 8]        MR. CHAMBLISS:  Okay.  Also, you said you

[ 9] went to Mr. Bello and -- how did you become aware

[10] of the incident?

[11]        MR. GIURFA:  I believe I just answered the

[12] question before, when I said to Mr. Mascetti --

[13]        MR. CHAMBLISS:  Could you indulge me, I

[14] don't remember.  Could you indulge me, please.

[15]        MR. GIURFA:  Indulge you.  Again, I'll

[16] (unintelligible) as I said before.  Pipefitter

[17] Chambliss and Sheetmetal Worker Local Chairman

[18] Mascetti approached me in my office regarding an

[19] incident involving possible workplace violence

[20] that happened the same morning at the 7:00 a.m.

[21] job briefing.

[22]        MR. CHAMBLISS:  Do you recall what time was

[23] that --

[24]        MR. CAMPBELL:  Objection.

[25]

---

Page 175

[ 1]        MR. CHAMBLISS:  -- is what I'm asking?

[ 2]        MR. CAMPBELL:  We're beating this thing to

[ 3] death --

[ 4]        MR. CHAMBLISS:  Can he just --

[ 5]        MR. CAMPBELL:  -- he's already answered the

[ 6] question.

[ 7]        MR. CHAMBLISS:  He said that we came in

[ 8] there.  I'm trying -- trying to figure out do you

[ 9] know what time that we came in?

[10]        MR. D'ALESSANDRO:  Said he didn't recall.

[11]        MR. CHAMBLISS:  Didn't recall.

[12]        Okay.  No more questions at this time.

[13]        MR. D'ALESSANDRO:  Mr. Humphreys, do you

[14] have anything else?

[15]        MR. HUMPHREYS:  According to the Standards

[16] of Excellence that Amtrak has adopted, and that

[17] we're held such a high standard to, could you read

[18] the paragraph of Conduct to me, Dino?

[19]        MR. CAMPBELL:  Objection.  I fail to see

[20] the relevancy.  We've already said that the

[21] Foreman was horseplaying.  That's the only thing

[22] that we're gonna talk about that's relevant in the

[23] whole statement about Conduct.

[24]        MR. D'ALESSANDRO:  This gentleman's not

[25]

---

Page 176

[ 1] Charged, and the Foreman was already handled

[ 2] according to the testimony.

[ 3]        MR. HUMPHREYS:  Alright.  No further

[ 4] questions --

[ 5]        MR. D'ALESSANDRO:  We're aware --

[ 6]        MR. HUMPHREYS:  -- at the moment.

[ 7]        MR. D'ALESSANDRO:  We're aware what the

[ 8] Standards --

[ 9]        MR. HUMPHREYS:  Okay.  No further questions

[10] at the moment.

[11]        MR. CHAMBLISS:  Well I thought he was

[12] getting to the -- where did he come with the

[13] horseplay, what made him get that determination.

[14] Um --

[15]        MR. CAMPBELL:  Are you asking a question --

[16]        MR. CHAMBLISS:  -- differentiate --

[17]        MR. CAMPBELL:  Excuse me.  Objection.  Are

[18] you asking a question?

[19]        MR. D'ALESSANDRO:  He's asking -- he's

[20] talking to me.  Hold on.

[21]        MR. CAMPBELL:  Oh.  He's -- clarification

[22] is what he wants.

[23]        MR. D'ALESSANDRO:  His opinion -- in his

[24] opinion that -- that's what it was, horseplay.

[25]

[ 1]        MR. CLARK: Alright.

[ 2]        MR. D'ALESSANDRO: Thank you very much.

[ 3]    The time now is --

[ 4]        (Unintelligible comment by someone.)

[ 5]        MR. D'ALESSANDRO: -- 36 after 1:00.

[ 6]        (Off the record.)

[ 7]        MR. D'ALESSANDRO: It's 1:48. The witness

[ 8]    has entered the room. Could you identify yourself

[ 9]    for the record, please?

[10]        MR. MASCETTI: Robert Mascetti, Sheetmetal

[11]    Worker, Water Plant Operator.

[12]        MR. D'ALESSANDRO: Alright. Mr. Humphreys.

[13]        MR. HUMPHREYS: Yes, sir.

[14]        Bob, on the date of the incident, the 10th,

[15]    at the time after the incident occurred, Jerry

[16]    came downstairs to you and let you know what was

[17]    going on; is that correct?

[18]        MR. MASCETTI: That's correct.

[19]        MR. HUMPHREYS: At that time, what did

[20]    Jerry ask you to do?

[21]        MR. MASCETTI: At that time we discussed

[22]    what happened. He was upset, and I -- he wanted

[23]    me to go up there and talk to his Manager Dino

[24]    about the incident.

[25]

---

[ 1]        MR. HUMPHREYS: And could you guestimate

[ 2]    what time that was?

[ 3]        MR. MASCETTI: I'd say around 8:00, 8:30.

[ 4]    About 8:30.

[ 5]        MR. HUMPHREYS: Eight-thirty in the

[ 6]    morning.

[ 7]        When you came upstairs and talked to Dino,

[ 8]    can you tell me what that -- that conversation,

[ 9]    how the conversation took place and exactly what

[10]    was said, to your best recollection?

[11]        MR. MASCETTI: I went in his room. I said,

[12]    Dino, there was an incident that happened between

[13]    Jerry and Steve. There was a book thrown and

[14]    there was an incident. Jerry's upset.

[15]        He then proceeded to say that he was

[16]    gonna -- he would be investigating it. I said

[17]    Jerry now is working on a train on 9 Track;

[18]    there's a level one that the train needs to get

[19]    out right away; and then he said that he would

[20]    check with Jerry after the train (inaudible;

[21]    speaking too low), the level one.

[22]        MR. HUMPHREYS: So later on that morning,

[23]    going into the afternoon, you came upstairs again;

[24]    is that correct?

[25]

---

Page 195

[ 1]        MR. MASCETTI: No. That -- that same

[ 2]    morning at 10:30 in the morning, I saw Dino at the

[ 3]    south end of 9 or 10 Track. I went up to him and

[ 4]    asked him if he spoke with Jerry Chambliss. He

[ 5]    said no at that time, that Chris Bello will be

[ 6]    handling the investigation.

[ 7]        At that time, I said: Dino, just make sure

[ 8]    it gets done. I have to go to the train wash and

[ 9]    go to work.

[10]        MR. HUMPHREYS: Later on that afternoon,

[11]    you came back upstairs again to talk to Chris

[12]    Bello; is that correct?

[13]        MR. MASCETTI: That's correct.

[14]        MR. HUMPHREYS: At which time you sat down

[15]    and you discussed the events of the incident that

[16]    had happened between Mr. Snyder and Jerry

[17]    Chambliss; correct?

[18]        MR. MASCETTI: Chris Bello wanted a

[19]    statement from Jerry.

[20]        MR. HUMPHREYS: Could you tell us what took

[21]    place in Mr. Bello's office?

[22]        MR. MASCETTI: Jerry -- Chris asked Jerry

[23]    what happened. Jerry was giving Chris the

[24]    information of the incident, and then at that time

[25]

---

Page 196

[ 1]    as Jerry was talking about the incident, Chris

[ 2]    asked -- Jerry said: I didn't know what he was

[ 3]    thinking about -- meaning Steve Snyder, why he

[ 4]    would do such a thing; and then Mr. Chris Bello

[ 5]    answered that he -- Steve does stuff like that;

[ 6]    that he does some "cornball" stuff, I would say;

[ 7]    "cornball stuff" and that he acts like a cornball

[ 8]    sometimes. And that's what -- that was the end of

[ 9]    that?

[10]        MR. HUMPHREYS: Jerry seem very upset to

[11]    you?

[12]        MR. MASCETTI: Of the incident?

[13]        MR. HUMPHREYS: Yes.

[14]        MR. MASCETTI: Jerry was upset, very upset,

[15]    when I first talked to him in the morning at 8:30.

[16]    At that time, I think basically that the

[17]    statement, if you're asking my opinion, that he

[18]    was upset because it had taken that long to --

[19]    to -- for the Comp -- the investigation.

[20]        MR. HUMPHREYS: So he appeared to be under

[21]    high amount of stress?

[22]        MR. MASCETTI: Can't answer that. I

[23]    don't -- I don't know if I can answer that. I

[24]    don't know if he was stressed or not. I know he

[25]

[ 1]  was upset over how long it took for the

[ 2]  investigation.

[ 3]      MR. HUMPHREYS:  For now I'll defer to

[ 4]  Jerry.  Jerry has some questions for him, because

[ 5]  I know there's gonna be more that I have to ask.

[ 6]      MR. CHAMBLISS:  How you doing, Bob?

[ 7]      MR. MASCETTI:  Okay.

[ 8]      MR. CHAMBLISS:  When you initially

[ 9]  approached Mr. Giurfa, was I with you?

[10]      MR. MASCETTI:  No.  First time, no.  You

[11]  was not with me.

[12]      MR. CHAMBLISS:  Did Mr. Bello call us into

[13]  the office?

[14]      MR. MASCETTI:  At approximately 12:30 that

[15]  afternoon.

[16]      MR. CHAMBLISS:  On the 13th, what as your

[17]  conversation with Mr. Giurfa?

[18]      MR. MASCETTI:  The conversation we had was

[19]  about, the mentioning of the conversation was

[20]  about you, your injury, and the Police Report.

[21]  That was the conversation.

[22]      MR. CHAMBLISS:  And what did Mr. Giurfa say

[23]  to you about it?

[24]      MR. MASCETTI:  Dino said that he's

[25]

[ 1]  reporting an injury; isn't he?  And I said

[ 2]  probably and he also had a Police Report and he

[ 3]  said at that time that I was not Jerry Chambliss,

[ 4]  that I was not reporting an injury and I said:

[ 5]  No, I am not Jerry Chambliss.

[ 6]      MR. CHAMBLISS:  Has Mr. Giurfa at any other

[ 7]  time accepted a report of an incident from you

[ 8]  in -- on my behalf?

[ 9]      MR. CAMPBELL:  Objection.

[10]      MR. D'ALESSANDRO:  It's not relevant to

[11]  these Charges.  We're only talking about the

[12]  Charges here in front of us.

[13]      MR. CHAMBLISS:  Right and it -- can I

[14]  explain the relevance.

[15]      MR. D'ALESSANDRO:  What happened previous

[16]  and after this is immaterial.  I'm not going to

[17]  rule on it anyway.

[18]      MR. CHAMBLISS:  As -- as a representative,

[19]  you -- do you....

[20]      You were the Local Chairman at that time,

[21]  and your job was to represent the Sheetmetal

[22]  Workers; correct?

[23]      MR. MASCETTI:  Correct.  At that time.

[24]      MR. CHAMBLISS:  Stated in our Contract,

[25]

---

Page 199

[ 1]  you're basically like a Railroad lawyer --

[ 2]      MR. CAMPBELL:  Objection.

[ 3]      MR. CHAMBLISS:  -- am I correct?

[ 4]      MR. CAMPBELL:  I see no relevance to him

[ 5]  being a Railroad lawyer.

[ 6]      MR. D'ALESSANDRO:  Why don't you just ask

[ 7]  him to explain his position.

[ 8]      MR. CHAMBLISS:  Explain your position?

[ 9]      MR. MASCETTI:  At the time I was the Local

[10]  Chairman of the Sheetmetal Local 363.  Yes, I

[11]  do -- I represent all members of the Local 363.

[12]      MR. CHAMBLISS:  On the 17th of May, what

[13]  happened pertaining to this incident; to your

[14]  knowledge, what happened on that day?

[15]      MR. MASCETTI:  On that day, I -- I'm --

[16]  understanding that there was gonna be a meeting

[17]  taking place -- well let's go --

[18]      On the 17th, let's start from the beginning

[19]  of that day.

[20]      MR. CAMPBELL:  Objection.  What is the

[21]  relevance of the 17th?

[22]      MR. D'ALESSANDRO:  Is it relevant to the

[23]  injury?

[24]      MR. MASCETTI:  Yes.  That was his first day

[25]

---

Page 200

[ 1]  back from the week that he was off.

[ 2]      MR. D'ALESSANDRO:  Okay.  Continue.

[ 3]      MR. MASCETTI:  We talked about reporting

[ 4]  that injury when he first got back.

[ 5]      MR. D'ALESSANDRO:  Right.

[ 6]      MR. MASCETTI:  Mr. Jerry Chambliss and I

[ 7]  talked about it, and I proceeded to go on to work.

[ 8]  At that time, I must not have been around, and he

[ 9]  used Mike Humphreys as a shop steward to go up to

[10]  a meeting with Dino about a -- Dino called for a

[11]  meeting.  This is what I'm hearing.

[12]      MR. CAMPBELL:  Objection.  Do you -- were

[13]  you in the meeting?

[14]      MR. MASCETTI:  Not in the beginning.

[15]  That's why I gotta go through this.

[16]      MR. D'ALESSANDRO:  Relax.

[17]      MR. MASCETTI:  This is what I've heard, and

[18]  then after the fact, that's what I'll tell you

[19]  when I -- where I was involved.

[20]      Dino called for a meeting with Jerry

[21]  Chambliss.  He could not find me, so he took Shop

[22]  Steward Mike Humphreys up to the meeting.

[23]      MR. D'ALESSANDRO:  Okay.

[24]      MR. MASCETTI:  That's where Dino presented,

[25]

Page 201

[ 1]  says that you do not want any Union Rep in the
[ 2]  meeting. There was a blow up. I don't know what
[ 3]  was said, because I wasn't there.
[ 4]       MR. D'ALESSANDRO: Okay.
[ 5]       MR. MASCETTI: I found out -- once I heard
[ 6]  about it and found out about it, I came up to Dino
[ 7]  and Chris Bello where I met them in the hall here,
[ 8]  and I asked him --
[ 9]       MR. D'ALESSANDRO: Getting close. Let's
[10]  not push it.... (Tape 3/Side A ends.)
[11]       (Off the record. Tape 3/Side B begins.)
[12]       MR. D'ALESSANDRO: This is the second side
[13]  of the tape. You can continue.
[14]       MR. MASCETTI: Continue.
[15]       I met Dino and Chris Bello in the hall, and
[16]  I asked them what was going on. They said they
[17]  wanted a meeting with Jerry without a Union Rep.
[18]  I said well that's Jerry's right to have his Union
[19]  Rep with Management and him, that he would like to
[20]  have his Union Rep with him. I said I'm here now,
[21]  that I will meet with you with Jerry.
[22]       Dino proceeded to say that where's(?) Dino
[23]  meeting; we do not want Union reps in the meeting;
[24]  that Chris -- if there's gonna be a meeting Chris
[25]

Page 202

[ 1]  Bello will handle it. I said: Chris --
[ 2]       MR. CAMPBELL: I'm gonna have to object
[ 3]  again. I see no relevance to none --
[ 4]       MR. D'ALESSANDRO: No real relevance --
[ 5]       MR. CAMPBELL: -- of these Charges.
[ 6]       MR. D'ALESSANDRO: Unless there's --
[ 7]       MR. MASCETTI: Well the meeting --
[ 8]       MR. D'ALESSANDRO: Unless there's some kind
[ 9]  of outcome to it.
[10]       MR. MASCETTI: Well that was the day --
[11]  that's the day that he was gonna report his
[12]  injury.
[13]       MR. D'ALESSANDRO: On the 17th?
[14]       MR. MASCETTI: On the 17th.
[15]       MR. D'ALESSANDRO: That's enough said.
[16]       MR. MASCETTI: Okay.
[17]       MR. D'ALESSANDRO: Do you have any other
[18]  questions?
[19]       MR. CHAMBLISS: Not at this time.
[20]       MR. D'ALESSANDRO: Mr. Humphreys, do you
[21]  have anything else?
[22]       MR. HUMPHREYS: Not at the moment, no.
[23]       MR. D'ALESSANDRO: Mr. Campbell?
[24]       MR. CAMPBELL: Just a few. How you doing,
[25]

Page 203

[ 1]  Mr. Mascetti?
[ 2]       MR. MASCETTI: Okay, B.L. How you doing.
[ 3]       MR. CAMPBELL: Is it true that on 5/10/04,
[ 4]  the day of the alleged injury, you were here?
[ 5]       MR. MASCETTI: I was here.
[ 6]       MR. CAMPBELL: And you personally talked to
[ 7]  Mr. Chambliss?
[ 8]       MR. MASCETTI: Yes, I did. I talked to
[ 9]  Jerry Chambliss on 9 Track early in the morning.
[10]       MR. CAMPBELL: And --
[11]       MR. MASCETTI: -- (inaudible; both
[12]  speaking) when I heard about it and he told me.
[13]       MR. CAMPBELL: -- you had concerns about
[14]  what happened?
[15]       MR. MASCETTI: Listening to Jerry, by his
[16]  story, yes.
[17]       MR. CAMPBELL: And what were your concerns,
[18]  again?
[19]       MR. MASCETTI: My concern was about his
[20]  welfare and the safety of the -- of on the job.
[21]       MR. CAMPBELL: And could you explain what
[22]  you mean by that?
[23]       MR. MASCETTI: To where he comes in freely
[24]  and not -- unstressed, un -- unworried about
[25]

Page 204

[ 1]  his -- to do his duties safely.
[ 2]       MR. CAMPBELL: At no time did you perceive
[ 3]  that he was injured, on the 10th?
[ 4]       MR. MASCETTI: That morning that I talked
[ 5]  to Jerry, he was very upset --
[ 6]       MR. CAMPBELL: I agree.
[ 7]       MR. MASCETTI: -- the initial part of that
[ 8]  incident.
[ 9]       MR. CAMPBELL: Yes.
[10]       MR. MASCETTI: And he did not want to talk
[11]  to Management at that time because he was upset,
[12]  that I would handle it form him, and I went up to
[13]  see -- talk to Dino about it.
[14]       MR. CAMPBELL: But you saw this gentleman;
[15]  correct?
[16]       MR. MASCETTI: Yes, I did see him.
[17]       MR. CAMPBELL: At no time did you ever
[18]  consider him being injured?
[19]       MR. HUMPHREYS: We object to that because
[20]  it's -- that -- that would be his opinion.
[21]       MR. CAMPBELL: That's what we're asking
[22]  for, sir.
[23]       MR. D'ALESSANDRO: That's what we're
[24]  looking for.
[25]

Page 205

MR. MASCETTI: I did not see blood.

MR. CAMPBELL: Okay. Is that the only way a person's injured, Mr. Mascetti, if there is blood?

MR. MASCETTI: I cannot tell.

MR. D'ALESSANDRO: It's his opinion, Mr. Campbell.

MR. CAMPBELL: But I'm asking for it.

UNIDENTIFIED SPEAKER: -- gave it to you.

MR. CAMPBELL: Okay. (Unintelligible) you want to lead him for me, boss.

MR. D'ALESSANDRO: (Inaudible) --

MR. CAMPBELL: Okay --

MR. D'ALESSANDRO: -- leading either way.

MR. CAMPBELL: Okay. Well -- I know that. So on 5/10, your major concern was the treatment that this gentleman should receive after he reported an incident to you; is that true or false?

MR. MASCETTI: At that time that Jerry and I talked, our concern was to report the incident.

MR. CAMPBELL: Alright. On May 17th, you talked about there was a meeting. What was that meeting held for?

Page 206

MR. MASCETTI: When I came up to find out at the end about the meeting --

MR. CAMPBELL: Yes.

MR. MASCETTI: -- and I talked to Chris Bello and Dino, was about calming(?) Steve Snyder and Jerry together and coming to an agreement and settle issues.

MR. CAMPBELL: So at -- that's seven days later from May 10th, you still had no concern about personal injury; is that not correct?

MR. MASCETTI: I'm not sure I understand that question, B.L.

MR. CAMPBELL: Okay. Let me see if I can change it for you. When did you first realize that there was an alleged injury to Mr. Chambliss?

MR. MASCETTI: I thought there was an injury when he said he had to go to the doctor's the next day when he called me.

MR. CAMPBELL: Did you tell anyone that?

MR. MASCETTI: Did I tell anyone that he was going to the doctor's, no.

MR. CAMPBELL: No further questions.

MR. HUMPHREYS: We object to that. It's a simple fact that he talked to Dino on the 13th and

Page 207

the fact was brought up that Dino made the statement that there was an injury.

MR. D'ALESSANDRO: He didn't --

(Inaudible comments.)

MR. CHAMBLISS: Just -- I've got a question. Just for the record.

MR. HUMPHREYS: Okay.

MR. D'ALESSANDRO: I understand your objection, but -- but the thing is reporting it to him doesn't make any difference. He just asked him when he was aware that he went to the doctor's and he reported that he was injured. That's (inaudible; speaking too low). It's actually irrelevant (inaudible; speaking too low).

MR. CAMPBELL: You had a question, Mr. Chambliss?

MR. CHAMBLISS: Not at this time.

MR. CAMPBELL: I have no further questions for Mr. Mascetti.

MR. D'ALESSANDRO: Have you got anything, Mr. --

MR. HUMPHREYS: Not at the moment. No. No.

MR. D'ALESSANDRO: Mr. Mascetti, you're

Page 208

dismissed.

(Unintelligible comments by someone.)

MR. D'ALESSANDRO: You can stay as long as you want. Stay as long as you want. It's 1:57.

(Off the record.)

MR. D'ALESSANDRO: Two o'clock on the nose. Mr. Humphreys, you have a witness that entered the room?

MR. HUMPHREYS: Yeah, we do. But I'll defer the que -- the first questioning for Mr. Chambliss.

MR. D'ALESSANDRO: Okay.

MR. CHAMBLISS: How you doing, Ms. Bunch.

MS. BUNCH: (Unintelligible; barely audible.)

MR. CHAMBLISS: Were you present in the lunchroom on May the 10th when the incident happened between Mr. Snyder and myself?

MS. BUNCH: Yes.

MR. CHAMBLISS: Could you tell us what you saw if anything?

MS. BUNCH: Do you want me to go from the safety meeting or do you --

182

Page 209

[1]       MR. CHAMBLISS: Yeah.

[2]       MS. BUNCH: Well we was having a safety

[3]   meeting and after the safety meeting, me, Doria,

[4]   and Stacey was at the table. I was sitting this

[5]   way, Doria had her back to him, and Stacey was

[6]   standing up, and we were talking. All of a sudden

[7]   I seen somebody throw the book. I looked and it

[8]   hit him in the face, but I don't know where in the

[9]   face. So I said WOW. I seen a book in the air,

[10]  right, and I was like WOW, you know.

[11]      And then Stacey and Doria turned around,

[12]  right. So then later on we talk — I talked to

[13]  Jerry, right, and I said Jerry are you going to

[14]  Dino or something, you know, and he said yeah.

[15]  And then later on that day the Police came and we

[16]  talked to the Police — I talked to the Police. I

[17]  gave Chris my statement, that same day.

[18]      MR. CHAMBLISS: Um and —

[19]      MR. D'ALESSANDRO: Chris who?

[20]      MS. BUNCH: Bello.

[21]      MR. D'ALESSANDRO: Okay. That's alright.

[22]  Just...

[23]      MR. CHAMBLISS: How would you say the book

[24]  was thrown: Was it thrown soft? Medium? Hard?

[25]

Page 210

[1]       MS. BUNCH: It was like a hard ball.

[2]       MR. CHAMBLISS: So you said — in your

[3]   opinion it struck me very hard.

[4]       MS. BUNCH: Yeah. It woulda hurt me.

[5]       MR. CHAMBLISS: Pass it down here.

[6]   Passing — could you read your statement to me,

[7]   please.

[8]       MS. BUNCH: I saw — well see I didn't go

[9]   into detail because Chris didn't want any details.

[10]      MR. CHAMBLISS: So you're saying that you

[11]  tried to give more information, but he didn't —

[12]      MS. BUNCH: Yeah.

[13]      MR. CHAMBLISS: — want to write more

[14]  information?

[15]      MS. BUNCH: Right. He just said tell him

[16]  what — what he saw — I saw.

[17]      I saw Steve throw the Safety Book and hit

[18]  Jerry in the face. Then he got up, walked over,

[19]  told Jerry to give him his book back.

[20]      MR. CHAMBLISS: So in your opinion, when —

[21]  when you saw him walk over to me and get the book,

[22]  was it a joking situation?

[23]      MS. BUNCH: He was like: Give me my book,

[24]  you know. He didn't say please or anything.

[25]

Page 211

[1]   That's all I heard.

[2]       MR. CHAMBLISS: Did you give this

[3]   information to Mr. Bello when he — when he —

[4]   when he spoke with you?

[5]       MS. BUNCH: Well I was trying, but he just

[6]   said tell him what I saw, and that's what I saw.

[7]       MR. CHAMBLISS: So basically you're saying

[8]   that he wouldn't let you get the whole story out?

[9]       MS. BUNCH: Right.

[10]      MR. CHAMBLISS: Do you feel that Mr. Bello

[11]  was honestly trying to investigate this matter to

[12]  get to the truth?

[13]      MS. BUNCH: (No response.)

[14]      MR. CHAMBLISS: Can you answer verbally,

[15]  please.

[16]      MS. BUNCH: No.

[17]      MR. CHAMBLISS: Okay. I'm done at this

[18]  time.

[19]      MR. D'ALESSANDRO: Mr. Humphreys?

[20]      MR. HUMPHREYS: Yeah. It's just going to

[21]  probably reiterate what Jerry said. Now, in terms

[22]  of hard, soft or easy, let's — let's change the

[23]  terms. Did he throw it like a fastball in

[24]  baseball or did he —

[25]

Page 212

[1]       MS. BUNCH: Yeah.

[2]       MR. HUMPHREYS: — throw it like a slow

[3]   pitch in baseball?

[4]       MS. BUNCH: No. A fastball. It was like,

[5]   you know, throwing a ball.

[6]       MR. HUMPHREYS: So it wasn't

[7]   under-handed —

[8]       MS. BUNCH: No.

[9]       MR. HUMPHREYS: — you saw him throw it —

[10]      MS. BUNCH: I — I saw —

[11]      MR. HUMPHREYS: — over-handed —

[12]      MS. BUNCH: Uh-huh.

[13]      MR. HUMPHREYS: — is that what you're

[14]  telling us?

[15]      MS. BUNCH: Yeah.

[16]      MR. HUMPHREYS: You saw him throw the book

[17]  over-hand?

[18]      MS. BUNCH: Yeah.

[19]      MR. HUMPHREYS: And it definitely was not

[20]  under-handed?

[21]      MS. BUNCH: No.

[22]      MR. HUMPHREYS: Because the man was sitting

[23]  at a table. How could you pitch something

[24]  under-handed sitting at a table?

[25]

183

Page 213

[1]      MR. D'ALESSANDRO: Just a question.

[2]      MR. HUMPHREYS: So you agree, you could not

[3]  pitch —

[4]      MS. BUNCH: You can't —

5]      MR. HUMPHREYS: — a book —

[6]      MS. BUNCH: You can't —

[7]      MR. HUMPHREYS: — underhanded —

[8]      MR. CAMPBELL: Objection. Please let the

[9]  lady answer the question. You're leading —

[10]      MR. HUMPHREYS: I didn't finish my

[11]  question —

[12]      MR. CAMPBELL: But you're leading her —

[13]      MR. HUMPHREYS: I changed the question —

[14]      MR. CAMPBELL: — you're making gestures —

[15]      MR. CHAMBLISS: Objection —

[16]      MR. CAMPBELL: — making moves —

[17]      MR. CHAMBLISS: — be directed to the

[18]  Hearing —

[19]      MR. CAMPBELL: I am, and he is hearing me,

[20]  sir.

[21]      MR. D'ALESSANDRO: Just ask questions and

[22]  get answers, alright.

[23]      MR. HUMPHREYS: Do I need to re-ask the

[24]  question? Do you understand the question?

[25]

Page 214

[1]      MS. BUNCH: (No audible response.)

[2]      MR. HUMPHREYS: Okay. I'll re-ask the

[3]  question.

[4]      From what you saw from the way Mr. Snyder

[5]  was sitting, could he have possibly tossed the

[6]  book easily to hit Jerry in the face the way that

[7]  he did?

[8]      MS. BUNCH: No. Uh-uh, 'cause Jerry was

[9]  sitting at the head of the table and he was

[10]  sitting down here.

[11]      MR. HUMPHREYS: At one end of the table,

[12]  then the other; correct?

[13]      MS. BUNCH: Right.

[14]      MR. HUMPHREYS: Alright. I don't have any

[15]  further questions.

[16]      MR. D'ALESSANDRO: Mr. Chambliss?

[17]      MR. CHAMBLISS: Not right now.

[18]      MR. D'ALESSANDRO: Mr. Campbell?

[19]      MR. CAMPBELL: Yes, sir. Give me one

[20]  second.

[21]      MR. D'ALESSANDRO: Okay.

[22]      MR. CAMPBELL: So Pam, you were in that

[23]  room that day?

[24]      MS. BUNCH: In the lunchroom, yes.

[25]

Page 215

[1]      MR. CAMPBELL: Pretty well observing what

[2]  was going on?

[3]      MS. BUNCH: (No audible response.)

[4]      MR. CAMPBELL: About how far were you

[5]  sitting away (unintelligible) — what was the

[6]  distance that you would say between them?

[7]      MS. BUNCH: I don't — I don't know. Was

[8]  just one of our lunch tables. At our table in the

[9]  lunchroom —

[10]      MR. CAMPBELL: Okay.

[11]      MS. BUNCH: — it was — it was like that.

[12]  I mean it was that table in the lunchroom. I

[13]  mean, you know, I guess um — I don't know. I

[14]  really never thought about it.

[15]      MR. CAMPBELL: Well do you think it was two

[16]  feet away?

[17]      MR. CHAMBLISS: Objection. Question asked

[18]  and answered.

[19]      MR. D'ALESSANDRO: He's estimating, just to

[20]  give her a distance.

[21]      MR. CAMPBELL: Say was it the distance

[22]  between you and Mr. Art D'Alessandro?

[23]      MS. BUNCH: Yeah.

[24]      MR. CAMPBELL: So let's say it's about

[25]

Page 216

[1]  12-13 feet?

[2]      MS. BUNCH: I don't — I don't know,

[3]  'cause — I don't want to say yeah in —

[4]      MR. D'ALESSANDRO: She doesn't know.

[5]      MS. BUNCH: I don't know.

[6]      MR. CHAMBLISS: She doesn't know.

[7]      MR. CAMPBELL: So you —

[8]      MS. BUNCH: I really don't know.

[9]      MR. CAMPBELL: — don't know —

[10]      MS. BUNCH: I don't know.

[11]      MR. CAMPBELL: — is that your answer?

[12]      MS. BUNCH: Yeah.

[13]      MR. CAMPBELL: You said you didn't really

[14]  see where he hit him at in the face; is that what

[15]  you're —

[16]      MS. BUNCH: I know it — it hit up here

[17]  somewhere, but I — I can't be exact. I saw it

[18]  when it hit.

[19]      MR. CAMPBELL: Okay.

[20]      MS. BUNCH: And I thought it hit right

[21]  here.

[22]      MR. CAMPBELL: So when it hit him, actually

[23]  how was the book — how did it hit him: Open?

[24]  Closed? Sideways? Top or bottom? Since you saw

[25]

Page 217

[1]    it.

[2]        MS. BUNCH:  The edge.  Can I use this?

[3]        MR. CAMPBELL:  Yes.  You sure can.

[4]        MS. BUNCH:  This right here.  This right

[5]    here.

[6]        MR. CAMPBELL:  You're saying —

[7]        MS. BUNCH:  Hit him —

[8]        MR. CAMPBELL:  Alright.  You're saying —

[9]        MS. BUNCH:  — (inaudible; both speaking).

[10]       MR. CAMPBELL:  — of the edge?

[11]       MS. BUNCH:  Uh-huh.  It hit right here.

[12]       MR. HUMPHREYS:  Would that be the binder?

[13]       MR. CAMPBELL:  Excuse me.

[14]       MR. D'ALESSANDRO:  You'll have a chance.

[15]       MR. CAMPBELL:  I think I'm asking

[16]    questions.

[17]        So it was the front that hit him.

[18]       MS. BUNCH:  Uh-huh.

[19]       MR. CAMPBELL:  Hit him on his nose?

[20]       MS. BUNCH:  Yeah.  I know it was close to

[21]    his eye.

[22]       MR. CAMPBELL:  Close to his eye?

[23]       MS. BUNCH:  Uh-huh.  Well I mean, you know,

[24]    it was — hit right here.  Right here.

[25]

Page 218

[1]        MR. CAMPBELL:  Along the side of the bridge

[2]    of his nose?

[3]        MS. BUNCH:  Yeah.

[4]        MR. CAMPBELL:  You said it came like a

[5]    hardball —

[6]        MS. BUNCH:  Yeah.

[7]        MR. CAMPBELL:  — be pitched?

[8]        MS. BUNCH:  Yeah.  Yeah.  'Cause I was

[9]    like:  Whoa!  You know.

[10]       MR. CAMPBELL:  So you said you thought it

[11]    would have hurt you in the (unintelligible; both

[12]    speaking) —

[13]       MS. BUNCH:  Yeah.

[14]       MR. CAMPBELL:  About how fast do you think

[15]    that book was going?

[16]       MS. BUNCH:  It was going fast.  I mean —

[17]       MR. CAMPBELL:  (Inaudible) —

[18]       MR. HUMPHREYS:  She answered the question.

[19]    We object.

[20]       MR. CHAMBLISS:  Objection.  Yeah.  He's

[21]    asked the same question over and over again.

[22]       MR. CAMPBELL:  Well I'm trying to determine

[23]    "real fast".  You do drive, don't you?

[24]       MS. BUNCH:  Uh-huh.

[25]

Page 219

[1]        MR. CHAMBLISS:  Objection.  She says —

[2]        MR. CAMPBELL:  You do know speed —

[3]        MR. CHAMBLISS:  — fast like a fast — a

[4]    softball — fastball.

[5]        MS. BUNCH:  A hardball.

[6]        MR. D'ALESSANDRO:  Hardball.

[7]        MR. CAMPBELL:  Now since it's a hardball,

[8]    you're talking about like at the baseball games?

[9]        MS. BUNCH:  Yeah.

[10]       MR. CAMPBELL:  Do you watch baseball?

[11]       MS. BUNCH:  Yeah.

[12]       MR. CHAMBLISS:  Objection.  Relevance.

[13]       MR. D'ALESSANDRO:  Relax.  Let him ask the

[14]    question.

[15]       MR. CAMPBELL:  The average speed of a

[16]    baseball is about 80 to 90 miles an hour.

[17]       MS. BUNCH:  It was going fast.  It was — I

[18]    mean it was like a hard — I mean like you was

[19]    throwing a ball.

[20]       MR. CAMPBELL:  Okay.  And you saw it hit

[21]    him along the side of the bridge of his nose?

[22]       MS. BUNCH:  Yeah.

[23]       MR. CAMPBELL:  Did it knock his glasses

[24]    off?

[25]

Page 220

[1]        MS. BUNCH:  No.

[2]        MR. CAMPBELL:  Did it move his glasses?

[3]        MS. BUNCH:  I think so — I — I don't

[4]    remember 'cause I — I — I was stunned 'cause you

[5]    don't see nothing like that.

[6]        MR. CAMPBELL:  You were just so shocked

[7]    that —

[8]        MS. BUNCH:  Yeah.  I was shocked.

[9]        MR. CAMPBELL:  You couldn't even believe

[10]    it.

[11]       MS. BUNCH:  It tripped me out.

[12]       MR. CAMPBELL:  Did you go pick the

[13]    gentleman up after the book hit him?

[14]       MS. BUNCH:  No.  I asked him was he alright

[15]    and what was going on, you know.

[16]       MR. CAMPBELL:  Did you see any blood or

[17]    anything (unintelligible)?

[18]       MS. BUNCH:  I really didn't pay no atten —

[19]    all I asked was is he alright and what was going

[20]    on.

[21]       MR. CAMPBELL:  Well I'm saying did you

[22]    check for any bruises or cuts.

[23]       MS. BUNCH:  I'm not a doctor; I can't do

[24]    that.

[25]

MR. CAMPBELL: That is correct, but I mean -- but you do know a bruise or a cut if you see one?
MR. HUMPHREYS: We object.
MR. CHAMBLISS: Objection.
MR. D'ALESSANDRO: (Inaudible) answer.
MR. CAMPBELL: You made a statement that you thought that -- you went to give a statement to Mr. Bello; correct?
MS. BUNCH: Yeah.
MR. CAMPBELL: You said that you thought he wasn't looking for the truth?
MS. BUNCH: No. I said that he didn't want -- he -- all he wanted to know was what I saw, and I told him what I saw.
MR. CAMPBELL: Well isn't your statement what you saw?
MS. BUNCH: Yeah -- I mean, he didn't -- he didn't want me to -- I mean, he didn't want to hear about the safety meeting or, you know.... You know, he didn't want to hear if we were having a safety meeting. (unintelligible; barely audible) leaving out; he didn't want to hear (unintelligible; other chatter in the background)

in there --
MR. CAMPBELL: Excuse me. Take your time. I just had some interference with noise. I want your testimony to come out clear. Could you go again, what did he want?
MS. BUNCH: He didn't -- he didn't want to know who was in the room, like he didn't want to know me, Stacey and Doria was doing --
MR. CAMPBELL: Yes.
MS. BUNCH: -- at the time, you know, 'cause I was trying to tell him that we was just sitting there talking when we -- when I saw the book and yelled(?). He didn't want to know that.
MR. CAMPBELL: So he asked for just the facts?
MS. BUNCH: Uh-huh.
MR. CAMPBELL: Is there anything that you would have put on that statement different if you had told him everything, just who was there and what?
MS. BUNCH: I would have told him what we were doing and how I was sitting, where I could sit -- so you know, how I was sitting and what we

was talking -- we was just standing there talking (inaudible; speaking too low).
MR. CAMPBELL: But it -- is it not true that you didn't see everything that happened?
MS. BUNCH: What you mean?
MR. CAMPBELL: Did you see the whole thing from the time the book left his hand to when --
MS. BUNCH: I saw it, yeah.
MR. CAMPBELL: -- it traveled through the air --
MS. BUNCH: I saw it.
MR. CAMPBELL: -- when it hit him?
MS. BUNCH: I saw it.
MR. CAMPBELL: What was his immediate reaction after the book hit him?
MS. BUNCH: He sit there. He was -- I guess he was in shock.
MR. CAMPBELL: In shock. Did -- so what did he do; I mean, just sit there motionless; didn't do anything, just sit there?
MS. BUNCH: I think he was in shock.
MR. CAMPBELL: Did you ever see him put his hands up?
MS. BUNCH: No. Uh-uh. No.

MR. CAMPBELL: No further questions.
MR. CHAMBLISS: I have one other question. Ms. Bunch, Mr. Campbell asked you about your statement, about what you wanted to put in there. I know I was present when you made the statement to the Police Officer --
MS. BUNCH: Right.
MR. CAMPBELL: Objection. Are you asking a question?
MR. CHAMBLISS: Well I'm getting to my question.
MR. D'ALESSANDRO: Let's give him any opportunity....
MR. CHAMBLISS: You -- and I know you made a statement in the safety meeting on the next day about the incident, how it happened. Would you have put in the statement how hard you thought the book was thrown?
MS. BUNCH: Yeah. They didn't ask me that. You know. If I'd known that was, you know, I would have said how hard it was (unintelligible) threw.
MR. CAMPBELL: Let me ask that question now: How hard did he throw the book?

Page 225

[ 1]    MS. BUNCH: Like a hardball. Fast.

[ 2]    MR. CAMPBELL: How fast?

[ 3]    MR. CHAMBLISS: Objection --

[ 4]    MR. HUMPHREYS: We've already been through

5]   this.

[ 6]    MR. CHAMBLISS: We've already been --

[ 7]    MR. D'ALESSANDRO: Well we keep on going

[ 8]   back to the same statement.

[ 9]    (Inaudible comment and tapping noise on

[10]   table.)

[11]    MR. D'ALESSANDRO: And he's not -- he

[12]   didn't ask him that question. He...

[13]    MR. CAMPBELL: How fast?

[14]    MS. BUNCH: I mean, he threw it like that.

[15]    MR. CAMPBELL: How fast would you consider

[16]   it? Or you don't know?

[17]    UNIDENTIFIED SPEAKER: Yeah.

[18]    MS. BUNCH: I don't --

[19]    MR. HUMPHREYS: Objection.

[20]    MS. BUNCH: I know it was fast.

[21]    MR. CHAMBLISS: Thank(?) -- thank(?) --

[22]   thank(?) --

[23]    MR. D'ALESSANDRO: He threw the book.

[24]    MR. CAMPBELL: Ain't no doubt about he

[25]

---

Page 226

[ 1]   threw the book.

[ 2]    MR. D'ALESSANDRO: Mr. Humphreys, do you

[ 3]   have any --

[ 4]    MR. HUMPHREYS: Yeah. B.L. was questioning

[ 5]   you about the length of the table. Is it true

[ 6]   that Steve was at one end of the table in the

[ 7]   lunchroom -- in our lunchroom, the High Speed

[ 8]   Rail -- and Jerry was at the other --

[ 9]    MS. BUNCH: Right.

[10]    MR. HUMPHREYS: -- the other end of the

[11]   table; is that correct?

[12]    MS. BUNCH: Right.

[13]    MR. HUMPHREYS: Very good.

[14]    Did it create a lot of noise when it hit

[15]   him?

[16]    MS. BUNCH: Yeah, it did.

[17]    MR. HUMPHREYS: Like a popping sound --

[18]    MS. BUNCH: Yeah.

[19]    MR. HUMPHREYS: -- like a smack?

[20]    MS. BUNCH: 'Cause Stacey and Dori turned

[21]   around -- well turned when I said: WHOA!, you

[22]   know. And then Stacey kind of turned and then

[23]   when Dori heard the noise, she turned around.

[24]   Because see, I was sitting towards them and Stacey

[25]

---

Page 227

[ 1]   was standing right here and Dori was sitting right

[ 2]   here and like we was talking and I was like:

[ 3]   WHOA!, and Stacey kind of turned and then when --

[ 4]   Dori turned when she heard the noise; she said:

[ 5]   What was that, you know.

[ 6]    MR. HUMPHREYS: Very good, ma'am.

[ 7]    MS. BUNCH: And we were like a table from

[ 8]   that.

[ 9]    MR. HUMPHREYS: I don't have any -- one

[10]   other question. When Steve walked back over to

[11]   Jerry and said give me back my book, was he being

[12]   sarcastic? Was he being nasty?

[13]    MS. BUNCH: I think he was rude.

[14]    MR. HUMPHREYS: Rude?

[15]    MS. BUNCH: Yeah. I think he was very

[16]   rude.

[17]    MR. HUMPHREYS: So do you think that he

[18]   meant to hit Jerry on purpose; yes or no?

[19]    MS. BUNCH: Yeah.

[20]    MR. HUMPHREYS: He definitely meant to hit

[21]   Jerry on purpose?

[22]    MS. BUNCH: Yeah, 'cause I mean why else

[23]   would you throw a book.

[24]    MR. HUMPHREYS: And you said just -- just

[25]

---

Page 228

[ 1]   for the record, just to make sure we understand

[ 2]   each other, you said -- this is called a binder,

[ 3]   the end of the book, this part of the book. Are

[ 4]   you saying --

[ 5]    MS. BUNCH: Right.

[ 6]    MR. HUMPHREYS: -- this part of the book

[ 7]   hit Jerry right, right between the eyes?

[ 8]    MS. BUNCH: Right there, yeah.

[ 9]    MR. HUMPHREYS: Right between the eyes?

[10]   The bridge of the nose between the eyes?

[11]    MS. BUNCH: Yep.

[12]    MR. HUMPHREYS: I don't have any further

[13]   questions.

[14]    MR. D'ALESSANDRO: Do you have anything

[15]   else, Mr. Chambliss?

[16]    MR. CHAMBLISS: Not at this time.

[17]    MR. CAMPBELL: You refer to two more

[18]   employees, Stacey and Dori?

[19]    MS. BUNCH: Uh-huh.

[20]    MR. CAMPBELL: And you said after the book

[21]   hit him they turned and looked?

[22]    MS. BUNCH: Right.

[23]    MR. CAMPBELL: So they did not see the book

[24]   being thrown?

[25]

Page 229

[ 1]        MR. HUMPHREYS: Objection. They -- they've

[ 2] given statements.

[ 3]        MR. CAMPBELL: Excuse me.

[ 4]        MS. BUNCH: I don't -- I don't know.

[ 5]        MR. D'ALESSANDRO: What's your objection?

[ 6]        UNIDENTIFIED SPEAKER: Okay.

[ 7]        MR. D'ALESSANDRO: She -- she

[ 8] (unintelligible).

[ 9]        MS. BUNCH: I don't know 'cause we didn't

[10] really talk about it. You know, we didn't really

[11] get in details about it, really.

[12]        MR. CAMPBELL: But your testimony was:

[13] When the book made a loud popping sound, you said

[14] whoa; is that not correct?

[15]        MS. BUNCH: While it was in the air.

[16]        MR. CAMPBELL: Yes.

[17]        MS. BUNCH: I said -- I said: WHOA!, you

[18] know.

[19]        MR. CAMPBELL: And that's when they turned

[20] around?

[21]        MS. BUNCH: Yeah.

[22]        MR. CAMPBELL: So they were really not

[23] looking from --

[24]        MS. BUNCH: No, they --

[25]

Page 230

[ 1]        MR. CAMPBELL: -- your point of view?

[ 2]        MS. BUNCH: No, they wouldn't -- no, they

[ 3] was -- Stacey was standing and Dori was sitting,

[ 4] like there in the conversation.

[ 5]        MR. CAMPBELL: Okay.

[ 6]        MS. BUNCH: (Inaudible.)

[ 7]        MR. CAMPBELL: And where were they in

[ 8] relationship to you?

[ 9]        MS. BUNCH: See the tables go like that,

[10] right, and I'd be sitting right here; Doria'd be

[11] sitting right here; and Stacey'd standing at the

[12] end of the table.

[13]        MR. CAMPBELL: So were they looking at you?

[14]        MS. BUNCH: Yeah.

[15]        MR. CAMPBELL: No further questions.

[16]        MR. HUMPHREYS: I have one more question.

[17]        So what you're saying is Stacey possibly

[18] could have seen what had happened?

[19]        MS. BUNCH: Yeah.

[20]        MR. HUMPHREYS: Because he was standing --

[21]        MS. BUNCH: Right.

[22]        MR. HUMPHREYS: -- he wasn't just looking

[23] at you; he wasn't talking to you or Dori; is that

[24] correct?

[25]

Page 231

[ 1]        MS. BUNCH: Right.

[ 2]        MR. HUMPHREYS: So there's a good chance

[ 3] that Stacey possibly could have saw what happened?

[ 4]        MS. BUNCH: Yeah.

[ 5]        MR. HUMPHREYS: Thank you. No further

[ 6] questions.

[ 7]        MR. D'ALESSANDRO: Mr. Chambliss?

[ 8]        MR. CHAMBLISS: No. No further questions.

[ 9]        MR. D'ALESSANDRO: Mr. Campbell?

[10]        MR. CAMPBELL: No further questions at this

[11] time.

[12]        MR. D'ALESSANDRO: Okay.

[13]        MR. HUMPHREYS: Thanks, Pam.

[14]        MR. CAMPBELL: Yes, ma'am.

[15]        MS. BUNCH: He prob -- Stacey probably saw

[16] it, I mean, 'cause we didn't never talk about it.

[17]        MR. HUMPHREYS: Do me a favor, if you see

[18] Stacey, we want to bring Stacey in real quick

[19] 'cause Stacey (unintelligible) --

[20]        MR. D'ALESSANDRO: 2:17.

[21]        (Off the record.)

[22]        MR. D'ALESSANDRO: Eighteen after 2:00.

[23]        A witness has entered the room. Could you

[24] identify yourself for the record, please, sir?

[25]

Page 232

[ 1]        MR. DEFFENBAUGH: Stacey Deffenbaugh.

[ 2]        MR. D'ALESSANDRO: Okay.

[ 3]        MR. HUMPHREYS: Stacey, that morning -- you

[ 4] haven't given us a statement, but that morning in

[ 5] the lunchroom on the day of the occurrence, were

[ 6] you standing at the end of the table when this

[ 7] incident occurred?

[ 8]        MR. DEFFENBAUGH: I was standing -- the

[ 9] table next to (inaudible).

[10]        MR. HUMPHREYS: The table with Jerry and

[11] Steve's incident occurred?

[12]        MR. DEFFENBAUGH: Uh-huh.

[13]        MR. HUMPHREYS: Did you actually see the

[14] incident occur?

[15]        MR. DEFFENBAUGH: (Speaking too low; sounds

[16] like "no").

[17]        MR. HUMPHREYS: (Inaudible remark.) Did

[18] you hear a loud sound or an odd sound come from

[19] that direction.

[20]        MR. DEFFENBAUGH: Yeah. Everybody gasped,

[21] then the noise, and then we turned around.

[22]        MR. HUMPHREYS: Did the noise catch you off

[23] guard?

[24]        MR. DEFFENBAUGH: (Inaudible.)

[25]

Page 233

[ 1]    MR. HUMPHREYS:  What do you think that
[ 2] noise was?
[ 3]    MR. DEFFENBAUGH:  From the aftermath of
[ 4] what I seen, it was a book in front of Jerry and
[ 5] he was picking it up in pieces.
[ 6]    MR. HUMPHREYS:  Who was picking it up?
[ 7]    MR. DEFFENBAUGH:  Jerry.
[ 8]    MR. HUMPHREYS:  Where was Steve at in
[ 9] relationship to that, when Jerry was picking up
[10] the book in pieces?
[11]    MR. DEFFENBAUGH:  Just right -- right in
[12] the vicinity of him, walking back to --
[13]    MR. HUMPHREYS:  So --
[14]    MR. DEFFENBAUGH:  -- where he was at.
[15]    MR. HUMPHREYS:  I'm sorry.
[16]    So at the time of the safety meeting --
[17] Steve read the safety rule to everybody?
[18]    MR. DEFFENBAUGH:  (Inaudible.)
[19]    MR. HUMPHREYS:  Gave everybody job
[20] assignments?
[21]    MR. DEFFENBAUGH:  (Inaudible.)
[22]    MR. HUMPHREYS:  Steve, was it true that
[23] Steve was sitting -- stand -- sitting or standing
[24] at one end of the table and Jerry was at the other
[25]

Page 234

[ 1] end of the table in the lunchroom?
[ 2]    MR. DEFFENBAUGH:  Yes.
[ 3]    MR. HUMPHREYS:  Would you say that's about
[ 4] eight, ten feet?
[ 5]    MR. DEFFENBAUGH:  About that, yeah.
[ 6]    MR. HUMPHREYS:  One more time for the
[ 7] record:  This was an odd sound?
[ 8]    MR. DEFFENBAUGH:  Yes.  I can't -- I can't
[ 9] describe it.  It was -- it was a loud sound.  It
[10] wasn't --
[11]    MR. HUMPHREYS:  Like a smack --
[12]    MR. DEFFENBAUGH:  -- crack.
[13]    MR. HUMPHREYS:  Was it like a smack?
[14]    MR. DEFFENBAUGH:  Crack or a smack, yeah.
[15]    MR. HUMPHREYS:  I have no more questions at
[16] the moment.
[17]    MR. D'ALESSANDRO:  Mr. Chambliss?
[18]    MR. CHAMBLISS:  Stacey, did you hear
[19] anything -- did you hear -- did you hear or see
[20] Steve Snyder approach me at all?
[21]    MR. DEFFENBAUGH:  He -- he was approaching
[22] you at that time.  Don't -- didn't hear any of the
[23] conversation.
[24]    MR. CHAMBLISS:  Okay.  That's all.
[25]

Page 235

[ 1]    MR. D'ALESSANDRO:  Mr. Campbell, do you
[ 2] have any questions?
[ 3]    MR. CAMPBELL:  Yes.  Mr. Deffenbaugh, how
[ 4] are you doing?
[ 5]    MR. DEFFENBAUGH:  Alright.  How you doing.
[ 6]    MR. CAMPBELL:  I've just got a few
[ 7] questions, see what you know about this.
[ 8]    You did testify that you did not see the
[ 9] gentleman throw the book?
[10]    MR. DEFFENBAUGH:  I did not.
[11]    MR. CAMPBELL:  You did not see the book hit
[12] this gentleman?
[13]    MR. DEFFENBAUGH:  I did not.
[14]    MR. CAMPBELL:  After the book hit him, did
[15] you see the Foreman go over to him?
[16]    MR. DEFFENBAUGH:  He was walking towards
[17] him when I turned around, yes.
[18]    MR. CAMPBELL:  And what was his demeanor at
[19] that time?
[20]    MR. DEFFENBAUGH:  I really couldn't say.  I
[21] wasn't focused on him.
[22]    MR. CAMPBELL:  Did he look angry to you?
[23]    MR. DEFFENBAUGH:  I still can't say.
[24]    MR. CAMPBELL:  Did he look happy to you?
[25]

Page 236

[ 1]    MR. DEFFENBAUGH:  (Unintelligible) --
[ 2]    MR. CHAMBLISS:  Objection.  Answered.
[ 3]    MR. D'ALESSANDRO:  He didn't know
[ 4] anything -- he doesn't know.
[ 5]    MR. CAMPBELL:  So you -- you don't really
[ 6] know a lot about this whole case, do you?
[ 7]    MR. DEFFENBAUGH:  Not really.
[ 8]    MR. CAMPBELL:  Thank you.  No further
[ 9] questions.
[10]    MR. D'ALESSANDRO:  Gentlemen, have
[11] anything?
[12]    MR. HUMPHREYS:  No, I don't have any
[13] questions for Stacey.
[14]    MR. CHAMBLISS:  I (unintelligible).
[15]    Stacey, in your -- in your opinion, by the
[16] sound you heard, do you think the book was thrown
[17] hard, that's all?
[18]    MR. DEFFENBAUGH:  (Inaudible) had to make
[19] a -- to make a crack like that, I would say pretty
[20] hard.
[21]    MR. CHAMBLISS:  Thank you.  That's all.
[22]    MR. D'ALESSANDRO:  Mr. Humphreys?
[23]    MR. HUMPHREYS:  No questions.
[24]    MR. D'ALESSANDRO:  Mr. Campbell?
[25]

**Page 281**

[1]  were told earlier?

[2]      MR. BELLO:  No.  I'm totally sure about

[3]  that.

[4]      MR. CHAMBLISS:  Okay.

5]      MR. D'ALESSANDRO:  Alright.

[6]      UNIDENTIFIED SPEAKER:  No questions,

[7]  (unintelligible).

[8]      MR. CAMPBELL:  I don't have any questions.

[9]      MR. D'ALESSANDRO:  Okay.  Again, Mr. Bello,

[10]  you're dismissed for the time being.

[11]      MR. BELLO:  Alright.

[12]      MR. D'ALESSANDRO:  Thank you.

[13]      Do we have anyone else?

[14]      MR. HUMPHREYS:  At the moment I'll talk —

[15]  like to question Jerry.

[16]      MR. D'ALESSANDRO:  Okay.  So you're going

[17]  to call Mr. Chambliss.

[18]      MR. HUMPHREYS:  Yes.  Call Mr. Chambliss.

[19]      Jerry, we have your statement here.  Would

[20]  you like to go ahead and read your statement to

[21]  us, please?

[22]      MR. CHAMBLISS:  Find it...

[23]      MR. HUMPHREYS:  I have two copies of it.

[24]      MR. CHAMBLISS:  I got it.

[25]

**Page 282**

[1]      On May 10th at the morning safety meeting,

[2]  I was hit in the face with a book by Supervisor

[3]  Steve Snyder.  After the meeting was over, I was

[4]  having a conversation with Bill Vullo when

[5]  Mr. Snyder threw a paper towel at the trash can

[6]  next to me.  I asked if he was trying to hit me.

[7]  Mr. Snyder said:  This was — this was trying to

[8]  hit you, picked up the safety book and launched it

[9]  at me, hitting me in the face.  Stunned, I sat

[10]  there in disbelief when he walked up to me and

[11]  said:  I hit you in your little face, and laughed.

[12]  I told him just take your book and go, because I

[13]  was too angry to talk about it.  I went downstairs

[14]  and called my Union Rep — my Union man, Bob, and

[15]  told him about what happened.  Later at lunch,

[16]  Ms. Pam Bunch and Doria Washington told me they

[17]  saw what happened and asked if I was okay.

[18]      MR. HUMPHREYS:  On the morning of the 10th

[19]  sitting in the lunchroom, Steve Snyder, as you

[20]  said, picked up a book and launched it at you.

[21]  How did he launch the book at you:  Did he throw

[22]  it hard; did he throw it like a fastball, like we

[23]  previously asked our witnesses?

[24]      MR. CHAMBLISS:  Yeah.  He threw it

[25]

**Page 283**

[1]  extremely hard.

[2]      MR. HUMPHREYS:  Like a fastball?

[3]      MR. CHAMBLISS:  Yeah.

[4]      MR. HUMPHREYS:  Was he sitting or standing?

[5]      MR. CHAMBLISS:  Trying to recall, because

[6]  like I said, I was talking to Mr. Vullo and when

[7]  the first piece of paper went past me, it drew my

[8]  attention from Mr. Vullo 'cause he started to get

[9]  up to Mr. Snyder, and I don't recall whether he

[10]  was sitting or standing at that point in time.  I

[11]  just — when the — when the paper went over my

[12]  shoulder and drew my attention to it, I just asked

[13]  him:  What you doing, trying to hit me.  And he

[14]  stated:  This is trying to hit you and — and

[15]  threw the book.

[16]      MR. HUMPHREYS:  When you asked if — when

[17]  he was trying to hit you, were you joking?

[18]      MR. CHAMBLISS:  No.  Because the trash can

[19]  was away from me.  He missed the trash can and

[20]  thing went over my shoulder; it was close to my

[21]  face than it was the trash can.

[22]      MR. HUMPHREYS:  After he hit you in the

[23]  face with book, he walked over and he said:  I hit

[24]  you in your little face; is that correct?

[25]

**Page 284**

[1]      MR. CHAMBLISS:  Uh, yeah.

[2]      MR. HUMPHREYS:  In a sarcastic tone?

[3]      MR. CHAMBLISS:  Yeah.

[4]      MR. HUMPHREYS:  How did the book hit you,

[5]  Jerry?

[6]      MR. CHAMBLISS:  I don't have —

[7]      MR. HUMPHREYS:  I've got a Safety Book.  I

[8]  have a Safety Book.

[9]      MR. CHAMBLISS:  The binder of the book

[10]  struck me across the face like this.

[11]      MR. CAMPBELL:  Let it be clear for the

[12]  record that he has the book across his nose, the

[13]  top at his forehead; the bottom at his right

[14]  cheek, for the record.

[15]      MR. D'ALESSANDRO:  It's the right cheek.

[16]      MR. CAMPBELL:  That's correct.

[17]      MR. D'ALESSANDRO:  Am I correct in assuming

[18]  that?

[19]      MR. CHAMBLISS:  No — well I'm just showing

[20]  how the book hit me.  I don't —

[21]      MR. D'ALESSANDRO:  Right up your nose?

[22]      MR. CHAMBLISS:  — he was right here; came

[23]  across like this, if you want to be exact —

[24]      MR. D'ALESSANDRO:  Your right or left?

[25]

197

Page 285

[ 1]    MR. CAMPBELL: Now he's --

[ 2]    MR. CHAMBLISS: Right. The book hit like

[ 3]  this.

[ 4]    MR. D'ALESSANDRO: Your left.

[ 5]    MR. CHAMBLISS: Yes, my left. The bottom

[ 6]  of the book was at my left, top of the book to my

[ 7]  right.

[ 8]    MR. HUMPHREYS: Did you feel any pain at

[ 9]  that moment?

[10]    MR. CHAMBLISS: At that moment, I -- I was

[11]  in shock that he did it. Alls I felt was -- was

[12]  anger. The moment when it happened, all -- all I

[13]  felt was anger and I was shocked that it had

[14]  happened.

[15]    MR. HUMPHREYS: Shocked that an Amtrak

[16]  Supervisor would hit a -- an employee in the face

[17]  with a book?

[18]    MR. CHAMBLISS: Yeah.

[19]    MR. HUMPHREYS: You went downstairs, talked

[20]  to Bob Mascetti. Bob Mascetti came up and talked

[21]  to Dino at that time?

[22]    MR. CHAMBLISS: Yeah. At -- at that point

[23]  after he did it, there -- like I said, it was a

[24]  train that was late and needed to go out. They

[25]

Page 286

[ 1]  had asked that everybody go down to the train. I

[ 2]  was upset. I was in shock. I didn't know what to

[ 3]  do. I proceeded downstairs and went to my train.

[ 4]  I called Mr. Mascetti on my cell phone. I asked

[ 5]  him to come downstairs because I had a complaint.

[ 6]  I complained that Mr. Snyder had hit me with the

[ 7]  book. He told me he would go immediately and talk

[ 8]  to Mr. -- Mr. Giurfa and see what he was gonna do

[ 9]  about it.

[10]    MR. HUMPHREYS: And when Bob came back

[11]  downstairs, what did he say to you?

[12]    MR. CHAMBLISS: He said Mr. Giurfa said he

[13]  would call me upstairs and take a statement.

[14]    MR. HUMPHREYS: Did Mr. Giurfa call you

[15]  back upstairs to take a statement?

[16]    MR. CHAMBLISS: No. At that time

[17]  Mr. Giurfa did not call me back upstairs. Later

[18]  on that day, Mr. Mascetti came back to me and said

[19]  that he re-approached Mr. Giurfa and he -- he

[20]  deferred it to Chris Bello, when Mr. Bello came

[21]  into work.

[22]    MR. HUMPHREYS: At what time approximately

[23]  did you or Mr. Mascetti come up into Mr. Bello's

[24]  office to discuss the incident?

[25]

Page 287

[ 1]    MR. CHAMBLISS: After lunch, they came --

[ 2]  the Supervisors came out on the floor and told me

[ 3]  that they wanted to see me upstairs. At that

[ 4]  point in time, I called my Union Rep,

[ 5]  Mr. Mascetti, and we went upstairs to Mr. Bello's

[ 6]  office.

[ 7]    MR. HUMPHREYS: And Mr. Bello took your

[ 8]  statement at that time?

[ 9]    MR. CHAMBLISS: Mr. Bello sat down and

[10]  asked me what was going on, explaining everything.

[11]  He asked me to write a statement and give it to

[12]  him and that he would be investigating it. He

[13]  said he didn't know what Mr. Giurfa wanted to do;

[14]  he had just walked in; he got thrown in the middle

[15]  of this; and he didn't know where it was gonna go.

[16]    MR. HUMPHREYS: So as the day went along --

[17]  you got off at 3:00 o'clock; correct?

[18]    MR. CHAMBLISS: Yes, I did.

[19]    MR. HUMPHREYS: You went home at that

[20]  point?

[21]    MR. CHAMBLISS: Yes, I did. Before I got

[22]  off at 3:00 o'clock, at -- I was

[23]  upset. It was about 1:00 o'clock after I talked

[24]  to Mr. Bello. I called the Amtrak Police because

[25]

Page 288

[ 1]  it was apparent to me that -- that they weren't

[ 2]  going to do anything about the situation. Amtrak

[ 3]  Police came out here at about 2:00 o'clock, and

[ 4]  they sat in the locker room and took a statement

[ 5]  from me. After they took my statement, they were

[ 6]  walking out, they saw Ms. -- Ms. Bunch and they

[ 7]  also took a statement from her.

[ 8]    MR. HUMPHREYS: Police Officer took a

[ 9]  statement from Ms. Bunch?

[10]    MR. CHAMBLISS: Yes.

[11]    MR. HUMPHREYS: At that point, after that

[12]  happened, what did you do?

[13]    MR. CHAMBLISS: At that --

[14]    MR. HUMPHREYS: Was it getting close -- was

[15]  it getting close to quitting time?

[16]    MR. CHAMBLISS: At that point in time, it

[17]  was past quitting time. I clocked out; I got in

[18]  my car; I went home. I was upset. I was stressed

[19]  out; my head was hurting. I had to pick up my --

[20]  my children, which I do every day. Went home. I

[21]  picked up my children. Later on that day because

[22]  my head was hurting and I was having a hard time

[23]  dealing with the situation that had occurred, I

[24]  called my medical benefits, my mental health line,

[25]

Page 289

[1] and talked — talked to someone there, one of the
[2] counselors on the line.
[3]     MR. HUMPHREYS:  Can you tell us who the
[4] counselor, what her name was?
[5]     MR. CHAMBLISS:  I believe her name was
[6] Janice Carter.
[7]     MR. HUMPHREYS:  And she worked for who,
[8] once again?
[9]     MR. CHAMBLISS:  United Health Care.  The
[10] insurance company.  I don't know who she work
[11] for — it's — it's a number on our medical card,
[12] a 1-800-number that we're supposed to call for
[13] mental health and substance abuse.
[14]     MR. HUMPHREYS:  And what did she have to
[15] say to you?
[16]     MR. CHAMBLISS:  At that point in time after
[17] talking with me for about 30-40 minutes, she
[18] ascertained that that, well in her opinion, that I
[19] was severely under a lot of stress and that she
[20] wanted to get me some counseling for the situation
[21] immediately, and I told her I — I was supposed to
[22] go to work the next day; she told me, no, she did
[23] not want me to go there.  At that point in time
[24] she felt that it would be best that I go see a
[25]

Page 290

[1] counselor.  She then looked up in her log book the
[2] different counselors in my area; set up a meeting
[3] with a counselor and gave me what they — what
[4] they call referrals to a counselor at that point
[5] in time.
[6]     MR. HUMPHREYS:  The next day you made a
[7] doctor's appointment; is that right?
[8]     MR. CHAMBLISS:  Well af — well the next
[9] day, yes, I made a doctor's appointment.
[10]     MR. HUMPHREYS:  How were you feeling that
[11] day?
[12]     MR. CHAMBLISS:  Well I woke up that morning
[13] on — on May 10th.  After I got off the phone with
[14] her, I called my Union Rep, Mr. Mascetti.  I told
[15] him what the counselor had said, and I asked him
[16] how do I mark off because I had no knowledge about
[17] what to do in this instance because I wasn't — I
[18] wasn't on the job at that point in time.  And he
[19] said it was a good question.  He didn't know.  He
[20] said he was gonna call the Union Rep above him and
[21] ask him, inquire to how I was to mark off because
[22] in his opinion the — stress is also an injury.
[23]     So I waited.  At that point in time I took
[24] some — some Tylenol; I laid down; had to get some
[25]

Page 291

[1] sleep.  I went to sleep.  My alarm clock went off
[2] at about five-something in the morning, at
[3] normally time I get up.  At that point in time I
[4] called in because Mr. Mascetti had not returned my
[5] call back to let me know what to do or how to mark
[6] off.
[7]     I called in to the mark-off tape, and the
[8] only options that — since I've been here, to mark
[9] off you need to mark off sick or you either mark
[10] off personal business.  Because I was going to see
[11] a doctor for my injuries or whatever, I marked off
[12] sick, because I didn't know anything else at that
[13] point in time.
[14]     MR. HUMPHREYS:  At that point in time, were
[15] you feeling pain?
[16]     MR. CHAMBLISS:  Not at that point in time.
[17] I — I'd been to sleep.  I woke up.  At that point
[18] in time I didn't feel any pain.  I didn't feel any
[19] pain in my face until that morning because I was
[20] still in bed when I called.  I went into the
[21] bathroom, washed my face, washed up, and when I
[22] went to wash my face, my face was sore.
[23]     At that point in time I was like okay, well
[24] you know, I want to go get this checked out and
[25]

Page 292

[1] make sure there's — there's nothing wrong.
[2]     MR. HUMPHREYS:  So was it the next day that
[3] you went to the doc — your doctor's office?
[4]     MR. CHAMBLISS:  Yeah.  I contacted my
[5] regular — regular doctor, the doctor on my
[6] insurance card.  He asked me what was wrong.  I
[7] explained to him what had happened, and I wanted
[8] to get my face checked out.  He explained to me at
[9] that point in time, he said well that's —
[10] that's — that's a injury-type case and that your
[11] insurance company doesn't cover that type of
[12] situation.  He said you need to contact a
[13] different doctor for that because I'm through your
[14] insurance company, and we don't — we don't deal
[15] with that type of situations.
[16]     So I contacted Mr. Gaber's(?) office,
[17] whatever, and got an appointment with him.  He
[18] recommended that — that — that I go see him
[19] because he deals with — he thought it was a
[20] worker's comp-type situation, and I went to see
[21] him because he said the insurance company doesn't
[22] cover that, and he's through the insurance
[23] company.
[24]     MR. HUMPHREYS:  When you went to see him,
[25]

**Page 245**

[ 1]  anything else, Mr. --

[ 2]      MR. CAMPBELL:  No, sir.

[ 3]      MR. D'ALESSANDRO:  You're dismissed for the

[ 4]  time being.

[ 5]      MR. VULLO:  Thank you, sirs.

[ 6]      MR. HUMPHREYS:  Thank you, Bill.

[ 7]      (Parting comments.)

[ 8]      MR. D'ALESSANDRO:  And it is 2:30.  Same to

[ 9]  you, thank you.

[10]      (Off the record, and then back on in the

[11]  middle of a question by Mr. Humphreys.

[12]  Transcriptionist believes this to be Mr. Vullo,

[13]  since he was just leaving and no new witness was

[14]  introduced.)

[15]      MR. HUMPHREYS:  .... you were in a hurry to

[16]  get out of there, because we know how --

[17]      MR. VULLO:  That's --

[18]      MR. HUMPHREYS:  -- the trains constantly --

[19]      MR. VULLO:  That's correct.

[20]      MR. HUMPHREYS:  -- late out here and having

[21]  problems.  But anyhow, did you ask Jerry at any

[22]  time then or even during the day if he was okay?

[23]      MR. VULLO:  No.  Like I said, I turned

[24]  around and thought they were horseplaying, and I

[25]

**Page 246**

[ 1]  left to get 2158 our and later on I heard that,

[ 2]  you know, what had happened.  He didn't report to

[ 3]  me that he was, you know, there was an injury or

[ 4]  anything, other than he threw, you know Steve --

[ 5]  Mr. Snyder threw the book at him.

[ 6]      MR. HUMPHREYS:  Okay.  I don't have any

[ 7]  more questions now.

[ 8]      MR. D'ALESSANDRO:  Mr. Chambliss, one more

[ 9]  time?

[10]      MR. CHAMBLISS:  No.  That's all.  No I

[11]  don't have any questions.

[12]      MR. D'ALESSANDRO:  Mr. Campbell?

[13]      MR. CAMPBELL:  Just one question:  At any

[14]  time in this whole incident, did you ever perceive

[15]  that this gentleman was injured?

[16]      MR. VULLO:  No, sir.

[17]      MR. CAMPBELL:  No further questions.

[18]      MR. D'ALESSANDRO:  We'll try this again.

[19]  It's 2:31.

[20]      (Off the record.)

[21]      MR. D'ALESSANDRO:  It's 2:35.  We're back

[22]  on the record.  A witness has entered the room.

[23]  Could you identify yourself for the record,

[24]  please, sir?

[25]

**Page 247**

[ 1]      MR. McLEAN:  Yes.  Michael A. McLean,

[ 2]  Amtrak Foreman II, High Speed Rail

[ 3]  (unintelligible; barely audible).

[ 4]      MR. D'ALESSANDRO:  Mr. Chambliss, I think

[ 5]  you wanted to go first.

[ 6]      MR. CHAMBLISS:  How you doing, Mac(ph)?

[ 7]      MR. McLEAN:  Fine.

[ 8]      MR. CHAMBLISS:  Can you give us a little

[ 9]  history about yourself?

[10]      MR. McLEAN:  Well I've been -- I've been

[11]  with Amtrak for about seven years now.  I was a

[12]  Foreman on the conventional(?) side and decided to

[13]  come over to High Speed Rail.  I've been a Foreman

[14]  over at High Speed Rail about -- about four years

[15]  now.  (Unintelligible.)  That's about it.

[16]      MR. CHAMBLISS:  Mr. McLean, on the 18th of

[17]  May, did -- what conversation did we have, can you

[18]  give me any information on a conversation you had

[19]  with me?

[20]      MR. McLEAN:  Yeah.  I think you came to me

[21]  and you had -- you had discussed with me about the

[22]  situation that happened to you, (unintelligible)

[23]  situation.  You also indicated that after that

[24]  situation that -- that you tried to inform(?)

[25]

**Page 248**

[ 1]  Amtrak or one of the Managers --

[ 2]      MR. CAMPBELL:  Can I get an objection here.

[ 3]  I don't really know which situation he's talking

[ 4]  about that happened on the 18th.

[ 5]      MR. D'ALESSANDRO:  It relevant to what's

[ 6]  going on here or what are we talking about or

[ 7]  could it be more specific --

[ 8]      MR. CHAMBLISS:  Yes.

[ 9]      MR. D'ALESSANDRO:  -- okay.

[10]      MR. CHAMBLISS:  Uh-huh.

[11]      MR. McLEAN:  Okay.

[12]      MR. CHAMBLISS:  Mr. McLean, did I discuss

[13]  with you at any time an injury I received on May

[14]  10th or what happened to me on the 17th between

[15]  Mr. Giurfa and my Union Rep and myself?

[16]      MR. McLEAN:  Yes.  You did explain to me

[17]  some of that situation.  Yes.

[18]      MR. CHAMBLISS:  Can you tell me what

[19]  that -- what that conversation entailed?

[20]      MR. McLEAN:  You discussed that you did

[21]  have -- that during your situation over this book

[22]  being thrown or something, a safety book being

[23]  thrown at you, that -- that you tried to talk to

[24]  one of the Amtrak Managers and that you could not

[25]

get in touch with anybody or they wouldn't talk to you, discuss with you something of that nature.

MR. CHAMBLISS: At – at that time, did I mention to you anything about an injury?

MR. McLEAN: You did say, yeah, that you felt like that you had – were hurt. Yeah.

MR. CHAMBLISS: Can you (unintelligible)?

MR. McLEAN: Yeah. You did say that you thought that you were hurt, yes you did, that you did go to the doctor or hospital. You said that.

MR. CHAMBLISS: At that point in time did I – get your opinion(?), did I state to you that I was trying to re – let them know that a injury had occurred and they wouldn't talk to me?

MR. McLEAN: Yeah. You did say something like that. Yes.

MR. CHAMBLISS: And do you remember your response to me at that point in time?

MR. McLEAN: Yeah. I told you – I told you I don't know what to tell you 'cause if they haven't talked to you – I didn't know what the situation was or why they wouldn't talk to you (unintelligible; speaking low and mumbling).

MR. CHAMBLISS: I'm done.

MR. D'ALESSANDRO: Mr. Humphreys?

MR. HUMPHREYS: Yeah, Mac, could you surmise what that reason is, was?

MR. McLEAN: What reason for...?

MR. HUMPHREYS: That they didn't want to talk to Jerry?

MR. McLEAN: No. I have no idea why they didn't want to talk to Jerry. No, I don't know why.

MR. HUMPHREYS: In your opinion, do you feel as if Jerry's had some type of personality conflict with the Supervisors upstairs?

MR. CAMPBELL: Objection.

MR. D'ALESSANDRO: It's irrelevant.

MR. HUMPHREYS: I don't have any more questions.

MR. D'ALESSANDRO: Anything else?

MR. CHAMBLISS: Not at this time.

MR. D'ALESSANDRO: Mr. Campbell?

MR. CAMPBELL: Yes, Mac –

MR. McLEAN: Uh-huh.

MR. CAMPBELL: You said you've been an Amtrak Supervisor for seven years; is that not correct?

MR. McLEAN: That's correct.

MR. CAMPBELL: Four years at High Speed Rail?

MR. McLEAN: Yes, sir.

MR. CAMPBELL: Have you had any training what you're supposed to do when an employee's injured?

MR. McLEAN: Yes, sir, I have.

MR. CAMPBELL: Could you tell me what that is?

MR. McLEAN: Yes. I need to report it immediately. Yes, sir. (Inaudible; speaking too low.)

MR. CAMPBELL: So if an employee comes to you and reports an injury, what would you do?

MR. McLEAN: I would report it to the Manager.

MR. CAMPBELL: On 5/18, Mr. Chambliss said he was talking to you –

MR. McLEAN: Yes, sir.

MR. CAMPBELL: – about a injury he received?

MR. McLEAN: That is correct.

MR. CAMPBELL: Do you know about the date

that he allegedly received that injury?

MR. McLEAN: No, sir. I'm not sure of that. I came off from my two ADO days; I came back from my ADO days.

MR. CAMPBELL: Did he go into any detail about that, report to you?

MR. McLEAN: Yeah. He did tell me what day it was; I couldn't remember. Yes, but I couldn't – I can't recollect what day that it actually happened, you know.

MR. CAMPBELL: Did he tell you who he had talked to in Management?

MR. McLEAN: No.

MR. CAMPBELL: Did he at any time report to you that he was injured and needed help?

MR. McLEAN: No. He did not report it, said he needed help. We discussed it about (inaudible; speaking too low).

MR. CAMPBELL: Did you at any time think that he was reporting an injury to you?

MR. McLEAN: No.

MR. CAMPBELL: If he had reported an injury to you, said he –

MR. CHAMBLISS: Objection.

189

Page 253

[ 1]          MR. D'ALESSANDRO:  What's your objection?

[ 2]          MR. CHAMBLISS:  I'll withdraw.

[ 3]          MR. D'ALESSANDRO:  Okay.

[ 4]          MR. CAMPBELL:  If he had reported an injury

 5]  to you on the 18th, what would you have done?

[ 6]          MR. McLEAN:  I would've immediately gotten

a Manager (inaudible).

[ 8]          MR. CAMPBELL:  No further questions.

[ 9]          MR. D'ALESSANDRO:  Mr. Humphreys?

[10]          MR. HUMPHREYS:  No questions.

[11]          MR. D'ALESSANDRO:  Mr. Chambliss?

[12]          MR. CHAMBLISS:  During our conversation,

[13]  Mr. McLean, what did I tell you about the incident

[14]  that happened on May 10th?

[15]          MR. McLEAN:  You said that — that a

[16]  Foreman had thrown a book at you and had hit you

[17]  in the corner(?), I guess the center of your eye,

[18]  and the fact that — I'm not sure whether you

[19]  indicated whether your glasses were knocked off or

[20]  not.  I don't remember that portion, but — and

[21]  that you — that you were pretty upset about it,

[22]  and I'm assuming you — I remember you saying that

[23]  you went to your doctor and got checked out and

[24]  you were upset because (unintelligible) had

[25]

Page 254

[ 1]  occurred or nothing was done to the Foreman.

[ 2]          MR. CHAMBLISS:  And on that occasion,

[ 3]  you — you stated earlier that I told you I had

[ 4]  the injury and I asked what should I — I do at

[ 5]  that point in time?

[ 6]          MR. McLEAN:  Think that's correct.

[ 7]          MR. CHAMBLISS:  And you said that you —

[ 8]  you didn't know what to tell me?

[ 9]          MR. McLEAN:  Yeah.  I said I didn't know

[10]  what to tell you.

[11]          MR. CHAMBLISS:  That's all.

[12]          MR. D'ALESSANDRO:  Mr. Humphreys?

[13]          MR. HUMPHREYS:  No questions.

[14]          MR. D'ALESSANDRO:  Mr. Campbell?

[15]          MR. CAMPBELL:  At any time did

[16]  Mr. Chambliss report to you a personal injury?

[17]          MR. McLEAN:  No, sir.

[18]          MR. CAMPBELL:  In your conversation with

[19]  him on the 18th, at any time did you have a

[20]  notion, any kind, that he was telling you about a

[21]  personal injury?

[22]          MR. McLEAN:  No.  No.  It was a discussion.

[23]          MR. CHAMBLISS:  I have one more question.

[24]          What constitutes to you, Mr. McLean,

[25]

Page 255

[ 1]  reporting a personal injury?

[ 2]          MR. McLEAN:  If you would tell me that you

[ 3]  were actually hurt — if you say:  I'm hurt, Mac,

[ 4]  I'm hurt; I need some (unintelligible) attention.

[ 5]  That to me constitutes a — an injury.

[ 6]          MR. CHAMBLISS:  Okay.  But on that — on

[ 7]  that occasion I stated to you that I was hurt and

[ 8]  I did seek medical attention; correct?

[ 9]          MR. McLEAN:  That is correct.  You did say

[10]  that.

[11]          MR. D'ALESSANDRO:  Mr. Humphreys?

[12]          MR. HUMPHREYS:  (No audible response.)

[13]          MR. D'ALESSANDRO:  Mr. Campbell?

[14]          MR. CAMPBELL:  No further questions.

[15]          MR. D'ALESSANDRO:  Your dismissed.

[16]          MR. CHAMBLISS:  Thanks Mac.

[17]          MR. HUMPHREYS:  Mr. Allione.

[18]          MR. D'ALESSANDRO:  Do we have somebody —

[19]  yeah.  Could you have Mr. —

[20]          MR. HUMPHREYS:  Allione.

[21]          MR. D'ALESSANDRO:  — Allione.

[22]          (Several comments about pronunciation of

[23]  "Allione".)

[24]          MR. D'ALESSANDRO:  Okay.  It's 2:44.

[25]

Page 256

[ 1]          (Off the record.)

[ 2]          MR. D'ALESSANDRO:  It's 3:45.  Another

[ 3]  witness has entered the room.  Could you identify

[ 4]  yourself for the record?

[ 5]          MR. ALLIONE:  Joseph Allione, Amtrak High

[ 6]  Speed Rail.

[ 7]          MR. HUMPHREYS:  Alright, Joe, just a

[ 8]  couple questions.

[ 9]          On July the 6th, the morning we sat down to

[10]  discuss the Intent as far as the discipline to be

[11]  imposed against Mr. Chambliss, that we all have a

[12]  copy of, (unintelligible...), you made a statement

[13]  to Jerry and I that you wanted to pull yourself

[14]  out as the Charging Officer; could you tell us

[15]  why?

[16]          MR. ALLIONE:  Because of the high

[17]  profile — because of what was at stake with this

[18]  case, I didn't feel that I was experienced enough

[19]  to handle it.

[20]          MR. HUMPHREYS:  When you — when we were

[21]  sitting at the table, and we had been at the table

[22]  for, Lord, I guess an hour, Dino walked in, and

[23]  you and Dino walked outside after we had been

[24]  discussing the Intent.  At that point is when you

[25]

**Page 293**

[ 1]  he did an examination; is that right?

[ 2]      MR. CHAMBLISS:  Yes.  I went to see him on

[ 3]  the 11th, and he did an examination -- I think

[ 4]  they were already put into evidence as Exhibits 1,

[ 5]  2, and 3.

[ 6]      MR. D'ALESSANDRO:  Not to interrupt you,

[ 7]  your statement I made Number 13.

[ 8]      MR. CHAMBLISS:  Okay.

[ 9]      (Exhibit No. 13 marked for identification.)

[10]      MR. HUMPHREYS:  And as a result of his

[11]  examination, what did the doctor conclude, and at

[12]  that time were you in any pain?

[13]      MR. CHAMBLISS:  Yes.  His assessment was,

[14]  I'll read it here.  It's a document:  Assessment:

[15]  Mr. Chambliss has a headache disorder and

[16]  secondary nasal pain as a result of being struck

[17]  in face by a safety manual at work yesterday.  I

[18]  have recommended that he try Fioricet for the

[19]  headache disorder.  This may help relax him a bit,

[20]  as well.  The usual precautions were carefully

[21]  outlined.  I consider him not fit for duty until

[22]  May 17th...and he will return to me in

[23]  approximately nine to ten days, certainly sooner

[24]  if needed.

[25]

**Page 294**

[ 1]      MR. HUMPHREYS:  So you did what your doctor

[ 2]  suggested that you do.  Did you, indeed, come back

[ 3]  to work May 17th?

[ 4]      MR. CHAMBLISS:  Yes, I did.

[ 5]      MR. HUMPHREYS:  And that was a Monday if

[ 6]  I'm not mistaken; is that correct?

[ 7]      MR. CHAMBLISS:  Yes.  I believe so.

[ 8]      MR. HUMPHREYS:  That day, can you tell us

[ 9]  what happened while you were at work that day?

[10]      MR. CHAMBLISS:  On that day, after I talked

[11]  to Mr. Mascetti, he said he had had a conversation

[12]  with Mr. Giurfa about the injury, and he told him

[13]  that he wasn't Jerry Chambliss.  So I said, okay,

[14]  well, you know, I need to go up and talk to him --

[15]  I was speaking with him over the phone.  He said

[16]  well I'll come down there later; we can go up and

[17]  talk to Mr. Giurfa.

[18]      Before that happened, Mr. Bello came down

[19]  on the train and asked me to come upstairs; they

[20]  wanted to have a meeting with me.  I tried to call

[21]  Mr. Mascetti back again.  I guess because he was

[22]  in the car wash -- I'm not sure -- he didn't hear

[23]  his phone ringing; he didn't answer.  I then

[24]  approached Mr. Michael Humphreys, which is the

[25]

**Page 295**

[ 1]  Shop Steward at that time, to go upstairs with me

[ 2]  because they wanted to talk to me, and I wanted to

[ 3]  let them know that I had had an injury because

[ 4]  they didn't want to accept it from Mr. Mascetti.

[ 5]      MR. HUMPHREYS:  And at that point, when we

[ 6]  walked to the steps -- we've already heard

[ 7]  testimony, but I'd like to get your feel of the

[ 8]  events that occurred -- what happened?

[ 9]      MR. CHAMBLISS:  On the 17th when we came up

[10]  the steps, Mr. Bello opened the door to the

[11]  stairwell.  He had asked me to come into the

[12]  conference room and have a seat.  He turned around

[13]  and he asked Mr. Humphreys:  What are you doing

[14]  here?  Mr. Humphreys, you stated to him at that

[15]  point in time, that you were my Union

[16]  representation, that you were coming up with me.

[17]      Mr. Bello said that I didn't need Union

[18]  representation; asked me what was I being paranoid

[19]  about; and he said I wasn't the one being charged

[20]  with anything, you don't need -- I don't see why

[21]  you need to bring a Union rep with you.

[22]      I explained to him that I would feel more

[23]  comfortable, that I had some issues that I wanted

[24]  to discuss also.  He said he didn't know if that

[25]

**Page 296**

[ 1]  was gonna be okay.  At that point in time, Dino

[ 2]  walked up to the conversation and said -- and --

[ 3]  and got kind of upset -- I don't know why:  No.

[ 4]  No union reps.  No.  No.  It's an informal thing.

[ 5]  No Union reps.  I want talking about(?).

[ 6]      Mr. Bello looked at me at this time and

[ 7]  said, you know what I mean, Jerry; you don't

[ 8]  really need him.  I said I feel more comfortable.

[ 9]  It's my contractual right to have my Union

[10]  representation present.  Mr. Giurfa at that time

[11]  said:  No; no meeting; I don't want to talk to

[12]  you.  Mr. Giurfa then turned around, walked back

[13]  towards his office.

[14]      Mr. Humphreys at that point in time took me

[15]  by the arm said:  Jerry, come on let's go.  I

[16]  mean, you don't need this -- any more stress on

[17]  you.

[18]      We left the office.  Immediately after

[19]  leaving the office, we called Mr. Mascetti.  This

[20]  time he did answer his phone.  He came down from

[21]  the car wash.  He went upstairs to talk to

[22]  Mr. Giurfa.

[23]      About five, ten minutes later, he returned

[24]  downstairs because we were waiting in the locker

[25]

[ 1]  room to find out whether we were gonna have the
[ 2]  meeting or not.  He said that Dino would not have
[ 3]  the meeting.  Dino got upset with him and threw
[ 4]  him out the office, as well.
[ 5]       MR. HUMPHREYS:  I don't have any questions
[ 6]  at this moment.
[ 7]       MR. D'ALESSANDRO:  Mr. Campbell, do you
[ 8]  have anything for this gentleman?
[ 9]       MR. CAMPBELL:  Yes, I do, sir.
[10]       First I'd like to ask, was there a injury
[11]  Ten Day report turned in by them; I'm not sure, I
[12]  think they might have turned one in as an exhibit
[13]  for their side?
[14]       MR. D'ALESSANDRO:  Their side, Ten Day
[15]  Report?
[16]       MR. CAMPBELL:  If not, I'd like to get one
[17]  on the record.
[18]       MR. D'ALESSANDRO:  There is not a Ten Day
[19]  Report.
[20]       MR. CAMPBELL:  Alright.  Then I'd like
[21]  to --
[22]       MR. D'ALESSANDRO:  Oh, yes there is.
[23]       MR. CAMPBELL:  Yes, I thought they had put
[24]  one --
[25]

[ 1]       MR. HUMPHREYS:  Exhibit 8, there is.
[ 2]       MR. D'ALESSANDRO:  I'm sorry.
[ 3]       MR. CAMPBELL:  I thought they did.  I'm a
[ 4]  little slow.
[ 5]       MR. D'ALESSANDRO:  We're not gonna argue
[ 6]  that point.
[ 7]       MR. CAMPBELL:  I know.  I'll agree with
[ 8]  you.
[ 9]       MR. D'ALESSANDRO:  It's a Ten Day Report.
[10]       MR. CAMPBELL:  Can I please see that Ten
[11]  Day Report?
[12]       MR. D'ALESSANDRO:  Exhibit 8.
[13]       MR. CAMPBELL:  Okay.  If you'd like a
[14]  clearer copy of the report, I have one, sir; it's
[15]  a little faded.  I think I might have a better
[16]  copy.
[17]       MR. D'ALESSANDRO:  It's okay.
[18]       MR. CAMPBELL:  Mr. Chambliss, I'd like for
[19]  you to look at Exhibit No. 8.  Are you familiar
[20]  with this Report?
[21]       MR. CHAMBLISS:  I -- I know what it is.  I
[22]  mean I can read it, and it says:  Employee's Ten
[23]  Day Report.
[24]       MR. CAMPBELL:  So do you know what a Ten
[25]

[ 1]  Day Report is?
[ 2]       MR. CHAMBLISS:  It's a report after an
[ 3]  employee's injured on the job, they do a report,
[ 4]  whether or not the employee worked for the next
[ 5]  ten days and the condition the employee was in.
[ 6]       MR. CAMPBELL:  Okay.  Now if you look at
[ 7]  this it has the date of the injury.  What's the
[ 8]  date on there, the date of the alleged injury?
[ 9]       MR. CHAMBLISS:  No, it doesn't say "alleged
[10]  injury".  It says "Date Injured" is --
[11]       MR. CAMPBELL:  Yes.
[12]       MR. CHAMBLISS:  -- 5/10/2004.
[13]       MR. CAMPBELL:  I said "alleged".
[14]       MR. CHAMBLISS:  Okay.
[15]       MR. CAMPBELL:  That's the only things that
[16]  I'm after in this hearing.
[17]       So the alleged injury happened on
[18]  5/10/2004; is that not correct?
[19]       MR. CHAMBLISS:  The injury happened on
[20]  5/10/2004.
[21]       MR. CAMPBELL:  And what did you do on 5/11?
[22]       MR. CHAMBLISS:  On 5/11, I went to my
[23]  doctor.
[24]       MR. CAMPBELL:  Okay.
[25]

[ 1]       MR. CHAMBLISS:  Two doctor's actually.  I
[ 2]  went to the therapist that they set me up with,
[ 3]  and I also went to a medical doctor.
[ 4]       MR. CAMPBELL:  Alright.  And if you look
[ 5]  over at that list and you go over to the far right
[ 6]  it has two letters: "OI".  I think that means:
[ 7]  Out -- Off Duty Due to Injury; is that not
[ 8]  correct?
[ 9]       MR. CHAMBLISS:  That's what it says in the
[10]  ledger at the bottom of the page.  That's what it
[11]  says it stands for.
[12]       MR. CAMPBELL:  And the second day was 5/12,
[13]  you were still out injured due to the injury -- or
[14]  alleged injury?
[15]       MR. CHAMBLISS:  No, you had it right the
[16]  first time; due to the injury.
[17]       MR. CAMPBELL:  And 5/13 you were out due to
[18]  the alleged injury; is that not correct?
[19]       MR. CHAMBLISS:  I was out due to the injury
[20]  and the report -- may I state the report says:
[21]  "Off Duty Due to Injury", not alleged.
[22]       MR. CAMPBELL:  Okay.  Now let me just ask a
[23]  question here:  When did you decide you were
[24]  injured?
[25]

**Page 301**

[ 1]        MR. CHAMBLISS:  Obviously when I called up
[ 2]  to the lady and I -- after speaking with her and
[ 3]  being stressed out, which is why I called her, I
[ 4]  was trying, you know, determine whether a thing
[ 5]  of -- I'm saying, okay, I'm injured -- I don't
[ 6]  know what point in time you call it injured.  When
[ 7]  I woke up the next morning and my face was sore, I
[ 8]  went to the doctor for that.  And to me, stress is
[ 9]  an injury and face being sore is an injury.
[10]        MR. CAMPBELL:  So --
[11]        MR. CHAMBLISS:  In my opinion.  So if -- if
[12]  you want to ask that, at that point in time when
[13]  I -- when I got home and the headaches compounded
[14]  and I was stressed out, at that point in time,
[15]  that's when I realized I had been injured?
[16]        MR. CAMPBELL:  So when was that, 5/11?
[17]        MR. CHAMBLISS:  No.  That -- that was 5/10,
[18]  when I got home.  I'm talk -- speaking about that
[19]  day.  I got home.  I was trying to deal with the
[20]  situation; clearly stressed out.  If -- if you
[21]  have a copy of the mark-off tape, I believe it
[22]  states it on there that -- that I was marking off
[23]  sick and I was stressed out and I was going to see
[24]  my doctor.  I'm not sure -- like I said, it was
[25]

**Page 302**

[ 1]  5:30 in the morning, but I believe that's what I
[ 2]  said.
[ 3]        MR. CAMPBELL:  So you called in at 5:30 in
[ 4]  the morning on tape?
[ 5]        MR. CHAMBLISS:  Five-thirty-one in the
[ 6]  morning.  Yes, I did.
[ 7]        MR. CAMPBELL:  And what did you say on the
[ 8]  tape?
[ 9]        MR. CHAMBLISS:  I said, as I stated before,
[10]  I stated that I was marking off sick, and I
[11]  believe -- I'm not absolutely a hundred percent
[12]  certain -- but I -- I also stated on the tape that
[13]  I was stressed out.
[14]        MR. CAMPBELL:  Okay.  Then you had two rest
[15]  days, if I'm not mistaken, the 14th and the 15th?
[16]        MR. CHAMBLISS:  That's what the form states
[17]  they are --
[18]        MR. CAMPBELL:  Right.
[19]        MR. CHAMBLISS:  -- rest days.
[20]        MR. CAMPBELL:  And that's -- 1, 2, 3, 4,
[21]  5 -- that's six days since 5/10; is that not
[22]  correct?
[23]        MR. CHAMBLISS:  Since 5/10?
[24]        MR. CAMPBELL:  Yes.
[25]

**Page 303**

[ 1]        MR. CHAMBLISS:  To the 15th is five days.
[ 2]        MR. CAMPBELL:  Right.  Then on the 5/16th,
[ 3]  which would be six -- seven days after the 10th;
[ 4]  5/10 being the first day, 5/16th being the 17th
[ 5]  day; is that not correct?
[ 6]        MR. CHAMBLISS:  I'm not understanding your
[ 7]  statement.
[ 8]        MR. CAMPBELL:  Let's count:  5/10 is one
[ 9]  day; correct?
[10]        MR. CHAMBLISS:  Yes.
[11]        MR. CAMPBELL:  And then 11, would be two;
[12]  12, three; 13th --
[13]        MR. CHAMBLISS:  No, that's not what the --
[14]        MR. CAMPBELL:  -- four --
[15]        MR. CHAMBLISS:  That's not what the form
[16]  states.  It --
[17]        MR. CAMPBELL:  No.  I'm not asking what the
[18]  form states, sir.  I'm asking you how many days is
[19]  it from 5/10 to 5/16?
[20]        MR. CHAMBLISS:  According to this form,
[21]  it's six days.
[22]        MR. CAMPBELL:  Okay.  No, according to the
[23]  form from 5/11 to 5/16 is six days; is that not
[24]  correct?
[25]

**Page 304**

[ 1]        MR. CHAMBLISS:  Okay.  Depends on how you
[ 2]  count it.  If you count the 10th or if you start
[ 3]  counting from that point on --
[ 4]        MR. HUMPHREYS:  Object.  Five-ten (5/10) is
[ 5]  not even -- is not even listed on this, on this
[ 6]  report.
[ 7]        MR. CAMPBELL:  I'm sorry, but it is, sir,
[ 8]  date of injury.
[ 9]        MR. HUMPHREYS:  My apology.
[10]        MR. CAMPBELL:  Five-ten (5/10).  So we can
[11]  go back from 5/10 to 5/16, is seven days; correct,
[12]  sir -- anyway you count it:  Forward, backward,
[13]  sideways?
[14]        MR. CHAMBLISS:  Okay.
[15]        MR. CAMPBELL:  You agree with that?
[16]        MR. CHAMBLISS:  Okay.
[17]        MR. CAMPBELL:  Okay.  Then on 5/17, it has
[18]  a different code down there.  Could you tell me
[19]  what it says?
[20]        MR. CHAMBLISS:  Five-seventeen (5/17) it
[21]  has "WR", and in the ledger it says:  Worked
[22]  Regular Duties.
[23]        MR. CAMPBELL:  Oh.  You worked regular
[24]  duties on the seventh(sic).  You worked regular
[25]

Page 305

[ 1] duties on 18th; is that not correct?

[ 2]     MR. CHAMBLISS:  Yes.

[ 3]     MR. CAMPBELL:  You worked regular duties on

[ 4] the 19th; is that not correct?

[ 5]     MR. CHAMBLISS:  That's correct.

[ 6]     MR. CAMPBELL:  On the 20th you had a "WR",

[ 7] and it's worked regular, "x'd" out, and then it's

[ 8] signed "OI" doctor's appointment; is that not

[ 9] correct?

[10]     MR. CHAMBLISS:  That's correct.

[11]     MR. CAMPBELL:  So could you tell me what

[12] happened from the 17th and why you had to leave on

[13] the 20th?

[14]     MR. CHAMBLISS:  I had a doctor's

[15] appointment because it -- in the previous letter

[16] that I wrote(sic) to you, it said that I was

[17] supposed to report back in approximately 9 to 10

[18] days to the doctor, and by you counting, you can

[19] count and see that that's 9 to 10 days.

[20]     MR. CAMPBELL:  Okay.  Let me ask a

[21] question:  Was your doctor's appointment for eight

[22] hours?

[23]     MR. CHAMBLISS:  No, my doctor's appointment

[24] wasn't for eight hours, but since Amtrak has --

[25]

Page 306

[ 1] and I wouldn't want to get in trouble for any late

[ 2] arrival or anything like that -- I asked for

[ 3] permission from my Supervisor to go to the

[ 4] doctor's appointment and he gave me permission to

[ 5] attend that doctor's appointment.

[ 6]     MR. CAMPBELL:  What Supervisor was that?

[ 7]     MR. CHAMBLISS:  Give me a second; I will

[ 8] give you the paperwork.  Indulge me while I look

[ 9] through here.

[10]     MR. CAMPBELL:  Take your time, sir.  We're

[11] here just to be fair and impartial.

[12]     MR. D'ALESSANDRO:  Let me shut this down.

[13] It's 4:44.

[14]     (Off the record.)

[15]     MR. D'ALESSANDRO:  The last time I gave you

[16] was an hour off.  It's actually 3:44 right now.

[17]     (Unintelligible comment.)

[18]     MR. CAMPBELL:  Yes.  I was asking you about

[19] which Supervisor gave you permission to be off all

[20] day for your doctor's appointment on 5:20?

[21]     MR. CHAMBLISS:  Mr. Tom Bernarding.

[22]     Over here at Amtrak, we have "Request for

[23] Time Off" sheets.  (Unintelligible),

[24] Mr. Bernarding gave me permission off on the 20th.

[25]

Page 307

[ 1]     MR. D'ALESSANDRO:  That would be Exhibit

[ 2] 14.  Exhibit 13 is your statement.

[ 3]     (Exhibit No. 14 marked for identification.)

[ 4]     MR. CAMPBELL:  Now so I'm going back.  Your

[ 5] doctor's appointment must have been all day; is

[ 6] that why you needed permission for an entire day?

[ 7]     MR. CHAMBLISS:  As I stated earlier, Amtrak

[ 8] doesn't look happily on late arrival or early

[ 9] dismissal.  So to negate both of those and not be

[10] brought up on Charges, I figured it pertinent to

[11] give -- get the day off with permission.

[12]     MR. CAMPBELL:  So then you were not off

[13] just for a doctor's appointment, you had

[14] permission; is that what you're telling me?

[15]     MR. CHAMBLISS:  As I stated before, I got

[16] permission off because I had a doctor's

[17] appointment.

[18]     MR. CAMPBELL:  Did you not get paid for

[19] being off, off injured for a doctor's appointment?

[20]     MR. CHAMBLISS:  I don't understand --

[21]     MR. CAMPBELL:  Did you not receive eight

[22] hours' pay for being off due to a doctor's

[23] appointment for an injury?

[24]     MR. CHAMBLISS:  No, I didn't get any pay

[25]

Page 308

[ 1] for being off.

[ 2]     MR. CAMPBELL:  We're not going to get into

[ 3] that, but just so you know, Amtrak pays for any

[ 4] doctor's appointments that happen --

[ 5]     MR. CHAMBLISS:  Well your question was:

[ 6] Had I received any pay --

[ 7]     MR. CAMPBELL:  Yes.

[ 8]     MR. CHAMBLISS:  -- for that.  And the

[ 9] answer was:  No, I have not received any pay for

[10] that.

[11]     MR. CAMPBELL:  That's -- that's fine.

[12]     That's a better copy, sir.  That's Number 8

[13] if you want to put the number on it.

[14]     (Unintelligible/barely audible comment by

[15] someone.)

[16]     MR. CAMPBELL:  Okay.  Let's go back on

[17] the -- 5/10 when the book hit you.  Did you know

[18] you were hurt right then?

[19]     MR. CHAMBLISS:  No, I didn't.  I believe I

[20] stated to you that I didn't know my face was sore

[21] until the next morning when I got up, which was

[22] that -- that next day, which was 5/11; when I went

[23] to wash my face, I noticed my face was sore.

[24]     MR. CAMPBELL:  So you're --

[25]

Page 309

[ 1]        MR. CHAMBLISS:  I mean that's -- to me

[ 2]   that's normal.  I mean, I've been out playing ball

[ 3]   or something and got bumped, and at that point in

[ 4]   time went your whole day; the next day I got up,

[ 5]   arm was sore.  I mean to me that's normal and

[ 6]   that's what happened.

[ 7]        The next day I got up; face was sore.

[ 8]        MR. CHAMBLISS:  So you didn't realize it

[ 9]   till 5/11, that morning?

[10]        MR. CAMPBELL:  Correct.

[11]        MR. CAMPBELL:  And what time did you say

[12]   you got up?

[13]        MR. CHAMBLISS:  I told you that my alarm

[14]   went off at 5:30 in the morning.  I believe I

[15]   called them here at 5:31.  I didn't get up at that

[16]   time; I just made the phone call, laid back down.

[17]   I got up later on that morning.  When I washed up

[18]   and my face was sore.

[19]        MR. CAMPBELL:  So you -- you testified that

[20]   you felt no pain when he hit you with the book,

[21]   but you were just angry and shocked that he would

[22]   throw it; is that correct?

[23]        MR. CHAMBLISS:  I testified that at that

[24]   point in time I was in shock.  No, I did not feel

[25]

Page 310

[ 1]   any pain at that point in time.  I was angry.  I

[ 2]   was upset.  At that point in time I didn't

[ 3]   immediately feel pain.  No.

[ 4]        MR. CAMPBELL:  Okay.  You --

[ 5]        MR. CHAMBLISS:  I felt the impact of the

[ 6]   book hitting me in the face and I was shocked that

[ 7]   he did so.

[ 8]        MR. CAMPBELL:  Okay.  So you also testified

[ 9]   that you really wasn't looking at the Foreman when

[10]   he threw the book?

[11]        MR. CHAMBLISS:  No more than I'm looking at

[12]   you now.  I mean, I'm looking at you now; we're

[13]   having a conversation.  But as far as your -- your

[14]   facial expressions and what you're doing, if you

[15]   ask me three months from now, I won't be able to

[16]   tell you.

[17]        MR. CAMPBELL:  Do you know if I'm standing

[18]   or sitting?

[19]        MR. CHAMBLISS:  Yeah.  Right now I do.

[20]        MR. CAMPBELL:  But you --

[21]        MR. CHAMBLISS:  You're in front of me right

[22]   now; I can look at you and observe that.  But

[23]   three months from now after going through all that

[24]   I've gone through -- the harassment from

[25]

Page 311

[ 1]   Supervisors; the stress I've been doing -- going

[ 2]   through this, being followed around the job; false

[ 3]   charges being charged against me, no, I do not,

[ 4]   three months later.

[ 5]        MR. CAMPBELL:  So on 5/10, that day, you

[ 6]   can't remember if he was standing.  So you have no

[ 7]   knowledge; correct?

[ 8]        MR. CHAMBLISS:  I won't say I have no

[ 9]   knowledge.

[10]        MR. CAMPBELL:  What knowledge do you have?

[11]        MR. CHAMBLISS:  I have --

[12]        MR. HUMPHREYS:  I object.  Where is this

[13]   leading to?

[14]        MR. CAMPBELL:  He testified to it, sir.

[15]   It's -- one thing is about the distance and -- oh,

[16]   I'm sorry.

[17]        MR. D'ALESSANDRO:  He did testify to it,

[18]   but the thing is, is the relevance to it.

[19]        MR. CAMPBELL:  Yes.  The relevance is --

[20]   excuse me (unintelligible)?

[21]        MR. D'ALESSANDRO:  Hurry up.

[22]        MR. CAMPBELL:  The relevancy is the speed

[23]   and the distance that he threw, which they are

[24]   claiming --

[25]

Page 312

[ 1]        MR. D'ALESSANDRO:  Okay.

[ 2]        MR. CAMPBELL:  -- it will make a major

[ 3]   difference if he was standing or sitting.

[ 4]        MR. D'ALESSANDRO:  Okay.  It's four --

[ 5]   4:49, and I'm going to flip the tape.

[ 6]        (Off the record.  Tape 4/Side B begins.)

[ 7]        MR. D'ALESSANDRO:  It's still 4:49, and

[ 8]   we're back on the record.  Mr. Campbell.

[ 9]        MR. CAMPBELL:  Yes.  I was asking.  He had

[10]   no -- he had testified that he had no knowledge if

[11]   the man was standing or sitting; is that not --

[12]        MR. CHAMBLISS:  No.  I didn't say I didn't

[13]   have any knowledge.  I said that I couldn't recall

[14]   at this point in time.  It was three months ago.

[15]        MR. CAMPBELL:  So at this time you have no

[16]   knowledge; is that correct?

[17]        MR. D'ALESSANDRO:  Mr. Campbell, he's

[18]   answered the question.

[19]        MR. CAMPBELL:  After -- shortly after you

[20]   felt shocked and angry, you talked to Bob

[21]   Mascetti, your Local Chairman?

[22]        MR. CHAMBLISS:  Yes.

[23]        MR. CAMPBELL:  Did you -- what did you

[24]   discuss with him, again?

[25]

**Page 313**

[ 1]    MR. CHAMBLISS:  I told him about the

[ 2] incident that had occurred.  I told him that I

[ 3] wanted him to go to Mr. Giurfa, and that at that

[ 4] point in time, mentally I was in no condition to

[ 5] go upstairs and talk to Mr. Giurfa because he's

[ 6] known -- basically he's a known hothead and he has

[ 7] a tendency to go off and I -- I wasn't in the

[ 8] mental state to deal with him at that point in

[ 9] time.

[10]    MR. CAMPBELL:  And who was that:

[11] Mr. Giurfa?

[12]    MR. CHAMBLISS:  Yes.  That's Mr. Giurfa.

[13]    MR. CAMPBELL:  Dino?

[14]    MR. CHAMBLISS:  Dino Guiseppe Giurfa,

[15] High --

[16]    MR. CAMPBELL:  Okay.

[17]    MR. CHAMBLISS:  -- Speed Rail, Assistant

[18] Superintendent.

[19]    MR. CAMPBELL:  And at the time you were

[20] talking to Mr. Mascetti, you still weren't in any

[21] pain?

[22]    MR. CHAMBLISS:  I believe I answered that

[23] before --

[24]    MR. CAMPBELL:  Okay.

[25]

**Page 314**

[ 1]    MR. CHAMBLISS:  -- and I'll state it once

[ 2] again --

[ 3]    MR. CAMPBELL:  Thank you.

[ 4]    MR. CHAMBLISS:  -- at that point in time,

[ 5] no, I didn't feel any pain.

[ 6]    MR. CAMPBELL:  Okay.

[ 7]    MR. CHAMBLISS:  I felt pain the next

[ 8] morning when I washed my fact, I felt the pain --

[ 9] when I touched that earlier, I felt the pain.

[10] Other than that, I (unintelligible) had a

[11] headache; I took some medicine for it; I laid

[12] down; I went to sleep; I was trying to cope with

[13] what had happened.

[14]    MR. CAMPBELL:  Alright.  Short -- then you

[15] went to each lunch; is that not correct, after you

[16] talked to Bob Mascetti?

[17]    MR. CHAMBLISS:  No.  That's incorrect?

[18]    MR. CAMPBELL:  Okay.  When did you go to

[19] lunch?

[20]    MR. CHAMBLISS:  I went to lunch later on

[21] that day.

[22]    MR. CAMPBELL:  Okay.

[23]    MR. CHAMBLISS:  Because at that point in

[24] time, I understand -- being here 15 years, this is

[25]

**Page 315**

[ 1] something I do understand -- I understand if I'd

[ 2] have acted in any way towards Mr. Snyder for what

[ 3] he had done for me that I would have been

[ 4] tooken -- taken out of service and fired.  So I

[ 5] tried to do the best thing and go about the day as

[ 6] I knew how to, tried to be professional and

[ 7] compose myself, even though I was in -- my head

[ 8] was hurting; I was under a lot of stress; but I

[ 9] tried to compose myself and make it through the

[10] day because that's my duty to come in here and do

[11] a job.  So I tried to handle the situation the

[12] best I could, and yes, I did go to lunch because

[13] that's the time you do -- that's what you do, you

[14] get a lunch break.

[15]    MR. CAMPBELL:  Yes.  We pay you for that.

[16]    So after lunch, sometime after lunch, did

[17] you have the opportunity to talk to Mr. Mascetti

[18] again?

[19]    MR. CHAMBLISS:  Mr. Mascetti -- yes, I did.

[20]    When the Foreman came to me and told me

[21] that I was needed upstairs in Mr. Bello's office,

[22] I called Mr. Mascetti again, and Mr. Mascetti came

[23] down and we went to Mr. Bello's office.

[24]    MR. CAMPBELL:  Now what resolution were you

[25]

**Page 316**

[ 1] looking for, for Mr. Mascetti to do at this time?

[ 2]    MR. CHAMBLISS:  At that point in time, I

[ 3] wanted the incident (unintelligible) file.  I

[ 4] had -- at that point in time I had knowledge that

[ 5] Mr. Snyder had treated other individuals that way

[ 6] before and Amtrak had done nothing about it; I

[ 7] felt like I was -- I was treated wrong, my civil

[ 8] rights were violated.  He degraded me in front of

[ 9] my co-workers, and I -- I felt that something

[10] needed to be done.  Basically, you know, I felt

[11] like anyone who had been hit in the face,

[12] basically how would you feel if you got hit in the

[13] face; you would want something done.  I wanted

[14] something done.  I wanted -- I wanted um to have a

[15] record of it and that his behavior was

[16] unacceptable.

[17]    MR. CAMPBELL:  So at that time they asked

[18] you for a statement; is that not true?

[19]    MR. CHAMBLISS:  That's -- that's true.

[20]    MR. CAMPBELL:  And the statement that you

[21] put in at 12:45 p.m., is your statement at that

[22] time?

[23]    MR. CHAMBLISS:  If that's the time that I

[24] wrote on it, then yes, it is.

[25]

Page 317

[ 1]      MR. CAMPBELL: Okay. And then you got off
[ 2] at 3:00 o'clock; is that not correct?
[ 3]      MR. CHAMBLISS: I got -- I got off -- yeah,
[ 4] around 3:00 o'clock.
[ 5]      MR. CAMPBELL: But you called the Amtrak
[ 6] Police at 2:00; is that not correct?
[ 7]      MR. CHAMBLISS: I don't -- I know I called
[ 8] the Amtrak Police at about 1:00-1:30. I don't
[ 9] know the approximate time. I said they arrived
[10] here around 2:00.
[11]      MR. CAMPBELL: Okay. They arrived around
[12] 2:00, and --
[13]      MR. CHAMBLISS: Two, 2:30; I can't be sure
[14] of the time. I didn't write it down.
[15]      MR. CAMPBELL: You made a complete report
[16] about what happened to you?
[17]      MR. CHAMBLISS: I believe you're in receipt
[18] of the Police Report. I gave them the pertinent
[19] facts to the case at that point in time. I gave
[20] them what knowledge I had at that time.
[21]      MR. CAMPBELL: Okay. And did they take any
[22] action against anybody that you know of?
[23]      MR. CHAMBLISS: Um, the Officer which --
[24] name was V. Paz, told me at that point in time
[25]

Page 318

[ 1] that they had had a situation the day before when
[ 2] they had arrested someone for a similar incident,
[ 3] an assault --
[ 4]      MR. CAMPBELL: Get your tape. It ran out.
[ 5]      MR. CHAMBLISS: Mr. Paz told me they had a
[ 6] situation like that, they had an assault before;
[ 7] they had arrested the individual; and they had
[ 8] found out that they could not go out and arrest
[ 9] the individual.
[10]      After speaking with the Officer, the
[11] Officer was shocked at the actions. He made out
[12] the report.
[13]      I don't -- I don't know what you're looking
[14] for. All the other information that the Police
[15] Officer wrote down is in the Report.
[16]      MR. CAMPBELL: So you don't know if they
[17] took any action against any individuals?
[18]      MR. CHAMBLISS: No, I don't. I don't know.
[19] They never came back to me and said we did this,
[20] we did that. I know I later on called and got a
[21] Police Report, and they listed it as simple
[22] assault.
[23]      MR. CAMPBELL: Simple assault.
[24]      Okay. And then after that you got off -- I
[25]

Page 319

[ 1] think you testified that you drove -- picked your
[ 2] children up and went home; is not correct -- is
[ 3] that correct?
[ 4]      MR. CHAMBLISS: Yes. I'm responsible for
[ 5] my children's welfare and well-being. I have a
[ 6] responsibility -- like I have a responsibility to
[ 7] Amtrak to complete the work that day -- I had a
[ 8] responsibility to pick up my children that day.
[ 9]      MR. CAMPBELL: And then the next morning
[10] that you realized you were injured, you called
[11] your doctor; is that not correct?
[12]      MR. CHAMBLISS: Yes, I did. When I
[13] realized my face was sore, I called the doctor to
[14] try to get someone to look at it. That's what
[15] normally people do: If they have ache or pain,
[16] call the doctor to find out what's going on.
[17]      MR. CAMPBELL: Is it not true that you told
[18] your doctor that it was a incident on the job and
[19] you got hurt on the job?
[20]      MR. CHAMBLISS: Yeah. I told the doctor
[21] that I got hit in the face with a rule -- by a
[22] book by my Supervisor. He was shocked that it had
[23] happened, and -- what else you want?
[24]      MR. CAMPBELL: He told you that he couldn't
[25]

Page 320

[ 1] handle it and you needed another type doctor --
[ 2]      MR. CHAMBLISS: He told me --
[ 3]      MR. CAMPBELL: -- (inaudible; both
[ 4] speaking) insurance?
[ 5]      MR. CHAMBLISS: He told me that that sounds
[ 6] like a worker's comp type situation and that his
[ 7] office doesn't do that. And I was like: Well
[ 8] no -- I explained to him that we don't have
[ 9] worker's comp. I just need to be seen. He said:
[10] Well it would be better off all around if you go
[11] see a different doctor, because his -- his office
[12] is through our insurance company, and the
[13] insurance company will not pick up the bill for
[14] that.
[15]      MR. CAMPBELL: Is it not true that shortly
[16] after that you had a lawyer call about this case?
[17]      MR. CHAMBLISS: That's not true. I have a
[18] document that my attorney sent to Amtrak on June
[19] 8th --
[20]      MR. CAMPBELL: May I see that document?
[21]      MR. CHAMBLISS: -- stating that he was
[22] representing me.
[23]      MR. CAMPBELL: We'd like --
[24]      MR. CHAMBLISS: And to my knowledge, that's
[25]

Page 321

[1]   the first time that he contacted Amtrak.

[2]        MR. CAMPBELL:  We'd like to make this an

[3]   exhibit -- do you have copies or should we go off

[4]   the record.

[5]        MR. CHAMBLISS:  No.  That's my only copy.

[6]        MR. CAMPBELL:  Could we go off record; I'll

[7]   make a copy of this.

[8]        MR. D'ALESSANDRO:  Okay.  It's 3:58.

[9]        (Exhibit No. 15 marked for identification.)

[10]       (Off the record.)

[11]       MR. D'ALESSANDRO:  ...the record at 3:58.

[12]       MR. CAMPBELL:  So you did contact a lawyer

[13]  about this case; is that not correct?

[14]       MR. CHAMBLISS:  Yes, I did.

[15]       MR. CAMPBELL:  When did you contact the

[16]  lawyer?

[17]       MR. CHAMBLISS:  I don't know the exact date

[18]  that I contacted the lawyer.

[19]       MR. CAMPBELL:  Could you give us a close

[20]  guess, within two to three days?

[21]       MR. CHAMBLISS:  Uh I believe I contacted

[22]  the lawyer during the first period of time that I

[23]  was off injured, during that group of time.

[24]  Between I'd say the 13th and the 10th, I contacted

[25]

Page 322

[1]   him within that point in time.

[2]        MR. CAMPBELL:  So you had planned on suing

[3]   Amtrak early on in the injury or alleged injury;

[4]   is that not correct?

[5]        MR. CHAMBLISS:  When I had situation --

[6]   when the situation happened, after I got home and

[7]   I found out my face was sore and I had to go to

[8]   doctor for it, I contacted some (unintelligible)

[9]   an attorney; yes, I did.

[10]       MR. CAMPBELL:  So your intentions early on

[11]  was to sue Amtrak for this incident?

[12]       MR. CHAMBLISS:  No, my intentions early on

[13]  weren't to sue Amtrak for this incident, because

[14]  if my intentions early on were to sue Amtrak for

[15]  this incident, on the 10th, as soon as Mr. Snyder

[16]  hit me, then I would have contacted a lawyer, I

[17]  would have went to the hospital and that would

[18]  have been that if that's what I wanted -- if

[19]  that's what I wanted to do.

[20]       My interest was not in suing Amtrak or

[21]  doing anything.  My interest is in my well-being

[22]  and my welfare.  It's -- when I found out I got

[23]  injured, I felt like I needed someone to protect

[24]  my interests.

[25]

Page 323

[1]        MR. CAMPBELL:  So shortly after the police

[2]   left, they (unintelligible) simple assault; 5/11

[3]   you made a doctor's appointment; and sometime

[4]   around 11 or 12 you also made a lawyer's

[5]   appointment; is that correct?

[6]        MR. CHAMBLISS:  Somewhere in there.

[7]        MR. CAMPBELL:  Did you forget to call

[8]   Amtrak and make a report to any of them that you

[9]   were injured?

[10]       MR. CHAMBLISS:  No.  I didn't forget to

[11]  call Amtrak at all.  I told my Union Rep about it.

[12]  Amtrak officials have not given out their numbers

[13]  to the offices up here.  I had no numbers to reach

[14]  them.  On the other side, on the Mechanical side,

[15]  they have an Amtrak number where you can reach.

[16]  Only numbers I had was the NEC and they weren't

[17]  handling the situation.  This is a unique

[18]  situation over here with the two different

[19]  companies.

[20]       MR. CAMPBELL:  So you did not call any

[21]  Amtrak official, thought?

[22]       MR. CHAMBLISS:  I had no number to contact

[23]  the Amtrak official.  I tried to contact the

[24]  Amtrak official when I returned to work.  Only

[25]

Page 324

[1]   other way I con -- can contact the Amtrak official

[2]   was through my Union Representative who was on the

[3]   property, because I had his number, and he told me

[4]   that he alerted them of the situation.

[5]        MR. CAMPBELL:  He alerted them that you

[6]   were claiming a personal injury?

[7]        MR. CHAMBLISS:  Yes.

[8]        MR. CAMPBELL:  And when was that, if you

[9]   remember?

[10]       MR. CHAMBLISS:  He told me he had a

[11]  conversation with Mr. Giurfa on the 13th.

[12]       MR. CAMPBELL:  On the 13th of May?

[13]       MR. CHAMBLISS:  Yeah.  And he told me

[14]  that -- actually at that point in time he told

[15]  them that a re -- a Police Report was made, and

[16]  that -- what else did he say... He said a Police

[17]  Report was made and that at that point in time

[18]  Mr. Giurfa told him that he wasn't me, and he

[19]  suggested that when I come back in to talk to him.

[20]       MR. CAMPBELL:  So did your Union Rep inform

[21]  you of that conversation?

[22]       MR. CHAMBLISS:  That's what I just said.

[23]       MR. CAMPBELL:  Yes.  I mean on the 13th, he

[24]  told you that he needed you to report that?

[25]

**Page 325**

[1]  MR. CHAMBLISS: He didn't tell me on -- on

[2]  the 13th. I forget which day I spoke with him,

[3]  but he called me at home; checked to see how I was

[4]  feeling; and told me that the conversation had

[5]  occurred on the 13th.

[6]  MR. CAMPBELL: Right. Do you think

[7]  Mr. Mascetti who is the Local Chairman has any of

[8]  the Management's numbers?

[9]  MR. CHAMBLISS: I couldn't answer to what

[10]  Mr. Mascetti has.

[11]  MR. CAMPBELL: Well when did you inform any

[12]  of the Managers that(sic) you finally came back

[13]  that you had received a personal injury; when did

[14]  you do that?

[15]  MR. CHAMBLISS: When I came back on the

[16]  17th I attempted to inform them. They threw me

[17]  out of the office; they threw Mr. Humphreys out of

[18]  the office; they said they would not talk to us.

[19]  On the 18th, I don't know how many ways to

[20]  put it, I went to my Supervisor -- because I

[21]  wasn't gonna go to the Supervisor that hit me, I

[22]  felt uncomfortable even speaking with Mr. Snyder,

[23]  so I waited till the 18th since Mr. Giurfa and the

[24]  Amtrak Management staff up here was all

[25]

**Page 326**

[1]  (unintelligible...) throwing me out. Went to

[2]  Mr. McLean on the 18th and asked him, I said -- I

[3]  said: Well Mac, you know, I have an injury; I got

[4]  hurt that day; you know, I tried to talk to them;

[5]  they threw me out of the office. I don't know

[6]  what to do; what should I do? He said: Well

[7]  Jerry, they won't talk to you, I don't know what

[8]  to tell you. I mean at that point in time, he's

[9]  my Amtrak Supervisor and I told him that I had an

[10]  injury and I was looking for a way to do it, if he

[11]  had knowledge -- he's my Supervisor -- I felt like

[12]  he should have more knowledge than me. He should

[13]  be able to tell me something to do. He didn't

[14]  know.

[15]  And my -- and I'm sitting here

[16]  (unintelligible) -- well if the Amtrak Supervisor,

[17]  the person I get my stuff from, my answers from,

[18]  doesn't know what to do in this type of situation,

[19]  how am I expected to know what to do in that type

[20]  of situation, besides the fact that I told him at

[21]  that point in time that I was injured. I said

[22]  well I was injured on this occasion, I'm trying to

[23]  tell him. I mean how many more ways do I have to

[24]  report it. I was injured at this point in time;

[25]

**Page 327**

[1]  what should I do; the Managers won't talk to me.

[2]  To me that's reporting it.

[3]  MR. CAMPBELL: So that was on the 17th;

[4]  correct?

[5]  MR. CHAMBLISS: Incorrect. That was on the

[6]  18th.

[7]  MR. CAMPBELL: On the 18th.

[8]  MR. CHAMBLISS: As he -- as he stated

[9]  earlier.

[10]  MR. CAMPBELL: Did you ever go back to your

[11]  Union Representative?

[12]  MR. CHAMBLISS: Yes. I went back to my

[13]  Union Representative. I had a talk with them; I

[14]  told them what was going on. At that point in

[15]  time he said: Well, Jerry, you know, I don't -- I

[16]  don't know what to do; you've tried. They -- they

[17]  denied you your legal right to have your

[18]  representative in there. Basically, the ball's in

[19]  their court. I don't know what they want to do.

[20]  Just hold tight, let's find out what they're gonna

[21]  do.

[22]  At that point in time, there was nothing

[23]  left for me to do. I attempted to come to Amtrak

[24]  Management. I took it to my Supervisor on the

[25]

**Page 328**

[1]  floor. I don't understand what they -- what more

[2]  they were looking for from me.

[3]  MR. CAMPBELL: Did you go to anybody else

[4]  in Management besides --

[5]  MR. CHAMBLISS: As Mr. Giurfa --

[6]  MR. CAMPBELL: -- who we talked to?

[7]  MR. CHAMBLISS: -- stated earlier, he is

[8]  the end-all, the be-all here at High Speed Rail.

[9]  If he threw me out, who else was I supposed to go

[10]  to. I was supposed to go to Philadelphia to try

[11]  to see Slim(?)?

[12]  MR. CAMPBELL: Do you know any of the

[13]  Management in Washington?

[14]  MR. CHAMBLISS: Not at High Speed Rail.

[15]  MR. CAMPBELL: Besides High Speed Rail.

[16]  MR. HUMPHREYS: We object. What difference

[17]  does it make --

[18]  MR. CHAMBLISS: Yeah.

[19]  MR. HUMPHREYS: -- the man tried to report

[20]  his incident.

[21]  MR. D'ALESSANDRO: It's immaterial

[22]  Mr. Campbell.

[23]  MR. CAMPBELL: When did you report, finally

[24]  make a official report of this?

[25]