UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JERRY K. CHAMBLISS,

    Plaintiff,

      v.

NATIONAL RAILROAD PASSENGER
CORPORATION, *et al.*,

    Defendants.

Civil Action No. 05-2490 (CKK)

## MEMORANDUM OPINION
(February 20, 2007)

Pending before the Court is Defendants' Motion for Summary Judgment.  Plaintiff brings claims pursuant to both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, alleging that Defendants National Railroad Passenger Corporation ("Amtrak") and Steven S. Snyder, one of Plaintiff's supervisors at Amtrak, discriminated against Plaintiff on the basis of race (Count One), Compl. ¶¶ 15-20, and that Amtrak retaliated against Plaintiff by terminating him "because he spoke up for his civil rights," (Count Two) *id.* ¶¶ 21-23. The claim within Count Two of Plaintiff's Complaint that Amtrak retaliated against Plaintiff by refusing to settle his workers' compensation claim (raised in a separate lawsuit) unless he waived all civil rights, *see id.*, is now moot.  In addition, in his Complaint, Plaintiff asserts claims of assault and battery (Count Three), "intentional interference with economic relationship" (Count Four), and intentional infliction of emotional distress (Count Five) solely against Defendant Snyder.  Defendants have moved for summary judgment on all five counts of Plaintiff's Complaint.  Upon a searching consideration of the filings currently before the Court, the attached

exhibits, the relevant case law, and the entire record herein, the Court shall grant Defendant's

Motion for Summary Judgment in its entirety.

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to

the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)).  The

local rules for summary judgment "assist[] the district court to maintain docket control and to

decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan,*

*Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996).  "Requiring strict

compliance with the local rule is justified both by the nature of summary judgment and by the

rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties

assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts

of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980).  "[A] district

court should not be obliged to sift through hundreds of pages of depositions, affidavits, and

interrogatories in order to make [its] own analysis and determination of what may, or may not, be

a genuine issue of material fact." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir.

1988)).

The Court further notes that Plaintiff has already been given an extra chance to comply

with Local Civil Rule 56.1.  On August 24, 2006, the Court found that Plaintiff's original

"Statement of Material Facts" failed to admit, deny, or deny-in-part/admit-in-part each statement

set out by Defendants in corresponding numbered paragraphs and support each response through

citations to the record.  Instead, the Court found, Plaintiff's "Statement of Material Facts" did not

respond to the Defendants' Statement in any organized way. *Chambliss v. Nat'l R.R. Passenger*

2

*Corp., et al.*, Civil Action No. 05-2490, Order (Aug. 24, 2006). Advising Plaintiff that the purpose of Rule 56.1 is to "place the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Jackson*, 101 F.3d at 151, the Court struck Plaintiff's Opposition in its entirety and, in the interest of justice, gave Plaintiff another opportunity to file a Statement of Material Facts in Dispute/Not in Dispute that complied fully with Local Civil Rule 56.1.

Despite the Court's clear admonition that if Plaintiff failed to file his revised Opposition in conformance with Local Civil Rule 56.1, it would be stricken and declared conceded without further notice, Plaintiff's more recent Statement of Genuine Issues Necessary to be Litigated (hereinafter "Plaintiff's Statement") still fails to comply with Local Civil Rule 56.1. As Defendants point out in their Reply Memorandum, Defendants' Statement of Material Facts Not in Dispute (hereinafter "Defendants' Statement") includes 33 numbered paragraphs. However, rather than responding to Defendants' Statement by admitting or denying each paragraph, as he was specifically instructed to do in this Court's June 5, 2006 Scheduling and Procedures Order, Plaintiff has provided 18 broad headings, which do not correspond to the paragraphs of Defendants' Statement. *See Chambliss v. Nat'l R.R. Passenger Corp.*, Civil Action No. 05-2490, Scheduling and Procedures Order (Jun. 5, 2006) at 1-2. Each of Plaintiff's broad headings is followed by a number of lengthy bullet-pointed paragraphs containing both factual and legal arguments including, in some instances, citations to cases. *See, e.g.*, Pl's Stmt ¶ 6. As a result, the Court is unable to parse from Plaintiff's excess and unresponsive verbiage those specific facts that Plaintiff considers in dispute. *See Gibson v. Office of the Architect of the Capitol*, Civ. No.

3

00-2424(CKK), 2002 WL 32713321, at *1 n.1 (D.D.C. Nov. 19, 2002).  Finally, Plaintiff does

not provide precise citations to the portions of the record on which he relies.  Instead, Plaintiff

follows each set of bullet-pointed paragraphs with a long string citation to multiple documents

that do not indicate any correlation between specific factual assertions and portions of record

evidence.  Most egregiously, each of Plaintiff's string citations includes a general citation to the

227-page transcript of Plaintiff's deposition, without any pincite to suggest which portions of the

227-page transcript Plaintiff deems significant.  As Plaintiff thus fails completely to provide the

Court with record support for his assertions, the Court is entirely unable to credit them.

       In addition, Plaintiff's failure to comply with Local Civil Rule 56.1 has significantly

prejudiced Defendants, who have been required to file four motions and reply memoranda in

response to Plaintiff's filings, and who have faced the unnecessarily difficult task of

meaningfully responding to Plaintiff's improper filings.  *See* Defs' Reply at 2-4.

       Pursuant to Local Civil Rule 56.1, in resolving the present summary judgment motion,

this Court "assumes that facts identified by the moving party in the statement of material facts are

admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition

to the motion."  LCvR 56.1; 7(h).  Because Plaintiff's Statement is both opaque and fails to

comply with Local Civil Rule 56.1 the Court has therefore treated all facts alleged in Defendants'

Statement as conceded.  Despite Plaintiff's abject failure to comply with his obligations under

Local Civil Rule 56.1 and this Court's orders, in the interest of justice, the Court has nevertheless

undertaken a review of the record evidence that Plaintiff submitted in connection with his

Opposition in order to determine whether that evidence raises genuine issues of fact.  The Court

shall first outline the facts identified by Defendants in their Statement, and then proceed to

4

indicate those additional facts that the Court was able to glean from its independent review of the record in this matter. The Court notes that, because Plaintiff has not complied with his obligations under Local Civil Rule 56.1, he is left with the Court's interpretation of the record evidence.

   A.    *Facts Identified by Defendants*

Plaintiff Jerry K. Chambliss was first employed by Amtrak in 1989. Defs' Stmt. ¶ 1; Pls' Ex. 2A (5/24/06 Chambliss Dep.) at 9:9-10. Over the course of his employment with Amtrak, Plaintiff was cited for violations of Amtrak's attendance policy and insubordination. Defs' Stmt. ¶ 2; Defs' Ex. B (Chambliss Disciplinary Records, introduced as Exs. 1-12 at 5/24/06 Chambliss Dep.).[1] During the time period relevant to Plaintiff's Complaint, Plaintiff was supervised by Defendant Steven S. Snyder at least one day a week. Defs' Stmt. ¶ 3; Pls' Ex. 2A (5/24/06 Chambliss Dep.) at 82:1-3.

---

[1] The Court notes that in his Statement, Plaintiff "disagrees that throughout his employment he has been repeatedly disciplined for violations of Amtrak's attendance policy, insubordination, and other examples of misconduct." Pl's Stmt. ¶ 2. Instead, Plaintiff states, he "has fully complied with the Defendant's policies, in spite of Defendant's failure to apply its stated policies in an equitable manner to members of all races," and cites broadly to various depositions in support of this statement. *Id.* Plaintiff's denial is contradicted by the record evidence. In support of their Statement, Defendants proffered 17 pages of Plaintiff's disciplinary records, which indicate that between May 1, 2002 and April 21, 2003, Plaintiff received counseling, a verbal warning, a written warning, and three discipline investigations for excessive absenteeism. *See* Defs' Ex. B at 5 (4/21/03 Notice of Intent to Impose Discipline Meeting); 7 (4/11/03 Memo to D. Giurfa, Asst. Gen. Mgr Amtrak High Speed Rail, noting previous actions taken regarding Plaintiff's absenteeism). These records further indicate that Plaintiff was investigated for insubordination for refusing to accept a job assignment and challenging the authority of a Supervising Technician in front of other employees in May 2002. *See* Defs' Ex. B at 12 (5/29/02 Memo to D. Smith, Mgr Amtrak High Speed Rail) and 13 (5/29/02 Memo to D. Smith re: Discipline Investigation for J. Chambliss, R. Allison, W. Wilson). Plaintiff was shown all of these records at his May 24, 2006 deposition in this matter. *See* Pls' Ex. 2A (5/24/06 Chambliss Dep.) at 13:19-40:20.

On May 10, 2004, Defendant Snyder threw a safety pamphlet at Plaintiff.  Defs' Stmt ¶ 4;

Pls' Ex. 2A (5/24/06 Chambliss Dep.) at 70:13-71:9.[2]  The safety pamphlet weighed

approximately four (4) ounces.  Defs' Stmt. ¶ 7; Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op.,

introduced as Ex. 22 at 5/24/06 Chambliss Dep.) at 3.  The pamphlet struck Plaintiff in the face,

but did not move his glasses.  Defs' Stmt. ¶ 8; Pls' Ex. 2A (5/24/06 Chambliss Dep.) at 88:15-19.

Plaintiff did not report any injuries on the date of the incident, but instead continued working and

completed his entire assigned shift.  Defs' Stmt. ¶¶ 9-10; Defs' Ex. F (5/10/04 Chambliss Stmt.);

Defs' Ex. D (Stmt of C.M. Bello, General Foreman, stating that during a meeting regarding the

incident on 5/10/04, Plaintiff "never made mention of any injury he received from the incident

and did not appear to be injured in any way."); Defs' Ex. E (5/10/04 Police Report) at 3 (stating

"no injuries reported); Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 95:13-16; 96:19-21).  The next

morning, Plaintiff discovered that his nose was sore. Defs' Stmt. ¶ 11; Pl's Ex. 2A (5/24/06

Chambliss Dep.) at 97:16-98:10.

Plaintiff was out from work from May 11, 2004 through May 17, 2004.  Defs' Stmt. ¶ 12;

Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 97:14-16; 99:7-16).  Plaintiff did not report any physical

injury to an Amtrak official during this time period.  Defs' Stmt ¶ 13; Pl's Ex. 2A (5/24/06

Chambliss Dep.) at 138:13-141:9.  Plaintiff did not file an accident report until June 14, 2004.

Defs' Stmt ¶ 14; Defs' Ex. H (6/14/04 Employee Personal Statement, introduced as Ex. 18 at

---

[2] Plaintiff describes the safety pamphlet as a "book", Pls' Stmt ¶ 3; however during the course of Amtrak's formal investigation into this matter or the relevant arbitration, Defendant Snyder identified the actual pamphlet he threw at Plaintiff. Pls' Ex. 12 (Portions of Arb. Tr.) at 121:2-10. Moreover, in its January 20, 2006 Arbitration Award, the arbitration panel noted that the pamphlet "was of such minuscule weight - 4 ounces." Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op.) at 3.

5/24/06 Chambliss Dep.); Defs' Ex. I (6/14/04 Employee Injury/Illness Report, introduced as Ex. 19 at 5/24/06 Chambliss Dep.).  However, Amtrak's Standards of Excellence require that employees "[i]mmediately report to your supervisor all injuries and illnesses that occur . . . while you are performing your duties or on Amtrak property."  Defs' Stmt. ¶ 20; Defs' Ex. J (7/6/06 Decl. of Christine Turnblacer) at Ex. II (Amtrak Standards of Excellence), page 5.  Moreover, Plaintiff was aware of Amtrak's policy, and had complied with this policy with respect to previous workplace injuries.  Defs' Stmt. ¶ 15; Defs' Ex. C (8/12/04 Decision notifying Plaintiff of termination) at 2; Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 107:18-108:16.

Amtrak initiated an investigation into Plaintiff's conduct and determined that Plaintiff had committed three significant violations of Amtrak policy.  Defs' Stmt ¶ 16; Defs' Ex. C (8/12/04 Decision).  First, Amtrak determined that Plaintiff had six occurrences of absence or tardiness in a ninety day period, in violation of Amtrak's National Systems Attendance Policy. Defs' Stmt ¶ 18; Defs' Ex. C (8/12/04 Decision) at 1-2; Defs' Ex. B at 2-3 (6/28/04 Memo to J. Allione, Mgr, Amtrak High Speed Rail indicating that Plaintiff did not have permission to be absent from work 6/17/04-6/20/04); Def's Ex. B at 4 (1/30/04 e-mail from M. Wiggins to J. Allione stating that Plaintiff was denied time off from work 6/17/04-6/20-04).  Second, Amtrak determined that Plaintiff had failed to timely report the physical injury he claimed to have suffered as a result of the May 10, 2004 incident.  Defs' Stmt. ¶ 19; Defs' Ex. C (8/12/04 Decision) at 3.  Finally, Amtrak determined that Plaintiff had failed to deal honestly and accurately with his supervisors regarding the May 10, 2004 incident and his claimed injuries, in violation of Amtrak policy which requires employees to always tell the truth.  Defs' Stmt ¶ 21; Defs' Ex. C (8/12/04 Decision) at 2, 4; Defs' Ex. J (7/6/06 Turnblacer Decl.) Ex. II (Amtrak

Standards of Excellence) at 3.

Based on this investigation, Amtrak terminated Plaintiff's employment, effective August 12, 2004.  Defs' Stmt. ¶ 22; Defs' Ex. C (8/12/04 Decision) at 4.  Plaintiff filed a grievance regarding his termination, which was arbitrated in accordance with the applicable collective bargaining agreement.  Defs' Stmt. ¶ 23; Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 128:15-129:4.  On January 20, 2006, the arbitration panel issued an order reinstating Plaintiff without back pay.  Defs' Stmt. ¶ 24; Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op.).  In relevant part, the panels's opinion stated:

> Upon careful consideration of the record, the Board concludes that the Claimant violated Carrier's well established policy governing the reporting of industrial injuries.  We further conclude that his explanations for that failure are unpersuasive.  Had he complied with those rules, all questions and concerns of both parties may have been able to be addressed.  Thus his absence commencing May 11 was unauthorized.  Swirling around that judgment, however, is the Board's serious concern as to whether Carrier has established a case for its principal charge: intent to defraud.

> The time Claimant missed on this occasion was a violation of Carrier's National System Attendance Policy.  Standing alone, however, attendance issues would not in our judgment warrant dismissal.  Termination thus rests chiefly upon the charge of falsifying an injury.  Notwithstanding the suspicious circumstantial evidence, in our view, that evidence is inconclusive.  The record speaks to a situation in which the Claimant allowed himself to become emotionally distraught as he brooded over the pamphlet tossing incident, ultimately convincing himself that it was deliberate, that he had been struck a serious blow, and that he had been singled out for that mistreatment.  It is, of course, a mark and measure of adulthood to modify the impulses that sometimes surge up, to exercise judgment, to organize behavior and decision-making and to learn and adhere to the rules of everyday life.  In becoming emotionally flustered and retiring from his job obligations, Claimant simply failed to meet his employer's reasonable standards.

Defs' Stmt. ¶ 25; Ex. G (1/20/06 Nat'l Med'n Bd. Op.) at 3-4.[3]  Amtrak reinstated Plaintiff and

---

[3] The Court notes that the arbitration in this matter did not address Plaintiff's claims of employment discrimination and that, in any event, the Court would consider Plaintiff's claims of

Plaintiff returned to work at the end of 2005.  Defs' Stmt. ¶ 26; Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 196:20-199:9.

In June 2005, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Defs' Stmt. ¶ 27; Defs' Ex. K (6/15/05 Charge of Discrim., introduced as Ex. 14 at 5/24/06 Chambliss Dep.).  Plaintiff's Charge was filed in Baltimore and sent to Washington, D.C., such that Plaintiff was unaware of the exact date when he filed his charge or whether it was also filed with the D.C. Office of Human Rights.  Defs' Stmt. ¶¶ 28-31; Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 57:19-59:3.  The EEOC investigated Plaintiff's Charge of Discrimination and issued a Notice of Right to Sue, dated September 30, 2005.  Defs' Stmt. ¶ 32; Defs' Ex. L (9/30/05 Notice of Right to Sue, introduced as Ex. 23 at 5/24/06 Chambliss Dep.).  On December 30, 2005, Plaintiff filed a Complaint in this Court, naming as Defendants Amtrak and Steven S. Snyder.  Defs' Stmt. ¶ 33; Compl.  Plaintiff's Complaint includes five counts: (1) race discrimination under Title VII and 42 U.S.C. § 1981 (against both defendants); (2) retaliation under Title VII and 42 U.S.C. § 1981 (against Amtrak only); (3) assault and battery (against Snyder only); (4) intentional interference with economic relationship (against Snyder only); and (5) intentional infliction of emotional distress (against Snyder only).  Defs' Stmt. ¶ 33; Compl.

B.    *Additional Facts Identified by the Court*

The Court reiterates that the following facts are based on the Court's independent review of the documentary evidence and deposition testimony provided by Plaintiff and that Plaintiff has

---

employment discrimination de novo.  *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60, 95 S. Ct. 1011, 39 L. Ed. 2d 147 (1974).  Nevertheless, "the arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate."  *Id.*

not identified particular facts, supported by precise citations to record evidence, in order to rebut Defendants' Statement.  As Plaintiff has failed to comply with his obligations under Local Civil Rule 56.1, he is left with the Court's interpretation of the record evidence.  In addition, the Court notes that some of the facts described below are provided as background to Defendants' sparse allegations of facts, and not necessarily because they raise genuine questions of fact as to material issues.

### 1.     Facts Relating to the May 10, 2004 Incident

Plaintiff Chambliss is a black man of African-American descent, Defendant Snyder is a white man.  Defs' Ex. K (6/15/05 Charge of Discrimination).  On May 10, 2004, Plaintiff was sitting at a table in the Amtrak High Speed Rail lunchroom.  Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 70:13-19; Defs' Ex. F (Witness Stmts re: 5/10/04 incident) at 2 (B. Vullo Stmt.) and 3 (S. Snyder Stmt.).  Defendant Snyder tossed a used napkin into a trash can near Plaintiff and Plaintiff asked Defendant Snyder whether he was trying to hit Plaintiff.  Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 71:1-6;  Defs' Ex. F at 1 (Chambliss Stmt.) and 3 (Snyder Stmt.).  Thereafter, Defendant Snyder threw the safety pamphlet at Plaintiff and hit him in the nose.  Defendant Snyder maintained that he did not intend to hit Plaintiff with the pamphlet and that his action was a joke.  Defs' Ex. F at 3-4 (Snyder Stmt.); Pl's Ex. 12 (Portions of Arb. Tr.) at 116:6-17 (Snyder Test.).[4]  A number of other Amtrak employees were present in the lunchroom at the time of the

---

[4] Plaintiff identifies Exhibit 12 to his Opposition as "Portions of Testimony from Abritration [sic] Hearing" but does not provide the cover sheet for the transcript.  Moreover, the Court notes that the transcript portions Plaintiff provides do not indicate when the documented hearing occurred, but do suggest that the documented hearing was conducted by Mr. D'Alessandro, the Hearing Officer who rendered the August 12, 2004 Decision on Amtrak's charges against Plaintiff.  *See* Defs' Ex. C (8/12/04 Decision) at 3.  In contrast, the transcript portions Plaintiff provides do not indicate any participation by any of the members of the

incident, including some who saw the pamphlet thrown and others who did not see the pamphlet

thrown but rather heard it hit Plaintiff.  Defs' Ex. F at 2 (B. Vullo Stmt.) and 6 (D. Washington

Stmt.); Pl's Ex. 12 (Portions of Arb. Tr.) at 209:23-212:21 (P. Bunch Test.).  Plaintiff was very

upset by the incident and his distress was noted by employees who saw him on the day of the

incident.  Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 86:20-87:8; Pl's Ex. 12 (Portions of Arb. Tr.)

at 196:10-197:2; Defs' Ex. D (C.M. Bello Stmt.); Pl's Ex. 11 (9/27/05 Bello Dep.) at 39:11-20;

43:4-44:16.

Approximately one hour after the incident, Plaintiff spoke with his union representative,

Robert Mascetti, about the incident and asked Mr. Mascetti to speak with Plaintiff's manager,

Dino Giurfa about the incident.  Pl's Ex. 12 (Portions of Arb. Tr.) at 193:14-24 (Mascetti Test.).

Mr. Mascetti did so, and Mr. Giurfa indicated that he would investigate the situation.  *Id.* at

194:7-21; 174:14-21 (Giurfa Test.).  Mr. Giurfa referred the investigation of the incident to

General Foreman Christopher Bello.  *Id.* at 173:14-174:4.  Around noon on May 10, 2004,

Plaintiff and his union representative met with Mr. Bello to discuss the incident.  Mr. Bello did

not perceive any physical injury to Plaintiff during this meeting.  Defs' Ex. D (C.M. Bello Stmt.);

Pl's Ex. 11 (9/27/05 Bello Dep.) at 34:166-35:19; 36:15-17.  In addition, there is no evidence

that Plaintiff reported any physical injury to Mr. Bello.  Defs' Ex. D (C.M. Bello Stmt.) ("Mr.

Chambliss never made mention of any injury he received from the incident and did not appear to

be injured in any way.").  After meeting with Plaintiff and Mr. Mascetti, Mr. Bello interviewed

---

arbitration panel in this matter.  *See* Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op.).  The Court is
therefore unsure whether the transcript proffered as Plaintiff's Exhibit 12 actually documents
Amtrak's formal investigation into this matter or the arbitration hearing; however, for ease of
recognition the Court will refer to it as the transcript of the arbitration hearing ("Arb. Tr.").

Defendant Snyder, who told Mr. Bello that he intended the incident as a joke.  Defs' Ex. D (C.M. Bello Stmt.); Pl's Ex. 11 (9/27/05 Bello Dep.) at 45:3-16.  Mr. Bello also spoke with the employees who observed the incident and had them write down statements of what they observed.  *Id.* at 47:2-12; Defs' Ex. F.

Based on his investigation, Mr. Bello "determined that Mr. Snyder's actions did not warrant his immediate removal from service and [felt] Mr. Snyder intend [sic] no malice," despite the fact that there was "no question that he used poor judgment."  Defs' Ex. D (C.M. Bello Stmt.).  Mr. Bello informed Defendant Snyder "that his action was in poor judgment especially for a supervisor and that it could also be considered horseplay which is a violation of Amtrak's standards of excellence regarding conduct."  *Id.*  Mr. Bello further informed Defendant Snyder that he "would have to discuss the entire matter with [Mr. Giurfa] to determine the appropriate actions or possible discipline necessary to address this matter."  *Id.*  The next week, Defendant Snyder was given a two (2) day suspension for violating Amtrak's safety policy, which was "to be served according to operational commitments" (held in abeyance).  Pl's Ex. 5 (Snyder Personnel Docs.) at 3-4 (5/17/04 Notice of Intent to Impose Discipline Meeting and Waiver).

After Plaintiff met with Mr. Bello on May 10, 2004, he called Amtrak police to report the incident.  Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 92:17-96:18.  Plaintiff did not report any injuries to the police officer who investigated the incident.  *Id.*; Defs' Ex. E (5/10/04 Amtrak Police Report) at 3.  At his deposition, Plaintiff testified that when he arrived home after completing his shift on May 10, 2004, his head was hurting and he called Amtrak's mental health line and spoke to a counselor.  Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 97:4-8.  According to

Plaintiff, the counselor determined that Plaintiff was under too much stress to go to work the next

day and told Plaintiff to "mark off" from work. *Id.* at 97:7-11.[5]  On the morning of May 11,

2004, Plaintiff called Amtrak's "mark-off number" to report that he would not be coming to

work and reported that he was stressed. *Id.* at 138:18-139:9.  Later on May 11, 2004, Plaintiff

saw Dr. Jeffrey D. Gaber, a private physician not associated with Amtrak.  Dr. Gaber's

consultation note indicates that Plaintiff had a "headache disorder and nasal pain," as well as

anxiety, although no loss of consciousness, problems breathing, or nosebleed.  Pl's Ex. 3 at 1

(Dr. Gaber 5/11/04 Consultation Note).  Dr. Gaber recommended to Plaintiff that he try a

medication, Fioricet, for his headaches and stated that he did not consider Plaintiff "fit for duty

until May 17, 2004." *Id.* at 1-2.[6]  According to Plaintiff, the Amtrak mental health line also

referred Plaintiff to a Dr. Hollander, whom Plaintiff continued to see through August 2004 for

mental health issues relating to the May 10, 2004 incident.  Pl's Ex. 2A (5/24/06 Chambliss

---

[5] There is no evidence, other than Plaintiff's deposition testimony, of the substance of
Plaintiff's conversation with the Amtrak mental health line.  During his deposition, Plaintiff
testified that he tried to obtain records of this conversation and was told that although tapes
existed of the conversation, Amtrak could not provide them to Plaintiff.  Pl's Ex. 2A (5/24/06
Chambliss Dep.) at 145:3-10.

[6] In their Reply Memorandum, Defendants assert that the medical reports from Dr. Gaber
were not produced during discovery in this action.  Defs' Reply at 11.  However, the May 11,
2004 consultation note proffered by Plaintiff in support of his Opposition includes a Bates stamp
on the bottom that reads "Amtrak/Chambliss488" and matches the Bates stamps included on
documents proffered by Defendants, *see e.g.*, Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op.) at 2. As
such, it appears to the Court that Dr. Gaber's consultation note was, in fact, produced during
discovery in this action.  In addition to the consultation note, however, Plaintiff has proffered
another note dated May 11, 2004 addressed "To Whom It May Concern," which indicates that
Plaintiff had a May 11, 2004 doctor's appointment, would be unable to work from May 11
through May 16, 12004, and would be able to return to work on May 17, 2004.  Pl's Ex. 3 at 3
(5/11/04 Note).  This note contains no Bates stamp, and the Court therefore will not consider it as
it is unclear whether it was produced in discovery in this action.

Dep.) at 112:15-113:13.

During the period that he was out from work, Plaintiff contacted Mr. Mascetti and told Mr. Mascetti that he had been to the doctor. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 139:14-140:10. In turn, on May 13, 2004, Mr. Mascetti had a discussion with Mr. Giurfa about Plaintiff in which Mr. Mascetti indicated that Plaintiff had filed a police report. Pl's Ex. 12 (Portions of Arb. Tr.) at 172:4-23 (Giurfa Test.); 197:16-21 (Mascetti Test.). In connection with the arbitration in this matter, Mr. Mascetti testified that during the May 13, 2004 conversation, Mr. Giurfa asked whether Plaintiff was reporting an injury and "said at that time that [Mr. Mascetti] was not Jerry Chambliss, that [Mr. Mascetti] was not reporting an injury." *Id.* at 197:22-198:5 (Mascetti Test.).

When Plaintiff returned to work on May 17, 2004, Mr. Giurfa scheduled a meeting with Plaintiff and Defendant Snyder to "resolve this issue." *Id.* at 146:12-20 (Giurfa Test.). Plaintiff insisted that a union representative be present at the meeting, Mr. Giurfa objected to a union representative being present because the "meeting was very informal between two employees and [he] didn't want any undue influence," and the meeting was cancelled. *Id.* at 146:19-147:20; Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 100:6-20. The next day, May 18, 2004, Plaintiff met with his supervisor, Michael McLean, and told Mr. McLean that he was trying to report a physical injury but that management would not speak with him. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 101:18-102:2; Pl's Ex. 12 (Portions of Arb. Tr.) at 247:16-249:2 (McLean Test.). In connection with the arbitration in this matter Mr. McLean testified that, during their May 18, 2004 conversation, Plaintiff mentioned that he was injured but that Mr. McLean did not think Plaintiff was reporting a physical injury to him. *Id.* at 249:3-254:22.

14

Based on the foregoing, the Court concludes that Amtrak employees may have been aware that Plaintiff was upset by the May 10, 2004 incident; however, Plaintiff has proffered no evidence demonstrating that he reported his *physical* injury to any representative of Amtrak during the period that he was out from work, May 11, 2004 to May 17, 2004.

### 2.    *Events Leading to Plaintiff's Filing of His Complaint*

Plaintiff testified during his deposition that, at some point during May or June 2004, he contacted an attorney to file a claim under the Family and Medical Leave Act. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 103:12-19.[7]  Thereafter, on June 8, 2004, Mr. Giurfa and Joseph Allione, Manager of Amtrak High Speed Rail, called Plaintiff into an office and told him that if he was claiming a physical injury, he had to provide doctor's statements and complete certain forms. *Id.* at 104:2-18. On June 9, 2004, Plaintiff contacted Amtrak's Dispute Resolution Office ("DRO") regarding the May 10, 2004 incident. Pl's Ex. 1 at 3-7 (6/22/04 Case Manager Intake Form completed by G. Atkinson).  "While [Plaintiff] did not say that he believed the incident was racially motivated, he told the DRO that he believed if Mr. Snyder had been African American he would have been taken out of service immediately and asked to leave the property. [Plaintiff] also said that Mr. Snyder had had problems with African American employees in the past." Pl's Ex. 1 at 12 (6/22/04 Memo from G. Atkinson, Intake Coordinator to T. Campbell).  In addition, handwritten notes apparently written by Ms. Atkinson during Plaintiff's June 9, 2004 telephone call to the DRO indicate that Plaintiff complained that Mr. Giurfa "did nothing" and that Defendant Snyder had not been punished for hitting Plaintiff. Pl's Ex. 1 at 1-2 (Handwritten

---

[7] In addition, in connection with the arbitration in this matter, Plaintiff testified that he contacted an attorney during the period between May 11, 2004 and May 17, 2004 when he was out from work. Pl's Ex. 12 (Portions of Arb. Tr.) at 323:1-6 (Chambliss Test.).

notes dated 6/9). Thereafter, Plaintiff filed a physical injury report on June 14, 2006. Defs' Ex.

H (6/14/04 Employee Personal Statement); Defs' Ex. I (6/14/04 Employee Injury/Illness Report).

It appears that following Plaintiff's complaint to the DRO, Ms. Atkinson spoke with Mr.

Giurfa. Pl's Ex. 1 at 8-9 (Handwritten notes dated 6/14). During this conversation, Mr. Giurfa

told Ms. Atkinson that Amtrak Labor Relations determined that the incident did not constitute

workplace violence because Defendant Snyder thought it was a joke, that he planned to charge

Plaintiff with late reporting of an injury, false reporting of an injury, and "accidentproneness,"

and that Plaintiff was represented by an attorney in connection with his FMLA claim. *Id.* Upon

learning that Plaintiff was represented by an attorney, the DRO transferred Plaintiff's complaint

to Amtrak's EEO Compliance Unit. Pl's Ex. 1 at 12 (6/22/04 Memo from Atkinson to

Campbell). Amtrak advised Plaintiff of this transfer on June 22, 2004, and also advised

Plaintiffs of his right to file a complaint with the federal EEOC and/or state or local agencies,

notwithstanding his DRO complaint. Pl's Ex. 1 at 13-14 (6/22/04 Letter from G. Atkinson to

Plaintiff).

Plaintiff was notified of the charges against him in late June or early July 2004, and a

number of meetings occurred regarding the charges. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at

115:15-119:1. The Amtrak Hearing Officer, Mr. D'Alessandro, completed his disciplinary

investigation into the charges against Plaintiff on July 29, 2004. Defs' Ex. C (8/12/04 Decision).

Plaintiff's union representative "was present throughout the entire investigations [sic], and was

afforded the opportunity to question company witnesses and to review documentation proposed

for inclusion in the record." *Id.* at 2.[8]  As described above, the Hearing Officer issued his

Decision on August 12, 2004 and Amtrak terminated Plaintiff's employment effective that date.

*Id.* at 3-4.

It appears that during the course of the relevant meetings and the arbitration in this

matter, Plaintiff challenged various aspects of Amtrak's three charges against him.  Plaintiff

continues to challenge the validity of Amtrak's charges in his Opposition to Defendants' Motion

for Summary Judgment, and the Court shall therefore briefly address the facts relevant to each

charge.

---

[8] In his Opposition, Plaintiff asserts that "Amtrak did not adequately investigate the May 10, 2004 incident where Defendant Snyder struck Plaintiff" and that Amtrak "made light of the entire matter, and only decided to take action after Plaintiff continued to complain of discrimination."  Pl's Opp'n at 10.  Plaintiff asserts that Amtrak disregarded statements made by minority witnesses to the incident, and that Amtrak's decision to credit Defendant Snyder's view of the incident is evidence of Amtrak's "clear intent to once again condone the racist activities of Defendant Snyder."  *Id.* at 10-11.  Based on the record evidence, the Court cannot agree with Plaintiff that Amtrak failed to adequately investigate the May 10, 2004 incident.  The Court notes that, beginning on the afternoon of the incident, Amtrak collected witness statements from and spoke with the Amtrak employees that witnessed the incident.  *See* Defs' Ex. F (witness statements); Pls' Ex. 11 (9/27/05 Bello Dep.) at 47:2-12.  Amtrak thus began an investigation into the incident shortly after it occurred.  Moreover, despite concluding that Defendant Snyder intended the incident as a joke, *see* Defs' Ex. D (C.M. Bello Stmt.), Amtrak charged Defendant Snyder with a two-day suspension, Pl's Ex. 5 (Snyder Personnel Docs.) at 3-4 (5/17/04 Notice of Intent to Impose Discipline Meeting and Waiver).  Ultimately, Plaintiff appears to believe that Amtrak's decision not to terminate Defendant Snyder is, in and of itself, evidence that Amtrak did not adequately investigate the May 10, 2004 incident.  However, the discipline administered to Defendant Snyder bears no relation to the quality of Amtrak's investigation, but is instead relevant to Plaintiff's unsuccessful attempt to assert a claim for disparate treatment.  Similarly, while Plaintiff asserted in his deposition that he believes the arbitration hearing in this matter was unfair, *see* Pl's Ex 2A (5/24/06 Chambliss Dep.) at 129:20-135:17, he has proffered no evidence in support of this assertion or demonstrated that the arbitration hearing was conducted in a manner other than that to which Plaintiff was entitled pursuant to the relevant collective bargaining agreement.

a.     *Absenteeism*

Plaintiff's disciplinary records indicate that between May 1, 2002 and April 21, 2003, Plaintiff received counseling, a verbal warning, a written warning, and three discipline investigations for excessive absenteeism.  *See* Defs' Ex. B at 5 (4/21/03 Notice of Intent to Impose Discipline Meeting); 7 (4/11/03 Memo to D. Giurfa, Asst. Gen. Mgr Amtrak High Speed Rail, noting previous actions taken regarding Plaintiff's absenteeism).  In addition, prior to the May 10, 2004 incident, Plaintiff received a three-day suspension for violating Amtrak's National Systems Attendance Policy, which was held in abeyance for six months.  *See* Defs' Ex. B at 6 (4/28/03 Waiver signed by Chambliss).

In connection with Plaintiff's termination, Amtrak determined that Plaintiff was absent from or late to work six times within a ninety-day period.  *See* Defs' Ex. C (8/12/04 Decision) at 2.  Four of these dates (May 11-13, 2004 and May 16, 2004) are during the period of time when Plaintiff was out from work following the May 10, 2004 incident.  *Id.*  Plaintiff contends that these dates should not be considered absences because he was injured; however, as noted above, Plaintiff did not report any *physical* injury to an Amtrak representative during the period that he was out from work.  In addition, with respect to Plaintiff's charged absence between June 17 and June 20, 2004, Plaintiff contends that he gave his managers notice that he would be out from work, that an issue arose as to whether his supervisor could grant Plaintiff permission to be out from work, and that without a clear resolution of the issue, Plaintiff took the time off.  Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 121:7-24:9.  However, an e-mail proffered by both parties indicates that Plaintiff was told that he had no vacation time available and would not be given permission to take the days off unless he offered a legitimate reason for doing so.  Defs' Ex. B at

18

4 (6/30/04 e-mail from M. Wiggins to J. Allione).  As such, it appears that Plaintiff was not excused from work for the period from June 17 to June 20, 2004.

Plaintiff also contends that he should not have been counted as 22 minutes late on June 13, 2004, asserting that he was late because the bridge he had to cross to get to work was out. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 123:6-125:2.  Plaintiff further asserts that another manager excused several white employees' tardiness for the same reason, while Plaintiff's tardiness was not excused.  *Id.*; Pl's Ex. 2 (Chambliss Personnel Docs.) at 2 (4/8/04 e-mail from J. Casson to J. Cabral noting that several employees were late due to the bridge closure and that their time should be adjusted as such).  However, Plaintiff provides no evidence that his manager excused any other employees' tardiness, white or black, without excusing Plaintiff's tardiness. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 124:1-20.  In any event, it is clear that Plaintiff's own tardiness on June 13, 2004 was not excused.

Finally, with respect to Amtrak's claim that Plaintiff was one hour and eighteen minutes late on June 16, 2004, Plaintiff contends that his supervisor allowed him to begin and end his shift an hour earlier on that day.  Pl's Ex. 12 (Portions of Arb. Tr.) at 85:1-87:17; *see also* Pl's Ex. 2 at 1 (6/30/04 e-mail from T. Bernarding to J. Cabral stating that Plaintiff had been allowed to work from 6:00 a.m. until 2:00 p.m.).  Plaintiff contends that he actually left work an hour early on June 16, 2004, rather than coming to work one hour and eighteen minutes late.  Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 120:6-121:22.  Unlike Plaintiff's other challenges to his attendance record, wherein Plaintiff provides excuses for his absence or tardiness but does not contend that he was present or on time, Plaintiff's testimony regarding June 16, 2004 raises a factual issue as to whether Plaintiff was actually tardy on that date.

19

Plaintiff may thus be able to raise a factual issue as to one instance of tardiness with which he was charged; however, as to the other five instances of absence or tardiness, Plaintiffs' excuses fail to raise factual issues as to whether the instances actually occurred. Moreover, the record clearly shows that five instances of absence or tardiness within a ninety (90) period constitutes a violation of Amtrak's National System Attendance Policy. *See* Defs' Ex. J (Turnblacer Decl.) Ex. I (Amtrak Nat'l Sys. Attendance Policy) at 2 (indicating "[a]n employee may be regarded as having an instance of excessive absence/tardiness whenever his/her attendance record shows any of the following . . . [a] fifth occurrence of absence and/or tardiness in any 90-day period.").[9]

### b.     *Failure to Immediately Report Physical Injury*

As discussed above, Plaintiff variously contends that he reported his "stress" when he called into the Amtrak mental health line on May 10, 2004 and when he called the "mark-off" line on May 11, 2004. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 97:4-11; 138:18-139:9. Plaintiff also asserts that during the period that he was out from work, he told Mr. Mascetti that he had been to the doctor and that Mr. Mascetti attempted to tell Mr. Giurfa that Plaintiff was injured. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 139:14-140:10; Pl's Ex. 12 (Portions of Arb. Tr.) at 172:4-23 (Giurfa Test.); 197:16-198:5. However, as concluded above, there is no indication anywhere in the record that Plaintiff reported his *physical* injury to any representative of Amtrak during the period that he was out from work. Furthermore, the record clearly demonstrates that

_____

[9] The arbitration panel reviewing Plaintiff's grievance in this matter determined that the time Plaintiff missed from work in connection with the May 10, 2004 incident was a violation of Amtrak's National System Attendance Policy. *See* Defs' Ex. G (1/20/06 Nat'n Med'n Bd. Op.) at 4.

Amtrak's Standards of Excellence require employees to immediately report injuries and that Plaintiff was aware of this policy. Defs' Ex. J (7/6/06 Decl. of Christine Turnblacer) at Ex. II (Amtrak Standards of Excellence), page 5; Defs' Ex. C (8/12/04 Decision) at 2; Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 107:18-108:16. Amtrak's Standards of Excellence clearly explain that one purpose of requiring employees to immediately report physical injuries is "to ensure that necessary medical attention is provided." Defs' Ex. J (Turnblacer Decl.) at Ex. II, page 5. Furthermore, as the arbitration panel's opinion highlighted, Plaintiff's failure to immediately report his physical injury to an Amtrak supervisor "deprived Amtrak [] of its right to send him to a Company doctor to determine whether he had been injured and, if so, how seriously." Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op.) at 3. As such, it is clear that Plaintiff's failure to personally report his *physical* injury during the period that he was out from work constituted a violation of Amtrak policy.[10]

> c.    *Failure to Deal Honestly With Supervisors Regarding Physical Injury*

Finally, Plaintiff contests Amtrak's charge that he violated Amtrak's Standards of Excellence pertaining to "Trust and Honesty" and "Integrity" by claiming a physical injury sustained on May 10, 2004 but not claiming the physical injury at the time of the incident. With respect to this charge, the record is clear that Plaintiff did not report any physical injury on May

---

[10] Plaintiff's assertion in his Statement that Amtrak "refused to allow Plaintiff to file a written report prior to" June 14, 2004, Pl's Stmt. ¶ 9, is of no consequence because the record clearly shows that Plaintiff made no attempt to personally report his physical injury to Amtrak management during the period that he was out from work. The events that transpired after Plaintiff returned to work on May 17, 2004 are entirely irrelevant to whether Plaintiff "immediately" reported his physical injury, as required by Amtrak's policy. To this end, the Court notes that the arbitration panel in this matter concluded that Plaintiff was aware of, and violated, Amtrak's policy. Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op.) at 3.

10, 2004 to either an Amtrak supervisor or to the Amtrak police.  Pl's Ex. 2A (5/24/06

Chambliss Dep.) at 92:17-96:18; 138:13-141:9; Defs' Ex. E (5/10/04 Amtrak Police Report) at 3.

However, the consultation note completed by Dr. Gaber, the private physician, supports

Plaintiff's claims that he sustained a physical injury on May 10, 2004 and that he was advised by

his doctor not to return to work until May 17, 2004.  Pl's Ex. 3 at 1-2 (5/11/04 Consultation

Note).  While Plaintiff clearly failed to pass this information along to Amtrak during the period

that he was out from work, Dr. Gaber's consultation note is sufficient to raise a factual dispute as

to whether Plaintiff in fact failed to deal honestly with his supervisors regarding his physical

injury.[11]

### 3.    *Facts Unrelated to the May 10, 2004 Incident*

In addition to the facts detailed above, the Court's independent review of the record in

this matter revealed the following facts, unrelated to the May 10, 2004 incident, but possibly

relevant to Plaintiff's broad charges of discrimination and retaliation.

#### a.    *Plaintiff's Asserted "Protected Activity"*

As discussed above the record includes evidence that, prior to his August 12, 2004

termination, on June 9, 2004, Plaintiff complained to the DRO that "he believed if Mr. Snyder

had been African American he would have been taken out of service immediately and asked to

leave the property" and that "Mr. Snyder had had problems with African American employees in

---

[11] As noted above, the arbitration panel in this matter found "much in Carrier's case that forces itself upon our attention" regarding Plaintiff's alleged falsification of on-the-job injuries, stating that "Carrier skepticism about [Plaintiff's] inability to report to work between May 11 and May 17 is easily understood."  Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op.) at 3.  However, the arbitration panel ultimately had "serious concern as to whether Carrier has established a case for its principal charge: intent to defraud."  *Id.* at 4.  Finding insufficient evidence of that charge, the arbitration panel ordered Plaintiff reinstated.  *Id.*

the past." Pl's Ex. 1 at 12 (6/22/04 Memo from G. Atkinson to T. Campbell).[12]  In making this complaint, Plaintiff "did not say that he believed the incident was racially motivated."  *Id.*  Amtrak documented Plaintiff's complaint to the DRO in both handwritten notes and internal memoranda.  *See* Pl's Ex. 1 at 1-2 (handwritten notes re: 6/9 telephone call with Plaintiff); 3-7 (Case Manager Intake Form; 12 (6/22/04 Memo from G. Atkinson to T. Campbell).

In addition, the record contains a letter that Plaintiff wrote to the DRO in June 2003 complaining that his supervisors refused to excuse him for doctor's appointments and possible surgery after he sprained his ankle on February 7, 2003.  Pl's Ex. 1 at 18-19 (Letter from Plaintiff to DRO).[13]  The opening of the letter states that Plaintiff writes "to detail the events that support my case of discriminatory harassment against the Amtrak and NEC management staff at the High Speed Rail Facility."  *Id.* at 18.  The letter does not, however, explain that Plaintiff believed he had experienced discriminatory harassment on the basis of his race.  Indeed, it appears from the deposition testimony of Dawn Marcelle, Amtrak senior director for dispute resolution, that in response to the letter in question, the DRO informed Plaintiff that "his problem didn't fall under the purview of the DRO" and "referred his concerns to human resources."  Pl's Ex. 8 (8/2/05

---

[12]  Defendants incorrectly assert that Plaintiff failed to provide a copy of Amtrak's June 22, 2004 memorandum.  *See* Defs' Reply at 14.  A memorandum of that date matching Plaintiff's description is included among the documents submitted by Plaintiff in connection with his Opposition to Defendants' Motion for Summary Judgment, and includes a Bates stamp indicating it was produced during discovery in this action.  *See* Pl's Ex. 1 at 12 (6/22/04 memo from G. Atkinson to T. Campbell).

[13]  Defendants also incorrectly assert that Plaintiff failed to provide a copy of his June 2003 letter to the DRO.  *See* Defs' Reply at 14.  A letter referencing Plaintiff's February 7, 2003 injury is included among the documents that Plaintiff submitted in connection with his Opposition to Defendants' Motion for Summary Judgment, and includes a Bates stamp indicating it was produced during discovery in this action.  *See* Pl's Ex. 1 at 18-19 (Letter from Plaintiff to DRO).

Marcelle Dep.) at 22:5-23:8. Elsewhere in her deposition, Ms. Marcelle testified that the DRO "is focused on allegations of discrimination and harassment based on some protective group status such as race or gender or religion." *Id.* at 13:14-20.

> b. *Evidence of Prior Events Involving Defendant Snyder*

Plaintiff's Opposition broadly asserts that "Defendant Snyder violated Defendant Amtrak's 'Standards of Excellence' policy on at least two (2) occasions and its 'Anti-Discrimination and Anti-Harassment' policies on numerous occasions." Pl's Opp'n at 10. Plaintiff fails, however, to provide the Court with a precise list of Snyder's alleged violations of Amtrak policies, or even citations to the exact record evidence Plaintiff believes supports his allegations. The Court has nevertheless independently reviewed the record evidence to discern the extent of possible incidents involving Defendant Snyder. The Court notes that its recitation of the facts regarding these alleged violations are based almost exclusively on various deposition transcripts submitted by Plaintiff.[14]

For purposes of determining whether Plaintiff can adduce evidence of a racial animus on the part of either Defendant Snyder or Amtrak, the Court does not consider evidence of any events occurring after the May 10, 2004 incident and Amtrak's investigation of that incident, as such events are entirely irrelevant to Plaintiff's instant claim of discrimination.[15] Nevertheless,

---

[14] The Court further notes that, with the exception of Plaintiff's own deposition, the transcripts proffered by Plaintiff document depositions taken in Plaintiff's workers' compensation action in the Circuit Court for Baltimore City. *See e.g.*, Pl's Ex. 6 (10/18/05 Smith Dep.). Plaintiff has not provided the Court with the exhibits introduced in these depositions, thus the Court's recitation of facts elicited from these depositions is based solely on those portions of the deposition transcripts provided by Plaintiff.

[15] In support of his Opposition, Plaintiff proffers records from Defendant Snyder's personnel file that demonstrate that Defendant Snyder was disciplined for a racially

based on the Court's review of the record, it appears that Defendant Snyder was involved in a

number of incidents with Amtrak employees prior to the May 10, 2004 incident with Plaintiff.

First, in or around August 2002, Amtrak employee Harry Charleus wrote a letter complaining

that Mr. Snyder approached him in a threatening manner and used profanity while yelling at Mr.

Charleus about not completing his work.  *See* Pl's Ex. 9 (8/2/05 Charleus Dep.) at 10:12-13:18.

Plaintiff identified Mr. Charleus as black.  Pl's Ex. 2A at 80:7-81:1.  However, there is no

evidence that Mr. Charleus reported the incident as racially motivated.  Pl's Ex. 8 (8/2/05

Marcelle Dep.) at 14:12-20 (if Mr. Charleus had reported a racial aspect to the incident, his

complaint would have been handled by the DRO).  Moreover, when asked specifically, Mr.

Charleus did not recall hearing Defendant Snyder "use the N word to anyone." Pl's Ex. 9 (8/2/05

Charleus Dep.) at 16:9-11.  Mr. Charleus did, however, recall Defendant Snyder telling

employees to "stop complaining like a bunch of bitches."  Pl's Ex. 9 (8/2/05 Charleus Dep.) at

14:6-8.  This incident appears to be the same incident testified to by Amtrak employee Doria

Washington (black), who asserted that, while transporting a group of employees in a van,

Defendant Snyder "said . . . stop complaining, stop whining and told us all to shut up and called

us the N word and B name."  Pl's Ex. 7 (8/2/05 Washington Dep.) at 20:8-21:5.

---

discriminatory incident more than a year after the May 10, 2004 incident. Pl's Ex. 5 at 1 (9/28/05 Waiver).  In addition, Plaintiff proffers evidence that Defendant Snyder was twice disciplined for failure to attend to his duties, Pl's Ex. 5 at 6 (6/21/04 Waiver) and 20 (1/7/04 Waiver), and that Defendant Snyder was twice subjected to drug and alcohol testing, Pl's Ex. 5 at 12 (5/21/04 Drug and Alcohol Testing Notification Form) and 30 (12/25/03 Drug and Alcohol Testing Notification Form).  However, as discussed above, events occurring after the May 10, 2004 incident and events not germane to Defendant Snyder's interactions with Amtrak employees are entirely irrelevant to Plaintiff's allegations that the May 10, 2004 was motivated by racial animus and that Amtrak engaged in discrimination by terminating Plaintiff while failing to terminate Defendant Snyder.  Compl. ¶ 10.

In addition, Amtrak employee Carlos Alvarado testified that he signed the letter Mr. Charleus wrote in August 2002. Pl's Ex. 10 (9/27/05 Alvarado Dep.) at 15:15-16:19. Mr. Alvarado further testified that he was present during the incident in the van described by Ms. Washington and heard Defendant Snyder call people bitches, but did not hear Defendant Snyder use the "N word," *id.* at 25:7-27:5. Mr. Alvarado also testified regarding a separate complaint he made about Defendant Snyder because Snyder, while "playing around" with him, tried to grab Mr. Alvarado's hard hat, and attempted to kick Mr. Alvarado. *Id.* at 18:18-23:16. Although Plaintiff identifies Mr. Alvarado as Hispanic, Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 78:15-79:6, Mr. Alvarado did not describe the incident where Defendant Snyder tried to kick him as racially motivated. Pl's Ex. 10 (9/27/05 Alvarado Dep.) at 23:1-6.[16]

Significantly, Mr. Charleus, Ms. Washington, and Mr. Alvarado all testified that they discussed these incidents with supervisor Dennis Smith, that Mr. Smith discussed the incidents with Defendant Snyder, and that they did not have problems with Defendant Snyder after he spoke with Mr. Smith. *See* Pl's Ex.7 (8/2/05 Washington Dep.) at 32:19-34:6; Pl's Ex. 8 (8/2/05 Charleus Dep.) at 16:20-29:12; Pl's Ex. 10 (9/27/05 Alvarado Dep.) at 24:13-19. For his part, Mr. Smith testified that he recalled investigating one incident where Defendant Snyder was accused of using profanity and that he spoke with Mr. Snyder regarding the incident, but that no formal investigation ensued. Pl's Ex. 6 (10/18/05 Smith Dep.) at 54:20-55:21; 64:19-66:8; 75:3-

---

[16] In addition, Plaintiff and others testified that Defendant Snyder may have made derogatory comments regarding homosexuality to another Amtrak employee; however, it is not clear that any of these individuals actually heard Defendant Snyder's alleged comments. *See* Pl.'s Ex. 2A (5/24/06 Chambliss Dep.) at 78:9; Pl's Ex. 9 (8/2/05 Charleus Dep.) at 14:9-45:3. In any event, such an incident would not provide evidence of a racial animus on the part of Defendant Snyder.

19.

Based on the Court's review of the record evidence it appears that, prior to the May 10, 2004 incident, Defendant Snyder was involved in one racially charged incident, that Amtrak addressed this incident, and that the parties involved did not report subsequent problems with Defendant Snyder. The record evidence thus fails to support Plaintiff's claim that "Defendant Snyder had a history of . . . making racist and demeaning statements to the minority employees under his supervision." Pl's Opp'n at 16. Moreover, while the record evidence clearly suggests that Defendant Snyder's behavior was inappropriate at times, the record does not include evidence that Defendant Snyder exhibited a pattern of discriminatory behavior that went ignored by Amtrak.

    *c.    Plaintiff's Other Allegations Concerning Race Discrimination*

Plaintiff's Opposition and deposition in this matter are peppered with vague allegations regarding race discrimination at Amtrak. Again, Plaintiff has failed to provide the Court with specific record citations supporting these allegations; however, the Court has reviewed the record for evidence that Plaintiff experienced race discrimination while employed by Amtrak. The Court's review of the record reveals that, although Plaintiff identified a number of incidents during his deposition that he believed demonstrated a racial animus on the part of Amtrak, Plaintiff's own descriptions of these incidents do not show them to be in any way connected to Plaintiff's race. *See* Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 34:15-36:20 (Plaintiff was told to do a job because he was the most junior man present but believed it was because he was the only black man present); 37:6-40:12,180:4-183:21, and 208:7-224:14 (Supervisor yelled at Plaintiff and others agreed Plaintiff was harassed; however the incident bears no relation to Plaintiff's

27

race).

Furthermore, in his deposition Plaintiff identifies two white Amtrak employees whom he believes received preferential treatment, and another black employee whom Plaintiff asserts filed an EEOC complaint alleging disparate treatment. *See id.* at 66:19-70:7; 146:3-147:12; 148:7-19 (alleging that white employee was offered FMLA time and had doctor's notes accepted despite having more absences than Plaintiff); 155:10-156:9 (alleging that white employee whom Plaintiff trained was given a job over Plaintiff); 159:3-17 (alleging that black employee was taken out of service for not wearing safety equipment but white employees were left in service for same offense). Plaintiff fails, however, to provide any documentary evidence or deposition testimony to corroborate these allegations or to indicate in any way the time period in which these incidents allegedly occurred. The Court therefore lacks sufficient information to evaluate the relevance of these allegations to the instant matter. Most importantly, however, as Plaintiff does not indicate his basis of knowledge with respect to each of these allegations, the Court is unable to determine whether they are supported by personal knowledge or are simply inadmissible hearsay.

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S. Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant
to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587,
106 S. Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in
discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by
affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v.
Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v.
Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation
omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also
Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate
the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is
not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the
speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting
*Celotex Corp.*, 477 U.S. at 327). Accordingly, the Court reviews the defendant's motion for
summary judgment under a "heightened standard" that reflects "special caution." *Aka v.
Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted),
*overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nonetheless, while this
special standard is more exacting, it is not inherently preclusive. Although more circumspect, the
Court will continue to grant a motion for summary judgment in which the nonmoving party has
failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to
a judgment as a matter of law.

30

### III: DISCUSSION

Plaintiff's Complaint includes five claims. Count One is brought against both Defendant Amtrak and Defendant Snyder, and alleges race discrimination in violation of both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Count Two is brought solely against Amtrak and claims that Amtrak retaliated against Plaintiff, in violation of Title VII and § 1981, by terminating him because he spoke up for his civil rights. Plaintiff's remaining claims are brought solely against Defendant Snyder and include assault and battery (Count Three), "intentional interference with economic relationship" (Count Four), and intentional infliction of emotional distress (Count Five).

Plaintiff brings his discrimination and retaliation claims pursuant to both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* However, in their Motion for Summary Judgment, Defendants argue that Plaintiff's claims under Title VII are time-barred because Plaintiff failed to file a charge of discrimination with the EEOC within 300 days of his termination. *See* Defs' Mot. for Summ. J. at 7-9 (citing 42 U.S.C. §2000e-5(e)). In his Opposition, "Plaintiff concedes that he did not timely file his charge of discrimination with the EEOC, and, Title VII is thus not applicable." Pl's Opp'n at 5. As such, the Court will only consider Plaintiff's discrimination and retaliation claims under the rubric of 42 U.S.C. § 1981. As Defendants have moved the Court for summary judgment with respect to each of Plaintiffs' claims, the Court shall address each claim in turn.

A.    *Plaintiff's Discrimination Claim*

1.    *Proper Standards*

Count One of Plaintiff's Complaint asserts that Defendants "engaged in racial

discrimination against the plaintiff . . . by terminating him for infractions that it does not

terminate white employees [sic]" and engaged "in disparate treatment when it disciplined the

white employee Steven Snyder who attacked the plaintiff."  Compl. ¶ 16.  At the outset, the

Court notes that Plaintiff cannot make out a cause of action for employment discrimination by

asserting that Amtrak failed to properly discipline Defendant Snyder, as such a failure does not

constitute an "adverse employment action" with respect to Plaintiff.  *See Hopkins v. Women's*

*Div., Gen. Bd. of Global Ministries*, 98 Fed. Appx. 8, 9 (D.C. Cir. 2004) (declining to discipline

another staff member is not a "tangible employment action") (citing *Stewart v. Ashcroft*, 352

F.3d 422, 426 (D.C. Cir. 2003)).[17]  However, the Court understands the gist of Count One to be

that Amtrak applied its disciplinary policies in a discriminatory manner when it terminated

Plaintiff for infractions for which, in Plaintiff's view, Amtrak would not have terminated a white

employee.  The Court further understands that Plaintiff posits Defendant Snyder as an example of

a white employee who received what Plaintiff views as disparate discipline.[18]

---

[17] As a practical matter, the Court notes that Amtrak did, in fact, discipline Defendant Snyder in connection with the May 10, 2004 incident.  Pl's Ex. 5 (Snyder Personnel Docs.) at 3-4 (5/17/04 Notice of Intent to Impose Discipline Meeting and Waiver).

[18] Plaintiff's Complaint also asserts that "Defendant Steven S. Snyder attacked the plaintiff because of his race."  *Id.* ¶ 17.  When asked to clarify this statement during his deposition, Plaintiff explained that he "felt like Mr. Snyder attacked me because of my race and because he has a disposition towards ethnic people . . . and because . . . [he] felt like Amtrak wasn't going to do anything about it, he felt free to hit, kick, curse and treat African-American employees or ethnic employees any way he saw fit because there was no discipline coming."  Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 176:19-177:8.  However, as discussed above, the record does not support Plaintiff's allegation that Amtrak condoned a pattern of discriminatory behavior on the part of Defendant Snyder.  Moreover, it appears that Plaintiff's claim that Defendant Snyder "attacked [him] because of his race" is meant to provide support for Plaintiff's claim that he and Defendant Snyder received disparate discipline as a result of the May 10, 2004 incident, notwithstanding Defendant Snyder's alleged history of violating of Amtrak policies.

Pursuant to 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). As amended by the Civil Rights Act of 1991, "§ 1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship, including discriminatory contract terminations." *Rivers v. Roadway Express*, 511 U.S. 298, 302, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994). "The allocation of burdens in a § 1981 case is governed by the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 45 (D.D.C. 2003) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989), *superseded in part by* The Civil Rights Act of 1991); *see also Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (*McDonnell Douglas* framework applies to claims brought pursuant to § 1981).

As such, to prove a violation of § 1981, Plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race or gender. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (internal quotation marks and citation omitted). Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817). It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal

33

citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817. If he succeeds, the burden shifts to the Defendants to articulate some legitimate, non-discriminatory reason for Plaintiff's termination, and to produce credible evidence supporting its claim. *Id.* Defendants' burden is only one of production, and they "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S. Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L. Ed. 2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S. Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089. Pretext may be established

34

"directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S. Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S. Ct. 2097. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S. Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S. Ct. 2742) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka*, 156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

 Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S. Ct. 2097. "[The trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 120 S. Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S. Ct. 1089). The Court of Appeals has distilled this analysis, noting that the jury can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements of attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289.  However, evidence in each of the three categories is not required.  *Id.*

      "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]."  *Paquin*, 119 F.3d at 27-28.  "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he has suffered discrimination."  *Aka*, 156 F.3d at 1290.

      2.    *Application of the* McDonnell Douglas *Analysis*

      At the outset, the Court notes that Amtrak has already articulated legitimate nondiscriminatory reasons for Plaintiff's termination, in the form of the August 12, 2004 Decision notifying Plaintiff of his termination.  *See* Defs' Ex. C (8/12/04 Decision).  As the D.C. Circuit has recently reiterated in *Czekalski v. Peters*, No. 05-5221, Slip Op. (D.C. Cir. Feb. 2, 2007), "once a defendant has proffered such a nondiscriminatory explanation, it has 'done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case.'"  *Id.* at 6 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1479, 75 L. Ed. 2d 403 (1983)).  Thus, whether Plaintiff actually made out a prima facie case "'is no longer relevant,' and the only question is 'whether the defendant intentionally discriminated against the plaintiff.'"  *Id.*  Nevertheless, the Court evaluates Plaintiff's prima facie case because, as noted above, it "'is part of the evidence [the Court] must consider in addressing the question' of whether [Plaintiff] has created a genuine issue of [race] discrimination."  *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)).

      Plaintiff claims disparate-treatment discrimination, and thus makes out a prima facie case

36

"'by establishing that: (1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Id.* (quoting *George*, 407 F.3d at 412); *see also Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002). Here, Plaintiff has met the first two elements of his prima facie case: (1) as an African-American, Plaintiff is a member of a protected class, *see Carter*, 387 F.3d at 879; *see also* Defs' Ex. K (6/15/05 Charge of Discrimination), and (2) Plaintiff's termination is clearly an adverse employment action, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). Defendants assert that Plaintiff cannot establish the third element of his prima facie case "because he has not and cannot identify any similarly situated employee who was treated differently." Defs' Reply at 5. However, "this is not a correct statement of the law." *Czekalski*, Slip Op. at 9 (quoting *George*, 407 F.3d at 412). A plaintiff may, of course, satisfy the third prong of the prima facie test "by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class, [however] this is not the only way." *Id.* Another way is to show that "the discharge was not attributable to the two [most] common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *George*, 407 F.3d at 412.

Here, Defendants correctly argue that, as a matter of law, Plaintiff and Defendant Snyder – the only Amtrak employee whom Plaintiff claims received disparate discipline – are not similarly situated. Defs' Reply at 5. To show that another individual is similarly situated, Plaintiff must "demonstrate that all of the relevant aspects of their employment situation are nearly identical." *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 73 (D.D.C. 2005) (citing *Phillips v. Holladay Prop. Servs.*, 937 F. Supp. 32, 37 (D.D.C. 1996), *aff'd Phillips*

*v. Holladay Corp.*, No. 96-7202, 1997 WL 411695 (D.C. Cir. Jun. 19, 1997); *Neuren v. Adduci,*
*Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513-14 (D.C. Cir. 1995)), *aff'd* No. 05-7121, 2006
WL 1878891 (D.C. Cir. Jun. 27, 2006)). Thus, "the co-workers must have dealt with the same
supervisor, have been subject to the same standards and have engaged in the same conduct . . . ."
*Id.* It is undisputed that Plaintiff and Defendant Snyder did not work the same job or have the
same supervisor, that they were disciplined for different conduct, and that they had varying
disciplinary histories. Moreover, there is no evidence in the record that suggests that Plaintiff's
position has been eliminated.

Nevertheless, Plaintiff can meet the third element of his prima facie case by
demonstrating that he did not perform below Amtrak's legitimate expectations. *George*, 407
F.3d at 412. On this, Plaintiff has succeeded in raising a factual issue; although Amtrak
maintains that Plaintiff's conduct violated various policies, as discussed above, Plaintiff
challenges each of Amtrak's charges. It therefore appears that Plaintiff could make out a prima
facie case of disparate treatment discrimination, albeit a rather thin one. As the D.C. Circuit has
instructed, the Court makes "these points on the prima facie case not to evade the ultimate
question of discrimination *vel non*, but rather because [Plaintiff's] prima facie case is part of the
evidence [the Court] must consider in addressing that question." *Czekalski*, Slip Op. at 10
(quoting *George*, 407 F.3d at 413).

In response to Plaintiff's claim that his termination represented disparate treatment on the
basis of race, Amtrak has adduced three legitimate nondiscriminatory reasons – the same three
reasons on which Amtrak based its August 2004 decision to terminate Plaintiff. Amtrak asserts
that it "acted properly in response to (1) [Plaintiff's] failure to report his alleged injury suffered

on May 10, 2004; (2) [Plaintiff's] dishonesty in dealing with management regarding this alleged

injury; and (3) [Plaintiff's] violation of Amtrak's National Systems Attendance Policy."  Defs'

Mot. for Summ. J. at 10.

Given these credible, legitimate nondiscriminatory factors identified by Amtrak, Plaintiff

now must seize the "opportunity to discredit the employer's explanation," *Aka*, 156 F.3d at 1288,

by demonstrating that the proffered reasons are a mere pretext for discrimination, *see Paquin*,

119 F.3d at 26-27.   As always, Plaintiff retains the "ultimate burden of persuading the court that

she has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 256, 101 S. Ct.

1089.  However, "one way for a plaintiff to show that an adverse employment decision was made

for a discriminatory reason is to show that the nondiscriminatory explanation the defendant

proffered for its decision was false."  *Czekalski*, Slip Op. at 10 (citations omitted).  Here, Plaintiff

challenges each justification Amtrak offers for Plaintiff's termination.  First, Plaintiff argues that

he was inappropriately charged with most of the instances of absence or tardiness cited by

Amtrak.  Pl's Opp'n at 6.   However, as the Court concluded above, Plaintiff cannot raise a

factual issue regarding at least five of the instances, and the record clearly shows that five

instances of absence or tardiness within a ninety (90) period constitutes a violation of Amtrak's

National System Attendance Policy.  *See* Defs' Ex. J (Turnblacer Decl.) Ex. I (Amtrak Nat'l Sys.

Attendance Policy) at 2.  Second, Plaintiff disputes Amtrak's charge that he violated Amtrak

policy by failing to immediately report his physical injury to his supervisors.  Pl's Opp'n at 6-7.

Nevertheless, there is no indication anywhere in the record that Plaintiff reported his physical

injury to any representative of Amtrak during the period that he was out from work, as required

by Amtrak policy.  Defs' Ex. J (7/6/06 Decl. of Christine Turnblacer) at Ex. II (Amtrak Standards

of Excellence), page; Defs' Ex. C (8/12/04 Decision) at 2; Pl's Ex. 2A (5/24/06 Chambliss Dep.)

at 107:18-108:16.  Plaintiff thus fails to demonstrate a factual issue with respect to either of these

charges.

In contrast, as detailed above, Plaintiff has successfully raised a genuine issue of fact as to

whether he violated Amtrak's Standards of Excellence pertaining to "Trust and Honesty" and

"Integrity."  The consultation note completed by Dr. Gaber supports Plaintiff's claims that he

sustained a physical injury on May 10, 2004 and that he was advised by his doctor not to return

to work until May 17, 2004.  Pl's Ex. 3 at 1-2 (5/11/04 Consultation Note).  Based on this

evidence, a jury could conclude that Plaintiff was, in fact, injured seriously enough to be ordered

out of work until May 17, 2004 and that, even though Plaintiff failed to timely report his physical

injury to his supervisors, he did not do so based on an intent to defraud.[19]  The Court notes,

however, that while a jury might thus conclude that one of Amtrak's proffered reasons was false,

Plaintiff has not demonstrated pretext as to the other two legitimate nondiscriminatory reasons

offered by Amtrak.  The fact that Plaintiff successfully challenges one of Amtrak's reasons for

terminating Plaintiff "'does not defeat summary judgment if at least one reason for each of the

actions stands unquestioned,' unless [the] reasons are intertwined or pretext is otherwise

obvious."  *Kirk v. Small*, No. 03-5360, 2004 WL 1249294, *1 (D.C. Cir. Jun. 7, 2004) (citing

*Burdine*, 450 U.S. at 254-56, 101 S. Ct. 1089; *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th

Cir. 1995)).

The Court now turns to considering the "ultimate question of discrimination *vel non*."

---

[19] As noted above, this is the conclusion reached by the arbitration panel in this matter. *See* Defs' Ex. G (1/20/06 Nat'l Med'n Bd. Op. at 4.

*Aikens*, 460 U.S. at 714, 103 S. Ct. 1748.  As always, Plaintiff retains the "ultimate burden of

persuading the court that [he] has been the victim of intentional discrimination."  *Burdine*, 450

U.S. at 256, 101 S. Ct. 1089.  At this point,

> a court reviewing summary judgment looks to whether a reasonable jury could
> infer intentional discrimination or retaliation from all the evidence, including (1)
> the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the
> employer's proffered explanation for its action; and (3) any further evidence of
> discrimination that may be available to the plaintiff (such as independent evidence
> of discriminatory statements or attitudes on the part of the employer).

*Carter*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal citations and quotation marks omitted).

At the outset the Court notes that Defendants' factual allegations, which the Court treats

as conceded in light of Plaintiff's failure to comply with Local Civil Rule 56.1, provide

absolutely no support for Plaintiff's claim that Amtrak applied its disciplinary policies in a

discriminatory manner.  Notwithstanding Plaintiff's abject failure to comply with Local Civil

Rule 56.1, however, the Court shall consider whether, taking into consideration the record

evidence and deposition testimony proffered by Plaintiff, Plaintiff could meet his burden of

demonstrating that he has been the victim of intentional discrimination.  To reiterate, insofar as

Plaintiff can make out a prima facie case, it is a thin one.  Plaintiff cannot show that he was

treated differently from a similarly situated individual, and there is no evidence in the record as

to whether his position has been eliminated.  With respect to demonstrating that he was not

terminated for failing to meet Amtrak's legitimate expectations, Plaintiff is only successful in

raising a factual question as to one of the three charges leveled by Amtrak.

In attempting to rebut Amtrak's legitimate nondiscriminatory reasons for terminating

Plaintiff, Plaintiff does not introduce additional evidence from which a reasonable jury could

infer intentional discrimination on the part of Amtrak.  Plaintiff makes two assertions in this

respect: (1) that he was charged with being late to work when a bridge was out while white

employees were excused for being late, Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 123:6-125:2;

and (2) that Amtrak refused to accept Dr. Gaber's consultation note but accepted doctor's notes

from a white employee, *id.* at 146:3-147:12.  However, as the Court concluded above, with

respect to the bridge closing Plaintiff offers only evidence that another supervisor excused some

of his employees, without demonstrating that Plaintiff's own supervisor excused any employees,

either white or black.  Pl's Ex. 2A (5/24/06 Chambliss Dep. at 124:1-20; Pl's Ex. 2 (Chambliss

Personnel Docs.) at 2 (4/8/04 e-mail from J. Casson to J. Cabral).  Moreover, as to the doctors'

notes, Plaintiff offers only his own testimony that Amtrak accepted a note from a white

employee, without providing any corroborating evidence in the form of documents or deposition

testimony.  More significantly, however, presented with only Plaintiff's limited testimony the

Court cannot assess the context of this allegation to determine whether it is even relevant to the

instant action, or discern whether Plaintiff's allegation is anything other than inadmissable

hearsay.

Finally, the Court considers "'any further evidence of discrimination that may be

available to the plaintiff,' as well as 'any contrary evidence that may be available to the

employer.'" *Czekalski*, Slip Op. at 13 (citing *Aka,*, 156 F.3d at 1289).  Throughout his Opposition

and deposition, Plaintiff asserts that "Defendant Snyder had a history of taking inappropriate

actions and making racist and demeaning statements to the minority employees under his

supervision," Pl's Opp'n at 16, but fails to pinpoint for the Court the specific record evidence

that he believes supports this assertion.  In any event, the Court notes that evidence of a

42

discriminatory animus on Snyder's part, alone, would not constitute evidence of discrimination

on the part of Amtrak because there is no evidence that Snyder played any role in the decision to

terminate Plaintiff.  *See Hall v. Giant Food*, 175 F.3d 1074, 1079-80 (D.C. Cir. 1999); *Holbrook*

*v. Reno*, 196 F.3d 255, 260-61 (D.C. Cir. 1999) (citing *Hall* for the proposition that "a

supervisor's discriminatory remarks could not be considered evidence of discrimination because

the decision to dismiss the employee was made not by the supervisor, but by the company's

[other personnel].").

Thus, a history of discriminatory behavior on the part of Defendant Snyder would only be

relevant to Plaintiff's claim of discrimination insofar as it showed racial bias on the part of

Amtrak, i.e., that Amtrak was aware of Defendant Snyder's allegedly discriminatory behavior

and failed to address it.  However, the Court's review of the record evidence only reveals one

obviously racially charged incident involving Defendant Snyder prior to the May 10, 2004

incident.  Although the deposition testimony in the record evidences a number of other incidents

involving Defendant Snyder and minority Amtrak employees, the record does not demonstrate

that these incidents were racially motivated.  Significantly, with the exception of the instance in

which Defendant Snyder called employees bitches and used the "N word," the individuals

involved in the various incidents do not indicate that they believe Defendant Snyder acted

towards them as he did because of their race.[20]  Nor do they testify that they believed Defendant

---

[20] The Court notes that the instant case differs in many respects from *Czekalski*, in which the D.C. Circuit concluded that summary judgment in favor of the defendant was inappropriate. In that case, the plaintiff successfully raised a factual issue as to each of the defendant's proffered reasons for the adverse employment action. *Czekalski*, Slip Op. at 13.  Furthermore, the plaintiff in *Czekalski* adduced additional evidence of discriminatory attitudes on the part of her supervisor – the same supervisor that made the decision to reassign the plaintiff – in the form of testimony from male colleagues that they considered the supervisor to be sexist.  *Id.* at 13-14.  Moreover,

Snyder to actually be racist or indicate that Amtrak ignored a history of racist actions on the part

of Defendant Snyder.[21]  Instead, they report that Amtrak addressed the various incidents

involving Defendant Snyder, including the racially charged incident, and that the parties involved

did not experience subsequent problems with Defendant Snyder.  *See* Pl's Ex.7 (8/2/05

Washington Dep.) at 32:19-34:6; Pl's Ex. 8 (8/2/05 Charleus Dep.) at 16:20-29:12; Pl's Ex. 10

(9/27/05 Alvarado Dep.) at 24:13-19.

Moreover, as also discussed above, notwithstanding the fact that Plaintiff's Opposition

and deposition in this matter are peppered with vague allegations regarding race discrimination at

Amtrak, Plaintiff has not adduced credible evidence that he or other Amtrak employees were

subject to racially discriminatory treatment.  Plaintiff's own descriptions of incidents in which he

was involved fail to show that these incidents were in any way connected to Plaintiff's race.  *See*

Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 34:15-36:20; 208:7-224:14.  In addition, Plaintiff

identifies two white Amtrak employees whom he believes received preferential treatment, and

another black employee whom Plaintiff asserts filed an EEOC complaint alleging disparate

treatment.  *See id.* at 66:19-70:7; 146:3-147:12; 148:7-19; 155:10-156:9; 159:3-17.  However,

---

the male colleagues substantiated their claims that the supervisor was sexist by pointing to
specific events.  *Id.*  Here, Plaintiff cannot rebut two of Amtrak's proffered legitimate
nondiscriminatory reasons for Plaintiff's termination, the supervisor whom Plaintiff alleges acted
in a discriminatory manner was not the relevant decision-maker, and Plaintiff's "other evidence"
of discrimination consists largely of his own assertions, unsupported by record evidence or
testimony of other Amtrak employees.

[21] In his deposition, Mr. Alvarado testified that he complained to Mr. Smith about
Defendant Snyder touching him without his permission and "verbally saying racial slurs."  Pl's
Ex. 10 (9/27/05 Alvarado Dep.) at 21:9-22:12.  However, Mr. Alvarado later described the
incident to which he was referring as the same incident in which Defendant Snyder called people
bitches and used the "N word."  *Id.* at 25:5-27:5.

Plaintiff fails to provide any testimony or documentary evidence to corroborate these allegations and does not indicate in any way the time period in which these incidents allegedly occurred. As the Court is therefore unable to evaluate whether any of the incidents described by Plaintiff are actually relevant to the instant matter, Plaintiffs' allegations fail to raise a genuine issue as material fact. Furthermore, as Plaintiff does not indicate his basis of knowledge with respect to his allegations concerning other Amtrak employees, the Court cannot determine whether Plaintiff actually witnessed the various incidents or whether his testimony is instead simply inadmissible hearsay.

In sum, Plaintiff would seek to have this Court conclude that he was subject to disparate-treatment discrimination on the basis of his race based on (1) the fact that he was terminated while Defendant Snyder – to whom Plaintiff was not similarly situated – was not; (2) the factual question as to whether Plaintiff was dishonest regarding his May 10, 2004 physical injury; and (3) a single previous racially charged incident involving Defendant Snyder, to which Amtrak responded at the time. While it is clear that Plaintiff believes Amtrak improperly terminated him, courts "have consistently declined to serve as a super-personnel department that reexamines an entity's business decisions." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal citation and quotation marks omitted); *see also Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001) (stating that "consistent with the courts' reluctance to became involved in micromanagement of everyday employment decisions, the question before the court is limited to whether [the plaintiff] produced sufficient evidence of . . . discrimination, not whether he was treated fairly."). Based on the totality of the admissible evidence before the Court, a jury could not reasonably conclude that, in terminating Plaintiff, Amtrak applied its disciplinary policies in

a racially discriminatory manner.  As such, the Court shall grant Defendants' Motion for Summary Judgment with respect to Count One of Plaintiff's Complaint.

### B.    *Plaintiff's Retaliation Claim*

Count Two of Plaintiff's Complaint is brought solely against Amtrak and asserts that "[p]rior to his termination, plaintiff often spoke up concerning his civil rights based upon his race.  Plaintiff often complain [sic] to supervisory personnel concerning disparate treatment based upon race by National Railroad Passenger Corporation/Amtrak."  Compl. ¶ 21.  Plaintiff's claim within Count Two that Amtrak retaliated against Plaintiff by refusing to settle his workers' compensation claim (raised in a separate lawsuit) unless he waived all civil rights, *see id.*, is now moot because during his deposition Plaintiff acknowledged that he had settled his workers' compensation claim with Amtrak without signing any waiver or release of any civil rights. *See* Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 170:12-172:14; 185:9-187:2.

"Like claims of discrimination, claims of retaliation are also governed by the *McDonnell Douglas* burden-shifting scheme."  *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)).[22]  To establish a prima facie case of retaliation, Plaintiff must show that (1) he engaged in statutorily protected activity;

---

[22] It does not appear that the D.C. Circuit has ever clearly decided that claims of retaliation are actionable under § 1981.  *See Carney*, 151 F.3d at 1094-95 (assuming without deciding that plaintiff could pursue retaliation claim under § 1981).  However, the Court notes that the Civil Rights Act of 1991 added a subsection to § 1981 defining the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b); *see also Rivers*, 511 U.S. at 300, 114 S. Ct. 1510, and that "in the aftermath of the 1991 Act, a number of courts have concluded that certain retaliatory discharge claims are actionable under § 1981," *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998).

(2) his employer took an adverse personnel action against him; and (3) a causal connection exists between the two.  *Id.* at 1095 (citing *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)). "An activity is 'protected' for the purposes of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.'" *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006) (quoting *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212-13 (D.D.C. 2006)). However, the "alleged discriminatory treatment . . . cannot be generic; rather, the plaintiff must be opposing an employment practice made unlawful by the statute under which she has filed her claim of retaliation." *Id.* (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)). Thus, "to be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981." *Hawkins*, 163 F.3d at 693.

      Here, Plaintiff asserts that Amtrak retaliated against him for engaging in two separate activities: (1) "writing a letter complaining of discrimination with regard to a February 7, 2003 incident," Pl's Opp'n at 13, and (2) "after the attack on him by Defendant Snyder, complaining that had Defendant Snyder been African-American, Plaintiff would've been taken off of the job," *id.*  Plaintiff's termination clearly constitutes an adverse personnel action; however, the Court nevertheless concludes that Plaintiff cannot make out a prima facie claim of retaliation with respect to either activity.  Moreover, even if the Court assumed, *arguendo*, that Plaintiff could make out a prima facie claim of retaliation, Plaintiff could not survive summary judgment on this claim for the same reasons that he cannot survive summary judgment as to his discrimination claim.

      Plaintiff asserts that he "engaged in civil rights activity prior to his termination by writing

a letter complaining of discrimination with regard to a February 7, 2003 incident." Pl's Opp'n at

13. As discussed above, the letter to which Plaintiff refers is the one that he wrote in June 2003

to Amtrak's DRO complaining that his supervisors refused to excuse him for doctor's

appointments and possible surgery after he sprained his ankle on February 7, 2003. Pl's Ex. 1 at

18-19. The opening of the letter states that Plaintiff writes "to detail the events that support my

case of discriminatory harassment against the Amtrak and NEC management staff at the High

Speed Rail Facility." *Id.* at 18. The letter does not, however, explain that Plaintiff believed he

had experienced discriminatory harassment on the basis of his race. Indeed, it appears from the

deposition testimony of Dawn Marcelle, Amtrak senior director for dispute resolution, that in

response to the letter in question, the DRO informed Plaintiff that "his problem didn't fall under

the purview of the DRO" and "referred his concerns to human resources." Pl's Ex. 8 (8/2/05

Marcelle Dep.) at 22:5-23:8. Elsewhere in her deposition, Ms. Marcelle testified that the DRO

"is focused on allegations of discrimination and harassment based on some protective group

status such as race or gender or religion." *Id.* at 13:14-20.

It is therefore unclear whether Plaintiff's June 2003 letter constitutes activity protected

under § 1981, which deals with discrimination on the basis of race. *See Lemmons*, 431 F. Supp.

2d at 92 (complaint of harassment not protected activity under § 1981 where, *inter alia*, it alleged

harassment "generally and generically" and did "not refer to harassment or discrimination based

on race.") (internal quotations omitted). However, even if the Court considers Plaintiff's letter to

be "protected activity" for the purposes of § 1981, Plaintiff cannot establish a prima facie case of

retaliation because he cannot demonstrate the requisite causal connection between the letter and

his August 2004 termination. "The causal connection component of the prima facie case may be

established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Carney*, 151 F.3d at 1095 (citing *Mitchell*, 759 F.2d at 86).

Here, based on the record, it appears that many of the same individuals were involved in Plaintiff's request for time off following his February 7, 2003 injury and Plaintiff's discipline following the May 10, 2004 incident (e.g., Frank Christello, Mike McLean, Dino Giurfa, and Bill Vullo). Thus, it is reasonable to infer that, in disciplining Plaintiff after the May 10, 2004 incident, these individuals were aware of Plaintiff's previous complaint of discrimination. However, Plaintiff complained to the DRO about his February 7, 2003 injury in June 2003, *see* Pl's Ex. 1 at 18 (date-stamped 6/9/03), and Plaintiff was not terminated until more than fourteen (14) months later, on August 12, 2004. Plaintiff has adduced no evidence directly indicating that the June 2003 letter led to his August 2004 termination, but rather relies solely on the fact that he had previously written the letter. This fact alone is insufficient, however, because the "cases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) and citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)). Plaintiff's termination more than fourteen (14) months after he wrote his June 2003 letter, without more, thus fails to demonstrate the requisite causal connection.

Plaintiff likewise cannot make out a prima facie case of retaliation under § 1981 based on his assertion that after the May 10, 2004 incident he "complained to Defendant Amtrak . . . that had Defendant Snyder been African-American, Plaintiff would've been taken off the job." Pl's Opp'n at 13. Plaintiff cites a June 22, 2004 memorandum written by Amtrak as evidence of Amtrak's "awareness that the Plaintiff was complaining of racial discrimination with regards to the incident." *Id.* The record evidence supports Plaintiff's claim that, following the May 10, 2004 incident but before receiving notice of Amtrak's charges against him,[23] Plaintiff contacted the DRO and "[w]hile he did not say that he believed the incident was racially motivated, [Plaintiff] told the DRO that he believed if Mr. Snyder had been African American, he would have been taken out of service immediately and asked to leave the property. [Plaintiff] also said that Mr. Snyder had had problems with African American employees in the past." Pl's Ex. 1 at 12 (6/22/04 memorandum from G. Atkinson to T. Campbell); *see also* Pl's Ex. 1 at 1-2 (6/9/04 handwritten notes documenting phone conversation with Plaintiff).

This evidence also demonstrates that, in making his complaint to the DRO, Plaintiff did not assert rights protected by § 1981. Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Moreover, the phrase "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and

---

[23] In his deposition, Plaintiff testified that he received notice of Amtrak's charges against him in late June or early July 2004. Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 115:15-119:1. Thus, as a matter of fact, when Plaintiff contacted the DRO on June 9, 2004, he could not have complained about Amtrak's decision to terminate him. *See* Pl's Ex. 1 at 12 (6/22/04 memorandum from G. Atkinson to T. Campbell); *see also* Pl's Ex. 1 at 1-2 (6/9/04 handwritten notes documenting phone conversation with Plaintiff).

the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

42 U.S.C. § 1981(b).  However, Plaintiff complained to the DRO that he believed Defendant

Snyder received preferential treatment on account of his race.  Pl's Ex. 1 at 12 (6/22/04

memorandum from G. Atkinson to T. Campbell); *see also* Pl's Ex. 1 at 1-2 (6/9/04 handwritten

notes documenting phone conversation with Plaintiff).  Plaintiff did not complain that he himself

was subject to discriminatory treatment on the basis of his race; in fact, the evidence

demonstrates that Plaintiff "did not say that he believed the incident was racially motivated."

Pl's Ex. 1 at 12 (6/22/04 memorandum from G. Atkinson to T. Campbell).  Amtrak's discipline

of Defendant Snyder bears no connection to Plaintiff's own right to "make and enforce

contracts," the right to which he is entitled pursuant to § 1981.  As Plaintiff's complaint to the

DRO in June 2004 therefore does not constitute protected activity under § 1981, Plaintiff cannot

make out a prima facie case of retaliation based on that complaint.

 Moreover, even if the Court were to assume, *arguendo*, that Plaintiff could make out a

prima facie case of retaliation, Plaintiff could not avoid summary judgment on his retaliation

claim for the same reasons that are fatal to his discrimination claim.  In response to Plaintiff's

claim that he was retaliated against, Amtrak asserts that it terminated Plaintiff because he "(1)

failed to report his injury promptly; (2) failed to deal honestly with management regarding his

injury; and (3) exceeded the allowed absences under the National System Attendance Plan."

Defs' Reply at 16-17.  As the Court concluded above, Plaintiff cannot demonstrate pretext as to

two of Amtrak's legitimate nondiscriminatory reasons, and his ability to raise a genuine issue of

material fact as to one of Amtrak's proffered reasons does not preclude summary judgment in

favor of Amtrak.  *See Kirk*, No. 03-5360, 2004 WL 1249294 at *1; *Russell*, 51 F.3d at 69.

Furthermore, Plaintiff does not adduce additional evidence in support of his claim of retaliation, thus in considering the "ultimate question of [retaliation] *vel non*,"*Aikens*, 460 U.S. at 714, 103 S. Ct. 1748, the Court is faced with the evidence addressed above in connection with Plaintiff's discrimination claim. Despite Plaintiff's sweeping claims of discrimination on the part of Defendant Snyder, specifically, and Amtrak, generally, the record indicates only one clearly race-related incident involving Defendant Snyder and does not support Plaintiff's allegations that he was subject to discriminatory treatment by other supervisors and that other Amtrak employees were subject to disparate treatment on the basis of race. In sum, as with his discrimination claim, Plaintiff cannot bear his "ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089. As no reasonable trier of fact could conclude that Amtrak retaliated against Plaintiff either for his June 2003 letter or his June 2004 complaint to the DRO, Count Two of Plaintiff's Complaint cannot survive Defendants' Motion for Summary Judgment.

C.    *Plaintiff's Assault and Battery Claim is Time-Barred*

Count Three of Plaintiff's Complaint is brought solely against Defendant Snyder, is entitled "Assault and Battery," and is focused entirely on the May 10, 2004 incident. Plaintiff alleges that Defendant Snyder "a white supervisor, physically assaulted and battered the plaintiff by hitting him in the face with a book" and that Defendant Snyder "acted with the intent and capability to bodily harm to the plaintiff." Compl. ¶¶ 25-26. As Defendants correctly argue in their Motion for Summary Judgment, however, District of Columbia law provides a one-year statute of limitations for actions for assault and battery. D.C. Stat. § 12-301(4); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 n.4 (D.C. 2001). Plaintiff attempts to escape the

52

import of this one-year statute of limitations by arguing that the "common law torts alleged in this cause of action are intertwined with the civil rights action under 42 USC 1981 [sic], thus, they are all governed by a three year limitations period." Pl's Opp'n at 15. Plaintiff's argument is unconvincing, however, because it flies in the face of Plaintiff's own pleading of Count Three. Count Three is entitled "Assault and Battery" and only alleges that Defendant Snyder committed assault and battery by striking Plaintiff in the face with the safety pamphlet. Compl. ¶¶ 25-26. As such, Count Three bears no relation to Plaintiff's claims under 42 U.S.C. § 1981 and, as it is merely a common law claim for assault and battery, is barred by the District of Columbia's one-year statute of limitations applicable to such claims. As a result, the Court shall grant Defendants' Motion for Summary Judgment as to Count Three of Plaintiff's Complaint.

D.    *Plaintiff's Claim for "Intentional Interference With Economic Relationship"*

Count Four of Plaintiff's Complaint is also brought solely against Defendant Snyder and asserts that Plaintiff sues Defendant Snyder "for intentional interference with his contractual relationship with the defendant National Railroad Passenger Corporation/Amtrak." Compl. at 6. Plaintiff's Complaint further alleges that Defendant Snyder "occupied a managerial position with the defendant National Railroad Passenger Corporation/Amtrak and caused the plaintiff to be terminated from his employment." Compl. ¶ 30. In his deposition, Plaintiff explained that he believes that Defendant Snyder's "actions," specifically the May 10, 2004 incident, interfered with Plaintiff's ability to do the job that he was required to do under his contract with Amtrak. *See* Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 188:6-192:21. At the outset, the Court notes that the District of Columbia recognizes two separate torts – tortious interference with contract, and intentional interference with prospective business advantage or business relationship – and that it

53

is not entirely clear which tort Plaintiff seeks to assert.  However, Plaintiff's Complaint refers to

his "contractual relationship" with Amtrak and, when asked about Count Four during his

deposition, Plaintiff indicated that the count was based on Plaintiff's union agreement.

*See* Compl. at 6; Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 191:22-192:21.  As a result, the Court

will treat Count Four as one brought for tortious interference with contract.

A claim for tortious interference with contract entails four elements under District of

Columbia law: "'(1) the existence of a contract; (2) knowledge of the contract; (3) intentional

procurement of a breach of the contract; and (4) damages resulting from the breach.'"  *CASCO*

*Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 83 (D.C.

2003) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C. 2000) (footnote and citation

omitted)).  *See also PM Services Co. v. ODOI Assoc.*, 2006 WL 20382 at *34 (D.D.C. 2006);

*Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 55-56 (D.D.C. 2001); *Mercer Mgmt. Consulting*

*v. Wilde*, 920 F. Supp. 219, 239 (D.D.C. 1996).  In moving for summary judgment as to Count

Four, Defendants argue that Plaintiff's claim suffers from three infirmities: (1) that "there is no

evidence that Snyder had any role in a decision affecting Chambliss' employment," Defs' Mot.

for Summ. J. at 15-16; (2) that Plaintiff cannot claim that Defendant Snyder's throwing the safety

pamphlet at Plaintiff led to Plaintiff's termination because there "were intervening events, solely

in [Plaintiff's] control, that led directly to [his termination]," *id.* at 16; and (3) that Plaintiff

received all of the rights to which he was entitled under the applicable collective bargaining

agreement, *id.* at 16-17.  Although not labeled as such, Defendants' first two arguments appear to

go to Plaintiff's ability to prove that Defendant Snyder intentionally procured a breach of

Plaintiff's collective bargaining agreement with Amtrak, and Defendants' third argument appears

to go to whether Plaintiff can show damages resulting from the breach of his collective

bargaining agreement.

In response to Defendants' first and second arguments, Plaintiff's Opposition asserts that

Defendant Snyder's "history of taking inappropriate actions and making racist and demeaning

statements to the minority employees under his supervision" created a hostile work environment

that interfered with Plaintiff's ability to do his job. Pl's Opp'n at 16-17. However, Plaintiff has

never suggested in any way that Count Four embodies a hostile work environment, nor has

Plaintiff offered or moved to amend his Complaint to include such a claim. *See Belizan v.*

*Hershon*, 434 F.3d 579, 582-83 (D.C. Cir. 2006) ("a request for leave [to amend] must be

submitted in the form of a written motion."). As such, Plaintiff's argument in this respect is

inapposite and the Court will not entertain it. Also inapposite is Plaintiff's argument – made in

response to Defendants' assertion that Plaintiff has already received everything to which he is

entitled under his collective bargaining agreement – that the existence of his collective

bargaining agreement does not preclude him from asserting his statutory rights. *See* Pl's Opp'n

at 18-19. Plaintiff has asserted his statutory rights in the form of his claims under 42 U.S.C. §

1981. In contrast, Count Four of Plaintiff's Complaint appears to assert a cause of action based

on common law tort. It therefore appears that Plaintiff altogether fails to rebut Defendants'

arguments that Plaintiff cannot prevail on his claim for intentional interference with economic

relationship.

Defendants correctly argue that Count Four ignores numerous intervening events,

including Plaintiff's absence from work between May 11 and May 17, 2004 and his failure to

report his physical injury during that time, which indicate that Defendant Snyder's throwing the

safety pamphlet at Plaintiff did not cause his termination.  More significantly, however, it is clear

that Plaintiff has altogether failed to demonstrate that, in throwing the safety pamphlet at

Plaintiff, Defendant Snyder acted with an intent to interfere with Plaintiff's collective bargaining

agreement.  Intentionally procuring a breach of contract requires "a strong showing of intent . . .

to establish liability."  *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1998)

(internal quotation omitted).  Intentional procurement of a breach must involve egregious

conduct such as "libel, slander, physical coercion, fraud, misrepresentation, or disparagement."

*See Shepard v. Dickstein, Shapiro, Morin & Oshinksy*, 59 F. Supp. 2d 27, 34 (D.D.C. 1999)

(quoting *Genetic Sys.*, 691 F. Supp. at 423).  Plaintiff posits that when Defendant Snyder threw

the pamphlet at Plaintiff on May 10, 2004, he set off a chain of events that led to Plaintiff's

termination.  *See* Pl's Ex. 2A (5/24/06 Chambliss Dep.) at 188:22-190:2 ("when he struck me, I

was out because of the injuries I sustained from him striking me . . . [a]nd because of those things

that he did, I feel like I was brought up on charges and dismissed. . . . [i]f he had never hit me,

there would have been no reporting of anything, nothing for them to charge me with.").

However, Plaintiff has altogether failed to adduce evidence from which a reasonable trier of fact

could conclude that Defendant Snyder threw the safety pamphlet at Plaintiff with the requisite

intent to interfere with his collective bargaining agreement with Amtrak.  As such, the Court

shall grant Defendants' Motion for Summary Judgment as to Count Four of Plaintiff's

Complaint.

> E.    *Plaintiff's Claim for Intentional Infliction of Emotional Distress*

Finally, Count Five of Plaintiff's Complaint is brought solely against Defendant Snyder.

Plaintiff alleges that Defendant Snyder "attacked the plaintiff because of his race," Compl. at 7, ¶

23,[24] that Plaintiff has suffered damages "[a]s a result of the racial discrimination practiced against [him]," *id.* at 7, ¶ 24, and that Defendant Snyder's "conduct was extreme and outrageous and beyond the bounds of decency in society," *id.* at 7, ¶ 25.[25]  Defendants move for summary judgment on Count Five on two grounds.  First, Defendants assert that Plaintiff's claim is time-barred because it arises from the May 10, 2004 incident and thus is intertwined with his assault and battery claim.  *See* Defs' Mot. for Summ. J. at 17-18.  Second, Defendants argue that Plaintiff cannot meet the high standard required to prevail on a claim for intentional infliction of emotional distress.  *See id.* at 18-20.

The Court does not agree with Defendants that Plaintiff's claim for intentional infliction of emotional distress is barred by the one-year statute of limitations applicable to claims for assault and battery.  Defendants are correct that under District of Columbia law:

> [A]n independent action for intentional infliction of emotional distress is subject to the District's three-year residual limitation period, D.C. Code § 12-301(8) . . . [while] a claim for emotional distress that is 'intertwined with any of the causes of action for which a period of limitation is specifically provided,' including assault and battery, is subject to the limitation period for the intertwined claim.

*Rendall-Speranza v. Nassim*, 107 F.3d 913, 920 (D.C. Cir. 1997) (quoting *Saunders v. Nemati*,

---

[24] The Court notes that the last paragraph of Count Four of Plaintiff's Complaint is identified as Paragraph 34, but that Count Five of Plaintiff's Complaint inexplicably commences with a paragraph numbered 22.  Compl. at 7.  For the sake of clarity, the Court shall identify paragraphs within Count Five by both paragraph number and page number.

[25] To the extent that Plaintiff bases his claim of intentional infliction of emotional distress on the "racial discrimination practiced against him," Compl. at 7, ¶ 25, the Court notes that this conduct is addressed by Plaintiff's discrimination claim.  *Green v. Am. Broad. Co.*, 647 F. Supp. 1359, 1363 (D.D.C. 1986) (citing *Stewart v. Thomas*, 538 F. Supp. 891, 896 (D.D.C. 1982)) ("To the extent that plaintiff's claim results from a stressful work situation created by defendants' alleged acts of discrimination, it is subsumed within her discrimination claim.").

580 A.2d 660, 664-65 (D.C. 1990)). Defendants argue that "[a]ll of plaintiff's claims arise from

the incident in which Snyder hit [Plaintiff] with the four ounce safety pamphlet." Defs' Mot. for

Summ. J. at 18. If this were true, Plaintiff's claim for intentional infliction of emotional distress

would certainly be barred by the one-year statue of limitations for assault and battery. *See*

*Rendall-Speranza*, 107 F.3d at 920. However, a review of Plaintiff's Opposition reveals that he

believes his "cause of action arose because Defendant Snyder engaged in consistently

discriminatory behavior towards Plaintiff and his co-workers, over a period of years." Pl's

Opp'n at 19. Thus, the instant case is unlike *Rendall-Speranza* because in that case "[e]very

incident that, [plaintiff] allege[d], contributed to her emotional distress involved an assault and

battery." 107 F.3d at 920. In contrast, Plaintiff alleges that Defendant Snyder's action in

throwing the pamphlet at Plaintiff was "only one of many times where he engaged in egregious

conduct that was not seen as a joke by his subordinate employees." Pl's Opp'n at 19-20. Thus, to

the extent that Plaintiff's claim for intentional infliction of emotional distress is based on

Defendant Snyder's conduct prior to the May 10, 2004 incident, that claim is subject to the

general three-year limitations period. *See Saunders*, 580 A.2d at 665.

The Court does, however, agree with Defendants that Plaintiff cannot prevail on his claim

of intentional infliction of emotional distress. In order to prove an intentional infliction of

emotional distress claim, the "plaintiff must show (1) extreme and outrageous conduct on the

part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe

emotional distress." *Duncan v. Children's Nat'l. Med. Ctr.*, 702 A.2d 207, 211 (D.C. 1997)

(quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994)). "There is no general duty of

care to avoid causing mental distress, and liability is not imposed for all conduct which causes

mental distress." *Id.* (citing *Dist. of Columbia v. Thompson*, 570 A.2d 277, 290 (D.C. 1990) (citation omitted), *modified*, 593 A.2d 621 (D.C. 1991)). Rather, a claim for intentional infliction of emotional distress must be founded upon acts "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (citation omitted); *see also* Restatement (Second) of Torts § 46 cmt. d (1965). "If that standard means what it says, then the conduct alleged must truly be extraordinary to hold a defendant accountable for this tort." *Carey v. Edgewood Mgmt. Corp.*, 754 A.2d 951, 956 (D.C. 2000); *see also Larijani v. Georgetown Univ.*, 791 A.2d 41, 46 (D.C. 2002) (noting that the tort of intentional infliction of emotional distress has "proof requirements as severe as any in our law"); *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (liability for intentional infliction of emotional distress does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities").

Ultimately, the definition of extreme and outrageous conduct is dependent on "the prevailing norms of society." *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993). Typically, conduct is extreme or outrageous when "the recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim, 'Outrageous!'" *Id.* Moreover, the court must consider the context of the conduct, including "the nature of the activity, the relationship between the parties, and the particular environment in which the conduct took place." *Id.*

Based on the entirety of the evidence before the Court, Plaintiff cannot show that Defendant Snyder's alleged conduct was sufficiently "extreme and outrageous" to constitute

intentional infliction of emotional distress.  As noted, the bar Plaintiff must meet to establish

extreme or outrageous conduct is high; "mere insults, indignities, threats, annoyances, petty

oppressions, or other trivialities" are not legally extreme or outrageous.  *King*, 640 A.2d at 668.

This is especially so in the context of an employer-employee relationship.  In the employment

context, courts within the District of Columbia "traditionally have been demanding in the proof

required to support an intentional infliction of emotional distress claim."  *Kerrigan v. Britches of

Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) (citing examples); *see also Duncan*, 702 A.2d

at 212 ("generally, employer-employee conflicts do not rise to the level of outrageous conduct").

Plaintiff asserts that his intentional infliction of emotional distress claim is based on the

fact that he "was aware and made uncomfortable by the conduct of [Defendant Snyder] prior to

being struck in the face" and further asserts that "Defendant Snyder had been made aware that his

behavior was disturbing and considered to be abusive by the numerous minority employees, co-

workers of the Plaintiff who complained of his actions to Defendant Amtrak's Diversity Office."

Pl's Opp'n at 20.[26]  As detailed above, the record demonstrates that Defendant Snyder was

involved in a number of incidents with minority employees of Amtrak prior to the May 10, 2004

---

[26] Plaintiff also asserts that Defendant Snyder's "behavior was unwelcome, based on race,
sufficiently severe or pervasive to alter the conditions of employment and create an abusive
atmosphere" and that "Plaintiff suffered from emotional distress as the result of the actions of the
Defendant Snyder in creating and maintaining a hostile work environment."  Pl's Opp'n at 19.
Plaintiff's Opposition thus parrots the elements a plaintiff must prove to establish a claim of
hostile work environment.  *See Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005);
*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct.367, 126 L. Ed. 2d 295 (1993).  However,
as noted above, Plaintiff has not actually moved to amend, nor in any way indicated a desire to
add additional claims to his Complaint. *See Belizan*, 434 F.3d at 582-83  ("a request for leave [to
amend] must be submitted in the form of a written motion.").  As such, Plaintiff's attempt to
graft a hostile work environment claim onto his claim for intentional infliction of emotional
distress is of no consequence.

incident with Plaintiff. *See* Pl's Ex. 9 (8/2/05 Charleus Dep.) at 10:12-13:18; Pl's Ex. 7 (8/2/05 Washington Dep.) at 20:8-21:5; Pl's Ex. 10 (9/27/05 Alvarado Dep.) at 15:15-16:19. Plaintiff would have the Court conclude that these incidents represent a pattern of "consistently discriminatory behavior towards Plaintiff and his co-workers, over a period of years," Pl's Opp'n at 19; however, the Court is unable to do so because, with the exception of the instance in which Defendant Snyder called employees bitches and used the "N word," the individuals involved in the various incidents do not describe them as racially motivated. *See* Pl's Ex. 9 (8/2/05 Charleus Dep.) at 10:12-13:18; Pl's Ex. 7 (8/2/05 Washington Dep.) at 20:8-21:5; Pl's Ex. 10 (9/27/05 Alvarado Dep.) at 15:15-16:19.

Even more significantly, Plaintiff does not indicate, nor does the record reveal, any incidents prior to the May 10, 2004 incident which involved both Defendant Snyder and Plaintiff. Plaintiff is therefore entirely unable to point to any evidence that Defendant Snyder engaged in "extreme and outrageous" conduct directed at Plaintiff himself. At its base, Plaintiff's intentional infliction of emotional distress claim consists of his alleged discomfort at hearing about incidents involving Defendant Snyder and other minority Amtrak employees which Plaintiff characterizes as discriminatory, but which the employees involved do not actually characterize as such. This simply does not rise to the level of "extreme and outrageous," conduct which Plaintiff is required to demonstrate to prevail on his claim for intentional infliction of emotional distress. As such, the Court shall grant Defendants' Motion for Summary Judgment as to Count Five of Plaintiff's Complaint.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendants' Motion for Summary Judgment in its entirety.  An appropriate Order accompanies this Memorandum Opinion.

Date:   February 20, 2007

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge